IN THE UNITED STATES DISTRICT COURT **JUDGE KOELTL**
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ANKL LIQUIDATING TRUST, | ) | **07 CV 10624** Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AIRCAST LLC, AIRCAST HOLDING | ) | RECEIVED |
| COMPANY LLC, and DJO, LLC | ) | NOV 2 7 2007 |
| Defendants. | ) | U.S.D.C. S.D. N.Y. |
| | ) | CASHIERS |
| | ) | |

## COMPLAINT

### I.    NATURE OF THE ACTION

1.    Plaintiff ANKL Liquidating Trust is an assignee of ANKL, Inc., and ANKL International, L.L.C. (collectively, "Sellers"). Sellers entered into an Asset Purchase Agreement ("APA") with Defendants Aircast LLC ("Purchaser") and Aircast Holding Company LLC (collectively with Purchaser, "Earnout Obligors"), pursuant to which Purchaser purchased Sellers' business, as a going concern, of the manufacture, distribution, and sale of medical devices for the functional management of joint injuries, fractures, and edema. On information and belief, DJO, LLC, succeeded to or otherwise assumed, in part or whole, the obligations of Earnout Obligors under the APA.

2.    Defendants have committed fraud, repeatedly breached their obligations under the APA, and converted Plaintiff's assets, as follows:

> ➤ Defendants have failed to pay Plaintiff contingent consideration under the APA in the amount of $9.3 million for the years 2006 and 2007.

> Defendants also have failed to pay Plaintiff $5 million of contingent consideration under the APA for the year 2005. Defendants misrepresented to Plaintiff that they did not owe the contingent consideration to Plaintiff and fraudulently induced Plaintiff to release certain claims it had under the APA.

> Defendants have failed to pay Plaintiff interest on the unpaid contingent consideration at the rate of 8.0% per annum, which, through the date of this filing, exceeds $1.87 million.

> Defendants have refused to provide Plaintiff with access to its own books and records—including copies of tax returns, audited financial statements, and calculations of net sales and associated work papers of an independent auditor—all of which were conveyed to Defendants under the APA, but subject to Plaintiff's right to access them.

> As a result of Defendants' refusal to deliver copies of tax returns and associated work papers to Plaintiff, Plaintiff has suffered out-of-pocket expenses and may not be able to realize at least $1 million related to or derived from tax deductions that otherwise would be available to it. Plaintiff also has been unable to respond to routine inquiries from local tax authorities, subjecting it to potential disallowances of previously-taken deductions and monetary penalties. Defendants' refusal to provide Plaintiff access to Sellers' own tax records also is impeding Plaintiff from liquidating Sellers' business, subjecting it to potential taxes in excess of $11 million that otherwise could be avoided.

> Defendants have converted bank accounts belonging to Plaintiff, including cash assets of at least $225,000, and have intervened with banks to prevent Plaintiff from closing accounts registered in Sellers' names. Defendants' wrongful actions have caused Plaintiff to suffer substantial expenses and have impeded Plaintiff from liquidating up Sellers' business, again subjecting it to potential taxes in excess of $11 million that otherwise could be avoided.

3.    For all of these reasons, Plaintiff is entitled to judgment as a matter of law, an award of damages in excess of $26,525,000, interest on the unpaid contingent consideration in excess of $1,870,000, punitive damages, attorneys' fees and expenses, specific performance of Defendants' obligations to deliver the requested books and records, and declaratory and other equitable relief.

## II.    PARTIES

4.    Plaintiff ANKL Liquidating Trust is a New Jersey-based trust. On or about December 7, 2004, ANKL, Inc. (formerly Aircast Incorporated), and ANKL International, L.L.C. (formerly Aircast International Sales, L.L.C.), assigned all of their respective rights and

2

obligations under the APA to Plaintiff ANKL Liquidating Trust.[1]  For ease of reference, the term "Sellers," as used in this Complaint, includes Plaintiff ANKL Liquidating Trust as assignee of the rights of ANKL, Inc. and ANKL International, L.L.C. under the APA.

5.    Defendant Aircast LLC (formerly AI Asset Acquisition Company LLC) is a Delaware limited liability company.

6.    Defendant Aircast Holding Company LLC (formerly AI Holding Company LLC) is a Delaware limited liability company.  Aircast Holding Company LLC is the sole owner of Defendant Aircast LLC.

7.    Defendant DJO, LLC (formerly dj Orthopedics, LLC), is a Delaware limited liability company and a wholly owned subsidiary of DJO, Inc. (formerly dj Orthopedics, Inc.). DJO, LLC, is the sole owner of Aircast Incorporated, which is the sole owner of Defendant Aircast Holding Company LLC.[2]

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that the matter in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

9.    This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq.

10.    This Court has personal jurisdiction over Defendants pursuant to Defendants' consent to the exclusive jurisdiction of New York Federal and State Courts for resolution of the

---

[1] Under the APA, Sellers sold all of their right, title and interest in and to the names and marks "Aircast Incorporated" and "Aircast International Sales, L.L.C" to Purchaser.

[2] For ease of reference, the terms "Purchaser" and "Earnout Obligors," as used in this Complaint, includes Defendant DJO, LLC.

issues raised by this lawsuit. *See* APA § 11.11; Settlement Agreement, § 4.15(a). This Court also has personal jurisdiction over Defendants pursuant to New York's long-arm statute, which provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state." N.Y. C.P.L.R. § 302(a)(1). In addition, personal jurisdiction is proper under the Due Process Clause of the United States Constitution.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. Defendants also have consented to venue in this judicial district. *See* APA § 11.11(B)-(C), Settlement Agreement § 4.15(b).

## FACTUAL BACKGROUND

### A.    The Asset Purchase Agreement.

12.    Sellers entered into the APA, dated as of October 31, 2004, with Purchaser and certain Affiliated Purchasers.[3]

13.    Pursuant to the APA, Purchaser purchased Sellers' business, as a going concern, of the manufacture, distribution, and sale of medical devices for the functional management of joint injuries, fractures, and edema.

14.    Defendant Aircast Holding Company LLC (collectively with Purchaser, "Earnout Obligors") was also a party to Section 1.8 of the APA concerning contingent consideration. Pursuant to Section 1.8 of the APA, Earnout Obligors agreed to make contingent payments to Sellers, if earned in accordance with the terms of the APA, in order to induce Sellers to enter into the agreement.

---

[3] Except as otherwise defined herein, capitalized words are defined in the APA.

4

15.    Pursuant to Section 1.8 of the APA, Earnout Obligors were required to pay Sellers, or their respective assigns, Earnout Payments of $5 million each year certain target Net Sales of Purchaser and Affiliated Purchasers were met based on audited financial statements of Purchaser and Affiliated Purchasers for the years 2005, 2006, and 2007.

