Kenneth I. Schacter
Theo J. Robins
**BINGHAM McCUTCHEN LLP**
399 Park Avenue
New York, New York  10022
(212) 705-7000
kenneth.schacter@bingham.com

*Attorneys for Defendants Aircast LLC,*
*Aircast Holding Company, LCC,*
*and DJO, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

| | | |
|---|---|---|
| ANKL LIQUIDATING TRUST, | : | |
| | : | |
| Plaintiff, | : | 07-CV-10624 (JGK) |
| | : | |
| - against - | : | **DECLARATION OF** |
| | : | **KENNETH I. SCHACTER** |
| AIRCAST LLC, AIRCAST HOLDING COMPANY LLC, and DJO, LLC, | : | |
| | : | |
| | : | ECF Case |
| Defendants. | : | |
| | : | |
| | : | |

--------------------------------------------------------------- x

I, Kenneth Schacter, hereby declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746.

1.      I am a member of the law firm of Bingham McCutchen LLP, attorneys for Defendants Aircast LLC ("Aircast LLC"), Aircast Holding Company LLC ("Aircast Holding"), and DJO, LLC ("DJO") (collectively, "Defendants") herein.  I am fully familiar with the facts and circumstances recited herein.  I submit this declaration in support of Defendants' Motion to Dismiss the First through Fifth, Ninth and Tenth Claims for Relief.

2.      Annexed hereto as Exhibit A is a true and correct copy of the Asset Purchase Agreement by and among Aircast Incorporated, Aircast International Sales, L.L.C. and AI Asset Acquisition Company, dated October 31, 2004.

3.      Annexed hereto as Exhibit B is a true and correct copy of the Settlement Agreement by and among Aircast LLC, Aircast Holding, the ANKL Liquidating Trust, ANKL, Inc. and ANKL International, L.L.C., dated March 29, 2006.

4.      Annexed hereto as Exhibit C is a true and correct copy of Defendants' June 6, 2006 facsimile enclosing Aircast LLC's Net Sales calculation.

5.      Annexed hereto as Exhibit D is a true and correct copy of Defendant's 2005 audited Consolidated Financial Statements dated December 31, 2005.

6.      Annexed hereto as Exhibit E is a true and correct copy of a letter dated July 19, 2006 from G.W. Jim Johnson, III, a representative of ANKL, to Donald M. Roberts, DJO's General Counsel in response to the Net Sales calculation provided by Aircast LLC on June 6, 2006.

7.      Annexed hereto as Exhibit F is a true and correct copy of a letter dated August 2, 2006 from Donald M. Roberts to G.W. Jim Johnson, III in response to the July 19, 2006 letter.

8.      Annexed hereto as Exhibit G is a true and correct copy of an email dated July 17, 2007 from Tim Youmans, a representative of ANKL, to Vickie Capps, DJO's Chief Financial Officer.

9.      Annexed hereto as Exhibit H is a true and correct copy of a letter dated October 26, 2007  from T. Michael Guiffre to the General Counsel of Aircast LLC and Aircast Holding Company LLC.

2

10.     Annexed hereto as Exhibit I is a true and correct copy of a letter dated November 20, 2007 from Roger H. Lustberg, counsel for DJO, to T. Michael Guiffre.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 4, 2008, in New York, New York.


s/ Kenneth I. Schacter
KENNETH I. SCHACTER

# EXHIBIT A

Execution Version

ASSET PURCHASE AGREEMENT

among

AIRCAST INCORPORATED,

AIRCAST INTERNATIONAL SALES, L.L.C.,

and

AI ASSET ACQUISITION COMPANY LLC

Dated as of October 31, 2004

VA01/SCHIJ/54430.14

# TABLE OF CONTENTS

**Page**

ARTICLE I.    PURCHASE AND SALE OF ASSETS ................................................................ 2
    Section 1.1    Purchase and Sale of Assets ................................................................ 2
    Section 1.2    Assumed Liabilities ................................................................ 4
    Section 1.3    Excluded Assets and Excluded Liabilities ................................................................ 4
    Section 1.4    Purchase Price and Terms ................................................................ 7
    Section 1.5    Closing ................................................................ 8
    Section 1.6    Net Working Capital Adjustment ................................................................ 8
    Section 1.7    Allocation of the Purchase Price ................................................................ 10
    Section 1.8    Contingent Consideration ................................................................ 11
    Section 1.9    Agreement with Holders ................................................................ 15
    Section 1.10    Nonassignability of Assets ................................................................ 15
    Section 1.11    Subsidiary Asset Purchase Agreements ................................................................ 15
ARTICLE II.    REPRESENTATIONS AND WARRANTIES OF SELLERS ................................................................ 15
    Section 2.1    Corporate Organization and Authority of Sellers ................................................................ 15
    Section 2.2    No Conflict ................................................................ 16
    Section 2.3    Subsidiaries ................................................................ 16
    Section 2.4    Financial Statements ................................................................ 17
    Section 2.5    Absence of Certain Changes ................................................................ 17
    Section 2.6    Undisclosed Liabilities ................................................................ 18
    Section 2.7    Creditors; Bankruptcy; Etc ................................................................ 18
    Section 2.8    Customers ................................................................ 19
    Section 2.9    Title to Assets ................................................................ 19
    Section 2.10    Contracts; No Defaults ................................................................ 19
    Section 2.11    Intellectual Property ................................................................ 20
    Section 2.12    Real Property ................................................................ 21
    Section 2.13    Inventory ................................................................ 21
    Section 2.14    Accounts Receivable and Payable ................................................................ 21
    Section 2.15    Litigation and Proceedings ................................................................ 21
    Section 2.16    Employee Benefit Plans ................................................................ 22
    Section 2.17    Legal Compliance ................................................................ 24
    Section 2.18    Environmental Matters ................................................................ 24
    Section 2.19    Taxes ................................................................ 25
    Section 2.20    Governmental Authorities; Consents ................................................................ 26

Section 2.21   Licenses, Permits and Authorizations; Regulatory Approvals .................................27
Section 2.22   Insurance.................................................................................................................27
Section 2.23   Labor Matters..........................................................................................................28
Section 2.24   Health Care Matters.................................................................................................28
Section 2.25   Affiliate Transactions ..............................................................................................29
Section 2.26   Powers of Attorney .................................................................................................29
Section 2.27   Payments.................................................................................................................29
Section 2.28   Contracts Outside of Ordinary Course......................................................................29
Section 2.29   Reliance ...................................................................................................................29

ARTICLE III.      REPRESENTATIONS AND WARRANTIES OF PURCHASER....................30
Section 3.1    Corporate Organization and Authority of Purchaser ...............................................30
Section 3.2    No Conflict ..............................................................................................................30
Section 3.3    Litigation and Proceedings ......................................................................................30
Section 3.4    Governmental Authorities; Consents........................................................................30
Section 3.5    Financial Ability ......................................................................................................30
Section 3.6    Tax Matters..............................................................................................................31
Section 3.7    Reliance ...................................................................................................................31

ARTICLE IV.      COVENANTS AND AGREEMENTS OF SELLERS ....................................32
Section 4.1    Conduct of Business ................................................................................................32
Section 4.2    Inspection................................................................................................................33
Section 4.3    No Solicitations .......................................................................................................34
Section 4.4    Maintenance of Insurance........................................................................................34
Section 4.5    Monthly Operating Reports .....................................................................................34
Section 4.6    Changes of Name.....................................................................................................35
Section 4.7    Power of Attorney; Right of Endorsement; Etc.........................................................35
Section 4.8    Transition Assistance...............................................................................................35

ARTICLE V.      COVENANTS AND AGREEMENTS OF PURCHASER ...............................35
Section 5.1    Co-Existence Agreement ..........................................................................................35
Section 5.2    Acquisition Financing...............................................................................................35
Section 5.3    Designation of Certain Assigned Contracts...............................................................36

ARTICLE VI.      JOINT COVENANTS AND AGREEMENTS ..............................................36
Section 6.1    Support of Transaction.............................................................................................36
Section 6.2    Tax Matters .............................................................................................................37
Section 6.3    Certain Employee Benefits Matters...........................................................................37
Section 6.4    Transfer Taxes and Fees ..........................................................................................40
Section 6.5    Supplemental Disclosure ..........................................................................................40

| | | |
|---|---|---|
| Section 6.6 | Confidentiality | 40 |
| Section 6.7 | Bulk Sales Laws | 41 |
| Section 6.8 | Maintenance of Records | 41 |
| Section 6.9 | Removal of Excluded Assets | 41 |
| Section 6.10 | Non-Compete; Non-Solicitation; Non-Disparagement | 41 |
| Section 6.11 | Health Regulatory Matters | 43 |
| Section 6.12 | Environmental Matters | 43 |
| Section 6.13 | Further Assurances | 43 |
| ARTICLE VII. | CONDITIONS TO OBLIGATIONS | 43 |
| Section 7.1 | Conditions to Obligations of Purchaser | 43 |
| Section 7.2 | Conditions to the Obligations of Sellers | 47 |
| ARTICLE VIII. | TERMINATION | 48 |
| Section 8.1 | Termination | 48 |
| Section 8.2 | Effect of Termination | 48 |
| ARTICLE IX. | INDEMNIFICATION | 49 |
| Section 9.1 | Survival of Representations | 49 |
| Section 9.2 | Right to Indemnification | 49 |
| Section 9.3 | Conduct of Proceedings | 52 |
| Section 9.4 | Limits and Conditions of Indemnification | 53 |
| Section 9.5 | Remedy for Failure to Transfer Assets | 55 |
| ARTICLE X. | CERTAIN DEFINITIONS | 55 |
| ARTICLE XI. | MISCELLANEOUS | 67 |
| Section 11.1 | Notices | 67 |
| Section 11.2 | Assignment | 68 |
| Section 11.3 | Rights of Third Parties | 68 |
| Section 11.4 | Expenses | 68 |
| Section 11.5 | Construction | 68 |
| Section 11.6 | Captions; Counterparts | 69 |
| Section 11.7 | Entire Agreement | 69 |
| Section 11.8 | Amendments; Waivers | 69 |
| Section 11.9 | Publicity | 69 |
| Section 11.10 | Governing Law | 69 |
| Section 11.11 | Jurisdiction | 69 |
| Section 11.12 | Severability | 70 |
| Section 11.13 | Knowledge Attributable to Sellers | 70 |
| Section 11.14 | Specific Performance | 70 |

Section 11.15    Conflict in Provisions ...........................................................................70

## List of Schedules

| | |
|---|---|
| Schedule 1.1(a) | Prepaid Accounts, Expenses and Deposits |
| Schedule 1.1(f) | Facilities |
| Schedule 1.1(s) | Rights and Interests in Names |
| Schedule 1.3(a)(iv) | Assets Not Used in the Business |
| Schedule 1.3(a)(ix) | Other Excluded Assets |
| Schedule 1.3(a)(xi) | Excluded Assets Used in the Business |
| Schedule 1.4(a) | Cash Purchase Price Allocation |
| Schedule 1.11 | Subsidiaries and Affiliated Purchasers |
| Schedule 2.1 | Foreign Licenses/Certificates of Good Standing |
| Schedule 2.2 | No Conflict |
| Schedule 2.3 | Subsidiaries of Sellers |
| Schedule 2.4(a) | 2002-2003 Financial Statements |
| Schedule 2.4(b) | 2004 Financial Statements |
| Schedule 2.5 | Absence of Certain Changes |
| Schedule 2.6 | Undisclosed Liabilities |
| Schedule 2.8 | Customers |
| Schedule 2.9 | Title to Assets |
| Schedule 2.10(a) | Significant Contracts |
| Schedule 2.10(b) | Enforceability of Contracts |
| Schedule 2.10(c) | Parties in Possession; Leasehold Improvements |
| Schedule 2.11 | Intellectual Property |
| Schedule 2.12 | Real Property |
| Schedule 2.15 | Litigation and Proceedings |
| Schedule 2.16 | Employee Benefit Plans |
| Schedule 2.17 | Legal Compliance |
| Schedule 2.18 | Environmental Matters |
| Schedule 2.19 | Taxes |
| Schedule 2.20 | Governmental Authorities/Consents |
| Schedule 2.21 | Licenses, Permits and Authorizations |
| Schedule 2.22 | Insurance |
| Schedule 2.23 | Labor Matters |
| Schedule 2.24 | Health Care Matters |
| Schedule 2.25 | Affiliate Transactions |
| Schedule 2.26 | Powers of Attorney |
| Schedule 2.28 | Contracts Outside of Ordinary Course |
| Schedule 3.2 | No Conflict |
| Schedule 3.4 | Governmental Authorities/Consents |
| Schedule 6.3 | Employees |
| Schedule 7.1(g) | Third Party Consents |
| Schedule 10(a) | Assigned Contracts Designated by Purchaser |
| Schedule 10(b) | Permitted Liens |
| Schedule 10(c) | Products |
| Schedule 10(d) | Regulatory Approvals |

## List of Annexes

| | |
|---|---|
| Annex A-1 | Form of AI Note |
| Annex A-2 | Form of AIS Note |
| Annex A-3 | Form of Subordinated Note |
| Annex B | Agreement with Holders |
| Annex C | Form of Co-Existence Agreement |
| Annex D | Form of Opinion of Sellers Counsel |
| Annex E | Form of Escrow Agreement |
| Annex F | Form of Assumption Agreement |
| Annex G | Form of Bill of Sale |
| Annex H-1 | Form of Subsidiary Asset Purchase Agreement |
| Annex H-2 | Form of Germany Subsidiary Asset Purchase Agreement |
| Annex H-3 | Form of UK Subsidiary Asset Purchase Agreement |
| Annex I | Form of Non-Disclosure Agreement |
| Annex J | Form of Deposit Escrow Agreement |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into among AIRCAST INCORPORATED, a New Jersey corporation ("AI"), AIRCAST INTERNATIONAL SALES, L.L.C., a New Jersey limited liability company ("AIS") (each of AIS and AI a "Seller", and collectively, "Sellers"), and AI ASSET ACQUISITION COMPANY LLC, a Delaware limited liability company ("Purchaser"), as of this 31rst day of October, 2004.

### RECITALS:

WHEREAS, AI engages in the business of the manufacture, distribution and sale of medical devices for the functional management of joint injuries, fractures, and edema (the "AI Business");

WHEREAS, AIS engages in the business of the distribution and sale of medical devices for the functional management of joint injuries, fractures, and edema outside of the United States (the "AIS Business" and, together with the AI Business, the "Business");

WHEREAS, in certain countries outside of the United States, the AIS Business is conducted through the Subsidiaries (as such term is defined herein);

WHEREAS, upon the terms and subject to the conditions set forth herein and in the Subsidiary Asset Purchase Agreements (as such term is defined herein), Sellers desire to sell to Purchaser and the Affiliated Purchasers (as such term is defined herein) the Business as a going concern, and Purchaser and the Affiliated Purchasers desire to purchase from Sellers the Business as a going concern;

WHEREAS, in connection with the purchase and sale of the Business described above, the parties desire that, upon the terms and subject to the conditions set forth herein, Purchaser purchase the Sellers Assets (as such term is defined herein), upon the terms and subject to the conditions set forth herein, and assume the Sellers Assumed Liabilities (as such term is defined herein);

WHEREAS, in connection with the purchase and sale of the Business described above, the parties desire that AIS cause certain of the Subsidiaries to enter into the Subsidiary Asset Purchase Agreements with certain Affiliated Purchasers with respect to the purchase and sale of the Subsidiary Assets (as such term is defined herein) and the assumption by such Affiliated Purchasers of the Subsidiary Assumed Liabilities (as such term is defined herein);

WHEREAS, AI Holding Company LLC, a Delaware limited liability company and the sole owner of Purchaser, will make certain contingent payments to Sellers, if earned in accordance with the terms hereof, in order to induce Sellers to enter into this Agreement; and

WHEREAS, certain capitalized terms used herein have the meanings assigned to them in Article X.

### AGREEMENT:

In consideration of the mutual representations, warranties, covenants and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and subject to the conditions contained herein, the parties hereto agree as follows:

## ARTICLE I.
## PURCHASE AND SALE OF ASSETS

Section 1.1     Purchase and Sale of Assets. Upon the terms and subject to the conditions contained herein, at the Closing, Sellers will sell, convey, transfer, assign and deliver to Purchaser, and Purchaser will purchase from Sellers, all of the right, title and interest of each Seller in and to all of the properties and assets used or held for use in the operation of the Business as a going concern, other than the Excluded Assets (all such properties and assets referred to as the "Sellers Assets", and any properties and assets to be purchased by the Affiliated Purchasers pursuant to the Subsidiary Asset Purchase Agreements referred to as the "Subsidiary Assets", with the Sellers Assets and Subsidiary Assets being collectively referred to as the "Assets"), free and clear of all Liens (other than Permitted Liens), including each Seller's right, title and interest in and to the following:

(a)     all prepaid accounts, expenses and deposits relating to the Business, including those set forth on Schedule 1.1(a);

(b)     all computer software and systems (including data and related documentation) owned or used in connection with the Business, including maintenance agreements related thereto;

(c)     all right, title and interest of Sellers as lessee, sublessee, sublessor, licensee or occupant, with respect to the Leased Personal Property and Leased Real Property, except as set forth on Schedule 1.3(a)(ix);

(d)     all choses-in-action, rights under guarantees and warranties, rights of set-off, rights of recoupment, rights to indemnification, rights to refunds, rights of recovery and similar rights in favor of Sellers with respect to any Asset (but excluding any such rights which (i) relate exclusively to Excluded Liabilities or (ii) if they relate to both Assets or Assumed Liabilities and Excluded Liabilities and can be apportioned between Purchaser and Sellers, to the extent the same relate to Excluded Liabilities);

(e)     all claims under any insurance policies providing coverage relating to the Business to the extent Sellers or the Subsidiaries have not paid to a third party the cost of replacing, repairing or satisfying the underlying damage or claim that gave rise to such insurance claim;

(f)     all Permits, to the extent Transferable;

(g)     all rights with respect to unemployment, workers' compensation and other similar insurance and related funded reserves, in each case, relating to employees of Sellers who become employees of Purchaser or any Affiliated Purchaser;

(h)     all rights to telephone and facsimile numbers, including all ten-digit "800", "888" or similar numbers, used in the Business, as well as rights to receive mail and other communications addressed to Sellers or the Subsidiaries relating to the Business (including mail and communications from customers, advertisers, suppliers, distributors, agents and others and payments with respect to the Assets);

(i)     all rights under agreements with employees, consultants and independent contractors of Sellers or the Subsidiaries concerning non-competition, non-solicitation, confidentiality or ownership rights;

(j)     all internet addresses and Web URLs and associated assets used or held for use in connection with the Business to the extent Transferable;

(k)    all internet sites used or held for use in connection with the Business to the extent Transferable;

(l)    all machinery, equipment (both fixed and mobile, including computer equipment), replacement parts, maintenance stores, furniture, furnishings, fixtures, leasehold improvements, vehicles and other tangible personal property owned or used by any Seller or Subsidiary in the operation of the Business, including all such assets currently located at the facilities set forth on Schedule 1.1(l) (the "Machinery and Equipment");

(m)    all Transferred Real Property, which Transferred Real Property is listed and described on Schedule 2.12;

(n)    the Assigned Contracts;

(o)    the Marketing Materials;

(p)    all Intellectual Property, including the trademarks, design marks, patents and copyrights listed on Schedule 2.11; the goodwill associated therewith; all related continuations, continuations in part, divisionals, reissues, improvements, re-examinations, renewal or foreign counterparts; all copyrighted compilations and derivative works; trade secrets including confidential business information; and all rights thereunder, including all rights of enforcement and remedies for infringement and misappropriation under the Laws of all applicable jurisdictions, owned and used or held for use by any Seller or Subsidiary in the operation of the Business, except as set forth on Schedule 1.3(a)(ix) (the "Business Intellectual Property");

(q)    all items of inventory, including raw materials, work in process, finished goods, supplies, spare parts and other items of inventory and all shipping containers and other parts relating thereto held by any Seller or Subsidiary in connection with the operation of the Business;

(r)    the Acquired Accounts Receivable;

(s)    the names and marks "Aircast Incorporated" and "Aircast International Sales, L.L.C." and all other names and marks listed on Schedule 1.1(s), and all other rights associated therewith;

(t)    the goodwill generated by or associated with the Business;

(u)    all stationery, forms, labels, shipping materials, catalogs, brochures, art work, photographs, advertising materials and promotional materials used in the Business;

(v)    all books, data, records, manuals, ledgers, files, documents, correspondence, forms, and other materials and databases (in any form or medium) relating to the Business, including all books and records and materials maintained at the offices of Sellers and the Subsidiaries, advertising matter, product descriptions, price lists, Regulatory Files, correspondence, mailing lists, purchase orders, credit, collection and sales records, sales and promotional materials and records, purchasing materials and records, personnel records, market surveys and related materials, business procedures, accounting records, litigation files, correspondence files, studies, reports, lists, the personnel and wage records of retained employees and materials maintained for the Business;

(w)    all assets associated with each Employee Plan that is assumed by Purchaser pursuant to Section 1.2;

(x)    all other assets reflected on the balance sheet included in the 2004 Financial Statements other than those disposed of since June 30, 2004; and

(y)    all other assets of any nature whatsoever relating to the Business or the Assets other than the Excluded Assets.

Section 1.2    Assumed Liabilities.  Subject to and upon the terms and conditions set forth in this Agreement, as partial consideration for the Assets, Purchaser agrees to assume and pay, and discharge, perform or otherwise satisfy when due in accordance with the terms thereof, all Liabilities (including product liability) of the Sellers resulting from or arising out of the operations of the Business by the Sellers in the ordinary course, whether known or unknown, fixed or contingent, prior to the Closing (collectively, the "Sellers Assumed Liabilities", and all Liabilities of the Subsidiaries to be assumed by Affiliated Purchasers pursuant to the Subsidiary Asset Purchase Agreements referred to as the "Subsidiary Assumed Liabilities", with the Sellers Assumed Liabilities and Subsidiary Assumed Liabilities being collectively referred to as the "Assumed Liabilities"), except to the extent any such Liability constitutes an Excluded Liability, which Sellers Assumed Liabilities shall include the following:

(a)    the Assumed Accounts Payable, and all other Current Liabilities, as of the Closing Date, to the extent such Assumed Accounts Payable and other Current Liabilities are set forth on the Net Working Capital Schedule;

(b)    all Liabilities of Sellers arising under the Assigned Contracts, including the insurance policies listed on Schedule 2.22 and the employment agreements identified under the caption "Employment Agreements" in Schedule 2.10(a) (except as provided in Section 1.3(b)(x)); and

(c)    all Liabilities of Sellers to or in respect of any current or former employees of Sellers, and all Liabilities under or in respect of any Employee Plan, except as provided in Section 1.3 and Section 6.3.

No right of any Purchaser Indemnified Party under this Agreement (including any right of any Purchaser Indemnified Party for indemnification or any other remedy for breach of any of the representations, warranties, contracts or agreements of the Sellers or the Subsidiaries) shall be affected by the assumption by the Purchaser of the Sellers Assumed Liabilities or by the Affiliated Purchasers of the Subsidiary Assumed Liabilities.

Section 1.3    Excluded Assets and Excluded Liabilities.

(a)  -  The parties expressly acknowledge and agree that, notwithstanding the provisions of Section 1.1, the Assets as sold, conveyed, transferred, assigned and delivered to Purchaser under this Agreement shall not include, and Purchaser shall not purchase, the following assets, properties and rights of Sellers (collectively, the "Sellers Excluded Assets", and any properties and assets of the Subsidiaries not purchased by the Affiliated Purchasers pursuant to Section 1.3(a) of the respective Subsidiary Asset Purchase Agreements (or the comparable provision of any such agreement which deviates from the form of Subsidiary Asset Purchase Agreement annexed hereto) referred to as the "Subsidiary Excluded Assets", with the Sellers Excluded Assets and Subsidiary Excluded Assets being collectively referred to as the "Excluded Assets"):

(i)    all of each Seller's rights in and to all refunds of Taxes and other government charges arising in connection with the Taxes paid by Sellers or the Subsidiaries, other than such refunds relating to Assumed Liabilities;

(ii)     all of Sellers' right, title and interest in and to their respective corporate or other organizational minute books, stock or ownership ledger and other books and records pertaining to the organization, existence or capitalization of Sellers and the Subsidiaries, and corporate seals;

(iii)     any assets associated with each Employee Plan which is not assumed by Purchaser or any Affiliated Purchaser pursuant to Section 1.2(c) or the comparable provisions of any Subsidiary Asset Purchase Agreement;

(iv)     the assets of each Seller which are not used in connection with the Business and are set forth on Schedule 1.3(a)(iv);

(v)     all claims of Sellers under any insurance policies providing coverage relating to the Business (A) to the extent Sellers or the Subsidiaries have paid to a third party the cost of replacing, repairing or satisfying the underlying damage or claim that gave rise to such insurance claim or (B) to the extent the same relate to another Excluded Asset or an Excluded Liability;

(vi)     all shares of capital stock and/or other ownership or equity interest held by any Seller in the Subsidiaries (the "Subsidiary Interests");

(vii)     all cash, cash equivalents and marketable securities of Sellers on hand and in all bank and other accounts and lockboxes, including checks on hand or deposited;

(viii)     all off-the-shelf commercially available software that is not Transferable and is not, individually or in the aggregate, material to the Business;

(ix)     the assets set forth on Schedule 1.3(a)(ix), provided that (A) if Consent to the transfer of any such asset to Purchaser or an Affiliated Purchaser is obtained before the Closing, such asset shall be an Asset (and not an Excluded Asset) and (B) if such Consent is not obtained before the Closing, the inclusion of such asset in this Section 1.3(a)(ix) shall not preclude Purchaser or the Affiliated Purchasers from seeking to obtain such Consent after the Closing, and if such Consent is obtained after the Closing such asset shall be an Asset (and not an Excluded Asset) and Sellers shall, and shall cause the Subsidiaries to, cooperate with Purchaser to transfer such Asset to Purchaser or an Affiliated Purchaser;

(x)     all choses-in-action, rights under guarantees and warranties, rights of set-off, rights of recoupment, rights to indemnification, rights to refunds, rights of recovery and similar rights in favor of Sellers with respect to any Asset, but only to the extent the same are expressly excluded from the Assets under Section 1.1(d); and

(xi)     any asset listed on Schedule 1.3(a)(xi).

(b)     Notwithstanding anything else to the contrary contained in this Agreement or any of the Subsidiary Asset Purchase Agreements or other Acquisition Documents, neither Purchaser nor any Affiliated Purchaser shall assume any Liability of any of the Sellers ("Sellers Excluded Liabilities") or the Subsidiaries ("Subsidiary Excluded Liabilities") set forth or described in this Section 1.3(b), whether or not relating to the Assets or the Business (the Sellers Excluded Liabilities and the Subsidiary Excluded Liabilities shall be collectively referred to as the "Excluded Liabilities"):

(i)     any Liability resulting from or arising out of the Excluded Assets;

(ii)    any Liability resulting from or arising out of any operations of (A) Sellers outside of the ordinary course prior to the Closing or (B) Sellers or any of the Subsidiaries from and after the Closing;

(iii)    any Liability with respect to Income Taxes of any of the Sellers, Subsidiaries or Holders or other Taxes for which the Sellers or Subsidiaries are expressly responsible under the terms of this Agreement or the other Acquisition Documents;

(iv)    any Liability of any of the Sellers or the Subsidiaries for (A) knowing and intentional misappropriation of Intellectual Property or (B) breach or violation of any Law;

(v)    any Liability of the Sellers or Subsidiaries to (A) any other Seller or Subsidiary (other than any Liability of any Seller or Subsidiary to another Seller or Subsidiary to the extent that the rights of such latter Seller or Subsidiary with respect to such Liability are included in the Assets) or (B) any of the Holders or members of their Immediate Families or their respective Affiliates (for compensation, benefits or otherwise);

(vi)    any Liability of any of the Sellers or Subsidiaries under this Agreement or any other Acquisition Document;

(vii)    any Liability of any of the Sellers, Subsidiaries or Holders for expenses, Taxes or fees incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement, the other Acquisition Documents or the consummation (or preparation for the consummation) of the Transactions (including all attorneys' and accountants' fees, and brokerage fees incurred by or imposed upon any of the Sellers, Subsidiaries or Holders);

(viii)    any Liability of any of the Sellers or Subsidiaries for any Indebtedness;

(ix)    any Liability resulting from or arising out of any failure by any Seller or Subsidiary to fully and properly comply with any bulk sales or transfers Laws;

(x)    any Liability of any of the Sellers or Subsidiaries for retention or like payments to any current or former director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing) or employee of any of the Sellers or Subsidiaries or for severance or like payments to any current or former employee of any of the Sellers or Subsidiaries who do not become employees of the Purchaser or an Affiliated Purchaser as contemplated by Section 6.3(a);

(xi)    any Liability arising under the (A) Defined Benefit Plan, (B) Seller's 401(k) Plan, (C) any Employee Plan of any of the Sellers terminated prior to the date hereof or (D) any Employee Plan sponsored or maintained by any of the Subsidiaries (except to the extent expressly set forth in any of the Subsidiary Asset Purchase Agreements);

(xii)    any Liability (including any pension obligation) to Erich Albrecht, Beate Albrecht, Albrecht GmbH, their Immediate Family or Affiliates, including any Liability arising from or related to the Mutual Release by and between Aircast Europe GmbH and each of Erich Albrecht, Beate Albrecht and Albrecht GmbH, dated October 24 and 25, 2002, the Mutual Release by and among Sellers and Erich Albrecht, Beate Albrecht and Albrecht GmbH, which is undated, the Share Purchase and Transfer Deed between Erich Albrecht, Beate Albrecht, Albrecht GmbH and Sellers dated February 12 and 13, 2002 (deed of notary public Hans-Peter Ruth, deed no. R 258/2002 cd), the Disengagement Agreement by and among Sellers, Aircast Europe GmbH, Jim Johnson III, Beate Albrecht, Erich Albrecht

and Albrecht GmbH, dated September 15, 1999, the Cooperation Agreement by and among Sellers, Aircast Europe GmbH, Jim Johnson III, Beate Albrecht, Erich Albrecht and Albrecht GmbH dated June 25, 1998, or the transactions contemplated by such agreements;

(xiii)    any items identified as Excluded Liabilities in the Schedules to this Agreement;

(xiv)    any Environmental Claim associated with the Assets or the operation of the Business by any of the Sellers or Subsidiaries prior to the Closing, including any Liability resulting from or arising out of any Hazardous Substances present at, on, under, or originating from any of the Assets or otherwise associated with the operation of the Business prior to the Closing, regardless of whether such Environmental Claims or Hazardous Substances were known or unknown to any of the Sellers or Subsidiaries, or the Purchaser or the Affiliated Purchasers, at the time of Closing;

(xv)    any Liability of any of the Sellers or Subsidiaries to or with respect to The Aircast Foundation;

(xvi)    any Liability of any of the Subsidiaries, except to the extent expressly assumed by an Affiliated Purchaser pursuant to the terms of any Subsidiary Asset Purchase Agreement;

(xvii)    any Liability of any of the Sellers or Subsidiaries with respect to claims for indemnification, or reimbursement or advancement of expenses related to indemnification claims, by any of their respective directors, officers, limited liability company managers or managing directors (or functional equivalents of the foregoing), or employees or agents arising from or relating to any act or omission of such Persons prior to the Closing;

(xviii)    any Liability with respect to (A) any employment agreement (other than those assumed by Purchaser pursuant to Section 1.2(b) or by an Affiliated Purchaser pursuant to any Subsidiary Asset Purchase Agreement) or (B) any agreement, contract or other commitment of any of the Sellers or the Subsidiaries other than the Assigned Contracts; and

(xix)    any Liability for which insurance coverage is available under the insurance contracts and policies of Sellers and the Subsidiaries that can not or will not be assigned to Purchaser or an Affiliated Purchaser as of the Closing Date.

The Sellers hereby acknowledge that the Sellers or the Subsidiaries, as the case may be, are retaining all Excluded Liabilities.

Section 1.4    Purchase Price and Terms.

(a)    Upon the terms and subject to the conditions contained herein, as consideration for the Assets to be transferred to Purchaser pursuant to Section 1.1, at the Closing Purchaser shall (i) pay, in the aggregate, to Sellers, or their respective assigns, as allocated among Sellers in accordance with Schedule 1.4(a) hereto, an amount equal to (A) One Hundred Fifty Four Million Seven Hundred Fifty Thousand Dollars ($154,750,000) minus (B) the DLL Lease Payment Amount (the "Cash Purchase Price") and (ii) assume the Sellers Assumed Liabilities (such assumption, together with the Cash Purchase Price, as adjusted pursuant to Section 1.6, the contingent consideration, if any, payable pursuant to Section 1.8, the Subsidiary Cash Purchase Price and the assumption of the Subsidiary Assumed Liabilities pursuant to the Subsidiary Asset Purchase Agreements referred to as the "Purchase Price"). In addition, upon the terms and subject to the conditions contained herein and in the Subsidiary Asset Purchase Agreements, as consideration for the Assets to be transferred to the Affiliated Purchasers by the

Subsidiaries party thereto pursuant to such Subsidiary Asset Purchase Agreements, at the Closing Purchaser shall pay, in the aggregate, to Sellers, or their respective assigns, an amount equal to Twenty Million Dollars ($20,000,000) (the "Subsidiary Cash Purchase Price"), which shall be allocated among the respective Subsidiary Asset Purchase Agreements as provided in Schedule 1.4(a). If the laws applicable to any Subsidiary Asset Purchase Agreement require the purchase price thereunder to be paid directly by the Affiliated Purchaser party thereto or received directly by the Subsidiary party thereto, the amount of the Subsidiary Cash Purchase Price set forth on Schedule 1.4(a) with respect to such Subsidiary Asset Purchase Agreement shall be paid directly by such Affiliated Purchaser or to such Subsidiary in accordance with such Subsidiary Asset Purchase Agreement, and a corresponding reduction shall be made in the amount of the Subsidiary Cash Purchase Price to be paid by Purchaser to Sellers pursuant to the preceding sentence.

(b)    Payment of the Cash Purchase Price and, subject to the provisions of the last sentence of Section 1.4(a), the Subsidiary Cash Purchase Price shall be made as follows:

(i)    Thirty Million Dollars ($30,000,000) shall be paid in cash to Sellers at Closing by inter-bank transfer or wire transfer of immediately available funds to one or more bank account(s) designated by Sellers;

(ii)    Six Million Dollars ($6,000,000) shall be deposited into the Escrow Account at Closing by inter-bank transfer or wire transfer of immediately available funds, to be disbursed as provided in the Escrow Agreement;

(iii)    Fifteen Million Seven Hundred Fifty Thousand Dollars ($15,750,000), in the aggregate, shall be paid to AI and AIS, or their assigns, pursuant to a subordinated promissory note issued to each of them substantially in the form attached hereto as Annex A-3 (the "Subordinated Notes"), and Sellers shall deliver a notice to Purchaser at least three Business Days prior to the Closing stating the allocation of the Fifteen Million Seven Hundred Fifty Thousand Dollars ($15,750,000) between the two Subordinated Notes;

(iv)    88.56% of the balance of the Cash Purchase Price shall be paid to AI, or its assigns, pursuant to a promissory note substantially in the form attached hereto as Annex A-1 (the "AI Note"); and

(v)    11.44% of the balance of the Cash Purchase Price shall be paid to AIS, or its assigns, pursuant to a promissory note substantially in the form attached hereto as Annex A-2 (the "AIS Note" and, collectively with the AI Note and Subordinated Notes, the "Notes").

In addition, at the Closing, Purchaser shall, or shall cause the payor under the AI Note and the AIS Note to, deposit in cash an amount equal to the aggregate principal amount of the AI Note and the AIS Note into the Note Finance Escrow Account by inter-bank transfer or wire transfer of immediately available funds, to be disbursed as provided in the Deposit Escrow Agreement.

Section 1.5    Closing.

(a)    Upon the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place on the fifth (5) Business Day following the date on which all conditions to the obligations of the parties set forth in Article VII (other than those to be satisfied at Closing) are satisfied or waived, at the offices of Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New York, New York, or at such other time or place as Sellers and Purchaser may agree in writing (the day on which the Closing takes place being referred to herein as the "Closing Date").

The Closing shall be effective as of 9:00 a.m. Eastern Standard Time on the Closing Date. All proceedings to be taken and documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

(b)     Upon the terms and subject to the satisfaction or waiver by the appropriate party of the conditions set forth in Article VII, at the Closing each party hereto, as applicable, shall deliver all documents and take all actions applicable to such party as set forth in Article VII to be delivered or taken on or prior to the Closing Date.

Section 1.6     Net Working Capital Adjustment.

(a)     The Cash Purchase Price shall be subject to adjustment to the extent that Net Working Capital at Closing is less than Nine Million Eight Hundred Fifty Thousand Dollars ($9,850,000), in accordance with the provisions of this Section 1.6.

(b)     For purposes of this Agreement: "Net Working Capital" is defined as the difference determined by subtracting Current Liabilities assumed by Purchaser and the Affiliated Purchasers pursuant to this Agreement and all Subsidiary Asset Purchase Agreements from Current Assets purchased by Purchaser and the Affiliated Purchasers pursuant to this Agreement and all Subsidiary Asset Purchase Agreements without giving recognition to purchase accounting adjustments; "Current Assets" is defined as accounts receivable (net of the allowance for doubtful accounts), inventory (net of any related reserves), prepaid expenses and other current assets, excluding any inter-company or related party balances, Tax assets which are Excluded Assets pursuant to Section 1.3(a) and the insurance claims to be conveyed to Purchaser pursuant to Section 1.1(e) and, in each case, the comparable provisions of the Subsidiary Asset Purchase Agreements; and "Current Liabilities" is defined as accounts payable, accrued expenses and other current liabilities, excluding the current portion of long term debt, any inter-company or related party balances, the DLL Lease Payment Amount, current Tax Liabilities which are Excluded Liabilities pursuant to Section 1.3(b) and the insured losses subject to the insurance claims to be conveyed to Purchaser and the Affiliated Purchasers pursuant to Section 1.1(e) and, in each case, the comparable provisions of the Subsidiary Asset Purchase Agreements. Each line item that is used to calculate Net Working Capital shall have been calculated in accordance with U.S. GAAP.

(c)     Net Working Capital Report. Within sixty (60) calendar days after the Closing Date, Purchaser shall prepare and deliver (or cause to be prepared and delivered) to Sellers for review, a draft report of Purchaser's calculation of Net Working Capital at Closing, together with a reasonably detailed explanation of the calculation thereof. To the extent reasonably related to Purchaser's calculation of Net Working Capital at Closing, Sellers will provide to Purchaser and its accountants full access to the books and records of Sellers and the Subsidiaries.

(d)     Disputes. If Sellers shall disagree with the draft report of Purchaser's calculation of Net Working Capital at Closing delivered to Sellers pursuant to Section 1.6(c), they shall notify Purchaser of such disagreement in writing within twenty (20) calendar days after their receipt of such draft report of Purchaser's calculation of Net Working Capital at Closing, which notice shall set forth in detail the particulars of such disagreement. In the event that Sellers do not provide to Purchaser such a notice of disagreement within such twenty (20) day period, Sellers shall be deemed to have accepted the calculation of Net Working Capital at Closing delivered by Purchaser in its draft report pursuant to Section 1.6(c), which shall be final, binding and conclusive for all purposes hereunder. In the event any such notice of disagreement is timely provided by Sellers, Purchaser and Sellers shall use their reasonable efforts for a period of twenty (20) calendar days (or such longer period as Sellers and Purchaser may mutually agree upon) to resolve any disagreements with respect to Purchaser's calculation of Net

Working Capital at Closing. If, at the end of such period, Sellers and Purchaser are unable to resolve such disagreements, then Sellers and Purchaser shall submit the issues in dispute to KPMG, LLP (or such other independent accounting firm of recognized national standing as may be mutually selected by Sellers and Purchaser) (the "Auditor") to resolve any remaining disagreements. The parties hereto shall direct the Auditor to deliver its final written report within thirty (30) calendar days of the date on which such dispute is referred to the Auditor, based solely on written submissions forwarded by Purchaser and Sellers to the Auditor within ten (10) Business Days following the Auditor's selection. The fees and expenses of the Auditor shall be paid one-half by Purchaser and one-half by Sellers. The determination and resolution of the issues in dispute by the Auditor shall be final, conclusive and binding on the parties hereto. Within five (5) Business Days after receipt by Purchaser and Sellers of the Auditor's written report resolving such issues in dispute, any supplemental payments shall be made in accordance with Section 1.6(e). The final written report of Net Working Capital at Closing, whether determined by the parties or the Auditor, shall be deemed to be a schedule to this Agreement (the "Net Working Capital Schedule").

     (e)    Payment of Amount.

         (i)    If, as a result of the procedure set forth in Sections 1.6(c) and (d), Net Working Capital at Closing is determined to be less than Nine Million Eight Hundred Fifty Thousand Dollars ($9,850,000), then Sellers, or their respective assigns, shall promptly deliver to Purchaser an amount equal to the difference between Net Working Capital at Closing as determined in accordance with Sections 1.6(c) and (d), as applicable, and Nine Million Eight Hundred Fifty Thousand Dollars ($9,850,000).

         (ii)    To the extent Purchaser shall be entitled to payment under Section 1.6(e)(i), such amount shall be setoff against the principal of the Subordinated Notes in proportion to the relative principal amounts of the Subordinated Notes issued to AI and to AIS, and no interest on any such principal amount setoff shall be payable by Purchaser.

     Section 1.7    Allocation of the Purchase Price. Within sixty (60) calendar days after the Closing Date, Sellers shall prepare and deliver to Purchaser a proposed schedule (the "Allocation Schedule"), together with one or more IRS Forms 8594 prepared on the basis of such Allocation Schedule, allocating the Purchase Price and the purchase price provided in the Subsidiary Asset Purchase Agreements (including any adjustments thereto) among the Assets in the manner required by Section 1060 of the Code (the "Allocation"). Any subsequent adjustment to the Purchase Price, including any adjustment provided for in Sections 1.6 and 1.8, shall be reflected in an amended Allocation Schedule and one or more IRS Forms 8594 prepared and delivered by Sellers in the same manner as the initial Allocation Schedule described above. Within fifteen (15) calendar days after receipt of an Allocation Schedule, Purchaser shall notify Sellers in writing if it has any objections to the Allocation Schedule and IRS Forms 8594. If Purchaser does not so notify Sellers, Purchaser shall be deemed to have concurred with the Allocation Schedule and IRS Forms 8594. If Purchaser timely objects to the Allocation Schedule or any IRS Form 8594 as provided herein, Purchaser and Sellers shall endeavor to resolve such objection, and any such objection that is not resolved within thirty (30) Business Days of Sellers' receipt of Purchaser's objection shall be referred to the Auditor, whose resolution of the disputed issues shall be final and binding upon the Purchaser and Sellers. Sellers and Purchaser agree to use, and to cause their respective Affiliates to use, such Allocation for all relevant federal, state, local or foreign tax purposes, timely file one or more IRS Forms 8594 and any similar forms required under state, local or foreign law in accordance with the requirements of Section 1060 of the Code or such state, local or foreign law and the Allocation, and timely amend such forms in the case of any subsequent adjustments to the Purchase Price or the purchase price provided in any Subsidiary Asset Purchase Agreement, provided, however, that nothing contained herein shall prevent the Sellers, any Subsidiary, Purchaser or any Affiliated Purchaser from settling any proposed deficiency or adjustment by any Taxing authority that Sellers, any

Subsidiary, Purchaser or any Affiliated Purchaser, as the case may be, are otherwise entitled to settle under this Agreement, based upon or arising out of the Allocation, and neither of Sellers or any Subsidiary nor Purchaser or any Affiliated Purchaser shall be required to litigate before any court, any proposed deficiency or adjustment by any taxing authority challenging such Allocation.

      Section 1.8     Contingent Consideration.

        (a)     As further consideration for the Assets to be transferred to Purchaser pursuant to Section 1.1:

        (i)     in the event that the Net Sales of the Purchaser and the Affiliated Purchasers for the year ended December 31, 2005 (the "2005 Net Sales"), as finally determined in accordance with subsections (c) and (d) below, equals or exceeds Ninety Nine Million Seven Hundred Thousand Dollars ($99,700,000) (the "Target 2005 Net Sales"), AI Holding Company shall pay to the Sellers, or their respective assigns, Five Million Dollars ($5,000,000) (the "2005 Earnout Payment") by inter-bank transfer or wire transfer of immediately available funds to one or more bank account(s) designated jointly by AI and AIS, or their respective assigns, in writing, within five days of the final determination of 2005 Net Sales;

        (ii)     in the event that the Net Sales of the Purchaser and the Affiliated Purchasers for the year ended December 31, 2006 (the "2006 Net Sales"), as finally determined in accordance with subsections (c) and (d) below, equals or exceeds One Hundred Fourteen Million Dollars ($114,000,000) (the "Target 2006 Net Sales"), AI Holding Company shall pay to the Sellers, or their respective assigns, Five Million Dollars ($5,000,000) (the "2006 Earnout Payment") by inter-bank transfer or wire transfer of immediately available funds to one or more bank account(s) designated jointly by AI and AIS, or their respective assigns, in writing, within five days of the final determination of 2006 Net Sales;

        (iii)     in the event that the Net Sales of the Purchaser and the Affiliated Purchasers for the year ended December 31, 2007 (the "2007 Net Sales"), as finally determined in accordance with subsections (c) and (d) below, equals or exceeds One Hundred Twenty Nine Million Dollars ($129,000,000) (the "Target 2007 Net Sales"), AI Holding Company shall pay to the Sellers, or their respective assigns, Five Million Dollars ($5,000,000) (the "2007 Earnout Payment") by inter-bank transfer or wire transfer of immediately available funds to one or more bank account(s) designated jointly by AI and AIS, or their respective assigns, in writing, within five days of the final determination of 2007 Net Sales;

        (iv)     notwithstanding the failure of the 2006 Net Sales to meet or exceed the Target 2006 Net Sales, AI Holding Company shall pay to the Sellers, or their respective assigns, the 2006 Earnout Payment (contemporaneously with the 2007 Earnout Payment), if the sum of the 2006 Net Sales and the 2007 Net Sales equals or exceeds Two Hundred Forty Three Million Dollars ($243,000,000);

        (v)     in the event that any Earnout Payment is due and payable at a time when an event of default has occurred and is continuing under the Acquisition Debt Financing (as the same may be amended, restated, supplemented or otherwise modified from time to time, together with any debt financing obtained in lieu or in replacement thereof, the "Debt Financing"), such Earnout Payment shall not be paid until such time as no event of default under the Debt Financing exists and is continuing under the Debt Financing. Furthermore, to the extent that any Earnout Payment would result in an event of default under any Debt Financing, only the portion of such Earnout Payment that can be paid without resulting in such an event of default, if any, shall be paid at such time; provided that any Earnout Payment (or portion thereof) that is due and payable, but has not been paid as a result of the provisions of this

sentence, shall be paid at such time (in whole or in part) that such payment would not result in an event of default under the Debt Financing. Any unpaid amount in respect of a due and payable Earnout Payment shall accrue interest at the rate of 8.0% per annum from and including the date such Earnout Payment was due and payable to but excluding the date any such payment is made. Each such payment shall be accompanied by payment of any interest accrued thereon. Subject to the foregoing, the Debt Financing shall contain provisions which expressly permit Purchaser to distribute to AI Holding Company in any fiscal year an amount not to exceed fifty percent (50%) of Excess Cash Flow (to be defined in the Debt Financing), but without giving effect to any reductions of Excess Cash Flow as a result of voluntary prepayments of indebtedness, for the preceding fiscal year, which will be available to fund the Earnout Payments, and subject to the foregoing provisions of this Section 1.8(a)(v) Purchaser will make, and subject to such provisions AI Holding Company shall cause Purchaser to make, distributions to AI Holding Company from such Excess Cash Flow as may be necessary to enable AI Holding Company to make the payments contemplated by this Section 1.8.

       (vi)    upon the occurrence of any Change of Control, all outstanding Earnout Payments will accelerate unless the Net Sales of the Purchaser and the Affiliated Purchasers were less than Ninety Nine Million Dollars ($99,000,000) in the aggregate for the period of the last twelve (12) full calendar months ending prior to the occurrence of such Change in Control (the "Change of Control Period") (in which case the Earnout Payments shall remain subject to payment in accordance with the other terms of this Section 1.8). If a Change of Control occurs after December 31, 2006 and 2006 Net Sales do not exceed the Target 2006 Net Sales and the 2007 Earnout Payment is accelerated pursuant to this Section 1.8(a)(vi), then AI Holding Company shall pay to Sellers the 2007 Earnout Payment and the provisions of Section 1.8(a)(iv) shall no longer apply; provided, however, that Sellers may elect (which election shall be made by giving Purchaser notice to that effect within sixty (60) days after Purchaser provides to Sellers the calculation of Net Sales during the Change of Control Period contemplated by Section 1.8(c)) to waive the foregoing provisions of this Section 1.8(a)(vi) and retain the opportunity to earn both the 2006 Earnout Payment and 2007 Earnout Payment as contemplated by Sections 1.8(a)(iii) and (iv). Such Earnout Payments will be paid promptly after Net Sales is calculated with respect to such Change of Control (but in no event more than sixty (60) days after such Change of Control) if such Change of Control occurs on or before December 31, 2006 and promptly after Sellers make the election contemplated by the preceding sentence if such Change of Control occurs after December 31, 2006;

       (vii)    in the event that AI Holding Company shall fail pay when due any Earnout Payment payable pursuant to this Section 1.8 (other than by reason of the application of Section 1.8(a)(v)), AI Holding Company shall also pay to the Sellers, or their respective assigns, all reasonable out-of-pocket expenses (including reasonable attorneys fees and expenses) incurred by the Sellers, or their respective assigns, in enforcing payment of such Earnout Payment, together with interest on the amount of such Earnout Payment at the rate of 8.0% per annum from the date such Earnout Payment was due until the date such Earnout Period is paid (but not duplicative of interest provided in Section 1.8(a)(v)); and

       (viii)    except as provided in Section 1.8(a)(v) and Section 1.8(a)(vii), no interest shall be payable by Purchaser or AI Holding Company with respect to any Earnout Payment.

       (b)    As used in this Agreement, the following terms shall have the following meanings:

       (i)    "2005 Financial Statements" means the audited consolidated statements of income and an unaudited calculation of Net Sales of Purchaser and the Affiliated Purchasers, each for the twelve-month period ended December 31, 2005.

(ii)     "2006 Financial Statements" means the audited consolidated statements of income and an unaudited calculation of Net Sales of Purchaser and the Affiliated Purchasers, each for the twelve-month period ended December 31, 2006.

(iii)    "2007 Financial Statements" means the audited consolidated statements of income and an unaudited calculation of Net Sales of Purchaser and the Affiliated Purchasers, each for the twelve-month period ended December 31, 2007.

(iv)     "Earnout Audit Completion Date" means April 30th of the following year for any given Earnout Year.

(v)      "Earnout Determination Date" means the date thirty (30) days following the Earnout Audit Completion Date for any given Earnout Year.

(vi)     "Earnout Financial Statements" refers to each of the 2005 Financial Statements, 2006 Financial Statements and 2007 Financial Statements.

(vii)    "Earnout Payments" refers collectively to the 2005 Earnout Payment, the 2006 Earnout Payment and the 2007 Earnout Payment.

(viii)   "Earnout Years" refers to each of the 2005, 2006 and 2007 calendar years.

(c)      The Purchaser shall use commercially reasonable efforts to ensure that the Earnout Financial Statements for any given Earnout Year are completed by the Earnout Audit Completion Date for such Earnout Year. By the Earnout Determination Date for any given Earnout Year, the Purchaser shall, in good faith, calculate the Net Sales for any given Earnout Year in accordance with this Agreement and deliver to the Holders' Representative (as defined in Section 6 of the Agreement with Holders) a copy of the Earnout Financial Statements for the applicable Earnout Year. The Purchaser shall, in good faith, calculate the Net Sales for the Change of Control Period and use commercially reasonable efforts to provide such calculation within forty five (45) days but in no event more than sixty (60) days after a Change of Control. In the event of a Change of Control or if Purchaser and the Affiliated Purchasers consummate any acquisition of any business or any operating division, business unit or product line thereof (whether by merger, consolidation, recapitalization, acquisition of assets or otherwise) prior to December 31st of any given Earnout Year, the Net Sales for such Earnout Year or Change of Control Period shall be determined on a pro forma basis, which pro forma adjustments shall remove the effect of such Change of Control or acquisition(s) on the calculation of the actual Net Sales for such Earnout Year or Change of Control Period. Such pro forma adjustment shall be made by mutual agreement of the Purchaser and the Holders' Representative or, if they are unable to agree, any such disagreement shall be referred to the Auditor who shall finally determine the amount of any such pro forma adjustment in accordance with Section 1.8(d).

(d)      Upon delivery to the Holders' Representative of the calculation of the Net Sales for any given Earnout Year or Change of Control Period, Purchaser will (i) provide the Holders' Representative with reasonable access to the employees of the Purchaser and Affiliated Purchasers who assisted in preparation of the Earnout Financial Statements for such Earnout Year or the financial statements relevant to such Change of Control Period and the calculation of the Net Sales for such Earnout Year or Change of Control Period, as the case may be, (ii) provide the Holders' Representative with access to all of the records of the Purchaser and Affiliated Purchasers reasonably related to the calculation of the Net Sales for such Earnout Year or Change of Control Period and (iii) use commercially reasonable efforts to provide the Holders' Representative and his accountants access to the work papers of

the independent auditor of the Earnout Financial Statements for such Earnout Year, or relevant to such Change of Control Period, to the extent in each case that such access reasonably relates to the Holders' Representative's evaluation of the Earnout Financial Statements for such Earnout Year or Change of Control Period and the calculation of the Net Sales for such Earnout Year or Change of Control Period. Purchaser may condition such access upon delivery to it of a non-disclosure agreement in form and substance reasonably acceptable to the Holders' Representative. The Holders' Representative may dispute the calculation of the Net Sales for such Earnout Year or Change of Control Period or any element of the Earnout Financial Statements for such Earnout Year or the financial statements relevant to such Change of Control Period and relevant to the calculation of the Net Sales for such Earnout Year or Change of Control Period by notifying Purchaser of such disagreement in writing, setting forth in detail the particulars of such disagreement, within forty-five (45) calendar days after the Holders' Representative's receipt of the calculation of the Net Sales for such Earnout Year or Change of Control Period. In the event that the Holders' Representative does not provide such a notice of disagreement within such forty-five (45) calendar day period, the Holders' Representative shall be deemed to have accepted Purchaser's calculation of the Net Sales for such Earnout Year or Change of Control Period, which shall be final, binding and conclusive for all purposes hereunder. In the event any such notice of disagreement is timely provided, Purchaser and the Holders' Representative shall use their reasonable commercial efforts for a period of thirty (30) calendar days (or such longer period as they may mutually agree) to resolve any disagreements with respect to the calculation of the Net Sales for such Earnout Year or Change of Control Period. If, at the end of such period, they are unable to resolve such disagreements, then such dispute shall be referred to the Auditor which shall resolve any remaining disagreements. The Auditor shall determine as promptly as practicable, but in any event within thirty (30) calendar days of the date on which such dispute is referred to the Auditor, based solely on the written submissions forwarded by Purchaser and the Holders' Representative, whether and to what extent (if any) the Net Sales for such Earnout Year or Change of Control Period requires adjustment. The fees and expenses of the Auditor shall be paid one-half by the Purchaser and one-half by the Sellers. The determination of the Auditor shall be final, conclusive and binding on the parties.

Section 1.9    Agreement with Holders.  As of the date hereof, each of Glen W. Johnson III, Kristina M. Flanagan and Henry J. McVicker shall have duly executed and delivered to Purchaser the Agreement with Holders in the form attached hereto as Annex B.

Section 1.10    Nonassignability of Assets.  Notwithstanding anything to the contrary contained in this Agreement, to the extent that any of the Assets which Purchaser reasonably considers not material to the Business as a whole are non-assignable or non-transferable to Purchaser or an Affiliated Purchaser, or the assignment or transfer thereof to Purchaser or an Affiliated Purchaser is prohibited by any applicable Law or would require any Consent and such applicable Law shall not have been satisfied or such Consent shall not have been obtained, as the case may be, prior to the Closing, neither this Agreement nor any Subsidiary Asset Purchase Agreement shall constitute an assignment or transfer thereof if an attempted assignment or transfer thereof would (a) constitute a breach thereof or (b) create rights in others not desired by Purchaser. After the Closing, Purchaser may continue to seek to satisfy such applicable Law or obtain such Consents. Once such applicable Law is complied with or Consent is obtained for the assignment or transfer of any Asset not assigned or transferred at the Closing, Sellers shall, and shall cause the Subsidiaries to, cooperate with Purchaser to assign or transfer such Asset to Purchaser or an Affiliated Purchaser at no additional cost to Sellers or the Subsidiaries, provided such cooperation shall not require the Sellers or Subsidiaries to undertake any action to comply with such Law or obtain such Consent except reasonable administrative tasks requested by Purchaser.

Section 1.11    Subsidiary Asset Purchase Agreements.  As promptly as practicable after the execution and delivery of this Agreement, AIS shall cause Aircast Europe GmbH, a German limited liability company ("Aircast Germany"), to enter into a Subsidiary Asset Purchase Agreement in the form

attached hereto as Exhibit H-2, translated into German (the "Germany Subsidiary Asset Purchase Agreement") and Purchaser shall cause AI Acquisition Company GmbH, a German limited liability company ("Germany Acquisition Subsidiary"), to enter into the Germany Subsidiary Asset Purchase Agreement. By no later than the Closing Date: AIS shall cause Aircast L.P., a limited partnership registered in England and Wales ("Aircast LP,") and Aircast Limited, a company registered in England and Wales ("Aircast Limited" and, together with Aircast LP, "Aircast U.K."), to enter into a Subsidiary Asset Purchase Agreement in the form attached hereto as Exhibit H-3 (the "UK Subsidiary Asset Purchase Agreement") and Purchaser shall cause AI Acquisition Company UK, Ltd., a company registered in England and Wales ("UK Acquisition Subsidiary"), to enter into the UK Subsidiary Asset Purchase Agreement. As promptly as practicable following the date of this Agreement, AIS shall cause each of the Subsidiaries listed on Schedule 1.11 to enter into a separate agreement with the applicable Affiliated Purchaser listed on Schedule 1.11 and Purchaser shall cause each such Affiliated Purchaser to enter into such separate agreement, each such agreement to be substantially in the form of Annex H-1, with such modifications as are necessary or appropriate as a result of (a) differences in the businesses and Assets of each such Subsidiary and (b) differences in local law or customs which may require changes in order to maintain substantially the same legal meaning and effect under local law and custom as provided for with respect to the comparable provisions of this Agreement (such agreements, together with the Germany Subsidiary Asset Purchase Agreement and the UK Subsidiary Asset Purchase Agreement are, collectively, the "Subsidiary Asset Purchase Agreements"). Germany Acquisition Subsidiary and UK Acquisition Subsidiary, together with the Affiliated Purchasers listed on Schedule 1.11, are, collectively, the "Affiliated Purchasers".

## ARTICLE II.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As a material inducement to Purchaser to enter into and perform its obligations under this Agreement, each of the Sellers, jointly and severally, represents and warrants to Purchaser as set forth below:

Section 2.1    Corporate Organization and Authority of Sellers. Each Seller has been duly organized and is validly existing as a corporation or limited liability company, as the case may be, in good standing under the laws of the State of New Jersey, and has the corporate or limited liability company power and authority, as applicable, to conduct its business as it is now being conducted and to own or lease the properties and assets it now owns and to enter into this Agreement and the Acquisition Documents to which it is a party and to perform its obligations hereunder and thereunder. Each Seller is duly licensed or qualified and in good standing as a foreign entity in which the character and location of any property or assets owned or leased by such Seller or the character of its activities or business is such as to require it to be so licensed or qualified (each of which are set forth on Schedule 2.1), except where the failure to be so licensed or qualified would not, individually or in the aggregate, have a Material Adverse Effect or a material adverse effect on the consummation of the Transactions. The execution, delivery and performance by each Seller of the terms and conditions of this Agreement and the Acquisition Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by the Board of Directors of each Seller, and by all of the stockholders of AI and by all of the members of AIS, as applicable, and no other corporate or limited liability company proceeding or other action on the part of either Seller is necessary to authorize this Agreement, the Acquisition Documents or the transactions contemplated hereby and thereby, except that with respect to AI such authorization shall become effective twenty (20) days following the provision of notice to the non-voting stockholders of AI (the "Statutory Notice Period"), in accordance with N.J.S.A. Section 14A:5-6(2). This Agreement has been duly and validly executed and delivered by each Seller and, as of the Closing, the Acquisition Documents to which any Seller is a party will have been duly executed and delivered by each such Seller, as the case may be.

Upon expiration of the Statutory Notice Period, this Agreement shall constitute and, thereafter upon execution and delivery each Acquisition Document will constitute, a legally valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms.

Section 2.2    No Conflict. Except as set forth in Schedule 2.2, the execution and delivery by each Seller of this Agreement, the execution and delivery by each Seller and Subsidiary of each of the Acquisition Documents to which it is a party and the consummation of the Transactions do not and will not violate, conflict with, result in a breach of or result in a default under (or an event that, with notice or lapse of time or both, would constitute a default under) or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration under, or result in the creation of any Lien upon any of the properties or assets of any of the Sellers or Subsidiaries under any of the terms, conditions or provisions of (a) any Law applicable to any Seller or Subsidiary, the Business or the Assets, (b) the Fundamental Documents of any Seller or any Subsidiary, (c) or give any Governmental Authority the right to reverse, withdraw, suspend, repeal or modify, any Permit required for the operation of the Business as presently operated by Sellers and the Subsidiaries or (d) any (i) Significant Contract or (ii) any Assigned Contract or other contract, agreement, commitment, indenture or instrument to which any Seller or Subsidiary is a party or by which any Seller or Subsidiary may be bound which is not a Significant Contract, except in the case of the Assigned Contracts and other contracts, agreements, commitments, indentures and instruments referred to in this subclause (d)(ii) for such violations, conflicts, breaches, defaults and terminations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or a material adverse effect on the consummation of the Transactions.

Section 2.3    Subsidiaries. Set forth on Schedule 2.3 is a list of all Subsidiaries. Each Subsidiary has been duly organized and is validly existing and in good standing under the laws of the jurisdiction of its formation (to the extent such concept is recognized in such jurisdiction) and has the corporate, partnership, limited liability company or other organizational power and authority, as applicable, to own or lease its properties and assets, to conduct its business as it is now being conducted and to enter into the Acquisition Documents to which it is a party and to perform its obligations hereunder and thereunder. Sellers have previously provided to Purchaser copies of the organizational documents of each Subsidiary, and such copies are true, correct and complete. Each Subsidiary is duly licensed or qualified and in good standing (to the extent such concept is recognized in such jurisdiction) in each jurisdiction in which its ownership of property or assets or the character of its activities or business is such as to require such Subsidiary to be so licensed or qualified (each of which are set forth on Schedule 2.3), except where the failure to be so licensed or qualified would not, individually or in the aggregate, have a Material Adverse Effect or a material adverse effect on the consummation of the Transactions. The execution, delivery and performance by each Subsidiary of the terms and conditions of the Acquisition Documents to which it is a party and the consummation of the transactions contemplated thereby have been duly and validly authorized and approved by all necessary corporate or other actions of such Subsidiary and no other corporate proceeding or other action on the part of such Subsidiary is necessary to authorize the Acquisition Documents to which such Subsidiary is a party or the transactions contemplated thereby. As of the Closing, the Acquisition Documents to which any Subsidiary is a party will have been duly executed and delivered by each such Subsidiary, as the case may be. Upon execution and delivery each Acquisition Document to which such Subsidiary is a party will constitute a legally valid and binding obligation of such Subsidiary, enforceable against such Subsidiary in accordance with its terms. Except for shares of capital stock of, or ownership interests in, the Subsidiaries, the Sellers and Subsidiaries do not own of record or beneficially, any shares of capital stock or other ownership interest in any Person which (i) engages in the Business or (ii) holds any right, title or interest in any of the Assets. Except for the Subsidiaries entering into Subsidiary Asset Purchase Agreements, no Subsidiary holds any right, title or interest in or to any assets, properties, interests in properties or rights intended to

be conveyed by Sellers or the Subsidiaries to Purchasers or the Affiliated Purchasers hereunder or under the Subsidiary Asset Purchase Agreements.

Section 2.4    Financial Statements.  Attached as Schedule 2.4(a) are the (a) audited combined balance sheet of Sellers and the Subsidiaries at December 31, 2002, together with the related combined statements of income, stockholder's equity and cash flows of Sellers and the Subsidiaries for the twelve-month period ended December 31, 2002 and (b) the audited combined balance sheet of Sellers and the Subsidiaries at December 31, 2003, together with the related combined statements of income, stockholder's equity and cash flows of Sellers and the Subsidiaries for the twelve-month period ended December 31, 2003 (collectively, the "2002-2003 Financial Statements").  Attached as Schedule 2.4(b) are the unaudited combined balance sheets of Sellers and the Subsidiaries as of June 30, 2004 and unaudited combined statement of income of Sellers and the Subsidiaries for the six month period ending June 30, 2004 (collectively, the "2004 Financial Statements" and, together with the 2002-2003 Financial Statements, the "Financial Statements").  The 2002-2003 Financial Statements (i) have been prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP") consistently applied throughout the periods covered, (ii) fairly present the assets, liabilities, financial condition, results of operations, retained earnings and cash flows which they purport to present as of the dates thereof and for the periods indicated thereon, (iii) have been prepared in accordance with the books and records of Sellers and Subsidiaries (which are true and correct in all material respects), (iv) are true, correct and complete in all material respects, and (v) contain and reflect all necessary adjustments and accruals for a fair presentation of the financial condition, results of operations, retained earnings and cash flows of Sellers and Subsidiaries which the 2002-2003 Financial Statements purport to present as of the dates and for the periods indicated thereon.  Except as set forth in Schedule 2.4(b), the 2004 Financial Statements have been prepared in accordance with (i) the books and records of Sellers and Subsidiaries consistent with past practice and (ii) U.S. GAAP, excluding footnotes and year-end adjustments which, individually and in the aggregate, will not be material.

Section 2.5    Absence of Certain Changes.  Except as set forth on Schedule 2.5, since December 31, 2003, there has been no:

(a)    transaction entered into by any of the Sellers or the Subsidiaries, except in the ordinary course of business;

(b)    amendment or termination of (or receipt of notice of termination of) any material contract, agreement, commitment, lease, sublease or Permit to which any Seller or Subsidiary is a party, except in the ordinary course of business;

(c)    sale, lease or other disposition of, or mortgage, pledge or other encumbrance of, any material asset of any Seller or Subsidiary, except in the ordinary course of business;

(d)    capital expenditure by any Seller or Subsidiary (or series of related capital expenditures) involving more than $1,000,000 (or its equivalent), individually or in the aggregate;

(e)    creation, incurrence, assumption, or guarantee by Sellers or any Subsidiary of any Indebtedness other than trade payables incurred in the ordinary course of business;

(f)    loan to, or any other transaction with, any of the Sellers' or Subsidiaries' directors, officers, limited liability company managers or managing directors (or functional equivalents of the foregoing) or employees, independent contractors, consultants or equity holders, except for sales of Products to any such individual in the ordinary course of business;

(g)     change in any Seller's or Subsidiary's past practice with respect to the provision of services resulting in, or the incurrence of, liability for deferred revenues;

(h)     except as required by applicable Law, any Employee Plan or otherwise in the ordinary course of business (including, without limitation, for the benefit of any newly hired employees), increase by any Seller or Subsidiary of any bonuses, salaries or other compensation payable to any director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing) or employee;

(i)     except as required by applicable Law, any Employee Plan or otherwise in the ordinary course of business (including, without limitation, for the benefit of any newly hired employees), adoption of, or increase in the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement or other employee benefit plan for or with any employees of Sellers or Subsidiaries;

(j)     change in the accounting methods used by Sellers or Subsidiaries;

(k)     destruction of, damage to, or loss of any of the material assets or properties owned or used by any of the Sellers or Subsidiaries, or waiver or release of any right or other asset of material value to any of the Sellers or Subsidiaries;

(l)     change on or before the date of this Agreement in the Sellers' and Subsidiaries' business, operations, financial condition or results of operations, which could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; or

(m)     contract, agreement or commitment by any Seller or any Subsidiary to do any of the foregoing.

Section 2.6     Undisclosed Liabilities.  Except as set forth in Schedule 2.6, Sellers and the Subsidiaries have no Liabilities that (a) would be required to be reflected on an audited balance sheet prepared in accordance with U.S. GAAP or (b) individually or in the aggregate, have had or would reasonably be expected to have a Material Adverse Effect, except for Liabilities reflected or reserved against in the audited combined balance sheet of Sellers and the Subsidiaries at December 31, 2003 and Liabilities incurred in the ordinary course of business since December 31, 2003.

Section 2.7     Creditors; Bankruptcy; Etc.  Neither any Seller nor any Subsidiary is involved in any Proceeding by or against any Seller or any Subsidiary as a debtor in any court under Title 11 of the United States Bankruptcy Code or any other insolvency or debtors' relief act, whether foreign, state, local or federal, or for the appointment of a trustee, receiver, liquidator, assignee, sequestrator or other similar official of any Seller or any Subsidiary or for a substantial part of any Seller's or any Subsidiary's property.

Section 2.8     Customers.  Schedule 2.8 lists the twenty (20) largest customers (the "Customers") of Sellers and the Subsidiaries since December 31, 2003 through September 30, 2004. As of the close of business on the third Business Day preceding the Closing Date, and except as set forth on Schedule 2.8, since December 31, 2003 no Customer has canceled, otherwise terminated, or caused a material adverse change in, or made any written or oral threat to any Seller or Subsidiary or to any of their respective Affiliates that such Customer is committed to or plans to cancel, otherwise terminate or cause a material adverse change in, its relationship with the Sellers or Subsidiaries.

Section 2.9     Title to Assets.  Except with respect to the Transferred Real Property (as to which certain representations are made pursuant to Section 2.12) and Intellectual Property (as to which certain representations are made pursuant to Section 2.11), a Seller or one of the Subsidiaries owns and has good title to the Assets, which are reflected as owned by the particular Seller or Subsidiary on the books and records of such Seller or Subsidiary, free and clear of all Liens, other than (a) Permitted Liens and (b) Liens set forth on Schedule 2.9.  Except as set forth in Schedule 2.9, the Assets include all agreements, contracts and commitments and all assets, properties and interests in properties (real, personal and mixed, tangible and intangible) necessary to enable Purchaser and the Affiliated Purchasers to carry on the Business as presently conducted by Sellers and the Subsidiaries.

Section 2.10     Contracts; No Defaults.

(a)     Schedule 2.10(a) contains a list of all oral and written contracts, agreements and commitments to which any Seller or Subsidiary is a party and that are material to the operation of the Business (the "Significant Contracts"), including:

(i)     each contract, agreement or commitment providing for the performance of services or the delivery of goods and/or materials by or to any Seller or Subsidiary which provides for consideration to be furnished to or by such Seller or Subsidiary of value in excess of $100,000 in any twelve (12) month period;

(ii)     each lease, rental or occupancy agreement or contract involving aggregate payments in excess of $100,000 in any twelve (12) month period;

(iii)     each licensing or other agreement or contract granting any Seller or Subsidiary the right to use Intellectual Property that is material to the operation of the Business;

(iv)     each collective bargaining agreement with any labor union or other employee representative of a group of employees relating to wages, hours, and other conditions of employment;

(v)     each joint venture agreement, partnership agreement or limited liability company agreement;

(vi)     each agreement or contract that limits the right of any Seller or Subsidiary to compete in any industry or geographic area;

(vii)     each agreement or contract that obligates any Seller or Subsidiary to clean up or remediate any environmental contaminants;

(viii)     each agreement or contract relating to the acquisition or disposition by any Seller or Subsidiary of any business, or any operating division, business unit or product line thereof (whether by merger, consolidation, recapitalization, acquisition of assets or otherwise);

(ix)     each contract, agreement or commitment with any present or former employee, independent contractor who is a person or consultant who is a person or for the employment or retention of any person, including any such consultant or independent contractor, provided any such contract, agreement or commitment with any such independent contractor or consultant need only be set forth on Schedule 2.10(a) if it involves aggregate compensation in excess of $25,000 in any twelve (12) month period;

(x)     each contract, agreement or commitment for or relating to (A) any guaranty, direct or indirect, of any obligation for borrowings, advances, goods or services purchased, or otherwise, excluding endorsements made for collection in the ordinary course of business, or (B) any settlement or conciliation providing for payment or other consideration in excess of $25,000 with respect to any claim asserted by any Person; and

(xi)     each contract, agreement or commitment deemed material to the Business by any Key Manager.

(b)     True, correct and complete copies of the Significant Contracts referred to in Section 2.10(a)(i) to (xi), together with any amendment, supplement or modification thereof, have been delivered to or made available to Purchaser or its agents or representatives, and for each oral contract, agreement or commitment listed on Schedule 2.10(a), such Schedule 2.10(a) contains a reasonably complete description of the terms and conditions thereof. Except as set forth on Schedule 2.10(b), (i) the Significant Contracts referred to in Section 2.10(a)(i) to (xi) are in full force and effect, (ii) such Significant Contracts are valid and binding obligations of the Sellers and Subsidiaries party thereto, enforceable against any Seller or Subsidiary and, to the knowledge of Sellers, the other parties thereto, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights generally and subject to general principles of equity and (iii) no condition exists or event has occurred which, with notice or lapse of time or both, may conflict with or would constitute a breach, violation or default by any Seller or Subsidiary under any such Significant Contract, or, to the knowledge of Sellers, any other party thereto, or give any Seller, any Subsidiary or, to the knowledge of Sellers, any other party thereto the right to exercise a remedy under, or to accelerate the maturity or performance of, or to terminate or modify, any such Significant Contract, except where the occurrence of any such event or the existence of any such condition would not, individually or in the aggregate, have a Material Adverse Effect.

(c)     With respect to the Leases and Subleases, except as set forth in Schedule 2.10(c): (i) except for the Leases and the Subleases, there are no leases or other agreements, written or oral, to which a Seller or Subsidiary is a party, granting to any party or parties (other than a Seller or Subsidiary, as applicable) the right of use or occupancy of any parcel of real property; (ii) there are no parties (other than a Seller, Subsidiary or sublessee under a Sublease, as applicable) in possession or occupancy of the premises demised to a Seller or Subsidiary pursuant to the Leases (the "Leased Real Property"); (iii) no Seller or Subsidiary is obligated under any Lease for any leasehold improvements or reimbursement of any sum to any landlord with respect to any leasehold improvements; and (iv) Sellers and the Subsidiaries have not made any alterations, additions, modifications or improvements to any of the Leased Real Property that would reasonably be expected to require Sellers and the Subsidiaries to expend more than $100,000, individually or in the aggregate, to restore the Leased Real Property to its original condition at the end of its applicable Lease term.

Section 2.11     Intellectual Property.  Schedule 2.11 lists each patent, registered trademark, design mark, service mark and trade name, registered copyright and domain name, and each application for any of the foregoing, that is included in the Business Intellectual Property, other than those that constitute Excluded Assets. Except as set forth on Schedule 2.11, to the knowledge of Sellers, (a) Sellers and the Subsidiaries have all right, title and interest in and to the Business Intellectual Property, free and clear of all Liens, except for Permitted Liens; (b) there is no claim or notice of infringement of the Intellectual Property rights of any other Person pending or threatened in writing within the two (2) year period preceding the date hereof, against any Seller or Subsidiary relating to the operation of the Business, as currently conducted; (c) each material item of Business Intellectual Property is valid, subsisting, in full force and effect, has not been abandoned or passed into public domain, and all necessary registration, maintenance and renewal documentation and fees in connection with such

Business Intellectual Property have been timely filed with appropriate authorities and paid; (d) no person or entity is infringing or misappropriating the Business Intellectual Property except for such infringements or misappropriations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (e) except as set forth on Schedule 2.11, no present or former employee of any Seller or Subsidiary has any proprietary, financial or other interest, direct or indirect, in any material item of the Business Intellectual Property; and (f) Sellers and the Subsidiaries have taken reasonable precautions to protect trade secrets constituting material Business Intellectual Property, including the execution of appropriate agreements.

Section 2.12    Real Property.    Schedule 2.12 lists (a) all Transferred Real Property and (b) the address of all Transferred Real Property and Leased Real Property and the name of the landlord(s) or owner(s) named in the Leases. Except as set forth on Schedule 2.12, a Seller or Subsidiary has good and marketable fee simple title to each item of Transferred Real Property referenced in clause (a) above free and clear of all Liens, other than (x) Permitted Liens and (y) Liens constituting the Subleases. There are no parties (other than a Seller, Subsidiary or sublessee under a Sublease, as applicable) in possession or occupancy of the Transferred Real Property.

Section 2.13    Inventory.    The inventories of Sellers and Subsidiaries are of good, usable and merchantable quality. Such inventories include no items which are below customary quality control standards of Sellers' and Subsidiaries' industry and any applicable governmental quality control, or of a quality or quantity not usable or, in the case of finished goods, saleable in the ordinary course of business (it being understood that inventory not usable or saleable within one year constitutes obsolete inventory except for items purchased in connection with long-term contracts with existing customers). All of the finished Products included in inventory were produced or manufactured in accordance with the specifications for such Products as set forth in the applicable Regulatory Approval and substantially in compliance with applicable Law. The aggregate value of the inventory as reflected in the 2002-2003 Financial Statements has been written down on the books of account of Sellers and Subsidiaries to realizable market value or adequate reserves have been provided in accordance with U.S. GAAP, and reasonable and prudent practices in Sellers' and Subsidiaries' industry.

Section 2.14    Accounts Receivable and Payable.    Since December 31, 2003, each Seller and Subsidiary has collected its accounts receivable, and paid its accounts payable, in the ordinary course. All Acquired Accounts Receivable represent bona fide accounts receivable that arose in the ordinary course of business for goods delivered or services rendered or to be rendered and will not, except as otherwise reserved for, be subject to any actions, set-offs or counterclaims.

Section 2.15    Litigation and Proceedings.    Except as set forth on Schedule 2.15, there is no Proceeding (excluding for this purpose only any inquiry or investigation by a Governmental Authority) pending or, to the knowledge of Sellers, any inquiry or investigation by a Governmental Authority pending or any Proceeding threatened against any Seller or Subsidiary: (a) which seeks to enjoin any of the Sellers or Subsidiaries from consummating the Transactions or (b) which, if adversely determined to any Seller or Subsidiary, would have, individually or in the aggregate, a Material Adverse Effect. Except as set forth on Schedule 2.15, none of the Sellers or Subsidiaries is subject to any unsatisfied Order entered in any Proceeding. Schedule 2.15 sets forth a list of all Proceedings pending against or involving any Seller or Subsidiary or in respect of which a Seller or Subsidiary is plaintiff or complainant. All materials provided to Purchaser relating to the matters described in Schedule 2.15, to the knowledge of Sellers, are true and correct and do not omit any materials that are material to the matters described in Schedule 2.15.

Section 2.16    Employee Benefit Plans.

(a)    Schedule 2.16 sets forth a complete and accurate list of each (i) "employee pension benefit plan" as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (other than any plan exempt from ERISA by reason of Section 4(b)(4) of ERISA), (ii) "employee welfare benefit plan" as defined in Section 3(1) of ERISA (other than any plan exempt from ERISA by reason of Section 4(b)(4) of ERISA) ("Welfare Plan") and (iii) employment, consulting, severance or other similar agreement, contract, plan or program providing for payment in lieu of compensation, material deferred compensation, profit-sharing bonuses, stock options, stock appreciation rights, stock purchases or other forms of incentive compensation or post-retirement insurance, compensation or benefits, which covers any current or former Business Employee (each such agreement, contract, plan or program referred to in clauses (i), (ii) or (iii), an "Employee Plan"). Sellers and Subsidiaries have made available to Purchaser true, correct and complete copies of (w) each Employee Plan (or, if not written, a written summary of its material terms), including all plan documents, trust agreements, insurance contracts or other funding vehicles and all amendments thereto, (x) all summaries and summary plan descriptions, including any summary of material modifications in effect in the three most recent calendar years, (y) the most recent actuarial report and most recent other financial statements relating to each Employee Plan, if any, and (z) the most recent determination or opinion letter, if any, issued by the IRS or any comparable documentation issued by a Governmental Authority in any foreign jurisdiction with respect to any Employee Plan and any pending request for such a determination letter. Neither Sellers nor the Subsidiaries have made any commitment to create any additional material Employee Plan or to modify or change any existing Employee Plan in any material respect.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Employee Plan has been maintained in compliance with its terms and all provisions of ERISA, the Code, and any other Laws applicable thereto.

(c)    Each Employee Plan which is intended to be "qualified" within the meaning of Sections 401(a) and 501(a) of the Code has been determined by the IRS to be so qualified and has received a favorable determination letter from the IRS as to such qualification and each Seller knows of no facts which would reasonably be expected to indicate that the qualified status of each such Employee Plan or the tax exempt status of each trust created thereunder has been adversely affected. No Employee Plan is currently subject to any audit, inquiries, proceedings, or other investigation by the IRS, the Department of Labor, the Pension Benefit Guaranty Corporation (the "PBGC") or any other Governmental Authority nor subject to any law suits, complaints, claims or legal proceedings of any kind for which Sellers have received written notice and, to the knowledge of Sellers, no Employee Plan is currently subject to any audit, inquiries, proceedings, or other investigation by the IRS, the Department of Labor, the PBGC or any other Governmental Authority nor subject to any lawsuits, complaints, claims or legal proceedings of any kind for which Sellers have not received written notice.

(d)    No Employee Plan is a "multiemployer plan," as defined in Section 3(37) and Section 4001(a)(3) of ERISA. No Seller or Subsidiary has at any time within the last five years contributed, or been obligated to contribute, to any Employee Plans which are "multiemployer plans" (within the meaning of Sections 3(37) and 4001(a)(3) of ERISA) under Subtitle E of ERISA or maintains or has at any time within the last five years ever maintained a "multiple employer plan" within the meaning of Section 4063 or 4064 of ERISA. The Defined Benefit Plan is the only Employee Plan that is subject to Title IV of ERISA. No Seller or Subsidiary has incurred any liability to the PBGC other than for premiums not yet due and no event or condition exists which could reasonably be expected to result in liability to Purchaser or any Affiliated Purchaser under Title IV of ERISA including, without limitation, by virtue of any Seller or Subsidiary being considered a "single employer" with any other entity, within the meaning of Section 4001 of ERISA or Section 414 of the Code.

(e)     All contributions and premiums required to be made under the terms of any Employee Plan or by a plan maintained by an ERISA Affiliate or as required by applicable Law have been timely made.

(f)     No Seller, Subsidiary or ERISA Affiliate has engaged in a transaction with respect to any Welfare Plan that would reasonably be expected to subject Sellers to a material tax or penalty imposed by either Section 4975 of the Code or Section 502(i) of ERISA.

(g)     No Welfare Plan provides for continuing benefits or coverage for any participant or beneficiary or covered dependent or a participant after such participant's termination of employment, except to the extent required by applicable Law.

(h)     With respect to any Welfare Plan: (i) no such plans are "multiple employer welfare arrangements" within the meaning of Section 3(40) of ERISA and (ii) no such plan is a "voluntary employees' beneficiary association" within the meaning of Section 501(c)(9) of the Code or other funding arrangement for the provision of welfare benefits (such disclosure to include the amount of any such funding).

(i)     No Seller, Subsidiary or ERISA Affiliate is bound by any collective bargaining agreement or similar agreement to maintain or contribute to any Employee Plan.

(j)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or as set forth on <u>Schedule 2.16</u> or unless otherwise expressly provided in any Subsidiary Asset Purchase Agreement, each pension, retirement, health, life, disability, severance and other welfare plan which is exempt from ERISA by reason of Section 4(b)(4) thereof (a "<u>Foreign Plan</u>") is, and has been, established, registered for tax purposes (where required) with the applicable Governmental Authority, qualified, administered and funded (where required) in compliance with the terms thereof and all applicable Laws. With respect to each Foreign Plan, all required filings and reports have been made in a timely and complete manner with all Governmental Authorities. All obligations of any Seller or Subsidiary to or under the Foreign Plans (whether pursuant to the terms thereof or any applicable Laws) have been satisfied, and there are no outstanding material defaults or violations thereunder by any Seller or Subsidiary. Full payment has been made in a timely manner of all amounts which are required to be made as contributions, payments or premiums to or in respect of any Foreign Plan under applicable Law or under any Foreign Plan or any agreement relating to a Foreign Plan, and no material excise taxes, penalties or punitive fees are owing or assessable under any such Foreign Plan.

(k)     Unless otherwise expressly provided in any Subsidiary Asset Purchase Agreement, to the knowledge of Sellers, no event has occurred with respect to any Foreign Plan registered with an applicable taxing Governmental Authority which would reasonably be expected to result in the revocation of such registration of such Foreign Plan, or which would entitle any Governmental Authority (without the consent of the sponsor of such Foreign Plan) to wind up or terminate any such Foreign Plan, in whole or in part, or could otherwise reasonably be expected to have an adverse effect on the tax status of any such Foreign Plan.

(l)     No contribution holidays have been taken under any of the Foreign Plans, and there have been no withdrawals of assets or transfers of assets from any Foreign Plan, except in accordance with applicable Laws.

(m)     Unless otherwise expressly provided in any Subsidiary Asset Purchase Agreement, except as set forth in <u>Schedule 2.16</u>, neither the execution and delivery of this Agreement, any other Acquisition Document or other related agreements by any Seller or any Subsidiary nor the

consummation of the Transactions will reasonably be expected to: (i) entitle any employee, consultant, director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing) of Sellers or the Subsidiaries to severance pay, unemployment compensation or any other payment, or (ii) accelerate the time of payment or vesting other than as required by Law, or increase the amount of compensation due any such employee, consultant, director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing). Except as set forth in Schedule 2.16, within the twelve (12) month period preceding the date hereof, the Sellers and Subsidiaries have taken no action to entitle, and the Sellers and Subsidiaries do not owe, any employee, director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing) of any of the Sellers or Subsidiaries any severance pay or other compensation that has not been paid, will not be paid on or prior to the Closing Date, or will not have been properly recorded on the books and records of Sellers and Subsidiaries.

(n)     None of the Employee Plans provide for any post-retirement benefits or post-termination benefits to any current or former Business Employees for which any Seller or Subsidiary has any obligation to pay premiums on behalf of such Business Employees.

Section 2.17     Legal Compliance.

(a)     Except with respect to (i) matters set forth on Schedule 2.17, (ii) compliance with health care matters (as to which certain representations and warranties are made pursuant to Section 2.24) and (iii) compliance with Environmental Laws (as to which certain representations and warranties are made pursuant to Section 2.18), to the knowledge of Sellers, each Seller and Subsidiary, and the material Transferred Real Property, are in compliance with all Laws applicable thereto of Governmental Authorities having jurisdiction over Sellers and Subsidiaries or any of their respective Significant Contracts, properties or assets or directors, officers, limited liability company managers or managing directors (or functional equivalents of the foregoing) or employees (collectively, "Applicable Laws").

(b)     No Seller or Subsidiary has received any oral or written notice from any Governmental Authority regarding any actual, alleged or potential (i) violation of or failure to comply with any Applicable Law or the terms and conditions of any Permit by any Seller or Subsidiary or (ii) obligation on the part of any Seller or Subsidiary to undertake or bear all or any portion of the cost of any remedial action of any nature.

Section 2.18     Environmental Matters.  Except as set forth on Schedule 2.18, to the knowledge of Sellers: (a) each Seller and Subsidiary and the Transferred Property comply with all applicable Environmental Laws, except for failures to comply which, individually and in the aggregate, would not have a Material Adverse Effect; (b) each Seller and Subsidiary has obtained all Permits required for the Transferred Property by any applicable Environmental Law, and is currently in compliance with all of the terms, conditions and requirements of such Permits, a complete list of which is set forth in Schedule 2.18, except for failures to comply which, individually and in the aggregate, would not have a Material Adverse Effect, and there are no pending or threatened proceedings seeking to revoke, cancel or suspend any such Permit; (c) neither the Sellers nor any Subsidiary, nor any other Person, has caused, the Transferred Property is not adversely affected by, any Release, threatened Release or disposal of any Hazardous Material at the Transferred Property or originating or emanating from any other property; (d) there are no Hazardous Materials on, in or under the Transferred Property, whether contained in barrels, tanks, equipment (moveable or fixed) or other containers, deposited or located in land, waters, sumps or in any other part of the site, incorporated into any structure on the site, or otherwise existing thereon, except that which is in compliance with Environmental Laws and would not result in the imposition of liability against any Seller, Subsidiary, Purchaser or Affiliated Purchaser under Environmental Laws; (e) the Transferred Property does not contain and has not contained any:  (i)

underground storage tank, (ii) asbestos-containing building material, (iii) landfills or dumps, (iv) hazardous waste management facility as defined pursuant to RCRA or any comparable foreign, state or local Law or (v) site designated for any removal or cleanup activity pursuant to CERCLA or any comparable foreign, state or local Law; (f) neither the Sellers nor the Subsidiaries nor, to the knowledge of Sellers, any other Person, has used, stored or otherwise handled any Hazardous Materials, nor conducted any activities involving the use, handling, treatment, storage, transportation or disposal of any Hazardous Material, at the Transferred Property, including activities involving any sort of: (i) manufacturing, processing or refining; (ii) cleaning or degreasing of any equipment, machinery, part or component;`(iii) sale, storage or transport of Hazardous Materials; (iv) services which utilize Hazardous Materials; (v) drilling, mining or production of oil, gas, minerals or other naturally occurring products; or (vi) agricultural activities involving the use and storage of fertilizers or pesticides, except that which is in compliance with Environmental Laws and would not result in the imposition of Liability against any Seller, Subsidiary, Purchaser or Affiliated Purchaser under Environmental Laws; (g) the Sellers and Subsidiaries have no pending or contingent Liability, and have received no written notice, relating to any Environmental Claim concerning the Transferred Property, and there are no conditions or occurrences at the Transferred Property which could form the basis for an Environmental Claim against the Sellers, the Subsidiaries or the Transferred Property; (h) the Sellers or the Subsidiaries have not submitted to any governmental agency or other Person any notice, and are not required to give any such notice, regarding any Release on, under, or from the Transferred Property; (i) the Transferred Property is not subject to, and to the knowledge of Sellers there is no restriction on the ownership, occupancy, use or transferability of the Transferred Property in connection with, any (i) Environmental Law or (ii) Release, threatened Release, or disposal of a Hazardous Material; (j) there are no Environmental Claims against any Person whose Liabilities for environmental matters, or any violation of Environmental Laws, the Sellers or Subsidiaries have retained or assumed contractually or by operation of Law; (k) the Sellers have provided or otherwise made available to Purchaser all environmental audits, reports, and assessments concerning the Sellers, the Subsidiaries and Transferred Property which Sellers or the Subsidiaries possess, have custody of or control; and (l) all statements contained in Sellers' General Information Notices, Preliminary Assessment Reports, and applications for ISRA approval for the Transferred Property submitted by Sellers to the NJDEP for purposes of complying with ISRA are accurate and complete.

Section 2.19     Taxes. Except as set forth on Schedule 2.19:

(a)     All Tax Returns that are required to be filed with any Governmental Authority by any of the Sellers or Subsidiaries or with respect to their assets or the Business have been timely filed and were accurate and complete in all material respects. All Taxes due and payable by any Seller or Subsidiary or with respect to their assets or the Business (whether or not shown on any Tax Return) have been timely paid in full. Neither Seller nor any Subsidiary is currently the beneficiary of or has applied for any extension of time within which to file any Tax Return with respect to Taxes other than Income Taxes. There are no Liens with respect to Taxes on any of Sellers' or Subsidiaries' assets, other than Liens for Taxes not yet due and payable. No claim has ever been made by any Governmental Authority in a jurisdiction in which a Seller or Subsidiary does not file Tax Returns that such Seller or Subsidiary is or may be subject to Tax in that jurisdiction and, to the knowledge of Sellers, there is no basis on which a Governmental Authority could assert such a claim.

(b)     Each Seller and Subsidiary has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, partner, member or other third party, and has timely and properly completed and filed the Forms W-2 and 1099 or other information returns or reports required with respect thereto.

(c)     No dispute concerning any Tax Liability of a Seller or Subsidiary is pending or, to the knowledge of Sellers, threatened. No Tax proceedings by a Governmental Authority are pending or are being conducted with respect to any Seller or Subsidiary. With respect to Taxes for which the statute of limitations remains open, no Seller or Subsidiary has received from any foreign, federal, state or local Governmental Authority (i) any notice indicating an intent to open a Tax audit or other review, (ii) a request for information related to Tax matters, or (iii) any notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted or assessed against a Seller or Subsidiary or with respect to the assets of such Seller or Subsidiary or the Business, in each case other than with respect to an audit, review or examination that has been completed and closed and with respect to which Sellers and the Subsidiaries have paid all Taxes asserted or assessed by the Governmental Authority.

(d)     No Seller or Subsidiary has waived any statute of limitations in respect of Taxes (other than Income Taxes) or agreed to any extension of time with respect to a Tax assessment or deficiency of a Tax (other than an Income Tax).

(e)     Sellers have provided to Purchaser correct and complete copies of all Income, sales and use and VAT Tax Returns of Sellers and the Subsidiaries, and of all examination reports and statements of deficiencies assessed against or agreed to by any of Sellers or the Subsidiaries, for all Tax periods as to which the statute of limitations remains open.

(f)     No Seller or Subsidiary has ever obtained from a Governmental Authority a ruling with respect to Taxes. There is no pending request by any Seller or Subsidiary for a ruling by a Governmental Authority with respect to Taxes.

(g)     The unpaid Taxes (other than Income Taxes) of Sellers and the Subsidiaries did not, as of June 30, 2004, exceed the reserve for Liability for Taxes (other than Income Taxes) set forth on the face of the 2004 Financial Statements.

(h)     No Seller or Subsidiary has ever been required to make any material adjustment by the IRS pursuant to Code section 482 or to any similar adjustment by another Governmental Authority pursuant to any foreign Tax Law, and to the knowledge of Sellers, there is no basis on which the IRS or another Governmental Authority could make such an adjustment.

(i)     No Seller or Subsidiary is party to any Tax sharing agreement. No Seller or Subsidiary has any Liability for Taxes of any other Person as a transferee or successor, by contract or otherwise.

Section 2.20     Governmental Authorities; Consents. No consent, license, notice, waiver, expiration of waiting period, approval or authorization of, or designation, declaration or filing with, any Governmental Authority or other third party is required to be made or obtained on the part of any Seller or Subsidiary with respect to such Seller's or Subsidiary's execution, delivery and performance of this Agreement and any of the Acquisition Documents and the consummation of the Transactions, as applicable, except for (a) compliance with applicable requirements of the HSR Act, (b) expiration of the waiting period under Belgian tax statutes, (c) any novations or consents required in connection with Government Contracts or subcontracts thereunder, (d) the stockholders and members of each Seller, as applicable, which have already been obtained, and (e) as otherwise disclosed in Schedule 2.20.

Section 2.21     Licenses, Permits and Authorizations; Regulatory Approvals.

(a)     Schedule 2.21 hereto sets forth an accurate and complete list of all material Permits held by Sellers and Subsidiaries, copies of which have been provided to Purchaser. Except as

VA01/SCHIJ/54430.14                          26

disclosed on Schedule 2.21, all Permits listed on Schedule 2.21 are in full force and effect, and such Permits constitute all of the material Permits used or necessary to permit Sellers and the Subsidiaries to conduct the Business as currently conducted. Each Seller and Subsidiary is in compliance in all material respects with all terms and conditions of, and all of its obligations under, such Permits. To the knowledge of Sellers, there is no pending or threatened Proceeding or complaint against any Seller or Subsidiary that (a) questions or contests the validity of, or seeks the revocation, nonrenewal or suspension of, any Permit listed on Schedule 2.21, or (b) seeks the imposition of any condition, administrative sanction, modification or amendment with respect thereto, in each case, which might reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect. There is no fact that, to the knowledge of Sellers, would reasonably be expected to disqualify any Seller or Subsidiary from obtaining the approval of applicable Government Authorities, if any, to consummate the Transactions.

(b)  All of the Regulatory Approvals are current and in full force and effect and are owned exclusively by a Seller or Subsidiary. All required Regulatory Approvals have been obtained by a Seller or Subsidiary for each of the Products and all Regulatory Files have been properly maintained for each of the Products in material compliance with applicable Law. To the knowledge of Sellers, there is no Proceeding by any Governmental Authority pending or threatened seeking the recall of any Products or the revocation or suspension of any Regulatory Approval. Sellers have made available to Purchaser complete and correct copies of all Regulatory Approvals. There have been no past recalls involving the Products in the last three years.

Section 2.22  Insurance. Except as disclosed on Schedule 2.22, the Assets are covered by valid and currently effective insurance policies, or programs of self-insurance, of such types and amounts as are consistent with customary practices and standards of companies engaged in businesses similar to that of Sellers and the Subsidiaries. Schedule 2.22 sets forth an accurate and complete list of all insurance policies which cover the Assets, any properties, assets, directors, officers, limited liability company managers or managing directors (or functional equivalents of the foregoing) or employees of Sellers or the Subsidiaries, or of which any Seller or Subsidiary is a named insured or otherwise a beneficiary of coverage (the "Insurance Policies"), which Schedule 2.22 includes the following information: (a) the name of the insurer, (b) the period of coverage, (c) the scope of coverage and (d) the policy numbers. All premiums with respect thereto are currently paid and, to the knowledge of Sellers, Sellers and the Subsidiaries are in compliance in all material respects with the terms and conditions thereof. All pending Proceedings relating to the Assets or Assumed Liabilities which, to the knowledge of Sellers, are not covered by the Insurance Policies (other than as a result of applicable deductibles and retentions on such Insurance Policies) are identified on Schedule 2.22. Sellers or the Subsidiaries, as applicable, have given timely notice to the appropriate insurance carrier with respect to all Proceedings and other known claims that may be covered by insurance. Except as set forth on Schedule 2.22: (i) no material dispute with any insurance carrier exists with respect to the scope of any insurance coverage; (ii) Sellers and the Subsidiaries have not received any refusal of coverage or any notice that a defense will be afforded with reservation of rights; (iii) Sellers and the Subsidiaries have not received any notice of cancellation, termination or reduction in coverage or any other indication that any Insurance Policy is no longer in full force and effect or will not be renewed; (iv) to the knowledge of Sellers, within the two year period preceding the date of this Agreement none of the Sellers' or Subsidiaries' present or former insurance carriers is insolvent; and (v) to the knowledge of Sellers, no Insurance Policy has had aggregate claims equal to or exceeding 90% of the overall coverage limitations of such Insurance Policy.

Section 2.23  Labor Matters. Except as set forth on Schedule 2.23:

(a)  No Seller or Subsidiary is a party to any collective bargaining agreement.

(b)     There are no strikes, work stoppages, slowdowns or lockouts pending or, to the knowledge of the Sellers, threatened, which involve the employees of any Seller or Subsidiary.

(c)     There are no arbitrations or grievances pending against any Seller or Subsidiary.

(d)     To the knowledge of Sellers, there is no organizing activity involving the employees of any Seller or Subsidiary pending or threatened by any labor union or group of employees. There are no representation proceedings pending or, to the knowledge of Sellers, threatened before the National Labor Relations Board or its equivalent in any foreign jurisdiction which relate to the employees of any Seller or Subsidiary, and no labor organization or group of employees of any Seller or Subsidiary has made a pending demand for recognition by any such Seller or Subsidiary.

(e)     There are no unfair labor practice charges, grievances or complaints pending or, to the knowledge of Sellers, threatened against any Seller or Subsidiary by or on behalf of any employee of any Seller or Subsidiary.

(f)     To the knowledge of Sellers, the Sellers and Subsidiaries are in compliance with all applicable Laws regarding employment, including all federal, foreign, state and local fair employment practice Laws, wage and hour Laws, workplace safety Laws, and work leave Laws, including disability and family and medical leave Laws.

Section 2.24    Health Care Matters.

(a)     Except where the occurrence of any such event or existence of any such condition does not have, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the operations of the Sellers and the Subsidiaries are in compliance with all applicable Laws (including good manufacturing practices and good clinical practices) of the United States Food and Drug Administration (the "FDA") and all other Governmental Authorities having jurisdiction over their Products or operations, except as set forth on Schedule 2.24. To the knowledge of Sellers, there is no actual or threatened enforcement action concerning the Products or the operations of Sellers or the Subsidiaries by the FDA, or other Governmental Authorities which have jurisdiction over such Products or operations, including any fines, injunctions, civil or criminal penalties, recalls, seizures, detentions, investigations or suspensions, except as set forth on Schedule 2.24.

(b)     To the knowledge of Sellers, (i) all material reports, documents, claims and notices relating to the Products or operations of Sellers and the Subsidiaries required to be filed, maintained, or furnished to any applicable Governmental Authority by the Sellers or the Subsidiaries have been so filed, maintained or furnished and (ii) all such reports, documents, claims and notices were complete and correct in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing).

(c)     Sellers and the Subsidiaries have complied with, and not received notice of any pending investigation regarding activities prohibited under, federal, state or foreign criminal or civil health care Laws (including the federal Anti-Kickback statute, Stark law and federal False Claims Act and any comparable state or foreign Laws), or the regulations promulgated pursuant to such Laws. There is no civil, criminal, administrative, or other action, suit, demand, claim, hearing, notice of violation, proceeding, notice or demand pending, received or, to the knowledge of Sellers, threatened against Sellers or the Subsidiaries which would reasonably result in its exclusion from any third party payment program in which it participates.

Section 2.25     Affiliate Transactions.  Except as set forth in Schedule 2.25, and except for Indebtedness between any Seller and any Holder and services provided in their capacities as officers, directors, limited liability company managers or managing directors of the Seller or Subsidiaries, no director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing) of Sellers or the Subsidiaries nor any member of any such person's Immediate Family nor any Holder or Affiliate of any Holder or member of such Holder's Immediate Family is a party to any transaction with any Seller or Subsidiary relating to the Business, including without limitation, any contract, agreement or other arrangement (a) providing for the furnishing of services to or by, (b) providing for the rental of real or personal property to or from, or (c) otherwise requiring payments to or from any such person or any corporation, partnership, trust or other entity in which any such person has an interest as an equity holder, director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing), trustee, member or partner. Except as set forth in Schedule 2.25, and except for services provided by any employee of any Seller or Subsidiary in his or her capacity as an employee, all transactions between any Seller or Subsidiary and any employee of any Seller or Subsidiary who is not an officer, director, limited liability company manager, managing director (or functional equivalents of the foregoing) or equity holder of Sellers or the Subsidiaries were negotiated at arms length.

Section 2.26     Powers of Attorney.  Schedule 2.26 sets forth a true and complete list of the names of all Persons holding general or special powers of attorney from any of the Sellers and Subsidiaries and a summary of the terms thereof.

Section 2.27     Payments.  None of the Sellers or the Subsidiaries, nor to the knowledge of Sellers, any director, officer, limited liability company manager, managing director (or functional equivalents of the foregoing), or equity holder, agent, employee or other Person associated with or acting on behalf of any of the Sellers or the Subsidiaries, has used any entity funds for any unlawful contribution, gift, entertainment or expense relating to political activity, or made any direct or indirect unlawful payment to any foreign or domestic official or employee of a Governmental Authority from entity funds, or made any rebate, kickback or other unlawful payment.

Section 2.28     Contracts Outside of Ordinary Course.  Schedule 2.28 sets forth each contract, agreement, license, commitment, purchase and sale order, lease and sublease (of real or personal property) and other instrument to which any of the Sellers or Subsidiaries is a party or by which their assets are bound, which relate to the Business but which were not entered into in the ordinary course of business.

Section 2.29     Reliance.  The foregoing representations and warranties are made by Sellers with the knowledge and expectation that Purchaser is placing complete reliance thereon in entering into, and performing its obligations under, this Agreement, and the same shall not be affected in any respect whatsoever by any investigation conducted by or on behalf of Purchaser, whether in contemplation of or pursuant to this Agreement or otherwise.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As a material inducement to Sellers to enter into and perform their respective obligations under this Agreement, Purchaser represents and warrants to Sellers as set forth below:

Section 3.1     Corporate Organization and Authority of Purchaser.  Each of Purchaser and AI Holding Company LLC has been duly formed and is validly existing as a limited liability company in good standing under the laws of the State of Delaware, and has the limited liability company power and

authority to conduct its business as it is now being conducted and to own or lease the properties and assets it now owns and to enter into the Acquisition Documents to which it is a party and to perform its obligations thereunder. The execution, delivery and performance by each of Purchaser and AI Holding Company LLC of the terms and conditions of the Acquisition Documents to which it is a party and the consummation of the Transactions have been duly and validly authorized and approved by the Board of Directors of Purchaser and AI Holding Company LLC, and no other limited liability company proceeding or other action on the part of Purchaser or AI Holding Company LLC is necessary to authorize this Agreement, the Acquisition Documents or the Transactions. This Agreement has been duly and validly executed and delivered by Purchaser and, as of the Closing, the Acquisition Documents to which Purchaser is a party will have been duly executed and delivered by Purchaser. As of the Closing, the Acquisition Documents to which AI Holding Company LLC is a party will have been duly executed and delivered by AI Holding Company LLC. This Agreement constitutes and, upon execution and delivery each other Acquisition Document to which Purchaser is a party will constitute, a legally valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms. Upon execution and delivery, each Acquisition Document to which AI Holding Company LLC is a party will constitute a legally valid and binding obligation of AI Holding Company LLC, enforceable against AI Holding Company LLC in accordance with its terms.

Section 3.2     No Conflict. Except as set forth in Schedule 3.2, the execution and delivery by each of Purchaser and AI Holding Company LLC of each Acquisition Document to which it is a party and the consummation of the Transactions do not and will not violate, conflict with, result in a breach of or result in a default under (or an event that, with notice or lapse of time or both, would constitute a default under) (a) the provisions of any Law applicable to Purchaser or AI Holding Company LLC, (b) the provisions of the Fundamental Documents of Purchaser or AI Holding Company LLC, (c) subject to obtaining any Consents or complying with any other obligations set forth on Schedule 3.4, any agreement, indenture or instrument to which Purchaser or AI Holding Company LLC is a party or by which Purchaser or AI Holding Company LLC may be bound (or result in the termination or in a right of termination or cancellation of, or accelerate the performance required by, any contract, agreement, commitment, indenture or instrument to which Purchaser or AI Holding Company LLC is a party) or (d) any Order applicable to Purchaser or AI Holding Company LLC.

Section 3.3     Litigation and Proceedings. There is no Proceeding pending or, to the knowledge of Purchaser, threatened against or involving Purchaser which would impair the ability of Purchaser to consummate the Transactions.

Section 3.4     Governmental Authorities; Consents. No consent, license, notice, waiver, expiration of waiting period, approval or authorization of, or designation, declaration or filing with, any Governmental Authority or other third party is required to be made or obtained on the part of Purchaser with respect to Purchaser's execution, delivery and performance of this Agreement and any of the Acquisition Documents and the consummation of the Transactions, as applicable, except for (a) compliance with applicable requirements of the HSR Act, (b) any novations or consents required in connection with Government Contracts or subcontracts thereunder and (c) as otherwise disclosed in Schedule 3.4.

Section 3.5     Financial Ability.

(a)     Subject to the satisfaction of the conditions set forth in Section 7.1(n), Purchaser will have at the Closing the financial resources necessary to pay the amounts required to be paid by it at Closing. Purchaser has a reasonable expectation that AI Holding Company will have the financial resources necessary to make the Earnout Payments, if required, when due in accordance with Section 1.8

and to make all principal and interest payments when due in accordance with the terms and conditions of the Subordinated Notes.

(b)     Purchaser has delivered to Sellers true, complete and correct copies of the debt commitment letter and the fee letter (together, the "Debt Commitment Letter"), each from Credit Suisse First Boston, Wachovia Bank, National Association and Wachovia Capital Markets, L.L.C., dated October 27, 2004, pursuant to which such entities have advised Purchaser that they have committed, upon the terms and subject to the conditions set forth in the Debt Commitment Letter, to provide up to an aggregate of $85 million in debt financing in connection with the transactions contemplated by this Agreement.

(c)     Purchaser has delivered to Sellers a true, complete and correct copy of the equity commitment letter (the "Equity Commitment Letter" and, together with the Debt Commitment Letter, the "Commitment Letters"), from Thomas Weisel Capital Partners, L.P., dated October 31, 2004, pursuant to which such entity has advised Purchaser that it has committed, upon the terms and subject to the conditions set forth in the Equity Commitment Letter, to provide up to an aggregate of $90 million in equity financing in connection with the transactions contemplated by this Agreement. The Equity Commitment Letter names the Sellers as express third party beneficiaries of the rights of the Purchaser thereunder.

(d)     As of the date hereof, the Commitment Letters are in full force and effect, and have not been withdrawn or terminated or otherwise amended or modified in any respect, and Purchaser has no reason to believe that the financing transactions contemplated by the Commitment Letters will not be consummated in accordance with their respective terms (the "Acquisition Financing"). As of the date hereof, Purchaser is not a party to any agreement other than the Commitment Letters with respect to the Acquisition Financing.

Section 3.6     Tax Matters.

(a)     As of the Closing Date and on each day that the AI Note and the AIS Note remain outstanding, for federal income tax purposes: (i) Purchaser is disregarded as an entity separate from its owner as set forth in Treasury Regulation Section 301.7701-3(b)(ii); and (ii) AI Finance Holding Company, Inc. is treated as the owner of the assets that are held by Purchaser.

(b)     As of the Closing Date, for federal income tax purposes: (i) AI Holding Company is disregarded as an entity separate from its owner as set froth in Treasury Regulation Section 301.7701-3(b)(ii); (ii) AI Finance Holding Company, Inc. is treated as the owner of the assets that are held by AI Holding Company; and (iii) none of Purchaser, AI Holding Company or AI Finance Holding Company, Inc. has an intention to take any action or fail to take any action that would cause Purchaser or AI Holding Company not to be disregarded as an entity separate from its owner as set forth in Treasury Regulation Section 301.7701-3(b)(ii) or cause AI Finance Holding Company, Inc. not to be treated as the owner of the assets that are held by Purchaser and AI Holding Company for federal income tax purposes.

Section 3.7     Reliance. The foregoing representations and warranties are made by Purchaser with the knowledge and expectation that Sellers are placing complete reliance therein in entering into, and performing their obligations under, this Agreement, and the same shall not be affected in any respect whatsoever by any investigation conducted by or on behalf of Sellers, whether in contemplation of or pursuant to this Agreement or otherwise.

## ARTICLE IV.
## COVENANTS AND AGREEMENTS OF SELLERS

Section 4.1     Conduct of Business.  From the date hereof through the Closing, each Seller shall, and AIS shall cause each Subsidiary to, except as otherwise expressly permitted by this Agreement or as expressly consented to by Purchaser in writing (which consent shall not be unreasonably withheld), operate its business in the ordinary course and not take any action inconsistent with this Agreement or the Subsidiary Asset Purchase Agreements.  Without limiting the generality of the foregoing, unless expressly consented to in writing by Purchaser (which consent shall not be unreasonably withheld), each Seller shall, and AIS shall cause each Subsidiary to:

        (a)     not enter into any material contract, agreement or commitment (or series of related material contracts, agreements or commitments), or extend, modify, terminate or renew any Significant Contract, except in the ordinary course of business;

        (b)     not sell, assign, transfer, convey, lease, encumber or otherwise dispose of any Assets, except inventory in the ordinary course of business;

        (c)     not permit any Lien to encumber any of the Assets, or otherwise subject any of the Assets to any Lien, other than (i) Permitted Liens or (ii) any Lien removed at or prior to Closing;

        (d)     not waive or relinquish any material right or claim, other than in the ordinary course of business;

        (e)     maintain the Assets in good operating condition and repair consistent with past practice;

        (f)     pay accounts payable and other obligations and Liabilities when they become due and payable in the ordinary course of business;

        (g)     not take any action, or fail to take any action permitted by this Agreement or the Subsidiary Asset Purchase Agreements, which action or omission would result in a breach of any of the representations and warranties of Sellers set forth in Article II or of the Subsidiaries under any of the Subsidiary Asset Purchase Agreements;

        (h)     not issue, grant, sell or encumber any equity interest or any right relating thereto or make any other changes in the equity capital structure of the Subsidiaries;

        (i)     not acquire or agree to acquire by merging or consolidating with, or by purchasing any material portion of the capital stock or assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof;

        (j)     not hire any new management employees, enter into any employment contract or collective bargaining agreement, written or oral, or modify the terms of any existing such contract or agreement, provided, however, that this provision shall not prevent the Sellers or Subsidiaries from hiring a new managing director of Aircast SCS;

        (k)     except as required by applicable Law, any Employee Plan or otherwise in the ordinary course of business, not grant any increase in the base compensation of any director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing) or employee;

(l)    except as required by applicable Law, any Employee Plan or otherwise in the ordinary course of business, not adopt, amend, modify or terminate any bonus, profit-sharing, incentive, severance or other plan, contract or commitment for the benefit of any director, officer, limited liability company manager, managing director (or functional equivalents of the foregoing) or employee;

(m)    not enter into any new transaction with any director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing) or Affiliate (or any director, officer, limited liability company manager or managing director (or functional equivalents of the foregoing) of such Affiliate) or any member of the Immediate Family of any such Person, except for sales of Products to any such individual in the ordinary course of business;

(n)    not in any manner take or cause to be taken any action which is designed or intended or would reasonably be anticipated to have the effect of discouraging customers, employees, consultants, suppliers, lessors and other associates of Sellers and Subsidiaries from maintaining the same business relationships with Purchaser and the Affiliated Purchasers after the Closing Date as were maintained with Sellers and Subsidiaries prior to the date of this Agreement;

(o)    not enter into any material lease, license or easement of real property or terminate, renew, extend or amend any Lease or Sublease;

(p)    not make any change in any method of accounting or accounting principles, practices or policies, other than those required by U.S. GAAP;

(q)    not cancel any debts owed to or claims held by it, other than in the ordinary course of business;

(r)    not discontinue any product, implement any new product or service or make any other fundamental change in the Business or the operations of Sellers and Subsidiaries;

(s)    prepare and file on or before the due date therefor all Tax Returns required to be filed by the Sellers and Subsidiaries on or before the Closing Date, and pay all Taxes (including estimated Taxes) due on such Tax Return or which are otherwise required to be paid at any time prior to or during such period;

(t)    not prepare or file any Tax Return relating to Taxes, other than Income Taxes, for any Seller or Subsidiary inconsistent in any material respect with past practice or, on any such Tax Return, take any position that is inconsistent in any material respect with positions taken on prior Tax Returns unless required by Law, and not consent to the waiver or extension of any limitation period with respect to a claim for Taxes (other than Income Taxes) or settle any audit or other Proceeding relating to Taxes (other than Income Taxes) payable by or relating to any Seller or Subsidiary; and

(u)    not enter into any contract, agreement or commitment, or otherwise become obligated, to do any action prohibited hereunder.

Section 4.2    Inspection.  Sellers shall, and AIS shall cause the Subsidiaries to, afford to Purchaser and its existing and potential financing sources, and its and their respective accountants, counsel and other representatives (such financing sources, counsel, accountants and representatives, collectively the "Purchaser's Representatives") reasonable access, during normal business hours, to the customers and suppliers, properties, books, records, files, papers, contracts, commitments, Tax Returns, and appropriate directors, officers, limited liability company managers and managing directors (or functional equivalents of the foregoing) and employees of Sellers and the Subsidiaries, and shall furnish

Purchaser and the Purchaser's Representatives with all financial and operating data and other information concerning the affairs of Sellers and the Subsidiaries as Purchaser and the Purchaser's Representatives may reasonably request. Prior to the Closing, all information disclosed by or on behalf of the Sellers or the Subsidiary to any of such recipients which is confidential and not in the public domain shall be held confidential by such recipients.

       Section 4.3     No Solicitations.

       (a)     From the date hereof through the Closing Date (the "Exclusivity Period"), Sellers shall, and shall cause their respective Affiliates and each of their directors, officers, limited liability company managers, managing directors (or functional equivalents of the foregoing), members, partners, employees, equity holders, agents and representatives (collectively, the "Sellers Representatives") to, immediately halt any discussions with any Person regarding the following transactions (other than transactions in the ordinary course or not involving the Assets or the Business): (i) the acquisition or pledge of any substantial equity interest in, or control of, any Seller or Subsidiary, whether by way of a merger, consolidation, tender offer, share exchange or other transaction, (ii) the acquisition or pledge of any Assets, (iii) a public or private offering of securities, recapitalization or other transaction involving a material adjustment to any Seller's or Subsidiary's outstanding equity securities or indebtedness for money borrowed (other than transfers by a stockholder or member for (x) tax planning purposes or (y) estate planning purposes to family members of such stockholder or member or trusts for the benefit of such Persons) or (iv) any other joint venture, consolidation or other transaction involving the sale or other disposition of all or any substantial portion of the Business (any of the foregoing, an "Alternative Transaction"), except to advise such Persons that a prospective investor has been granted the exclusive right to negotiate concerning a proposed transaction and has entered into this Agreement with Sellers (without identifying Purchaser) and that Sellers and the Sellers' Representatives are legally bound to a "quiet period" covering any transaction.

       (b)     During the Exclusivity Period, Sellers shall not, and shall cause the Subsidiaries and Sellers Representatives not to, enter into any Alternative Transaction or, directly or indirectly, solicit, facilitate or encourage the submission of any proposal or offer from any Person or engage in any discussions with or provide information to any Person concerning an Alternative Transaction.

       (c)     Sellers shall notify Purchaser promptly after their receipt of any offer, proposal or inquiry by any Person with respect to any Alternative Transaction, and promptly after the date hereof Sellers shall notify Purchaser of any offer, proposal or inquiry by any Person with respect to any Alternative Transaction received prior to the date hereof; provided, however, the obligation set forth in this Section 4.3 shall only apply to (i) written offers, proposals and inquiries (including for this purpose any electronic transmission) and (ii) oral offers, proposals and inquiries received by a member of each Seller's Board of Directors, a stockholder or member of Sellers, Mr. Tom Crowley or the Chief Executive Officer, President or Chief Operating Officer of either Seller. In addition, Sellers shall furnish to Purchaser the material terms of each such offer, proposal or inquiry.

       Section 4.4     Maintenance of Insurance. Between the date hereof and the Closing Date, each Seller shall maintain, and shall cause each Subsidiary to maintain, in full force and effect the Insurance Policies to which it is a party. Each Seller and Subsidiary shall also cooperate with and assist Purchaser in (a) obtaining, at Purchaser's sole cost and expense, title insurance policies with respect to the Transferred Real Property and (b) assuming any property or liability insurance policies of Sellers or the Subsidiaries that Purchaser, in its sole discretion, desires to assume.

       Section 4.5     Monthly Operating Reports. From the date hereof through the Closing Date, Sellers shall use reasonable efforts (taking into account all other obligations of Sellers' personnel

responsible for generating the Monthly Operating Reports) to provide to Purchaser a Monthly Operating Report within fifteen (15) calendar days after the end of any applicable month.

Section 4.6    Changes of Name.  Prior to the Closing, Sellers shall, and shall cause the Subsidiaries to, take all actions and prepare all documentation necessary to change their names to different names that are not derivative of their existing names or any other trade names constituting part of the Assets or presently used in the Business.

Section 4.7    Power of Attorney; Right of Endorsement; Etc.  Effective as of the Closing, Sellers hereby constitute and appoint the Purchaser and its successors and assigns the true and lawful attorney of Sellers with full power of substitution, in the name of Purchaser or the name of Sellers, (a) to endorse for Sellers, without recourse (as such concept is contemplated for uniform commercial code purposes), checks, notes and other instruments in connection with the Business or attributable to the Assets, (b) to negotiate, execute and deliver Consents for the transfer of Assets and assets set forth on Schedule 1.3(a)(ix) requiring a Consent, but which Consent has not been obtained as of the Closing (provided Purchaser shall not have authority to obligate Sellers to pay or incur any expense or Liability in order to obtain any such Consent) and (c) to the extent not otherwise provided for in Article IX, to institute and prosecute all Proceedings which Purchaser may deem proper in order to collect, assert or enforce any claim, right or title in or to the Assets in favor of Purchaser.  Sellers agree that the foregoing powers are coupled with an interest and shall be irrevocable by Sellers directly or indirectly by the dissolution of Sellers or in any other manner.  Nothing in this Section 4.7 is intended to, nor shall this Section 4.7 be interpreted to, modify the respective rights, powers and obligations of the Purchaser and Sellers under the other provisions of this Agreement.

Section 4.8    Transition Assistance.  During the 120 day period after the Closing Date: (a) Sellers shall promptly forward to Purchaser copies of any communications or other information received by Sellers or the Subsidiaries in respect of any Acquired Accounts Receivable or Assumed Accounts Payable; (b) any amounts received by Sellers or the Subsidiaries in respect of any Acquired Accounts Receivable shall be held in trust for Purchaser or the Affiliated Purchasers, as applicable and promptly paid over to Purchaser; (c) Sellers shall, and shall cause the Subsidiaries to, as promptly as practicable, forward to Purchaser any telephone calls, orders, notices, requests, inquiries and other communications relating to the Business that Sellers or the Subsidiaries may receive following the Closing; and (d) Sellers shall, and shall cause the Subsidiaries to, cooperate in an orderly transfer of the Business to Purchaser and the Affiliated Purchasers.

## ARTICLE V.
## COVENANTS AND AGREEMENTS OF PURCHASER

Section 5.1    Co-Existence Agreement.  Effective as of the Closing, Purchaser shall enter into a co-existence agreement with The Aircast Foundation substantially in the form attached hereto as Annex C (the "Co-Existence Agreement").

Section 5.2    Acquisition Financing.

(a)    Subject to the terms and conditions of the Commitment Letters, Purchaser will use commercially reasonable efforts to consummate the Acquisition Financing as promptly as reasonably practicable after the date hereof, or to obtain alternative financing in an amount sufficient to pay the amounts required to be paid by Purchaser at Closing and to make all principal payments when due in accordance with the terms and conditions of the AI Note and the AIS Note; provided, however, that this Section 5.2(a) shall not require Purchaser to seek to obtain or consummate any alternative financing (i) providing for either total debt financing in excess of $90 million or total equity financing in excess of $85

million, (ii) which is not on terms reasonably satisfactory to Purchaser or (iii) which is not on terms substantially equivalent to the terms described in the Commitment Letters.

(b)    Purchaser shall promptly notify Sellers in the event that the financing contemplated by the Commitment Letters is no longer available or reasonably expected to be available from the same financing sources and on terms and conditions substantively identical to those contained in the Commitment Letters.

Section 5.3    Designation of Certain Assigned Contracts.  Within ten (10) Business Days after the date of this Agreement, Purchaser shall provide a notice to Sellers designating the contracts, agreements, licenses, commitments, purchase and sale orders, leases and subleases (of real or personal property) and other instruments set forth on Schedule 2.28 that will be Assigned Contracts.  Such Schedule shall be affixed to this Agreement as Schedule 10(a).

## ARTICLE VI.
## JOINT COVENANTS AND AGREEMENTS

Section 6.1    Support of Transaction.

(a)    Each Seller and Purchaser shall, and shall cause each of their respective Affiliates to, (i) use its commercially reasonable efforts to assemble, prepare and file any information (and, as needed, to supplement such information) as may be reasonably necessary to obtain as promptly as practicable all Consents of Governmental Authorities required to be obtained in connection with the Transactions, (ii) use its commercially reasonable efforts to obtain all Consents of other third parties that it or its Affiliates are required to obtain in order to consummate the Transactions and transfer the Assets and assets set forth on Schedule 1.3(a)(ix) to Purchaser and the Affiliated Purchasers as contemplated by the Acquisition Documents and (iii) take such other action as may reasonably be necessary or as another party may reasonably request to satisfy the conditions of Article VII or otherwise to comply with this Agreement or any of the Acquisition Documents.

(b)    Each party shall use commercially reasonable efforts to obtain as promptly as practicable prior to the Closing Date all Consents of third Persons identified on Schedule 7.1(g) and all Permits which are required for (i) the consummation of the Transactions and (ii) the ownership and operation by Purchaser and any Affiliated Purchaser of all Assets and the Business to be conducted by Purchaser and any Affiliated Purchaser related thereto.

(c)    Purchaser shall reasonably cooperate with Sellers and their Affiliates in Sellers' efforts to obtain all Consents and Permits referenced under this Section 6.1, provided that such cooperation shall not require, or be deemed to require, either party to (x) expend any funds (other than processing costs, costs of counsel and other advisors and reasonable out-of-pocket expenses incurred in providing information and otherwise cooperating with the other party and, in the case of Sellers, (A) amounts required to cure any default or arrearage with respect to the underlying agreement, Permit or other right for which such Consent or Permit is sought and (B) pre-established fees and expenses imposed by the Persons or Governmental Authorities from whom such Consent or Permit is sought), (y) provide any other financial accommodation by way of guarantee, security deposit, letter of credit or otherwise or (z) agree to any material or commercially unreasonable amendment, alteration or modification of any Significant Contract.

(d)    Each party shall (i) take promptly all actions necessary to make any filings required of such party under the HSR Act with respect to the Transactions, if applicable, (ii) use its best efforts to respond as promptly as practicable to all inquiries received from the Federal Trade Commission

("FTC") or the Antitrust Division of the United States Department of Justice for additional information or documentation in connection with all notices, reports or other documentation filed by Purchaser and any Seller under the HSR Act and (iii) cooperate with the other parties to this Agreement in connection with the filing by or on behalf of such other parties under the HSR Act with respect to the Transactions and in connection with resolving any investigation or other inquiry concerning the Transactions commenced by the FTC or the Antitrust Division or state attorneys general.

Section 6.2    Tax Matters.

(a)    Each Seller and Purchaser agrees to cooperate fully, as and to the extent reasonably requested by the other party, in connection with the preparation and filing of any Tax Return, claim for refund or audit and the prosecution or defense of any claim, suit or proceeding relating to any proposed adjustment that relates to any Seller, the Assets, the Assumed Liabilities or the Subsidiaries. Such cooperation shall include the retention of records and information relating to the Assets, the Assumed Liabilities and the Subsidiaries, and upon the other party's request, furnishing or causing to be furnished to each other as promptly as practicable, such information and assistance (including access to books and records) relating to the Assets, the Assumed Liabilities or the Subsidiaries as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or audit and the prosecution or defense of any claim, suit or proceeding relating to any proposed adjustment and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(b)    The parties agree to treat all payments made under any indemnity provision contained in this Agreement, or as a result of any misrepresentation or breach of warranties or covenants, as adjustments to the Purchase Price for Tax purposes.

Section 6.3    Certain Employee Benefits Matters.

(a)    Effective as of the Closing Date, Purchaser shall, or shall cause an Affiliated Purchaser to, offer employment to each Active Business Employee at the salary or wage level indicated on Schedule 6.3; provided, however, each Transferred Employee's at-will status shall remain in effect and nothing contained herein or in any Subsidiary Asset Purchase Agreement shall modify such status (to the extent such Transferred Employee's terms and conditions of employment are not otherwise provided for in an employment agreement being assumed by Purchaser or an Affiliated Purchaser hereunder or under any Subsidiary Asset Purchase Agreement).

(b)    In accordance with Sections 1.2 and 1.3, effective as of the Closing Date, Purchaser shall assume, and each Seller shall assign and transfer to Purchaser sponsorship and all rights and liabilities that such Seller may have in all Employee Plans, other than the Defined Benefit Plan, Seller's 401(k) Plan, any Employee Plan terminated prior to the date hereof or any Employee Plan sponsored or maintained by any of the Subsidiaries (the "Assumed Plans"). At all times prior to, on and after the Closing Date, the Sellers shall be solely responsible for the Defined Benefit Plan, Seller's 401(k) Plan, any Employee Plan terminated prior to the date hereof or any Employee Plan sponsored or maintained by any of the Subsidiaries (except to the extent expressly set forth in any of the Subsidiary Asset Purchase Agreements).

(c)    Unless otherwise expressly provided in any Subsidiary Asset Purchase Agreement, Purchaser shall, or shall cause its Affiliated Purchasers to, recognize, from and after the Closing Date, the service of each Transferred Employee who becomes employed by Purchaser or an Affiliated Purchaser, as applicable, as of the Closing Date (i) for purposes of determining eligibility to participate in and vesting, and, if applicable, eligibility to commence retirement benefits, but not benefit

accruals, under any qualified pension, savings, or profit-sharing plans in which Transferred Employees may participate, or such other qualified pension or profit-sharing plans maintained by Purchaser or any Affiliated Purchaser established on or after the Closing Date in which Transferred Employees participate and (ii) for all purposes under any group health plans, vacation and other paid time off plans and policies, severance, sick pay, disability and other welfare benefit plans established or maintained by Purchaser or an Affiliated Purchaser, as applicable, on or after the Closing Date.

(d)     Unless otherwise expressly provided in any Subsidiary Asset Purchase Agreement, for purposes of determining whether any Transferred Employee or his or her covered dependents have satisfied any required co-payments, annual deductibles, out-of-pocket maximums or other similar amounts payable by any Transferred Employee from and after the Closing under the terms of any Seller's, any Subsidiary's, Purchaser's or any Affiliated Purchaser's group health plan for the calendar year in which the Closing occurs, Transferred Employees and their covered dependents shall be credited with the amount of deductibles, co-payments and other similar amounts made by, or on behalf of, such Transferred Employees and their covered dependents under Sellers' or any Subsidiary's, as applicable, group health plan for such year.

(e)     Unless otherwise expressly provided in any Subsidiary Asset Purchase Agreement, Sellers and Subsidiaries shall not have any liabilities or obligations with respect to benefits accrued and claims incurred under any plans sponsored, maintained or contributed to by Purchaser or Affiliated Purchasers for or in respect of any Transferred Employee.

(f)     Sellers shall bear full responsibility for providing any notice to their employees and the employees of the Subsidiaries which may be required pursuant to the WARN or any similar applicable Law for any "employment loss" (as defined in WARN) for so long as they remain employees of Sellers or the Subsidiaries. Sellers shall bear any Liability or obligation which may accrue to the employees of Sellers or the Subsidiaries, any unit of local government or otherwise under WARN or other similar applicable Law as a result of providing improper or untimely notice under the requirements of WARN or such Law prior to the Closing. Purchaser shall bear full responsibility for providing any notice to Transferred Employees, which notice may be required by WARN or any similar applicable Laws for any "employment loss" (as defined in WARN) which occurs after the Closing. Purchaser shall bear any Liability or obligation which may accrue to employees whom it or the Affiliated Purchasers hire, any unit of local government or otherwise under WARN or any similar applicable Law as a result of providing improper or untimely notice under the requirements of WARN or such Law after the Closing.

(g)     To the extent permitted by applicable Law, Purchaser shall assume any accrued but unused vacation or other paid-time off ("PTO") for each U.S. Transferred Employee. If required by Law, prior to the Closing Date, Sellers shall allow each U.S. Transferred Employee to elect, in accordance with applicable Law, to have such U.S. Transferred Employee's accrued PTO either paid to such U.S. Transferred Employee on the Closing Date by Sellers, or to have such PTO assumed by Purchaser. Sellers shall be responsible for all accrued but unpaid time-off for each Business Employee that is not a Transferred Employee or who elects not to have his/her PTO assumed by Purchaser.

(h)     Effective as of the Closing, Purchaser shall be responsible for providing continuation coverage as required by Section 4980B of the Code, Part 6 of Title I of ERISA or applicable Law ("COBRA"), under a group health plan maintained by Purchaser, to those employees of each Seller and any other qualified beneficiaries under COBRA with respect to such employees, who have a COBRA qualifying event (due to termination of employment with a Seller or otherwise) prior to, on or after the Closing Date, including any employees of Sellers who remain employed following the Closing Date and who lose coverage upon termination of Sellers' group health plan.

(i)     Payroll Reporting and Withholding.

(i)     Each Seller and Purchaser shall adopt the "alternative procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 96-60. Under this Procedure, Purchaser as the successor employer shall provide all required Forms W-2 to all Transferred Employees reflecting all wages paid and taxes withheld by each Seller as the predecessor and Purchaser as the successor employer for the entire year during which the Closing Date shall take place. Each Seller shall provide all required Forms W-2 to all other Business Employees of the Business who are not Transferred Employees reflecting all wages and taxes paid and withheld by such Seller before and after the Closing Date.

(ii)     Each Seller and Purchaser shall adopt the alternative procedure of Rev. Proc. 96-60 for purposes of filing IRS Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate). Under this procedure each Seller shall provide to Purchaser all IRS Forms W-4 and W-5 on file with respect to each Transferred Employee, and Purchaser will honor these forms until such time, if any, that such Transferred Employee submits a revised form.

(iii)     With respect to garnishments, tax levies, child support orders and wage assignments in effect with a Seller on the Closing Date for Transferred Employees, Purchaser shall honor such payroll deduction authorizations with respect to Transferred Employees and will continue to make payroll deductions and payments to the authorized payee, as specified by the court or governmental order which was filed with a Seller on or before the Closing Date, and each Seller will continue to make such payroll deductions and payments to authorized payees with respect to all other Business Employees. Each Seller shall, subject to confidentiality restrictions imposed by applicable Law, prior to the Closing Date, provide Purchaser with such information in the possession of such Seller as may be reasonably requested by Purchaser and necessary for Purchaser to make the payroll deductions and payments to the authorized payee as required by this clause (iii).

(iv)     Unless otherwise prohibited by this or another agreement entered into in connection with the Transactions, or by an Assumed Plan, with respect to Transferred Employees with authorizations for payroll deductions in effect with a Seller on the Closing Date, Purchaser will honor such payroll deduction authorizations relating to each Transferred Employee, and shall not require that such Transferred Employee submit a new authorization to the extent that the type of deduction by Purchaser does not differ from that made by such Seller. Such deduction types include, without limitation: contributions to any Assumed Plan; scheduled loan repayments to any Assumed Plan or to an employee credit union; and direct deposit of payroll, bonus advances, union dues, employee relocation loans, and other types of authorized company receivables usually collectible through payroll deductions. Each Seller shall, subject to confidentiality restrictions imposed by applicable Law, prior to the Closing Date, provide Purchaser with such information in the possession of such Seller as may be reasonably requested by Purchaser and necessary for Purchaser to honor the payroll deduction authorizations contemplated by this clause (iv).

(j)     Purchaser shall assume and be responsible for all obligations and claims for unemployment and/or worker's compensation claims for U.S. Transferred Employees which remain unpaid as of the Closing Date, whether reported or not.

(k)     Nothing contained in this Agreement or the other Acquisition Documents shall confer upon any Transferred Employee any rights with respect to employment by Purchaser or an Affiliated Purchaser, nor shall any provision of this Agreement or any other Acquisition Document create

any third party beneficiary rights in any Transferred Employee, any beneficiary or dependents thereof, or any collective bargaining representative thereof.

(l)    Each Transferred Employee who is participating in or has participated in the flexible spending account or dependent care assistance plans ("Flex Plans") of Sellers, together with the elections made prior to the Closing Date with respect to such accounts through the Closing Date, are Identified on Schedule 6.3. Purchaser shall take all actions necessary and legally permissible to ensure that as of or as soon as practicable following the Closing Date, it includes the Transferred Employees who are participating in Sellers' Flex Plans as of the Closing Date, in the plans of Purchaser that correspond in category to those Flex Plans ("Purchaser's Flex Plans"). Purchaser shall further take all actions necessary and legally permissible so that Purchaser's Flex Plans provide that (i) the Transferred Employees who elected to participate in the Sellers' Flex Plans shall be treated as if they had been participants in Purchaser's Flex Plans as of the beginning of the plan year and at the level of coverage provided under the Sellers' Flex Plans (or, if less, that provided under the Purchaser's Flex Plan); (ii) the Transferred Employees' salary reduction elections shall be taken into account for the remainder of Purchaser's Flex Plan plan year as if made under Purchaser's Flex Plan and up to an amount not to exceed $3,000 with respect to the flexible spending account Flex Plan or $5,000 with respect to the dependent care assistance Flex Plan, in each case, for the 2004 plan year, and the maximum amount allowed under Purchaser's Flex Plan thereafter; and (iii) Purchaser's Flex Plan shall reimburse medical expenses incurred by the Transferred Employees at any time during the Flex Plan plan year (including claims incurred prior to the Closing Date but unpaid prior to the Closing Date), up to the amount of the Transferred Employee's election and reduced by amounts previously reimbursed by the Sellers' Flex Plan. Sellers shall take all actions necessary and legally permissible to amend the Sellers' Flex Plan to provide that the Transferred Employees shall cease to be eligible for reimbursements from its Flex Plans as of the Closing Date. As soon as practicable following the Closing Date, Sellers shall transfer to Purchaser and Purchaser agrees to accept, and Purchaser shall transfer to Sellers and Sellers agree to accept, those amounts that represent the debit and credit balances under the Sellers' Flex Plans and Purchaser's Flex Plans of the Transferred Employees who are to become covered by Purchaser's Flex Plans and the transfer of such amounts shall take into account on a net basis employees' payroll deductions and claims paid through the Closing Date.

Section 6.4    Transfer Taxes and Fees. Any sales, transfer or other comparable Taxes payable by any party in connection with the transfer of the Assets to Purchaser and the Affiliated Purchasers by Sellers or any Subsidiary shall be paid one-half by Purchaser and one-half by Sellers (it being understood that Sellers shall be solely responsible for all Income Taxes resulting from or payable in connection with the Transactions). Real property Taxes for the period during which the Closing occurs shall be pro-rated as of the Closing Date.

Section 6.5    Supplemental Disclosure. Each party hereto shall have the obligation at least one Business Day prior to Closing to notify immediately the other parties hereto in writing with respect to any matter hereafter discovered which constitutes a material breach of any representation or warranty of such notifying party contained in this Agreement. In addition, one Business Day prior to Closing Sellers shall deliver to Purchaser versions of Schedules 2.2, 2.17, 2.20 and 2.23 updated to the most recent practical date and identifying any changes in such Schedules from the versions thereof attached to this Agreement.

Section 6.6    Confidentiality. Each of Purchaser and Sellers agrees that following the Closing Date it and its Affiliates shall, and shall cause its respective directors, officers, limited liability company managers and managing directors (or functional equivalents of the foregoing), and shall use all reasonable efforts to cause all its other employees, auditors, attorneys, consultants, advisers and agents to, hold in strict confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law and after prior written notice to each other party hereto, all confidential information

of the other party in its respective possession with respect to the Business and will not release or disclose such confidential information of such Seller or Purchaser in its respective possession to any other Person, except to its auditors, attorneys, financial advisors and other consultants, agents and advisors in connection with post-Closing matters hereunder or other matters as to which Sellers and Purchaser have obligations or liabilities hereunder; provided that the foregoing obligations shall not apply to any such information which otherwise comes into the public domain other than as a result of a breach of this provision.

Section 6.7    Bulk Sales Laws. Sellers, the Subsidiaries, Purchaser and the Affiliated Purchasers agree to waive compliance in all respects with the requirements of the bulk sales or bulk transfer laws of any jurisdiction which may be applicable to the transactions contemplated by this Agreement.

Section 6.8    Maintenance of Records. For a period of seven years after the Closing Date, Purchaser shall, and shall cause the Affiliated Purchasers to, and Sellers shall, and shall cause the Subsidiaries to, each maintain the books and records in existence as of the Closing Date relating to the Assets and the Business. From and after the Closing Date, upon reasonable written notice, Purchaser and Sellers shall furnish or cause to be furnished to the other and their respective representatives, employees, counsel and accountants access, during normal business hours, to such books and records relating to periods prior to the Closing Date, and shall permit such Persons to examine and copy, at the sole cost and expense of the party providing access, such books and records to the extent reasonably requested by the other party as is reasonably necessary for financial reporting, accounting and tax matters, the preparation and filing of any returns, reports or forms or the defense of any claim or assessment. The parties agree to cooperate so that such access does not unreasonably disrupt the normal operations of Purchaser, Affiliated Purchasers, Sellers or Subsidiaries. In addition, if requested by Sellers, Sellers or Subsidiaries may retain, or Purchaser will deliver to Sellers (at the sole cost and expense of Purchaser), a copy of any of the books and records conveyed to Purchaser or the Affiliated Purchasers that are reasonably required by Sellers or the Subsidiaries for any of the purposes described above in this Section 6.8 or otherwise required by Law, provided that Purchaser may condition such delivery to receipt from Sellers and the Subsidiaries (and their representatives) of a non-disclosure agreement related thereto substantially in the form attached hereto as Annex 1.

Section 6.9    Removal of Excluded Assets. Within fifteen (15) Business Days after the Closing Date, Sellers and the Subsidiaries shall remove all Excluded Assets from all facilities and other real property to be occupied by Purchaser or an Affiliated Purchaser. Such removal shall be done in such manner as to avoid any damage to the facilities and other properties to be occupied by Purchaser or an Affiliated Purchaser and any disruption of the business operations to be conducted by Purchaser or an Affiliated Purchaser after the Closing. Any damage to the Assets or to the facilities resulting from such removal shall be paid by Sellers at the Closing or, with respect to any damage incurred or discovered after the Closing, within fifteen (15) Business Days after demand therefor by Purchaser. Should Sellers or any Subsidiary fail to remove the Excluded Assets as required by this Section 6.9, Purchaser or any Affiliated Purchaser shall have the right, but not the obligation, (a) to remove the Excluded Assets, at Sellers' sole cost and expense; (b) to store the Excluded Assets and to charge Sellers all storage costs associated therewith; or (c) to exercise any other right or remedy conferred by this Agreement or otherwise available at law or in equity. Sellers shall promptly reimburse Purchaser for all costs and expenses incurred by Purchaser or any Affiliated Purchaser in connection with any Excluded Assets not removed by Sellers and the Subsidiaries on or before the Closing Date.

Section 6.10    Non-Compete; Non-Solicitation; Non-Disparagement.

(a)    During the Non-Compete Period, the Sellers shall not, and shall cause the Subsidiaries, and their respective directors, officers, limited liability company managers and managing directors (or functional equivalents of the foregoing) (as applicable), not to, directly or indirectly, own, manage, control, participate in, consult with, render services for, or in any manner engage in or represent any business within any Restricted Territory that competes with the Business acquired by Purchaser and the Affiliated Purchasers from Sellers and the Subsidiaries or any product or service of such Business (including products and services substantially similar or related to those offered by such Business) as the Business is conducted or proposed to be conducted from and after the Closing Date.  As used in this Agreement, (i) "Restricted Territory" means the world and (ii) "Non-Compete Period" means the period commencing on the Closing Date and ending on the fifth anniversary of the Closing Date.  As used in this Section 6.10(a), "proposed to be conducted" shall refer to the discussion of the future conduct of the Business set forth in the Sellers' management presentation dated July 14, 2004 or the Sellers' business plan dated February, 2004.

(b)    Nothing in this Agreement shall prohibit any Seller or Subsidiary, and their respective directors, officers, limited liability company managers and managing directors (or functional equivalents of the foregoing) (as applicable), from being a passive owner of not more than 1% (calculated in the aggregate for all Sellers and Subsidiaries) of the class of a corporation which is publicly traded so long as no Seller or Subsidiary or any of their respective directors, officers, limited liability company managers or managing directors (or functional equivalents of the foregoing) or any member of the Immediate Family of any such Person has any active participation in the business of such corporation.

(c)    During the Non-Compete Period, each Seller shall not, and each Seller shall cause each Subsidiary not to, directly or indirectly through another Person (i) induce or attempt to induce any employee, salesperson or representative of Purchaser, any Affiliated Purchaser or any Affiliate of Purchaser to leave the employ of Purchaser or any Affiliated Purchaser or Affiliate, or in any way interfere with the relationship between Purchaser, any Affiliated Purchaser or Affiliate, on the one hand, and any employee, salesperson or representative thereof, on the other hand, (ii) hire any Person who was an employee, salesperson or representative of Purchaser, any Affiliated Purchaser or Affiliate of Purchaser after such individual's employment or contractual relationship with Purchaser, any Affiliated Purchaser or Affiliate has been terminated, provided that the obligation in this clause (ii) will expire as to each such employee, salesperson or representative, if sooner than the end of the Non-Compete Period, on the first anniversary of the termination of such individual's employment or contractual relationship with Purchaser, any Affiliated Purchaser and any Affiliate of Purchaser, (iii) induce or attempt to induce any customer, supplier, licensee or other business relation of Purchaser or any Affiliated Purchaser or Affiliate of Purchaser (A) to reduce or cease doing business with Purchaser, any Affiliated Purchaser or Affiliate of Purchaser, or (B) to do business with any third party that competes with the Business acquired by Purchaser and the Affiliated Purchasers from Sellers and the Subsidiaries or any product or service of the Business (including products and services substantially similar or related to those offered by such Business) as the Business is conducted or proposed to be conducted from and after the Closing Date (provided that for purposes of this clause (B), responding to unsolicited third-party inquiries and other actions that have not been initiated directly or indirectly by Sellers or the Subsidiaries shall not be deemed to be an inducement or attempted inducement and referrals of Elliot Levine, Levine & Seltzer LLP, Timothy Youmans, Edward Youmans and Strategic Initiatives, Inc. shall not violate this clause (B)), or (iv) in any way interfere with the relationship between any such customer, supplier, licensee or business relation, on the one hand, and Purchaser, any Affiliated Purchaser or Affiliate of Purchaser, on the other hand.

(d)    If, at the time of enforcement of this Section 6.10, a court holds that the restrictions stated herein are unreasonable under the circumstances then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. The parties hereto acknowledge that money damages would be an inadequate remedy for any breach of this Section 6.10. Therefore, in the event of a breach or threatened breach of this Section 6.10, Purchaser or its successors or assigns shall, in addition to other rights and remedies existing in their favor, be entitled to specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions of this Section 6.10 (without posting a bond or other security and without having to prove actual damages).

(e)    Sellers will not, and Sellers will cause the Subsidiaries not to, directly or indirectly through another Person do or say anything that could reasonably be expected to impact negatively Purchaser's or any Affiliated Purchaser's name or reputation in the marketplace.

Section 6.11    Health Regulatory Matters.

(a)    For the ninety day (90) period following the transfer by Sellers and the Subsidiaries to Purchaser and the Affiliated Purchasers of each Regulatory Approval pursuant to the terms hereof, Sellers promptly shall notify Purchaser if any of the Sellers or Subsidiaries receives information which would constitute a material adverse event in respect of a Product sold by Sellers or the Subsidiaries pursuant to such Regulatory Approval. From and after the transfer by Sellers or the Subsidiaries to Purchaser or Affiliated Purchasers of each Regulatory Approval pursuant to the terms hereof, Sellers agree that Purchaser shall be solely responsible and liable for conducting all voluntary and involuntary recalls of units of Products sold pursuant to such Regulatory Approval (whether sold before or after transfer of such Regulatory Approval).

(b)    Sellers shall provide reasonable assistance to Purchaser in connection with the transfer to Purchaser or its designee of the manufacturing technology with respect to the Products, including manufacturing technology, analytical methods, and any other information in the possession of Sellers that is reasonably required by Purchaser or its designee for the successful completion of such technology transfer.

Section 6.12    Environmental Matters. With respect to each Transferred Property located in New Jersey, Sellers shall use their commercially reasonable efforts to assemble, prepare and file any information (and, as needed, to supplement such information) as may reasonably necessary to obtain as promptly as practical from the NJDEP (i) an ISRA non-applicability letter, (ii) written approval of Sellers' negative declaration, (iii) a site-wide "No Further Action" letter or (iv) a remediation in progress waiver, as each such term is defined under ISRA.

Section 6.13    Further Assurances. Following the Closing, Sellers and Purchaser shall, and shall cause each of their Affiliates and successors and assigns to, from time to time, execute, acknowledge and deliver such additional instruments, documents, conveyances or assurances and take such other actions as shall be necessary, or otherwise reasonably requested by the other party, to confirm and assure the rights and obligations provided for in this Agreement and the other Acquisition Documents and render effective the consummation of the Transactions.

## ARTICLE VII.
## CONDITIONS TO OBLIGATIONS

Section 7.1    Conditions to Obligations of Purchaser. The obligation of Purchaser to consummate, or cause to be consummated, the transactions contemplated under this Agreement in

connection with the Closing is subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by Purchaser:

(a)   Representations and Warranties; Schedules.  Each of the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects (in the case of any representation or warranty without any materiality qualification, but excluding the representations and warranties contained in Sections 2.2, 2.17, 2.20 and 2.23) or in all respects (in the case of any representation or warranty containing a materiality qualification and those contained in Sections 2.2, 2.17, 2.20 and 2.23)) both on the date hereof and as of the Closing Date, as if made anew at and as of that time, and each of the covenants and agreements of Sellers to be performed as of or prior to the Closing shall have been duly performed in all material respects, except in each case for changes after the date hereof which are expressly contemplated or expressly permitted by this Agreement, and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects (in the case of any representation or warranty without any materiality qualification) or in all respects (in the case of any representation or warranty containing a materiality qualification) as of such date.  With respect to the representations and warranties contained in Sections 2.2, 2.17, 2.20 and 2.23, whether the representations and warranties contained therein are true and correct as of the Closing Date shall be evaluated with reference to the updated versions of Schedules 2.2, 2.17, 2.20 and 2.23 contemplated by Section 6.5.  The versions of Schedules 2.2, 2.17, 2.20 and 2.23 delivered to Purchaser pursuant to Section 6.5 shall not have any material change from the versions of such Schedules attached to this Agreement as of the date of this Agreement.

(b)   Sellers' Certificates.  Each Seller shall have delivered to Purchaser a certificate signed by an authorized officer of such Seller, dated as of the Closing Date, certifying that the conditions specified in Section 7.2(a) have been fulfilled and as to the incumbency of the officers of each Seller executing any documents or instruments to be delivered to Purchaser hereunder.

(c)   HSR Act.  All waiting periods (and any extensions thereof) under the HSR Act applicable to the Transactions, if any, shall have expired or been terminated.

(d)   Co-Existence Agreement.  Purchaser shall have received the Co-Existence Agreement, duly executed by The Aircast Foundation.

(e)   Litigation.  No Law, and no Order of any Governmental Authority, shall be in effect which prohibits the consummation of the Transactions and no legal action brought by any Person (other than an action caused by, or arising from, any action or omission of the Purchaser or its Affiliates) or governmental investigation of any Governmental Authority shall be pending that would reasonably be expected to result in such Order or in a material damages award against Purchaser resulting from the consummation of the Transactions.

(f)   Governmental Consents.  All Consents of any Governmental Authority:  (i) required to consummate the Transactions, (ii) required in order to prevent a breach of or default under or a termination of any Significant Contract and (iii) required for the operation of the Business by Purchaser and the Affiliated Purchasers from and after the Closing in all material respects as the Business was operated by Sellers and Subsidiaries prior to the Closing, shall have been obtained and shall be in full force and effect, without the imposition of any conditions not reasonably acceptable to Purchaser.

(g)   Third Party Consents.  All Consents listed on Schedule 7.1(g) shall have been obtained and shall be in full force and effect without the imposition of any conditions not reasonably acceptable to Purchaser.

(h)    Opinions of Counsel to Sellers. Purchaser shall have received opinions of counsel for Sellers and counsel for Aircast Germany, dated the Closing Date and to the effect set forth in Annex D, which opinions shall contain qualifications and assumptions customary for transactions similar to the Transactions.  In addition, Purchaser shall have received opinions of counsel for Aircast U.K. and counsel for Aircast SCS, dated the Closing Date and in form and substance reasonably acceptable to Purchaser, as evaluated with reference to the Transactions and the Acquisition Financing. Each opinion of counsel will state that the lenders to Purchaser will be entitled to rely on the opinion.

(i)    FIRPTA Certificate. Purchaser shall have received from each Seller a non-foreign person affidavit that meets the requirements of Treasury Regulations Section 1.1445-2(b)(2)(iii)(B).

(j)    Agreement With Holders. The Agreement with Holders shall have been signed by Holders owning at least eighty-five percent (85%) of the Ownership Percentage (as defined in such agreement) set forth on Schedule 5(b)(i) to such agreement.  The Agreement with Holders shall be in full force and effect and each of the representations and warranties of the Holders contained in the Agreement with Holders shall be true and correct in all material respects (in the case of any representation or warranty without any materiality qualification) or in all respects (in the case of any representation or warranty containing a materiality qualification) both on the date hereof and as of the Closing Date, as if made anew at and as of that time, and each of the covenants and agreements of Holders to be performed as of or prior to the Closing shall have been duly performed in all material respects, except in each case for changes after the date hereof which are expressly contemplated or expressly permitted by the Agreement with Holders, and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects (in the case of any representation or warranty without any materiality qualification) or in all respects (in the case of any representation or warranty containing a materiality qualification) as of such date.

(k)    Acquisition Documents; Closing Papers. Sellers shall have delivered to Purchaser:

(i)    the Bill of Sale, Assumption Agreement and each of the other Acquisition Documents (other than the Co-Existence Agreement and the Agreement with Holders), in form and substance reasonably acceptable to Purchaser and its counsel, in each case, duly executed by Sellers (and Subsidiaries, the Escrow Agent and/or Holders, if applicable);

(ii)    one or more instruments of assignment assigning to Purchaser and the Affiliated Purchasers all of any Seller's and Subsidiary's rights in the Business Intellectual Property, which, to the extent necessary to perfect the assignment of such rights, shall be in recordable form, as Purchaser and its counsel may reasonably require;

(iii)    amendments to the certificate of incorporation or certificate of formation, as applicable, or foreign equivalent of each Seller and each Subsidiary wherein the name of each Seller and each Subsidiary is changed to a new name, not confusingly similar to its current name, in each case, in proper form and complete, ready to be filed, duly executed by the proper officers of the respective Seller or Subsidiary;

(iv)    one or more special warranty deeds conveying to Purchaser good and marketable fee simple title to the Transferred Real Property located in the United States, any transfer tax forms required in connection therewith, and such title affidavits as may be required by Purchaser's title

insurance company, which affidavits shall be in a form reasonably acceptable to Sellers, in each case, duly executed by each Seller, as applicable;

(v)    all documents filed or, to the knowledge of Sellers, required to be filed, in connection with the novation of Federal Supply Schedule Contract No. V797P-4378a between AI and the Department of Veterans Affairs, effective October 1, 2002, as modified, in proper form and complete and duly executed by the proper officers of AI; and

(vi)    all of the other documents and items reasonably requested by Purchaser and its counsel, pursuant to any term or provision of this Agreement and any other Acquisition Documents in order to consummate the Transactions and effectuate the transfer of the Assets to Purchaser and the Affiliated Purchasers, in each case, duly executed by Sellers and the Subsidiaries, as appropriate.

(l)    Resolutions; Fundamental Documents. Sellers and the Subsidiaries shall have delivered to Purchaser copies, certified by the Secretary or an Assistant Secretary of the appropriate Seller or Subsidiary, (i) of resolutions duly adopted by the Boards of Directors or foreign equivalent and the stockholders or members, as applicable, of each Seller and each Subsidiary, approving this Agreement, the other Acquisition Documents and the consummation of the Transactions, and (ii) of the Fundamental Documents of each Seller and each Subsidiary. The authorization of the execution, delivery and performance by AI of this Agreement, the Acquisition Documents and the transaction contemplated hereby and thereby AI shall have become effective.

(m)    Release of Liens. Purchaser shall have received duly executed releases (including UCC-3 termination statements) of all Liens (other than Permitted Liens) on the Assets in form and substance reasonably satisfactory to the Purchaser and its counsel.

(n)    Acquisition Financing. The closing of the Acquisition Financing contemplated by the Commitment Letters shall occur at Closing or Purchaser shall have obtained alternative financing in an amount sufficient to consummate the Transactions as contemplated by Section 5.2(a); provided, however that this condition will be deemed to be satisfied if (i) Purchaser shall have breached any representation or warranty in Section 3.5(b), (c) or (d) or (ii) any financing contemplated by the Commitment Letters is not available because the Purchaser breached its covenant set forth in Section 5.2(a).

(o)    Environmental Clearance. With respect to any Transferred Property located in New Jersey, Sellers shall have received from the New Jersey Department of Environmental Protection ("NJDEP") and provided to Purchaser, (i) an ISRA non-applicability letter, (ii) written approval of Seller's negative declaration, (iii) a site-wide "No Further Action" letter, (iv) a remediation in progress waiver, or (v) if none of the foregoing have been obtained prior to the satisfaction of all other conditions to the Closing and subject to Sellers' compliance with Section 6.12, an executed remediation agreement in form and substance reasonably acceptable to Purchaser countersigned by Sellers and an approved remediation funding source reasonably acceptable to Purchaser, all as defined under ISRA.

(p)    Absence of Material Adverse Change. No event, defect, condition, change, development or effect shall exist or have occurred from the date of this Agreement to the Closing Date that, individually or in the aggregate, has, had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and Purchaser shall have received a certificate signed by the Chairman and Chief Executive Officer of each Seller to that effect.

(q)    Subsidiary Asset Purchase Agreements. All conditions to the transactions contemplated by each of the Subsidiary Asset Purchase Agreements to which an Affiliated Purchaser is a

party shall have been satisfied and such transactions shall be consummated in accordance with the respective terms and conditions of each such Subsidiary Asset Purchase Agreement prior to the Closing.

(r)     Key Managers. Thomas Crowley, Fabian McCarthy and Johan de Ruiter (the "Key Managers") shall have continued to be employed by the Sellers and/or the Subsidiaries, as the case may be, in the same positions they hold as of the date of this Agreement and their employment agreements (if any) with the Sellers and/or the Subsidiaries, as the case may be, shall have remained in full force and effect.

Section 7.2     Conditions to the Obligations of Sellers. The obligation of Sellers to consummate, or cause to be consummated, the transactions contemplated under this Agreement in connection with the Closing is subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by Sellers:

(a)     Representations and Warranties. Each of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects (in the case of any representation or warranty without any materiality qualification) or in all respects (in the case of any representation or warranty containing a materiality qualification) both on the date hereof and as of the Closing Date, as if made anew at and as of that time, and each of the covenants and agreements of Purchaser to be performed as of or prior to the Closing Date shall have been duly performed in all material respects, except in each case for changes after the date hereof which are contemplated or expressly permitted by this Agreement, and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such date.

(b)     Purchaser's Certificate. Purchaser shall have delivered to Sellers a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, certifying that the conditions specified in Section 7.2(a) have been fulfilled and as to the incumbency of the officers of Purchaser executing any documents or instruments to be delivered to Sellers hereunder.

(c)     HSR Act. All waiting periods (and any extensions thereof) under the HSR Act applicable to the Transactions, if any, shall have expired or been terminated.

(d)     Litigation. No Law, and no Order of any Governmental Authority, shall be in effect which prohibits the consummation of the Transactions and no legal action (other than an action caused by, or arising from, any action or omission of any Seller or their Affiliates) or governmental investigation of any Governmental Authority shall be pending that would reasonably be expected to result in such Order or in a material damages award against Sellers resulting from the consummation of the Transactions.

(e)     Governmental Consents. All Consents of any Governmental Authority required to consummate the Transactions shall have been obtained and shall be in full force and effect, without the imposition of any conditions not reasonably acceptable to Sellers.

(f)     Acquisition Documents; Closing Papers. Purchaser shall have delivered to Sellers:

(i)     counterparts of the Assumption Agreement and each of the other Acquisition Documents to which Purchaser is a party, in each case, duly executed by Purchaser (and the Affiliated Purchasers, if applicable); and

(ii)    all of the other documents and items reasonably requested by Sellers and their counsel, pursuant to any term or provision of this Agreement and the other Acquisition Documents in order to consummate the Transactions and the assumption of the Assumed Liabilities by Purchaser and the Subsidiary Assumed Liabilities by the Affiliated Purchasers, in each case, duly executed by Purchaser and the Affiliated Purchasers, as appropriate.

(g)    Resolutions; Fundamental Documents.  Purchaser and the Affiliated Purchasers shall have delivered to Sellers copies, certified by the Secretary or an Assistant Secretary of Purchaser or the appropriate Affiliated Purchaser, (i) of resolutions duly adopted by the Board of Directors or foreign equivalent of Purchaser and each Affiliated Purchaser, approving this Agreement, the other Acquisition Documents and the consummation of the Transactions, and (ii) the Fundamental Documents of Purchaser and each Affiliated Purchaser.

(h)    Subsidiary Asset Purchase Agreements.  All conditions to the transactions contemplated by each of the Subsidiary Asset Purchase Agreements shall have been satisfied and such transactions shall be consummated in accordance with the respective terms and conditions of each such Subsidiary Asset Purchase Agreement prior to the Closing.

## ARTICLE VIII.
## TERMINATION

Section 8.1    Termination.  This Agreement may be terminated and the Transactions abandoned as provided below:

(a)    By mutual written consent of the parties hereto at any time prior to the Closing.

(b)    By Purchaser prior to the Closing, by written notice to Sellers from Purchaser, if (i) the Closing has not occurred on or before December 31, 2004, other than as a result of a breach of a representation, warranty, covenant or agreement of Purchaser, (ii) consummation of any of the Transactions is enjoined, prohibited or otherwise restrained by the terms of a final, non-appealable order or judgment of a court of competent jurisdiction or (iii) the authorization of the execution, delivery and performance by AI of this Agreement, the Acquisition Documents and the transaction contemplated hereby and thereby AI shall not have become effective on or before the date that is twenty-five (25) days after the date of this Agreement.

(c)    By Sellers prior to the Closing, by written notice to Purchaser from Sellers, if (i) the Closing has not occurred on or before December 31, 2004 other than as a result of a breach of a representation, warranty, covenant or agreement of Sellers or (ii) consummation of any of the Transactions is enjoined, prohibited or otherwise restrained by the terms of a final, non-appealable order or judgment of a court of competent jurisdiction.

Section 8.2    Effect of Termination.

(a)    Effect.  In the event of termination of this Agreement pursuant to Section 8.1 by Sellers and/or Purchaser, this Agreement shall forthwith terminate, without any liability on the part of any party hereto or their respective Affiliates, directors, officers, limited liability company managers, managing directors (or functional equivalents of the foregoing) or equity holders, other than (i) as set forth in Section 8.2(b) or (ii) any liability of Sellers or Purchaser as the case may be, for breaches of this Agreement occurring prior to such termination; provided, however, that the provisions of this Section 8.2 and Article XI shall survive any termination of this Agreement.  If this Agreement is terminated by Purchaser pursuant to Section 8.1(b)(i) solely because the condition set forth in Section 7.1(h) has not

been satisfied, Purchaser shall be entitled to payment of its Costs pursuant to <u>Section 8.2(b)</u>, but such termination shall not give Purchaser a right to claim damages for breach of this Agreement by Sellers.

(b)    <u>Reimbursement of Costs</u>.

(i)    Sellers agree that if this Agreement is terminated by (A) Purchaser pursuant to <u>Section 8.1(b)(i)</u> (other than solely if the Closing has not been consummated because the condition in <u>Section 7.1(n)</u> (Acquisition Financing) or <u>Section 7.1(f)</u> (Governmental Consents) has not been satisfied), <u>Section 8.1(b)(ii)</u> or <u>Section 8.1(b)(iii)</u>, or (B) Sellers pursuant to <u>Section 8.1(c)(f)</u> (other than solely if the Closing has not been consummated because any of the conditions in <u>Section 7.1(n)</u> (Acquisition Financing), <u>Section 7.2(a)</u> (Purchaser's Representations and Warranties), <u>Section 7.2(b)</u> (Purchaser's Certificate), <u>Section 7.2(e)</u> (Governmental Consents), <u>Section 7.2(f)</u> (Purchaser's Deliveries of Acquisition Documents and Closing Papers) or <u>Section 7.2(g)</u> (Purchaser's Deliveries of Resolutions and Fundamental Matters) has not been satisfied) or <u>Section 8.1(c)(ii)</u>, then Sellers, jointly and severally, shall reimburse Purchaser for all Costs incurred by or on behalf of or borne by Purchaser in connection with this Agreement, the Acquisition Documents and the Transactions.

(ii)    For purposes of this <u>Section 8.2(b)</u>, "Costs" means the costs incurred by or on behalf of or borne by Purchaser or any of Purchaser's Affiliates in connection with its evaluation of the Transactions and negotiation of this Agreement and the Acquisition Documents, including (A) all fees and expenses of legal, financial and other advisers incurred by or on behalf of or borne by Purchaser or any of Purchaser's Affiliates, and (B) all out-of-pocket expenses incurred by or on behalf of or borne by Purchaser or any of Purchaser's Affiliates.

## ARTICLE IX.
## INDEMNIFICATION

Section 9.1    <u>Survival of Representations</u>.  All representations and warranties of the Sellers, the Subsidiaries, the Purchaser and the Affiliated Purchasers included in this Agreement, the Acquisition Documents or in any written certificate, schedule, statement, document or instrument furnished hereunder or in connection with the negotiation, execution and performance of this Agreement or the Acquisition Documents shall survive until April 30, 2006 and shall thereafter expire; provided, however, (a) the representations and warranties contained in Section 2.21 (Licenses, Permits and Authorization; Regulatory Approvals) and 2.24 (Health Care Matters) shall survive until the fifth anniversary of the Closing Date, (b) the representations and warranties contained in Sections 2.16 (Employee Benefit Plans) and 2.19 (Taxes) shall survive until expiration of the applicable statute of limitations (including any extensions thereof) plus six (6) months and (c) the representations and warranties contained in Sections 2.1 (Corporate Organization and Authority of Sellers) (but not as to the second sentence thereof), 2.2 (No Conflict), 2.3 (Subsidiaries) (but not as to the second and third sentences thereof), 2.9 (Title to Assets), 2.11 (Intellectual Property) (but only as to clause (a) of the second sentence thereof), 2.12 (Real Property) (but only as to the second sentence thereof), 2.18 (Environmental Matters), 3.1 (Corporate Organization and Authority of Purchaser), 3.2 (No Conflict) and any comparable representations and warranties in the Subsidiary Asset Purchase Agreements shall survive indefinitely. Notwithstanding anything herein to the contrary, if notice has been given by Sellers or Purchaser pursuant to this <u>Article IX</u> on or before the end of any applicable survival period, then the right to indemnification with respect to the breach of representation and warranty that is the subject of such notice shall survive until final resolution and payment (if any) with respect thereto.  No right of any Purchaser Indemnified Party for indemnification under this Agreement shall be affected by any examination made for or on behalf of Purchaser, any Affiliated Purchaser or any of Purchaser's Affiliates, the knowledge of any of the directors, officers, shareholders, employees or agents of Purchaser, any

Affiliated Purchaser or any of Purchaser's Affiliates, or the acceptance of any certificate or opinion by Purchaser, any Affiliated Purchaser or any of Purchaser's Affiliates.

Section 9.2    Right to Indemnification.

(a)    Subject to the provisions of this Article IX, from and after the Closing Date, each Seller, jointly and severally, agrees to indemnify and hold harmless Purchaser and the Affiliated Purchasers and their respective successors, assigns, directors, officers, employees, shareholders, representatives and agents and their respective Affiliates (collectively, the "Purchaser Indemnified Parties"), from and against any and all damages, claims, Liabilities, demands, losses, costs, Taxes, assessments, shortages, actions, suits, Proceedings, hearings, investigations, charges, complaints, injunctions, judgments, Orders, decrees, rulings, dues, penalties, fines, amounts paid in settlement, obligations, Liens, fees or expenses (whether absolute, accrued, conditional or otherwise and whether or not resulting from third party claims), including reasonable accounting and attorneys' fees and expenses in connection with the foregoing and with the enforcement of this Agreement or any other Acquisition Document (collectively, "Damages"), that any Purchaser Indemnified Party may suffer, sustain or become subject to as a result of, or arising out of or relating to:

(i)    the breach of any representation or warranty of any of the Sellers or Subsidiaries under this Agreement or any Acquisition Document or any written certificates delivered at Closing, provided that for purposes of this Section 9.2(a)(i) the breach of the representations and warranties set forth in Sections 2.2, 2.17, 2.20 and 2.23 shall be evaluated solely with reference to the Schedules attached to this Agreement as of the date of this Agreement, and not the updated Schedules contemplated by Section 6.5;

(ii)    the nonfulfillment or breach of any agreement or covenant on the part of any of the Sellers or Subsidiaries under this Agreement or any Acquisition Document;

(iii)    any Excluded Liability or any Excluded Asset;

(iv)    any Income Taxes of any Seller or Subsidiary for any Tax period, or any other Income Taxes that relate to the Assets or the Business for Tax periods or portions thereof ending on or before the Closing Date;

(v)    any claim by any Person for a broker's, financial advisor's, finder's or other similar fee or commission or expense reimbursement in connection with the Transactions based upon arrangements made by or on behalf of any Seller, Subsidiary or Holder; and

(vi)    any failure of any of the Sellers or Subsidiaries to pay or satisfy, or cause to be paid or satisfied, any transaction expenses incurred by any of the Sellers or Subsidiaries in connection with this Agreement, any Acquisition Document or the Transactions.

(b)    Subject to the provisions of this Article IX, from and after the Closing Date, Purchaser agrees to indemnify and hold harmless Sellers and Subsidiaries and their respective successors, assigns, directors, officers, employees, shareholders, representatives and agents and their respective Affiliates (collectively the "Sellers Indemnified Parties") from and against any Damages that any Sellers Indemnified Party may suffer, sustain or become subject to as a result of, or arising out of or relating to:

(i)    the breach of any representation or warranty of Purchaser or any Affiliated Purchaser under this Agreement, any Acquisition Document or any written certificates delivered at Closing;

(ii)     the nonfulfillment or breach of any agreement or covenant on the part of Purchaser or any Affiliated Purchaser under this Agreement or any Acquisition Document;

(iii)     the failure of Purchaser or any Affiliated Purchaser to pay or satisfy any Sellers Assumed Liability or Subsidiary Assumed Liability; and

(iv)     any claim by any Person for a broker's, financial advisor's, finder's or other similar fee or commission or expense reimbursement in connection with the Transactions based upon arrangements made by or on behalf of Purchaser or any Affiliated Purchaser.

(c)     Subject to the provisions of this Article IX, from and after the Closing Date, each Seller, jointly and severally, agrees to release the Purchaser Indemnified Parties from, and to assume all responsibility for, and to indemnify, defend (with counsel selected by Sellers and reasonably acceptable to Purchaser), and hold harmless Purchaser Indemnified Parties against and in respect of, any and all Damages which may be imposed upon or incurred by any of the Purchaser Indemnified Parties, or asserted against any of the Purchaser Indemnified Parties, by any other Person or Persons (including a Governmental Authority), arising out of or in any way connected with: (i) a matter referenced in Schedule 2.18; (ii) any Environmental Claim existing as of the Closing Date or resulting from or arising out of any occurrence prior to the Closing Date; (iii) any Environmental Condition existing on, under, in, or originating from, any of the Transferred Property or Assets as of the Closing Date, or resulting from or arising out of the operation of the Business by the Seller and Subsidiaries prior to the Closing Date, regardless of how such Environmental Condition is discovered by any Purchaser Indemnified Party or any third party; and/or (iv) any Seller's failure to properly and diligently perform any of its obligations under this Section 9.2(c). All obligations under this Section 9.2(c) shall survive the Closing, and shall be in addition to, and in no way construed to limit or replace, any other obligations or liabilities which Sellers may have to any Purchaser Indemnified Party; provided, however, if indemnification for a claim by a Purchaser Indemnified Party involving remediation of Environmental Conditions is available both under this Section 9.2(c) and under any other provision of this Agreement, then such claim for remediation of Environmental Conditions shall be subject to, and limited by, the following provisions of this Section 9.2(c) and Section 9.2(d); and provided further, however, that if a Purchaser Indemnified Party may bring a claim against Sellers with respect to Environmental Conditions under both this Agreement and any alternative rights available to such Purchaser Indemnified Party, then such Purchaser Indemnified Party shall bring such claim under this Agreement unless such Purchaser Indemnified Party determines, in its reasonable discretion, that bringing such claim under this Agreement instead of such alternative rights will have a prejudicial or other adverse impact on such Purchaser Indemnified Party. With regard to any matter for which any Purchaser Indemnified Party is entitled to indemnification pursuant to the foregoing in this Section 9.2(c), any Purchaser Indemnified Party shall have the right, but not the obligation, to conduct any investigation and/or remedial action, or to take any other action, at Sellers' cost in response to any Environmental Condition at the Transferred Property. Notwithstanding anything in this Section 9.2(c) to the contrary, except as expressly provided in the last sentence of this Section 9.2(c), Sellers shall have no obligation under this Section 9.2(c) to reimburse any Purchaser Indemnified Party for the costs of any remedial action performed by any Purchaser Indemnified Party to the extent that the cost of such remedial action exceeds an amount necessary in order to: (i) meet the minimum remediation required to satisfy applicable regulatory requirements arising under Environmental Laws and (ii) prevent human exposure to Hazardous Materials, any material adverse impact on Purchaser's ongoing business operations, reasonably foreseeable future business expansions, the marketability of the Transferred Property, or Purchaser's ability to obtain financing (collectively, the "Minimum Remediation Standards"). Furthermore, Sellers' obligations under this Section 9.2(c) to reimburse any Purchaser Indemnified Party for the costs of any remedial action performed by any Purchaser Indemnified Party shall be conditioned upon the Purchaser Indemnified Party seeking such reimbursement having submitted to Sellers a detailed cost proposal for the remedy prior to its implementation. Within fifteen (15) Business Days after Sellers'

receipt of the cost estimate, Sellers shall approve such estimate, agree with the Purchaser Indemnified Party to employ an alternative remedy as requested by Sellers or elect to invoke the procedure for determining the remedial costs to be reimbursed by Sellers ("Reimbursable Remedial Costs") pursuant to Section 9.2(d). The failure of Sellers to notify Purchaser of one of the actions referred to in the preceding sentence during such fifteen (15) Business Day period shall be deemed approval of the Purchaser Indemnified Party's estimate. If Sellers elected to invoke informal arbitration of the Reimbursable Remedial Costs pursuant to Section 9.2(d) during such fifteen (15) day period, then Sellers' obligation to reimburse any Purchaser Indemnified Party shall be limited to such Reimbursable Remedial Costs. The limitations provided by this Section 9.2(c) and Section 9.2(d) shall not apply if and to the extent any Liability is asserted against Purchaser with respect to the failure of Phillips Electronics North America Corporation to fulfill its environmental remediation obligations with respect to the Transferred Real Property and Purchaser becomes obligated by Law to perform such remediation in a manner that requires it to exceed the Minimum Remediation Standards, precludes it from obtaining and submitting to Sellers a detailed cost proposal for the environmental remediation prior to its implementation or requires it to expend more than the Reimbursable Remedial Costs.

(d)     In case of disagreement among Sellers and any Purchaser Indemnified Party regarding the remedy to be performed by a Purchaser Indemnified Party pursuant to Section 9.2(c), each party may at its own cost designate a professional engineer having a minimum of ten (10) years experience in the practice of environmental remediation in New Jersey to provide a written estimate of the lowest-cost remedy required to achieve the Minimum Remediation Standards. If their two estimates differ by less than ten (10%) percent, the average cost of the two determinations shall be conclusively established as the "Remedial Cost Estimate" for purposes of this Section 9.2(d). If their two determinations differ by ten (10%) percent or more, the two engineers shall appoint a third similarly qualified engineer (the cost of whose services shall be shared 50% by Sellers and 50% by the Purchaser Indemnified Party who will be seeking reimbursement of the remedial cost pursuant to Section 9.2(c)) to provide a third estimate of the lowest-cost remedy required to achieve the Minimum Remediation Standards, and the average of the costs of the two closest estimates shall be binding on the parties for purposes of establishing the amount of the Remedial Cost Estimate. The Remedial Cost Estimate, together with any reasonable additional costs incurred due to unforeseen conditions, cost overruns not within the control of the engineer performing the remedial work, force majeure events, and governmental oversight costs, shall be conclusively established as the Reimbursable Remedial Costs for purposes of Section 9.2(c).

Section 9.3     Conduct of Proceedings.

(a)     Third Party Claims. If any claim for indemnity under Section 9.2 shall arise, the Person seeking indemnification pursuant to this Article IX (the "Indemnified Party") shall give written notice thereof, specifying in reasonable detail the basis of the claim, to the party from which indemnification is sought (the "Indemnitor"). When an Indemnified Party seeking indemnification under Section 9.2 receives notice of any claim by a third party ("Third Party Claims") which is to be the basis for a claim for indemnification hereunder, the Indemnified Party shall give written notice thereof, specifying in reasonable detail the basis of the Third Party Claim, to the Indemnitor. Any such notices shall be delivered to the Indemnitor promptly after the Indemnified Party learns of the existence of a claim or Third Party Claim; provided, however, that the Indemnified Party's delay or failure to notify the Indemnitor shall not bar the Indemnified Party's right to indemnification except to the extent, if at all, that the Indemnitor is materially prejudiced by reason of such delay or failure. Upon notice from the Indemnified Party, the Indemnitor may, but except as provided in Section 9.2(c) with respect to indemnification claims thereunder shall not be required, to assume the defense of any such Third Party Claim, including its compromise or settlement, through counsel of its choosing, which counsel shall be reasonably acceptable to Indemnified Party, to defend against any such Third Party Claim, or to

compromise or settle the same, if the Indemnitor deems it advisable to do so, all at the expense of the Indemnitor; provided, however, that the Indemnitor shall not compromise or settle, or consent to entry of any judgment in, any Third Party Claim without obtaining the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld). The Indemnified Party will fully cooperate in the defense of any such Third Party Claim as and to the extent reasonably requested by the Indemnitor, and such cooperation shall include the retention and, upon the request of the Indemnitor, the provision to each other of any information, books or records reasonably relevant or useful for the defense of any such Third Party Claim, or making employees available on a mutually convenient basis to provide additional information and an explanation of any material provided hereunder. The Indemnified Party may participate in such defense at its own expense through counsel of its choice. Notwithstanding the foregoing, if, in the Indemnified Party's reasonable judgment based upon the advice of its outside legal counsel, (i) there exists an actual conflict of interest between the Indemnified Party and another Indemnified Party or between the Indemnified Party and the Indemnitor, (ii) there exists a potential conflict of interest between the Indemnified Party and another Indemnified Party or between the Indemnified Party and the Indemnitor which has a reasonable likelihood of becoming an actual conflict of interest or (iii) there are material defenses available to the Indemnified Party that are different from, or in addition to, those available to another Indemnified Party or the Indemnitor, the Indemnified Party shall have the right to employ at the Indemnitor's expense, one lead counsel of Indemnified Party's choosing and one local counsel in each applicable jurisdiction (if more than one jurisdiction is involved) to represent the Indemnified Party. If the Indemnitor fails to acknowledge in writing its obligation to defend against or settle such Third Party Claim within thirty (30) calendar days after receiving notice thereof from the Indemnified Party (or such shorter time specified in the notice as the circumstances of the matter may dictate), the Indemnified Party shall have the right to undertake the defense and settlement of any such Third Party Claim, at the Indemnitor's expense, and the Indemnitor shall not have the right to control the defense thereof; provided that, if the Indemnified Party assumes the defense of any such Third Party Claim because of the failure of the Indemnitor to do so in accordance with this <u>Section 9.3</u>, (x) the Indemnified Party shall not compromise or settle such Third Party Claim prior to final judgment thereon or forego any appeal with respect thereto without the prior written consent of the Indemnitor (which consent shall not be unreasonably withheld), (y) the Indemnitor shall have no liability with respect to any compromise or settlement thereof effected without its prior written consent (which consent shall not be unreasonably withheld) and (z) under no circumstances shall the Indemnitor be liable for the fees and expenses of more than one lead counsel and one local counsel per jurisdiction (if more than one jurisdiction is involved) with respect to such Third Party Claim for the Indemnified Party together with its Affiliates, and their respective successors, assigns, directors, officers, limited liability company managers, managing directors (or functional equivalents of the foregoing), employees, agents, advisors and equity holders, taken collectively and not separately.

(b)     <u>Other Claims</u>. In the event one party hereunder should have a claim for indemnification that does not involve a claim or demand being asserted by a third party, the Indemnified Party shall promptly send notice of such claim to the party from whom indemnification is sought; but the delay or failure to so notify the Indemnitor shall not relieve the Indemnitor from any liability that the Indemnitor may have to such Indemnified Party, except to the extent, if at all, that the Indemnitor is materially prejudiced as a result of such delay or failure. The Indemnitor shall have thirty (30) calendar days to object to such claim by delivery of a written notice of such objection to the Indemnified Party specifying in reasonable detail the basis for such objection. Failure to timely so object shall constitute a final and binding acceptance of the claim by the Indemnitor.

Section 9.4     <u>Limits and Conditions of Indemnification</u>. Notwithstanding the foregoing, the rights of the Sellers Indemnified Parties and the Purchaser Indemnified Parties to indemnification pursuant to this <u>Article IX</u> shall be subject to the following limitations and conditions, to the extent applicable; provided, however, that the limitations and conditions set forth in this <u>Section 9.4</u> shall not:

(x) limit a party's ability to enforce its rights and obligations under this Agreement by a decree of specific performance or other equitable relief issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith, (y) apply to claims brought by Purchaser or any Affiliated Purchaser against Sellers or the Subsidiaries which arise out of the failure of the Sellers and Subsidiaries to sell the Assets to Purchaser and the Affiliated Purchasers on the Closing Date, or (z) apply to a claim brought by Purchaser or any Affiliated Purchaser against Sellers or the Subsidiaries in which a court of competent jurisdiction issues a final, unappealable judgment, Order or decree concluding that such Seller's or Subsidiary's action or inaction constitutes fraud or willful misconduct. Except as otherwise provided herein, any claims by any Purchaser Indemnified Parties or Sellers Indemnified Parties for indemnification made hereunder shall be subject to the following:

(a)     Indemnity Thresholds for Sellers.  The Purchaser Indemnified Parties shall not have the right to be indemnified pursuant to Section 9.2(a)(i) for breaches of representations and warranties or Section 9.2(a)(iii) for Excluded Liabilities under Section 1.3(b)(iv)(B) unless and until the Purchaser Indemnified Parties shall have incurred on a cumulative basis since the Closing Date aggregate Damages in an amount exceeding $750,000, in which event the right to be indemnified shall apply to the full amount of such Damages; provided, however, that in no event shall the limitations set forth in this Section 9.4(a) apply to the rights of the Purchaser Indemnified Parties to be indemnified pursuant to (i) Section 9.2(a)(i) with respect to the representations and warranties set forth in 2.16 (Employee Benefit Plans), 2.18 (Environmental Matters) and 2.19 (Taxes) and any comparable representations and warranties contained in the Subsidiary Asset Purchase Agreements or (ii) any of Sections 9.2(a)(ii) through 9.2(a)(vi) (except as expressly provided above with respect to Section 9.2(a)(iii)) and Section 9.2(c).

(b)     Indemnity Thresholds for Purchaser.  The Sellers Indemnified Parties shall not have the right to be indemnified pursuant to Section 9.2(b)(i) for breaches of representations and warranties unless and until the Sellers Indemnified Parties shall have incurred on a cumulative basis since the Closing Date aggregate Damages in an amount exceeding $750,000, in which event the right to be indemnified shall apply to the full amount of such Damages; provided, however, that in no event shall the limitations set forth in this Section 9.4(b) apply to the rights of the Sellers Indemnified Parties to be indemnified pursuant to any of Sections 9.2(b)(ii) through 9.2(b)(iv).

(c)     Indemnity Limitations for Sellers.  The sum of all Damages pursuant to which indemnification is payable by Sellers pursuant to Section 9.2(a)(i) shall not exceed $21,000,000 in the aggregate; provided, however, that (i) from and after May 1, 2005 such amount shall be reduced by the amount, if any, by which $3,000,000 exceeds the amount of all claims for indemnification made by the Purchaser Indemnified Parties on or before April 30, 2005 that have been paid to the Purchaser Indemnified Parties or are then pending, (ii) from and after May 1, 2006, (A) if there is no such reduction pursuant to clause (i), such amount shall be reduced by the amount, if any, by which $6,000,000 exceeds the amount of all claims for indemnification made by the Purchaser Indemnified Parties on or before April 30, 2006 that have been paid to the Purchaser Indemnified Parties or are then pending or (B) if there has been a reduction pursuant to clause (i), such amount shall be further reduced by the amount, if any, by which $3,000,000 exceeds the amount of all claims for indemnification made by the Purchaser Indemnified Parties after April 30, 2005 and on or before April 30, 2006 that have been paid to the Purchaser Indemnified Parties or are then pending; and provided further, however, that in no event shall the limitations set forth in this Section 9.4(c) apply to the rights of the Purchaser Indemnified Parties to be indemnified pursuant to (i) Section 9.2(a)(i) with respect to the representations and warranties set forth in Sections 2.1 (Corporate Organization and Authority of Sellers) (except the second sentence thereof), 2.2 (No Conflict), 2.3 (Subsidiaries) (except the second and third sentences thereof), 2.9 (Title to Assets), 2.11 (Intellectual Property) (but only as to clause (a) of the second sentence thereof), 2.12 (Real Property) (but only as to the second sentence thereof), 2.16 (Employee Benefit Plans), 2.18 (Environmental

Matters), 2.19 (Taxes) and any comparable representations and warranties contained in the Subsidiary Asset Purchase Agreements or (ii) any of Sections 9.2(a)(ii) through 9.2(a)(vi) and Section 9.2(c). The sum of all Damages to which indemnification is payable by Sellers pursuant to this Agreement shall not exceed the Purchase Price.

      (d)    Indemnity Limitations for Purchaser. The sum of all Damages pursuant to which indemnification is payable by Purchaser pursuant to Section 9.2(b)(i) shall not exceed $21,000,000 in the aggregate; provided, however, that (i) from and after May 1, 2005 such amount shall be reduced by the amount, if any, by which $3,000,000 exceeds the amount of all claims for indemnification made by the Seller Indemnified Parties on or before April 30, 2005 that have been paid to the Seller Indemnified Parties or are then pending, (ii) from and after May 1, 2006, (A) if there is no such reduction pursuant to clause (i), such amount shall be reduced by the amount, if any, by which $6,000,000 exceeds the amount of all claims for indemnification made by the Seller Indemnified Parties on or before April 30, 2006 that have been paid to the Seller Indemnified Parties or are then pending or (B) if there has been a reduction pursuant to clause (i), such amount shall be further reduced by the amount, if any, by which $3,000,000 exceeds the amount of all claims for indemnification made by the Seller Indemnified Parties after April 30, 2005 and on or before April 30, 2006 that have been paid to the Seller Indemnified Parties or are then pending; and provided further, however, that in no event shall the limitations set forth in this Section 9.4(d) apply to the rights of the Seller Indemnified Parties Indemnified Parties to be indemnified pursuant to (i) Section 9.2(b)(i) with respect to the representations and warranties set forth in Sections 3.1 (Corporate Organization and Authority of Purchaser) and 3.2 (No Conflict) and any comparable representations and warranties contained in the Subsidiary Asset Purchase Agreements or (ii) any of Sections 9.2(b)(ii) through 9.2(b)(iv). The sum of all Damages to which indemnification is payable by Purchaser pursuant to this Agreement shall not exceed the Purchase Price.

      (e)    Insurance Proceeds. The amount of any claim for indemnity hereunder shall be reduced to reflect any insurance proceeds recoverable by and paid to the Indemnified Party, provided that in no event shall any indemnification payment be delayed in anticipation of the receipt of any insurance proceeds.

      (f)    Remedy for Indemnification Claims. To the extent any Purchaser Indemnified Party shall be entitled to receive a payment from Sellers pursuant to this Article IX, such amount shall first be paid from the Escrow Account. If such claim cannot be satisfied in full from the Escrow Account, then Purchaser, on behalf of such Purchaser Indemnified Party, may set-off the amount of such payment that has not been satisfied against the principal amount of the Subordinated Notes outstanding, and no interest on any such principal amount shall be payable by the payor. If such claim cannot be satisfied in full from the Escrow Account and the principal amount of the Subordinated Notes and the Notes outstanding, then such Purchaser Indemnified Party may initiate a Proceeding directly against any of the Sellers, the Subsidiaries or, to the extent permitted in the Agreement with Holders, the Holders for the amount that is not so satisfied.

      Section 9.5    Remedy for Failure to Transfer Assets. In the event the Sellers and Subsidiaries are unable to sell, convey, transfer, assign and deliver to Purchaser and the Affiliated Purchasers at the Closing and closings under the Subsidiary Asset Purchase Agreements any material Asset which is Transferable, solely due to the failure to obtain a necessary Consent notwithstanding the Sellers' and Subsidiaries' compliance with the terms and conditions of this Agreement, and if Purchaser elects to waive the conditions to Closing provided in Section 7.1 and consummate the Transactions, then Purchaser shall be entitled to Damages from Sellers for the failure to sell, convey, transfer, assign and deliver such Asset in an amount equal to the lesser of (a) the cost to obtain a comparable replacement for such Asset plus the reasonable costs incurred by the Purchaser and Affiliated Purchasers, as the case may be, in connection therewith or (b) the cost to obtain such Consent plus the reasonable costs incurred by

the Purchaser and Affiliated Purchasers in connection therewith, in each case as determined by Purchaser acting in a commercially reasonable manner.

## ARTICLE X.
## CERTAIN DEFINITIONS

As used herein, the following terms shall have the following meanings:

"2002-2003 Financial Statements" has the meaning specified in Section 2.4.

"2004 Financial Statements" has the meaning specified in Section 2.4.

"2005 Earnout Payment" has the meaning specified in Section 1.8(a)(i).

"2005 Financial Statements" has the meaning specified in Section 1.8(b)(i).

"2005 Net Sales" has the meaning specified in Section 1.8(a)(i).

"2006 Earnout Payment" has the meaning specified in Section 1.8(a)(ii).

"2006 Financial Statements" has the meaning specified in Section 1.8(b)(ii).

"2006 Net Sales" has the meaning specified in Section 1.8(a)(ii).

"2007 Earnout Payment" has the meaning specified in Section 1.8(a)(iii).

"2007 Financial Statements" has the meaning specified in Section 1.8(b)(iii).

"2007 Net Sales" has the meaning specified in Section 1.8(a)(iii).

"Acquired Accounts Receivable" shall mean the accounts receivable and other receivables of Sellers outstanding as of the Closing Date (including any rights with respect to receivables which have not been billed prior to the Closing Date).

"Acquisition Debt Financing" means the debt financing contemplated by the Debt Commitment Letter.

"Acquisition Documents" shall mean this Agreement, the Bills of Sale, the Assumption Agreements, the Agreement with Holders, the Co-Existence Agreement, the Subsidiary Asset Purchase Agreements, the Notes, the Escrow Agreement, the Deposit Escrow Agreement and the deeds or other documents of transfer related to the Assets.

"Acquisition Financing" has the meaning specified in Section 3.5(d).

"Action" means any action, suit, arbitration or other proceeding by or before any Governmental Authority.

"Active Business Employee" means any employee of any Seller or Subsidiary who is, immediately prior to the Closing, actively employed, on vacation or on any approved or legally permitted leave of absence, short-term disability, sick leave or other form of leave (excluding any leave due to long-term disability).

"Affiliate" means, with respect to any specified Person, (a) a director, officer, limited liability company manager or managing director (or the functional equivalent of the foregoing) of such Person or (b) a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the first Person. "Control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of voting securities, by contract or credit arrangement, as trustee or executor, or otherwise. Without limiting the generality of the previous sentence, any Person owning twenty percent (20%) or more of the voting securities of another Person shall be deemed to control that Person.

"Affiliated Purchasers" has the meaning specified in Section 1.11.

"Agreement" has the meaning specified in the Preamble hereto.

"Agreement with Holders" means the agreement between Purchaser and all or certain of the Holders, in substantially the form attached as Annex B.

"AI" has the meaning specified in the Preamble hereto.

"AI Business" has the meaning specified in the Recitals hereto.

"AI Holders" means Glenn W. Johnson III, Kristina M. Flanagan, Henry J. McVicker, Mitzi Johnson, Mary K. Noyes, Joseph McVicker and Juliet McVicker, who are all of the Persons holding any capital stock of AI.

"AI Holding Company" has the meaning specified in the Recitals hereto.

"AI Note" has the meaning specified in Section 1.4(b)(iv).

"Aircast France" has the meaning specified in Section 1.11.

"Aircast Germany" has the meaning specified in Section 1.11.

"Aircast U.K." has the meaning specified in Section 1.11.

"AIS" has the meaning specified in the Preamble hereto.

"AIS Business" has the meaning specified in the Recitals hereto.

"AIS Holders" means Glenn W. Johnson III, Kristina M. Flanagan, Henry J. McVicker, Mitzi Johnson, Mary K. Noyes, Joseph McVicker and Juliet McVicker, who are all of the Persons holding any membership interests of AIS.

"AIS Note" has the meaning specified in Section 1.4(b)(v).

"Allocation" has the meaning specified in Section 1.7.

"Allocation Schedule" has the meaning specified in Section 1.7.

"Alternative Transaction" has the meaning specified in Section 4.3(a).

"Applicable Laws" has the meaning specified in Section 2.17.

"Assets" has the meaning specified in Section 1.1.

"Assigned Contracts" shall mean (a) the Significant Contracts (except as set forth on Schedule 2.10(a)), (b) the Leases and Subleases (except as set forth on Schedule 2.10(a) or, for any such Lease or Sublease which is not a Significant Contract, on Schedule 1.3(a)(xi)), (c) all insurance policies referred to on Schedule 2.22 (except as set forth on Schedule 2.22), (d) all other contracts, agreements, licenses, commitments, purchase and sales orders, leases and subleases (of real or personal property) and other instruments to which any of the Sellers or Subsidiaries is party or by which their assets are bound, in each case to the extent they were entered into in the ordinary course of business and relate to the Business and in each case to the extent Transferable and (e) the contracts, agreements, licenses, commitments, purchase and sales orders, leases and subleases (of real or personal property) and other instruments set forth on Schedule 10(a).

"Assumed Accounts Payable" shall mean the accounts payable of Sellers, outstanding as of the Closing Date, which relate to the Business and are included in the Net Working Capital Schedule (excluding any payables to any Holder or his or her Affiliates).

"Assumed Liabilities" has the meaning specified in Section 1.2.

"Assumed Plans" has the meaning specified in Section 6.3(b).

"Assumption Agreement" shall mean one or more assumption agreements, dated as of the Closing Date, relating to the assumption of the Assumed Liabilities by Purchaser, in substantially the form attached hereto as Annex F.

"Auditor" has the meaning specified in Section 1.6(d).

"Bills of Sale" shall mean one or more bills of sale and assignment, dated as of the Closing Date, relating to the transfer of the Assets from Sellers to Purchaser, in substantially the form attached hereto as Annex G.

"Business" has the meaning specified in the Recitals hereof.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in New York, New York.

"Business Employees" means the employees of the Sellers and the Subsidiaries who are principally employed in connection with the conduct of the Business.

"Business Intellectual Property" has the meaning specified in Section 1.1(p).

"Cash Purchase Price" has the meaning specified in Section 1.4(a).

"Change of Control" shall mean shall mean the occurrence of any of the following events: (a) Thomas Weisel Capital Partners, L.P. and its Affiliates cease to be the largest equity holder of Purchaser (measured by the ability to cast votes for approval of a merger or consolidation under Delaware law), (b) Thomas Weisel Capital Partners, L.P. and its Affiliates cease to have the ability to appoint a majority of the board of directors of Purchaser or (c) Purchaser consummates the sale of all or substantially all of the assets of Purchaser and the Affiliated Purchasers. For purposes of this definition, the last sentence of the definition of "Affiliate" shall not apply.

"Change of Control Period" has the meaning specified in Section 1.8(a)(vi).

"Closing" has the meaning specified in Section 1.5(a).

"Closing Date" has the meaning specified in Section 1.5(a).

"COBRA" has the meaning specified in Section 6.3(h).

"Code" means the Internal Revenue Code of 1986, as amended.

"Co-Existence Agreement" has the meaning specified in Section 5.1.

"Commitment Letters" has the meaning specified in Section 3.5(c).

"Confidentiality Agreement" has the meaning specified in Section 11.7.

"Consent" shall mean any consent, approval, authorization, expiration of waiting period, waiver, permit, grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing with, or report or notice to, any Person, including any Governmental Authority.

"Costs" has the meaning specified in Section 8.2(b)(ii).

"Current Assets" has the meaning specified in Section 1.6(b).

"Current Liabilities" has the meaning specified in Section 1.6(b).

"Customers" has the meaning specified in Section 2.8.

"Damages" has the meaning specified in Section 9.2(a).

"Debt Commitment Letters" has the meaning specified in Section 3.5(b).

"Debt Financing" has the meaning specified in Section 1.8(a)(v).

"Defined Benefit Plan" means the Aircast Incorporated Employees' Retirement Plan.

"Deposit Escrow Agreement" means the escrow agreement, dated as of the Closing Date, by and among Sellers, AI Finance Holding Company, Inc. and the Escrow Agent, in substantially the form attached hereto as Annex J.

"DLL Lease Payment Amount" means an amount equal to the sum of (a) the number of lease payments owed under the terms of the Master Lease Agreement, dated December 29, 2003, between Aircast Incorporated and De Lage Landen Financial Services, Inc., as amended, until the earliest date the buyback option under such agreement can be exercised and (b) the buyback payment under the terms of such Master Lease Agreement, as amended.

"Earnout Audit Completion Date" has the meaning specified in Section 1.8(b)(iv).

"Earnout Determination Date" has the meaning specified in Section 1.8(b)(v).

"Earnout Financial Statements" has the meaning specified in Section 1.8(b)(vi).

"Earnout Payments" has the meaning specified in Section 1.8(b)(vii).

"Earnout Years" has the meaning specified in Section 1.8(b)(viii).

"Employee Plan" has the meaning specified in Section 2.16(a).

"Environmental Claim" means any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding, claim or contingent claim (whether administrative, judicial, quasi-judicial or private in nature) arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law, or (b) in connection with any Hazardous Material, from any abatement, removal, remedial, corrective, or other response action in connection with a Hazardous Material, Environmental Law, or from any actual or alleged damage, injury, threat, or harm to health, safety, natural resources, or the environment, regardless of whether such matter is now known or unknown, or how or when such matter occurred or is discovered.

"Environmental Condition" shall mean the presence, prior to Closing, of any Hazardous Materials on, at, under or emanating from the Transferred Property or Assets, in violation of any Environmental Law or in excess of any regulatory criteria and/or standard adopted pursuant to applicable Environmental Law for the protection of human health or the environment.

"Environmental Laws" means (a) any present or future federal, foreign, state or local law, regulation or common law relating to the handling, use, control, management, treatment, storage, disposal, release or threat of release of any Hazardous Material, including the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§9601 et seq., the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq., the federal Water Pollution Control Act ("CWA"), 33 U.S.C. §§1251 et seq., the federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 et seq., the Toxic Substances Control Act ("TSCA"), 7 U.S.C. §§ 136 et seq., the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f et seq., the Occupation Safety and Health Act of 1970 (the "OSH Act"), 29 U.S.C. §§ 651 et seq., and any similar foreign, state or local laws, rules or regulations, including ISRA and the New Jersey Spill Compensation and Control Act, N.J.S.A. §§ 58:10-23.11 et seq., and (b) any and all requirements arising under applicable present or future federal, foreign, state or local laws, statutes, rules, ordinances, codes, orders, licenses, permits, approvals, plans, authorizations, concessions, or the like, and all applicable judicial, administrative, and regulatory decrees, judgments, and orders, relating to the protection of human health or the environment, including: (i) any and all requirements pertaining to reporting, licensing, authorizing, approving, permitting, investigating, and remediating emissions, discharges, releases, or threat of releases of any Hazardous Materials into the indoor or outdoor air, surface water, groundwater, or land, or otherwise into the environment, or relating to the manufacture, operation, processing, distribution, use, treatment, storage, disposal, transport, handling or management of any Hazardous Material; and (ii) any and all requirements pertaining to the protection of the health and safety of employees.

"Equity Commitment Letter" has the meaning specified in Section 3.5(c).

"ERISA" has the meaning specified in Section 2.16(a).

"ERISA Affiliate" means any trade or business, whether or not incorporated, that together with the Sellers and Subsidiaries, individually or collectively, would be deemed a "single employer" within the meaning of Section 4001 of ERISA or Section 414 of the Code.

"Escrow Account" means the account established with the proceeds of the payment contemplated by Section 1.4(b)(ii) pursuant to the Escrow Agreement.

"Escrow Agent" means the escrow agent under the Escrow Agreement and the Deposit Escrow Agreement.

"Escrow Agreement" means the escrow agreement, dated as of the Closing Date, by and among Sellers, Purchaser and the Escrow Agent, in substantially the form attached hereto as Annex E.

"Excluded Assets" has the meaning specified in Section 1.3(a).

"Excluded Liabilities" has the meaning specified in Section 1.3(b).

"Exclusivity Period" has the meaning specified in Section 4.3(a).

"FDA" has the meaning specified in Section 2.24(a).

"Financial Statements" has the meaning specified in Section 2.4.

"Flex Plans" has the meaning specified in Section 6.3(l).

"Foreign Plan" has the meaning specified in Section 2.16(j).

"FTC" has the meaning specified in Section 6.1(c).

"Fundamental Documents" means the documents by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Fundamental Documents" (a) of a corporation would include its charter and bylaws, (b) of a partnership would include its certificate of partnership and partnership agreement and (c) of a limited liability company would include its certificate of formation and operating agreement.

"Germany Acquisition Subsidiary" has the meaning specified in Section 1.11.

"Germany Subsidiary Asset Purchase Agreement" has the meaning specified in Section 1.11.

"Government Contract" means any oral and written contracts, agreements or commitments between a Seller or any of the Subsidiaries and the United States Government or a department or agency thereof.

"Governmental Authority" means (a) any federal, state, regional, county, city, municipal or local government, whether foreign or domestic, (b) governmental or quasi-governmental authority of any nature, including any regulatory or administrative agency, commission, department, board, bureau, court, tribunal, arbitrator, arbitral body, agency, branch, official entity or other administrative or regulatory body obtaining authority from any of the foregoing, including courts, public utilities, sewer authorities and any supra-national organization, state, county, city or other political subdivision, or (c) any other Person, exercising or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

"Hazardous Material" means any substance or material: (a) the presence of which requires investigation or remediation under any Environmental Law, (b) which is or becomes regulated by any federal, foreign, state or local Governmental Authority under any Environmental Law, including any substance or waste material which is defined or listed as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "industrial waste," "hazardous substance," "solid waste,"

"hazardous material," "pollutant" or "contaminant"; (c) which contains gasoline, diesel fuel or other petroleum hydrocarbons or a petroleum derivative; (d) which contains polychlorinated biphenyls ("PCBs"), asbestos or urea formaldehyde; or (e) which is explosive, corrosive, flammable, infectious, radioactive or toxic.

"Holders" means, together, the AI Holders and the AIS Holders.

"Holders' Representative" shall have the meaning specified in Section 1.8(c).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Immediate Family" means, as to any individual, such individual's spouse, children and parents.

"Income Tax" means any federal, state, local or foreign income or franchise tax (including estimated tax), including any interest, penalty or addition thereto.

"Indebtedness" of any Person shall mean all obligations of such Person (whether for principal, interest, premiums, prepayment fees, penalties or otherwise) (a) for or in respect of borrowed money, (b) evidenced by notes, bonds, debentures, letters of credit or similar instruments, (c) for or in respect of the deferred purchase price of goods or services, (d) under or arising from leases which are required to be capitalized in accordance with U.S. GAAP or (e) in the nature of guarantees of any of the obligations described in clauses (a) through (d) above of any other Person.

"Indemnified Party" has the meaning specified in Section 9.3(a).

"Indemnitor" has the meaning specified in Section 9.3(a).

"Insurance Policies" has the meaning specified in Section 2.22.

"Intellectual Property" means any patents, trademarks, service marks, trade names, domain names, copyrights, trade secrets, know how, technology and inventions and any registrations or applications for registration of any of the foregoing.

"Inventory" means all inventory of finished Products owned as of the Closing by Sellers or any Subsidiary whether held at a location or facility of Sellers or the Subsidiaries (or of any other Person on behalf of Sellers or the Subsidiaries) or in transit to or from Sellers or the Subsidiaries (or any such other Person).

"IRS" means the United States Internal Revenue Service.

"ISRA" means the New Jersey Industrial Site Recovery Act, NJSA §§13:1 K-6, *et seq.*

"Key Managers" has the meaning specified in Section 7.1(r).

"knowledge of Sellers" has the meaning specified in Section 11.13.

"Law" shall mean any constitution, treaty, statute, law, ordinance, regulation, judgment, decree, injunction, ruling, Order, rule, stipulation or determination issued, promulgated or entered by or with any Governmental Authority.

"Leases" means all lease, sublease, rental or occupancy agreements (written or oral) pursuant to which any Seller or Subsidiary leases or subleases any real property as lessee or sublessee other than (a) that certain Business Center License Agreement, dated as of January 27, 2004, between Aircast Inc. and Trial Suites, LLC, with respect to the premises located at 423 Fourth Street, Suite 103, West Palm Beach, Florida 33401 and (b) that certain Services Agreement, dated as of April 29, 2003, between Aircast Inc. and Preferred Offices, LLC, with respect to the premises located at 1455 Pennsylvania Avenue, N.W., Suite 109, Washington, D.C. 20004.

"Leased Personal Property" means the Machinery and Equipment and other personal property used or held for use in the Business pursuant to any lease, sublease, rental or similar agreement (written or oral).

"Leased Real Property" has the meaning specified in Section 2.10(c).

"Liability" means any liability or obligation, whether now existing or arising in the future, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated and whether due or to become due, regardless of when asserted.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, encumbrance, security interest, claim, grant of power to confess judgment, lease, sublease, license, lien, collateral security arrangement, conditional sale contract, title or interest retention contract, adverse claim or interest, easement, encroachment, title defect, voting trust agreement, option, charge, right of first refusal or offer, or other encumbrance or restriction of any kind or nature whatsoever, or rights of others, or other contract to grant any of the foregoing or an interest in property.

"Machinery and Equipment" has the meaning specified in Section 1.1(l).

"Marketing Materials" means (a) all market research, marketing plans, media plans, advertising, sales training materials, customer lists and information with respect to sales of Products, promotional and marketing books and records owned by Sellers and the Subsidiaries and used exclusively in connection with the marketing and promotion of the Products; and (b) those items of advertising and promotional materials and literature owned by Sellers and the Subsidiaries as of the Closing and used in connection with the advertising and promotion of the Products, provided that "Marketing Materials" shall exclude the labeling of the Products, which shall be deemed part of the Regulatory Approvals.

"Material Adverse Effect" means a material adverse effect on the business, operations, condition (financial or otherwise), properties (including the Assets), Liabilities or results of operations of the Sellers and the Subsidiaries, taken as a whole, or on the Business, other than a material adverse effect arising or resulting from (a) general economic or political conditions, events, circumstances, changes or effects not relating particularly to the Sellers or the Business (including those relating to the economy and acts of war, terrorism or other like acts of hostility) and (b) changes in applicable law, rule or regulation.

"Minimum Remediation Standards" has the meaning specified in Section 9.2(c).

"Monthly Operating Report" means the monthly income statements and balance sheets of Sellers.

"Net Sales" means total sales revenue less returns, allowances and rebates and any other deductions used in the development of net sales as reported, computed in accordance with U.S. GAAP in the 2002-2003 Financial Statements.

"Net Working Capital" has the meaning specified in Section 1.6(b).

"Net Working Capital Schedule" has the meaning specified in Section 1.6(d).

"NJDEP" has the meaning specified in Section 7.1(o).

"Non-Compete Period" has the meaning specified in Section 6.10(a).

"Note Finance Escrow Account" means the account established with the payment contemplated by the last sentence of Section 1.4 pursuant to the Deposit Escrow Agreement.

"Notes" has the meaning specified in Section 1.4(b)(v).

"Order" means an award, decision, ruling, judgment, writ, decree, compliance agreement, injunction, subpoena, verdict or order issued or rendered by any court, administrative agency or other Governmental Authority or any arbitrator.

"ordinary course" or "ordinary course of business" means any conduct engaged in or action taken by a Person that is consistent in nature, scope and magnitude with the past practices of such Person and is engaged in or taken in the ordinary course of the normal day-to-day operations of such Person.

"PBGC" has the meaning specified in Section 2.16(c).

"Permits" means all permits, licenses, authorizations, registrations, franchises, approvals, certificates, variances, waivers or other authorizations, approvals, consents, clearances or similar rights issued, granted or obtained by or from any Governmental Authority. "Permits" specifically includes, without limitation, all pending and approved 501(k)s and pre-marketing approval applications ("PMAs") (and their respective international counterparts) and all supplements thereto for each of the Products, in each cases to the extent Transferable.

"Permitted Liens" means (a) mechanics liens, materialmen's liens, and similar Liens with respect to any Assumed Liabilities not yet due and payable; (b) Liens imposed by statute for rents, Taxes, assessments and any other charges of a Governmental Authority, to the extent the foregoing rents, Taxes, assessments and charges (I) are Assumed Liabilities and not yet due and payable or (II) relate to real property Taxes for the period during which the Closing occurs that are being pro-rated pursuant to Section 6.4 and are not yet due and payable; (c) Liens disclosed on Schedule 10(b); (d) rights of parties under Assigned Contracts to the extent the same relate to performance after the Closing; and (e) with respect to the Transferred Real Property, and provided that the following are not (i) violated in any material respect by existing improvements or the current use of the Transferred Real Property, or (ii) interfering with the use and enjoyment of the Transferred Real Property in connection with the Business: (A) any easements, rights of way, encroachments and other restrictions that would be shown on or disclosed by a current title report, the German land register or an accurate survey; and (B) zoning, building and other restrictions imposed by applicable Law.

"Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, trust, Governmental Authority or other entity of any kind.

"Proceeding" means any action, suit, proceeding, complaint, litigation, charge, hearing, inquiry or investigation before or by a Governmental Authority or arbitrator.

"Product" or "Products" means the items manufactured and sold by any of the Sellers or Subsidiaries, which are set forth on Schedule 10(c).

"PTO" has the meaning specified in Section 6.3(g).

"Purchase Price" has the meaning specified in Section 1.4(a).

"Purchaser" has the meaning specified in the Preamble hereto.

"Purchaser Indemnified Parties" has the meaning specified in Section 9.2(a).

"Purchaser's Flex Plans" has the meaning specified in Section 6.3(f).

"Purchaser's Representatives" has the meaning specified in Section 4.2.

"Regulatory Approvals" means, with respect to each Product, the approvals, clearances, supplements and other documentation for such Product identified in Schedule 10(c).

"Regulatory Files" means the applicable 510(k) or PMAs for each Product and all supplements thereto, and the required regulatory files and data relating thereto in the possession or control of Sellers or the Subsidiaries.

"Release" shall mean any spilling, leaking, seeping, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, placing, burying or disposing in or upon or under any land or water or air, or otherwise into the indoor or outdoor environment, including the abandonment or discarding of barrels, drums, containers, tanks, and other receptacles containing or previously containing any Hazardous Material.

"Reimbursable Remedial Costs" has the meaning specified in Section 9.2(c).

"Remediation Cost Estimate" has the meaning specified in Section 9.2(d).

"Restricted Territory" has the meaning specified in Section 6.10(a).

"Seller" has the meaning specified in the Preamble hereto.

"Sellers" has the meaning specified in the Preamble hereto.

"Seller's 401(k) Plan" means the Aircast Incorporated 401(k) Plan.

"Sellers Assets" has the meaning specified in Section 1.1.

"Sellers Assumed Liabilities" has the meaning specified in Section 1.2.

"Sellers Excluded Assets" has the meaning specified in Section 1.3(a).

"Sellers Excluded Liabilities" has the meaning specified in Section 1.3(b).

"Sellers Indemnified Parties" has the meaning specified in Section 9.2(b).

"Sellers Representatives" has the meaning specified in Section 4.3(a).

"Significant Contracts" has the meaning specified in Section 2.10.

"Subleases" means all sublease, rental or occupancy agreements pursuant to which any Seller or Subsidiary gives a third party a right to occupy a portion of the Transferred Real Property or the Leased Real Property.

"Subordinated Notes" has the meaning specified in Section 1.4(b)(iii).

"Subsidiary" means, with respect to any Seller, any corporation, partnership or other entity of which 50% or more of the voting power of the equity securities or equity interests is owned, directly or indirectly, by such Seller, each of which such Subsidiary is set forth in Schedule 2.3.

"Subsidiary Interests" has the meaning specified in Section 1.3(a)(vi).

"Subsidiary Asset Purchase Agreements" has the meaning specified in Section 1.11.

"Subsidiary Assets" has the meaning specified in Section 1.1.

"Subsidiary Assumed Liabilities" has the meaning specified in Section 1.2.

"Subsidiary Cash Purchase Price" has the meaning specified in Section 1.4.

"Subsidiary Excluded Assets" has the meaning specified in Section 1.3(a).

"Subsidiary Excluded Liabilities" has the meaning specified in Section 1.3(b).

"Target 2005 Net Sales" has the meaning specified in Section 1.8(a)(i).

"Target 2006 Net Sales" has the meaning specified in Section 1.8(a)(ii).

"Target 2007 Net Sales" has the meaning specified in Section 1.8(a)(iii).

"Tax" or "Taxes" means any federal, state, local or foreign net or gross income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium (including taxes under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax, governmental fee or like assessment, together with any interest and penalties, additions to tax or additional amounts imposed by any Governmental Authority.

"Tax Return" or "Tax Returns" means all reports, returns, forms, declarations, claims for refund or statements of any kind or nature relating to Taxes, and any schedule or attachment thereto and any amendment thereof.

"The Aircast Foundation" means The Aircast Foundation, Inc., a New Jersey corporation.

"Third Party Claims" has the meaning specified in Section 9.3(a).

"Transactions" shall mean the transactions contemplated by this Agreement and the other Acquisition Documents on the terms and conditions hereof and thereof.

"Transferable" means, with respect to any Asset, the ability of Sellers or the Subsidiaries to convey, transfer, assign and deliver such Asset to Purchaser or the Affiliated Purchasers. An Asset will be deemed Transferable unless: (a) the license or other agreement pursuant to which Sellers or the Subsidiaries possess such Asset or, if such Asset is a Permit or Assigned Contract, the terms of such Permit or Assigned Contract or applicable Law, expressly prohibit conveyance, transfer, assignment or delivery thereof to a third party, (b) such license, other agreement, Permit or Assigned Contract or applicable Law, does not provide a process for obtaining Consent to such conveyance, transfer, assignment or delivery, (c) such conveyance, transfer, assignment or delivery would cause the license or other agreement, Permit or Assigned Contract to terminate or be breached or violate applicable Law and (d) Sellers and the Subsidiaries are unable to obtain Consent to such conveyance, transfer, assignment or delivery before the Closing, notwithstanding their efforts to obtain such Consent as contemplated by Section 6.1.

"Transferred Employee" means each Active Business Employee who receives an offer of employment from Purchaser or an Affiliated Purchaser and who accepts such offer of employment.

"Transferred Leased Property" means any property leased pursuant to the Leases.

"Transferred Property" means any Transferred Leased Property and any Transferred Real Property.

"Transferred Real Property" means any real property and all easements and rights of way appurtenant thereto owned by any Seller or Subsidiary and used or held for use in the operation of the Business.

"Treasury Regulations" means the regulations issued pursuant to the Code.

"UK Acquisition Subsidiary" has the meaning specified in Section 1.11.

"UK Subsidiary Asset Purchase Agreement" has the meaning specified in Section 1.11.

"U.S. GAAP" has the meaning specified in Section 2.4.

"U.S. Transferred Employee" means a Transferred Employee employed in the United States.

"WARN" means the Worker Adjustment and Retraining Notification Act, as amended.

"Welfare Plan" has the meaning specified in Section 2.16(a).

## ARTICLE XI.
## MISCELLANEOUS

Section 11.1    Notices. All notices and other communications among the parties hereunder shall be in writing and shall be deemed to have been duly delivered (a) upon receipt if delivered in person, (b) five (5) calendar days after posting in the United States mail having been sent registered or certified mail return receipt requested, (c) two (2) calendar days after being sent by a reputable, nationally recognized overnight courier, or (d) upon receipt if delivered by telecopy and promptly confirmed by delivery in person, post or courier as aforesaid in each case, with postage prepaid, addressed as follows:

(i)     If to Purchaser, to:

AI Asset Acquisition Company LLC
c/o Tailwind Capital Partners LLC
390 Park Avenue, 17th Floor
New York, New York 10022
Attention:  Douglas M. Karp
Telecopy No.: (212) 271-3610

with a copy to:

Kelley Drye & Warren LLP
2 Stamford Plaza
281 Tresser Blvd.
Stamford, Connecticut 06901
Attention: John T. Capetta, Esq.
Telecopy No.: (203) 327-2669

(ii)    If to Sellers, to:

(if prior to Closing):
Aircast Incorporated
92 River Road
Summit, New Jersey 07901
Attention:  Glenn W. Johnson III
Telecopy No.: (908) 273-1060

(if after Closing):
Glenn W. Johnson
Four Seasons Residence
1425 Brickell Avenue
Suite 56E
Miami, Florida 33131
Telecopy No.:  (207) 799 8586

in each case with a copy to:

Latham & Watkins LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004-1304
Attention:  Stuart S. Kurlander, Esq.
Telecopy No.: (202) 637-2201

or to such other address or addresses as the parties may from time to time designate to the other parties hereto in writing in accordance with the provisions hereof.

Section 11.2     Assignment.  No party hereto shall assign this Agreement or any part hereof without the prior written consent of each other party hereto; provided, however, that from and after the Closing (a) Purchaser shall have the right without the consent of Sellers to (i) assign its rights and obligations hereunder to any Affiliate of Purchaser or to any successor to all or substantially all of its

business or assets or (ii) collaterally assign its rights hereunder to any lender and (b) each Seller shall have the right without consent of Purchaser to assign its rights and obligations hereunder to a liquidating trust, whether directly or indirectly via distribution to the AI Holders and AIS Holders, upon such Seller's dissolution. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and legal representatives.

Section 11.3    Rights of Third Parties. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the parties hereto and their respective successors and permitted assigns, and the Persons entitled to indemnification as provided in Article IX, any rights or remedies under or by reason of this Agreement.

Section 11.4    Expenses. Except as expressly set forth in this Agreement, each party hereto shall bear its own expenses incurred in connection with this Agreement and the transactions herein contemplated whether or not such transactions shall be consummated, including all fees of its legal counsel, financial advisers and accountants; provided, however, that the fees and expenses of the Auditors, if any, and the filing fees due under the HSR Act, shall be paid one-half by Purchaser and one-half by Sellers.

Section 11.5    Construction. Unless otherwise stated, references to Sections, Articles, Exhibits, Schedules or Annexes refer to the Sections, Articles, Exhibits, Schedules and Annexes to this Agreement. Terms defined in the singular shall have comparable meanings when used in the plural, and vice versa. Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. All Exhibits, Schedules and Annexes attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Schedule or Annex, but not otherwise defined therein, shall have the meaning as defined in this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". Each of the parties hereto acknowledges and agrees that all parties hereto participated jointly in the negotiation and drafting of this Agreement. If any ambiguity or question of intent or interpretation shall arise with respect to this Agreement, then this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party to this Agreement by virtue of the authorship of any provision of this Agreement, and no rule of strict construction shall be applied against any party.

Section 11.6    Captions; Counterparts. The captions in this Agreement are for convenience of reference only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 11.7    Entire Agreement. This Agreement (together with the Exhibits, Schedules and Annexes to this Agreement, which, although they may be bound separately, constitute part of this Agreement), that certain Confidentiality Agreement dated as of July 9, 2003 between Thomas Weisel Capital Partners, L.P. and AI (the "Confidentiality Agreement") and the other Acquisition Documents and certificates delivered pursuant hereto and thereto constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersede any other agreements, whether written or oral and whether by any officer, employee, representative or Affiliate of any party hereto, that may have been made or entered into by or among any of the parties hereto relating to the Transactions. No representations, warranties, covenants, understandings, agreements, oral or otherwise relating to the Transactions exist between the parties except as expressly set forth in this Agreement, the Confidentiality Agreement and the Acquisition Documents.

Section 11.8    Amendments; Waivers. Any of the provisions of this Agreement may be amended or modified only by a written instrument signed by each of the parties hereto and any of the provisions of this Agreement may be waived only by a written instrument signed by the party or parties making such waiver. The failure of any party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such party thereafter to enforce each and every such provision. No waiver of any breach of, or noncompliance with, this Agreement shall be held to be a waiver of any other or subsequent breach or noncompliance.

Section 11.9    Publicity. Neither Sellers nor Purchaser shall, nor shall they permit any of their respective Affiliates to, issue any press releases or other public communications of any nature whatsoever prior to or concurrent with the Closing relating to the Transactions without the prior written approval of the other party, which approval shall not be unreasonably withheld by any party. Seller shall not, and shall not permit any of its Affiliates to, issue any press releases or other public communications of any nature whatsoever after the Closing relating to the Transactions or that includes any financial related information pertaining to the Business, in each case without the prior written approval of Purchaser, which approval shall not be unreasonably withheld. Notwithstanding the foregoing provisions of this Section 11.9, any party may issue such press releases or other public communications otherwise subject to the foregoing provisions of this Section 11.9 as such party may consider necessary in order to satisfy such party's legal obligations after such consultation with the other parties hereto as is reasonable under the circumstances.

Section 11.10    Governing Law. THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.

Section 11.11    Jurisdiction. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN NEW YORK, NEW YORK FOR ANY SUIT, ACTION OR PROCEEDING AMONG THEM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW, (A) THE RIGHT TO TRIAL BY JURY; (B) ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT; AND (C) ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. FINAL JUDGMENT IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON EACH PARTY DULY SERVED WITH PROCESS THEREIN AND MAY BE ENFORCED IN ANY JURISDICTION IN WHICH ANY PARTY OR ANY OF ITS PROPERTY IS LOCATED. PROCESS IN ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT PURSUANT TO THIS SECTION 11.11 MAY BE SERVED ON ANY PARTY ANYWHERE IN THE WORLD, AND MAY BE SENT OR DELIVERED TO THE PARTY TO BE SERVED AT THE ADDRESS AND IN THE MANNER PROVIDED FOR THE GIVING OF NOTICES SET FORTH IN SECTION 11.1.

Section 11.12    Severability. In the event that any one or more of the provisions of this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

Section 11.13    Knowledge Attributable to Sellers.  Whenever any statement herein or in any schedule, exhibit, certificate or other document delivered to any party pursuant to this Agreement is made "to the knowledge of Sellers" or containing words of similar intent or effect, the knowledge of the Sellers will be determined to be the actual knowledge (after due inquiry) of Glenn W. Johnson III, Fabian McCarthy, Melanie Iuliano, Thomas Crowley, Johan de Ruiter, Ajey Atre and William Devitt.

Section 11.14    Specific Performance.  Each of the parties acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement and that irreparable harm would result if this Agreement were not specifically enforced.  Therefore, the rights and obligations of the parties under this Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith, without the necessity of posting a bond or other security or proving actual damages and without regard to the adequacy of any remedy at law.  A party's right to specific performance shall be in addition to all other legal or equitable remedies available to such party.

Section 11.15    Conflict in Provisions.  In case of any conflict between the provisions of this Agreement and the provisions of any Subsidiary Asset Purchase Agreement or other Acquisition Document, the terms of this Agreement shall control.

*[Remainder of page intentionally left blank; signature page follows]*

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date first above written.

AIRCAST INCORPORATED

By:_____
    Name:
    Title:

AIRCAST INTERNATIONAL SALES, L.L.C.

By:_____
    Name:
    Title:

AI ASSET ACQUISITION COMPANY LLC

By:_____
    Name:
    Title:

As to Section 1.8(a) only:

AI HOLDING COMPANY LLC

By:_____
Name:
Title:

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date first above written.

AIRCAST INCORPORATED

By:_____
    Name:
    Title:

AIRCAST INTERNATIONAL SALES, L.L.C.

By:_____
    Name:
    Title:

COMPANY LLC

By: _____ M. Karp
    Title: President

As to Section 1.8(a) only:

AI HOLDING COMPANY LLC

By: _____ M. Karp
    Title: President

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date first above written.

AIRCAST INCORPORATED



AIRCAST INTERNATIONAL SALES, LLC.



AI ASSET ACQUISITION COMPANY, LLC



As to Section 1.8(a) only:

AI HOLDING COMPANY LLC

# EXHIBIT B

## SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT (this "Agreement"), dated as of March 29, 2006, by and among: Aircast LLC (formerly AI Asset Acquisition Company LLC), a Delaware limited liability company (the "Old Aircast Purchaser"); Aircast Holding Company LLC (formerly AI Holding Company LLC), a Delaware limited liability company and sole owner of the Old Aircast Purchaser ("Aircast Intermediate Holdco" and, collectively with the Old Aircast Purchaser, the "Earnout Obligors"); the ANKL Liquidating Trust, a New Jersey trust (the "ANKL Liquidating Trust"); ANKL, Inc. (formerly Aircast Incorporated), a New Jersey corporation ("AI"); and ANKL International, L.L.C. (formerly Aircast International Sales, L.L.C.), a New Jersey limited liability company ("AIS" and, collectively with AI, the "Old Aircast Sellers").

## RECITALS:

A.    The Old Aircast Sellers and the Old Aircast Purchaser entered into an Asset Purchase Agreement, dated as of October 31, 2004 (the "Aircast Purchase Agreement"), pursuant to Section 1.8 of which the Earnout Obligors have the obligation to make certain payments to the Old Aircast Sellers or their respective assigns upon the satisfaction of conditions specified therein relating to the financial performance of Aircast Intermediate Holdco and its Subsidiaries during the time periods specified therein, in each case on the terms and conditions set forth therein

B.    The Old Aircast Sellers have assigned all of their respective rights and obligations under the Aircast Purchase Agreement to the ANKL Liquidating Trust (the "Assignment").

C.    Pursuant to the Stock Purchase Agreement, dated as of February 27, 2006 (the "dj Purchase Agreement"), by and among: dj Orthopedics, LLC, a Delaware limited liability company ("dj"); Tailwind Management LP, a Delaware limited partnership (the "Stockholder Representative"); TWCP, L.P., a Delaware limited partnership ("TWCP"); TWCP Founders' Circle (QP), L.P., a Delaware limited partnership ("TWCP-QP"); TWCP Founders Circle (AI), L.P., a Delaware limited partnership ("TWCP-AI"); Thomas Weisel Capital Management LLC, a Delaware limited liability company ("TWCM"); and Thomas Weisel Capital Partners Employee Fund, L.P., a Delaware limited partnership ("TWCPEF" and, collectively with TWCP, TWCP-QP, TWCP-AI and TWCM, the "Tailwind Stockholders"); DLJ Growth Capital Partners, L.P., a Delaware limited partnership ("DLJ"); GCP Plan Investors, L.P., a Delaware limited partnership ("GCP" and, collectively with DLJ, the "DLJ Stockholders"); and GSO Credit Opportunities Fund (Helios), L.P., a Cayman Islands limited partnership (the "Credit Opportunities Stockholder" and, collectively with the Tailwind Stockholders and the DLJ Stockholders, the "Sellers"), dj agreed to purchase from the Sellers all of the outstanding shares of capital stock of Aircast Incorporated, a Delaware corporation and sole owner of Aircast Intermediate Holdco, subject to the terms and conditions set forth therein (the "Stock Purchase").

D.    Under Section 1.8(a)(vi) of the Aircast Purchase Agreement, all outstanding Earnout Payments (as defined therein) will become due upon the occurrence of a Change of Control (as defined therein) if certain conditions specified therein relating to the financial performance (the "Acceleration Conditions") of Aircast Intermediate Holdco and its Subsidiaries during the Change of Control Period (as defined therein) are satisfied (the "Earnout Obligations Acceleration").

E.    Although the closing of the Stock Purchase pursuant to the terms and conditions of the dj Purchase Agreement (the "dj Purchase Agreement Closing") will constitute a Change of Control for purposes of Section 1.8(a)(vi) of the Aircast Purchase Agreement, the parties anticipate that the Acceleration Conditions will not be satisfied as of the dj Purchase Agreement Closing and, as a result, the dj Purchase Agreement Closing is not expected to result in the Earnout Obligations Acceleration.

F.    The Earnout Obligors, the ANKL Liquidating Trust and the Old Aircast Sellers desire to enter an agreement providing for the termination, settlement and release of the obligations of the Earnout

Obligors under Section 1.8 of the Aircast Purchase Agreement (other than any such obligation with respect to any Earnout Obligations Acceleration, if applicable), on the terms and conditions set forth in this Agreement.

G.    Any capitalized terms not otherwise defined in this Agreement have the respective meanings set forth in the Aircast Purchase Agreement.

## AGREEMENT:

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I:
## SETTLEMENT CLOSING

Section 1.1    Settlement Closing Generally.  At 10:00 a.m. (New York time) on the later to occur of: (a) the fifth Business Day after the date of this Agreement; or (b) the first Business Day after the day on which the dj Purchase Agreement Closing occurs, as long as it has not been determined by such time that the dj Purchase Agreement Closing would result in the Earnout Obligations Acceleration, the Earnout Obligors will pay or cause to be paid to the ANKL Liquidating Trust, by wire transfer of immediately available funds to such account as may be designated in writing by the ANKL Liquidating Trust to the Earnout Obligors not later than two (2) Business Days prior to the date of the Settlement Closing (as defined below) or, absent such designation, by check, seven hundred thousand dollars ($700,000) (the "Settlement Payment"), in consideration of and exchange for the releases provided pursuant to Section 2.1 and the other covenants and agreements of the ANKL Liquidating Trust and the Old Aircast Sellers set forth in this Agreement (the "Settlement Closing").

Section 1.2    Effect of Failure to Occur of Conditions to Settlement Closing.  If: (a) the dj Purchase Agreement is terminated without the dj Purchase Agreement Closing having occurred; or (b) prior to the occurrence of the Settlement Closing, it has been determined that the dj Purchase Agreement Closing would result in the Earnout Obligations Acceleration, then in either of such cases; the Settlement Closing shall not occur, the Earnout Obligors shall provide prompt written notice thereof to the ANKL Liquidating Trust and this Agreement and all of the obligations of the parties hereunder (other than any obligations under any terms hereof that, by their terms, survive termination of this Agreement) shall, automatically and without any further action by any of the parties, terminate and be null and void, ab initio, and without any force or effect.

Section 1.3    Effect of Subsequent Determination of Earnout Obligations Acceleration.  If it is determined subsequent to the occurrence of the Settlement Closing that the dj Purchase Agreement Closing resulted in the Earnout Obligations Acceleration: (a) the Earnout Obligors shall provide written notice thereof to the ANKL Liquidating Trust (with a copy provided simultaneously to the Stockholder Representative), as soon as reasonably practicable after learning of such determination; (b) automatically and without any further action by any of the parties, the releases provided pursuant to Section 2.1 shall be deemed to be rescinded in full, effective retroactively to the time of the Settlement Closing, and this Agreement and all of the obligations of the parties hereunder (other than any obligations under terms hereof that, by their terms, survive termination of this Agreement) shall terminate and be null and void, ab initio, and without any force or effect; and (c) the Settlement Payment shall be retained by the ANKL Liquidating Trust and credited against and deducted from, on a dollar for dollar basis, the obligation of the Earnout Obligors to the ANKL Liquidating Trust incurred as a result of the Earnout Obligations Acceleration, and the ANKL Liquidating Trust shall promptly provide reasonable written evidence of such crediting and deduction to the Earnout Obligors and the Stockholder Representative. The parties agree and acknowledge that the provisions of the preceding clause (c) of this Section 1.3 shall survive any termination of this Agreement.

2

## ARTICLE II:
### RELEASES, AGREEMENTS AND ACKNOWLEDGEMENTS

Section 2.1    Releases. In consideration of and exchange for the Settlement Payment, the covenants and agreements of the Earnout Obligors set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the ANKL Liquidating Trust and each of the Old Aircast Sellers, effective and conditioned upon occurrence of the Settlement Closing, the ANKL Liquidating Trust and each of the Old Aircast Sellers, on behalf of itself and its predecessors, successors (by merger or consolidation or otherwise), Affiliates; trustees, beneficiaries and assigns, and each such Person's respective direct and indirect employees, officers, directors, managers, members, partners, stockholders, equityholders, trustees, beneficiaries, agents and representatives, their respective successors and assigns and, with respect to any of the foregoing who is a natural person, each of such natural person's heirs, personal representatives, legatees, executors, administrators and assigns (collectively, the "Releasors"), hereby finally and irrevocably terminates and discharges the performance obligation of either or both of the Earnout Obligors under Section 1.8 of the Aircast Purchase Agreement (other than any such obligation relating to the determination of whether the Earnout Obligations Acceleration has occurred, if applicable) and waives, releases and forever discharges dj, the Sellers, the Earnout Obligors and their respective predecessors, successors (by merger or consolidation or otherwise), Affiliates and assigns, and each such entity's respective employees, officers, directors, managers, members, partners, stockholders, equityholders, agents and representatives and their respective successors and assigns (collectively, the "Releasees"), from any and all actions, causes of action, claims, suits, arbitrations, complaints, demands, collections, debts, liens, contracts, agreements, promises, liabilities, damages (including compensatory damages, tort damages, contract damages and punitive damages), losses, costs or expenses or other relief of any nature whatsoever, whether known or unknown, matured or unmatured, in law or in equity, whether based on a tort, contract or any other theory of recovery, which any of the Releasors has had, now has or may hereafter have against any of the Releasees pursuant to, arising out of or relating to Section 1.8 of the Aircast Purchase Agreement, except for any of the foregoing relating to the determination of whether the Earnout Obligations Acceleration has occurred, if applicable (collectively, the "Released Claims").

Section 2.2    Agreements and Acknowledgements. In consideration of the Settlement Payment, the covenants and agreements of the Earnout Obligors set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the ANKL Liquidating Trust and each of the Old Aircast Sellers, effective and conditioned upon the occurrence of the Settlement Closing, the ANKL Liquidating Trust and each of the Old Aircast Sellers hereby agrees and acknowledges, on behalf of itself and the other Releasors, that: (a) it has accepted the terms of this Agreement in complete compromise and satisfaction of the Released Claims and waives and assumes the risk that facts or applicable law may exist that would have, if known by it at the time that it entered into this Agreement, materially affected its decision to enter into this Agreement; (b) it intends that its release hereunder shall be as comprehensive and broad as is legally permissible with respect to the Released Claims and it shall have no further recourse against any of the Releasees with respect to any of the Released Claims; (c) it shall be forever barred from bringing or causing to be brought any Proceeding arising out of or relating to any of the Released Claims; and (d) the Settlement Payment constitutes sufficient consideration for the execution and delivery of this Agreement and providing the releases and covenants and agreements set forth herein.

## ARTICLE III:
### REPRESENTATIONS AND WARRANTIES

Section 3.1    Representations and Warranties of the ANKL Liquidating Trust. The ANKL Liquidating Trust hereby represents and warrants to the Earnout Obligors as follows:

3

(a)    Authority; Enforceability. The ANKL Liquidating Trust has all required power, authority and legal capacity to execute and deliver this Agreement and perform its obligations hereunder. The persons executing and delivering this Agreement on behalf of the ANKL Liquidating Trust have each been duly authorized to execute and deliver this Agreement on behalf of the ANKL Liquidating Trust. This Agreement, when executed and delivered by all of the parties, will constitute the legal, valid and binding obligation of the ANKL Liquidating Trust, enforceable against it in accordance with its terms.

(b)    Non-Contravention. Neither the ANKL Liquidating Trust's execution and delivery of this Agreement, nor the performance by the ANKL Liquidating Trust of any of its obligations hereunder, violates or will violate any Law applicable to the ANKL Liquidating Trust or constitutes or will constitute a breach of or default under any contract, agreement, covenant or restriction by which the ANKL Liquidating Trust is bound or any of its property is subject. The ANKL Liquidating Trust has obtained all consents and approvals necessary for it to execute and deliver this Agreement and perform its obligations hereunder.

(c)    No Undisclosed Inducements. The ANKL Liquidating Trust has entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts and circumstances and no representations and warranties; covenants or agreements, other than those expressly set forth in this Agreement, were made by any of the Earnout Obligors, any of their respective Affiliates or any employee, officer, director, manager, member, partner, stockholder, equityholder, agent or representative of any such entity to induce the ANKL Liquidating Trust to enter into this Agreement.

(d)    No Assignment of Rights by the ANKL Liquidating Trust. The ANKL Liquidating Trust has the sole and exclusive right to the Released Claims and the sole and exclusive right and authority to execute, deliver and perform this Agreement and receive the Settlement Payment in exchange for the releases and covenants and agreements set forth in this Agreement. The ANKL Liquidating Trust has not sold, assigned, conveyed, pledged or otherwise transferred to any Person any of the Released Claims or any rights concerning any of the Released Claims.

(e)    Assignment of Rights under Aircast Purchase Agreement by the Old Aircast Sellers. All of the respective rights and obligations of each of the Old Aircast Sellers have been duly and validly assigned by the Old Aircast Sellers to the ANKL Liquidating Trust pursuant to the Assignment and the Assignment is valid and enforceable.

Section 3.2    Representations and Warranties of the Old Aircast Sellers. Each of the Old Aircast hereby jointly and severally represents and warrants to the Earnout Obligors as follows:

(a)    Authority; Enforceability. Each of the Old Aircast Sellers has all required power, authority and legal capacity to execute and deliver this Agreement and perform its obligations hereunder. The person executing and delivering this Agreement on behalf of each of the Old Aircast Sellers has been duly authorized to execute and deliver this Agreement on behalf of the each of the Old Aircast Sellers. This Agreement, when executed and delivered by all of the parties, will constitute the legal, valid and binding obligation of each of the Old Aircast Sellers, enforceable against it in accordance with its terms.

(b)    Non-Contravention. Neither the Old Aircast Sellers' execution and delivery of this Agreement, nor the performance by the Old Aircast Sellers of any of their respective obligations hereunder, violates or will violate any Law applicable to either or both of the Old Aircast Sellers or constitutes or will constitute a breach of or default under any contract, agreement, covenant or restriction by which the either or both of the Old Aircast Sellers is bound or any of their respective

property is subject. Each of the Old Aircast Sellers has obtained all consents and approvals necessary for it to execute and deliver this Agreement and perform its obligations hereunder.

(c)    No Undisclosed Inducements. Each of the Old Aircast Sellers has entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts and circumstances and no representations and warranties, covenants or agreements, other than those expressly set forth in this Agreement, were made by any of the Earnout Obligors, any of their respective Affiliates or any employee, officer, director, manager, member, partner, stockholder, equityholder, agent or representative of any such entity to induce the Old Aircast Sellers to enter into this Agreement.

(d)    No Assignment of Rights by the Old Aircast Sellers. Other than the Assignment, neither of the Old Aircast Sellers has sold, assigned, conveyed, pledged or otherwise transferred to any Person any of the Released Claims or any rights concerning any of the Released Claims.

(e)    Assignment of Rights under Aircast Purchase Agreement by the Old Aircast Sellers. All of the respective rights and obligations of each of the Old Aircast Sellers have been duly and validly assigned by the Old Aircast Sellers to the ANKL Liquidating Trust pursuant to the Assignment and the Assignment is valid and enforceable.

Section 3.3    Representations and Warranties of the Earnout Obligors. Each of the Earnout Obligors hereby jointly and severally represents and warrants to the ANKL Liquidating Trust and each of the Old Aircast Sellers as follows:

(a)    Authority; Enforceability. The Earnout Obligor has all required power, authority and legal capacity to execute and deliver this Agreement and to perform its obligations hereunder. The person executing and delivering this Agreement on behalf of the Earnout Obligor has been duly authorized to execute and deliver this Agreement on behalf of the Earnout Obligor. This Agreement, when executed and delivered by all of the parties, will constitute the legal, valid and binding obligation of the Earnout Obligor, enforceable against it in accordance with its terms.

(b)    Non-Contravention. Neither the Earnout Obligor's execution and delivery of this Agreement, nor the performance by the Earnout Obligor of any of its obligations hereunder, violates or will violate any Law applicable to the Earnout Obligor or constitutes or will constitute a breach of or default under any contract, agreement, covenant or restriction by which the Earnout Obligor is bound or any of its property is subject. The Earnout Obligor has obtained all consents and approvals necessary for it to execute and deliver this Agreement and perform its obligations hereunder.

(c)    No Undisclosed Inducements. The Earnout Obligor has entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts and circumstances and no representations and warranties, covenants or agreements, other than those expressly set forth in this Agreement, were made by the ANKL Liquidating Trust, either of the Old Aircast Sellers, any of their respective Affiliates or any direct or indirect employee, officer, director, manager, member, partner, stockholder, equityholder, trustee, beneficiary, agent or representative of any of the foregoing, to induce the Earnout Obligor to enter into this Agreement.

## ARTICLE IV:
## MISCELLANEOUS PROVISIONS

Section 4.1    Effect of Termination of Agreement Upon Miscellaneous Provisions. The provisions of this Article IV shall survive any termination of this Agreement.

5

Section 4.2     No Admission. The parties agree and acknowledge that nothing in this Agreement shall be construed or in any way interpreted as an admission of liability by any party or as an admission that any party has violated any applicable Law or violated or breached any contract or agreement binding upon such party.

Section 4.3     Fees and Expenses. As between the ANKL Liquidating Trust and the Old Aircast Sellers, on the one hand, and the Earnout Obligors, on the other hand, the ANKL Liquidating Trust and the Old Aircast Sellers, on the one hand, and the Earnout Obligors, on the other hand, shall each bear the cost of, and shall be responsible for, their own attorneys' and other fees and expenses, if any, incurred in connection with the negotiation, execution, delivery and performance of this Agreement.

Section 4.4     Further Actions. Subject to the terms and conditions of this Agreement, at any time and from time to time after the effectiveness of this Agreement, each of the parties, at its own cost and expense, in good faith and in a timely manner, shall use its respective commercially reasonable efforts to take or cause to be taken all appropriate actions, do or cause to be done all things necessary, proper or advisable, and execute, deliver and acknowledge such documents and other papers as may be required to carry out the provisions of this Agreement and to give effect to the consummation of the transactions contemplated by this Agreement.

Section 4.5     Notices. All notices, requests, demands, waivers, consents and other communications required or permitted to be provided under this Agreement shall be in writing and shall be deemed to have been duly provided if: (a) delivered personally; (b) mailed using certified or registered mail with postage prepaid; or (c) sent by next-day or overnight mail or delivery using a nationally recognized overnight courier service, as follows:

If to the Earnout Obligors (before the dj Purchase Agreement Closing):

Aircast LLC and Aircast Holding Company LLC
c/o Tailwind Management LP
390 Park Avenue, 17th Floor
New York, NY 10022
Attention: Douglas M. Karp

with copies (which shall not constitute notice) to:

dj Orthopedics, LLC
2985 Scott Street
Vista, CA 92081
Attention: General Counsel

and:

Bingham McCutchen LLP
355 South Grand Avenue
Los Angeles, CA 90071
Attention: Roger H. Lustberg, Esq.

and:

Kelley Drye & Warren LLP
Two Stamford Plaza
281 Tresser Blvd.

Stamford, CT 06901
Attention: John T. Capetta, Esq.

If to the Earnout Obligors (after the dj Purchase Agreement Closing):

Aircast LLC and Aircast Holding Company LLC
c/o dj Orthopedics, LLC
2985 Scott Street
Vista, CA 92081
Attention: General Counsel

with copies (which shall not constitute notice) to:

Bingham McCutchen LLP
355 South Grand Avenue
Los Angeles, CA 90071
Attention: Roger H. Lustberg, Esq.

and:

Tailwind Management LP
390 Park Avenue, 17th Floor
New York, NY 10022
Attention: Douglas M. Karp

and:

Kelley Drye & Warren LLP
Two Stamford Plaza
281 Tresser Blvd.
Stamford, CT 06901
Attention: John T. Capetta, Esq.

If to the Stockholder Representative:

Tailwind Management LP
390 Park Avenue, 17th Floor
New York, NY 10022
Attention: Douglas M. Karp

with a copy (which shall not constitute notice) to:

Kelley Drye & Warren LLP
Two Stamford Plaza
281 Tresser Blvd.
Stamford, CT 06901
Attention: John T. Capetta, Esq.

7

If to the ANKL Liquidating Trust or the Old Aircast Sellers:

  c/o Glenn W. Johnson
  101 20th Street, #3603
  Miami, FL 33131

  with a copy (which shall not constitute notice) to:

  Elaine Ferrara
  51 Buxton Road
  Chatham, NJ 07928

The Stockholder Representative or any party may designate a new address to which communications shall thereafter be transmitted by providing written notice to that effect to the parties or other parties. Each communication transmitted in the manner described in this Section 4.5 shall be deemed to have been provided, received and become effective for all purposes at the time it shall have been: (i) delivered to the addressee as indicated by the return receipt (if transmitted by mail) or the affidavit or receipt of the messenger (if transmitted by personal delivery or courier service); or (ii) presented for delivery to the addressee as so addressed during normal business hours, if such delivery shall have been rejected, denied or refused for any reason or, in each case, at such other address as may be specified in writing to the other parties hereto, as provided above.

  Section 4.6 Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by: (a) the ANKL Liquidating Trust or any of the Old Aircast Sellers without the prior written consent of each of the Earnout Obligors; or (b) any of the Earnout Obligors without the prior written consent of the ANKL Liquidating Trust; provided, however, that, at any time after the Settlement Closing, the ANKL Liquidating Trust, the Old Aircast Sellers or any of the Earnout Obligors may assign its rights, interests or obligations under this Agreement to any of its Affiliates upon written notice thereof to the other parties.

  Section 4.7 Successors. This Agreement and all of the provisions hereof shall be binding upon, and shall inure to the benefit of the parties and their respective predecessors, successors (by merger or consolidation or otherwise), Affiliates and assigns, each such entity's respective employees, officers, directors, managers, members, partners, stockholders, equityholders, agents and representatives and, with respect to any of the foregoing who is a natural person, each of such natural person's heirs, personal representatives, legatees, executors, administrators and assigns.

  Section 4.8 Amendment. No purported amendment or modification to any provision of this Agreement by the ANKL Liquidating Trust, any of the Old Aircast Sellers or any of the Earnout Obligors shall be effective against or binding upon the parties unless the ANKL Liquidating Trust and each of the Earnout Obligors shall have each duly executed a written instrument which states that it constitutes an amendment or modification (as applicable) to this Agreement and specifies the provision(s) that are being amended or modified (as applicable).

  Section 4.9 Waiver. No purported waiver of any provision of this Agreement shall be effective against or binding upon the ANKL Liquidating Trust, the Old Aircast Sellers or any of the Earnout Obligors unless a written instrument which states that it constitutes a waiver of one or more provisions of this Agreement and specifies the provision(s) that are being waived has been executed by: (a) the ANKL Liquidating Trust (with respect to waivers by the ANKL Liquidating Trust or any of the Old Aircast Sellers); or (b) each of the Earnout Obligors (with respect to waivers by the Earnout Obligors). Any such waiver shall

8

be effective only to the extent specifically set forth in such written instrument. Neither the exercise (from time to time and at any time) by a party of, nor the delay or failure (at any time or for any period of time) to exercise, any right, power or remedy shall constitute a waiver of the right to exercise, or impair, limit or restrict the exercise of, such right, power or remedy or any other right, power or remedy at any time and from time to time thereafter. No waiver of any right, power or remedy of a party shall be deemed to be a waiver of any other right, power or remedy of such party or shall, except to the extent so waived, impair, limit or restrict the exercise of such right, power or remedy.

Section 4.10   Entire Agreement. This Agreement and the Aircast Purchase Agreement constitute the entire agreement, and supersede all of the previous or contemporaneous discussions, contracts, representations, warranties and understandings (whether oral or written), by or between the parties with respect to the subject matter hereof.

Section 4.11   Severability. If any provision of this Agreement shall hereafter be held to be invalid, unenforceable or illegal, in whole or in part, in any jurisdiction under any circumstances for any reason: (a) such provision shall be reformed to the minimum extent necessary to cause such provision to be valid, enforceable and legal while preserving the intent of the parties as expressed in, and the benefits to such parties provided by, such provision; or (b) if such provision cannot be so reformed, such provision shall be severed from this Agreement and an equitable adjustment shall be made to this Agreement (including addition of necessary further provisions to this Agreement) so as to give effect to the intent as so expressed and the benefits so provided. Such holding shall not affect or impair the validity, enforceability or legality of such provision in any other jurisdiction or under any other circumstances. Neither such holding nor such reformation or severance shall affect or impair the legality, validity or enforceability of any other provision of this Agreement.

Section 4.12   Headings. The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

Section 4.13   Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument, respectively. This Agreement shall become effective and be deemed to have been executed and delivered by each of the parties at such time as counterparts hereto shall have been executed and delivered by all of parties, regardless of whether all of the parties have executed the same counterpart. Counterparts may be delivered via facsimile or other electronic transmission and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

Section 4.14   Governing Law. THIS AGREEMENT SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

Section 4.15   Consent to Jurisdiction, etc.

(a)      EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN NEW YORK AND ANY APPELLATE COURT THEREFROM (COLLECTIVELY, THE "NEW YORK COURTS"), IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR FOR RECOGNITION OR ENFORCEMENT

9

OF ANY JUDGMENT RELATING THERETO, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH PROCEEDING MAY BE HEARD AND DETERMINED IN THE NEW YORK COURTS. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY OF THE NEW YORK COURTS. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH PROCEEDING IN ANY OF THE NEW YORK COURTS.

(c)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 4.5. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 4.16     Waiver of Punitive and Other Damages and Jury Trial.

(a)     THE PARTIES EACH EXPRESSLY WAIVE AND FOREGO, ANY RIGHT TO RECOVER PUNITIVE, EXEMPLARY, LOST PROFITS, CONSEQUENTIAL OR SIMILAR DAMAGES IN ANY PROCEEDING ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY PROCEEDING ARISING UNDER OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(c)     EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY PROCEEDING ARISING UNDER OR RELATING TO THIS AGREEMENT, SEEK TO ENFORCE EITHER OF THE FOREGOING WAIVERS, (ii) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (iii) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (iv) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 4.16.

Section 4.17     Remedies. Each of the parties shall have and retain all rights and remedies, at law or in equity, including rights to specific performance and injunctive or other equitable relief, arising out of or relating to a breach or threatened breach of this Agreement. Without limiting the generality of the foregoing,

VA01/MCDOJ/65492.7

each of the parties acknowledges that money damages would not be a sufficient remedy for any breach or threatened breach of this Agreement and that irreparable harm would result if this Agreement were not specifically enforced. Therefore, the rights and obligations of the parties shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and shall be granted in connection therewith, without the necessity of posting a bond or other security or proving actual damages and without regard to the adequacy of any remedy at law. A party's right to specific performance or injunctive relief shall be in addition to all other legal or equitable remedies available to such party.

Section 4.18    Third Party Beneficiaries. No Person is, is intended to be, or shall be, a beneficiary of this Agreement other than: (a) the Releasees other than the Earnout Obligors; (b) the Stockholder Representative; and (c) any successors of the parties under Section 4.7 and permitted assigns of the parties under Section 4.6.

Section 4.19    Confidentiality. Except and to the extent required by applicable Law, each party will maintain the confidentiality of and not make any disclosure concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other parties. If any party is required by applicable Law to make any such disclosure, it will provide prior written notice thereof to the other parties and use commercially reasonable efforts to obtain confidential treatment thereof.

Section 4.20    Interpretation. Each of the parties has been represented by counsel of its choosing and, accordingly, the language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent and no rule of strict construction shall be applied against any party. Unless otherwise expressly specified in this Agreement:

(a)    the words "hereof", "hereby" and "hereunder," and correlative words, refer to this Agreement as a whole and not any particular provision;

(b)    the words "include", "includes" and "including", and correlative words, are deemed to be followed by the phrase "without limitation";

(c)    the word "or" is not exclusive and is deemed to have the meaning "and/or";

(d)    references in this Agreement to a "party" means the ANKL Liquidating Trust, any of the Old Aircast Sellers or any of the Earnout Obligors and to the "parties" means the ANKL Liquidating Trust, the Old Aircast Sellers and the Earnout Obligors;

(e)    the masculine, feminine or neuter form of a word includes the other forms of such word and the singular form of a word includes the plural form of such word;

(f)    references to a Person shall include the successors and assigns of such Person; and

(g)    references made in this Agreement to a Section mean a Section of this Agreement.

[remainder of this page intentionally left blank; signature page(s) follow]

IN WITNESS WHEREOF, the parties have entered into Agreement as of the date written above.

THE EARNOUT OBLIGORS:

AIRCAST LLC

By: _____
Name: T.A. Crowley JR
Title: PRESIDENT

AIRCAST HOLDING COMPANY LLC

By: _____
Name: T.A. Crowley JR
Title: PRESIDENT

THE ANKL LIQUIDATING TRUST:

THE ANKL LIQUIDATING TRUST

By: _____
Name:  Glenn W. Johnson
Title:   Trustee

and:

By: _____
Name:  Jack McVicker
Title:   Trustee

THE OLD AIRCAST SELLERS:

ANKL, INC.

By: _____
Name:
Title:

ANKL INTERNATIONAL, L.L.C.

By: _____
Name:
Title:

VA01/MCDOJ/65492.7

IN WITNESS WHEREOF, the parties have entered into Agreement as of the date written above.

THE EARNOUT OBLIGORS:

AIRCAST LLC

By: _____
Name:
Title:

AIRCAST HOLDING COMPANY LLC

By: _____
Name:
Title:

THE ANKL LIQUIDATING TRUST:

THE ANKL LIQUIDATING TRUST

By: _____
Name: Glenn W. Johnson, Jr.
Title:  Trustee

and:

By: _____
Name:  Jack McVicker
Title:  Trustee

THE OLD AIRCAST SELLERS:

ANKL, INC.

By: _____
Name:
Title:

ANKL INTERNATIONAL, L.L.C.

By: _____
Name:
Title:

12

# EXHIBIT C

EXHIBIT

1

BINGHAM McCUTCHEN

O-0606-054

# Facsimile

DATE:   June 6, 2006

|  | NAME | FAX | PHONE |
|---|---|---|---|
| TO: | Glen W. Johnson | (207) 799-8586 | |
| CC: | Stuart S. Kurlander | (202) 637-2201 | |
| CC: | Donald M. Roberts | (760) 734-3566 | |
| FROM: | Roger H. Lustberg<br>roger.lustberg@bingham.com | (213) 680-6499 | (213) 229-8407 |

PAGES:   (INCLUDING THIS COVER PAGE): 2

RE:

MESSAGE:

Dear Mr. Johnson:

The attached is delivered on behalf of Aircast, LLC.

Very truly yours,
Bingham McCutchen

Bingham McCutchen LLP
Suite 4400
355 South Grand Avenue
Los Angeles, CA
90071-3106

213.680.6400
213.680.6499 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

For transmission problems, please call (213) 680-6421

The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above. If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any unauthorized reading, distribution, copying or disclosure of this transmittal is prohibited. If you have received this transmittal in error, please notify us immediately at (same telephone number as in first paragraph - will duplicate) and return the transmittal to the sender. Thank you.

| Timekeeper No: | 32108 | | Client/Matter No: | 3204248001 | | DATE/TIME STAMP |
|---|---|---|---|---|---|---|
| Client/Matter Name: | | | | | | |
| Return To: | Nichele Goitia - 44 | | | Floor No: | 44 | |

## Lustberg, Roger H.

**From:**  Roberts, Don [Don.Roberts@djortho.com]
**Sent:**  Tuesday, June 06, 2006 1:31 PM
**To:**  elevine@levsel.com
**Cc:**  Lustberg, Roger H.
**Subject:** Earnout calculation

Elliot -

On behalf of Aircast, LLC., attached is the calculation that Aircast performed under section 1.8 (c) of the Agreement pursuant to which Tailwind bought the business in 2004. The calculation shows that the threshold for acceleration of certain earnout amounts in the event of a change of control were not met. I assume you are already aware of this calculation, but delivery of this calculation is apparently required within 60 days of the change in control, which is today. Please forward this calculation to the sellers under the 2004 agreement. Thank you.

Regards, Don

<<2006-06-06_12-17-36.pdf>>

**Donald M. Roberts**
Senior Vice President, General Counsel
DJO Incorporated
2985 Scott St.
Vista, CA 92081
Tel: 760.734.5644
Fax: 760.734.3566
E-mail: Don.Roberts@djortho.com

Confidentiality Notice: This email may contain confidential or legally privileged information that is intended only for the individual or entity named in the email address. Any disclosure, copying, distribution, reliance or forwarding without expressed permission is strictly prohibited. If you have received this email in error, please reply to the sender and then delete all copies.

C:\Documents and Settings\njroker\Local Settings\Temporary Internet Files\OLK6\2005-2003 Monthly Sales.xls
NS

Akrest Holding Co., LLC
Reconciliation of Net Sales
By month January 2005-March 2008

4/28/2006
12:43 PM

| | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 |
|---|---|---|---|---|---|---|---|---|---|---|
| Domestic Product Sales | 4,576,420 | 4,296,514 | 5,163,822 | 4,070,482 | 5,143,164 | 5,051,599 | 4,796,959 | 5,703,358 | 5,267,104 | 5,170,042 |
| Royalty Income | | | | | 47,341 | 48,000 | 16,000 | 18,000 | 16,000 | 793 |
| Customer Admin Fee | (45,553) | (57,680) | (56,676) | (51,069) | (56,169) | (63,539) | (42,026) | (93,026) | (82,791) | (71,226) |
| Market Penetration Provisions | (12,116) | (7,036) | (49,031) | (6,067) | (17,763) | (43,471) | (51,236) | (72,312) | (91,588) | (45,965) |
| Cash Discount | (62,086) | (39,235) | (53,174) | (45,243) | (60,070) | (51,924) | (53,894) | (73,511) | (56,659) | (57,519) |
| Handling Fees | 24,659 | 22,922 | 25,315 | 24,897 | 24,762 | 25,434 | 22,655 | 23,852 | 28,131 | 24,803 |
| FOB Items in Transit | (86,925) | 7,013 | (137,529) | 149,768 | (202,708) | 133,821 | 123,432 | (207,185) | 220,530 | (37,427) |
| Credit & Rebate Accruflow | 31,742 | 1,705 | (32,530) | (4,105) | 55,659 | (116,065) | (9,986) | (159,950) | 17,410 | (8,809) |
| Net Domestic Sales | 4,447,742 | 4,213,292 | 4,900,668 | 4,927,651 | 4,943,121 | 5,676,922 | 4,805,168 | 5,139,244 | 5,627,333 | 4,939,835 |
| Europe | 2,684,556 | 2,512,639 | 2,986,693 | 2,496,194 | 2,646,212 | 3,142,119 | 2,669,332 | 2,592,926 | 3,025,178 | 2,563,041 |
| Asia Pacific | 83,871 | 80,070 | 89,699 | 61,611 | 69,275 | 247,265 | 31,742 | 92,028 | 113,446 | 116,970 |
| MEA | 105,160 | 34,376 | 18,291 | 46,420 | 732,740 | 82,740 | 136,094 | 28,865 | 134,322 | 55,856 |
| Canada | 161,531 | 154,119 | 166,004 | 134,461 | 109,912 | 297,539 | 223,099 | 135,588 | 217,546 | 172,452 |
| Latin Americas | 37,128 | 36,378 | 35,412 | 24,026 | 24,556 | 44,020 | 16,768 | 13,090 | 37,259 | 92,049 |
| ROW Sales | 385,610 | 304,943 | 329,608 | 338,590 | 278,483 | 641,564 | 417,521 | 269,540 | 503,073 | 437,026 |
| Net Sales | 7,520,925 | 7,031,759 | 9,231,157 | 6,180,845 | 7,384,836 | 9,359,705 | 7,882,121 | 7,970,713 | 9,155,584 | 7,875,901 |

C:\Documents and Settings\jnaker\Local Settings\Temporary Internet Files\OLK63\2005-2006 Monthly Sales.xls

**Aircast Holding Co., LLC**
**Reconciliation of Net Sales**
**By month January 2005-March**

| | Nov-05 | Dec-05 | 2005 | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Domestic Product Sales | 5,484,058 | 4,821,865 | 60,975,240 | 5,021,321 | 4,576,495 | 5,141,577 | 14,741,703 | | 81,675,410 |
| Royalty Income | 16,000 | 7,050 | 167,490 | 15,000 | 15,000 | 15,000 | 45,000 | | 212,483 |
| Customer Admin Fee | (55,429) | (66,957) | (744,155) | (58,380) | (41,734) | (54,247) | (152,361) | | (732,319) |
| Market Penetration Incentives | 23,507 | 15,406 | (45,837) | (703) | (1,246) | (1,284) | (2,243) | | (62,100) |
| Cash Discount | (72,194) | (52,220) | (822,220) | (73,432) | (46,060) | (57,467) | (166,569) | | (723,819) |
| Handling Fees | 23,985 | 21,978 | 294,519 | 21,598 | 21,694 | 24,653 | 69,985 | | 291,407 |
| FOB Terms in Transit | (281,710) | 309,722 | 11,263 | (190,021) | (142,139) | 39,153 | (289,296) | | (87,692) |
| Credit & Rebate Accr/Rev | (9,626) | (118,950) | 349,356 | 197,134 | 655,288 | 51,142 | 201,888 | | (148,254) |
| Net Domestic Sales | 5,128,597 | 4,944,560 | 59,617,151 | 4,931,097 | 4,327,704 | 5,155,187 | 14,413,998 | | 80,455,030 |
| Europe | 2,676,663 | 1,973,523 | 32,355,392 | 2,516,574 | 2,256,877 | 2,329,950 | 7,704,406 | | 31,868,024 |
| Asia Pacific | 192,045 | 169,145 | 1,377,105 | 59,770 | 79,503 | 100,712 | 247,985 | | 1,361,553 |
| MEA | 53,808 | 73,509 | 955,355 | 131,159 | 72,237 | 175,702 | 577,078 | | 1,071,353 |
| Canada | 138,427 | 227,312 | 2,156,449 | 171,681 | 152,730 | 134,952 | 819,733 | | 2,174,788 |
| Latin Americas | 44,985 | 34,933 | 445,109 | 29,773 | 21,956 | 34,615 | 88,343 | | 423,935 |
| ROW Sales | 429,473 | 504,989 | 4,830,023 | 399,561 | 325,396 | 573,481 | 1,226,440 | | 5,031,981 |
| Net Sales | 8,241,835 | 7,423,576 | 95,795,530 | 7,839,240 | 6,098,977 | 8,597,628 | 23,348,837 | | 97,385,558 |

4/28/2006
12:43 PM

# EXHIBIT D

Exhibit 99.2

CONSOLIDATED FINANCIAL STATEMENTS

Aircast Incorporated

December 31, 2005

Aircast Incorporated

Consolidated Financial Statements

December 31, 2005

## Contents

Report of Independent Auditors                                                          1
Consolidated Balance Sheets                                                             2
Consolidated Statements of Operations                                                  3
Consolidated Statements of Changes in Stockholders' (Deficit) Equity                   4
Consolidated Statements of Cash Flows                                                   5
Notes to Consolidated Financial Statements                                             6

Report of Independent Auditors

Board of Directors and Stockholders
Aircast Incorporated

We have audited the accompanying consolidated balance sheets of Aircast Incorporated as of December 31, 2005 and 2004, and the related consolidated statements of operations, changes in stockholders' (deficit) equity and cash flows for the year ended December 31, 2005 and the period from October 22, 2004 (inception) to December 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Aircast Incorporated at December 31, 2005 and 2004, and the consolidated results of their operations and their cash flows for the year ended December 31, 2005 and the period from October 22, 2004 (inception) to December 31, 2004, in conformity with accounting principles generally accepted in the United States.

/s/ Ernst & Young LLP

MetroPark, New Jersey
April 5, 2006, except for Note 16,
   as to which the date is April 7, 2006

1

Aircast Incorporated

Consolidated Balance Sheets

| | December 31 | |
| --- | --- | --- |
| | 2005 | 2004 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 9,905,453 | $ 10,804,634 |
| Accounts receivable, net of allowance for doubtful accounts of $225,729 and $148,272, respectively | 11,628,045 | 11,242,127 |
| Inventories, net | 6,547,541 | 7,952,452 |
| Prepaid expenses and other current assets | 2,493,729 | 1,581,774 |
| Due from buyer | 393,795 | — |
| Total current assets | 30,968,563 | 31,580,987 |
| | | |
| Property and equipment, net | 19,444,015 | 18,934,701 |
| Other intangible assets, net | 96,300,096 | 107,686,822 |
| Goodwill | 47,085,649 | 46,350,940 |
| Deferred financing costs, net | 2,921,055 | 3,490,639 |
| Fair value of derivatives | 1,184,509 | — |
| Other assets | 34,255 | 13,500 |
| Deferred tax asset – long-term | 596,988 | — |
| Total assets | $ 198,535,130 | $ 208,057,589 |
| | | |
| **Liabilities and stockholders' (deficit) equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,555,459 | $ 3,359,343 |
| Accounts payable – stockholders | — | 152,847 |
| Accrued expenses | 10,552,629 | 7,314,851 |
| Accrued expenses – stockholders | 842,900 | 50,000 |
| Accrued expenses – affiliate | 4,025,829 | 5,031,620 |
| Current portion of long-term debt | 2,415,951 | 2,750,000 |
| Total current liabilities | 21,391,868 | 18,658,661 |
| | | |
| Accrued pension liabilities | 294,252 | 186,727 |
| Long-term debt, less current portion | 83,487,113 | 92,250,000 |
| Seller subordinated notes | 16,515,122 | 15,796,603 |
| Total liabilities | 121,688,355 | 126,891,991 |
| | | |
| Commitments and contingencies | | |
| | | |
| Redeemable preferred stock, $0.01 par value; 12,492,500 shares authorized and 7,492,500 shares issued and outstanding at December 31, 2005 | 78,638,868 | — |
| | | |
| Stockholders' (deficit) equity: | | |
| Common stock, $0.01 par value; 3,000 shares authorized and 1,000 shares issued and outstanding at December 31, 2004 | — | 10 |
| New common stock, $0.01 par value; 25,000,000 shares authorized and 8,325,000 shares issued and outstanding at December 31, 2005 | 83,250 | — |
| Additional paid-in capital | 4,527,882 | 83,249,990 |
| Accumulated deficit | (4,000,929) | (2,133,015) |
| Accumulated other comprehensive (loss) income | (2,402,296) | 48,613 |
| Total stockholders' (deficit) equity | (1,792,093) | 81,165,598 |
| Total liabilities and stockholders' (deficit) equity | $ 198,535,130 | $ 208,057,589 |

*See accompanying notes.*

2

Aircast Incorporated

Consolidated Statements of Operations

| | | Year ended December 31, 2005 | | Period from October 22, 2004 (inception) to December 31, 2004 |
|---|---|---|---|---|
| Net sales | $ | 96,811,036 | $ | 5,607,012 |
| Cost of goods sold | | 36,219,196 | | 3,174,010 |
| Gross profit | | 60,591,840 | | 2,433,002 |
| | | | | |
| Selling, general and administrative expenses | | 51,889,551 | | 3,836,069 |
| Research and development expenses | | 1,783,605 | | 119,990 |
| Income (loss) from operations | | 6,918,684 | | (1,523,057) |
| | | | | |
| Interest expense | | 8,865,493 | | 528,778 |
| Other (income) expense, net | | (881,611) | | 45,124 |
| Loss before provision for income taxes | | (1,065,198) | | (2,096,959) |
| Provision for income taxes | | 802,716 | | 36,056 |
| Net loss | $ | (1,867,914) | $ | (2,133,015) |

*See accompanying notes.*

3

Aircast Incorporated

Consolidated Statements of Changes in Stockholders' (Deficit) Equity

| | Common Stock | | New Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Comprehensive Loss | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|---|---|
| | Number of Shares | Par Value | Number of Shares | Par Value | | | | |
| Balance at October 22, 2004 (inception) | 1,000 | $ 10 | — | $ — | $ 83,249,990 | $ — | $ — | — |
| Comprehensive loss: | | | | | | | | |
| Net loss | | | | | | (2,133,015) | (2,133,015) | |
| Other comprehensive income: | | | | | | | | |
| Foreign comprehensive translation adjustments | | | | | | | 48,613 | 48,613 |
| Total comprehensive loss | | | | | | | $ (2,084,402) | |
| Balance at December 31, 2004 | 1,000 | 10 | — | — | 83,249,990 | (2,133,015) | | 48,613 |
| Recapitalization of Common Stock | (1,000) | (10) | 8,325,000 | 83,250 | (75,008,240) | | | |
| Preferred share accretion | | | | | (3,713,868) | | | |
| Comprehensive loss: | | | | | | | | |
| Net loss | | | | | | (1,867,914) | (1,867,914) | |
| Other comprehensive income: | | | | | | | | |
| Minimum unfunded pension liability | | | | | | | (20,012) | (20,012) |
| Foreign comprehensive translation adjustments | | | | | | | (2,430,897) | (2,430,897) |
| Total comprehensive loss | | | | | | | $ (4,318,823) | |
| Balance at December 31, 2005 | — | $ — | 8,325,000 | $ 83,250 | 4,527,882 | (4,000,979) | | $ (2,402,296) |

See accompanying notes.

4

Aircast Incorporated

Consolidated Statements of Cash Flows

| | Year ended December 31, 2005 | Period from October 22, 2004 (inception) to December 31, 2004 |
|---|---|---|
| **Operating activities** | | |
| Net loss | $ (1,867,914) | $ (2,133,015) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation | 2,005,838 | 146,452 |
| Amortization | 10,847,703 | 719,865 |
| Deferred income taxes | (597,549) | — |
| Change in fair value of derivatives | (1,141,509) | — |
| Loss on disposal of property and equipment | 14,549 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (959,397) | 831,022 |
| Inventories | 930,408 | 1,493,756 |
| Prepaid expenses and other assets | (517,416) | (176,069) |
| Accounts payable | 255,037 | 1,362,597 |
| Accrued expenses – affiliate | (1,005,790) | 5,031,620 |
| Accrued expenses | 4,455,505 | (217,634) |
| Net cash provided by operating activities | 12,419,465 | 7,058,594 |
| | | |
| **Investing activities** | | |
| Capital expenditures | (3,017,366) | (298,825) |
| Purchase of business | (271,441) | (187,226,422) |
| Net cash used in investing activities | (3,288,807) | (187,525,247) |
| | | |
| **Financing activities** | | |
| Proceeds from bank loan | — | 95,000,000 |
| Proceeds from sale of common stock | — | 83,250,000 |
| Payment of bank loan | (9,096,936) | — |
| Deferred financing costs | (750,000) | (2,777,326) |
| Seller subordinated notes | — | 15,750,000 |
| Payment to stockholder | (152,847) | — |
| Net cash (used in) provided by financing activities | (9,999,783) | 191,222,674 |
| | | |
| Effect of exchange rate on cash and cash equivalents | (30,056) | 48,613 |
| | | |
| Increase in cash and cash equivalents | (899,181) | 10,804,634 |
| Cash and cash equivalents, beginning of period | 10,804,634 | — |
| Cash and cash equivalents, end of period | $ 9,905,453 | $ 10,804,634 |
| | | |
| **Supplemental disclosure of cash flow information** | | |
| Cash paid during the year for: | | |
| Interest | $ 8,056,393 | $ — |
| Income taxes | $ 497,986 | $ — |
| | | |
| **Supplemental schedule of non-cash financing activity** | | |
| Seller subordinated interest converted to debt | $ 732,608 | $ — |
| Seller subordinated interest to be converted to debt | $ 32,514 | $ 46,603 |
| Financing fees | $ — | $ 750,000 |

*See accompanying notes.*

5

Aircast Incorporated

Notes to Consolidated Financial Statements

December 31, 2005

## 1. Organization and Summary of Significant Accounting Policies

*Organization*

The accompanying consolidated financial statements include the accounts of Aircast Incorporated and its wholly-owned subsidiaries (consolidated "Aircast" or the "Company").

Aircast Incorporated, formerly known as AI Finance Holding Company, Inc., was formed under the provisions of the General Corporation Law of the State of Delaware by the filing of a Certificate of Incorporation with the Office of the Secretary of State of Delaware on October 22, 2004 (inception) and name change filed December 7, 2004. The Company had 3,000 shares of authorized Common Stock with a $0.01 par value at inception. On October 26, 2004, one share of Common Stock was sold to Thomas Weisel Capital Partners, LP in consideration of the payment of $83,250. On December 7, 2004, an additional 999 shares were sold in consideration of the payment of $83,250 per share to T. Weisel and affiliates.

On July 21, 2005, the Company entered into a Plan of Recapitalization. An aggregate of 25,000,000 shares of Common Stock, par value $0.01 per share and an aggregate of 12,492,500 shares of Preferred Stock, par value $0.01 per share, were authorized. In exchange for each share of Old Common Stock, the stockholders received 8,325 shares of New Common Stock and 7,492.5 shares of Series A Preferred Stock. At the completion of the recapitalization, 8,325,000 shares of Common Stock and 7,492,500 shares of Series A Preferred Stock were issued and outstanding (see Note 14 — Redeemable Preferred Stock for further details on the recapitalization).

Aircast Incorporated is the parent of Aircast Holding Company LLC ("Holdings").

Holdings is the parent of the following three wholly-owned companies: Aircast LLC, Aircast Scandinavia AB, and Aircast Asia-Pacific Limited. Aircast Scandinavia AB owns 100% of the following legal entities:

Aircast Europe GmbH
Aircast UK Limited
Aircast France Sarl
Aircast Italy S.r.l.
Aircast Handels GmbH (Austria)
Aircast Belgium BVBA
Aircast Productos Medicos, S.L. (Spain)

6

All significant intercompany accounts and transactions have been eliminated in the accompanying consolidated financial statements. The consolidated financial statements are expressed in United States dollars.

Aircast is a globally recognized leader in delivering scientifically based, pioneering devices for the functional management (protected early use) of joint injuries, fractures, edema and deep vein thrombosis ("DVT"). The Company operates production, distribution, and office facilities in New Jersey, Germany, and Hong Kong and markets its products worldwide.

### Revenue Recognition

Revenue is recognized when devices are received by customers in the U.S. Revenue is recognized when devices are shipped to customers outside of the U.S.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could materially differ from those estimates. Significant estimates included in the preparation of these financial statements include provisions made for doubtful accounts, useful lives for depreciation and goodwill and other asset impairments.

### Cash Equivalents

The Company considers all short-term investments with a maturity of three months or less when purchased to be cash equivalents.

### Allowance for Doubtful Accounts

The Company maintains an allowance for doubtful accounts. This allowance reflects the Company's estimate of the amount of its receivables that it will be unable to collect. The Company makes this estimate based upon a combination of an analysis of accounts receivable on a specific accounts basis and historical write-off experience.

7

*Inventories*

Inventory is recorded at the date of acquisition as follows: finished goods at estimated selling prices less a profit allowance for the selling effort and work-in-process and raw materials at estimated current replacement costs. Inventories at December 31, 2005 and 2004 are stated at the lower of cost (determined by the first-in, first-out method) or market.

*Property and Equipment*

Property and equipment were recorded at fair values at the date of the acquisition and at cost for subsequent additions. Expenditures for maintenance and repairs are charged to expense while improvements and replacements are capitalized. The cost and accumulated depreciation of property sold or retired are removed from the accounts and gains and losses, if any, are reflected in earnings for the period. Depreciation is provided on the straight-line method over the estimated useful lives of the related assets as follows:

| | |
|---|---|
| Buildings and improvements | 30 years |
| Furniture, fixtures and office equipment | 3 to 7 years |
| Machinery and equipment | 7 years |
| VenaFlow equipment | 5 years |
| Molds and dies | 7 years |
| Exhibits | 7 years |

*Deferred Financing Costs*

The Company capitalizes debt issuance costs, with such costs amortized over the lives of the related debt. Included in deferred financing costs, net at December 31, 2005 and 2004 are $1,669,349 and $2,005,617, respectively, of fees associated with the $55 million term loan, which is being amortized over six years, and $1,251,706 and $1,485,022, respectively, of fees associated with the $40 million term loan, which is being amortized over six and one half years. All of these debt issuance costs were capitalized on December 7, 2004, the date that the debt agreements were entered into. For the year ended December 31, 2005 and period ended December 31, 2004, amortization of deferred financing costs totaled $569,584 and $36,687, respectively.

8

*Contributions Made*

In accordance with SFAS 116, "Accounting for Contributions Received and Contributions Made", the Company has accrued for unconditional charitable donation commitments made by recording a liability in the amount of $1,024,100 for commitments made as of December 31, 2005 payable through 2010. The Company has recorded an expense related to these commitments of $691,100 for the year ended December 31, 2005.

*Long-Lived Assets*

Long-lived assets are recorded at the lower of amortized cost or fair value. As part of an ongoing review of the valuation of long-lived assets, management assesses the carrying value of such assets if facts and circumstances suggest they may be impaired. If this review indicates that the carrying value of these assets may not be recoverable, as determined by a nondiscounted cash flow analysis over the remaining useful life, the carrying value would be reduced to its estimated fair value.

*Federal and State Income Taxes*

The Company uses the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on the differences between financial statement and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse. Recognition of deferred tax assets is limited to amounts considered by management to be more likely than not realized in future periods.

*Research and Development Expenses*

Research and development costs are expensed as incurred.

*Shipping Expenses and Handling Income*

Expenses incurred in shipping devices to customers are recorded as part of selling, general and administrative in the amount of $2,442,399 and $173,122 for the year ended December 31, 2005 and period ended December 31, 2004, respectively.

Income generated in shipping devices to customers are recorded as part of net sales in the amount of $294,618 and $17,490 for the year ended December 31, 2005 and period ended December 31, 2004, respectively.

*Advertising Expense*

The Company advertises primarily in journals and through the mail to customers. Advertising costs are expensed as incurred and amounted to $970,876 and $50,208 for the year ended December 31, 2005 and period ended December 31, 2004, respectively.

*Foreign Currency Translations*

Assets and liabilities of the foreign subsidiaries are translated at rates of exchange in effect at the close of the period. The Company considers all local currency to be the functional currency. Revenues and expenses are translated at the weighted average of exchange rates in effect during the period. The effect of exchange rate fluctuations on translating foreign currency assets and liabilities into U.S. dollars are included as part of the foreign currency translation adjustment component of member's equity.

*Concentrations of Credit Risk*

Concentrations of credit risk with respect to accounts receivable are limited due to the number of entities comprising the Company's customer base and their dispersion across different industries and geographic areas in the United States and Europe. The Company performs ongoing credit evaluations of its customers and generally does not require collateral. One customer accounted for 11 percent of the Company's accounts receivable at December 31, 2005. No customer accounted for over 10 percent of the Company's accounts receivable at December 31, 2004 or the Company's revenue for the year ended December 31, 2005 or period ended December 31, 2004.

The Company's financial instruments consist primarily of cash investments, trade accounts receivable and trade accounts payable. The Company considers the book values of these instruments to be indicative of their respective fair values. The Company has cash in excess of the FDIC insurance amount of $100,000 as of December 31, 2005 and 2004 in the amounts of $7,281,747 and $8,344,402, respectively. The Company has mitigated the risk by placing its temporary cash investments with high credit quality institutions to limit its credit exposure.

10

*Goodwill and Other Intangibles*

Goodwill consists of the excess of cost over the fair value of identifiable net assets of businesses acquired. Other intangibles consist of customer relationships, Group Purchasing Organizations contracts, covenants not-to-compete, trademarks, patents, and in-process research and development. Goodwill is not amortized and is subject to an annual impairment test on a reporting unit level. Other intangible assets that have finite lives are being amortized over their estimated useful lives.

Other intangible assets which are amortized consist of the following:

| | Years Amortized | |
| --- | --- | --- |
| | U.S. | Europe |
| Patents | 8 | — |
| Trademarks | 20 | 15 |
| Group Purchasing Organizations contracts | 15 | — |
| Customer relationships | 10 | 7 |
| Non-compete agreements | 3 | 1 |
| In-process research and development | 15 | — |

*Recent Accounting Pronouncements*

In November 2004, the Financial Accounting Standards Board (the "FASB") issued SFAS No. 151, *Inventory Costs, an Amendment of ARB No. 43, Chapter 4* to clarify the accounting for abnormal amounts of idle facility expense, freight, handling costs and wasted material. SFAS No. 151 requires that these items be recognized as current-period charges regardless of whether they meet the "so abnormal" criteria outlined in ARB No. 43. In addition, this statement requires that allocation of fixed production overheads to the costs of conversion be based on the normal capacity of the production facilities. This statement is effective for inventory costs incurred during fiscal years beginning after June 15, 2005. Adoption of this statement is not expected to have a material impact on the Company's results of operations or financial condition.

11

*Derivative Financial Instruments*

Under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities", all derivatives are required to be recorded as assets or liabilities and measured at fair value. Gains or losses resulting from changes in the values of derivatives are recognized immediately in earnings or deferred, depending on the use of the derivative and whether or not it qualifies as a hedge. Derivative financial instruments are periodically used by the Company in the management of its interest rate and foreign currency exposures. Derivative financial instruments are not used for trading purposes. The fair value of the derivatives is based upon discounted expected future cash flows based on current economic indicators as calculated by the bank.

## 2. Acquisition

Effective December 8, 2004, the Company acquired certain assets and liabilities of Aircast, Inc. and Aircast International Sales and its wholly-owned subsidiaries. The Company paid approximately $159,000,000 in cash and approximately $15,750,000 in subordinated seller notes. After giving effect to the amounts paid above and acquisition fees aggregating approximately $12,748,000, the total purchase price for the acquisition of certain assets and liabilities effective December 8, 2004 was approximately $187,498,000. A substantial portion of the goodwill associated with the acquisition is expected to be deductible for tax purposes.

The condensed balance sheet of the acquired assets and liabilities at acquisition date were as follows:

| | |
|---|---:|
| Cash | $ 1,575 |
| Accounts receivable | 12,073,149 |
| Inventory | 9,523,931 |
| Prepaid and other assets | 1,435,615 |
| Property and equipment | 18,782,328 |
| Other intangible assets | 108,370,000 |
| Excess of purchase price over fair value | 47,123,592 |
| Accounts payable | 2,149,593 |
| Accrued expense – stockholders | 5,081,620 |
| Accrued expenses | 2,580,977 |

12

The purchase price of the acquisition has been allocated to the assets acquired and liabilities assumed and the excess of purchase price over fair value has been recorded on the consolidated balance sheet at December 31, 2004 to goodwill and other intangibles (see Note 3 – Goodwill and Other Intangible Assets for additional discussion of intangible assets). The acquisition was accounted for as a purchase and, accordingly, the results of operations of the acquired company are included in the consolidated statement of operations starting on December 8, 2004.

In the asset purchase agreement, the transaction includes an earnout schedule which entitles the sellers to specific earnout payments over the course of the next 3 years of $5,000,000 per year if the Company attains revenues in the target years. These potential earnout payments are not accrued in the accompanying financial statements as they have not been earned at December 31, 2005 or 2004.

## 3. Goodwill and Other Intangible Assets

Goodwill and other intangible assets are being accounted for in accordance with Statement of Financial Accounting Standards ("SFAS") No. 142, *Goodwill and Other Intangible Assets* issued by the FASB on January 1, 2002. Under this standard, goodwill is no longer amortized. The Company's $96,300,096 and $107,686,822 of definite lived intangible assets at December 31, 2005 and 2004, respectively, are being amortized over their estimated useful lives.

Under SFAS No. 142, the Company is required to review its goodwill for impairment at least annually. In general, this means that the Company must determine whether the fair value of the goodwill, calculated in accordance with applicable accounting standards, is at least equal to the recorded value shown on its balance sheet. If the fair value of the goodwill is less than the recorded value, the Company is required to write-off the excess goodwill as an expense. The Company's definite lived intangibles are reviewed for impairment under SFAS No. 144.

13

The related cost, accumulated amortization, and weighted-average amortization life of each definite lived intangible asset is as follows:

| | | December 31, 2005 | | |
| --- | --- | --- | --- | --- |
| | Cost | | Accumulated Amortization | Remaining Weighted-Average Amortization Life |
| Patents | $ 19,380,000 | $ | 2,581,788 | 6.9 |
| Trademarks | 25,760,000 | | 2,106,978 | 18.0 |
| Group Purchasing Organizations contracts | 11,260,000 | | 800,026 | 13.9 |
| Customer relationships | 49,380,000 | | 5,819,234 | 8.7 |
| Non-compete agreements | 1,330,000 | | 672,356 | 1.9 |
| In-process research and development | 1,260,000 | | 89,522 | 13.9 |
| | 108,370,000 | $ | (12,069,904) | |
| Less accumulated amortization | (12,069,904) | | | |
| | $ 96,300,096 | | | |

| | | December 31, 2004 | | |
| --- | --- | --- | --- | --- |
| | Cost | | Accumulated Amortization | Remaining Weighted-Average Amortization Life |
| Patents | $ 19,380,000 | $ | 159,288 | 8.0 |
| Trademarks | 25,760,000 | | 90,926 | 18.9 |
| Group Purchasing Organizations contracts | 11,260,000 | | 49,359 | 15.0 |
| Customer relationships | 49,380,000 | | 335,342 | 9.8 |
| Non-compete agreements | 1,330,000 | | 42,740 | 2.6 |
| In-process research and development | 1,260,000 | | 5,523 | 15.0 |
| | 108,370,000 | $ | (683,178) | |
| Less accumulated amortization | (683,178) | | | |
| | $ 107,686,822 | | | |

14

As of December 31, 2005, estimated amortization expense of definite lived intangible assets for each of the next five years is as follows:

| | |
|---|---|
| 2006 | $ 10,080,000 |
| 2007 | 10,057,644 |
| 2008 | 9,740,000 |
| 2009 | 9,740,000 |
| 2010 | 9,740,000 |

At December 31, 2005 and 2004, the weighted-average amortization life of definite lived intangible assets is 11.3 years and 12.1 years, respectively.

### 4. Related Party Transactions

The Company has entered into a management services agreement on December 6, 2004 ("Agreement") with Tailwind Capital Partners LLC ("TCP"). The Agreement provides for various consultative services to be rendered by TCP on the Company's behalf. The fee totals $750,000 annually plus expenses, and is accrued for on a monthly basis and is recorded as part of other expense. For the year ended December 31, 2005 and the period ended December 31, 2004, the Company accrued and recorded related expense of $842,000 and $50,000, respectively. The Company had a payable to TCP for $152,847 as of December 31, 2004. This was paid on February 24, 2005.

The Company was charged $5,031,620 as an advisory fee by TWCP Management LP, an affiliate of the Company and certain stockholders in connection with the December 8, 2004 acquisition of Aircast Incorporated. This amount was considered part of the purchase price. The advisory fee is included in accrued expenses-affiliate on the accompanying consolidated balance sheet and is $4,025,829 and $5,031,620 at December 31, 2005 and 2004, respectively.

### 5. Inventories

Inventories consist of the following:

| | December 31 | |
|---|---|---|
| | 2005 | 2004 |
| Raw materials | $  4,287,498 | $  3,024,740 |
| Finished goods | 2,391,340 | 5,058,751 |
| Work-in-process | — | 8,815 |
| Reserve for obsolescence | (131,297) | (139,854) |
| | $  6,547,541 | $  7,952,452 |

15

## 6. Property and Equipment

Property and equipment consists of the following:

|  | December 31 | |
|  | 2005 | 2004 |
|---|---|---|
| Land | $ 4,553,109 | $ 4,550,250 |
| Buildings and improvements | 6,406,141 | 6,744,221 |
| Furniture, fixtures and office equipment | 3,096,160 | 2,562,983 |
| Machinery and equipment | 1,811,909 | 1,760,853 |
| VenaFlow equipment | 3,233,675 | 1,748,023 |
| Molds and dies | 1,970,512 | 1,316,869 |
| Exhibits | 188,929 | 164,397 |
| Deposits on equipment | 283,648 | 224,204 |
| Transportation equipment | 10,924 | 12,718 |
|  | 21,555,007 | 19,084,518 |
| Less accumulated depreciation | (2,110,992) | (149,817) |
|  | $ 19,444,015 | $ 18,934,701 |

## 7. Accrued Expenses

Accrued expenses consist of the following:

|  | December 31 | |
|  | 2005 | 2004 |
|---|---|---|
| Employee compensation | $ 2,210,945 | $ 2,140,422 |
| Bonus | 1,502,678 | 77,577 |
| European VAT liability | 1,369,759 | — |
| Professional fees | 1,163,042 | 3,044,046 |
| Income tax payable | 1,065,299 | 36,056 |
| Accrued contributions | 1,024,100 | — |
| Interest payable | 593,110 | 482,080 |
| Sales commissions and royalties | 508,324 | 611,071 |
| Other accruals | 1,115,372 | 923,599 |
|  | $ 10,552,629 | $ 7,314,851 |

16

## 8. Retirement Plan

The Company maintains a defined contribution plan for substantially all of its U.S. employees. The Company has recorded an expense for the year ended December 31, 2005 and period ended December 31, 2004 of $500,000 for both periods. The plan provides employees an opportunity to make pre-tax payroll contributions. The Company is not required to make any contributions to the plan, however, the Company made a contribution in 2005 related to the $500,000 accrual at December 31, 2004 of $500,000.

Aircast Scandinavia AB has a pension plan which covers two key employees who are entitled to pension benefits as part of the terms of their employment agreement. The accrued pension costs of $294,252 as of December 31, 2005 reflected on the consolidated balance sheets are recorded in accordance with the amounts required under accounting principles generally accepted in the United States. The Company recorded $176,746 and $8,775 in pension expense for the year ended December 31, 2005 and period ended December 31, 2004, respectively. The Company has made contributions of $50,739 and paid benefits of $33,524 during the year ended December 31, 2005. There were no such transactions during the period ended December 31, 2004. At December 31, 2005 there was a minimum unfunded pension liability of $20,012.

## 9. Income Taxes

The provision for income taxes consists of the following:

|  | December 31 | |
| --- | --- | --- |
|  | 2005 | 2004 |
| Current: | | |
| Foreign | $ 1,432,190 | $ 36,056 |
| Deferred taxes: | | |
| Foreign | (629,474) | — |
| Provision for income tax | $ 802,716 | $ 36,056 |

17

The components of deferred income tax assets (liabilities) are as follows:

| | December 31 | |
| | 2005 | 2004 |
|---|---|---|
| Deferred tax assets: | | |
| Bad debt reserve | $ 17,163 | $ (2,472) |
| Inventory capitalization | 3,986 | 2,666 |
| Intangibles and goodwill | 598,610 | 144,288 |
| Other accruals | 704,903 | 12,363 |
| Contributions | 124,339 | 7,456 |
| Fixed assets | (688,857) | (42,539) |
| Inventory reserves | (28,703) | — |
| Unrealized (gain) loss | (468,019) | — |
| Net operating losses | 2,589,907 | 480,147 |
| Valuation allowances | (2,176,341) | (601,909) |
| Total deferred tax assets | $ 596,988 | $ — |

Deferred income taxes reflect the net effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The Company established a valuation allowance at December 31, 2005 and 2004 because the Company determined that it was more likely than not that some or all of the deferred tax assets would not be realized.

The 2005 and 2004 provision for income taxes are different than U.S. federal statutory tax (35%) determined by applying the federal income tax rate to income before provision for income taxes, primarily due to foreign income taxes, and various non-deductible items.

The Company has net operating loss carryforwards ("NOL's") of $5,411,874 at December 31, 2005, which expire beginning 2024 for federal tax purposes and $4,079,353, which expire at various dates for state tax purposes. The Company has NOL's of approximately $891,000 attributable to the foreign subsidiaries. The Company recorded a full valuation allowance against all federal and state NOL's and certain foreign NOL's.

The undistributed earnings of our foreign subsidiaries amounting to approximately $2,731,000 was considered to be indefinitely reinvested at December 31, 2005. Accordingly, no provision has been recorded for U.S. income taxes that might result from repatriation of these earnings.

18

Pre-tax income (loss) attributable to domestic and foreign operations is as follows:

| | December 31 | |
| | 2005 | 2004 |
|---|---|---|
| Domestic | $ (1,686,902) | $ (1,414,505) |
| Foreign | 621,704 | (682,454) |
| | $ (1,065,198) | $ (2,096,959) |

## 10. Accumulated Other Comprehensive Income

The following table sets forth the components of the Company's accumulated other comprehensive income (loss):

| | Foreign Currency Translation | Minimum Unfunded Pension Liability | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|
| Balance at October 22, 2004 (inception) | $ — | $ — | $ — |
| 2004 activity | 48,613 | — | 48,613 |
| Balance at December 31, 2004 | 48,613 | — | 48,613 |
| 2005 activity | (2,430,897) | (20,012) | (2,450,909) |
| Balance at December 31, 2005 | $ (2,382,284) | $ (20,012) | $ (2,402,296) |

## 11. Commitments and Contingencies

The Company rents office facilities, equipment, and automobiles under various non-cancelable agreements with terms generally ranging from two to three years, except for one lease which does not expire until 2070.

19

Future aggregate minimum lease payments under long-term leases as of December 31, 2005 are as follows:

| | | |
|---|---|---:|
| 2006 | $ | 390,890 |
| 2007 | | 171,365 |
| 2008 | | 58,038 |
| 2009 | | 32,254 |
| 2010 | | 32,254 |
| Thereafter | | 1,451,410 |
| | $ | 2,136,211 |

Total lease expense relating to the Company's operating leases was $602,360 and $24,775 for the year ended December 31, 2005 and period ended December 31, 2004, respectively. After March 2006, there is no commitment on the U.S. warehouse rental facility.

The Company makes charitable donations to various charitable organizations in the form of contractual commitments and verbal commitments. The contractual commitments have been recorded in the accompanying consolidated balance sheet and amounted to $1,024,100 at December 31, 2005. Through 2010, the verbal conditional commitments will approximate $12,000 as of December 31, 2005.

As of December 31, 2005, the Company has committed $266,005 related to research and development studies to be conducted between 2006 and 2007.

The Company has eight royalty agreements of which three agreements have minimum royalty payments. Future minimum requirements are comparable to the current year requirements. At December 31, 2005, the Company recorded an additional $23,750 for minimum royalty amounts due.

The Company also has an agreement in which a third-party pays royalty income to the Company. The Company recognized royalty income of $167,493 and $-0- for the year ended December 31, 2005 and period ended December 31, 2004, respectively, and has included such amounts in net sales in the accompanying consolidated statements of operations.

20

*Legal Matters*

The Company is party to legal proceedings and potential claims arising in the ordinary course of its businesses. In the opinion of management, the Company has adequate legal defenses, reserves, or insurance coverage with respect to these matters so that the ultimate resolution will not have a material adverse effect on the Company's financial position, results of operations, or cash flows.

## 12. Debt

On December 7, 2004, Aircast LLC entered into two term loans with Credit Suisse First Boston as administrative agent and a group of syndicated lenders (collectively, the "Lenders"); a 6-year term loan agreement ("Term Loan A") in the amount of $55 million and a 6½-year term loan agreement ("Term Loan B") in the amount of $40 million. Term Loan A is repayable in quarterly payments of $687,500 for 5 years and quarterly payments of $10,312,500 in year six. These amounts are adjusted on a pro-rata basis for any prepayments made. During the year ended December 31, 2005, the Company made prepayments of $6,500,000. As a result of these prepayments, as of December 31, 2005, the quarterly payments are $603,988 and the quarterly payments due in year six are $9,059,815. Term Loan B is repayable in one lump sum on June 7, 2011, the maturity date. The term loans are secured by all assets of the Company. The proceeds of both term loans were used to acquire substantially all of the assets of Aircast, Inc., a New Jersey corporation and Aircast International Sales, LLC, a New Jersey limited liability company for an aggregate purchase price of approximately $187,498,000 of which $15,750,000 is to be in the form of Seller Subordinated Notes.

Also on December 7, 2004 Aircast LLC entered into a 5-year revolving loan with the Lenders in an aggregate principal amount at any time outstanding not in excess of $5,000,000 ("Revolver"). Under the Revolver, the Lenders may extend credit, at any time and from time to time prior to the Revolver's credit maturity date, in an aggregate principal amount at any time outstanding not in excess of $2,000,000 (the "Swingline Loan"), and the Lenders may issue Letters of Credit, in an aggregate face amount at any time outstanding not in excess of $5,000,000. The aggregate indebtedness of the Revolver, Swingline Loan and Letters of Credit may not exceed $5,000,000 at any one time. There are no borrowings outstanding under the Revolver at December 31, 2005 or 2004. There is a 0.5% commitment fee on the unused portion of the Revolver.

There are subjective acceleration clauses within Term Loan A and B and the Revolver.

Interest accrues annually at LIBOR plus 2.75% on Term Loan A and at LIBOR plus 7% on Term Loan B and is payable upon the maturity of the applicable 3 month LIBOR contract. The weighted average interest rate for the year ended December 31, 2005 and period ended December 31, 2004 were 6.03% and 5.25%, respectively, on Term Loan A and 10.31% and 9.50%, respectively, on Term Loan B.

Under the term loans, the Company is subject to certain covenants including an interest coverage ratio, fixed charge coverage ratio, maximum leverage ratio and capital expenditures. As of December 31, 2005, the Company is in compliance with all of its covenants.

Maturities of the Company's debt for each of the next five years and thereafter at December 31, 2005 are as follows:

| | |
|---|---|
| 2006 | $ 2,415,951 |
| 2007 | 2,415,951 |
| 2008 | 2,415,951 |
| 2009 | 2,415,951 |
| 2010 | 36,239,260 |
| Thereafter | 40,000,000 |

*Interest Rate Swap Agreements.* As of December 31, 2005, the Company had outstanding interest rate swap agreements and an interest rate cap, both entered into during 2005, that effectively converted $60 million of its floating rate debt to fixed rate instruments. The floating rate debt being hedged by swaps consisted of $20 million of the Term Loan A which terminates in March 2009 and all $40 million of the Term Loan B which terminates in March 2008. The Company has also entered into a $20 million forward cap that begins in March 2008 and terminates in March 2010. The Company's swap and cap agreements that effectively convert a portion of its floating rate debt to fixed rate instruments are designated as cash flow hedges. Changes in the fair value of the Company's hedges are recorded immediately in its income statement as part of other income (expense), net, which amounted to $1,141,509 of income during the year ended December 31, 2005. The fair value of these agreements was $1,184,509 at December 31, 2005.

22

### 13. Seller Subordinated Notes

In connection with the acquisition, the Company issued $15,750,000 of Seller Subordinated Notes. The Seller Subordinated Notes are payable in one lump sum on June 7, 2011, the maturity date. Interest accrues annually at 8% on the Seller Subordinated Notes and 3.5% is payable semi-annually. The remaining 4.5% is converted into the principal amount to be paid on June 7, 2011, the maturity date. At December 31, 2005, there was $765,122 in interest that has been recorded as long-term debt, of which $732,608 has been converted to principal as of December 31, 2005. For the year ended December 31, 2005 and period ended December 31, 2004, the Company accrued total interest of $1,277,367 and $82,849, respectively.

### 14. Redeemable Preferred Stock

The Company's redeemable preferred stock consists of Series A shares, which are subject to the following rights, preferences, and limitations.

Stockholders of Series A Preferred Stock ("Stockholders") are entitled to vote as a separate class or series pursuant to the Delaware General Corporation Law or the Certificate of Incorporation. The Stockholders are also entitled to vote together with the holders of shares of Common Stock as a single class on all matters to which the holders of Common Stock are entitled to vote and are entitled to one vote per share of Series A Preferred Stock.

A holder of Series A Preferred Stock shall be entitled to receive cash dividends in an amount per share equal to the applicable percentage of the accreted value. Dividends are payable in cash, to the extent declared by the Board of Directors, in arrears quarterly. Dividends shall accrue daily whether or not dividends have been declared by the Board of Directors. Any dividends not declared as of any dividend payment date are added to the accreted value. Once added to the accreted value, the dividend is no longer payable in cash as a dividend but remains as part of the accreted value. Dividends are based on a per annum rate of eleven percent (11%) over a 365 day year. The accreted value is $10 per share plus any dividends not paid to date. Any dividends not paid, but added to the accreted value shall no longer be payable in cash as dividends.

In the event of a voluntary or involuntary liquidation, dissolution, or winding up of the Company, Stockholders have liquidation preference and are entitled to receive unpaid dividends out of the Company's legally available assets. At December 31, 2005, the liquidation preference is equal to the preferred stock balance recorded on the balance sheet.

In the event of a merger, Stockholders are entitled to be paid, out of the aggregate consideration receivable, an amount equal to the balance sheet amount before any payment to the common stockholders.

Shares of Series A Preferred Stock may be redeemed by the Company at the option of the Stockholders of Series A Preferred Stock.

### 15. Segment Information

The Company operates in one segment, and has operations in the United States, Europe and Asia. Revenues are attributable to countries based upon the location of the customers. Geographic area information are as follows:

| | | Year ended December 31, 2005 | | Period from October 22, 2004 (inception) to December 31, 2004 |
|---|---|---|---|---|
| Revenues from external customers: | | | | |
| Domestic | $ | 64,106,803 | $ | 4,083,686 |
| Foreign | | 32,704,233 | | 1,523,326 |
| Total revenues from external customers | $ | 96,811,036 | $ | 5,607,012 |
| | | | | |
| Property and equipment, net: | | | | |
| Domestic | $ | 16,318,637 | $ | 14,986,221 |
| Foreign | | 3,125,378 | | 3,948,480 |
| Total consolidated property and equipment, net | $ | 19,444,015 | $ | 18,934,701 |
| | | | | |
| Goodwill and other intangible assets, net: | | | | |
| Domestic | $ | 135,708,290 | $ | 144,134,917 |
| Foreign | | 7,677,455 | | 9,902,845 |
| Total consolidated goodwill and other intangible assets, net | $ | 143,385,745 | $ | 154,037,762 |

**16. Subsequent Event**

Effective April 7, 2006, dj Orthopedics, Inc. acquired 100% of the stock of Aircast Incorporated. Under the terms of the Stock Purchase Agreement, dj Orthopedics, Inc. paid approximately $291,000,000 in cash. The Company used a portion of these proceeds to pay down their entire bank debt balance. Prior to the effective date, dj Orthopedics agreed to reimburse Aircast Incorporated for certain professional fees incurred by the Company in connection with the transaction. This receivable is recorded on the accompanying balance sheet as a due from buyer at December 31, 2005.

# EXHIBIT E

EXHIBIT

2

**ANKL, Inc.**
**ANKL, International, LLC**
**ANKL Liquidating Trust**
*c/o Levine and Seltzer*
**150 East 52nd Street, 19th Floor**
**New York, NY 10022**

July 19, 2006

Donald M. Roberts
Senior Vice President, General Counsel
DJO Incorporated
2985 Scott Street
Vista, CA 92081

RE: Your fax of June 6, 2006 - Change of Control Earnout Calculation

Dear Don:

We have reviewed your fax of June 6, 2006, which provides the Change of Control Earnout Calculation.

Per section 1.8 (d) of the APA, (Closing Documents Volume 1, Tab 1, Page 13-14), this letter is Notice of Dispute and Disagreement to you that the sellers disagree with and dispute the Change of Control Earnout Calculation. This dispute notice is provided within the 45 days required under the APA.

In particular, we note that the calculation you provided in your June 6th fax is within 1.6% of the earnout target. Without detailed examination of the following information related to both Gross Revenue and Net Revenue for the Change of Control Earnout Period, we cannot agree with the accuracy of this calculation:

1) 2005 audited financials, work papers and calculations.
2) 2006 Jan-Mar audited financials, work papers and calculations (when available - please advise).
3) Auditor's examination and report of any changes in the definition of, or treatment of, any of the following since 12/07/04:
    a) Gross Sales
    b) Net Sales
    c) Foreign exchange
    d) Installment sales
    e) GPO net revenue or any other revenue recognition issues.
    f) In-transit or intercompany sales
    g) Delayed shipments beyond the "normal course of business" (would require looking at April and May 2006 as well).
    h) Inventory positions beyond the "normal course".
    i) Backorder levels.
    j) Any other audit or accounting treatment anywhere in the company's financials that may effect Net Sales in the Earnout Period.

RE:  Your fax of June 6, 2006 - Change of Control Earnout Calculation                July 19, 2006

So that we may mutually agree on a time line for our dispute examinations, please let Elliot Levine know your company's planned audit completion timing for the period covering Q1 2006.

Sincerely,

G.W. Jim Johnson, III
Holders Representative, Chairman and Trustee
ANKL, Inc.
ANKL International, LLC
ANKL Liquidating Trust

Enclosure:  Your fax of June 6, 2006 - Change of Control Earnout Calculation

cc:  Stuart Kurlander
     Rick Stollbach
     Jack Mcvicker
     Elliot Levine
     Tim Youmans

# EXHIBIT F

**AIRCAST**
1430 Decision Street
Vista, California 92081

August 2, 2006

Mr. G.W. Jim Johnson, III
Four Seasons Residence
1425 Brickell Avenue
Suite 56E
Miami, Florida 33131
Facsimile No: (207) 799-8586

Dear Mr. Johnson:

We are in receipt of your letter dated July 19, 2006 advising us of your disagreement with our calculation of Nets Sales for the Change of Control Period (as such terms are defined in the Asset Purchase Agreement dated as of October 31, 2004 by and among the entities subsequently renamed as ANKL, Inc., ANKL International Sales, L.L.C. and Aircast LLC) pursuant to Section 1.8 of the Asset Purchase Agreement and requesting specific information in order for you to examine our calculation.

Your letter does not constitute a valid notice of disagreement under Section 1.8 of the Asset Purchase Agreement. Without identifying each deficiency, we note that the 45 calendar day period referred to in your letter was the period during which you needed to conduct your examination, *and within such period* you were obligated to provide to us a notice identifying any 'disagreement to the *calculation* of Net Sales or any *element of the financial statements* relevant to such calculation'(emphasis added) 'setting forth in detail the particulars of such disagreement.' Your stated basis of disagreement, that the calculation is 'within 1.6% of the earnout target', is merely a factual observation and does not constitute a dispute as to the calculation itself or any element of the related financial statements. Further, your letter goes on to request information from us with which you intend to evaluate whether a disagreement, in fact, exists. It is obvious that your letter merely seeks to reserve your right to disagree, but it does not specify an actual disagreement with either the calculation of Net Sales for the Change of Control Period or any element of the relevant financial statements. Accordingly, your letter is not a proper notice and, therefore, under the Asset Purchase Agreement our calculation of Net Sales for the Change of Control Period is now 'final, binding and conclusive' for all purposes.

Notwithstanding your failure to deliver a valid notice of disagreement under the Asset Purchase Agreement, and without waiving any of our rights to dispute the validity, content and effect of your letter as a notice of disagreement under Section 1.8 of the Asset Purchase Agreement, we are willing to provide information to you to evidence our proper calculation of Net Sales for the Change of Control Period. If, for the sake of argument, we conceded that your

G.W. Jim Johnson, III
August 2, 2006
Page 2

letter constituted a valid notice of disagreement, then you would be obligated to complete your review, and any disagreements between us would have to be resolved, on or before August 18, 2006, which is the expiration of the 30 day period provided for in the Asset Purchase Agreement. We are not willing to extend this timeline by virtue of our willingness to voluntarily provide you with information related to our calculation of Net Sales for the Change of Control Period. If, by August 18, 2006, we are unable to resolve your "disagreement" and if it is determined that your letter is a qualifying notice of disagreement under the Asset Purchase Agreement,, then such disagreement will be submitted to KPMG (or such other Auditor as we may mutually agree) for resolution solely on the basis of written submissions, as provided in the Asset Purchase Agreement. The parties will share the expense of KPMG as provided in the Asset Purchase Agreement.

With respect to the specific information requested in your July 19 letter, we advise you:

1. A copy of the 2005 audited financial statements is enclosed.

2. We will request that E&Y provide to you or your representative access to the auditor's work papers for the 2005 audit. Please provide to us the name and relationship of the person(s) to whom you would like access to be granted.

3. There is no audit of the financial statements for the period from January to March 2006, and we do not intend to cause an audit of such financial statements to be prepared.

4. With respect to your request for the 'auditor's examination report of any changes in the definition of, or treatment of, any of the following....' we are unclear about what you are seeking, and we request further guidance.

If you would like to examine accounting records on site in the New Jersey facility for Aircast, please contact Matt Simons, Vice President of Finance and Accounting for DJO Incorporated (telephone (760) 734-5548). He will arrange to have the necessary personnel and records available for your visit. He plans to be on site in New Jersey on August 9 and 10, and those dates would therefore be the best for any such visit. We will also need the attached confidentiality agreement signed prior to any such visit or examination of accountant work papers.

Please contact the undersigned to discuss your information request.

Sincerely yours,

Donald M. Roberts

Enclosures
cc:    Roger H. Lustberg
       Stuart S. Kurlander, Esq. (by facsimile, (202) 637-2201)

# EXHIBIT G

Mar-04-09   10:36am   From-DJO LLC                    760-734-3566          T-173  P.002/004  F-695

## Roberts, Don

| | |
|---|---|
| **From:** | Tim Youmans [tyoumans@yahoo.com] |
| **Sent:** | Tuesday, July 17, 2007 1:52 PM |
| **To:** | Capps, Vickie |
| **Cc:** | Jim Johnson; David Kratzer; Roberts, Don; Rick Stollbach |
| **Subject:** | Status of your earnout dispute response |
| **Attachments:** | Earnout Calc Dispute Letter Final.doc |

Vickie-

In the attached letter sent to Don Roberts on July 19, 2007 (by fax and hardcopy), we requested, among other things, that Don provide us with your company's planned audit completion time line for the period covering Q1 2006.

We never received a response from anyone at DJO.

Since the deadline for filing extended 2006 corporate tax returns is now only a few months away, I must assume that your audits for 2006 are done by now.

Since it is customary that separate audits are done on acquired entities as of the acquisition date, I must also assume that you have a separate audit completed on Aircast's separate operations (pre-DJO) through your acquisition date in April 2006.

Please let me know if these assumptions are correct. Also, when we can expect to get copies of Aircast audits for 2005 and Jan 2006-April 2006?

Also, when can we have dialog regarding our obtaining the relevant audit work papers, internal accounting information and access to the management staff that prepared these calculations, as specified under the APA and in the attached letter?

As this is potentially a $10mm issue, I hope that it meets the minimum materiality threshold that would allow you to give this matter prompt attention.

-Tim Youmans

*David Kratzer*    7/24/07

*Tim Youmans*

Tim Youmans
EVP, ANKL Companies
tyoumans@yahoo.com
207 749 9678
207 541 4706 Fax

7/17/2007

# EXHIBIT H

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

October 26, 2007

T. Michael Guiffré
202-457-6441
mguiffre@pattonboggs.com

## VIA FACSIMILE (212) 271-3610 AND
## CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Aircast LLC and Aircast Holding Company LLC
c/o dj Orthopedics, LLC
2985 Scott Street
Vista, California 92081
Attention: General Counsel

Re:    Payment of Contingent Consideration

Dear General Counsel:

Aircast LLC (formerly AI Asset Acquisition Company LLC) and Aircast Holding Company LLC (formerly AI Holding Company LLC), the sole owner of Aircast LLC (collectively, the "Earnout Obligors"), have breached the Asset Purchase Agreement ("APA"), dated as of October 31, 2004, with ANKL, Inc. (formerly Aircast Incorporated); ANKL International, L.f..C. (formerly Aircast International Sales, L.L.C.); and the ANKL Liquidating Trust[1] (collectively, the "Old Aircast Sellers"). Pursuant to the APA, the Earnout Obligors are required to pay contingent consideration to the Old Aircast Sellers if certain target Net Sales[2] are met. The Earnout Obligors have breached their obligations under Section 1.8 of the APA by failing to deliver to the Old Aircast Sellers audited consolidated financial statements and other records and information to substantiate their calculations of Net Sales.

We have been directed by the Old Aircast Sellers to initiate legal action if the Earnout Obligors do not provide the following documents to us <u>within fourteen (14) days</u> of the date of this letter:

1.    <u>Earnout Financial Statements</u> for 2005 and 2006, including (i) the audited consolidated statements of income and (ii) the unaudited calculations of Net Sales, of the Earnout Obligors and the Affiliated Purchasers. <u>See</u> APA Section 1.8(c).

---

[1] ANKL, Inc. and ANKL International, L.L.C., have assigned all of their respective rights and obligations under the APA to the ANKL Liquidating Trust.

[2] Except as otherwise defined herein, capitalized words are defined in the APA.



October 26, 2007
Page 2

2.  The work papers of the independent auditor of the Earnout Financial Statements for 2005, 2006 and the Change of Control Period. See APA Section 1.8(d)(iii). These records include, but are not limited to, the auditor's examination, computation, and report of any of the following items:

    a.  Gross Sales
    b.  Net Sales
    c.  Foreign exchange
    d.  Installment sales
    e.  GPO net revenue or any other revenue recognition issues
    f.  Inter- and intra-company sales
    g.  Delayed shipments beyond the "normal course of business"
    h.  Inventory positions beyond the "normal course of business"
    i.  Backorder levels
    j.  Any other audit or accounting treatment in the Earnout Financial Statements for 2005, 2006 and the Change of Control Period that may affect the calculations of Net Sales in the Earnout Periods

    These records also include, but are not limited to, any documents reflecting the definition, treatment, or method used to compute Net Sales, including any variance or deviation from, or changes to, the definition, treatment, or method used to compute Net Sales in the 2002-2003 Financial Statements.

3.  All records of the Earnout Obligors and Affiliated Purchasers related to the calculations of Net Sales for 2005, 2006, and the Change of Control Period. See APA Section 1.8(d)(ii).

Over a year has passed since the Earnout Obligors were obligated to produce these documents. On or about June 6, 2006, the Earnout Obligors faxed Glenn Johnson a copy of what they represented was the earnout calculation for the Change of Control Period. See Enclosure 1. The Earnout Obligors did not deliver a copy of the Earnout Financial Statements applicable to the Change of Control Period or any other records related to their calculation of Net Sales, which they were obligated to do pursuant to Section 1.8(d) of the APA. Without this documentation, the Old Aircast Sellers had no means to determine the accuracy of the Earnout Obligors' earnout calculation.

The Old Aircast Sellers disputed the Earnout Obligors' calculation of Net Sales for the Change of Control Period in accordance with Section 1.8(d) of the APA on July 19, 2006. See Enclosure 2. The Old Aircast Sellers requested copies of the documents which the Earnout Obligors were required to produce pursuant to Section 1.8(d) to substantiate their earnout calculation.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

October 26, 2007
Page 3

Although the Earnout Obligors were required to "use ... reasonable commercial efforts for a period of thirty (30) calendar days ... to resolve any disagreements with respect to the calculation of the Net Sales," the Earnout Obligors did not respond to the Old Aircast Sellers' notice of dispute or produce any of the required documents.

On July 17, 2007, the Old Aircast Sellers inquired about the status of the Earnout Obligors' earnout dispute response, including whether it had completed its audit for 2006. The Earnout Obligors responded on July 23, 2007, by faxing the Old Aircast Sellers a copy of an August 2, 2006 letter that putatively had been mailed to Mr. Johnson and faxed to Stuart Kurlander, Esq. See Enclosure 3. We have confirmed that the August 2, 2006 letter was never delivered to Mr. Johnson or Mr. Kurlander.

Although the Earnout Obligors failed to deliver their letter dated August 2, 2006, until a year later, the Old Aircast Sellers expect the Earnout Obligors to meet the commitments they made in the letter. The Earnout Obligors said they were enclosing a copy of their 2005 audited financial statements, and therefore, there should be no delay for the Earnout Obligors to do so now. By now, the Earnout Obligors also should have completed and can produce their 2006 audited financial statements. The Earnout Obligors also agreed to provide access to their auditor's work papers, which should be immediately arranged.

As you know, the parties entered into a separate Settlement Agreement dated as of March 29, 2006. Under the Settlement Agreement, the Earnout Obligors agreed that they were not released from their obligations under Section 1.8 of the APA "relating to the determination of whether the Earnout Obligations Acceleration has occurred." Settlement Agreement, Section 2.1; see also Section 1.3. The Old Aircast Sellers also conditioned their releases in the Settlement Agreement on the Earnout Obligors abiding by their obligations under Section 1.8 of the APA concerning whether the Change of Control triggered accelerated Earnout Payments. Unless the Earnout Obligors immediately remedy their breach, the Old Aircast Sellers will rescind the Settlement Agreement and pursue all of their rights under Section 1.8 of the APA to contingent consideration. These rights include the Earnout Obligors' obligations to pay the Old Aircast Sellers $5 million each year that target net sales are met under Section 1.8(a)(ii) and (iii) based on audited financial statements for 2006 and 2007.

We look forward to the Earnout Obligors' immediate compliance with their production obligations. Given the limited time we have before proceeding to enforce the Old Aircast Sellers' rights, I encourage you to call me when you receive this correspondence.

In addition to this earnout matter, we need dj Orthopedics' cooperation and assistance in resolving the ownership of the European bank accounts and reconciling cash balances at the date of and after the closing of the transaction with the audited financial statements for all entities.


**PATTON BOGGS** LLP
ATTORNEYS AT LAW

October 26, 2007
Page 4


Sincerely,

T. Michael Guiffré


Enclosures

cc:

Bingham McCutchen LLP
355 South Grand Avenue
Los Angeles, California 90071
Attention: Roger H. Lustberg, Esq.

Tailwind Management LP
390 Park Avenue, 17th Floor
New York, New York 10022
Attention: Douglas M. Karp

Kelley Drye & Warren LLP
2 Stamford Plaza
281 Tresser Blvd.
Stamford, Connecticut 06901
Attention: John T. Capetta, Esq.

Kelley Drye & Warren LLP
400 Atlantic Street
Stamford, Connecticut 06901
Attention: John T. Capetta, Esq.

# EXHIBIT I

**BINGHAM**

LEGAL. INSIGHT. BUSINESS INSTINCT.

Roger H. Lustberg
Direct Phone: 213.229.8407
Direct Fax:    213.830.8601
roger.lustberg@bingham.com
Our File No.: 0000318250

November 20, 2007

T. Michael Guiffré, Esq.
Patton Boggs LLP
2550 M Street, NW
Washington, D.C. 20037-1350

Re:  DJO/Aircast – ANKL

Dear Mr. Guiffré:

This firm is counsel to DJO and Aircast LLC, and in that capacity we have been instructed to respond to your letters of October 26 and November 7, 2007 relating to that certain Asset Purchase Agreement dated as of October 31, 2004 (the "APA") among Aircast LLC (formerly AI Asset Acquisition Company LLC) and Aircast Holding Company LLC (formerly AI Holding Company LLC) and ANKL, Inc. (formerly Aircast Incorporated), ANKL International, L.L.C. (formerly Aircast International Sales, L.L.C.) and the ANKL Liquidating Trust (collectively, the "Old Aircast Sellers").

At the outset, let me state that DJO and Aircast do not accept your assertion that Don Roberts' letter dated August 2, 2006 addressed to Mr. Johnson was not timely delivered. Not only was this letter mailed to Mr. Johnson at the notice address specified in the APA, but in addition copies of the letter and attachments were both sent and faxed to Elliott Levine, who was at that time acting as financial advisor to the Old Aircast Sellers, and emailed to Stuart Kurlander, their legal counsel. In any event, given the circumstances, we find it odd that if in fact the Old Aircast Sellers received no response to Mr. Johnson's letter of July 19, 2006 (the "Johnson Letter"), they would wait a full year before following up. Accordingly, DJO is confident that the content of the letter was available to the Old Aircast Sellers in August of 2006.

Let me also reiterate the position stated in Mr. Roberts' August 2, 2006 letter that DJO and Aircast do not concede that the Johnson Letter constituted a valid notice of disagreement under Section 1.8 of the APA for the reasons set forth in Mr. Roberts' August 2, 2006 letter, and nothing in this letter or the actions DJO and Aircast are prepared to agree to at this time as set forth below shall constitute a waiver of any of DJO's or Aircast's rights to continue to dispute the validity, content and effect of the Johnson Letter.

Putting aside the validity issue, however, DJO and Aircast remain willing to provide the Old Aircast Sellers with access to financial information related to the earnout as contemplated under Section 1.8 of the APA.

With respect to the specific information requested in your letter of October 26, we advise as follows:

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Walnut Creek
Washington

Bingham McCutchen LLP
Suite 4400
355 South Grand Avenue
Los Angeles, CA
90071-3106

T 213.680.6400
F 213.680.6499
bingham.com

A/72322850.1

T. Michael Guiffre
November 20, 2007
Page 2

1. Aircast's 2005 audited financial statements (a copy of which has previously been delivered as an enclosure to Mr. Roberts' August 2, 2006 letter) are enclosed.

2. The unaudited calculation of Net Sales for the relevant period, a copy of which was furnished to Elliott Levine on June 6, 2006, is enclosed.

3. DJO and Aircast will request that Ernst & Young provide to the Old Aircast Sellers, or their representative, access to the auditor's work papers relating to the 2005 Aircast audit. Please provide the name and relationship of the person(s) who the Old Aircast Sellers designate to meet with Ernst & Young.

4. As noted in Mr. Roberts' August 2, 2006 letter, Aircast's financial statements for the period from January to March 2006 have not been audited and DJO does not intend to cause an audit of such financial statements to be prepared. However, access to the unaudited financials will be afforded at DJO's premises.

As you are aware, the parties have entered into a separate Settlement Agreement dated as of March 29, 2006. We find nothing in the Settlement Agreement that conditions the full releases given by the Old Aircast Sellers therein upon compliance with Section 1.8 of the APA. Consequently, whether or not Aircast has complied with Section 1.8, which we maintain it has, the Old Aircast Sellers do not have the right or ability to rescind the Settlement Agreement as you allege in your letter of October 26, 2007. Since the Settlement Agreement resolved all of the Old Aircast Sellers' rights to receive earnout payments for periods subsequent to March 2006, there is no reason for the Old Aircast Sellers to have access to Aircast financial information for any period thereafter and consequently, such will not be provided.

As noted in Mr. Roberts' August 2, 2006 letter, notwithstanding the willingness of DJO and Aircast to voluntarily provide the Old Aircast Sellers with access to the information contemplated by Section 1.8 of the APA, DJO and Aircast are not willing to extend the 30 day period provided in the APA following the proper delivery by the Old Aircast Sellers of a notice of disagreement thereunder. Accordingly, if by December 20, 2007, DJO and Aircast, on the one hand, and the Old Aircast Sellers, on the other hand, are unable to resolve any "disagreement" that may exist and if it is determined that the Johnson Letter did in fact constitute a valid notice of disagreement under the APA, then such disagreement will be submitted to KPMG or such other auditor as may be mutually agreed for resolution solely on the basis of written submissions in the manner provided in the APA. The parties will share the expense of KPMG as provided in the APA.

If the Old Aircast Sellers wish to review Aircast's accounting records for periods through March 2006, please contact Don Roberts at (760) 734-5644. He will arrange a mutually convenient time to have the necessary personnel and records available for inspection. Mr. Roberts will also try to arrange for an opportunity to meet with Ernst & Young, including access to their work papers for the relevant periods. For your information, the

T. Michael Guiffre
November 20, 2007
Page 3

Aircast facility in New Jersey has been closed, and all records are now located at DJO's
headquarters in Vista, California.

Recognizing that the Aircast information to which access may be provided is nonpublic
and proprietary, DJO will require that each of the persons who will be granted access
execute an NDA in the form enclosed.

Finally, with regard to resolution of the European bank account ownership issue, I am
advised that Aircast has already provided a reconciliation of the cash balances in such
accounts and the application thereof against then outstanding obligations that the Old
Aircast Sellers were required to discharge pursuant to the APA.  Consequently, we need
guidance on what additional information you are requesting.

Very truly yours,

Roger H. Lustberg

Enclosure

Cc:    Donald M. Roberts, Esq.
       John T. Capetta, Esq.