16.    Pursuant to Section 1.8(a)(vi) of the APA, upon the occurrence of any Change of Control, all outstanding Earnout Payments would accelerate (the "Earnout Obligations Acceleration") unless the Net Sales of Purchaser and Affiliated Purchasers was less than an amount specified in the APA (the "Acceleration Threshold") for the period of the last twelve full calendar months ending prior to the occurrence of such Change of Control (the "Change of Control Period").

17.    If a Change of Control occurred after December 31, 2005, and resulted in an Earnout Obligations Acceleration, Earnout Obligors were required to immediately pay Sellers Earnout Payments of $5 million each year for 2006 and 2007, or a total of $10 million (the "Accelerated Earnout Payment").

18.    If the Net Sales of Purchaser and Affiliated Purchasers during the Change of Control Period was less than the Acceleration Threshold, the Earnout Payments would not accelerate, but would remain subject to payment in accordance with the other terms of the APA.

19.    Pursuant to Section 1.8(c) of the APA, Purchaser was required to deliver to the Holders' Representative a copy of the audited financial statements and an unaudited calculation of Net Sales of Purchaser and Affiliated Purchasers for 2005, 2006, and 2007. In the event of a Change of Control, Section 1.8(c) also required Purchaser to provide the Holders' Representative with audited financial statements and a calculation of Net Sales applicable to the Change of Control Period.

20.     In Section 1.8(c) of the APA, the parties agreed that the Holders' Representative was defined in Section 6 of a contract titled "Agreement with Holders," which was executed contemporaneously with the APA. In the Agreement with Holders, the Holders' Representative was designated to represent the stockholders and members of Sellers for certain limited purposes. Section 6 of the Agreement with Holders designated Glenn W. Johnson III as the Holders' Representative.

21.     As specified in the definition of "Net Sales" in the APA, Purchaser was required to calculate Net Sales by subtracting from total sales revenue all returns, allowances and rebates and any other deductions used in the development of net sales as reported, computed in accordance with United States generally accepted accounting principles ("U.S. GAAP") in the 2002-2003 Financial Statements.

22.     After Purchaser delivered its calculation of Net Sales and the related audited financial statements to the Holders' Representative, Sellers had forty-five calendar days to deliver to Purchaser any written disagreement with Purchaser's calculation of Net Sales pursuant to Section 1.8(d) of the APA. Purchaser was required to "use ... reasonable commercial efforts for a period of thirty (30) calendar days ... to resolve any disagreements with respect to the calculation of the Net Sales." If, at the end of such period, the parties were unable to resolve their disagreements, the dispute would be referred to an auditor to resolve the dispute.

23.     The Earnout Obligors agreed, pursuant to Section 1.8(a)(vii) of the APA, that if they failed to pay any Earnout Payment, they would pay Sellers all of their out-of-pocket expenses, including reasonable attorneys' fees and expenses, in enforcing payment of any such Earnout Payment, together with interest on the amount of such Earnout Payment at the rate of 8.0% per annum from the date such Earnout Payment was due.

6

**B.**   **DJO, LLC's Purchase of Aircast Incorporated and the Parties' Settlement Agreement**

24.    On or about February 27, 2006, Defendant DJO, LLC, entered into a stock purchase agreement (the "DJO Stock Purchase Agreement"), pursuant to which it agreed to purchase all of the outstanding capital stock of Aircast Incorporated.

25.    Sellers entered into a settlement agreement with Earnout Obligors ("Settlement Agreement"), dated as of March 29, 2006, pursuant to which Earnout Obligors agreed that the consummation of the DJO Stock Purchase Agreement would constitute a Change of Control under the APA.

26.    Pursuant to paragraph F of the Settlement Agreement's Recitals, Earnout Obligors agreed that they were not released from their obligations under Section 1.8 of the APA "with respect to any Earnout Obligations Acceleration."

27.    Sellers also conditioned their releases in Section 2.1 of the Settlement Agreement on Earnout Obligors abiding by their obligations under Section 1.8 of the APA relating to the determination of whether any Earnout Obligations Acceleration occurred.

28.    In Section 1.3 of the Settlement Agreement, Earnout Obligors agreed that if there was an Earnout Obligations Acceleration, (i) they were not released from their obligations under Section 1.8 of the APA with respect to the Earnout Obligations Acceleration, including their obligation to make the Accelerated Earnout Payment; (ii) all releases provided under the Settlement Agreement would be deemed to be rescinded in full, effective retroactively; and (iii) the Settlement Agreement would "terminate and be null and void, *ab initio*, and without any force and effect."

7

29.    On or about April 7, 2006, a Change of Control under the APA occurred when DJO, LLC consummated its purchase of all of the outstanding capital stock of Aircast Incorporated.

C.    **Defendants' Failure to Comply with Their Obligations Concerning Contingent Earnout Payments.**

30.    As a result of the Change of Control, Purchaser was required, in good faith, to calculate the Net Sales for the Change of Control Period pursuant to Section 1.8(c) of the APA.

31.    Pursuant to Section 1.8(d) of the APA, upon Purchaser's delivery to the Sellers of the audited financial statements and its calculation of Net Sales for the Change of Control Period, Purchaser was required to do the following:

a.    Provide the Holders' Representative with reasonable access to the employees of Purchaser and Affiliated Purchasers who assisted in the preparation of the audited financial statements and the calculation of Net Sales for the Change of Control Period.

b.    Provide the Holders' Representative with access to all of the records of Purchaser and Affiliated Purchasers reasonably related to the calculation of Net Sales for the Change of Control Period.

c.    Use commercially reasonable efforts to provide Holders' Representative and its accountants access to the work papers of the independent auditor of the audited financial statements relevant to the Change of Control Period.

32.    On or about June 6, 2006, Purchaser faxed a copy of what it represented was the Net Sales for the Change of Control Period to the Holders' Representative. Purchaser asserted that the Acceleration Threshold was not met and represented to Sellers that the Net Sales for the Change of Control Period was approximately 1.6% below the Acceleration Threshold.

33.    On information and belief, Purchaser did not calculate the Net Sales for the Change of Control Period in accordance with the terms and conditions of the APA. Had Purchaser calculated Net Sales for the Change of Control Period in accordance with the APA, the amount of Net Sales would have exceeded the Acceleration Threshold.

34.    Contrary to its obligations pursuant to Section 1.8 of the APA, Purchaser did not deliver to the Holders' Representative audited financial statements relevant to the Change of Control Period or any other records related to its calculation of Net Sales.

35.    Without a copy of the audited financial statements or any other documentation related to Purchaser's calculation of Net Sales for the Change of Control Period, Sellers had no means to determine whether Purchaser's calculation of Net Sales was accurate.

36.    The 45-day period for Sellers to deliver to Purchaser any written disagreement with Purchaser's calculation of Net Sales did not commence because Purchaser failed to meet its contractual obligation to provide to Sellers a copy of its audited financial statements related to Purchaser's calculation of Net Sales for the Change of Control Period.

37.    Despite the fact that the 45-day period had not yet commenced for Sellers to deliver to Purchaser any written disagreement with Purchaser's calculation of Net Sales, in an abundance of caution, Sellers delivered a written notice of dispute and disagreement to Purchaser on July 19, 2006, within forty-five days after Purchaser provided its calculation of Net Sales for the Change of Control Period to Sellers. In their notice of dispute and disagreement, Sellers informed Purchaser that they could not agree that Purchaser's calculation of Net Sales for the Change of Control Period was accurate because Purchaser had failed to provide to Sellers its audited financial statements and other documents relevant to the Change of Control Period. In the notice of dispute and disagreement, Sellers requested copies of documents relevant to the

9

Change of Control Period. Sellers also asked Purchaser to advise them when its audited financial statements would be available.

38.    Purchaser did not respond to Sellers' July 19, 2006 notice of dispute and disagreement within thirty days of receiving Sellers' notice. Purchaser also did not deliver any of the documents Sellers requested in their notice of dispute or otherwise act in good faith to resolve the parties' disagreement about whether Purchaser had calculated the Net Sales of Purchaser and Affiliated Purchasers for the Change of Control Period in accordance with the terms and conditions of the APA.

39.    As of July 17, 2007, the 45-day period for Sellers to deliver to Purchaser any written disagreement with Purchaser's calculation of Net Sales still had not commenced because Purchaser had not yet delivered to Sellers its audited financial statements for the entire Change of Control Period. On or about July 17, 2007, Sellers inquired about the status of Purchaser's response to Sellers' July 19, 2006 notice of dispute, as Purchaser should have completed its audited financial statements for 2006 by then.

40.    Purchaser responded to Sellers on or about July 23, 2007, by faxing Sellers, without comment, a copy of a letter dated August 2, 2006, addressed to Jim Johnson and Stuart Kurlander, Esq. The letter dated August 2, 2006, represented that Purchaser was enclosing a copy of its 2005 audited financial statements to Sellers, ignoring Purchaser's obligation under Section 1.8 of the APA to provide audited financial statements for the entire twelve months of the Change of Control Period, which included January through March 2006. Purchaser also agreed in the letter dated August 2, 2006, to provide Sellers access to its auditor's work papers for the 2005 financial statements, but stated that it would not produce audited financial statements for the last three months of the Change of Control Period, as required under the APA.

10

Indeed, despite its obligation under the APA, Purchaser stated that it "[did] not intend to cause an audit of such financial statements to be prepared." Purchaser also refused to provide Sellers access to its unaudited financial statements and any related documents for January through March 2006.

41.    In fact, Purchaser had never delivered the letter dated August 2, 2006, to either Mr. Johnson or Mr. Kurlander, despite the requirement under Section 11.1 of the APA that all notices to Sellers be delivered to both Mr. Johnson and Mr. Kurlander. Contrary to its representation that it was enclosing its financial statements, Purchaser also never delivered a copy of its 2005 audited financial statements to Sellers or provided Sellers access to its auditor's work papers for the full Change of Control Period. In any event, even if Purchaser had delivered a copy of its 2005 audited financial statements to Sellers, that would not have satisfied Purchaser's obligation under Section 1.8 of the APA to provide audited financial statements for the entire twelve months of the Change of Control Period.

42.    After receiving Purchaser's facsimile on or about July 23, 2007, Sellers verbally informed Purchaser on several occasions that Purchaser had never delivered its letter dated August 2, 2006, to either Mr. Johnson or Mr. Kurlander. On or about October 26, 2007, Sellers confirmed in writing to Purchaser that it never delivered the letter dated August 2, 2006, to either Mr. Johnson or Mr. Kurlander. Sellers informed Purchaser that it had breached its obligations under the APA to deliver to the Sellers audited financial statements and other information and records to substantiate its calculation of Net Sales for the Change of Control Period.

43.    In their October 26, 2007 default notice, Sellers stated that they expected Purchaser to meet certain commitments it made in its letter dated August 2, 2006 (which it did not deliver to Sellers until on or about July 23, 2007). Specifically, Sellers requested Purchaser

to deliver a copy of its 2005 audited financial statements, as it said it would do. As production of the 2005 audited financial statements would not satisfy Purchaser's obligation to produce audited financial statements for the entire twelve months of the Change of Control Period, Sellers asked Purchaser to produce its audited financial statements for January through March 2006 and other documents relevant to Purchaser's calculation of Net Sales for the Change of Control Period. Sellers also requested immediate access to Purchaser's auditor's work papers for the entire twelve months of the Change of Control Period.

44.    On November 20, 2007, Defendants responded to Sellers' default notice by claiming that they had no obligation under the APA to provide any financial information to Sellers. Defendants based their opinion, in part, on the allegation that Sellers' July 19, 2006 dispute notice did not constitute a valid notice of disagreement under Section 1.8 of the APA (even though the period for delivering such a notice had not yet commenced) because Sellers allegedly did not provide sufficient detail regarding the basis for the disagreement. In fact, the Sellers did identify the basis for their disagreement in their July 19, 2006 dispute notice by informing Purchaser that they could not agree that Purchaser's calculation of Net Sales for the Change of Control Period was accurate because Purchaser had failed to provide to Sellers its audited financial statements and other documents relevant to the Change of Control Period.

45.    With their November 20, 2007 response to Sellers' default notice, Defendants enclosed a copy of the 2005 audited financial statements for Aircast Incorporated. On information and belief, these financial statements were not prepared as required under the terms and conditions of the APA. The Net Sales Defendants reported in their 2005 audited financial statements is not the same amount that Defendants had represented to Sellers in their June 6,

2006 facsimile concerning their Net Sales for 2005. It also does not appear that Defendants computed Net Sales in accordance with U.S. GAAP in the 2002-2003 Financial Statements.

46.     Defendants agreed in their November 20, 2007 response to Sellers' default notice to provide certain incomplete information to Sellers, but refused to provide access to all documents and other information to which Sellers are entitled pursuant to Section 1.8(c) and (d) of the APA. For example, contrary to their obligations pursuant to Section 1.8 of the APA:

      a.  Defendants refused to deliver to Sellers the audited financial statements of Purchaser and Affiliated Purchasers for the period January through March 2006. Defendants did not deny that they have an obligation under Section 1.8 of the APA to provide audited financials for the period from January through March 2006. However, Defendants admitted that, contrary to their obligations pursuant to Section 1.8 of the APA, they had not audited their financial statements for the period from January through March 2006, and they refused to undertake such an audit. Defendants' unreasonable opinion that Plaintiff should rely upon Defendants' own unaudited financial statements, which have never been reviewed and attested to by any auditor, plainly contravenes Section 1.8 of the APA.

      b.  Defendants refused to deliver to Sellers all records of Defendants and Affiliated Purchasers from 2005 and 2006 that were reasonably related to the calculations of Net Sales for the Change of Control Period.

      c.  Defendants refused to deliver to Sellers any financial information and documents related to its unaudited financial statements for the period January through March 2006.

  d. Defendants refused to deliver to Sellers any financial information for periods
subsequent to March 2006, despite the fact that such information could affect the
data reflected in the financial statements of the Purchaser and Affiliated
Purchasers for the period January through March 2006.

47. Defendants also stated in their November 20, 2007 response that the dispute
whether an Earnout Obligations Acceleration occurred should be referred to KPMG for
resolution. Any referral of the dispute to an auditor was improper because Defendants had
breached their obligation to deliver to Sellers the Purchaser's audited financial statements and
other documents relevant to the entire Change of Control Period, the 45-day period for Sellers to
deliver to Purchaser any written disagreement with Purchaser's calculation of Net Sales had not
yet commenced, and Defendants had failed to meet their obligation to act in good faith to resolve
the parties' disagreement prior to any referral of the dispute to an auditor.

**D.** **Aircast LLC and DJO, LLC's Refusal to Deliver Copies of Sellers' Books and Records to Sellers.**

48. Pursuant to Section 6.8 of the APA, Purchaser was required to maintain, for a
period of seven years, the books and records relating to the all of the properties and assets used
or held for use in the operation of Sellers' business, as a going concern, of the manufacture,
distribution, and sale of medical devices for the functional management of joint injuries,
fractures, and edema.

49. Purchaser was required to deliver to Sellers—at the sole cost and expense of
Purchaser—a copy of any of the books and records conveyed to Purchaser or Affiliated
Purchasers that were reasonably requested by Sellers.

50. Purchaser agreed in the APA that Sellers could reasonably request copies of the
books and records conveyed to Purchaser for financial reporting, accounting and tax matters, the

preparation and filing of any returns, reports or forms or the defense of any claim or assessment, or for any purpose otherwise required by law.

51.    On or about August 1, 2007, Sellers requested copies of Sellers' federal tax returns (including all schedules and forms) for the years 1997 through 2001. Sellers specified that the requested tax returns were needed to prepare Sellers' tax return for 2006.

52.    Purchaser initially refused to deliver to Sellers copies of the requested tax returns without further explanation from the Sellers of the need for such books and records.

53.    On August 15, 2007, Purchaser delivered to Sellers copies of the 2000 and 2001 federal tax returns of Aircast, Inc. (ANKL, Inc.'s predecessor). Purchaser did not deliver to Sellers copies of Aircast, Inc.'s federal tax returns for the years 1997 through 1999.

54.    Purchaser also did not deliver to Sellers copies of the federal tax returns of Aircast International Sales, L.L.C. (ANKL International, L.L.C.'s predecessor) for the years 1997 through 2001.

55.    As a result of Purchaser's refusal to deliver the requested books and records to Sellers, Sellers were forced to directly contact Ernst & Young, Sellers' former accountant, to obtain access to Sellers' books and records for the years 1997 through 2001. At considerable expense to Sellers, Sellers had to send their accountants to Ernst & Young's offices to review the records Sellers requested from Purchaser.

56.    Ernst & Young did not have all of the books and records Sellers requested from Purchaser on August 1, 2007.

57.    As a result of Defendants' refusal to deliver copies of tax returns and associated work papers to Plaintiff, Plaintiff has suffered out-of-pocket expenses and may not be able to realize at least $1 million related to or derived from tax deductions that otherwise would be

available to it. Plaintiff also has been unable to respond to routine inquiries from local tax authorities, subjecting it to potential disallowances of previously-taken deductions, monetary penalties, and otherwise avoidable or unwarranted tax payments.

58.    Defendants' refusal to deliver to Sellers their own tax records also is impeding Plaintiff from liquidating Sellers' business, subjecting it to potential taxes in excess of $11 million that otherwise could be avoided.

E.    **Aircast LLC and DJO, LLC's Refusal to Deliver Cash Assets Owned by Sellers.**

59.    Pursuant to Section 1.3(a)(vii) of the APA, Purchaser agreed that "all cash, cash equivalents and marketable securities of Sellers on hand and in all bank and other accounts and lockboxes, including checks on hand or deposited" were excluded from the assets sold by Sellers under the APA and that Purchaser was not purchasing such assets.

60.    Sections 1.3(a)(vii) of the associated subsidiary asset purchase agreements executed contemporaneously with the APA contained substantively the same terms, excluding from the asset sale "all cash, cash equivalents and marketable securities of Selling Subsidiaries on hand and in all bank and other accounts and lockboxes, including checks on hand or deposited" (collectively with the assets excluded pursuant to Section 1.3(a)(vii) of the APA, the "Excluded Assets").

61.    Subsequent to the closing of the APA, Purchaser has withheld at least a portion of the Excluded Assets from Sellers, believed to exceed $225,000 in value.

62.    Purchaser also has obstructed Sellers' access to bank accounts held in Sellers' names and/or associated with Sellers' employer or other identification numbers (collectively, "EIN's"), precluding Sellers from closing the accounts and liquidating their business. These

bank accounts were among the Excluded Assets and were not identified on any schedule of the assets sold to Purchaser pursuant to the APA or the subsidiary asset purchase agreements.

63.    Sellers have repeatedly made verbal demands that Purchaser cease interfering with Sellers' access to and closure of all accounts held in Sellers' names and/or associated with Sellers' EIN's. Purchaser has refused to comply with Sellers' demands, wrongfully asserting, without legal justification, that it owns such bank accounts.

64.    As a result of Purchaser obstructing Sellers from accessing and closing bank accounts held in Sellers' names and/or associated with Sellers' EIN's, which have impeded Sellers' efforts to liquidate their business, Sellers have suffered considerable expenses and are exposed to increased taxes and/or tax penalties in excess of $11 million.

## COUNT 1: BREACH OF THE ASSET PURCHASE AGREEMENT (SECTION 1.8)

65.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 64.

66.    The APA between Sellers and Earnout Obligors is a valid and enforceable contract.

67.    Sellers have fully performed their obligations under the APA.

68.    A Change of Control under the APA occurred on or about April 7, 2006.

69.    On information and belief, DJO, LLC, succeeded to or otherwise assumed, in part or whole, the obligations of Earnout Obligors under the APA, when it consummated the DJO Stock Purchase Agreement.

70.    On information and belief, the Net Sales for the Change of Control Period, as defined in the APA, exceeded the Acceleration Threshold. As a result, an Earnout Obligations Acceleration occurred.

17

71.    In Section 1.3 of the Settlement Agreement, Earnout Obligors agreed that if there was an Earnout Obligations Acceleration, (i) they were not released from their obligations under Section 1.8 of the APA with respect to the Earnout Obligations Acceleration, including their obligation to make the Accelerated Earnout Payment; (ii) all releases provided under the Settlement Agreement would be deemed to be rescinded in full, effective retroactively; and (iii) the Settlement Agreement would "terminate and be null and void, *ab initio*, and without any force and effect."

72.    As a result of the Earnout Obligations Acceleration, Earnout Obligors were required to immediately pay Sellers the Accelerated Earnout Payment.

73.    Pursuant to the Settlement Agreement, Earnout Obligors paid Sellers $700,000, which amount is to be credited against and deducted from, on a dollar for dollar basis, the obligation of Earnout Obligors to pay the Accelerated Earnout Payment to Sellers.

74.    Defendants failed to pay Sellers the Accelerated Earnout Payment.

75.    As a result of the Earnout Obligations Acceleration, any release Sellers provided under the Settlement Agreement concerning the Earnout Payment for the year 2005 is deemed to be rescinded in full, effective retroactively.

76.    On information and belief, the 2005 Net Sales exceeded the Target 2005 Net Sales, as those terms are defined in the APA. As a result, Earnout Obligors were required under the APA to pay the 2005 Earnout Payment of $5 million to Sellers.

77.    Defendants failed to pay Sellers the 2005 Earnout Payment.

78.    As a direct and proximate result of Defendants' breach of their contractual obligation to pay Sellers (i) the Accelerated Earnout Payment, and (ii) the 2005 Earnout Payment, Plaintiff suffered damages in an amount to be determined at trial, but believed to be

$14,300,000. Pursuant to Section 1.8(a)(vii) of the APA, Plaintiff is also entitled to prejudgment interest in an amount to be proved at trial, and indemnification of its reasonable costs and expenses in connection with this litigation, including attorneys' fees.

## COUNT 2: BREACH OF THE SETTLEMENT AGREEMENT

79.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 78.

80.    The Settlement Agreement between Sellers and Earnout Obligors is a valid and enforceable contract.

81.    Sellers have fully performed their obligations under the Settlement Agreement.

82.    Earnout Obligors explicitly agreed that the Settlement Agreement did not terminate, settle, or release "any ... obligation [under Section 1.8 of the APA] with respect to any Earnout Obligations Acceleration."

83.    Sellers' release under Section 2.1 of the Settlement Agreement explicitly provided that Sellers did not release "any ... obligation relating to the determination of whether the Earnout Obligations Acceleration has occurred."

84.    In Section 1.3 of the Settlement Agreement, Earnout Obligors agreed that if there was an Earnout Obligations Acceleration, (i) they were not released from their obligations under Section 1.8 of the APA with respect to the Earnout Obligations Acceleration, including their obligation to make the Accelerated Earnout Payment; (ii) all releases provided under the Settlement Agreement would be deemed to be rescinded in full, effective retroactively; and (iii) the Settlement Agreement would "terminate and be null and void, *ab initio*, and without any force and effect."

85.    A Change of Control under the APA occurred on or about April 7, 2006.

19

86.    On information and belief, DJO, LLC, succeeded to or otherwise assumed, in part or whole, the obligations of Earnout Obligors under the Settlement Agreement when it consummated the DJO Stock Purchase Agreement.

87.    Among their obligations relating to the determination of whether the Earnout Obligations Acceleration occurred as a result of the Change of Control, Defendants were required, pursuant to Section 1.8(c) and (d) of the APA, to deliver to the Holders' Representative (i) a copy of the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period; (ii) access to all of the records of Purchaser and Affiliated Purchasers related to the calculation of Net Sales for the Change of Control Period, including without limitation supporting schedules such as accounts receivable aging, cut-off work papers, and sales and related journals reporting detail of gross sales, returns and allowances, rebates, cash discounts and commissions; (iii) access to the work papers of the independent auditor of the audited financial statements; and (iv) access to employees who assisted in the preparation of the audited financial statements and the calculation of Net Sales.

88.    After the Change of Control, Defendants failed to deliver to the Holders' Representative (i) a copy of the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period; (ii) access to all of the records of Purchaser and Affiliated Purchasers related to the calculation of Net Sales for the Change of Control Period; (iii) access to the work papers of the independent auditor of the audited financial statements; and (iv) access to employees who assisted in the preparation of the audited financial statements and the calculation of Net Sales.

89.    On information and belief, the Net Sales for the Change of Control Period, as defined in the APA, exceeded the Acceleration Threshold. As a result, an Earnout Obligations Acceleration occurred.

90.    Defendants failed to pay Sellers the Accelerated Earnout Payment.

91.    Pursuant to the Settlement Agreement, Earnout Obligors paid Sellers $700,000, which amount is to be credited against and deducted from, on a dollar for dollar basis, the obligation of Earnout Obligors to pay the Accelerated Earnout Payment to Sellers.

92.    As a direct and proximate result of Defendants' breach of their contractual obligations to Plaintiff to (A) deliver to the Holders' Representative (i) a copy of the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period; (ii) access to all of the records of Purchaser and Affiliated Purchasers related to the calculation of Net Sales for the Change of Control Period; (iii) access to the work papers of the independent auditor of the audited financial statements; and (iv) access to employees who assisted in the preparation of the audited financial statements and the calculation of Net Sales; and (B) pay Sellers the Accelerated Earnout Payment, Plaintiff suffered damages in an amount to be determined at trial, but believed to be $9,300,000. Plaintiff is also entitled to prejudgment interest in an amount to be proved at trial, and indemnification of its reasonable costs and expenses in connection with this litigation, including attorneys' fees.

## COUNT 3: FRAUD

93.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 92.

94.     On information and belief, the 2005 Net Sales exceeded the Target 2005 Net Sales, as those terms are defined in the APA. As a result, Earnout Obligors were required under the APA to pay the 2005 Earnout Payment of $5 million to Sellers.

95.     Commencing on or about February 1, 2006, until the Settlement Agreement was executed on or about March 31, 2006, Geoffrey Raker, a representative of Defendants, and Elliot Levine, a representative of Sellers, had multiple conversations concerning the Settlement Agreement and the contractual provisions to be incorporated therein, including the release provisions contained in paragraph 2.1 of the Settlement Agreement.

96.     On several occasions during these conversations, Mr. Raker, on behalf of Defendants, represented to Elliot Levine, as a representative of Sellers, that the 2005 Net Sales did not exceed the Target 2005 Net Sales and that, as a result, Earnout Obligors were not required under the APA to pay Sellers a 2005 Earnout Payment, or words to that effect.

97.     On information and belief, Defendants' representations to Sellers were false because Defendants did not calculate the 2005 Net Sales as required under the terms and conditions of the APA. The Net Sales Defendants reported in their 2005 audited financial statements is not the same amount that Defendants had represented to Sellers in their June 6, 2006 facsimile concerning their Net Sales for 2005. It also does not appear that Defendants computed Net Sales in accordance with U.S. GAAP in the 2002-2003 Financial Statements.

98.     On information and belief, Defendants were aware that their representations to Sellers were false when they made them.

99.     Defendants' representations to Sellers were material to Plaintiff's agreement to release any claim to the 2005 Earnout Payment in the Settlement Agreement. Plaintiff would not

22

have agreed to release any claim to the 2005 Earnout Payment in the Settlement Agreement if Defendants had not made the representations.

100.    Plaintiff justifiably relied upon Defendants' representations to Sellers when it agreed to release any claim to the 2005 Earnout Payment in the Settlement Agreement.

101.    As a direct and proximate result of Defendants' knowing misrepresentations of material fact, upon which Plaintiff reasonably relied, Plaintiff suffered damages in an amount to be determined at trial, but believed to be $5 million. Pursuant to Section 1.8(a)(vii) of the APA, Plaintiff is also entitled to prejudgment interest in an amount to be proved at trial, and indemnification of its reasonable costs and expenses in connection with this litigation, including attorneys' fees. Plaintiff is also entitled to punitive damages.

**COUNT 4: NEGLIGENT MISREPRESENTATION**

102.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 101.

103.    On information and belief, the 2005 Net Sales exceeded the Target 2005 Net Sales, as those terms are defined in the APA. As a result, Earnout Obligors were required under the APA to pay the 2005 Earnout Payment of $5 million to Sellers.

104.    Pursuant to Section 1.8(c) of the APA, Purchaser was required, "in good faith, [to] calculate the Net Sales for any given Earnout Year in accordance with [the APA]" and to deliver such calculation to Sellers.

105.    Commencing on or about February 1, 2006, until the Settlement Agreement was executed on or about March 31, 2006, Geoffrey Raker, a representative of Defendants, and Elliot Levine, a representative of Sellers, had multiple conversations concerning the Settlement

Agreement and the contractual provisions to be incorporated therein, including the release provisions contained in paragraph 2.1 of the Settlement Agreement.

106.    On several occasions during these conversations, Mr. Raker, on behalf of Defendants, represented to Elliot Levine, as a representative of Sellers, that the 2005 Net Sales did not exceed the Target 2005 Net Sales and that, as a result, Earnout Obligors were not required under the APA to pay Sellers a 2005 Earnout Payment, or words to that effect.

107.    On information and belief, Defendants' representations to Sellers were false because Defendants did not calculate the 2005 Net Sales as required under the terms and conditions of the APA. The Net Sales Defendants reported in their 2005 audited financial statements is not the same amount that Defendants had represented to Sellers in their June 6, 2006 facsimile concerning their Net Sales for 2005. It also does not appear that Defendants computed Net Sales in accordance with U.S. GAAP in the 2002-2003 Financial Statements.

108.    Plaintiff reasonably relied upon Defendants' representations to Sellers when it agreed to release any claim to the 2005 Earnout Payment in the Settlement Agreement.

109.    As a direct and proximate result of Defendants' misrepresentations, upon which Plaintiff reasonably relied, Plaintiff suffered damages in an amount to be determined at trial, but believed to be $5 million. Pursuant to Section 1.8(a)(vii) of the APA, Plaintiff is also entitled to prejudgment interest in an amount to be proved at trial, and indemnification of its reasonable costs and expenses in connection with this litigation, including attorneys' fees. Plaintiff is also entitled to punitive damages.

## COUNT 5: BREACH OF THE ASSET PURCHASE
## AGREEMENT (SECTION 1.8) (SPECIFIC PERFORMANCE)

110.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 109.

111.    The APA between Sellers and Earnout Obligors is a valid and enforceable contract.

112.    Sellers have fully performed their obligations under the APA.

113.    A Change of Control under the APA occurred on or about April 7, 2006.

114.    On information and belief, DJO, LLC, succeeded to or otherwise assumed, in part or whole, the obligations of Earnout Obligors under the APA when it consummated the DJO Stock Purchase Agreement.

115.    Among their obligations relating to the determination of whether the Earnout Obligations Acceleration occurred as a result of the Change of Control, Defendants were required, pursuant to Section 1.8(c) and (d) of the APA, to deliver to the Holders' Representative (i) a copy of the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period; (ii) access to all of the records of Purchaser and Affiliated Purchasers related to the calculation of Net Sales for the Change of Control Period, including without limitation supporting schedules such as accounts receivable aging, cut-off work papers, and sales and related journals reporting detail of gross sales, returns and allowances, rebates, cash discounts and commissions; (iii) access to the work papers of the independent auditor of the audited financial statements; and (iv) access to employees who assisted in the preparation of the audited financial statements and the calculation of Net Sales.

116.    After the Change of Control, Defendants refused to deliver to the Holders' Representative (i) a copy of the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period; (ii) access to all of the records of Purchaser and Affiliated Purchasers related to the calculation of Net Sales for the Change of Control Period; (iii) access to the work papers of the independent auditor of the audited financial

statements; and (iv) access to employees who assisted in the preparation of the audited financial statements and the calculation of Net Sales.

117.    As a direct and proximate result of Defendants' breach of their contractual obligations to Plaintiff, Plaintiff is entitled to an order compelling Defendants to deliver to the Holders' Representative (i) a copy of the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period; (ii) access to all of the records of Purchaser and Affiliated Purchasers related to the calculation of Net Sales for the Change of Control Period, including without limitation supporting schedules such as accounts receivable aging, cut-off work papers, and sales and related journals reporting detail of gross sales, returns and allowances, rebates, cash discounts and commissions; (iii) access to the work papers of the independent auditor of the audited financial statements; and (iv) access to employees who assisted in the preparation of the audited financial statements and the calculation of Net Sales. Plaintiff is also entitled to indemnification of its reasonable costs and expenses in connection with this litigation, including attorneys' fees.

## COUNT 6: BREACH OF THE ASSET PURCHASE AGREEMENT (SECTION 6.8) (AGAINST DEFENDANTS AIRCAST LLC AND DJO, LLC)

118.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 117.

119.    The APA between Sellers and Earnout Obligors is a valid and enforceable contract.

120.    Sellers have fully performed their obligations under the APA.

121.    Pursuant to Section 6.8 of the APA, Purchaser was required to deliver to Sellers— at the sole cost and expense of Purchaser—a copy of any of the books and records conveyed to Purchaser or the Affiliated Purchasers that were reasonably required by Sellers.

122.    On information and belief, DJO, LLC, succeeded to or otherwise assumed, in part or whole, the obligations of Purchaser under the APA when it consummated the DJO Stock Purchase Agreement.

123.    Sellers reasonably requested copies of their federal tax returns for the years 1997 through 2001 to prepare their 2006 federal tax return.

124.    Defendants Aircast LLC and DJO, LLC, refused to deliver the requested tax returns to Sellers.

125.    As a direct and proximate result of Defendants Aircast LLC and DJO, LLC's breach of their contractual obligation to deliver copies of the books and records requested by Sellers, Sellers incurred costs and expenses to obtain a portion of the requested books and records from another source.

126.    As a direct and proximate result of Defendants Aircast LLC and DJO, LLC's breach of their contractual obligation to deliver copies of the books and records requested by Sellers, Sellers may not be able to realize the financial benefit, believed to exceed $1 million, related to or derived from certain tax deductions that otherwise would be available to Sellers if they had copies of the requested books and records.

127.    As a direct and proximate result of Defendants Aircast LLC and DJO, LLC's breach of their contractual obligation to deliver copies of the books and records requested by Sellers, Sellers have not been able to liquidate their business, subjecting Plaintiff to potential taxes in excess of $11 million that otherwise could be avoided.

128.    As a direct and proximate result of Defendants Aircast LLC and DJO, LLC's breach of their contractual obligation to deliver copies of the books and records requested by Sellers, Plaintiff suffered damages in an amount to be determined at trial, but believed to be in

excess of $12 million. Plaintiff is also entitled to prejudgment interest in an amount to be proved at trial, and indemnification of its reasonable costs and expenses in connection with this litigation, including attorneys' fees.

### COUNT 7: BREACH OF THE ASSET PURCHASE AGREEMENT
### (SECTION 6.8) (SPECIFIC PERFORMANCE)
### (AGAINST DEFENDANTS AIRCAST LLC AND DJO, LLC)

129.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 128.

130.    The APA between Sellers and Earnout Obligors is a valid and enforceable contract.

131.    Sellers have fully performed their obligations under the APA.

132.    Pursuant to Section 6.8 of the APA, Purchaser was required to deliver to Sellers— at the sole cost and expense of Purchaser—a copy of any of the books and records conveyed to Purchaser or the Affiliated Purchasers that were reasonably required by Sellers.

133.    On information and belief, DJO, LLC, succeeded to or otherwise assumed, in part or whole, the obligations of Purchaser under the APA when it consummated the DJO Stock Purchase Agreement.

134.    Sellers reasonably requested copies of their federal tax returns for the years 1997 through 2001 to prepare their 2006 federal tax return.

135.    Defendants Aircast LLC and DJO, LLC, refused to deliver the requested tax returns to Sellers.

136.    As a direct and proximate result of Defendants Aircast LLC and DJO, LLC's breach of their contractual obligations to Plaintiff, Plaintiff is entitled to an order compelling

Defendants to deliver to Plaintiff copies of the following records (collectively, the "Sellers' Tax

Records"):[4]

> ➢ Sellers' federal and state tax returns (including all schedules and forms) for the years 1985 through 2001;

> ➢ Sellers' tax work papers for the years 2000 through 2003;

> ➢ Sellers' sales journals and sales analyses by product and/or customer for the years 2003 and 2004;

> ➢ Sellers' fixed asset schedules, listing fixed assets by state for the years 2003 and 2004;

> ➢ Sellers' payroll records listing payroll by state for the years 2003 and 2004;

> ➢ All financial statements (audited and reviewed) prepared by Sellers' outside accounting firm for all years prior to 2002;

> ➢ Sellers' general ledgers, general journals, all subsidiary ledgers, and end-of-year trial balances for the years 2002 through 2004;

> ➢ Sellers' accounts receivable ledgers and aging reports for the years 2002 through 2004;

> ➢ All consolidating financial and tax-related work papers prepared in conjunction with the purchase by ANKL International, L.L.C., of its European subsidiaries 2002 and 2003 (prior to which ANKL International, L.L.C., had a partial ownership interest in the subsidiaries); and

> ➢ All electronic records required pursuant to 26 CFR 1.6001-1(e).

Plaintiff is also entitled to indemnification of its reasonable costs and expenses in connection

with this litigation, including attorneys' fees.

---

[4] To mitigate the possibility of successive litigation, Sellers seek a judgment requiring Defendants to deliver documents in addition to the originally-requested documents that Defendants have withheld. The additional requested documents are needed to enable Sellers to prepare tax returns and respond to inquiries and audits by tax authorities.

## COUNT 8: BREACH OF THE ASSET PURCHASE AGREEMENT
## (SECTION 1.3(a)(vii)) (AGAINST DEFENDANTS AIRCAST LLC AND DJO, LLC)

137.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 136.

138.    The APA between Sellers and Earnout Obligors is a valid and enforceable contract.

139.    Sellers have fully performed their obligations under the APA.

140.    Pursuant to Section 1.3(a)(vii) of the APA and the associated subsidiary asset purchase agreements executed contemporaneously with the APA, the Excluded Assets were excluded from the assets sold by Sellers under the APA and were not purchased by Purchaser.

141.    On information and belief, DJO, LLC, succeeded to or otherwise assumed, in part or whole, the obligations of Purchaser under the APA when it consummated the DJO Stock Purchase Agreement.

142.    Subsequent to the closing of the APA, Defendants Aircast LLC and DJO, LLC, have withheld at least a portion of the Excluded Assets from Sellers.

143.    Defendants Aircast LLC and DJO, LLC, also have obstructed Sellers' access to bank accounts held in Sellers' names and/or associated with Sellers' EIN's, precluding Sellers from closing the accounts and liquidating their business.

144.    As a direct and proximate result of Defendants Aircast LLC and DJO, LLC's breach of their contractual obligation to exclude the Excluded Assets from the assets purchased under the APA, Plaintiff suffered damages in an amount to be determined at trial, but believed to be in excess of $11,225,000. Plaintiff is also entitled to prejudgment interest in an amount to be proved at trial, and indemnification of its reasonable costs and expenses in connection with this litigation, including attorneys' fees.

## COUNT 9: CONVERSION (AGAINST DEFENDANTS AIRCAST LLC AND DJO, LLC)

145.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 144.

146.    At all times relevant to this lawsuit, Sellers had exclusive right, title and interest in and to the Excluded Assets, to the exclusion of Defendants Aircast LLC and DJO, LLC.

147.    Despite Sellers' exclusive right, title and interest in and to the Excluded Assets, Defendants Aircast LLC and DJO, LLC, have exercised unauthorized dominion and ownership over the Excluded Assets, to the exclusion of Sellers.

148.    Sellers have not authorized Defendants Aircast LLC and DJO, LLC, to exercise dominion and ownership over the Excluded Assets.

149.    Sellers have repeatedly made verbal demands that Defendants Aircast LLC and DJO, LLC, cease interfering with Sellers' access to and closure of all accounts held in Sellers' names and/or associated with Sellers' EIN's.

150.    Defendants Aircast LLC and DJO, LLC, refused Sellers' demands and have continued to exercise unauthorized dominion and ownership over the Excluded Assets, to the exclusion of Sellers.

151.    As a direct and proximate result of Defendants Aircast LLC and DJO, LLC's unauthorized exercise of dominion and ownership over the Excluded Assets, to the exclusion of Sellers, Plaintiff suffered damages in an amount to be determined at trial, but believed to be in excess of $225,000. Plaintiff is also entitled to prejudgment interest in an amount to be proved at trial, and indemnification of its reasonable costs and expenses in connection with this litigation, including attorneys' fees.

31

## COUNT 10: DECLARATORY JUDGMENT

152.    Plaintiff incorporates by reference all of the allegations set forth in the foregoing paragraphs 1 through 151.

153.    An actual controversy has arisen and now exists between Plaintiff and Defendants regarding the rights, duties and obligations of the parties under the APA.

154.    Defendants are required under Section 1.8(c) and (d) to deliver to Sellers the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period, including the period January through March 2006.

155.    Defendants are required under Section 1.8(c) and (d) to provide Sellers access to all records and information related to Purchaser's calculation of Net Sales for the entire Change of Control Period, including the period January through March 2006.

156.    Defendants are required under Section 1.8(c) and (d) to provide Plaintiff access to all records and information for periods subsequent to March 2006 to the extent that such information is relevant to calculating Net Sales for the entire Change of Control Period.

157.    Plaintiff's obligation under Section 1.8(d) of the APA to deliver to Purchaser any written disagreement with Purchaser's calculation of Net Sales for the Change of Control Period has not yet commenced because Purchaser failed to meet its contractual obligation to deliver to Sellers a copy of audited financial statements of Purchaser and Affiliated Purchasers relevant to Purchaser's calculation of Net Sales for the entire Change of Control Period, including the period January through March 2006.    In any event, Sellers' July 19, 2006 letter to Defendants constitutes a valid notice of disagreement under Section 1.8(d) of the APA.

158.    Plaintiff is not required under Section 1.8(d) of the APA to refer its dispute of Purchaser's calculation of Net Sales for the Change of Control Period to an auditor because

Defendants breached their obligation to deliver to Sellers audited financial statements of Purchaser and Affiliated Purchasers relevant to the entire Change of Control Period, the 45-day period for Sellers to deliver to Purchaser any written disagreement with Purchaser's calculation of Net Sales has not yet commenced, and because Defendants failed to meet their obligation to act in good faith to resolve the parties' disagreement prior to any referral of the dispute to an auditor.

159.    Sellers did not release any claims against Defendants resulting from any breach of Defendants' obligations under Section 1.8 of the APA concerning the determination whether the Change of Control triggered an Earnout Obligations Acceleration, including but not limited to Defendants' obligations under Section 1.8 of the APA to (i) deliver to Sellers the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period, including the period January through March 2006, and (ii) provide Sellers access to all records related to Purchaser's calculation of Net Sales for the entire Change of Control Period, including the period January through March 2006.

160.    Defendants dispute each of Plaintiff's assertions regarding the rights, duties and obligations of the parties under the APA set forth in the foregoing paragraphs 154 through 159.

161.    Plaintiff seeks a declaration by the Court of the rights, duties and obligations of the parties under the APA, as follows:

      a. Defendants are required under Section 1.8(c) and (d) to deliver to Plaintiff the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period, including the period January through March 2006.

      b. Defendants are required under Section 1.8(c) and (d) to provide Plaintiff access to all records and information related to Purchaser's calculation of Net Sales for the

entire Change of Control Period, including the period January through March 2006.

c. Defendants are required under Section 1.8(c) and (d) to provide Plaintiff access to all records and information for periods subsequent to March 2006 to the extent that such information is relevant to calculating Net Sales for the entire Change of Control Period.

d. Plaintiff's obligation under Section 1.8(d) of the APA to deliver to Purchaser any written disagreement with Purchaser's calculation of Net Sales for the Change of Control Period has not yet commenced.

e. Plaintiff's July 19, 2006 letter to Defendants constitutes a valid notice of disagreement under Section 1.8(d) of the APA.

f. Plaintiff is not required under Section 1.8(d) of the APA to refer its dispute of Purchaser's calculation of Net Sales for the Change of Control Period to an auditor.

g. Plaintiff did not release any claims against Defendants resulting from any breach of Defendants' obligations under Section 1.8 of the APA concerning the determination whether the Change of Control triggered an Earnout Obligations Acceleration, including but not limited to Defendants' obligations under Section 1.8 of the APA to (i) deliver to Sellers the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period, including the period January through March 2006, and (ii) provide Sellers access to all records related to Purchaser's calculation of Net Sales for the entire Change of Control Period, including the period January through March 2006.

34

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

(1)     Damages in an amount to be determined at trial, but believed to exceed $26,525,000.

(2)     Interest on the unpaid contingent consideration in an amount to be determined at trial, but believed to exceed $1,870,000 as of the date this Complaint was filed.

(3)     An order of specific performance compelling Defendants to deliver to the Holders' Representative (i) a copy of the audited financial statements of Purchaser and Affiliated Purchasers for the entire Change of Control Period; (ii) access to all of the records of Purchaser and Affiliated Purchasers related to the calculation of Net Sales for the Change of Control Period; (iii) access to the work papers of the independent auditor of the audited financial statements; and (iv) access to employees who assisted in the preparation of the audited financial statements and the calculation of Net Sales.

(4)     An order of specific performance compelling Defendants Aircast LLC and DJO, LLC, to deliver to Plaintiff a copies of the Sellers' Tax Records.

(5)     Punitive damages.

(6)     Prejudgment interest in an amount to be proved at trial.

(7)     Indemnification of Plaintiff reasonable costs and expenses in connection with this litigation, including attorneys' fees.

(8)     Declaratory relief, as set forth in Count 10 above.

(9)     Such other relief as the Court deems proper.

Respectfully submitted, this 27th day of November 2007.

By:

Jacob D. Krawitz (JK0216)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: 202-457-6000
Fax: 202-457-6315
E-mail: jkrawitz@pattonboggs.com

Of Counsel:

T. Michael Guiffré
Jason M.A. Twining
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: 202-457-6000
Fax: 202-457-6315
E-mail: mguiffre@pattonboggs.com
jtwining@pattonboggs.com

*Attorneys for Plaintiff*