UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ANKL LIQUIDATING TRUST, Plaintiff, | : | 07-CV-10624 (JGK) |
| - against - | : | ECF Case |
| AIRCAST LLC, AIRCAST HOLDING COMPANY LLC, and DJO, LLC, Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF ANKL LIQUIDATING TRUST'S FIRST THROUGH FIFTH, NINTH AND TENTH CLAIMS FOR RELIEF**

BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York 10022
Attorneys for Defendants

TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iii

I. PRELIMINARY STATEMENT ... 1

II. STATEMENT OF FACTS ... 3

A. The Asset Purchase And Provisions Of The Asset Purchase Agreement ... 3

B. DJO's Acquisition Of The Aircast Business And The Settlement Agreement ... 4

C. Net Sales For The Change of Control Period Do Not Meet The Threshold Required For An Earnout Payment ... 6

III. ARGUMENT ... 9

A. Standard On A Motion To Dismiss ... 9

B. On A Motion To Dismiss Under Rule 12(b)(6), The Court May Consider Certain Documents Outside The Complaint ... 9

C. The Contract Claims Regarding The Earnout Payment Should Be Dismissed ... 10

1. ANKL Failed to Provide a Valid Notice of Disagreement under APA Section 1.8 ... 10

a. ANKL Did Not Seek Access to Purchasers' Employees and Records until the End of the Period ... 12

b. The 45-Day Period Has Expired ... 13

2. The APA Requires that This Dispute Be Heard by an Auditor ... 15

D. The Fraud Claim Must Be Dismissed ... 17

1. ANKL Specifically Disclaimed Reliance on any Extra-Contractual Statements in the Settlement Agreement ... 18

**TABLE OF CONTENTS (con't)**

2. The Fraud Allegations Are Not Pled with Sufficient Particularity....20

3. Even If It Was Defrauded, ANKL Cannot Obtain Punitive Damages ....22

E. The Negligent Misrepresentation Claim Must Be Dismissed....23

F. The Conversion Claim Must Be Dismissed....24

IV. CONCLUSION....25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advanstar Commc'ns, Inc. v. Beckly-Cardy, Inc.*, No. 93 Civ. 4230 (KTD), 1994 WL 176981 (S.D.N.Y. May 6, 1994) ....16, 17

*ATSI Commc'n Inc. v. Shaar Fund Inc.*, 493 F.3d 87 (2d Cir. 2007) ....9

*Baxter v. A.R. Baron & Co.*, 94 Civ. 3913, 1995 U.S. Dist. LEXIS 14882 (S.D.N.Y Oct. 12, 1995) ....18

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1956 (2007) ....9, 21

*Camofi Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462 (S.D.N.Y. 2006) ....17

*Chelsea Square Textiles, Inc. v. Bombay Dyeing and Mfg. Co., Ltd.*, 189 F.3d 289 (2d Cir. 1999) ....16

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ....10

*Doldo Brothers, Inc. v. Coors Brewing Co.*, No. 7:08-CV-206, 2008 WL 657252 (N.D.N.Y. Mar. 7, 2008) ....16

*DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308 (S.D.N.Y. 2002) ....19, 20

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004) ....12, 20, 23

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228 (S.D.N.Y. 1999) ....22

*Hampshire Equity Partners II L.P. v. Teradyne Inc.*, No. 04 Civ. 3381, 2005 U.S. Dist. LEXIS 5261 (S.D.N.Y. Mar. 30, 2005) ....23

*Ins. Brokerage Antitrust Litig.*, MDL Docket No. 1663, 2007 U.S. Dist. LEXIS 64767 (D.N.J. Aug. 31, 2007) ....9

*Katz v. Image Innovation Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2008 WL 76210 (S.D.N.Y. March 24, 2008) ....12

*Matsumura v. Benihana Nat'l Corp*, No. 06 Civ. 7609 (NRB), 2008 WL 282021 (S.D.N.Y. Jan. 25, 2008) ....23

**TABLE OF AUTHORITIES (con't)**

*Mead v. ReliaStar Life Ins. Co.*, No. 2:05-cv-332 (WKS), 2008 WL 850675 (D. Vt. Mar. 27, 2008)……………………………………………………………………......13

*Moses H. Cone Merril Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983).....................17

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Petroleum Corp.*, 88 F.3d 129 (2d Cir. 1996).........................................................................................22

*Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496 (S.D.N.Y. 2007) ..........................................................................................................24

*Phoenix Four, Inc. v. Strategic Resources Corp.*, No. 05 Civ. 4837, 2006 WL 399396 (S.D.N.Y. Feb. 21, 2006) ..........................................................................19

*Ritchie Capital Management, L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656 (S.D.N.Y. July 17, 2007) ...........................................................10

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...........................................................18

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ................................................................10

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996).........................................................................................9

*Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 927 F. Supp. 650 (S.D.N.Y. 1996) ..........................................................................................................23

*Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997 (2d Cir. 1988) ............................................21

*Washington Capital Ventures, LLC v. Dynamicsoft, Inc.*, 373 F. Supp. 2d 360 (S.D.N.Y. 2005) ...............................................................................................18

**STATE CASES**

*Retty Financing, Inc. v. Morgan Stanley Dean Witter & Co.*, 293 A.D.2d 341, 740 N.Y.S.2d 198 (1st Dep't 2002)..........................................................................24

*Richbell Info. Svcs., Inc. v. Jupiter Partners L.P.*, 309 A.D.2d 288, 765 N.Y.S.2d 575 (1st Dep't 2003)..........................................................................................24

*Rio Algom Inc. v. Sammi Steel Co., Ltd.*, 168 A.D.2d 250, 562 N.Y.S.2d 486 (1st Dep't 1990)...........................................................................................................16

**FEDERAL RULES**

Fed. R. Civ. P. 9(b) ....................................................................................................18, 23

Defendants Aircast LLC ("Aircast LLC"), Aircast Holding Company LLC ("Aircast Holding" and, together with Aircast LLC, "Purchasers") and DJO, LLC ("DJO") (collectively, "Defendants"),[1] by their attorneys, Bingham McCutchen LLP, submit this memorandum of law in support of their motion to dismiss the First through Fifth, Ninth and Tenth Claims for Relief in plaintiff ANKL Liquidating Trust's complaint (the "Complaint").

## I.    PRELIMINARY STATEMENT

In October 2004, the former shareholders ("Sellers") of a company called Aircast Incorporated ("Aircast") sold substantially all of Aircast's assets to a new entity, defendant Aircast LLC, which was controlled by a private equity firm known as Tailwind Capital Partners LLC ("Tailwind").  The sale price was approximately $155 million in cash and promissory notes. Under the Asset Purchase Agreement ("APA") that governed the sale, the Sellers could earn an additional $5 million in each of the three years immediately following the sale of the business (the "Earnout" or "Earnout Payment") if the company's net sales ("Net Sales") exceeded certain agreed-upon thresholds.  The APA also provided that any future Earnout Payments would accelerate and become immediately due if (i) Tailwind sold the Aircast business to another entity and (ii) Net Sales during the 12 full months preceding the sale exceeded $99 million.

In February 2006, defendant dj Orthopedics LLC (now known as DJO, LLC) agreed to acquire Aircast.  At around this time, the Sellers agreed with the Purchasers to settle Sellers' claims to future earnout payments in exchange for $700,000 in cash (the "Settlement Agreement") with one caveat: if the Sellers were entitled to an accelerated Earnout Payment by virtue of the sale to DJO, Sellers would be paid that amount, not $700,000.  If not, Sellers waived any claims to future Earnout Payments.

---

[1]  Aircast LLC was formerly known as AI Asset Acquisition Company LLC.  Defendant Aircast Holding was formerly known as AI Holding Company LLC and was the sole owner of Aircast LLC.

In April 2006, the sale of Aircast did, in fact, occur. Tailwind effected the sale of 100% of the stock of the new Aircast Incorporated (the parent of the Purchasers) to DJO. As the Sellers were informed soon after the closing of the sale to DJO, however, Aircast's net sales for the 12 months preceding the closing were below the $99 million threshold.

This case represents the Sellers' effort to obtain a $10 million windfall to which they are not entitled by claiming entitlement to the accelerated Earnout Payments under the APA even though Net Sales were below the $99 million target. ANKL Liquidating Trust ("ANKL" or the "Trust"), a liquidating trust representing the Sellers, has asserted claims for breach of contract, fraud, negligent misrepresentation, conversion and a declaratory judgment. ANKL's claims fail for several reasons.

***First***, although ANKL now contests the calculation of Net Sales provided by Defendants following the DJO sale, ANKL failed to comply with the clear contractual requirements for disputing this calculation. Therefore, under the express terms of the APA – the controlling agreement – ANKL is "deemed to have accepted [Defendants'] calculation of . . . Net Sales . . ., which shall be final, binding and conclusive for all purposes. . . ."

***Second***, even if ANKL had followed the appropriate procedures for disputing the Net Sales calculation, the APA provides that any dispute regarding the calculation is to be submitted to an auditor; this Court is thus not the appropriate forum for resolution of this issue. Additionally, ANKL's assertion that Defendants were required to provide audited financial statements for a portion of the relevant time period is contradicted by the plain language of the APA itself. This is fatal to the First and Fifth Claims for breach of Section 1.8 of the APA, as well as the Second Claim for breach of the Settlement Agreement between Defendants and Sellers, dated March 29, 2006 (the "Settlement Agreement"), which is entirely duplicative of the First Claim.

***Third***, the fraud claim (Third Claim for Relief) must be dismissed because, as a matter of law, ANKL cannot rely on a purportedly fraudulent oral misrepresentation where such reliance is expressly disclaimed in the Settlement Agreement. Moreover, the fraud claim fails to comply with Rule 9(b) of the Federal Rules of Civil Procedure.

***Fourth***, ANKL does not even attempt to allege that the parties' relationship was anything more than an arm's length business relationship. This is fatal to the negligent misrepresentation claim (Fourth Claim for Relief).

***Fifth***, the Ninth Claim, for conversion, must be dismissed as duplicative of the Eighth Claim for breach of contract.[2]

## II. STATEMENT OF FACTS

### A. The Asset Purchase And Provisions Of The Asset Purchase Agreement

Aircast was in the business of manufacturing, distributing and selling medical devices under the Aircast name. (Compl. ¶ 1). In October 2004, Sellers sold substantially all of the assets of the old Aircast business pursuant to the terms of the APA. (*Id.* ¶¶ 12-14). One of the provisions of the APA, and the primary focus of the Complaint, is Section 1.8, pursuant to which Sellers would be entitled to receive a supplemental payment – an Earnout – if certain sales thresholds were met in 2005 and beyond. Section 1.8 contains the follows key provisions:

- Sellers were to be paid a $5 million Earnout Payment if Aircast's 2005 Net Sales exceeded $99.7 million, with additional $5 million Earnout Payments due if sales exceeded certain higher thresholds for each of 2006 and 2007.[3]

---

[2] The remaining Claims (Six through Eight) allege the Trust was refused copies of its own books and tax records, and denied accuses DJO and Aircast LLC of obstructing its ability to close certain bank accounts. These claims are wholly independent from those Defendants move to dismiss herein.

[3] Under the APA, Sellers could also be entitled to additional $5 million Earnout Payments for the years 2006 and 2007 if Aircast's sales in those years exceeded $114 million and $129 million, respectively.

- Any Earnout Payments for periods that have not been completed are both accelerated and deemed earned in the event of a Change of Control,[4] unless Net Sales for the 12 months preceding the Change of Control were less than $99 million.

- Purchasers must provide Sellers with a calculation of Net Sales for the 12-month period prior to the Change of Control within 60 days of any Change of Control. This 12-month period is called the "Change of Control Period."

- Upon delivery of the calculation, Purchasers must also provide Sellers with reasonable ***access*** to Purchasers' employees who participated in the preparation of the calculation, ***access*** to Purchasers' relevant financial statements and records relating to the calculation, and ***access*** to Purchasers' independent auditors' papers relevant to the calculation.

- Sellers may dispute the calculation or financial statement "by notifying [Purchasers] in writing, ***setting forth in detail the particulars of such disagreement*** within forty-five (45) calendar days of receipt of the calculation" or Sellers are deemed to have accepted Purchasers' calculation.

- Any disputes must be negotiated between the parties for 30 days, after which time all remaining disputes regarding the calculation must be submitted to an independent auditor for a binding resolution.

APA § 1.8 (annexed to the Declaration of Kenneth I. Schacter, dated April 4, 2008 (the "Schacter Decl.") as Exhibit A).

It is the calculation of Net Sales and the dispute process which form the basis of the First, Second, Fifth and Tenth Claims for Relief.

### B. DJO's Acquisition Of The Aircast Business And The Settlement Agreement

As noted above, in February 2006, approximately 18 months after Sellers sold the Aircast assets to Purchasers, the Tailwind entity controlling the Purchasers agreed to sell the Aircast business to DJO. Under a stock purchase agreement, DJO acquired all outstanding shares of the new Aircast Incorporated for $291 million. (Compl. ¶ 24). In connection with DJO's impending

[4] Capitalized terms used herein have the same meaning as in the APA unless otherwise indicated.

purchase of Aircast Incorporated, Purchasers, Sellers and various predecessors in interest entered into the Settlement Agreement. (*Id*. ¶ 25). As part of the Settlement Agreement, the parties agreed that DJO's stock purchase constituted a Change of Control within the meaning of APA Section 1.8. (*Id*.). The sale of the business occurred when the transaction closed on April 7, 2006. (*Id*. ¶ 29).

The Settlement Agreement provides that, in exchange for a payment of $700,000, ANKL and the Sellers released all claims against Purchasers for any Earnout Payments under Section 1.8 of the APA ***unless*** it turned out that an accelerated Earnout Payment was due as a result of the change of control triggered by the DJO transaction. *See* Settlement Agreement (annexed to the Schacter Decl. as Ex. B) § 2.1. An accelerated Earnout Payment would be due if, and only if, Net Sales for the 12 month Change of Control Period – from April 1, 2005 to March 31, 2006 – exceeded $99 million. Section 1.3 of the Settlement Agreement states that, if an accelerated Earnout Payment was due as a result of the Change of Control, the Settlement Agreement would be treated as null and void, the Sellers would keep the $700,000 payment as a credit against the accelerated Earnout Payment and the releases provided in Section 2.1 would be rescinded. *Id*. Absent the triggering of the accelerated Earnout Payment, though, the Settlement Agreement voids any claims by Sellers to any Earnout Payments for the years 2005, 2006 and 2007. *Id*. § 2.1.

Section 3.3 of the Settlement Agreement identifies two limited representations and warranties made by each party in entering the Settlement Agreement – namely, that the Purchasers have authority to enter into the Settlement Agreement and that execution and delivery of the Settlement Agreement does not violate the law or any other agreement. *Id*. § 3.3. Section

3.1(c) states that ***no other representations*** or warranties were made by the Purchasers, or anyone associated with the Purchasers, to the ANKL Trust:

> No Undisclosed Inducements. The ANKL Liquidating Trust has entered into this Agreement ***in reliance solely upon its own independent investigation and analysis of the fact and circumstances*** and ***no representations and warranties, covenants or agreements, other than those expressly set forth in this agreement, were made by any of the Earnout Obligors***, any of their respective Affiliates, or any employee, officer, director, manager, member, partner, stockholder, equityholder, agent or representative of any such entity ***to induce the ANKL Liquidating Trust to enter into this Agreement***. *Id*. (emphasis supplied).

There was thus no representation regarding Net Sales for 2005, for the Change of Control Period or for any other time. *See id*.

The DJO transaction under the stock purchase agreement closed on April 7, 2006, triggering the contractual Change of Control. (Compl. ¶ 29).

### C. Net Sales For The Change Of Control Period Do Not Meet The Threshold Required For An Earnout Payment

On June 6, 2006 – 60 days after the closing date of the DJO stock purchase agreement – Purchasers met their delivery obligations under the Section 1.8 of the APA by providing their calculation of Net Sales for the 12 months prior to the Change of Control to ANKL's designated representative. (Compl. ¶ 32). The calculation was clear – Net Sales fell short of the $99.7 million threshold necessary to trigger an Earnout Payment for 2005, so none was due.[5] Further, no accelerated Earnout Payment for the Change of Control Period was due either, as the Net Sales for the full 12 months preceding the closing date of April 6, 2006 was $97,385,555, which was below the acceleration threshold of $99 million. (*Id*. ¶ 32); June 6, 2006 Net Sales calculation (Schacter Decl., Ex. C).

[5] According to the audited financial statements, Net Sales for the year 2005 totaled $96,811,036. (Schacter Decl., Ex. D).

Section 1.8(d) gave ANKL the right of ***access*** to Purchasers' employees, documents and auditors for the purpose of understanding and, if appropriate, disputing the Net Sales calculation. This access right lasted for 45 days. ANKL does not allege – because it cannot – that it ever took advantage of its right of access. Without having done so, on July 19, 2006, 43 days after Defendants delivered their Net Sales calculation – and thus only two days before the deadline for ANKL to dispute the Net Sales calculation with particularity, ANKL delivered a purported "dispute" letter to Purchasers. (*Id*. ¶ 37); July 19, 2006 letter (Schacter Decl., Ex. E). Rather than "setting forth in detail the particulars of [its] disagreement" as required by Section 1.8(d) of the APA, ANKL stated in conclusory fashion that it could not agree with Defendants' calculation because it had not reviewed any documents related to the calculation. (*Id*.). Contrary to the requirements of Section 1.8(d), ANKL provided no "particulars" of its dispute whatsoever. Instead, it asked, for the first time, for 13 categories of documents that ANKL claimed it needed in order to determine whether the Net Sales calculation was accurate. It did not explain how it could possibly dispute the Net Sales calculation if it had never reviewed a single document on which the calculation was based.

As the Complaint acknowledges (¶ 40), Defendants have stated that they responded in writing to ANKL's deficient dispute notice by letter dated August 2, 2006. Schacter Decl., Ex. F. That letter pointed out that ANKL's notice did not comply with the APA's requirements. ANKL claims that its representatives never received this letter (even though it was addressed to Sellers' representative at the address provided for notices in the APA (compare Ex. F with APA § 11.1)), but ANKL references and relies on the letter in its pleading. (Compl. ¶ 41).[6]

[6] For purposes of this motion, the Court need not determine whether ANKL representatives actually received the August 2, 2006 letter because the issue is whether ANKL's July 19, 2006 dispute notice satisfied the requirements of the APA.

Nearly a year passed before ANKL again addressed the Net Sales issue. ANKL sent an email to Vickie Capps, DJO's Chief Financial Officer, dated July 17, 2007, which asserted that ANKL had never received a response to its deficient July 19, 2006 dispute notice (Schacter Decl, Ex. E).[7] ANKL never explains why it waited a year to follow up on its dispute notice if, as it claims, no one ever responded to it. (Compl. ¶ 39).

Following the Trust's July 2007 inquiry, Defendants re-faxed their letter dated August 2, 2006. Schacter Decl., Ex. F. That letter pointed out the deficiencies in ANKL's July 19, 2006 dispute notice but nonetheless provided a copy of the audited 2005 financial statements, and further stated that, despite ANKL's procedural breach, Defendants were still willing to provide access to relevant documents and employees. (Compl. ¶ 40). In their August 2, 2006 letter, Defendants also offered to provide ANKL access to its auditors' work papers, but pointed out that there was no requirement under the APA that they prepare audited financial statements for the period of January 2006 through March 2006. Schacter Decl., Ex. E.

ANKL again did nothing for months. It never sought access to the documents or employees, and instead waited until October 26, 2007 to respond. (Schacter Decl., Ex. H). ANKL claimed that Defendants had never delivered the August 2, 2006 letter and were somehow in breach of the APA. (*Id*. ¶ 42); Schacter Decl., Ex. F.

On November 20, 2007, Purchasers' counsel responded to ANKL's October 26 letter (Compl. ¶ 44); Schacter Decl., Ex. I. Purchasers again attached the audited 2005 financial statements, and informed ANKL that its July 19, 2006 letter was not a valid notice of dispute, as it did not set forth detailed particulars of ANKL's disagreement with the calculation. (Compl. ¶ 45). Notwithstanding ANKL's ongoing failure to comply with section 1.8(d) and the fact that the time for reviewing pertinent documents had long since passed, Defendants agreed again

[7] The email incorrectly refers to the July 19, 2006 dispute notice as a letter dated July 19, 2007.

voluntarily to provide ANKL with access to relevant documents and employees, and to the company's auditors. (*Id*.). Finally, Defendants informed ANKL that, if there was a legitimate dispute as to the calculation, the dispute should be referred to an auditor for resolution as set forth in APA Section 1.8(d). (*Id.* ¶ 47). ANKL responded by initiating this action on November 27, 2007.

## III. ARGUMENT

### A. Standard On A Motion To Dismiss

To survive a motion to dismiss, a complaint must contain sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1956 (2007) (rejecting *Conley v. Gibson*'s standard and imposing a stricter pleading standard "applicable to all federal complaints"). Conclusory allegations will not suffice. Dismissal is appropriate where, as here, the plaintiff fails to set forth specific facts demonstrating the plausibility of its claims. *See Twombly*, 127 S. Ct. at 1964-66; *see also ATSI Commc'n Inc. v. Shaar Fund Inc.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007) (citing *Iqbal v. Hasty*, 490 F. 3d 143 (2d Cir. 2007)); *In re Ins. Brokerage Antitrust Litig.*, MDL Docket No. 1663, 2007 U.S. Dist. LEXIS 64767, at * 42 (D.N.J. Aug. 31, 2007) (applying *Twombly* standard and dismissing Sherman Act claim because of insufficient factual allegations to establish horizontal relationship among insurer defendants).

### B. On A Motion To Dismiss Under Rule 12(b)(6), The Court May Consider Certain Documents Outside The Complaint

It is well established in the this Circuit that, in assessing the sufficiency of a complaint on a motion to dismiss, the Court may consider "the full text of documents only partially quoted in the [c]omplaint," *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996), and documents "integral to the complaint" that "plaintiffs

had either in its possession or had knowledge of and upon which they relied in bringing suit."
*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), cert. denied, 503 U.S.
960 (1992)); *accord ATSI*, 493 F.3d at 97.  If the documents contradict the allegations in the
complaint, "the contents of the documents are controlling where a plaintiff has alleged that the
document contains, or does not contain, certain statements."  *Roth v. Jennings*, 489 F.3d 499, 511
(2d Cir. 2007).

Thus, where – as here – the plaintiff's complaint refers to, but does not attach, the
operative agreements and to correspondence between the parties, but does not attach those
documents as exhibits, the Court may consider those governing documents on a motion to
dismiss.  *See, e.g.*, *Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007
WL 2044656, at *1 (S.D.N.Y. July 17, 2007) (reviewing contracts that were integral to plaintiff's
complaint and dismissing breach of fiduciary duty claim under Rule 12(b)(6)).

**C.      The Contract Claims Regarding The Earnout Payment Should
        Be Dismissed**

ANKL alleges four separate claims for relief stemming from alleged breaches of APA
Section 1.8.  The First Claim is for damages.  The Fifth Claim seeks specific performance.  The
Tenth Claim seeks a declaratory judgment.  The Second Claim, though denominated as a breach
of the Settlement Agreement, is in fact duplicative of the First Claim as it relies on obligations
set forth in Section 1.8 of the APA as the true basis of the breach.  (*See* Compl. ¶ 92).  As such,
these four claims are discussed together below.

**1.      ANKL Failed to Provide a Valid Notice of Disagreement
        under APA Section 1.8**

The APA provided that Purchasers were required to provide their calculation of Net Sales
for the Change of Control Period within 60 days of any change of control.  As ANKL concedes,
Purchasers did so by sending their June 6, 2006 Net Sales calculation.  The APA afforded ANKL

a means of testing the accuracy of the Net Sales calculation: ANKL was provided "access" to relevant documents, to the employees of Defendants who were responsible for the Net Sales calculation, and to the work papers of the company's outside auditors. However, the APA limits the time given to ANKL to examine the information to which it had access and to decide whether it agreed with the calculation. The APA does this by requiring that, if ANKL wishes to dispute the Net Sales calculation, it must do so within 45 days of receipt of the calculation, and it must dispute the calculation with particularity. Under the APA, failing to dispute the calculation with particularity means that the Net Sales calculation was deemed to be "final, binding and conclusive for all purposes. . . ." APA § 1.8(d).

Under the APA, in order to timely notify DJO that it disagreed with Purchasers' calculation of Net Sales for the Change of Control Period, ANKL was required to provide a written notice to Defendants "setting forth in detail the particulars of such disagreement. . . ." *Id*. This would have required ANKL to exercise diligence in the 45 day "access" period by reviewing documents and audit workpapers, and interviewing employees. Armed with this information, ANKL might have been in a position to dispute the Net Sales calculation with the particularity required by the APA, if there was a basis to do so. But ANKL did nothing in that 45-day period to take advantage of the "access" provided by the APA.

As the Complaint itself acknowledges, ANKL's notice did not detail the particulars of the basis for its disagreement. Indeed, ANKL alleges that its July 19 dispute letter merely stated that it could not agree with the calculation of Net Sales because Purchasers "had failed to provide to Sellers its audited financial statement and other documents relevant to the Change of Control Period." (Compl. ¶ 37). This letter, which purported to dispute the calculation but provided no details as to the basis for its disagreement – other than a meaningless "we can't confirm your

calculation" statement – cannot be said to "set forth in the detail the particulars" of the disagreement as the APA requires. APA § 1.8(d).

The concept of stating facts with particularity is a familiar one. As this Court is well aware, when pleading fraud, a plaintiff must allege "with particularity" the details of the alleged fraudulent statement, including who made the statement, when, where and that the speaker knew the statement was false when he made it. *See, e.g., Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *Katz v. Image Innovation Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2008 WL 76210, at *2 (S.D.N.Y. March 24, 2008) (Koeltl, J.). The parties to the APA agreed that a similar level of detail was required – more than simply "we disagree." At a minimum, in setting forth in detail the particulars of its disagreement, ANKL would have to identify specific bases for the disagreement – GAAP irregularities, miscalculation, etc. ANKL did not do this. Indeed, ANKL could not have done so, as it never even asked for any documents supporting the calculation until two days before the deadline for providing its particularized disagreement. July 19, 2006 letter , Schacter Decl, Ex. E. Nor can ANKL now be heard to argue that the period for it to object to the Net Sales calculation has not commenced, as that period is tied only to delivery of the calculation, not any financial statements.

a. ANKL Did Not Seek Access to Purchasers' Employees and Records until the End of the Period

Section 1.8(d) grants ANKL reasonable ***access*** to the employees who participated in the preparation of the financial statements, ***access*** to the records reasonably related to the calculation of Net Sales for the Earnout Year or Change of Control Period, and ***access*** to the work papers of Purchasers' independent auditor of the Earnout Financial Statements or relevant to the Change of Control Period. *Id*. The significant language in this provision is "access." Unlike the Earnout Financial Statements themselves, which Purchasers must "provide" or "deliver" to Sellers, the

Sellers merely have access to the supporting documents, employees and auditors, *i.e.*, the ability, ***on request***, to obtain or review the supporting documents and the ability to meet with and question the employees.[8] This "access" is intended to allow ANKL the opportunity to investigate the bases for the Net Sales calculation and, if it was unsatisfied that the calculation was done correctly, to "set[] forth in detail the particulars of such disagreement." APA § 1.8(d). ANKL could have contacted DJO upon receipt of the calculation and requested particular documents and personnel, but chose not to do so. ANKL cannot now complain that it was not provided access when the burden was on ANKL to make the effort if it wanted to dispute the calculation. *See Mead v. ReliaStar Life Ins. Co.*, No. 2:05-cv-332 (WKS), 2008 WL 850675, at *6 (D. Vt. Mar. 27, 2008) (plaintiff's failure to request documents to which defendant was required to provide access precluded her ability to claim that defendant failed to provide access to those documents).

Notably absent from the Complaint is any allegation that, upon receipt of the Net Sales calculation for the Change of Control Period, ANKL made any attempt to take advantage of the access afforded by the APA prior to sending its conclusory "dispute" letter. But that access, and the information obtained as a result of it, is precisely what ANKL needed in order to detail the particulars of its disagreement with the Net Sales calculation. ANKL's failure to avail itself of this access meant that it would not be able validly to dispute the calculation.

b. The 45-Day Period Has Expired

ANKL suggests that the 45-day period in which it was required to notify DJO of any dispute of the Net Sales calculation did not commence because, it claims, it did not receive a copy of the "audited financial statements related to [Purchasers'] calculation of Net Sales for the

[8] *Black's Law Dictionary* (8th ed. 2004) defines "access" as: an ***opportunity*** or ***ability*** to enter, approach, pass to and from or communicate with, access to the courts.

Change of Control Period." (*E.g.* Compl. ¶¶ 36, 37,39). There is no basis in the APA for this position.

Section 1.8(d) states that the Sellers must notify the Purchasers of any disagreement "within forty-five (45) calendar days after the [Sellers'] receipt of the calculation of the Net Sales for such . . . Change of Control Period." ANKL alleges that the 45-day period did not commence because DJO "failed to meet its contractual obligation to provide . . . a copy of its audited financial statements related to Purchaser's calculation of Net Sales for the Change of Control Period." (Compl. ¶ 36). However, there is no obligation in the APA to provide audited financial statements relating to the Change if Control Period.

Section 1.8(d) unambiguously links commencement of the 45-day period to delivery of the Net Sales calculation. There is no connection between the window for ANKL to provide a detailed notice of the particulars of its disagreement with the calculation and the delivery of any audited financial reports.

Nor, for that matter, is there any support for ANKL's contention that Purchasers were obligated to provide audited financial statements for the Change of Control Period at all.[9] The ***only*** audited financial statements that Purchasers must deliver to Sellers are those for ***fiscal years*** 2005, 2006 and 2007, the regular Earnout periods specified in the APA. *See* APA § 1.8(b). Section 1.8(d)(i), which provides that Sellers have ***access*** to some financial materials, specifically distinguishes between the Earnout Statements (a defined term meaning the ***audited*** consolidated financial statements for the fiscal years constituting the regular Earnout periods, and an ***unaudited*** calculation of the Net Sales for the 12-month period of 2005, 2006 and 2007

[9] As previously noted, the Change of Control Period ran from April 1, 2005 to March 31, 2006, which is the "last twelve (12) full calendar months ending prior to the occurrence of [a] Change of Control." APA § 1.8(a)(vi).

ending December 31 of each year), and the more generic "financial statements relevant to such Change of Control Period. . . ." *Id*. As used in Section 1.8(d)(i), the term "financial statements" is lacking the initial capitals found in other provisions, and is thus not a defined term but merely descriptive. Section 1.8(d) thus explicitly requires only that Sellers have access to ***unaudited*** financial statements for the 12-month Change of Control Period, not ***audited*** ones. There is no basis in the language of the APA to say that the "financial statements" relevant to the Change of Control Period must be audited and no basis for imposing on Purchasers an affirmative obligation to deliver audited financial statements for the Change of Control Period. Thus, ANKL's argument that the 45-day period did not begin to run, and did not expire, in mid-2006 is simply wrong.

As the 45-day period for any objection has expired, the Net Sales calculation is now "final, binding and conclusive." APA § 1.8(d).

### 2. The APA Requires that This Dispute Be Heard by an Auditor

Even if ANKL had properly preserved its disagreement with Defendants' calculation of the Net Sales for 2005, this Court is not the proper venue for hearing such a dispute. The APA contains an arbitration provision under which any disagreement regarding the Net Sales calculation that the parties are unable to resolve is to be heard by an independent auditor. Section 1.8(d) of the APA provides:

> If . . . [the parties] are unable to resolve disagreements [concerning the calculation of Net Sales], then such dispute shall be referred to the Auditor, which shall resolve any remaining disagreements. The Auditor shall determine as promptly as practicable . . . , based solely on the written submissions forwarded by [the parties], whether and to what extent (if any) the Net Sales for such Earnout Year or Change of Control Period requires adjustment. . . . The determination of the Auditor shall be final, conclusive and binding on the parties.

*Id*. The term "Auditor" is defined in Section 1.6 to mean "KPMG, LLP (or such other independent accounting firm of recognized national standing as may be mutually selected by [the parties])." *Id*. Assuming, *arguendo*, that ANKL timely provided notice of its disagreement of the Net Sales calculation, which it did not, the parties contemplated precisely this possibility and provided a mechanism for its resolution in the APA.

As a matter of public policy, this Court should not interfere with a valid, binding and enforceable arbitration provision. "The Federal Arbitration Act establishes a federal policy favoring arbitration agreements, and mandates the enforcement of contractual arbitration provisions. The FAA provides that written agreements to arbitrate 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Doldo Bros., Inc. v. Coors Brewing Co.*, No. 7:08-CV-206, 2008 WL 657252, at *7 (N.D.N.Y. Mar. 7, 2008) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006)) (some internal quotations omitted). A court must engage in a two-step inquiry to determine whether a dispute is arbitrable: did the parties agree to arbitrate, and if so, does the present dispute fall within the scope of their agreement? *See Chelsea Square Textiles, Inc. v. Bombay Dyeing and Mfg. Co., Ltd.*, 189 F.3d 289, 294 (2d Cir. 1999) (citing *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 666 (2d Cir. 1997)).

Courts routinely enforce arbitration provisions such as the one in APA Section 1.8(d). *See, e.g.*, *Advanstar Commc'ns, Inc. v. Beckly-Cardy, Inc.*, No. 93 Civ. 4230 (KTD), 1994 WL 176981, at *2-3 (S.D.N.Y. May 6, 1994) (enforcing arbitration provision nearly identical to one at issue here and requiring parties to submit dispute over calculation to independent auditor); *Rio Algom Inc. v. Sammi Steel Co., Ltd.*, 168 A.D.2d 250, 250, 562 N.Y.S.2d 486, 487 (1st Dep't 1990) (same).

ANKL cannot contend that the parties did not agree to submit disputes over the calculation of the Net Sales to an independent auditor. *See* APA § 1.8(d). Nor can it allege that the instant dispute does not fall within the scope of the agreement to arbitrate. To the extent that ANKL properly preserved the dispute as to the proper calculation of the 2005 Net Sales (Compl. ¶ 33), the dispute would fall within the scope of the arbitration clause. Well established federal law thus dictates that the parties' agreement to arbitrate be enforced. *See Moses H. Cone Merril Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration); *Advanstar Commc'ns, Inc.*, 1994 WL 176981, at *2-3.

Claims One, Two, Five and Ten all assert breaches of obligations set forth in APA Section 1.8. None of these claims has any merit.[10] ANKL failed to take advantage of its contractual right to review records and interview individuals involved in the calculation of Net Sales. As a result, its purported notice of disagreement was deficient and ANKL must be deemed to have accepted the calculation. Even if ANKL somehow did preserve its objection, the arbitration provision requires this dispute to be submitted to an independent auditor. Therefore, these four Claims must be dismissed.

**D. The Fraud Claim Must Be Dismissed**

In the Third Claim, ANKL alleges that it was fraudulently induced to enter into the Settlement Agreement. (*See* Compl. ¶¶ 93-101). To state a claim for fraud under New York law, Plaintiff must allege: (1) a material representation or omission of fact; (2) falsity of that

[10] The Tenth Claim for a declaratory judgment rests wholly on the argument that the 45-day period has not commenced. As shown, however, there is no merit to that argument. Because the Tenth Claim is otherwise entirely duplicative of the First and Fifth Claims, it must be dismissed for that reason also. *Camofi Master LDC v. College P'ship, Inc.* 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) (declaratory judgment claim was duplicative of breach of contract claim where it did not seek to clarify and settle legal relations in issue or relieve any uncertainty giving rise to proceedings; claim must be dismissed).

representation; (3) intent to defraud; (4) plaintiff's reasonable reliance; and (5) resulting damage to the plaintiff. *See Washington Capital Ventures, LLC v. Dynamicsoft, Inc.*, 373 F. Supp. 2d 360, 365 (S.D.N.Y. 2005). In addition, all fraud claims must be pled with particularity under Rule 9(b), which requires that a complaint (1) specify the allegedly fraudulent statements; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *See* Fed. R. Civ. P. 9(b); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). As set forth below, ANKL cannot allege reasonable reliance because it specifically disclaimed any reliance on extra-contractual representations in the Settlement Agreement. Moreover, ANKL has not alleged the elements of a fraud claim with the requisite particularity under Rule 9(b). *See Baxter v. A.R. Baron & Co.*, 94 Civ. 3913 (JGK), 1995 U.S. Dist. LEXIS 14882, at *10 (S.D.N.Y Oct. 12, 1995) (Koeltl, J.) (dismissing complaint because "[f]or all their prolixity, the vast majority of plaintiffs' allegations with respect to misrepresentations and omissions by [Defendants were] insufficiently pleaded under 9(b) in that the time, place, speaker and content of the allegedly fraudulent statements [was] lacking.").

**1. ANKL Specifically Disclaimed Reliance on any Extra-Contractual Statements in the Settlement Agreement**

ANKL's fraud claim is based on purported misstatements made by Geoffrey Raker, a representative of Defendants Aircast LLC and Aircast Holding,[11] to Elliott Levine, a representative of ANKL. According to the Complaint, from February 1 to March 31, 2006, Mr. Raker and Mr. Levine were negotiating what became the Settlement Agreement. (Compl. ¶ 95). ANKL alleges that during the course of those negotiations, Mr. Raker orally represented to Mr. Levine that the 2005 Net Sales would not exceed the threshold giving rise to an Earnout

[11] The fraud claim is brought against all three defendants – including defendant DJO – even though DJO was not a party to the Settlement Agreement and is not alleged to have made any statements of any kind to ANKL or to the Sellers.

Payment. (*Id.* ¶ 96). ANKL further alleges that it justifiably relied on this misrepresentation in entering the Settlement Agreement and releasing any claim to a 2005 Earnout Payment. (*Id.* ¶ 99). However, the Settlement Agreement contains a set of representation and warranties made by each contracting party (Schacter Decl., Ex. B §§ 3.1, 3.2, 3.3) and any representation by Defendants Aircast LLC and Aircast Holding that 2005 Net Sales were below the threshold is conspicuously absent. Indeed, the Settlement Agreement expressly disclaims any such representation.

"A party to a contract cannot allege that it reasonably relied on a parol representation when, in the same contract, it 'specifically disclaims reliance upon [that] particular representation.'" *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 319 (S.D.N.Y. 2002) (quoting *Harsco Corp v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996). *See also Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05 Civ. 4837, 2006 WL 399396, at *10 (S.D.N.Y. Feb. 21, 2006) (dismissing fraud claim, in part, due to contradictions in complaint showing that alleged omissions were actually disclosed). Courts are rightly skeptical of fraud claims based on alleged pre-contractual oral misrepresentations between sophisticated parties. *See DynCorp*, 215 F. Supp. 2d at 319.

In *DynCorp*, plaintiff alleged that it was fraudulently induced to enter an agreement based on pre-contractual misrepresentations regarding the financial performance and operations of a business unit of defendant GTE. *Id*. As in the instant case, the purchase agreement contained a "representations and warranties" provision by which DynCorp expressly disclaimed reliance on pre-contractual representations. The court found that, "DynCorp's particularized disclaimers make it impossible for it to prove one of the elements of a claim of fraud: that it reasonably relied on the representations that it alleges were made to induce it to enter the Purchase

Agreement." *Id*. (citing *Dannan Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-21, 184 N.Y.S.2d 599 (1959)).

Here, the Settlement Agreement sets forth the entirety of the parties' representations and warranties. Defendants Aircast LLC and Aircast Holding represented nothing more than that they were authorized to enter into the agreement and that the agreement did not violate the law or any other contract. (Schacter Decl, Ex. B § 3.3). Further, as in *DynCorp*, ANKL specifically stated that it "entered into this Agreement ***in reliance solely upon its own independent investigation and analysis of the facts . . . and no representations . . . other than those expressly set forth in this Agreement, were made by any of [Defendants] . . . to induce ANKL Liquidating Trust to enter into this Agreement.***" *Id*. § 3.1(c). Given this explicit, detailed and unambiguous disclaimer of reliance on any extra-contractual representations, ANKL cannot show justifiable reliance, a necessary element of a fraud claim. *DynCorp*, 215 F. Supp. 2d at 319. For this reason alone the fraud claim must be dismissed.

**2. The Fraud Allegations Are Not Pled with Sufficient Particularity**

The fraud claim fails for the additional reason that is not pled with the particularity required by Rule 9(b). To satisfy this standard, the plaintiff must plead details about the allegedly fraudulent statement, identify the speaker, state where and when the statements were made and explain why the statements were false when made. *See Eternity Global Master Fund Ltd.*, 375 F.3d at 187. ANKL has done none of this.

Most glaring is the failure to allege any facts – as opposed to conclusions – suggesting that Mr. Raker knew his statements (assuming he made them) were false. "[F]raud allegations may be so pleaded [on information and belief] as to facts peculiarly within the opposing party's knowledge; even then, however, the allegations must be accompanied by a statement of facts

upon which the belief is founded." *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1003 (2d Cir. 1988), cert. denied, 488 U.S. 852 (1988). ANKL fails to plead any facts providing a foundation for the allegations of *scienter*. *Id*.

ANKL alleges that Mr. Raker knew his statements that the 2005 Net Sales would not exceed the threshold requiring an Earnout Payment were false when he made them (Compl. ¶ 98) solely on the basis that the Net Sales figure reported in the 2005 audited financial statements differs slightly from the number provided to the Sellers in the June 6, 2006 letter regarding the Net Sales for 2005.[12] This is irrelevant.[13]

There is also no allegation that Mr. Raker was involved in the preparation of the Net Sales calculation or the 2005 audited financial statements, nor that he caused either document to be incorrect. In any event, both the 2005 audited financial statements and the June 6 calculation show that 2005 Net Sales are below the $99.7 million Earnout Payment threshold for 2005, which is consistent with Mr. Raker's alleged statements.

ANKL's allegations similarly lack particularity with respect to exactly what was said (Raker stated that "the 2005 Net Sales did not exceed the target 2005 Net Sales . . . ***or words to that effect***") (Compl. ¶ 96) (emphasis supplied), when it was said (unspecified times over a two month period (*id.* ¶¶ 95-96) or where it was said (no detail provided). In short, there are no particularized facts at all, other than identifying the alleged speaker. This is insufficient to

[12] Notably, there is no allegation that the Net Sales number reflected in the 2005 audited financial statements exceeded the $99.7 million 2005 fiscal year threshold either. Plainly, it did not. *See* 2005 Audited Financial Report, Schacter Decl., Ex. D, at 5.

[13] ANKL makes the conclusory and unsupportable assertion, on information and belief, that the true amount of 2005 Net Sales exceeds the Earnout Payment threshold. (Compl. ¶ 97). Yet ANKL acknowledges repeatedly that it lacks the information necessary to determine whether Defendants' calculation of Net Sales is accurate. Absent facts supporting this assertion, and ANKL alleges none, this allegation must be disregarded. *See Twombly*, 127 S. Ct. at 1964-66.

satisfy Rule 9(b).  *See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.* 58 F. Supp. 2d 228

(S.D.N.Y. 1999) (dismissing fraud claim for pleading on information and belief).

### 3.    Even if It Was Defrauded, ANKL Cannot Obtain Punitive Damages

Even if ANKL has sufficiently pled a fraud claim (and it has not) it is not entitled to

punitive damages for two reasons.  First, as it did in pleading the fraud claim in the first place, by

seeking punitive damages, ANKL is ignoring its own covenant – namely, that ANKL has waived

its right to recover punitive damages in any proceeding arising from the transaction contemplated

in the APA and Settlement Agreement.  Even if it had not waived that right, moreover, punitive

damages are not generally available for a fraud claim involving sophisticated commercial

entities.

Section 4.16 of the Settlement Agreement could not be more clear.  Headed "Waiver of

Punitive and Other Damages and Jury Trial," section 4.16(a) provides, in full:

> THE PARTIES EACH EXPRESSLY WAIVE AND FOREGO, ANY RIGHT TO RECOVER PUNITIVE, EXEMPLARY, LOST PROFITS, CONSEQUENTIAL OR SIMILAR DAMAGES IN ANY PROCEEDING ARISING OUT OF OR RESULTING FROM THIS AGREEMNT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

This waiver of punitive damages by a sophisticated party is obviously enforceable.

Parties, particularly well-heeled commercial entities, are free to waive their right to specific

types of damages.  *E.g. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Petroleum Corp.*,

88 F.3d 129, 134 (2d Cir. 1996) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc*., 514 U.S.

52, 115 S.Ct. 1212 (1995).  Nor is it an answer that, if ANKL succeeds on its fraud claim, the

Settlement Agreement could be terminated.  Section 4.1 expressly provides that "[t]he provisions

of this Article IV shall survive any termination of this Agreement."

Even absent the waiver, ANKL would not be entitled to punitive damages for what would

be, if proven (which it has not been), garden-variety fraud.  Under New York law, punitive

damages are only available only where the false statements giving rise to the fraud were malicious or brought about by evil motives (*see Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 927 F. Supp. 650, 664-65 (S.D.N.Y. 1996) (collecting cases)), or where a plaintiff demonstrates "egregious conduct directed to the plaintiff which is part of "a pattern of similar conduct directed at the public generally." *Int'l Motor Sports Group v. Gordon*, No. 98 CIV 5611(MBM), 1999 WL 619633, at *10 (S.D.N.Y. Aug. 16, 1999) (dismissing claim for punitive damages where there was no allegation of a pattern or behavior directed at the general public).

ANKL has alleged no pattern of egregious behavior nor evil motive; indeed, it has alleged no motive at all. Absent such particularized allegations, the request for punitive damages must be dismissed.

**E. The Negligent Misrepresentation Claim Must Be Dismissed**

ANKL's Fourth Claim for negligent misrepresentation (¶¶ 102-109) fails for two reasons. First, it is identical to the fraud claim. (*Compare id.* ¶ 97 with *id.* ¶ 107). Therefore, for the same reason that its fraud claim merits dismissal – ANKL has not alleged any misrepresentations or omissions or reasonable reliance – its negligent misrepresentation claim should be dismissed as well.[14] *See Hampshire Equity Partners II L.P. v. Teradyne Inc.*, 04 Civ. 3381 (LAP), 2005 U.S. Dist. LEXIS 5261, at *18-19 (S.D.N.Y. Mar. 30, 2005) (dismissing negligent misrepresentation and fraud claim because alleged statements not fraudulent ), *aff'd*, 2005 U.S. App. LEXIS 28817 (2d Cir. Dec. 20, 2005).

Second, under New York law, a negligent misrepresentation claim requires the existence of a "special relationship" between the plaintiff and the defendant. *Eternity Global Master Fund Ltd.*, 375 F.3d at 188 ("Liability in the commercial context is imposed only on those persons who

[14] ANKL has similarly failed to plead this claim with sufficient particularity as required by Fed. R. Civ. P. Rule 9(b). *See Matsumura v. Benihana Nat. Corp*, No. 06 Civ. 7609 (NRB), 2008 WL 282021, at *4-5 (S.D.N.Y. Jan. 25, 2008) (the heightened pleading standard of Rule 9(b) applies to negligent misrepresentation claims).

possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified"). Arm's-length contracts do not give rise to negligent misrepresentation claims. *See Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F.Supp. 2d. 496, 506 (S.D.N.Y. 2007) (dismissing negligent misrepresentation claim where plaintiff's "arguments [we]re insufficient to establish an independent duty apart from the business relationship between [plaintiff] and [defendant], which was governed by their contract"). ANKL has made no attempt to allege the existence of any fiduciary or other "special" relationship with Defendants. The negligent misrepresentation claim must be dismissed.

**F. The Conversion Claim Must Be Dismissed**

ANKL's Ninth Claim for conversion should be dismissed as duplicative of the Eighth Claim, for breach of Section 1.3(a)(vii) of the APA.

In connection with the Eighth Claim, ANKL alleges that "Defendants . . . have withheld at least a portion of the Excluded Assets from Sellers," (Compl. ¶ 142)[15] and that "Defendants . . have also obstructed Sellers' access to bank accounts held in Sellers' names," (*id*. ¶ 143). Similarly, in support of the conversion claim, ANKL alleges that "Defendants . . . have exercised unauthorized dominion and ownership over the Excluded Assets." (*Id*. ¶ 147).

[15] Excluded Assets is a defined term in the APA meaning assets that were not sold in the transaction, including certain overseas bank accounts. *See* APA § 1.3.

A claim for conversion should be dismissed if it is duplicative of a breach of contract claim. *See Retty Financing , Inc. v. Morgan Stanley Dean Witter & Co.*, 293 A.D.2d 341, 341, 740 N.Y.S.2d 198, 198 (1st Dep't 2002) (dismissing conversion claim as duplicative of breach of contract claim which was also dismissed). In this context, the conversion claim should be dismissed even if it "satisf[ies] the technical elements of that tort." *Richbell Info. Servs., Inc. v. Jupiter Partners L.P.*, 309 A.D.2d 288, 306, 765 N.Y.S.2d 575, 590 (1st Dep't 2003) ("We are not persuaded by [plaintiff's] argument that conversion is a wrong qualitatively different from a mere breach of contract, so that it is not duplicative.")

Here, the conversion claim is entirely duplicative of the contract claim. The thrust of each claim is that ANKL is being deprived of the ability to control the Excluded Assets, and that Defendants are interfering with ANKL's rightful possession of various accounts. As such, the Ninth Claim for conversion should be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court dismiss the First through Fifth, Ninth and Tenth Claims for Relief.

Dated: New York, New York
April 4, 2008

**BINGHAM MCCUTCHEN LLP**

By: s/ Kenneth I. Schacter

Kenneth I. Schacter
Theo J. Robins
399 Park Avenue
New York, NY 10022-4689
Telephone: (212) 705-7000
Facsimile: (212) 752-5378
kenneth.schacter@bingham.com

*Attorneys for Aircast LLC, Aircast Holding Company LLC and DJO, LLC*

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 176981 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 1

C
Advanstar Communications Inc. v. Beckley-Cardy, Inc.
S.D.N.Y.,1994.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
ADVANSTAR COMMUNICATIONS INC., Plaintiff,
v.
BECKLEY-CARDY, INC., Defendant.
No. 93 Civ. 4230 (KTD).

May 6, 1994.

Milbank, Tweed, Hadley & McCloy, New York City (Toni C. Lichstein, of counsel), for plaintiff Advanstar Communications Inc.
Phillips, Lytle, Hitchcock, Blaine & Huber, New York City (William J. Brennan, of counsel), for defendant Beckley-Cardy, Inc.

MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge.
*1 Plaintiff, Advanstar Communications Inc. ("Advanstar"), was the owner of a subsidiary corporation known as Beckley-Cardy, Inc. ("Old BCI"), which was run independently of Advanstar's operations. (Compl. ¶ 9). Although not altogether clear from papers submitted, the then managers of Old BCI apparently proposed to purchase Old BCI from Advanstar, and they formed Beckley-Cardy Acquisition, Inc. ("BC Acquisition") to consummate the purchase. (*See* Compl. ¶ 25). After the acquisition was accomplished, BC Acquisition was merged with and into Old BCI, and the name of the surviving company was changed to Beckley-Cardy, Inc. ("New BCI"), the defendant here. (Def.Mem. of Law at 2 n. 1).

On November 5, 1992, the sale closed for a purchase price of $49 million. (Compl. ¶ 8). In connection with the sale, BC Acquisition and Advanstar executed a Stock Purchase Agreement (the "Agreement"), which was consummated in the middle of a fiscal year. The parties to the Agreement based the initial price of $49 million partly on a Projected Balance Sheet. The Agreement allowed for adjustment of the purchase price depending on the results of an audit within certain guidelines described below. More importantly, the agreement provided, *inter alia*, for an independent auditor to have the final say as to the purchase price should a dispute arise as to the adjustment of the purchase price.

Prior to the closing date, Advanstar was obligated to deliver to BC Acquisition a Projected Balance Sheet. (Agreement § 1.4). The Projected Balance Sheet contains calculations projecting Old BCI's financial condition as of October 2, 1992. (Agreement § 13.1(a)). As noted above, the purchase price was at least partly based on these projections. (*See* Compl. ¶ 6). Moreover, the Agreement requires that the calculations in Projected Balance Sheet comply with Generally Accepted Accounting Principles ("GAAP") as well as Old BCI's "pre-closing" accounting method. (Agreement § 1.4(a) & (e); Compl. ¶¶ 19-21).

The Agreement also requires New BCI [FN1] to deliver to Advanstar a Closing Balance Sheet. The Closing Balance Sheet is an unaudited balance sheet of Old BCI as of the closing date of November 5, 1992. (Agreement § 13.1(a)). More importantly, in order to ensure that Projected Balance Sheet and the Closing Balance Sheet are consistent, the Agreement requires that the calculations in the Closing Balance Sheet comply with GAAP and Old BCI's accounting methods. (Agreement § 1.4(b) & (e); Compl. ¶¶ 19-21).

The price adjustment sections in the Agreement provide that the purchase price is adjusted to reflect the difference between the calculations in Projected Balance Sheet and the calculations in the Closing Balance Sheet. If Old BCI's value is greater in the Closing Balance Sheet than it was in the Projected

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Balance Sheet, New BCI is obligated to pay Advanstar the excess amount. If, on the other hand, the Closing Balance Sheet indicates that Old BCI's value is less than it was according to the Projected Balance Sheet, Advanstar is obligated to pay the deficiency to New BCI. (Agreement § 1.4(d)).

*2 The Agreement provides that Advanstar can object to New BCI's calculations in the Closing Balance Sheet if it does so by written notice within 30 days of receipt of the Closing Balance Sheet. Advanstar, however, was obligated to identify with specificity the calculations with which it disagreed. (Agreement § 1.4(c)). If such an objection is timely made, then the parties are obligated to use good faith efforts to resolve the dispute. If, however, this attempted resolution fails, "their disagreements shall be promptly submitted to an Independent Auditor, which shall conduct such additional review as is necessary to resolve the specific disagreements referred to it. The review of such Independent Auditor will be restricted as to scope to address only those specific disagreements referred to it by [Advanstar] and [New BCI]." (Agreement § 1.4(c)).

The Agreement also contains indemnity provisions, which govern general claims and disputes between the parties. These provisions provide that any claims are to be "resolved by litigation in a court of competent jurisdiction." (Agreement § 11.2(b)). The indemnity provisions also provide that any recovery for any such claim is subject to a $500,000 deductible. (Agreement § 11.1(c)(i)).

Prior to closing on November 5, 1992, Advanstar provided New BCI with audited statements of Old BCI for the years ending 1990 and 1991 and unaudited monthly statements through September 30, 1992. (Compl. ¶ 18). In addition, Advanstar provided New BCI with a Projected Balance Sheet. Approximately one month after the closing, New BCI sent to Advanstar a Closing Balance Sheet as of November 5, 1992. (Compl. ¶ 21). Apparently, the Closing Balance Sheet indicated that Old BCI's financials were not as strong as the Projected Balance Sheet had anticipated they would be.

By letter dated January 5, 1993, Advanstar notified New BCI that it disagreed with the Closing Balance Sheet submitted. In particular, Advanstar disagreed with the reported $1.4 million loss during the first five days of November, 1992. More importantly, through this letter, it informed New BCI that it rejected the representation that such a loss even occurred. (*See* Mead Aff. ¶ 3).

Pursuant to § 1.4 of the Agreement, New BCI attempted to have an independent auditor resolve the dispute. Prior to an examination by an independent auditor, Advanstar commenced this action seeking a declaration that the price adjustment dispute should not be submitted to an independent auditor. New BCI seeks such submission, and either dismissal of the action or a stay pending an independent auditor's review. (Compl. ¶ 7).

## DISCUSSION

The basic issue here is whether the claims raised in the Complaint are arbitrable. The Federal Arbitration Act, 9 U.S.C. § 1*et seq.*,"establishes a federal policy favoring arbitration." *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226 (1987) (citations omitted). "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration ... [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985) (citations omitted). Courts, however, cannot force arbitration when it is clearly not the intent of the parties to place a given matter within the ambit of an arbitration agreement. *See Chevron U.S.A., Inc. v. Consolidated Edison Co.,* 872 F.2d 534, 537 (2d Cir.1989); *Melun Indus., Inc. v. Strange,* 1990 WL 180534, 1990 U.S. Dist. LEXIS 15213, 90 Civ. 2027 (S.D.N.Y. Nov. 13, 1990). Therefore, the issue here is whether the parties agreed to arbitrate the dispute. "[A]s with any other contract, the parties' intentions control, but those

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 176981 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 3

intentions are generously construed as to issues of arbitrability." *Mitsubishi,* 473 U.S. at 626.

*3 The Agreement contains a narrow arbitration clause, as it sets forth explicit boundaries for arbitration. A narrow arbitration clause must be construed in favor of arbitration, but courts may not disregard the boundaries set by the agreement. *Chevron,* 872 F.2d at 537-38. Section 1.4 of the Agreement provides that the Closing Balance Sheet shall be consistent with GAAP and the accounting principles applied in the preparation of the Proposed Balance Sheet. The dispute here appears to be whether the calculations in the Closing Balance Sheet complied with GAAP and Old BCI's accounting methods. In other words, the dispute appears to be whether New BCI used the same accounting standards in creating the Closing Balance Sheet that Advanstar used in creating the Projected Balance Sheet. Advanstar particularly contends that because of Old BCI's performance in 1992 prior to the time of the sale, the purported $1.4 million loss could only have resulted from changes in the accounting method used to calculate the figures in the Closing Balance Sheet. (Compl. ¶ 23).

This dispute, however, is precisely the type of dispute that § 1.4 of the Agreement contemplates for arbitration. *See Gestetner Holdings, PLC v. Nashua Corp.,* 784 F.Supp. 78, 81 (S.D.N.Y.1992) (ruling that arbitration agreement contemplated disputes over accounting methods). The language of § 1.4 requires the parties use consistent accounting procedures in calculating the figures in the Projected Balance Sheet and the Closing Balance Sheet. More importantly, any disputes regarding these calculations are to be resolved by an independent auditor. The accounting methods are integral to the derivation of these calculations. As such, disputes regarding the accounting methods are also disputes regarding the calculations in the financial statements. Thus, it is clear that parties intended to have an independent auditor determine whether or not the parties departed from Old BCI's past accounting policies and procedures. *See Campeau Corp. v. May Dep't Stores Co.,* 723 F.Supp. 224, 228 (S.D.N.Y.1989) (ruling that arbitration agreement regarding price adjustment calculations contemplated disputes over accounting methods).

Advanstar argues that the parties only intended to address disputes regarding the calculation of Old BCI's financial condition during the five day period immediately preceding the closing. It particularly contends that the parties negotiated the accounting methods to be used for the Closing Balance Sheet, and as such, this dispute was subsumed in the Agreement; therefore, it is not contemplated by § 1.4 of the Agreement. (*See* Mead Aff. ¶ 14). Instead, Advanstar argues that disputes regarding the accounting methods used are governed by the indemnity provisions.

Advanstar's interpretation of § 1.4 simply cannot be gleaned from the Agreement's language. Section 1.4 clearly contemplates that disputes arising from disputes over the Closing Balance Sheet be resolved an independent auditor. More importantly, the Court of Appeals for the Second Circuit has ruled that "to determine arbitrability [courts] need only consider whether there exists an interpretation of the parties' agreement that covers the disputes at issue." *Chung v. President Enterprises Corp.,* 943 F.2d 225, 230 (2d Cir.1991). Thus, where claims may legitimately be understood to raise an arbitrable issue, arbitration must be compelled even if the claims can also be characterized in an another way. *Id.* In this case, the question is not even a close one. The parties agreed to submit disputes regarding the calculations in Closing Balance Sheet to an independent auditor. Disputes over calculations include disputes over the accounting methods used. Therefore, *Chung* requires that I determine the issues raised in the complaint are arbitrable. *Id.* Thus, the disputes that Advanstar characterizes as "improper extraordinary adjustments," (*see* Compl. ¶ 25-26), are more appropriately addressed by an independent auditor. Accordingly, BCI's motion to stay this action pending arbitration is granted.[FN2]

*4 SO ORDERED.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 176981 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

FN1. Technically, the purchaser of Old BCI was BC Acquisition, but for clarity, I refer to the two entities BC Acquisition and New BCI simply as New BCI throughout.

FN2. The motion to stay discovery pending this decision is mooted by this decision.

S.D.N.Y.,1994.
Advanstar Communications Inc. v. Beckley-Cardy, Inc.
Not Reported in F.Supp., 1994 WL 176981 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE

Questioned
As of: Apr 03, 2008

**JAMES A. BAXTER, J.A. BAXTER LIFE INVESTMENT TRUST, RICHARD KATZ, and EGI 1985 RETIREMENT BENEFIT TRUST, Plaintiffs, -against- A.R. BARON & CO., INC., THE BARON GROUP, INC., ROMAN OKIN, JEFFREY WEISSMAN, MARTIN WEISSMAN, SEYMOUR WEISSMAN, ANDREW BRESSMAN, MARK A. GOLDMAN, D.H. BLAIR & CO., INC., and J. MORTON DAVIS, Defendants.**

**94 Civ. 3913 (JGK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1995 U.S. Dist. LEXIS 14882; Fed. Sec. L. Rep. (CCH) P98,923**

**October 6, 1995, Decided**
**October 12, 1995, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, two individuals for themselves and on behalf of their respective investment trusts, sued defendants, a stock broker, officers of his brokerage firm, and others, alleging securities fraud, breach of fiduciary duty, and negligent misrepresentation. Defendants moved to dismiss each of the claims either for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or for failure to plead fraud with particularity under Fed R. Civ. P. 9(b).

**OVERVIEW:** The first cause of action was based on certain misrepresentations and omissions that plaintiffs alleged constituted violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Under rule 9(b), plaintiffs' complaint was required to identify (1) the statements alleged to be fraudulent, (2) who made the statements, (3) when and where the statements were allegedly made, and (4) why the statements were fraudulent. Nowhere in the complaint was there any mention of a date or time at which any of the alleged statements or omissions took place, or the method by which the alleged misrepresentations were made. There was no indication of the context in which one defendant failed to reveal certain facts. The ambiguous and imprecise pleading was inadequate, and it did not afford defendants a reasonable opportunity to answer the allegations properly. The claim of market manipulation under § 10(b) was still a claim of fraud, and also had to be pleaded with particularity under Rule 9(b). Plaintiffs failed to plead a § 10(b) claim of market manipulation with sufficient particularity.

**OUTCOME:** The court granted defendants' motions without prejudice to plaintiffs' right to replead and file an amended complaint.

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss***
[HN1] For the purposes of a motion to dismiss, the

allegations in the complaint are taken as true.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN2] Allegations of securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, are subject to the requirements of Fed. R. Civ. P. 9(b), specifically that the complaint must identify (1) the statements alleged to be fraudulent, (2) who made the statements, (3) when and where the statements were allegedly made, and (4) why the statements were fraudulent.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN3] The time, place, and nature of the misrepresentations must be set forth so that the defendant's intent to defraud under the securities laws is revealed.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN4] Fed. R. Civ. P. 9(b) provides a pleading requirement for scienter, requiring that malice, intent, knowledge, and other condition of mind of a person may be averred generally. This somewhat more relaxed pleading requirement must not be mistaken for license to base claims of fraud on speculation and conclusory allegations in light of Rule 9's purpose of providing defendants with fair notice of plaintiffs' claims, safeguarding defendants' reputations from improvident allegations of malfeasance, and protecting defendants against strike suits.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN5] To plead scienter sufficiently, plaintiffs must allege facts giving rise to a strong inference of fraudulent intent. The inference may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN6] To successfully plead a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S § 78j(b), the plaintiffs must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
[HN7] An important objective of Fed. R. Civ. P. 9(b) is to apprise the defendant of the transaction(s) involved with sufficient particularity so as to permit adequate responsive pleading.

*Evidence > Inferences & Presumptions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN8] Reliance is presumed in cases where nondisclosure of material information is alleged.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Civil Procedure > Dismissals > General Overview*
*Criminal Law & Procedure > Accusatory Instruments >*

*General Overview*
[HN9] Leave to amend should be freely granted, especially where dismissal of the complaint is based on Fed. R. Civ. P. 9(b).

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > General Overview*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > General Overview*
[HN10] Section 12(2) of the Securities Act of 1933 is only applicable in cases of initial public securities offerings.

*Criminal Law & Procedure > Scienter > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN11] Section 10(b) of the Securities Exchange Act of 1934 states that it is unlawful for any person to use or employ, in connection with the purchase or sale of any security any manipulative or deceptive device or contrivance. 15 U.S.C.S. § 78j(b). To set forth a claim for market manipulation under these provisions, plaintiffs must allege: (1) damage to the plaintiffs, (2) caused by reliance on defendants' misrepresentations or omissions of material facts, or on a scheme by the defendants to defraud, (3) scienter, (4) in connection with the purchase or sale of securities, (5) furthered by the defendants' use of the mails or any facility of a national securities exchange.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Price Manipulations > Matched Orders & Washed Sales*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN12] Market manipulation under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN13] Even where a 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), claim is based not on specific misrepresentations or omissions, but rather on a comprehensive scheme to defraud, the plaintiff must still demonstrate causation in fact by showing that defendant's allegedly fraudulent activities were actually responsible for plaintiff's injuries.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*
[HN14] A claim of market manipulation under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), is still a claim of fraud, and, therefore, the claim must be pleaded with particularity under Fed. R. Civ. P. 9(b).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN15] A complaint based on allegations of market manipulation must specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN16] A complaint is deficient where there is an

absence of details of manipulative acts, time performed, shares traded, injuries suffered and what the manipulator allegedly gained. Fed. R. Civ. P. 9(b) is satisfied where the complaint provides details of date, quantity, and price of purchases.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN17] Conclusory assertions tracking the language of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), itself with respect to "the defendants" is not an adequate pleading.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN18] Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Registration Requirements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Price Manipulations > Matched Orders & Washed Sales*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN19] That a security is registered on a national securities exchange is a prerequisite to an action under § 9 of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78i(a).

**COUNSEL:** [*1] Plaintiffs by: Max Folkenflik, Esq., Folkenflik & McGerity, New York, New York.

Defendants A.R. Baron, The Baron Group, Roman Okin, Andrew Bressman, and Mark Goldman by: David S. Smith, Esq., Smith Campbell & Paduano, New York, New York.

Defendants J. Morton Davis, D.H. Blair by: Daniel A. Pollack, Edward T. McDermott, Justin Y.K. Chu, Esqs., Pollack & Kaminsky, New York, New York.

Defendants Jeffrey Weissman, Martin Weissman, Seymour Weissman by: Daniel W. Krasner, Eric B. Levine, Jay Auslander, Esqs., New York, New York.

**JUDGES:** John G. Koeltl, United States District Judge

**OPINION BY:** John G. Koeltl

**OPINION**

*OPINION AND ORDER*

**JOHN G. KOELTL, District Judge:**

The Second Amended Complaint in this action alleging a broad-based securities fraud is brought by two individuals, James Baxter ("Baxter") and Richard Katz ("Katz"), on their own behalf and on behalf of their respective investment trusts, J.A. Baxter Life Investment Trust ("Baxter Trust") and EGI 1985 Retirement Benefit Trust ("Katz Trust"). The plaintiffs name as defendants A.R. Baron & Co., Inc. ("A.R. Baron"), one of its brokers, Roman Okin, its Chief Executive Officer, Jeffrey Weissman, its President, Andrew [*2] Bressman, A.R. Baron's parent company The Baron Group, Inc. ("The Baron Group"), and Martin Weissman, alleged to be President of The Baron Group during all or part of the relevant period. Plaintiffs also name as defendants D.H. Blair & Co., Inc. ("D.H. Blair"), and its principal officer, J. Morton Davis. Plaintiffs' claims arise from alleged misrepresentations, omissions, market manipulation and insider trading in certain securities of three companies in the biomedical industry, Health Professionals, Inc. ("HPI"), Cryomedical Sciences, Inc. ("CMSI"), and Cypros Pharmaceutical Corp. ("Cypros"). The alleged violations occurred over about a one-year period beginning in July 1992. Plaintiffs allege violations of § 10(b) and §§ 20(a) and 20(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), (b) (the "1934 Act"), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, § 9 of the 1934 Act, 15 U.S.C. § 78i, and § 12(2) of the Securities Act of 1933, 15 U.S.C. 77l(2) (the "1933 Act"). Plaintiffs also bring supplemental claims for common law fraud, breach of fiduciary duty, and negligent misrepresentation under New York law.

All of the defendants have moved [*3] to dismiss each of the claims either for failure to state a claim under Fed. R. Civ. P. 12(b) (6) or for failure to plead fraud with particularity under Fed R. Civ. P. 9(b). [1] For the reasons that follow, the defendants' motions are granted without prejudice to the plaintiffs' right to replead and file an amended complaint within thirty (30) days of the date of this opinion.

1 At oral argument, the parties agreed that defendant Seymour Weissman had not been served. *(See* Tr. at 52-54.) Accordingly, with respect to the claims against Seymour Weissman, the Court grants the defendant Seymour Weissman's motion to dismiss on the grounds of failure of service under Fed. R. Civ. P. 4(m), without prejudice to plaintiffs' right to effect service within thirty (30) days of this opinion. The parties suggest that it would be useful to them to review and determine the sufficiency of the allegations against Seymour Weissman. Advisory opinions, however, are always inappropriate--particularly so with respect to a party who has not even been served.

[*4] I.

[HN1] For the purposes of a motion to dismiss, the allegations in the complaint are taken as true. *Luce v. Edelstein*, 802 F.2d 49, 52 (2d Cir. 1986). Plaintiffs' allegations are organized into four different "causes of action." The first is a claim for securities fraud under § 10(b) of the 1934 Act, the foundation for which are various alleged misrepresentations and omissions made to the plaintiffs. The plaintiffs allege that defendant Roman Okin made these misrepresentations or omissions directly, making Okin the primary violator, and that the remaining defendants are "controlling persons," making them liable under § 20(a) of the 1934 Act. The second cause of action is a claim for securities fraud under § 12(2) of the 1933 Act. The third cause of action is a claim of securities fraud under § 10(b) of the 1934 Act alleging a manipulative scheme by all of the defendants. The fourth cause of action is a claim of fraud under § 9 of the 1934 Act against all but one defendant for manipulation of the price of HPI on the American Stock Exchange. Each cause of action will be considered in turn.

A.

The first cause of action is based on certain misrepresentations and omissions that [*5] plaintiffs allege to constitute violations of § 10(b) of the 1934 Act and Rule 10b-5. Plaintiffs allege that defendant Okin is "directly responsible" for the misrepresentations and omissions, (Compl. P 94), while the remaining defendants are liable as controlling persons, both under § 20(a) and § 20(b). (Compl. PP 94, 95.) Because § 20 liability will only attach if the primary violator is liable, the entirety of plaintiffs' first cause of action depends upon its sufficiency with respect to Okin.

[HN2] Allegations of securities fraud under § 10(b) and Rule 10b-5 are subject to the requirements of Fed. R. Civ. P. 9(b), specifically that the complaint must identify (1) the statements alleged to be fraudulent, (2) who made the statements, (3) when and where the statements were allegedly made, and (4) why the statements were fraudulent. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990) [HN3] ("The time, place, and nature of the misrepresentations must be set forth so that the defendant's intent to defraud . . . under the securities laws is revealed."). Rule 9(b) also [HN4] provides a pleading requirement for scienter, requiring [*6] that "malice, intent, knowledge, and other condition of mind of a person may be averred generally." This somewhat more relaxed pleading requirement "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations[,]" *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990), in light of Rule 9's purpose of providing defendants with fair notice of plaintiffs' claims, safeguarding defendants' reputations from improvident allegations of malfeasance, and protecting defendants against strike suits. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). Consequently, [HN5] to plead scienter sufficiently, plaintiffs must allege facts giving rise to a strong inference of fraudulent intent. The inference may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128. *See also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268-69 (2d Cir. 1993), [*7] *cert. denied sub. nom Ross v. ZVI Trading Corp. Employees' Money Purchase Pension Plan*, 128 L. Ed. 2d 70, 114 S. Ct. 1397 (1994).

Moreover, [HN6] to successfully plead a violation of

§ 10(b) of the 1934 Act, the plaintiffs must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir. 1985). *See also Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting *Bloor*).

In an attempt to meet their obligation of pleading with particularity, plaintiffs have compiled an exceedingly long and rambling complaint. But particularity is not to be confused with length. The Complaint [2] is very long, consisting of well over one-hundred paragraphs and forty pages. There are numerous descriptions of events having no apparent bearing on the plaintiffs' allegations. (*See, e.g.*, Compl. PP 78-85.) There are several references to rumors, complaints filed in other lawsuits, and allegations appearing in [*8] press reports. (*See, e.g.*, Compl. PP 46, 72, 86b.) *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969))); *Pross v. Katz*, 784 F.2d 455, 456 (2d Cir. 1986) ("[The Court's] task . . . is not made easy by the length of the complaint, a prolixity seemingly designed to obscure rather than to illumine the events giving rise to this lawsuit."). The lack of particularized pleading is remarkably egregious in this case because the plaintiffs have had access to extensive documentary discovery since the case was filed in May 1994, nearly a year and a half ago.

2 References to the Complaint refer to the Second Amended Complaint (with P 60a and Exhibit G).

For all their prolixity, the vast majority of plaintiffs' allegations [*9] with respect to the asserted misrepresentations and omissions by Okin are insufficiently pleaded under Rule 9(b) in that the time, place, speaker, and contents of the allegedly fraudulent statements are lacking. The bulk of the allegations of misrepresentations and omissions by Okin are listed in paragraph 43 of the Complaint. Nowhere in this paragraph is there any mention of a date or time at which any of these alleged statements or omissions took place, or the method by which the alleged misrepresentations were made. There is no indication of the context in which Okin "failed to reveal" certain facts. Furthermore, the person or persons to whom these misrepresentations or omissions were made is not even identified. While this paragraph of the Complaint alleges a great number of things Okin "failed to reveal," it does not indicate to whom, when, and under what circumstances. Such ambiguous and imprecise pleading is plainly inadequate and does not afford the defendants a reasonable opportunity to answer the allegations properly. *See Keenan v. D.H. Blair & Co., Inc.*, 838 F. Supp. 82, 86 (S.D.N.Y. 1993) [HN7] ("An important objective of Rule 9(b) is to apprise the defendant of the transaction(s) [*10] involved with sufficient particularity so as to permit adequate responsive pleading.")

Even where the Complaint does offer more detail with respect to some of the alleged misrepresentations, conspicuous deficiencies remain. For example:

> Okin called Baxter several times at the beginning of July 1992, and urged him to invest. According to Okin, the aim of A.R. Baron was to open accounts for investors interested in stocks with growth opportunities which were being promoted by A.R. Baron. According to Okin, the A.R. Baron stocks had a proven track record of growth during a 12 to 18-month period. During these early discussions, Okin said he did not want day-to-day traders, but was looking for longer term investors. Baxter said he was interested in medium- to long-term investments, but not high risk. Okin strongly recommended a purchase of HPI.

(Compl. P 21.) While this allegation is relatively specific with respect to when, by whom and to whom the statements were made, there is simply no indication of how these statements were fraudulent. In other instances, rather than pleading that Okin made a false representation, the Complaint alleges that Okin "implied" a false statement. [*11] (*See, e.g.*, Compl. P 57.) There are other allegations that the plaintiffs received false information but no source whatsoever is identified. Plaintiffs claim they were offered unregistered stock in February 1993 and that "Baxter was told, falsely, that the

only limitation in his right to sell the unregistered stock was the requirement that he held it for three months." (Compl. P 48.) Plaintiffs do not allege who made this statement. Finally, there are instances where plaintiffs allege that Okin made false statements to the defendants but the time such misrepresentations were made is unspecified or narrowed down to a broad range over several months. (*See, e.g.*, Compl. PP 23, 58, 59, 60.)

Plaintiffs maintain that the Complaint does identify the time, place, and speaker for the specific misrepresentations alleged. Nonetheless, plaintiffs ignore the fact that the specific list of Okin's alleged material misrepresentations and omissions simply is not anchored to specific allegations which allege the time, place, manner, and context of the communication. (*See* Compl. P 43.) Even the other alleged misrepresentations lack sufficient specificity. Plaintiffs claim that Okin made [*12] various misrepresentations "in several telephone calls at the beginning of 1992," and "in the period July 1992 through January 1993," citing PP 22, 23, 32-37, 45-48 of the Complaint. (Pls.' Mem. Opp'n at 24-25.) Yet, the Complaint does not indicate that these statements were made by telephone, nor, except in general terms, when they were made, nor in many cases that they were made to any particular plaintiff. In any event, cryptic references to "the beginning of 1992" or the six months between July 1992 and January 1993, or "throughout early 1993" simply do not begin to conform to the requirements of Rule 9(b). [3]

3 Plaintiffs' reliance on *Jaquith v. Newhard*, No. 91 Civ. 7503, 1993 WL 127212, 1993 U.S. Dist. LEXIS 5214 (S.D.N.Y. Apr. 20, 1993) (Leisure, J.) is misplaced. In that case, references to specific communications between identified parties about detailed subject matter alleged to have occurred in a particular month were found to comport with Rule 9(b). *Id.*, 1993 WL 127212, at *4. References to statements made "beginning in the fall of 1989," however, were found inadequate. *Id.*, 1993 WL 127212, at *5. Clearly, the present case is similar to the latter.

[*13] Moreover, in their discursive complaint the plaintiffs have not even alleged all of the elements of a § 10(b) claim for the alleged misrepresentations and omissions. There is a blanket allegation that plaintiffs relied on the defendants' actions and purchased securities "of HPI, among others." (*See* Compl. P 93.) There are few other instances where plaintiffs specifically allege having relied upon Okin's statements, [4] and fewer still where plaintiffs allege having bought or sold securities in connection with Okin's allegedly fraudulent statements or omissions. (*See, e.g.*, Compl. PP 48, 50, 53, 56, 59.) Where plaintiffs do make such allegations, only purchases of HPI securities are alleged, and the attendant allegations of fraud fall short of the requirements of Rule 9(b). [5] (*See, e.g.*, Compl. PP 22, 23, 57.) The Complaint is inadequate and incomplete and does not afford the defendants a fair opportunity to understand and defend against the case brought against them. The plaintiffs are in possession of the information required to set forth both the specifics of the alleged misrepresentations and omissions made to them and the specifics of the purchases and sales they [*14] made in alleged reliance on such misrepresentations and omissions.

4 [HN8] Reliance is presumed in cases where nondisclosure of material information is alleged. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972); *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992), *cert. denied*, 124 L. Ed. 2d 249, 113 S. Ct. 2338 (1993).

5 Plaintiffs offer a schedule of stock transactions involving the securities at issue as an exhibit to the Second Amended Complaint. (*See* Compl. Ex. G.) While this exhibit does appear to be a register of transactions including the dates and amounts of the trades, there is no way to link the indicated trades with the allegations of misrepresentations and omissions in the Complaint itself. The plaintiffs merely allege that the exhibit represents the transactions in HPI, CMSI, and Cypros securities in which they engaged. (*See* Compl. P 60a.)

Because plaintiffs have failed to plead their § 10(b) claims against Okin with sufficient particularity, [*15] and because many of the allegations fail to plead the § 10(b) violations themselves, the claims against defendant Okin must be dismissed. Moreover, because Okin is the only defendant alleged to have made misrepresentations or omissions constituting the primary violations, there is no basis for maintaining plaintiffs' claims against the remaining defendants as controlling persons under § 20. [6] *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025, 79 L. Ed. 2d 684, 104 S. Ct. 1280 (1984), *Brown v. The Hutton Group*, 795 F.

Supp. 1317, 1324-25 (S.D.N.Y. 1992); *The Limited, Inc. v. McCrory Corp.*, 645 F. Supp. 1038, 1046 (S.D.N.Y. 1986). [7] Therefore, the entire first cause of action for securities fraud under § 10(b) and § 20 is dismissed against all defendants. This dismissal is without prejudice to plaintiffs filing an amended complaint alleging fraud with sufficient particularity. *See Acito*, 47 F.3d at 54-55 [HN9] ("Leave to amend should be freely granted, especially where dismissal of the complaint [is] based on Rule 9(b)."); *Luce*, 802 F.2d at 56-57 ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." (citation omitted)). [*16] [8]

6 The Complaint is replete with allegations of insider trading by various defendants. (*See, e.g.*, Compl. PP 54, 55.) The plaintiffs conceded at oral argument that these allegations were not intended to create an independent cause of action under § 10(b) and Rule 10b-5. Rather, the alleged insider trading was offered only to create a sufficient factual basis to show scienter. (Tr. at 66-67.)

7 Accordingly, the Court does not reach the question of whether status alone is sufficient to plead controlling person liability. *Compare, e.g.*, *Food and Allied Serv. Trades Dep't, AFL-CIO v. Millfeld Trading Co., Inc.*, 841 F. Supp. 1386, 1390-91 (S.D.N.Y. 1994) (Sand, J.) (holding that "all that is required to make out a prima facie case of controlling person liability at the pleading stage is an allegation of control status"); *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 284-85 (S.D.N.Y. 1994) (Kaplan, J.) (same) *with Morse v. Weingarten*, 777 F. Supp. 312, 318 (S.D.N.Y. 1991) (Lasker, J.) (requiring plaintiffs to plead defendant's knowledge of primary violation); *In re Par Pharmaceutical, Inc. Sec. Litig.*, 733 F. Supp. 668, 679 (S.D.N.Y. 1990) (Patterson, J.) (requiring plaintiffs to allege defendant's culpable participation in the fraud). Nor does the Court make any determination that the Second Amended Complaint sufficiently pleads control status for the defendants apart from Okin.

[*17]

8 It is unnecessary to reach the question of whether the plaintiffs have pleaded scienter with sufficient particularity because the Complaint must be dismissed for other pleading failures and the plaintiffs have been given leave to replead. It is impossible to determine at this time which alleged misrepresentations and omissions will be repleaded, the details of such allegations which have been found lacking in the present complaint, and the details of scienter that may be alleged with respect to such alleged fraud.

B.

The plaintiffs' second cause of action alleges securities fraud under § 12(2) of the 1933 Act. As the parties agreed at oral argument, this claim should be dismissed for failure to state a claim in light of the Supreme Court's decision in *Gustafson v. Alloyd Co., Inc.*, 131 L. Ed. 2d 1, 115 S. Ct. 1061 (1995) which holds that § 12(2) [HN10] is only applicable in cases of initial public securities offerings. Because the circumstances of this case involve secondary market trading, the § 12(2) claims are dismissed with prejudice under *Gustafson*.

C.

The plaintiffs' third [*18] cause of action is based on market manipulation under § 10(b) of the 1934 Act and Rule 10b-5. Section 10(b) [HN11] states that it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). To set forth a claim for market manipulation under these provisions, plaintiffs must allege: (1) damage to the plaintiffs, (2) caused by reliance on defendants' misrepresentations or omissions of material facts, or on a scheme by the defendants to defraud, (3) scienter, (4) in connection with the purchase or sale of securities, (5) furthered by the defendants' use of the mails or any facility of a national securities exchange. *Cowen & Co. v. Merriam*, 745 F. Supp. 925, 929 (S.D.N.Y. 1990) (Patterson, J.). *See also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977) [HN12] (market manipulation under § 10(b) "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity"). With respect to market manipulation claims, the Court of Appeals explained: [*19]

> [HN13] Even where a 10(b) claim is based not on specific misrepresentations or omissions, but rather on a "comprehensive scheme to defraud," the plaintiff must still demonstrate causation in fact by showing

> that defendant's allegedly fraudulent activities were actually responsible for plaintiff's injuries.

*Bloor*, 754 F.2d at 61. Plaintiffs assert a market manipulation claim against all defendants directly based on both alleged material misrepresentations and omissions and on the use of alleged manipulative and deceptive devices, alleging that each defendant was a primary violator of § 10(b) in this regard. (*See* Compl. PP 102-05.)

As discussed above, the Complaint does not allege *any* misrepresentations or omissions by a defendant other than Okin. And, as explained above, the pleading is insufficient with respect to Okin himself. Therefore, for plaintiffs' claim for market manipulation to survive the motion to dismiss, the complaint must set forth allegations of a manipulative device or scheme. In this regard, the Complaint is wholly inadequate.

The plaintiffs allege a market manipulation scheme over twenty-six paragraphs. (*See* Compl. PP 61-86.) These paragraphs [*20] are long on innuendo but lacking in factual assertions or specificity with respect to how, when, and under what circumstances the alleged fraud was perpetrated on the plaintiffs. The facts on which the allegation of market manipulation is based are set forth in paragraph 86 of the Complaint. Plaintiffs complain that the defendants inflated the market prices of HPI, CMSI, and Cypros securities by misrepresenting the business condition of these companies and refusing to execute customer sell orders which might depress prices. This contention is apparently based, in part, on reports in the financial press. (*See* Compl. P 86a.) Also, several references are made to "complaints" filed against the defendants. Apparently, the complaints referred to are excerpts from customer complaints and correspondence, attached as exhibits. (*See* Compl. P 86a, Exs. C, D.) The plaintiffs maintain that these customer complaints "reveal a consistent course of conduct" of both misrepresentation of HPI's financial condition, (Compl. P 86c), and unauthorized trading in HPI securities. (Compl. P 86b.) The plaintiffs surmise that defendants A.R. Baron and D.H. Blair "seemed to intentionally time the execution [*21] of purchase orders in HPI, CMSI, and Cypros stock [in order to] maximize the manipulation of the market price." (Compl. P 86c.) Plaintiffs also assert that defendant Jeffrey Weissman "placed large orders for HPI stock at the close of the market." (*Id.*) Plaintiffs argue that the trading activities of the defendants are "indicative of market manipulation" and not justified by HPI's business condition. (*Id.*)

The broad strokes with which the plaintiffs have alleged market manipulation do not pass muster under Rule 9(b) [HN14] A claim of market manipulation under § 10(b) is still a claim of fraud, and, therefore, the claim must be pleaded with particularity under Rule 9(b). *See Rooney Pace, Inc. v. Reid*, 605 F. Supp. 158, 162-63 (S.D.N.Y. 1985) (Weinfeld, J.) (applying Rule 9(b) to market manipulation claim under § 10(b)); *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 557-58 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 64 L. Ed. 2d 802, 100 S. Ct. 2175 (1980). It may be true that the existence of customer complaints of unauthorized trading, failure to respond to customer orders to sell securities, or other trading irregularities may be some evidence of a scheme or device [*22] to defraud investors. Indeed, such allegations may not even need to reach the level of specificity ordinarily required by Rule 9(b) because details regarding the workings of a market manipulation scheme are often known only by defendants. *See Rooney Pace*, 605 F. Supp. at 162-63 (particularity not required where alleged market manipulation involves "clandestine activities knowledge of which would be within defendants' exclusive control") Nevertheless, [HN15] a complaint based on such allegations must still specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue. *Compare Connolly v. Havens*, 763 F. Supp. 6, 13 (S.D.N.Y. 1991) (Leisure, J.) [HN16] (complaint deficient given absence of details of manipulative acts, time performed, shares traded, injuries suffered and what manipulator allegedly gained) *with Cowen*, 745 F. Supp. at 929-30 (Rule 9(b) satisfied where complaint provided details of date, quantity, and price of purchases) *and Rooney Pace*, 605 F. Supp. at 162 (specific purchases and refusals to pay for purchased shares detailed in the complaint).

[*23] The Complaint in this case is entirely lacking in such detail. The allegations entitled "Third Claim For Relief (Securities Fraud - Section 10b, Rule 10b-5) (Market Manipulation)" are essentially a restatement of the statutory language of § 10(b). (*See* Compl. PP 102-04.) [HN17] Conclusory assertions tracking the language of § 10(b) itself with respect to "the defendants" is not an adequate pleading. *See DiVittorio v. Equidyne*

*Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) [HN18] ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."); *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 557-58 (2d Cir. 1979) ("It will not do merely to track the language of Rule 10b-5 and rely on such meaningless phrases as 'scheme and conspiracy' or 'plan and scheme and course of conduct to deceive.'"). Plaintiffs fail to cure this defect elsewhere in the Complaint. There are no specific allegations of market manipulation whatsoever with respect to defendants The Baron Group, Martin Weissman, Mark Goldman, or J. Morton Davis. And, while Martin Weissman and Davis are alleged [*24] to have owned securities in HPI, CMSI, and Cypros and therefore may have stood to benefit from any upward price movement, *(see* Compl. PP 40, 41, 67, 69, 70, 83, 85), this allegation alone does not allege market manipulation. Moreover, there are no such allegations even of this nature with respect to The Baron Group or Goldman.

With respect to the remaining defendants, the Complaint does make sweeping claims of market manipulation by A.R. Baron, D.H. Blair, Jeffrey Weissman, Bressman, and Okin. (*See, e.g.*, Compl. PP 61, 66, 86a-h.) Nonetheless, the allegation that "[the defendants] had as their purpose the attempt to manipulate the price of [HPI and CMSI] in the secondary market, so that the shares held by D.H. Blair, Davis, Jeffrey Weissman, and his father, Martin Weissman, could be sold at large profits," (Compl. P 67)--indeed, an allegation of an attempt to manipulate--does not suffice. [9] This allegation does not reveal, with any particularity, how the market in the securities at issue was manipulated with respect to these plaintiffs or how their specific transactions in HPI, CMSI, and Cypros securities were connected with the alleged manipulative scheme. The Complaint [*25] contains generalized allegations of various purchases and sales that the plaintiffs appear to allege were part of the manipulative scheme and which the plaintiffs also appear to contend form the basis for part of their claim for damages. Hence, the plaintiffs assert that "on a number of occasions, Okin actively dissuaded plaintiffs from selling securities and Okin failed to execute direct orders to sell at specified prices." (Compl. P 86a.) *See also supra* note 9. The plaintiffs also allege that they "experienced, on a number of occasions, unauthorized purchases of HPI or other securities, which Okin later convinced plaintiffs to accept." (Compl. P 86b.) These allegations do not identify the transactions at issue, and they do not even indicate the specific securities that were purchased. This is information which is in the plaintiffs' possession and could be particularized in an amended complaint. The Complaint also refers to transactions by other A.R. Baron and D.H. Blair customers, arguing that a review of these complaints "reveals" the defendants' market manipulation. This pleading technique does not plead fraud with particularity--it neither specifies how each defendant participated [*26] in the alleged scheme, nor relates how the plaintiffs were injured with respect to the identified transactions of other customers. *Compare Metzner v. D.H. Blair & Co.*, 663 F. Supp. 716, 721 (S.D.N.Y. 1987) (Weinfeld, J.) (dismissing 10(b) claims based on scheme to defraud where "[the] allegations also are based on 'subsequent review[s]' of accounts; but, no statement as to dates or other specifics of any such transactions is offered.") *with Metzner v. D.H. Blair & Co., Inc.*, 689 F. Supp. 262, 265 & n.4 (S.D.N.Y. 1988) (Conboy, J.) (denying motion to dismiss the amended market manipulation claim where specific transactions in the plaintiffs' accounts were identified).

9 There is one allegation that Okin refused to execute one sale of HPI stock for one plaintiff at a specified price, after which the price of HPI stock declined. *(See* Compl. PP 58-59.) Still, this isolated allegation of a disregarded customer order does not even establish when the incident took place, as is required by Rule 9(b). Nor, in fact, does it include even a suggestion that the ignored order was a part of a broader manipulative scheme that harmed the plaintiffs. Moreover, there are no specific allegations concerning how the other three plaintiffs were affected.

[*27] Because plaintiffs have not pleaded a § 10(b) claim of market manipulation with sufficient particularity, the third cause of action must be dismissed without prejudice to the plaintiffs' right to file an amended complaint.

D.

Plaintiffs' fourth cause of action alleges market manipulation under § 9(a) of the 1934 Act with respect to the stock of HPI, *(see* Compl. P 107), [HN19] the only security alleged to be registered on a national securities exchange, a prerequisite to an action under § 9 of the

1934 Act. 15 U.S.C. § 78i(a). *See Cowen,* 745 F. Supp. at 930; *Rooney Pace,* 605 F. Supp. at 163. Although the Complaint is inexplicit, plaintiffs appear to bring claims under § 9(a)(1), which prohibits "wash sales" and "matched trades," and § 9(a)(2), which prohibits a "series of transactions" designed to create the appearance of active trading for the purpose of inducing investors to buy or sell. *See Baum v. Phillips Appel & Walden, Inc.,* 648 F. Supp. 1518, 1530 (S.D.N.Y. 1986), *aff'd,* 867 F.2d 776 (2d Cir.), *cert. denied,* 493 U.S. 835, 107 L. Ed. 2d 75, 110 S. Ct. 114 (1989).

The plaintiffs' § 9(a) claims derive from the same alleged manipulative scheme described [*28] as the basis for their § 10(b) claims. There are no particulars of the alleged wash sales or series of transactions and no explanation of how these transactions harmed the plaintiffs. As discussed above, that scheme's impact on the plaintiffs' securities transactions is not alleged with particularity as required under Rule 9(b) Accordingly, the fourth cause of action under § 9(a) must also be dismissed without prejudice to the plaintiffs' right to file an amended complaint.

E.

Plaintiffs' fifth, sixth, and seventh causes of action assert claims under New York state law. Because the claims arising under federal law are dismissed, the Court declines supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c) (3). *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *Block v. First Blood Assoc.,* 988 F.2d 344, 351 (2d Cir. 1993) (no abuse of discretion to refuse supplemental jurisdiction over state law claims when federal claims were dismissed before trial).

III.

For the foregoing reasons, the [*29] Second Amended Complaint is dismissed in its entirety against all defendants without prejudice to plaintiffs' right to file an amended complaint within thirty (30) days of the date of this opinion.

SO ORDERED.

Dated: New York, New York

October 6, 1995

John G. Koeltl

United States District Judge

Doldo Bros., Inc. v. Coors Brewing Co.
N.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
DOLDO BROTHERS, INC. a New York corporation; and Finger Lakes Bottling Co., Inc. a New York corporation, Plaintiffs,
v.
COORS BREWING COMPANY a Colorado company, Defendant.
**No. 7:08-CV-206.**

March 7, 2008.

Douglas J. Mahr, Scolaro, Shulman Law Firm, Syracuse, NY, for Plaintiffs.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

## I. INTRODUCTION

*1 Plaintiffs commenced this action on February 22, 2008 pursuant to the Court's diversity jurisdiction seeking (a) a declaration that Defendant's stated intention to terminate Plaintiffs' distributor agreements for the exclusive territorial distribution of Molson beer violates New York Alcohol Beverage Control Law § 55-c ("ABC Law § 55-c"), and (b) a permanent injunction preventing termination of those agreements. *See* Compl., dkt. # 1. On February 25, 2008, Plaintiffs moved by way of application for an order to show cause for a preliminary injunction preventing termination of the agreements until further proceedings could be conducted under the provisions of ABC Law § 55-c. *See* Motion, dkt. # 6. The Court granted the application for an order to show cause, ordered Defendant to respond by February 28, 2008, and set the matter down for a hearing on March 5, 2008. *See* 2/25/08 Order to Show Cause, dkt. # 7. Defendant responded by opposing the motion for a preliminary injunction and by making a cross-motion to: (a) deposit $ 1,291,000 into the Court pursuant to Fed.R.Civ.P. 67(a) as "reasonable compensation" for the Molson distribution rights of the 2 plaintiffs; and (b) stay litigation pending arbitration. *See* Def. Opp. and Cross-Motion, dkts. # 10-# 11. Plaintiffs filed papers in opposition to the cross-motion on February 4, 2008, and the Court conducted a hearing on the motions on February 5, 2008.

## II. BACKGROUND[FN1]

FN1. Much of the background in this case is not disputed and is taken from the parties' submissions.

### *a. Parties*

Doldo Brothers, Inc. ("Doldo Brothers") is a licensed, multi-brand distributor of alcoholic and non-alcoholic beverages with its principal place of business in Watertown, New York. It has been the exclusive distributor of Molson in Jefferson and Lewis counties for 17 years. Finger Lakes Bottling Co., Inc. ("Finger Lakes") is a licensed, multi-brand distributor of alcoholic and non-alcoholic beverages with its principal place of business in Auburn, New York. It has been the exclusive distributor of Molson in Cayuga, Seneca, Ontario, Wayne, and Yeats counties for 16 years, and in Oswego County for 11 years. Coors Brewing Company ("Coors") is a Delaware corporation with its principal place of business in Colorado.

### *b. Agreements/Relationship of the Parties*

In the mid-1990s, both Plaintiffs signed written distribution agreements with Martlet Importing Co, Inc. ("Martlet"), a former imported of Molson beer into the United States. In the late 1990s, Martlet's importing rights of Molson beer were assigned to a joint venture between Miller Brewing Company ("Miller") and Molson Canada. Plaintiffs both contend that their primary domestic beer is, and was at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the time of the joint venture, Miller brand beer. Miller did not require Plaintiffs to sign written distribution agreements.

Molson Canada's relationship with Miller ended in 2000 and a joint venture between Molson Inc. and Coors was formed-Molson 2000 LLC-for the sole purpose of distributing Molson beer in the United States. In January 2001, Coors assumed sales and distribution responsibilities of this new joint venture. At that time, Molson 2000 LLC, which later changed its name to Molson USA LLC ("Molson USA"), requested Plaintiffs and the other New York Molson beer distributors to execute a document entitled the "Molson Amendment." In January 2001, both Plaintiffs executed the Molson Amendment. *See* Vasile Aff. ¶ 10 & Ex. B; Doldo Aff. ¶ 10 & Ex. B.

*2 The Molson Amendment provides in pertinent part:

> Any and all disputes between Distributor and the Company or its agent, Coors, except nonpayment of Distributor's account, including without limitation a dispute as to whether the Company has grounds to terminate this Agreement, which disputes are not resolved by Mediation, shall be submitted to binding arbitration in the city nearest to Distributor in which there is a regional office of the American Arbitration Association, before a single arbitrator, in accordance with the Commercial Arbitration Rules and procedures of the American Arbitration Association.

Molson Amendment ¶ 6.2.

In early 2001, Molson USA formulated and began to implement what it termed a policy of consolidation. Plaintiffs contend that the plan was "simply a marketing plan to align the Molson distributor network with the Coors distributor network."Plf. Mem L. p. 6. In late 2002, Molson USA contacted both Plaintiffs and purportedly told them that the plan was to align distribution channels with Coors distributors. *Id.* Molson USA proffered new distributor agreements, entitled "Molson Distributorship Agreement" (the "Molson Agreement"), to both Plaintiffs. Doldo Brothers signed the Molson Agreement, *see* Doldo Aff. ¶ 11 & Ex. C, Finger Lakes did not. The Molson Agreement has a binding arbitration provision with language identical to that found at paragraph 6.2 of the Molson Amendment. *See* Molson Agreement, ¶ 11.2.

Plaintiffs contend that, throughout 2003, their attorney disputed Molson USA's right to consolidate Molson beer distribution in New York. On Feb. 9, 2005, the parent companies of Coors and Molson merged, resulting the formation of the Molson Coors Brewing Company ("Molson Coors"). Plaintiffs contend that Molson USA "continued its operation as a wholly owned subsidiary of Molson Coors, and continued its efforts to align its distribution network."Plf. Mem. L. p. 6.

> On March 11, 2005, Molson USA contacted both plaintiffs and reiterated that it adopted a nationwide "policy of consolidation" in 2002. Thereafter, on August 4, 2005, Molson USA advised Plaintiffs that Molson USA commenced an arbitration against another New York State wholesaler, John G. Ryan, Inc. (the "Ryan Arbitration"), to obtain a declaration that it was entitled pursuant to [ABCL] § 55-c to terminated the Ryan distributorship pursuant to its consolidation policy. By this letter, Molson USA advised Plaintiffs that if successful, "Molson USA will seek declarations permitting the termination of its agreement with Plaintiffs."On September 19, 2007, as a result of the decision in the Ryan Arbitration, Molson USA advised Plaintiffs it was going to be "commencing an action against [Plaintiffs] in order to accomplish the consolidation of the Molson brands with the Coors network consistent with New York Consolidation Statutes Section 55-c."

Plf. Mem. L. p. 7.

By letter dated December 7, 2007, Coors announced to Plaintiffs that, as of December 2, 2007, Coors became, by assignment, the successor to Molson USA as the supplier of Molson brands. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

By this letter, Coors further announced that "[p]ursuant to Section 55-c of the New York Alcoholic Beverage Control Law... Coors has elected to terminate the distribution agreement for the Molson Brands with your company as part of its nationwide policy of consolidation for the Molson Brands ... effective March 15, 2008."*Id.* Coors offered to pay Plaintiffs 2.9 times their gross profit on the sale of the Molson brands as compensation for the loss of the right to distribute Molson brands in their respective territories. The "2.9 times gross profit on the sale of the Molson brands" figure was the amount that the arbitrator in the Ryan Arbitration ultimately determined was appropriate compensation under the provisions of ABC Law § 55-c.

***c. Plaintiffs' Arguments under the N.Y. Alcoholic Beverage Control Law***

*3 New York ABC Law § 55-c concerns agreements between brewers [FN2] and beer wholesalers. *See generally*N.Y. ABC L § 55-c. As to terminations of distribution agreements, § 55-c(4)(a) provides that "[n]o brewer may cancel, fail to renew, or terminate an agreement unless the party intending such action has good cause for such cancellation [and] the party intending to act has furnished [90 day] prior notification...."N.Y. ABC L § 55-c(4)(a).Section 55-c(2)(e)(i)(A) defines "good cause" to mean "[t]he implementation by a brewer of a national or regional policy of consolidation which is reasonable, nondiscriminatory and essential."NY ABC L 55-c(2)(e)(i)(A). The subsection further delineates what a brewer must do in announcing and implementing a policy of consolidation. *Id.* [FN3]

FN2.Section 55-c(2)(b) defines a "Brewer" to be:

any person or entity engaged primarily in business as a brewer, manufacturer of alcoholic beverages, importer, marketer, broker or agent of any of the foregoing who sells or offers to sell beer to a beer wholesaler in this state *or any successor to a brewer.*

NY ABC L 55-c(2)(b) (emphasis added).

FN3. In this regard, the subsection provides:

Such policy shall have been previously disclosed, in writing, in reasonable detail to the brewer's wholesalers, and shall result in a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand. All affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of such policy, and such notice shall be provided by the brewer implementing said policy. Further, an affected wholesaler who has actual knowledge of the intended implementation of such policy shall also notify each affected brewer. The term "affected brewers" means all other brewers with an agreement with an affected wholesaler who is a multiple brands wholesaler. The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss or diminishment of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy.

NY ABC L § 55-c(2)(e)(i)(A).

Section 55-c(6) allows for a civil action "in a court of competent jurisdiction ... for damages sustained in accordance with the laws of this state which shall govern all disputes arising under an agreement or by reason of its making and performance."NY ABC L § 55-c(6).

In any such action the court may grant such equitable relief as is necessary or appropriate, considering the purposes of this section, to remedy the effects of any failure to comply with the provisions of this section or the effects of conduct prohibited hereunder, including declaratory judgment, mandatory or prohibitive injunctive relief, or preliminary or other interim equitable relief; provided, however, that permanent injunctive relief shall not be granted to prohibit the ef-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fectiveness of a termination or non-renewal of an agreement in furtherance of a policy of consolidation that is in compliance with subparagraph (i) of paragraph (c) of subdivision two of this section.

*Id.* In such actions, "the brewer shall have the burden of proof that its action was based upon good cause, provided however, the wholesaler shall retain the burden of proof in all other respects."*Id.*

Section 55-c(7)(a) provides that when a brewer implements a national or regional consolidation policy, it "shall not terminate its relationship with an affected wholesaler until compensation as provided for in this subdivision has been paid."NY ABC L § 55-c(7)(a). Such compensation is further defined as "the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of such policy, together with fair and reasonable compensation for other damages sustained."*Id.* Section 55-c(2)(i) defines "fair market value of distribution rights" as "the amount a willing seller, under no compulsion to sell, would be willing to accept and a willing buyer, under no compulsion to purchase, would be willing to pay for the distribution rights."NY ABC L § 55-c(2)(i).

Subsection 7(c) provides that, "[i]n the event that the brewer and the beer wholesaler are unable to agree on the compensation to be paid for the value of the beer wholesaler's business and assets, the matter may with the consent of both the brewer and the beer wholesaler, be submitted to a neutral arbitrator to be selected by the parties; if they cannot agree on such an arbitrator, the same shall be selected by a judge of a court of competent jurisdiction."NY ABC L 55-c(7)(c). The same subsection also provides that "[n]o brewer or beer wholesaler may impose binding arbitration of any issue as a term or condition of an agreement."*Id.*

*4 Plaintiffs contend that the December 7, 2007 letter "was the first time Plaintiffs learned that Coors (as opposed to its predecessor) had allegedly adopted a policy of consolidation."Plf. Mem L. p. 7. They argue that Coors has not established good cause to terminate the distributor agreements in issue because *it* has not announced or implemented a national or regional policy of consolidation which is "reasonable, nondiscriminatory and essential" within the meaning of ABC Law § 55-c(2)(c)(i)(A). Plaintiffs further argue that Coors has not met the other prerequisites of termination under ABC Law § 55-c, including paying reasonable compensation. Finally, Plaintiff contend that ABC Law § 55-c(7)(c) prevents arbitration of the underlying disputes despite the clause for binding arbitration in both distribution agreements.

Defendant has opposed the application for a preliminary injunction and has cross-moved to stay the instant proceedings pending arbitration and to deposit funds into the Court in an amount which Defendant believes will be the ultimate compensation due Plaintiffs under ABC Law § 55-c.

## III. DISCUSSION

### *a. Right to Seek Preliminary Injunction*

Although Defendant has moved to stay the instant proceedings pending arbitration (discussed *infra* ), there is no dispute that the subject agreements allow the parties to seek preliminary injunctive relief prior to arbitration. Hence, the motion for a preliminary injunction must be addressed regardless of the outcome of Defendant's cross-motion.

### *b. Preliminary Injunction Standard*

Plaintiffs acknowledge that the traditional test for a preliminary injunction requires the movant to establish (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in favor of the plaintiff. Plf. Mem L. p. 7 (citing *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101 (2d Cir.2003)).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

However, Plaintiffs point to ABC Law § 55-c(6) and argue that the traditional test is not applicable and that it need prove only a violation of the statute, *and not* irreparable harm, in order to prevail.FN4The Court does not agree.

> FN4. Plaintiffs argue:
> While § 55-c recognizes this fundamental test, the Statute provides an alternate and superseding ground for the granting of equitable relief, including mandatory or prohibitive injunction. Specifically, § 55-c(6), which grants wholesalers a private right of action, provides, in pertinent part:
>
> In any such action, the court may grant such equitable relief as is necessary or appropriate, *considering the purposes of this section,* to remedy the effects of any failure to comply with the provisions of this section or the effects of conduct prohibited hereunder, including declaratory judgment, mandatory or prohibitive injunctive relief or preliminary or other interim equitable relief.... (Emphasis added).
>
> Section 55-c(6) also provides that *"the rights and remedies"* available to a beer wholesaler provided in the section "shall be intended to supplement and not be exclusive of any rights and remedies otherwise available pursuant to any other statute, or at law or equity."*Id.* (emphasis added).
>
> Plf. Mem. L. p. 8.

Some New York statutes, such as N.Y. Agriculture and Markets Law § 258-e(1) and N.Y. Education Law § 6824, explicitly allow injunctions "without [the movant] being compelled to allege or prove that an adequate remedy at law does not exist" and, thus, without proof of irreparable harm in the absence of an injunction. *See Wickham v. Champlain Creameries, Inc.*, 41 Misc.2d 552, 245 N.Y.S.2d 688, 696 (N.Y.Sup.Ct.1963) ("[L]ack of an adequate remedy at law need not be alleged or proven in an action for an injunction under Section 258-c of the Agriculture and Markets Law, by the express provisions of that section. Accordingly, plaintiff is not required to allege or prove irreparable damage in order to sustain this action for an injunction.").New York ABC Law § 55-c does not have such a provision. Certainly, the New York Legislature knows how to include such a provision in a statute if it desires it. By the absence of such a provision in ABC Law § 55-c, the Court must conclude that the New York Legislature intended that irreparable harm must be established in order to obtain injunctive relief under ABC Law § 55-c. Indeed, the New York Appellate Division, Second Department, recently reversed a trial court's order granting a preliminary injunction under ABC Law § 55-c because the plaintiff had failed to establish irreparable harm. *Dana Distributors, Inc. v. Crown Imports, LLC*, 2008 WL 458577, at * 1 (2nd Dept. Feb.19, 2008). Thus, Plaintiffs must establish irreparable harm to obtain a preliminary injunction.

***c. Irreparable Harm***

> *5 "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction .... Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.... In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied."*Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir.1999) (internal quotations and citations omitted). The threat of irreparable harm must be actual and imminent, not remote or speculative. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir.2002).
> *Hespeler v. Town Of Ledyard*, --- F.Supp.2d ----, 2008 WL 542390, at * 3 (D.Conn. Feb.27, 2008) (Smith, M.J.).

The Plaintiffs must "demonstrate the likelihood of irreparable harm in the absence of the injunction."*Id.* at * 4 (citing *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir.2004)). The alleged irreparable harm must be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"incapable of being remedied by monetary damages."*Snecma v. Turbine Engine Components Technologies Corp.* 531 F.Supp.2d 354, 2008 WL 204619, at * 2 (N.D.N.Y. Jan.25, 2008) (Hurd, D.J.); *see also Dana Distributors, Inc.*, 2008 WL 458577, at * 1 (It is well settled that "[w]here ... a litigant can fully be recompensed by a monetary award," there is not irreparable harm."). Plaintiffs, therefore, must establish the likelihood that actual and imminent harm that cannot be compensated momentarily will result from the termination of the distributor agreements on March 15, 2008.

However, Plaintiffs' arguments as to irreparable harm address the economic impact of the loss of the Molson line. Given the sales figures presented by the Plaintiffs in their papers,[FN5] the Molson line comprises 3-5% of Doldo Brothers' total sales, *see*, Doldo Aff. ¶ 23, and 10% of total sales and 15% of total gross profits of Finger Lakes. *See* Vasile Aff. ¶ 21; *see also* Def. Mem. L. p. 3.[FN6] Accepting Plaintiffs' figures as accurate, neither presents a scenario of loss that would rise to the level of irreparable harm recognized by previous cases. *See Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.*, 1986 WL 13950, at *11 (E.D.N.Y. Sep.9, 1986) (no irreparable harm where sale of beers at issue constituted between 17 and 29 percent of distributor's total sales); *Lanvin, Inc. v. Colonia, Inc.*, 739 F.Supp. 182, 193 (S.D.N.Y.1990) (loss of 10 percent of gross sales not irreparable harm); *Litho Prestige v. News America Pub., Inc.*, 652 F.Supp. 804, 807 (S.D.N.Y.1989) (loss of 4 percent of business does not constitute irreparable harm). While Plaintiffs argue in their papers that Finger Lakes will go from a profitable to an unprofitable business, and, therefore, no longer survive, their own figures do not support the argument. Indeed, at the March 5, 2008 hearing, Plaintiffs' counsel conceded that it is unlikely that either plaintiff will go out of business if the distribution agreements for the Molson line are terminated.

FN5. Plaintiffs presented no witnesses at the March 5, 2008 hearing. Thus, the factual record for purposes of the preliminary inunction motion is confined to the affidavits submitted in support and in opposition thereto.

FN6. Defendant contends:

By Plaintiffs' own admission, the MOLSON® product line is a relatively small percentage of their overall business. To its credit, Plaintiff Doldo is at least candid with the Court in conceding this undeniable fact. See, e.g., Doldo Aff. 23 ("Molson Beer comprises 3-5% of Doldo Brother's [sic] total sales or approximately $500,000 in gross sales.") Doldo does not, however, volunteer its gross profit from the sale of MOLSON® beer. By Coors' calculation, Doldo's gross profit is $125,000 (Styles Decl. 5)-a number that pales in comparison to Doldo's total gross sales of more than $10 million (or more than $16 million if the five percent figure is accurate). Unlike Doldo, Plaintiff Finger Lakes does volunteer its gross profit from the sale of MOLSON® beer.... Finger Lakes' statistics (assuming their accuracy) establish that the MOLSON® product line generates no more than 12.84 percent of Finger Lakes' gross profit ($370,000 + $2,881,080)-far less than the percentage that New York courts have repeatedly found to be insufficient to prove irreparable harm under the precedents cited herein.

Def. Mem L. p. 3.

*6 Plaintiffs' argument that they will be irreparably harmed by the loss of "good will" associated with the loss of the Molson line is equally unavailing. Although the loss of good will can, in certain circumstances, equate with irreparable harm, simply invoking the phrase is insufficient to make the critical finding to support a preliminary injunction. The cases cited by Plaintiffs do not support the application of the rule here. In *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir.2004), the defendant had taken action that appeared to have been taken by the plaintiff (thereby confusing the plaintiff's cus-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tomers) and that cast the plaintiff's business in a negative light. *Id.* at 397.No such conduct by Defendant is present here.

In *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir.1977), the Second Circuit affirmed the District Court's finding that the loss of the defendant's product line presented "ample evidence to show a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages."*Id.* at 445.However, a review of the District Court's decision reveals that the loss in question threatened a major impact on the plaintiff's competitiveness. *See Jacobson & Co., Inc. v. Armstrong Cork Co.*, 416 F.Supp. 564, 569-570 (S.D.N.Y.1976).[FN7] For the reasons discussed, including Plaintiffs' figures showing that less than 15% of their sales come from the Molson line and counsel's concession that neither plaintiff will likely be put out of business by the loss, the *Jacobson* decision does not compel a finding that Plaintiffs will suffer irreparable harm in the absence of an injunction. The argument to the contrary, especially with no proof to back it up, is both remote and speculative. Further, the loss of some economic advantage is contemplated by Section 55-c, and, presumably, will be compensated if the Molson line is discontinued for Plaintiffs and compensation awarded. *See* ABC Law § 55-c(7)(a) and (2)(i).[FN8]

> FN7. In *Jacobson & Co., Inc.*, the plaintiff was "a contractor in the business of furnishing and installing acoustical ceiling tile and systems, partitions, and other interior assemblies."416 F.Supp. at 565-66. Defendant was the leading supplier of acoustical tiles in the industry. *Id.* With regard to the plaintiff's loss of the defendant's product line of acoustic ceiling tiles, the District Court wrote:
>
> While there appear to be adequate substitutes for many although not all Armstrong products, there is no doubt that Armstrong is the leader in the industry and that its products are often required in architect's specifications. Almost all of Jacobson's major competitors are Armstrong distributors, and Jacobson's purchases from Armstrong far exceed those from other manufacturers. Accordingly, it is likely that Jacobson will be placed at some competitive disadvantage in bidding jobs if Armstrong's refusal to deal with it continues.
>
> *Jacobson & Co., Inc.*, 416 F.Supp. at 569-570.

> FN8. Indeed, if the mere allegation that a multi-brand distributor would suffer a loss of good will and, therefore, irreparable harm, is enough to impose the drastic remedy of a preliminary injunction, it would stand to reason that a brewer could never implement a consolidation plan as contemplated by New York ABC Law Section 55-c if objected to by a distributor.

The Court concludes that Plaintiffs have not established that they will suffer irreparable harm in the absence of an injunction. Therefore, the motion for a preliminary injunction is denied.

***d. Cross-Motion to Stay Proceedings Pending Arbitration***

Next, the Court turns to Defendant's cross-motion to stay the instant proceedings pending arbitration. Implicit in this motion is the representation that Defendant will seek to arbitrate all underlying issues.

Section 3 of the Federal Arbitration Act ("FAA") provides that upon being satisfied that the issues involved in a suit are "referable to arbitration under an agreement in writing for such arbitration", the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."9 U.S.C. § 3.

There is no dispute that Finger Lakes signed the Molson Amendment to its distributorship agreement. *See* Vasile Aff. ¶ 10 & Ex. B. The Molson

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Amendment provides, in pertinent part at paragraph 6.2, that any and all disputes between Coors and plaintiff, "including without limitation a dispute as to whether the Company has grounds to terminate [the distributorship] Agreement," would be resolved by arbitration before the American Arbitration Association in accordance with the AAA Commercial Arbitration Rules. Further, there is no dispute that Doldo Brothers, Inc. signed the Molson Agreement. Doldo Aff. ¶ 11 & Ex. C. The Molson Agreement contains, at paragraph 11.2, dispute resolution language identical to that found in the Molson Amendment.

*7 The Federal Arbitration Act establishes a "federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), and mandates the enforcement of contractual arbitration provisions. The FAA provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."9 U.S.C. § 2. Challenges to the validity of a contract requiring arbitration of disputes "should ... be considered by an arbitrator, not a court."*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006).

The Court recognizes that there are grounds to challenge the enforcement of the arbitration provisions in issue here. However, for the reasons stated by Judge Stanton of the Southern District last week in *Spirit & Sanzone Dist. Co., Inc. v. Coors Brewing Company*, 08-civ-0251 (S.D.N.Y. Feb. 28, 2008), and for the reasons stated by Judge Garaufis of the Eastern District in *John G. Ryan, Inc. v. Molson USA, LLC*, 2005 WL 2977767 (E.D.N.Y. Nov.7, 2005), which reasons this Court adopts, the Court finds no grounds arising from New York ABC Law § 55-c, the Dormant Commerce Clause, or the Twenty-first Amendment that prevent the instant disputes from being arbitrated. As Judge Stanton pointed out, the Supreme Court held last month that "[t]he FAA's displacement of conflicting state law is now well established, and has been repeatedly reaffirmed."*Preston v. Ferrer*, --- U.S. ----, ----, 128 S.Ct. 978, 979, ---L.Ed.2d ----, ---- (2008)."When parties agree to arbitrate all questions arising under a contract, the FAA supersedes state laws lodging primary jurisdiction in another forum, whether judicial or administrative."*Preston*, 128 S.Ct. at 987.

Further, the Court finds no reason in the Webb-Kenyon Act, 27 U.S.C. § 122(a), or the Twenty-first Amendment Enforcement Act, 27 U.S.C. § 122(a), that would override the parties' agreement to arbitrate or that would supersede the clearly established federal policy in favor of enforcing those agreements. There is no indication in either of these acts that Congress intended to override the federal policy in favor of enforcing arbitration agreements between private parties.

Finally, the Court finds no reason arising from the other terms of the parties' agreements that would compel a contrary conclusion. By designating a forum for disputes that are not brought to arbitration, or by designating a choice of law for all disputes under the agreements, the parties have not expressed a clear intent to vitiate the arbitration clause of their agreements. The argument is illogical as it would lead to a complete expungement of the arbitration provisions, "a result forbidden by canons of construction."*Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir.2005). Further, under Second Circuit case law

> if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it: "[T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."*World-Crisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir.1997) (internal quotation marks omitted). Moreover, we "cannot nullify an arbitration clause unless the forum selection clause specific-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ally precludes arbitration."*Personal Sec. & Safety Systems v. Motorola*, 297 F.3d 388, 396 n. 11 (5th Cir.2002).

*8 *Id.*, at 284.None of the other provisions cited by Plaintiffs specifically precludes arbitration.

The issues being raised in this matter are arbitrable. *See id.*, at 281-82;[FN9] *Spirit & Sanzone Dist. Co., Inc. v. Coors Brewing Company*, 08-civ-0251, pp. 4-5 ("In addition, a clause referring 'any and all' controversies to arbitration is 'inclusive, categorical, unconditional and unlimited' and it is a 'broad grant of power to the arbitrators' which shows 'that the parties intended to arbitrate issues of arbitrability.'") (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199-1200 (2d Cir.1996)). Thus, under FAA Section 3, the Court must stay proceedings pending arbitration. *See Shearson/Am. Express. Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (Under 9 U.S.C. § 3, the court has a duty to stay these proceedings if it is satisfied that the issue before it is arbitrable, and "[t]his duty ... is not diminished when a party bound by an agreement raises a claim founded on statutory rights."). Therefore, Defendant's cross-motion to stay the instant proceedings pending arbitration is granted. If arbitration proceedings are not initiated with regard to both Plaintiffs within fourteen (14) days of the date of this Decision and Order, Plaintiffs may apply to vacate the stay order.

FN9. The Second Circuit stated in *Bank Julius Baer & Co., Ltd.*,

In deciding whether a dispute is arbitrable, we must answer two questions: (1) "whether the parties agreed to arbitrate," and, if so, (2) "whether the scope of [that] agreement encompasses the claims" at issue. *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 666 (2d Cir.1997). Consistent with the strong federal policy in favor of arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

424 F.3d at 281-82. In the instant case, doubts on these two points, if any, are resolved in favor of arbitration.

***e. Cross-Motion to Deposit Money with Court Pursuant to Rule 67***

Defendant also moves to deposit $1,291,000.00 into the Court pursuant to Fed.R.Civ.P. 67(a) for what it believes will ultimately be the compensation that it be required to pay Plaintiffs for terminating their exclusive territorial Molson distribution rights. Plaintiffs respond that they "are not concerned that Coors will not pay Plaintiffs if Coors is permitted by this Court to terminate them. Thus, a deposit under Rule 67 is not warranted in this instance."Plf. Reply Mem. L. p. 3.

Given Plaintiffs' position, the Court finds no reason for a Rule 67(a) deposit in this matter. *See John v. Sotheby's, Inc.*, 141 F.R.D. 29, 34 (S.D.N.Y.1992) (The goal of Rule 67 is to provide a safe place for an asset and relieve a depositor of the burden of administering an asset. It is generally utilized when the title to the asset is in dispute, not when liability is being disputed.). Therefore, the cross-motion in this regard is denied.

**IV. CONCLUSION**

For the reasons discussed above, Plaintiffs' motion for a preliminary injunction [dkt. # 6] is **DENIED.**Defendant's cross-motion to (a) deposit $ 1,291,000 into the Court pursuant to Fed.R.Civ.P. 67(a); and (b) stay litigation pending arbitration [dkt. # 10] is **GRANTED IN PART AND DENIED IN PART.**The motion is **GRANTED** inasmuch as the present action is **STAYED PENDING ARBITRATION.**If arbitration proceedings are not initiated with regard to both Plaintiffs within fourteen (14) days of the date of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 657252 (N.D.N.Y.)
(Cite as: Slip Copy)

Page 10

this Decision and Order, Plaintiffs may apply to vacate the stay order. During the stay, Defendant shall submit to the Court a status report every ninety (90) days apprising the Court of the status of the arbitrations. The motion is **DENIED** as to the request to deposit $1,291,000 into the Court pursuant to Fed.R.Civ.P. 67(a).

***9 IT IS SO ORDERED.**

N.D.N.Y.,2008.
Doldo Bros., Inc. v. Coors Brewing Co.
Slip Copy, 2008 WL 657252 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE

Positive
As of: Apr 03, 2008

**HAMPSHIRE EQUITY PARTNERS II, L.P., Plaintiff, v. TERADYNE, INC. and TERADYNE CONNECTION SYSTEMS DIVISION, Defendants.**

**04 Civ. 3318 (LAP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2005 U.S. Dist. LEXIS 5261**

**March 30, 2005, Decided**
**March 30, 2005, Filed**

**SUBSEQUENT HISTORY:** Affirmed by Hampshire Equity Partners. II, L.P. v. Teradyne, Inc., 2005 U.S. App. LEXIS 28817 (2d Cir. N.Y., Dec. 20, 2005)

**DISPOSITION:** [*1] Defendants' motion to dismiss [Docket No. 6] granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed a motion to dismiss plaintiff's fraud action pursuant to Fed. R. Civ. P. 9(b) and Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** Plaintiff alleged that it was fraudulently encouraged by defendants to invest in a corporation and that it lost that investment when the corporation declared bankruptcy. Plaintiff claimed that defendants feared that without the investment the corporation, a major supplier of defendants, would go bankrupt, leaving them without a major supplier to handle the increase in projected production and sales. Plaintiff, however, also alleged that defendants were looking to eliminate the corporation as one of its suppliers. In granting defendants' motion to dismiss, the court held that the complaint did not allege any legally cognizable theory of motive or any specific facts giving rise to a strong inference that any allegedly fraudulent statement was knowingly false when made. The court held that vague and conclusory allegations that defendants allegedly had access to non-public information, including matters discussed at internal meetings or contained in unspecified internal documents, did not suffice. The court also held that it was infinitely more probable that the proximate cause of plaintiff's loss of its investment was a general market decline and not defendants' encouragement.

**OUTCOME:** The court granted defendants' motion to dismiss.

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***

[HN1] Fed. R. Civ. P. 9(b) requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. In addition, a complaint alleging fraud must (1) specify the statements that plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN2] Fed. R. Civ. P. 9(b) provides that malice, intent, knowledge, and other condition of mind may be averred generally. Since Fed. R. Civ. P. 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit, the relaxation of Fed. R. Civ. P. 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. Therefore, a fraud plaintiff must allege facts that give rise to a strong inference of fraudulent intent. Plaintiffs can establish the requisite strong inference of fraudulent intent either by demonstrating that defendants had both motive and opportunity to commit fraud, or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Governments > Fiduciary Responsibilities*
*Torts > Business Torts > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview*
[HN3] Fed. R. Civ. P. 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty, statutory, common law, tort, contractual, or fiduciary.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Motive & Opportunity*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN4] Scienter may be adequately plead by alleging motive and opportunity to commit fraud or specific facts giving rise to strong circumstantial evidence of conscious misbehavior or recklessness.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Criminal Law & Procedure > Accusatory Instruments > General Overview*
*Torts > Negligence > Causation > General Overview*
[HN5] A failure to adequately plead causation is fatal to a common law fraud claim under New York law. A complaint shall be dismissed if the plaintiffs have

completely failed to show how they were damaged by the alleged fraud, a showing required by Fed. R. Civ. P. 9(b). To establish causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered. In other words, the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the investment. If the relationship between the plaintiff's loss and the information misstated or concealed by the defendant is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie. Therefore, the fraud and injury must be connected; it must appear in an appreciable sense that the damage flowed from fraud as proximate and not remote cause.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN6] When a plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the probability that the loss was caused by an alleged fraud decreases.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
[HN7] The decision whether to grant a plaintiff leave to amend the complaint rests within the sound discretion of the court. In general, leave to replead should be freely given when justice so requires. Fed. R. Civ. P. 15(a). Nevertheless, leave to replead may be denied if repleading would be futile. Where it appears that granting leave to amend is unlikely to be productive, it is not an abuse of discretion to deny leave to amend.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN8] An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

COUNSEL: For Hampshire Equity Partners II, L.P., Plaintiff: Michael Jude Lane, Lauren Constance Bisordi, Anderson Kill & Olick, P.C., New York, NY.

For Teradyne, Inc., Teradyne Connection Systems Division, Defendants: Jason D. Frank, Katten Muchin Zavis Rosenman, New York, NY; Anthony L. Paccione,

Kirschstein, Ottinger, Israel & Schiffmiller, P.C, New York, NY.

**JUDGES:** Loretta A. Preska, U.S.D.J.

**OPINION BY:** Loretta A. Preska

**OPINION**

MEMORANDUM AND ORDER

LORETTA A. PRESKA, United States District Judge:

The plaintiff in this case claims to have lost a $ 55 million investment based on a single phone call. Hampshire Equity Partners II, L.P. ("Plaintiff") alleges that it was fraudulently encouraged by Mark Emerson, an executive at Teradyne Inc. ("Teradyne") and Teradyne Connection Systems Division ("TSC") (collectively, "Defendants"), to invest $ 55 million in Connector Services Corporation ("CSC") in November 2000 and that it lost that investment when CSC declared bankruptcy in 2003. Presently before the Court is Defendants' motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) [*2] .

I. *Background*

Plaintiff is a private equity firm that "invests in middle-market companies with the goal of helping them to execute their growth plans and enhance their value." (Compl., P10.) During the second half of 2000, Plaintiff explored an investment in CSC, a provider of "out-source component manufacturing for electronic connector companies such as Teradyne." (*Id.*) Plaintiff conducted due diligence on CSC, hiring LEK Consulting ("LEK") to assist it in that effort. LEK "provides clients with strategic advice and commercial support on major decisions and investments." (Compl. P12.) As part of its work for Plaintiff, LEK contacted various CSC customers, including Teradyne, to gather information. (Compl. P13.)

On November 3, 2000, LEK interviewed Mark Emerson ("Emerson"), an executive and agent of Teradyne and TCS, over the telephone. (Compl. PP1, 14.) Plaintiff describes Emerson as CSC's "main contact" at Teradyne and TSC. (*Id.*) During this phone call, Plaintiff alleges that Emerson described CSC as: (1) having a "very strong" business relationship with TCS; (2) poised for "increased growth . . . in the future" with TCS; (3) among "the top two" of TCS' suppliers; [*3] (4) among "the best suppliers out there"; (5) likely going to receive 75% of TCS' future business; and (6) likely to preserve a business relationship with TCS even in the event of an economic downturn. (Compl. PP16-19.)

However, Plaintiff also alleges that, at the time of the interview, Emerson: (1) knew his growth numbers were grossly inflated and inaccurate; (2) knew that CSC was only TCS's third largest supplier; (3) knew that if Plaintiff did not invest in CSC it would file for bankruptcy, and TCS needed CSC to stay in business in the event there was an increase in TCS' volume; and (4) was looking to eliminate CSC as one of TCS' suppliers. (Compl. PP17-21.)

On January 18, 2001, Emerson participated in a conference call with Plaintiff, Teradyne, and CSC in which Emerson confirmed his prior positive statements about CSC and stated that CSC "would be in a league of its own." (Compl. P22.) On February 21, 2001, Plaintiff entered into an agreement with CSC, investing approximately $ 55 million and becoming CSC's majority owner. (Compl. PP26-27.) Thereafter, TCS' business with CSC declined dramatically. (Compl. P29.) More than two years later, on September 24, 2003, CSC filed for bankruptcy. [*4] (Compl. P30.)

Plaintiff filed a six-count complaint ("Complaint") on April 30, 2004, seeking to hold Defendants responsible for the entire $ 55 million loss on each individual count. The specific counts of the Complaint are: (1) fraud; (2) fraudulent inducement; (3) fraudulent concealment; (4) fraudulent misrepresentation; (5) intentional interference with economic opportunity; and (6) negligent misrepresentation. Each of these claims fails to satisfy Rule 9(b)'s heightened pleading standard. Therefore, Defendants' motion to dismiss is granted. [1]

1 Because Plaintiff's complaint is appropriately dismissed under Rule 9(b), I need not reach Defendant's Rule 12(b)(6) motion. However, I have considered the 12(b)(6) motion and I find it equally persuasive. *See* IV, infra.

II. *Standard for Dismissal Under Rule 9(b)*

[HN1] Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P.

9(b) [*5] . In addition, a complaint alleging fraud must "'(1) specify the statements that plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Novak v. Kasaks*, 216 F.3d 300, 306 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993))).

[HN2] Rule 9(b) also provides that "malice, intent, knowledge, and other condition of mind may be averred generally." Fed. R. Civ. P. 9(b). Explaining the construction of Rule 9(b), the Court of Appeals in *Shields* noted that:

> Since Rule 9(b) is intended "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit . . . , the relaxation of Rule 9(b)'s specificity requirement for scienter "'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'"

*Shields*, 25 F.3d at 1128 [*6] (internal quotations omitted). Therefore, a fraud plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." Plaintiffs can establish the requisite "strong inference of fraudulent intent" either by demonstrating "that defendants had both motive and opportunity to commit fraud, or [] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001).

III. *Discussion*

As a threshold matter, I note that Rule 9(b) applies to Plaintiff's fraud claims (Counts One through Four) in addition to Plaintiff's claims for intentional interference with economic opportunity (Count Five) and negligent misrepresentation (Count Six). *See Frota v. Prudential-Bache Securities*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ([HN3] "Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty -- statutory, common law, tort, contractual or fiduciary."); *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 500 (S.D.N.Y. 2002) (applying Rule 9(b) to tortious interference claim that sounded in fraud); *Simon v. Castello*, 172 F.R.D. 103, 105-106 (S.D.N.Y. 1997) [*7] (applying Rule 9(b) to negligent misrepresentation claim that sounded in fraud). [2]

> 2 Plaintiff argues that Rule 9(b) does not apply to Count Five, intentional interference with economic opportunity. In support of that argument, Plaintiff cites *P.A. Bergner v. Martinez*, 823 F. Supp. 151, 163 (S.D.N.Y. 1993), claiming that Defendants rely on the case in their moving brief. As an initial matter, Defendants do not cite *Bergner* anywhere in their opening brief. More importantly, in *Bergner*, the Court ruled that the complaint at issue satisfied Rule 9(b)'s pleading requirements, and hence did not address the question of whether Rule 9(b) applies to a claim of intentional interference with economic opportunity that sounds in fraud. *Id.*

There is no doubt that Counts Five and Six are based on the same allegedly fraudulent conduct as Counts One through Four, that is, on the same "averments of fraud." In fact, the Complaint repeats and realleges in Counts Five and Six the same facts that provide [*8] the basis for the four preceding fraud claims. (Compl. PP60, 65.) Accordingly, all of Plaintiff's claims are subject to the strict pleading requirements of Rule 9(b). As more fully described below, Plaintiff's claims fail to meet those strict pleading requirements with respect to scienter and causation.

A. *Scienter*

[HN4] Scienter may be adequately plead by alleging motive and opportunity to commit fraud or specific facts giving rise to strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit*, 264 F.3d at 138-39. Plaintiff has failed to satisfy this requirement. The Complaint does not allege any legally cognizable theory of motive or any specific facts giving rise to a strong inference that any allegedly fraudulent statement was knowingly false when made.

In terms of motive, the Complaint states that Defendants intended to defraud Plaintiff because Defendants feared that CSC would go bankrupt, leaving them without a major supplier to handle the increase in projected production and sales. For this reason, Plaintiff claims that Defendants concealed from Plaintiff their

intent to terminate CSC as a supplier. To that end, the Complaint reads: [*9]

> The reality was that TCS had widespread, long-standing problems with CSC's products and services . . . .Emerson knew at the time that he was speaking to LEK, that if Hampshire did not invest in CSC, CSC would likely file for bankruptcy protection. Emerson purposely made these representations because TCS needed CSC to stay in business in the event that there was an increase in TCS' business. . . .At the time of Emerson's interview with LEK, TCS was looking to eliminate CSC as one of its suppliers.
>
> When confronted about why he gave a fraudulent due diligence interview, Emerson stated he did it to preserve an alternate source of supply, because TCS "needed a deep pocket investor" for CSC, in order to keep CSC's business operating, particularly in the event TCS' business increased in 2001 as expected.

(Compl. PP20, 21, 31.) Therefore, according to Plaintiff, Defendants had long-standing problems with CSC's products and services and had no intention of keeping CSC as a supplier but were simultaneously motivated to engage in fraud because Defendants needed CSC as a healthy supplier in the future. [3]

> 3 Plaintiff objects to this reading of the Complaint and describes Defendants as "hedging their bets" and attempting to preserve an alternate supply "in the event that Defendants enjoyed an increase in demand the following year." (Pl's. Br. at 21.) This recharacterization of the allegations in the Complaint does not resolve the inconsistency -- describing Defendants' intention to retain CSC as a potential supplier plainly conflicts with the assertion that Defendants were planning to terminate CSC as a supplier.

[*10] As a matter of law, such allegations of irrational motive cannot support a fraud claim under Rule 9(b). *In re 1993 Corning Secs. Litig.*, No. 93 Civ. 7015, 1996 U.S. Dist. LEXIS 6601, at *21 (S.D.N.Y. May 15, 1996) (granting motion to dismiss where plaintiff's theory of motive was illogical); *see also Kalnit*, 264 F.3d at 140-41 (affirming dismissal of fraud complaint where plaintiffs' view defies economic reason); *Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (dismissing fraud claims where plaintiff's view of the facts defies economic reason and therefore does not yield a reasonable inference of intent). Plaintiff has not alleged any legally cognizable theory of motive to commit fraud; therefore, I find that Plaintiff has not adequately pled scienter through motive and opportunity.

The Complaint also fails adequately to plead scienter because it does not contain any specific facts giving rise to a strong inference that any challenged statement was knowingly false when made. Vague and conclusory allegations that a defendant allegedly had access to non-public information, including matters discussed [*11] at internal meetings or contained in unspecified internal reports and documents, do not suffice. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiff's unsupported general claim of the existence of confidential company sales reports that revealed a larger decline in sales is insufficient to survive a motion to dismiss."); *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 52-53 (E.D.N.Y. 1999) (holding that an unsupported general claim of the existence of confidential company reports containing adverse information is insufficient to survive a motion to dismiss).

In this regard, not only does the Complaint fail to describe any documents, reports, or conversations that would give rise to an inference of scienter, the Complaint alleges almost no supporting facts at all. [4] The sole reference to any facts supporting an inference that Emerson knew his statements were false when he made them is the following allegation:

> Senior executives of Teradyne and TCS were made aware of the false and fraudulent statements Emerson made on defendants' behalf. They did nothing to correct [*12] the Report or to give truthful information to LEK or Hampshire.

(Compl. P23.) This allegation is conclusory and is unsupported by a single additional reference in the Complaint. There is no basis, therefore, to draw any inference that Defendants made the allegedly fraudulent

statements knowing they were false. For this reason as well, the Complaint fails adequately to plead scienter with the specificity required under Rule 9(b).

4 This omission is probably attributable to the fact that half of Emerson's allegedly fraudulent statements are forecasts of future TCS business prospects (Compl. PP16, 17, 19) and the other half are opinions about CSC's business (Compl. PP19, 22), both of which courts have routinely held cannot support a fraud claim. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 558 (S.D.N.Y. 2004) (conference call statements regarding future growth of pharmaceutical product are plainly opinions, not guarantees and not actionable); *Bavaria Int'l Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.*, No. 03 Civ. 0377, 2003 U.S. Dist. LEXIS 13197, at *17 (S.D.N.Y. July 30, 2003) (alleged fraudulent statement was nothing more than an expression of corporate optimism); *Dooner v. Keefe, Bruyette & Woods, Inc.*, 157 F. Supp. 2d 265, 280 (S.D.N.Y. 2001) (fraud allegation based on prediction or promise of future IPO not actionable); *DH Cattle Holdings Co. v. Smith*, 195 A.D.2d 202, 607 N.Y.S.2d 227, 231 (App. Div. 1st Dept. 1994) (statement that a tax shelter was a safe investment found to be non-actionable as mere opinion and puffery).

[*13] B. *Causation*

[HN5] A failure to adequately plead causation is "fatal to a common law fraud claim under New York law." *Bennett v. United States Trust Co. of N.Y.*, 770 F.2d 308, 316 (2d Cir. 1985). A complaint shall be dismissed if "the plaintiffs have completely failed to show how they were damaged by the alleged fraud, a showing required by Rule 9(b)." *Aquino v. Trupin*, 833 F. Supp. 336, 342 (S.D.N.Y. 1993). To establish causation, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). In other words, "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the [investment]." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). If the relationship between the plaintiff's loss and the information misstated or concealed by the defendant is "attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged mistatements or omissions and [*14] the harm actually suffered, a fraud claim will not lie." *Id.* at 174 (internal citations omitted). Therefore, the fraud and injury "must be connected; it must appear in an appreciable sense that the damage flowed from fraud as proximate and not remote cause." *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1496 (2d Cir. 1992).

Plaintiff's Complaint makes only a feeble attempt to show that the alleged fraud proximately caused the loss of the $ 55 million investment. The Complaint reads, in part:

> Eventually, TCS' use of CSC as a supplier of connectors declined dramatically. On or about September 24, 2003, CSC filed for bankruptcy protection.

(Compl. PP29-30.) These statements hardly draw a causal link between the alleged decline in CSC's business with TCS and CSC's 2003 bankruptcy, much less draw any link to the allegedly fraudulent comments made by Emerson in 2000, some three years earlier. As in the Citibank case, Plaintiff "suggests no reason why the investment was wiped out. [Plaintiff] has alleged the cause of [its] entering into the transaction in which [Plaintiff] lost money, but not the cause of the transaction's turning out [*15] to be a losing one." *Citibank*, 968 F.2d at 1495, *see also Lentell*, 396 F.3d at 176-78) (no proximate cause for loss other than direct intervention of a market collapse). [5]

5 Plaintiff cites to *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980), and *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004), to support the contention that "but for" causation, *i.e.*, that Plaintiff would not have made the transaction "but for" the alleged fraudulent statements, satisfies the causation requirement of Rule 9(b).

However, both cases are distinguishable from the present facts. In *Marbury*, the plaintiff was induced to purchase securities when an individual falsely represented that he was a licensed broker. *Marbury*, 629 F.2d at 707. No similar representation was made here, and thus it is factually inapplicable. In *Fogarazzo*, loss causation was pleaded where defendants allegedly

lied about the financial health of a company which ultimately failed because of the very facts defendants misrepresented. *Fogarazzo*, 341 F. Supp. 2d at 286. Here, not only has Plaintiff failed to create an inference of dishonesty in any of Defendants' optimistic statements about future business, but there is simply no allegation to connect Defendants' alleged misrepresentations to the loss of Plaintiff's investment three years later.

[*16] Furthermore, [HN6] when a plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the probability that the loss was caused by an alleged fraud decreases. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994). Although I need not reach the existence of causation, it is infinitely more probable that the proximate cause of CSC's bankruptcy and Plaintiff's loss of its $ 55 million investment was the overall decline in the high-tech market rather than any collection of optimistic statements from a single telephone call on November 3, 2000. Here, Plaintiff has not pled any facts to support an alternate theory. I find that Plaintiff has not adequately pled causation and that the Complaint must be dismissed under Rule 9(b).

C. *Leave to Amend the Complaint*

[HN7] The decision whether to grant Plaintiff leave to amend the Complaint rests "within the sound discretion of the court." *American Stock Exch., LLC v. Mopex, Inc.*, 230 F. Supp. 2d 333, 335 (S.D.N.Y. 2002). In general, leave to replead should be "freely given when justice so requires." Fed. R. Civ. P. 15(a) [*17] ; *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Nevertheless, leave to replead may be denied if repleading would be futile. *See Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend.") (internal quotation marks omitted).

Permitting Plaintiff to replead its fraud claims would be futile. No amount of repleading will allow a sophisticated investor like Plaintiff to convert one customer of its investee into a guarantor of its $ 55 million investment for "the small price of a phone call." *See Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 705-706, 597 N.E.2d 1080, 586 N.Y.S.2d 87 (1992). Accordingly, Plaintiff cannot overcome either: (1) the illogical nature of the described fraud -- Emerson's encouraging Plaintiff to invest in CSC to preserve CSC for future business while simultaneously planning to sever all ties with CSC; or (2) the forward-looking nature of the alleged fraudulent statements -- Emerson's comments are non-actionable projections of future TCS business [*18] and opinions as to CSC's financial prospects, not statements of fact based on inside information. Therefore, repleading will not allow Plaintiff to satisfy Rule 9(b)'s scienter requirement.

Plaintiff will also be unable to replead to satisfy Rule 9(b)'s causation requirement. While repleading would allow Plaintiff to supplement its Complaint with information establishing the connection between CSC's bankruptcy and the decline in TCS' business, creating a connection between Emerson's phone call and Plaintiff's loss of its investment three years later after the high-tech bubble burst is another matter entirely. On the record before me, I find that Plaintiff cannot plead the required causation. For these reasons, Plaintiff's request to replead is denied.

IV. *Defendants' Rule 12(b)(6) Motion*

As previously noted, because I dismiss Plaintiff's Complaint pursuant to Rule 9(b), I need not directly address Defendants' Rule 12(b)(6) motion. However, having considered Defendants' Rule 12(b)(6) arguments, I find them as persuasive as Defendants' Rule 9(b) arguments. Regarding Plaintiff's Counts One through Four and Six, Defendants' allegedly fraudulent statements are not actionable [*19] as they either concern future business, are opinions about CSC's financial condition, or are simply unsupported. [6] On Count Three, the Complaint does not allege any special relationship between Teradyne and Plaintiff sufficient to sustain a fraudulent concealment claim, and the commercial relationship they shared is insufficient. Count Six, the negligent misrepresentation claim, suffers from the same weakness. Finally, Count Five, Plaintiff's claim for intentional interference with economic opportunity, is fundamentally flawed, as Defendants simply did not disturb, sever, or adversely affect the business relationship between Plaintiff and CSC in any way. Accordingly, I find that Defendants' 12(b)(6) motion to dismiss would also succeed. [7]

6 By 'unsupported,' I refer to the lack of any financial justification to show that Emerson's statement that CSC was "among TCS' top two

suppliers" was inaccurate or fraudulent in any way. (Compl. P18.)

7   As further justification for denial of Plaintiff's request to replead, [HN8] "an amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente*, 310 F.3d at 258 (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)).

[*20]  V. *Conclusion*

For these reasons, Defendants' motion to dismiss [Docket No. 6] is granted. The Clerk of the Court shall mark this matter closed and all pending motions denied as moot.

**SO ORDERED**

March 30, 2005

Loretta A. Preska, U.S.D.J.

LEXSEE

Analysis
As of: Apr 03, 2008

**IN RE INSURANCE BROKERAGE ANTITRUST LITIGATION; IN RE EMPLOYEE-BENEFIT INSURANCE BROKERAGE ANTITRUST LITIGATION;**
**This Document Relates To: ALL ACTIONS**

**MDL Docket No. 1663, Civ. No. 04-5184 (GEB), Civ. No. 05-1079 (GEB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2007 U.S. Dist. LEXIS 64767**

**August 31, 2007, Decided**
**August 31, 2007, Filed**

**NOTICE:** NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Motion granted by In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 65037 (D.N.J., Aug. 31, 2007)

**PRIOR HISTORY:** In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 47659 (D.N.J., June 29, 2007)

**COUNSEL:** [*1] For EAGLE PRODUCTS, INC., Movant: HOWARD J. SEDRAN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA.

For STEPHEN LEWIS, Plaintiff: ADAM J LEVITT, FRED TAYLOR ISQUITH, WOLF HALDENSTEIN ADLER FREEMAN & HERTZ LLP, CHICAGO, IL; JAYNE ARNOLD GOLDSTEIN, MAGER & GOLDSTEIN LLP, CORAL SPRINGS, FL; KENNETH I. TRUJILLO, PHILADELPHIA, PA; MARK C. RIFKIN, WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ, LLP, NEW YORK, NY; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For DIANE PRUESS, Plaintiff: ADAM J LEVITT, FRED TAYLOR ISQUITH, MARY JANE EDELSTEIN FAIT, WOLF HALDENSTEIN ADLER FREEMAN & HERTZ LLP, CHICAGO, IL; JAYNE ARNOLD GOLDSTEIN, MAGER & GOLDSTEIN LLP, CORAL SPRINGS, FL; KENNETH I. TRUJILLO, PHILADELPHIA, PA; MARK C. RIFKIN, WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ, LLP, NEW YORK, NY; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For OPTICARE HEALTH SYSTEMS INC. (CIVIL 05-1168), Plaintiff: EDITH M. KALLAS, MILBERG, WEISS, BERSHAD & SCHULMAN, LLP, NEW YORK, NY; JOE R. WHATLEY, CHARLENE P. FORD, OTHNI J. LATHRAM, RICHARD P. ROUCO, WHATLEY, DRAKE, LLC, BIRMINGHAM, AL; JOHN J. STOIA, MARY LYNNE CALKINS, RACHEL LYNN JENSEN, THEODORE JOSEPH [*2] PINTAR, LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, LLP; SAN DIEGO, CA; JOSEPH P. GUGLIELMO, LILI R. SABO, WHATLEY DRAKE & KALLAS, NEW YORK, NY; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; BONNY ELAINE SWEENEY, JAMES DANIEL MCNAMARA, LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS, SAN DIEGO, CA; PETER S. PEARLMAN, COHN, LIFLAND, PEARLMAN, HERRMANN & KNOPF,

LLP, SADDLE BROOK, NJ.

For MARYANN WAXMAN, (CIVIL 05-1079), Plaintiff: KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; LILI R. SABO, WHATLEY DRAKE & KALLAS, NEW YORK, NY; PETER S. PEARLMAN, COHN, LIFLAND, PEARLMAN, HERRMANN & KNOPF, LLP, SADDLE BROOK, NJ.

For SUNBURST HOSPITALITY CORPORATION, (CIVIL 04-5742), Plaintiff: ELLEN MERIWETHER, MELODY FORRESTER, MICHAEL STEVEN TARRINGER, TIMOTHY FRASER, BRYAN L. CLOBES, MILLER, FAUCHER & CAFFERTY, LLP, PHILADELPHIA, PA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For GOLDEN GATE BRIDGE, HIGHWAY AND TRANSPORTATION DISTRICT, REDWOOD OIL CO, Plaintiffs: FREDERICK P. FURTH, MICHAEL P. LEHMANN, [*3] THOMAS P. DOVE, JON T. KING, THE FURTH FIRM LLP, SAN FRANCISCO, CA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; JULIO J. RAMOS, THE FURTH FIRM LLP, SAN FRANCISCO, NJ.

For SHELL VACATIONS LLC, Plaintiff: DOUGLAS A. MILLEN, STEVEN A. KANNER, WILLIAM HENRY LONDON, MUCH, SHELIST, FREED, DENENBERG, AMENT & RUBENSTEIN, PC, CHICAGO, IL; FREDERICK P. FURTH, MICHAEL P. LEHMANN, THOMAS P. DOVE, JON T. KING, THE FURTH FIRM LLP, SAN FRANCISCO, CA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; JULIO J. RAMOS, THE FURTH FIRM LLP, SAN FRANCISCO, NJ.

For BAYOU STEEL CORP, (CIVIL NO. 05-1800), Plaintiff: AUSTIN B COHEN, HOWARD J. SEDRAN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS,

PHILADELPHIA, PA US.

For REDWOOD OIL COMPANY, (CIVIL NO. 05-1798), Plaintiff: JAMES S. SHEDDEN, LAWRENCE WILEY SCHAD, MICHAEL S HILICKI, TONY KIM, BEELER, SCHAD & DIAMOND, PC, CHICAGO, IL; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO , TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, [*4] PA US; W. TIMOTHY NEEDHAM, JANSSEN MALLOY NEEDHAM MORRISON REINHOLTSEN & CROWLEY, EUREKA, CA.

For CLEAR LAM PACKAGING INC, (CIVIL 05-1797), Plaintiff: KATHLEEN CURRIE CHAVEZ, CHAVEZ LAW FIRM, GENEVA, IL; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT M. FOOTE, FOOTE, MEYERS, MIELKE & FLOWERS, GENEVA, IL; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For DR ROBERT H KIMBALL, (CIVIL 05-2374), Plaintiff: JAMES L REED, TRAVIS SCOTT CRABTREE, LOOPER REED & MCGRAW, HOUSTON, TX; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For DAVID BOROS, (CIVIL NO. 05-1793), Plaintiff: CADIO ZIRPOLI, GEOFFREY C. RUSHING, SAVERI & SAVERI, SAN FRANCISCO, CA; GUIDO SAVERI, RICHARD ALEXANDER SAVERI, SAVERI & SAVERI, INC., SAN FRANCISCO, CA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For SHELDON LANGENDORF, (CIVIL 05-3284), ESTELLE LANGENDORF, (CIVIL 05-3284), Plaintiffs: KENNETH I. TRUJILLO, PHILADELPHIA, PA; LARRY R. DRURY, CHICAGO, IL; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For Cellect, LLC, City of Stamford, Gateway Club Apartments, Ltd., [*5] Michigan Multi-King Corp., GLENN SINGER, The Enclave, LLC, The Omni Group of Companies, Plaintiffs: KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS,

PHILADELPHIA, PA US.

For COMCAR INDUSTRIES, INC., Plaintiff: KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; JOSEPH PRESTON STROM, STROM LAW FIRM LLC, COLUMBIA, SC US; MARIO ANTHONY PACELLA, STROM LAW FIRM LLP, COLUMBIA, SC US.

For ROBERT MULCAHY, Plaintiff: ELLEN MERIWETHER, MELODY FORRESTER, MICHAEL STEVEN TARRINGER, MILLER, FAUCHER & CAFFERTY, LLP, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For SIGNUM LLC, (CIVIL NO. 05-4047), Plaintiff: ARTHUR CAMDEN LEWIS, LEWIS, BABCOCK & HAWKINS, LLP, COLUMBIA, SC; JAMES M. GRIFFIN, JAMES M. GRIFFIN LAW OFFICE, COLUMBIA, SC; KENNETH I. TRUJILLO, PHILADELPHIA, PA; RICHARD A HARPOOTLIAN, COLUMBIA, SC; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For KLLM INC, (CIVIL NO. 05-4046), Plaintiff: ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; ROY H. LIDDELL, THOMAS M. LOUIS, JULIE C. SKIPPER, WELLS, MARBLE & HURST, PLLC, JACKSON, MS.

For FORTUNE BRANDS INC, (CIVIL NO. 05-4137), Plaintiff: ERNEST SUMMERS, III, LISA COLLEEN SULLIVAN, HOWREY, SIMON, ARNOLD & WHITE, LLP, CHICAGO, IL US; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US; THOMAS LOUIS RUFFNER, HOWREY LLP, CHICAGO, IL US.

For SLAY INDUSTRIES, (CIVIL NUMBER 05-5698), Plaintiff: JEFFREY J. LOWE, ST. LOUIS, MO; KENNETH I. TRUJILLO, PHILADELPHIA, PA; MICHAEL J. FLANNERY, CAREY & DANIS, ST. LOUIS, MO; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For SLAY TRANSPORTATION CO INC, (CIVIL NUMBER 05-5698), Plaintiff: JEFFREY J. LOWE, ST. LOUIS, MO; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For PALM TREE [*6] COMPUTERS SYSTEMS INC, (CIVIL NO. 05-5238), DELTA RESEARCH INSTITUTE INC, (CIVIL NO. 05-5238), Plaintiffs: DAVID HUGHES HARRIS, GOLDSTEIN, BUCKLEY, CECHMAN, RICE & PURTZ, PA, FORT MYERS, FL; KENNETH G. GILMAN, GILMAN & PASTOR, LLP, BOSTON, MA; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, [*7] PA US.

For EMERSON ELECTRIC CO., (CIVIL NO. 05-5697), Plaintiff: DOROTHY L. WHITE-COLEMAN, WHITE, COLEMAN & ASOCIATES, LLC, ST. LOUIS, MO US; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For DELTA PRIDE CATFISH INC, (CIVIL NO. 05-5290), Plaintiff: JULIE C. SKIPPER, ROY H. LIDDELL, WELLS, MARBLE & HURST, PLLC, JACKSON, MS; KENNETH I. TRUJILLO, PHILADELPHIA, PA; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For CAMERON OFFSHORE BOATS INC, (CIVIL NO. 05-5696), Plaintiff: H. ALAN MCCALL, STOCKWELL SIEVERT, LAKE CHARLES, LA US; JOSEPH N. KRAVEC, SPECTER & SPECTER, PITTSBURG, PA US; ROBERT ANDREW SANTILLO, TRUJILLO, RODRIGUEZ & RICHARDS, PHILADELPHIA, PA US.

For Tri-State Container Corp., Plaintiff: NATALIE FINKELMAN BENNETT, SHEPHERD, FINKELMAN, MILLER & SHAH, LLC, COLLINGSWOOD, NJ.

Connecticut Spring & Stamp Co., Plaintiff, Pro se.

For BELMONT HOLDINGS CORP., PLAINTIFF IN CIV. 05-5533, Plaintiff: CHRISTINA DONATO SALER, KOHN SWIFT & GRAF, PHILADELPHIA,

PA US.

For AMERICAN STANDARD, INC., PLAINTIFF
FROM DOCKET 05-4573, AMERICAN STANDARD
COMPANIES, INC., PLAINTIFF IN DOCKET 05-4573,
Plaintiffs: [*8] BARBARA T. SICALIDES, PEPPER,
HAMILTON, PHILADELPHIA, PA; JOANNA J.
CLINE, PEPPER HAMILTON LLP, CHERRY HILL,
NJ.

For SINCLAIR OIL CORP, Plaintiff in 06-3844,
Plaintiff: GEORGE M. HALEY, J. ANDREW
SJOBLOM, E. BLAINE RAWSON, HOLME
ROBERTS & OWEN, SALT LAKE CITY, UT US.

AIR LIQUIDE AMERICA L.P., Plaintiff, Pro se.

AIR LIQUIDE LARGE INDUSTRIES U.S. LP, Plaintiff,
Pro se.

AIR LIQUIDE USA LLC, Plaintiff, Pro se.

AL America Holdings, LLC, Plaintiff, Pro se.

American Air Liquide Holdings, Inc., Plaintiff, Pro se.

American Air Liquide, Inc., Plaintiff, Pro se.

American Plumbing and Mechanical, Inc., Plaintiff, Pro
se.

Huntsman Advance Materials LLC, Plaintiff, Pro se.

HUNTSMAN CORPORATION, Plaintiff, Pro se.

Huntsman Holdings, LLC, Plaintiff, Pro se.

HUNTSMAN LLC, Plaintiff, Pro se.

International Risk Insurance Company, Plaintiff, Pro se.

John Baird, Plaintiff, Pro se.

PLAINT CORPORATION, Plaintiff, Pro se.

For MARK TOBEY, KIM VAN WINKLE, Intervenor
Plaintiffs: GREGG ABBOTT, AUSTIN, TX US.

For MARSH & MCLENNAN COMPANIES, INC.,
Defendant: ANDREW T. BERRY, GARY N. WILCOX,
MCCARTER & ENGLISH, LLP, NEWARK, NJ; C.
LARRY CORBO, III, CAROLE ELAINE HOWARD,
JACKSON WALKER LLP, HOUSTON, TX;

CHRISTOPHER J. ST. JEANOS, [*9] JOHN ROBERT
OLLER, MITCHELL JAY AUSLANDER, WILLKIE
FARR & GALLAGHER, NEW YORK, NY US;
DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER,
SNOW, O'MARA, STEVENS & CANNADA, PLLC,
JACKSON, MS US; FREDERICK BARTLETT
WULFF, SR, JACKSON WALKER LLP, DALLAS,
TX; GREGORY K. CONWAY, WILLKIE, FARR &
GALLAGHER, WASHINGTON, DC US; KEVIN F
HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER
& HEMKER, ST LOUIS, MO US; KEVIN F.
O'MALLEY, WILLIAM F. GRACE, CHAFFE
MCCALL, NEW ORLEANS, LA US.

For MARSH INC., Defendant: ANDREW T. BERRY,
GARY N. WILCOX, MCCARTER & ENGLISH, LLP,
NEWARK, NJ; CAROLE ELAINE HOWARD,
JACKSON WALKER LLP, HOUSTON, TX;
CHRISTOPHER J. ST. JEANOS, JOHN ROBERT
OLLER, MITCHELL JAY AUSLANDER, WILLKIE
FARR & GALLAGHER, NEW YORK, NY US;
DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER,
SNOW, O'MARA, STEVENS & CANNADA, PLLC,
JACKSON, MS US; DAVID C GUSTMAN, JILL
CHRISTINE ANDERSON, FREEBORN & PETERS,
CHICAGO, IL US; FREDERICK BARTLETT WULFF,
SR, JACKSON WALKER LLP, DALLAS, TX; KEVIN
F    HORMUTH,    KEVIN    F.    O'MALLEY,
GREENSFELDER & HEMKER, ST LOUIS, MO US.

For MARSH USA INC., Defendant: ANDREW T.
BERRY, GARY N. WILCOX, MCCARTER &
ENGLISH, LLP, NEWARK, NJ; C. LARRY CORBO,
III, CAROLE ELAINE HOWARD, JACKSON
WALKER LLP, [*10] HOUSTON, TX;
CHRISTOPHER J. ST. JEANOS, JOHN ROBERT
OLLER, MITCHELL JAY AUSLANDER, WILLKIE
FARR & GALLAGHER, NEW YORK, NY US;
DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER,
SNOW, O'MARA, STEVENS & CANNADA, PLLC,
JACKSON, MS US; FREDERICK BARTLETT
WULFF, SR, JACKSON WALKER LLP, DALLAS,
TX; GREGORY K. CONWAY, WILLKIE, FARR &
GALLAGHER, WASHINGTON, DC US; KEVIN F
HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER
& HEMKER, ST LOUIS, MO US; PHILIP RITCHEY
SIMS, WILLIAM F. GRACE, CHAFFE MCCALL,
NEW ORLEANS, LA US; CHRISTOPHER J. ST.
JEANOS, WILLKIE FARR & GALLAGHER, NEW
YORK, NY US; DANIEL P. JORDAN, BUTLER,

SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US; DAVID C GUSTMAN, FREEBORN & PETERS, CHICAGO, IL US; GREGORY K. CONWAY, WILLKIE, FARR & GALLAGHER, WASHINGTON, DC US; JILL CHRISTINE ANDERSON, FREEBORN & PETERS, CHICAGO, IL US; JOHN ROBERT OLLER, MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US; KEVIN F HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER & HEMKER, ST LOUIS, MO US; P. RYAN BECKETT, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US; PHILIP RITCHEY SIMS, WILLIAM F. GRACE, CHAFFE MCCALL, NEW ORLEANS, LA US.

For SEABURY & SMITH, INC., DOING BUSINESS AS MARSH ASVANTAGE [*11] AMERICA, Defendant: MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US.

For B&T CORPORATION, (CIVIL 05-1168), BB&T INSURANCE SERVICES, INC., (CIVIL 05-1168), Defendants: ALAN L. BRIGGS, JAMES PAUL WEHNER, JR., AMY LYNN BROWN, HOLLY BROOKE JAMES, SQUIRE, SAMDERS & DEMPSEY, LLP, WASHINGTON, DC US; HOWARD J.C. NICOLS, SQUIRE, SANDERS & DEMPSEY, LLP, NEW YORK, NY; JACK LOUIS WUERKER, SQUIRE SANDERS & DEMPSEY, VIENNA, VA US.

For BRANCH BANKING & TRUST COMPANY, (CIVIL 05-1168), Defendant: ALAN L. BRIGGS, JAMES PAUL WEHNER, JR., AMY LYNN BROWN, SQUIRE, SAMDERS & DEMPSEY, LLP, WASHINGTON, DC US; HOWARD J.C. NICOLS, SQUIRE, SANDERS & DEMPSEY, LLP, NEW YORK, NY.

For UNUMPROVIDENT CORPORATION, Defendant: DEBORAH E HYRB, PATRICK SHEA, PAUL HASTINGS, JANOFSKY & WALKER, LLP, STAMFORD, CT US; JENNIFER BATES MCINTYRE, ROSEANN OLIVER, PERKINS COIE LLC, CHICAGO, IL; RACHEL ROSS KRAUSE, OGDEN & SULLIVAN, PA, TAMPA, FL US; STEVEN PAUL DEL MAURO, RANDI F. KNEPPER, MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, MORRISTOWN, NJ; TIMON V SULLIVAN, OGDEN & SULLIVAN, PA, TAMPA, FL US.

For ACE INA HOLDINGS, (CIVIL 05-1800, PUR. TO ORDER DATED 3/11/2005), Defendant: JEREMY J BRANDON, JOHNNY W. CARTER, [*12] SUSMAN GODFREY, LLP, DALLAS, TX US; LIZA M. WALSH, MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ; M. DUNCAN GRANT, PEPPER HAMILTON LLP, PHILADELPHIA, PA; DANIEL J. LEFFELL, NEW YORK, NY.

For ACE LIMITED, (PUR. TO ORDER DATED 3/11/2005, Defendant: ALAN N. SALPETER, CHICAGO, IL; H. LEE GODFREY, JEFFREY R. SEELY, JOHNNY W. CARTER, MICHAEL P. GEISER, NEAL S. MANNE, VINEET BHATIA, SUSMAN GODFREY, LLP, HOUSTON, TX; JEREMY J BRANDON, SUSMAN GODFREY, LLP, DALLAS, TX US; ROBERT J KRISS, MAYER, BROWN, ROWE & MAW, LLP, CHICAGO, IL; DANIEL J. LEFFELL, NEW YORK, NY; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For ACE USA, (PUR. TO ORDER DATED 3/11/2005), Defendant: ALAN N. SALPETER, CHICAGO, IL; FREDERIC STANLEY, JR, STANLEY, DEHLINGER & RASCHER, ALTAMONTE SPRINGS, FL US; GRETHCHEN S. SWEEN, JEREMY J BRANDON, JOHNNY W. CARTER, SUSMAN GODFREY, LLP, DALLAS, TX US; H. LEE GODFREY, JEFFREY R. SEELY, L. JANE RAY, MICHAEL P. GEISER, NEAL S. MANNE, VINEET BHATIA, SUSMAN GODFREY, LLP, HOUSTON, TX; LIZA M. WALSH, CONNELL FOLEY, LLP, ROSELAND, NJ; M. DUNCAN GRANT, PEPPER HAMILTON LLP, PHILADELPHIA, PA; ROBERT J KRISS, MAYER, BROWN, ROWE & MAW, LLP, CHICAGO, IL; DANIEL J. LEFFELL, NEW YORK, NY; MARC [*13] D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For WILLIS GROUP HOLDINGS LIMITED, (CIVIL 05-1168), WILLIS GROUP LIMITED, (CIVIL 05-1168), WILLIS NORTH AMERICA INC., Defendants: ANASTASIA ANGELOVA, RICHARD C. PEPPERMAN, II, SULLIVAN & CROMWELL, LLP, NEW YORK, NY.

For AMERICAN INTERNATIONAL GROUP, INC., Defendant: CARL H POCDTKE, DLA PIPER RUDNICK GARY CARY US LLP, CHICAGO, IL; DANIEL J. LEFFELL, LAYALIZA KLEIN SOLOVEICHIK, MARTIN FLUMENBAUM, REBECCA CAREN SHORE, ROBERTA A. KAPLAN,

PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, NEW YORK, NY; KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC; MARK A. ARONCHICK, HANGLEY ARONCHICK SEGAL & PUDLIN, PHILADELPHIA, PA; SAMUEL BAYARD ISAACSON, STEPHEN W SCHWAB, DLA PIPER RUDICK GRAY CARY US LLP, CHICAGO, IL.

For THE ST. PAUL TRAVELERS COMPANIES, INC., Defendant: DANIEL J. LEFFELL, NEW YORK, NY; MICHAEL J. GARVEY, SIMPSON THACHER & BARTLETT LLP, NEW YORK, NY.

For BROWN & BROWN, INC., Defendant: BARRY G. SHER, KEVIN C. LOGUE, SARAH EMILY HAGANS, VICTORIA ASHWORTH, PAUL HASTINGS JANOFSKY & WALKER, LLP, NEW YORK, NY US; THEODORE ALLAN KITTILA, PAUL, HASTINGS, HANOFSKY & WALKER, LLP, NEW YORK, NY.

For ACORDIA INC, WELLS FARGO, (CIVIL [*14] 05-1168), Defendants: ALAN L. KILDOW, DLA PIPER RUDNICK GRAY CARY US LLP, MINNEAPOLIS, MN; CARLOS F. ORTIZ, DLA, PIPER, RUDNICK, GRAY & CARY, LLP, NEW YORK, NY; SONYA RAE BRAUNSCHWEIG, DLA, PIPER, RUDNICK, GRAY, CARY & US, LLP, MINNEAPOLIS, MN.

For NATIONAL FINANCIAL PARTNERS CORP., Defendant: WILLIAM F. CLARKE, JR., SKADDEN ARPS, SLATE, MEAGHER & FLOM. LLP, NEW YORK, NJ.

For PRUDENTIAL FINANCIAL, INC., (CIVIL 05-1064), Defendant: CHRISTOPHER C. GILBERT, MARTIN B. UNGER, UNGER LAW GROUP, PL, ORLANDO, FL US; DOUGLAS SCOTT EAKELEY, JOHN R. MIDDLETON, LOWENSTEIN SANDLER PC, ROSELAND, NJ.

For THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, INC., (CIVIL 05-1064), Defendant: JOHN R. MIDDLETON, LOWENSTEIN SANDLER PC, ROSELAND, NJ.

For U.S.I. HOLDINGS CORPORATION, Defendant: RACHEL L. GERSTEIN, ROBERT HARDY PEES, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, NEW YORK, NY; RICHARD B. ZABEL, AKIN, GUMP, STRAUSS, HAVER & FELD, LLP, NEW YORK, NY.

For ACE INA, Defendant: FREDERIC STANLEY, JR, STANLEY, DEHLINGER & RASCHER, ALTAMONTE SPRINGS, FL US; GRETHCHEN S. SWEEN, JEREMY J BRANDON, SUSMAN GODFREY, LLP, DALLAS, TX US; H. LEE GODFREY, JEFFREY R. SEELY, JOHNNY W. CARTER, L. JANE RAY, NEAL S. MANNE, SUSMAN GODFREY, [*15] LLP, HOUSTON, TX; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For ACE INA HOLDINGS INC, Defendant: ALAN N. SALPETER, CHICAGO, IL; H. LEE GODFREY, JEFFREY R. SEELY, MICHAEL P. GEISER, NEAL S. MANNE, VINEET BHATIA, SUSMAN GODFREY, LLP, HOUSTON, TX; JOHNNY W. CARTER, SUSMAN GODFREY, LLP, DALLAS, TX US; M. DUNCAN GRANT, PEPPER HAMILTON LLP, PHILADELPHIA, PA; ROBERT J KRISS, MAYER, BROWN, ROWE & MAW, LLP, CHICAGO, IL; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For ACE LTD, (CIVIL 05-1167), Defendant: M. DUNCAN GRANT, PEPPER HAMILTON LLP, PHILADELPHIA, PA; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For AON CORPORATION, Defendant: AMY D HARMON, MARGUERITE S. WILLIS, RUSSELL THOMAS BURKE, NEXSEN, PRUET, JACOBS & POLLARD, COLUMBIA, SC; BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, ELIZABETH A. LARSEN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; DONALD A. ROBINSON, LEDA DUNN WETTRE; ROBINSON & LIVELLI, ESQS., NEWARK, NJ; JILL M. STEINBERG, BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, RENEE WICKLUND, RICHARD C GODFREY, KIRKLAND & [*16] ELLIS LLP, CHICAGO, IL.

For AON CORP, (CIVIL 05-1801), Defendant: DONALD A. ROBINSON, LEDA DUNN WETTRE, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON SERVICES GROUP, (CIVIL 05-1167), Defendant: LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, LEDA DUNN WETTRE, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For MARSH USA INC., (CONNECTICUT) (CIVIL 05-1168), Defendant: ANDREW T. BERRY, MCCARTER & ENGLISH, LLP, NEWARK, NJ; MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US.

For HILB, ROGAL & HOBBS, (CIVIL 05-1168) FORMERLY KNOWN AS HILB, ROGAL, & HAMILTON COMPANY, Defendant: MICHAEL R. GRIFFINGER, WILLIAM P. DENI, JR., GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, PC, NEWARK, NJ; SHAWN PATRICK REGAN, HUNTON & WILLIAMS, LLP, NEW YORK, NY; JONATHAN MICHAEL WILAN, NEIL KEITH GILMAN, HUNTON & WILLIAMS LLP, WASHINGTON, DC.

For ARTHUR J GALLAGHER & CO, Defendant: ANDREW KENNETH LEVINE, BROAD AND CASSEL, TALLAHASSEE, FL US; DANIELLE A. R. COFFMAN, WINSTON & STRAWN, LLP, CHICAGO, IL; DAVID EMILIO MOLLON, EDWIN MICHAEL LARKIN, LINA M. VIVIANO, WINSTON & STRAWN LLP, NEW YORK, NY; JAMES S. RICHTER, WINSTON & STRAWN LLP, NEWARK, NJ; KATHERINE E BORDEN, STEPHEN CHARLES [*17] SCHULTE, TERRY M. GRIMM, CHICAGO, IL.

For LEXINGTON INSURANCE COMPANY, Birmingham Fire Insurance Co. of PA, NEW HAMPSHIRE INSURANCE CO., Defendants: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For U.S.I HOLDINGS CORP, Defendant: PATRICK CHARLES SCHMITTER, ROBERT HARDY PEES, RICHARD B. ZABEL, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, NEW YORK, NY.

For HARTFORD FINANCIAL SERVICES GROUP INC, Defendant: ANDREA ROBINSON, WILMER CUTLER PICKERING, HALE & DORR LLP, BOSTON, MA; GREGORY M. REISER, WILMER, CUTLER, PICKERING, HALE & DORR, LLP,

PRINCETON, NJ; JAMES E. FOSTER, VIRGINIA B. TOWNES, AKERMAN SENTERFITT, ORLANDO, FL US; MARCI A EISENSTEIN, WILLIAM M HANNAY, SCHIFF HARDIN, LLP, CHICAGO, IL; PAUL ADAM ENGELMAYER, WILMER, BUTLER & PICKERING, ESQS., NEW YORK, NY; ROBERT W. TRENCHARD, ROBIN L. ALPERSTEIN, WILMER, CUTLER, PICKERING, HALE & DORR, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY; MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For HARTFORD FIRE INSURANCE COMPANY, Defendant: ANDREA ROBINSON, WILMER CUTLER PICKERING, HALE & DORR LLP, BOSTON, MA; JAMES E. FOSTER, VIRGINIA B. TOWNES, AKERMAN SENTERFITT, ORLANDO, [*18] FL US; ROBERT W. TRENCHARD, WILMER, CUTLER, PICKERING, HALE & DORR, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY; MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For PROPERTY & CASUALTY INSURANCE COMPANY OF HARTFORD, Defendant: MARCI A EISENSTEIN, WILLIAM M HANNAY, SCHIFF HARDIN, LLP, CHICAGO, IL; MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For TWIN CITY FIRE INSURANCE COMPANY, Nutmeg Life Insurance Co., The Hartford Fidelity & Bonding, Defendants: DANIEL J. LEFFELL, NEW YORK, NY; MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For AON GROUP INC, (CIVIL NO. 05-1801), Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JILL M. STEINBERG, BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, RICHARD C GODFREY, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON DIRECT GROUP INC, (CIVIL NO. 05-1801), Defendant: DANIEL EDWARD LAYTIN,

KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JILL M. STEINBERG, BAKER [*19] DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; LESLIE M. SMITH, RICHARD C GODFREY, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AFFINITY INSURANCE SERVICES INC, (CIVIL NO. 05-1801), Defendant: DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JILL M. STEINBERG, BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; LESLIE M. SMITH, RICHARD C GODFREY, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For HEALTHCARE PROVIDERS SERVICE ORGANIZATION, (CIVIL NO. 05-1801), Defendant: DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JILL M. STEINBERG, BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, MEMPHIS, TN; LESLIE M. SMITH, RICHARD C GODFREY, KIRKLAND & ELLIS LLP, CHICAGO, IL.

For AMERICAN RE CORPORATION, Defendant: DAVID GRAIS, DEWEY BALLANTINE, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY; MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY.

For AMERICAN RE-INSURANCE COMPANY, Defendant: DAVID GRAIS, JOHN F. COLLINS, MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY; EAMON O'KELLY, DEWEY BALLANTINE, NEW YORK, NY US; HOUSTON [*20] S. PARK, III, STEPHENS, LYNN, KLEIN, LA CAVA, HOFFMAN, WEST PALM BEACH, FL US; KRISTIN ANN MEISTER, DEWEY BALLANTINE, LLP, NEW YORK CITY, NY US; DANIEL J. LEFFELL, NEW YORK, NY.

For MUNICH-AMERICAN RISK PARTNERS INC, Defendant: DAVID GRAIS, JEFFREY S. RUGG, MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY; EAMON O'KELLY, DEWEY BALLANTINE, NEW YORK, NY US; DANIEL J. LEFFELL, NEW YORK, NY.

For AON RISK SERVICES COMPANIES INC, Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON RISK SERVICES INC U.S., Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, GRAHAM, LLP, CHICAGO, IL; LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON SERVICES GROUP INC, Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; DANIEL EDWARD LAYTIN, KIRKPATRICK & LOCKHART, NICHOLSON, [*21] GRAHAM, LLP, CHICAGO, IL; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For UNIVERSAL LIFE RESOURCES, DOING BUSINESS AS ULR, Defendant: DAVID A. GABIANELLI, HANCOCK ROTHERT & BUNSHOFT LLP, SAN FRANCISCO, CA; ERIC NEAL MACEY, STEPHEN J SIEGAL, NOVACK & MACEY, LLP, CHICAGO, IL; SCOTT L. METZGER, DUCKOR, SPRADLING, METZGER & WYNNE, SAN DIEGO, CA US; STEPHEN P. YOUNGER, PATTERSON, BELKNAP, WEBB & TYLER, NEW YORK, NY.

For UNIVERSAL LIFE RESOURCES INC, DOING BUSINESS AS ULR INSURANCE SERVICES INC, Defendant: ERIC NEAL MACEY, NOVACK & MACEY, LLP, CHICAGO, IL; NED GELHAAR, HANCOCK, ROTHERT & BUNSHOFT, LLP, LOS ANGELES, CA US; SCOTT L. METZGER, DUCKOR, SPRADLING, METZGER & WYNNE, SAN DIEGO, CA US; STEPHEN P. YOUNGER, PATTERSON, BELKNAP, WEBB & TYLER, NEW YORK, NY.

For WILLIS GROUP HOLDINGS LTD., Defendant: ANASTASIA ANGELOVA, RICHARD C. PEPPERMAN, II, SULLIVAN & CROMWELL, LLP, NEW YORK, NY; FREDRICK H. MCCLURE, TAMPA, FL US; JOHN L. WARDEN, SULLIVAN & CROMWELL, NEW YORK, NY US; RICHARD C. PEPPERMAN, II, SULLIVAN & CROMWELL, LLP, NEW YORK, NY.

For WILLIS GROUP LTD., WILLIS [*22] NORTH AMERICAN INC, Defendants: ANASTASIA ANGELOVA, RICHARD C. PEPPERMAN, II, SULLIVAN & CROMWELL, LLP, NEW YORK, NY; FREDRICK H. MCCLURE, TAMPA, FL US; JOHN L. WARDEN, SULLIVAN & CROMWELL, NEW YORK, NY US.

For BENEFITS COMMERCE, Defendant: ERIC NEAL MACEY, NOVACK & MACEY, LLP, CHICAGO, IL; SCOTT L. METZGER, DUCKOR, SPRADLING, METZGER & WYNNE, SAN DIEGO, CA US; STEPHEN P. YOUNGER, PATTERSON, BELKNAP, WEBB & TYLER, NEW YORK, NY.

For DOUGLAS P. COX, Defendant: ERIC NEAL MACEY, NOVACK & MACEY, LLP, CHICAGO, IL; SCOTT L. METZGER, DUCKOR, SPRADLING, METZGER & WYNNE, SAN DIEGO, CA US; STEPHEN P. YOUNGER, PATTERSON, BELKNAP, WEBB & TYLER, NEW YORK, NY.

For METLIFE INC, Defendant: CHRISTOPHER C. GILBERT, MARTIN B. UNGER, UNGER LAW GROUP, PL, ORLANDO, FL US; JAMES W. CARBIN, DUANNE MORRIS, LLP; EDWARD G. BIESTER, COUNSEL NOT ADMITTED TO USDC-NJ BAR, DUANE MORRIS, LLP, PHILADELPHIA, PA; PAUL JEFFREY RIEHLE, SEDGWICK DETERT MORAN & ARNOLD, SAN FRANCISCO, CA; MARGARET MARY O'ROURKE, WOLFF SAMSON, PC, WEST ORANGE, NJ.

For ST PAUL TRAVELERS COS INC, Defendant: PAUL C. CURNIN, SIMPSON THACHER & BARTLETT, NEW YORK, NY.

For ZURICH AMERICAN INSURANCE CO., DOING BUSINESS AS ZURICH NORTH AMERICA, Defendant: ANN M. ASHTON, DAVID S. TURETSKY, GEORGE E. ANHANG, RALPH C. FERRARA, LEBOEUF, LAMB, GREENE [*23] & MACRAE, LLP,

WASHINGTON, DC; GIL M. SOFFER, MATTHEW J. CANNON, KATTEN MUCHIN ZAVIS ROSENMAN, CHICAGO, IL; JONATHAN E. RICHMAN, LEBOEUF, LAMB, GREENE & MACRAE, LLP, NEW YORK.

For NATIONAL FINANCIAL PARTNERS CORPORATION, Defendant: DONNA L. MCDEVITT, TIMOTHY ALAN NELSEN, SKADDEN ARPS SLATE, MEAGHER & FLOM & LLP, CHICAGO, IL.

For AMERICA RE-INSURANCE CO, Athena Assurance Co., Gulf Insurance Co., Indemnity Insurance Co. North America, ST. PAUL FIRE & MARINE INSURANCE CO., ST. PAUL MERCURY INSURANCE CO., Westchester Surplus Lines Insurance Co., AMER REINSURANCE CO, Illinois Union Insurance Co., THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, HARTFORD STEAM BOILER INSPECTION & INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURG PA, Defendants: DANIEL J. LEFFELL, NEW YORK, NY.

For WELLS FARGO & CO, Defendant: CARLOS F. ORTIZ, DLA, PIPER, RUDNICK, GRAY & CARY, LLP, NEW YORK, NY; SONYA RAE BRAUNSCHWEIG, DLA, PIPER, RUDNICK, GRAY, CARY & US, LLP, MINNEAPOLIS, MN.

For HILB ROGAL & HAMILTON CO, Defendant: JONATHAN MICHAEL WILAN, NEIL KEITH GILMAN, HUNTON & WILLIAMS LLP, WASHINGTON, DC.

For BB&T CORP, Defendant: ALAN L. BRIGGS, JAMES PAUL WEHNER, JR., SQUIRE, SAMDERS & DEMPSEY, [*24] LLP, WASHINGTON, DC US; JACK LOUIS WUERKER, SQUIRE SANDERS & DEMPSEY, VIENNA, VA US.

For BRANCH BANKING & TRUST CO, Defendant: ALAN L. BRIGGS,JAMES PAUL WEHNER, JR. , HOLLY BROOKE JAMES, SQUIRE, SAMDERS & DEMPSEY, LLP, WASHINGTON, DC US.

For HUB INTERNATIONAL LTD, Defendant: ALAN SETH RABINOWITZ, NEW YORK, NY.

For AMERICAN RE CORP, Defendant: EAMON O'KELLY, JEFFREY S. RUGG, DEWEY BALLANTINE, NEW YORK, NY US; DANIEL J.

LEFFELL, NEW YORK, NY.

For MARSH USA INC., (ILLINOIS), MARSHA USA INC, MARSH & MCLENNAN INCORPORATED, Defendants: ANDREW T. BERRY, MCCARTER & ENGLISH, LLP, NEWARK, NJ.

For AMERICAN RE-INSURANCE COMPANY, Defendant: MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY.

For AON BROKERS SERVICES INC, Defendant: BENJAMIN R. OSTAPUK, KIRKLAND & ELLIS LLP, SAN FRANCISCO, CA; JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; LESLIE M. SMITH, KIRKLAND & ELLIS LLP, CHICAGO, IL; DONALD A. ROBINSON, LEDA DUNN WETTRE, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON GROUP INT, Defendant: DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AMERICAN RE INSURANCE CO, Defendant: JEFFREY S. RUGG, DEWEY BALLANTINE, LLP, NEW YORK, NY; DANIEL J. LEFFELL, [*25] NEW YORK, NY.

For MERCER HUMAN RESOURCE CONSULTING INC, Defendant: CAROLE ELAINE HOWARD, JACKSON WALKER LLP, HOUSTON, TX; FREDERICK BARTLETT WULFF, SR, JACKSON WALKER LLP, DALLAS, TX.

For MERCER HUMAN RESOURCE CONSULTING OF TEXAS INC, Defendant: CAROLE ELAINE HOWARD, JACKSON WALKER LLP, HOUSTON, TX; FREDERICK BARTLETT WULFF, SR, JACKSON WALKER LLP, DALLAS, TX; MITCHELL JAY AUSLANDER, NEW YORK, NY.

For ACE American Insurance Co., Defendant: DANIEL J. LEFFELL, NEW YORK, NY; MARC D. HAEFNER, CONNELL FOLEY, LLP, ROSELAND, NJ.

For AIU Insurance Co., National Union Fire Insurance Co. of Louisiana, Defendants: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For American Alternative Insurance Co. Corp., Defendant: DAVID GRAIS, EAMON O'KELLY, DEWEY BALLANTINE, LLP, NEW YORK, NY.

For American Casualty Co. of Reading, CNA FINANCIAL CORP., Continental Casualty Co., Defendants: MICHAEL R. BLANKSHAIN, MICHAEL LEE MCCLUGGAGE, BETH L. FANCSALI, WILDMAN, HARROLD, ALLEN & DIXON, LLP, CHICAGO, IL US; DANIEL J. LEFFELL, NEW YORK, NY; JOHN MICHAEL AGNELLO, CARELLA BYRNE BAIN, GILFILLAN CECCHI STEWART & OLSTEIN, PC, ROSELAND, NJ; MATTHEW JOSEPH CACCAMO, [*26] WILDMAN, HARROLD, ALLEN & DIXON, CHICAGO, IL US; MELISSA E. FLAX, CARELLA, BYRNE, BAIN, GILFILLAN, ROSELAND, NJ.

For AMERICAN HOME ASSURANCE CO., AMERICAN INTERNATIONAL INSURANCE CO., Commerce and Industry Insurance Co., Defendants: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For AON GROUP, INC., AON RE, INC., AON SERVICES GROUP, INC., Defendants: DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For AON RISK SERVICES INC US, Defendant: JOHN ARMANDO BOUDET, GREENBERG TRAURIG, PA, ORLANDO, FL US; DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For Arthur J. Gallagher Risk Management Service, Defendant: JAMES S. RICHTER, WINSTON & STRAWN LLP, NEWARK, NJ.

For AXIS REINSURANCE CO., AXIS Specialty Insurance Co., AXIS Surplus Insurance Co., Defendants: WILLIAM F. CLARKE, JR., SKADDEN ARPS, SLATE, MEAGHER & FLOM, LLP, NEW YORK, NJ; DANIEL J. LEFFELL, NEW YORK, NY.

For Berkshire Hathaway, Inc., Defendant: CATHERINE FLORENCE AUGUST JOHNSON, MUNGER, TOLLES & OLSON, LLP; LOS ANGELES, CA US; CHRISTOPHER P. ANTON, BUDD LARNER PC, SHORT HILLS, NJ; DANIEL J. LEFFELL, NEW YORK, NY; JOSEPH J. SCHIAVONE, BUDD

LARNER, PC, [*27] SHORT HILLS, NJ.

For Chicago Insurance Co., National Surety Corp., Defendants: STEVEN P. HANDLER, AMY GRAHAM DOEHRING, GEOFFREY A. VANCE, LAZAR P. RAYNAL, MCDERMOTT, WILL & EMERY, LLP, CHICAGO, IL US; DANIEL J. LEFFELL, NEW YORK, NY.

For Crum & Forster Holdings Corp, United States Fire Insurance Co., Defendants: LOUIS G. CORSI, LANDMAN, CORSI, BALLAINE & FORD, NEW YORK, NY US; CHRISTOPHER G. FRETEL, STEPHEN JACOBS, LANDMAN, CORSI, BALLAINE & FORD, NEW YORK, NY US; DANIEL J. LEFFELL, NEW YORK, NY; JOHN HERBERT NOORLANDER, LANDMAN, CORSI, BAILAINE & FORD, NEWARK, NJ.

For EXECUTIVE RISK INDEMNITY INC., FEDERAL INSURANCE CO., The Chubb Corp., VIGILANT INSURANCE CO., Defendants: PETER RICHARD BISIO, HOGAN & HARTSON, LLP, WASHINGTON, DC; DANIEL J. LEFFELL, NEW YORK, NY.

For FIREMAN'S FUND INSURANCE CO., Defendant: STEVEN P. HANDLER, AMY GRAHAM DOEHRING, GEOFFREY A. VANCE, LAZAR P. RAYNAL, MCDERMOTT, WILL & EMERY, LLP, CHICAGO, IL US.

For General Re Corporation, General Reinsurance Corp., Defendants: CHRISTOPHER P. ANTON, BUDD LARNER PC, SHORT HILLS, NJ; DANIEL J. LEFFELL, NEW YORK, NY; JOSEPH J. SCHIAVONE, BUDD LARNER, PC, SHORT HILLS, NJ.

For GREENWICH INSURANCE CO., Indian Harbor Insurance Co., [*28] Defendants: AMY E. BARABAS, ROBERT A. ALESSI, TAMMY L. ROY, CAHILL, GORDON & REINDELL, LLP, NEW YORK, NY US; DANIEL J. LEFFELL, NEW YORK, NY; JOHN L. THURMAN, FARRELL & THURMAN, PC, SKILLMAN, NJ.

For HARTFORD STEAM BOILER INSPECTION AND INSURANCE CO., National Union Fire Insurance Co. of Pittsburg, PA, Defendants: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP,

WASHINGTON, DC; MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US.

For Liberty Mutual Fire Insurance Co., Liberty Mutual Holding Co., LIBERTY MUTUAL INSURANCE CO., WAUSAU UNDERWRITERS INSURANCE COMPANY, Defendants: BRIAN E. ROBISON, VINSON & ELKINS, DALLAS, TX; DANIEL J. LEFFELL, NEW YORK, NY; KATHRINE MARLENE MORTENSEN, KORNSTEIN, VEISZ, WEXLER & POLLARD, NEW YORK, NY US.

For Mt. Hawley Insurance Co., RLI CORP, Defendants: AUGUSTA MORGAN RIDLEY, BRIAN ROBERT MEINERS, GRACIELA RODRIGUEZ, KEVIN RICHARD SULLIVAN, KING & SPALDING, LLP, WASHINGTON, DC; DANIEL J. LEFFELL, NEW YORK, NY.

For Pacific Insurance Co., Ltd, Defendant: MARY SUSAN HENIFIN, BUVHANAN INGERSOLL, PC, PRINCETON, NJ.

For RLI Insurance Corp, Defendant: AUGUSTA MORGAN RIDLEY, BRIAN ROBERT MEINERS, GRACIELA [*29] RODRIGUEZ, KEVIN RICHARD SULLIVAN, KING & SPALDING, LLP, WASHINGTON, DC.

For Summit Global Partners of Florida, Inc., USI Insurance Services of Florida, Inc., Defendants: ROBERT HARDY PEES, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, NEW YORK, NY.

For The Continental Insurance Group, Defendant: MICHAEL R. BLANKSHAIN, MICHAEL LEE MCCLUGGAGE, BETH L. FANCSALI, WILDMAN, HARROLD, ALLEN & DIXON, LLP, CHICAGO, IL US; MATTHEW JOSEPH CACCAMO, WILDMAN, HARROLD, ALLEN & DIXON, CHICAGO, IL US.

For TRAVELERS INDEMNITY COMPANY, RLI INSURANCE COMPANY, Defendants: MITCHELL JAY AUSLANDER, WILLKIE FARR & GALLAGHER, NEW YORK, NY US; DANIEL J. LEFFELL, NEW YORK, NY.

For UNITED STATES FIRE INSURANCE COMPANY, Defendant: LOUIS G. CORSI, LANDMAN, CORSI, BALLAINE & FORD, NEW YORK, NY US;

CHRISTOPHER G. FRETEL, STEPHEN JACOBS, LANDMAN, CORSI, BALLAINE & FORD, NEW YORK, NY US; JOHN HERBERT NOORLANDER, LANDMAN, CORSI, BAILAINE & FORD, NEWARK, NJ.

For XL Capital Ltd, Defendant: DANIEL J. LEFFELL, NEW YORK, NY; JOHN L. THURMAN, FARRELL & THURMAN, PC, SKILLMAN, NJ.

For AON RISK SERVICES OF THE CAROLINAS INC, Defendant: AMY D HARMON, MARGUERITE S. WILLIS, RUSSELL THOMAS BURKE, NEXSEN, PRUET, JACOBS & POLLARD, COLUMBIA, SC; [*30] DONALD A. ROBINSON, ROBINSON & LIVELLI, ESQS., NEWARK, NJ.

For INSURANCE CO OF THE STATE OF PENNSYLVANIA, (CIVIL NO. 05-4046), Defendant: KENNETH A. GALLO, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC; DANIEL J. LEFFELL, NEW YORK, NY.

For MARSH & MCLENNAN INC, Defendant: ANDREW T. BERRY, MCCARTER & ENGLISH, LLP, NEWARK, NJ; DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC, JACKSON, MS US.

For C. V. Starr & Co., Defendant: ROBERT A. MAGNANINI, BOIES, SCHILLER & FLEXNER, LLP, SHORT HILLS, NJ.

For FIRST MARKET INTERNATIONAL INC, Defendant: MAYANNE DOWNS, KIMBERLY DUNKEL HEALY, KING, BLACKWELL, DOWNS & ZEHNDER, PA, ORLANDO, FL.

For AMERICAN ALTERNATIVE INSURANCE CORPORATION, Defendant: JEFFREY S. RUGG, MOLLY LEHR, DEWEY BALLANTINE, LLP, NEW YORK, NY; DANIEL J. LEFFELL, NEW YORK, NY.

For Discover Re Managers, Inc., UNITED STATES FIDELITY AND GUARANTY SPECIALITY INSURANCE COMPANY, Defendants: EDWARD F. MALUF, MIRIAM THERESA DOWD, PHILIP L. BLUM, BINGHAM MCCUTCHEN, LLP, NEW YORK, NY.

For DISCOVER REINSURANCE COMPANY, DISCOVERY MANAGERS LTD, UNITED STATES FIDELITY & GUARANTY COMPANY, Defendants: BARRY HASSELL, COPELAND, COOK, TAYLOR & BUSH, RIDGELAND, [*31] MS; CHARLES GREG COPELAND, MICHAEL W. BAXTER, COPELAND, COOK, TAYLOR & BUSH, RIDGELAND, MS; EDWARD F. MALUF, MIRIAM THERESA DOWD, PHILIP L. BLUM, BINGHAM MCCUTCHEN, LLP, NEW YORK, NY.

For MARK A SMITH, (CIVIL NUMBER 05-5698), Defendant: KEVIN F HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER & HEMKER, ST LOUIS, MO US.

For AMERICAN INTERNATIONAL GROUP, Defendant: CHRIS S. COUTROULIS, CARLTON FIELDS, PA, TAMPA, FL US; JAMES E. FOSTER, VIRGINIA B. TOWNES, AKERMAN SENTERFITT, ORLANDO, FL US; STEVEN J BRODIE, CARLTON FIELDS, PA, MIAMI, FL US; DANIEL J. LEFFELL, NEW YORK, NY.

For CHUBB CORPORATION, THE, Defendant: DUSTIN E DEESE, MARVIN E. BARKIN, TRENAM, KEMKER, SCHRARF, BARKIN, FRYE, O'NEILL & MULLIS, TAMPA, FL US; DANIEL J. LEFFELL, NEW YORK, NY.

For HARTFORD INSURANCE CO OF THE SOUTHEAST, HARTFORD UNDERWRITER INS. CO., Defendant: ANDREA ROBINSON, WILMER CUTLER PICKERING, HALE & DORR LLP, BOSTON, MA; JAMES E. FOSTER, VIRGINIA B. TOWNES, AKERMAN SENTERFITT, ORLANDO, FL US; ROBERT W. TRENCHARD, WILMER, CUTLER, PICKERING, HALE & DORR, LLP, NEW YORK, NY.

For USI HOLDINGS INC, Defendant: DENIS L. DURKIN, BAKER & HOSTETLER, LLP, ORLANDO, FL; PATRICK CHARLES SCHMITTER, RACHEL L. GERSTEIN, RICHARD B. ZABEL, [*32] ROBERT HARDY PEES, AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, NEW YORK, NY.

For JOSEPH E LAMPEN, Defendant: KEVIN F HORMUTH, KEVIN F. O'MALLEY, GREENSFELDER & HEMKER, ST LOUIS, MO US.

For MARSH USA INC OF LOUISIANA, Defendant: DANIEL P. JORDAN, P. RYAN BECKETT, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC,

JACKSON, MS US.

For NAVIGATORS INSURANCE COMPANY, Defendant: ELLIOTT ABRUTYN, MORGAN, MELHUISH & ABRUTYN, LIVINGSTON, NJ.

For NAVIGATORS INSURANCE SERVICES OF TEXAS INC, Defendant: ELLIOTT ABRUTYN, MORGAN, MELHUISH & ABRUTYN, LIVINGSTON, NJ; ELTON F DUNCAN, JESSICA G ROUX, KELLEY SEVIN, THOMAS A. FRENCH, DUNCAN, COURINGTON & RYDBERG, NEW ORLEANS, LA US.

For THE CONTINENTAL INSURANCE COMPANY, Defendant: DANIEL J. LEFFELL, NEW YORK, NY; JOHN MICHAEL AGNELLO, CARELLA BYRNE BAIN, GILFILLAN CECCHI STEWART & OLSTEIN, PC, ROSELAND, NJ; MATTHEW JOSEPH CACCAMO, CHICAGO, IL US; MELISSA E. FLAX, CARELLA, BYRNE, BAIN, GILFILLAN, ROSELAND, NJ.

For UNITED STATES OF AMERICA, Defendant: SUSAN J. STEELE, UNITED STATES ATTORNEY'S OFFICE, NEWARK, NJ.

For Guy Carpenter & Company, Inc., MARSH & MCLENNAN COMPANIES, INC., Marsh Advantage America, Marsh Global Broking, Inc. (Missouri), Marsh Global Broking, Inc. [*33] (New Jersey), Marsh Global Placement, MARSH INC., MARSH USA INC. (Connecticut), MARSH USA INC., Seabury & Smith Inc., MARSH & MCLENNAN COMPANIES, INC., Marsh Advantage America, MARSH INC., Defendants: CHRISTOPHER J. ST. JEANOS, WILLKIE FARR & GALLAGHER, NEW YORK, NY US.

For MARSH & MCLENNEN, DEFENDANT IN 06-3844, Defendant: DARREN K NELSON, PARR WADDOUPS BROWN GEE & LOVELESS, SALT LAKE CITY, UT US.

For MARSH, DEFENDANT IN 06-3844, Defendant: DARREN K NELSON, PARR WADDOUPS BROWN GEE & LOVELESS, SALT LAKE CITY, UT.

For AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE CO., Consol Defendant: DANIEL J. LEFFELL, NEW YORK, NY; KENNETH A. GALLO, PATRICIA C. CROWLEY, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For LEXINGTON INSURANCE CO., Consol Defendant: DANIEL J. LEFFELL, NEW YORK, NY; PATRICIA C. CROWLEY, PAUL WEISS RIFKIND, WHARTON & GARRISON LLP, WASHINGTON, DC.

For National Association of Professional Insurance Agents, National Association of Professional Insurance Agents, Amicus: WILLIAM F. MEGNA, MORRIS, MANNING & MARTIN, LLP, PRINCETON, NJ.

For Independent Insurance Agents & Brokers of America, Inc., Amicus: SHAFFIN ABDUL DATOO, VENABLE LLP, NEW YORK, NY US.

**JUDGES:** Garrett E. Brown, Jr [*34] ., U.S.D.J.

**OPINION BY:** Garrett E. Brown, Jr.

**OPINION**

**MEMORANDUM OPINION**

**BROWN, Chief Judge**

*2*TABLE OF CONTENTS

| |
|---|
| INTRODUCTION |
| BACKGROUND |
| DISCUSSION |
| I. Standard for a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) |

*2*TABLE OF CONTENTS

| | |
|---|---|
| II. Second Amended Complaints & Revised Statements of Particularity | |
| A. Plaintiffs' Amended Allegations | |
| III. The McCarran-Ferguson Act | |
| IV. The Sherman Act, Section 1 | |
| A. Sufficiency of Facts: Broker-Centered Conspiracies | |
| 1. Defendants claim that the broker-centered conspiracy allegations lack factual support | |
| 2. Plaintiffs contend that the broker-centered conspiracy allegations are sufficiently supported | |
| B. Sufficiency of Facts: Global Conspiracy | |
| 1. Defendants claim that the global conspiracy allegations lack factual support | |
| 2. Plaintiffs contend that the global conspiracy allegations are sufficiently supported | |
| C. Per Se Claims and Market Allocation | |
| 1. Defendants claim that Plaintiffs have not alleged naked restraints that support a per se claim | |
| 2. Plaintiffs contend that the allegations sufficiently support a per se claim | |
| D. Plaintiffs' Second Amended Complaints and Particularized Statements Do Not Sufficiently Allege Facts to Support Section 1 Claims | |

*2*TABLE OF CONTENTS

1. Broker-Centered Conspiracies

2. Global Conspiracy

CONCLUSION

INTRODUCTION

This [*35] matter comes before the Court upon the motions of Defendants [1] to dismiss, pursuant to Federal Rule of Procedure 12(b)(6), Plaintiffs' antitrust claims in the Second Consolidated Amended Complaint and the Second Consolidated Amended Employee-Benefit Class Action Complaint (collectively, "Complaints"). The Court has read and considered all documents filed and submitted and has decided the motions based upon the parties' submissions and without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' motions to dismiss are granted.

1 Commercial Defendants: AIG Defendants (AIG, Inc., American International Specialty Lines Ins. Co., Lexington Ins. Co., Birmingham Fire Ins. Co. of Penn., American Home Assurance Co., National Union Fire Ins. Co. Of Pittsburgh, National Union Fire Ins. Co. of Louisiana, American International Ins. Co., The Ins. Co. of the State of Penn., AIU Ins. Co., Commerce and Industry Ins. Co., New Hampshire Ins. Co., Hartford Steam Boiler Inspection and Ins. Co.); Hartford Defendants (Hartford Financial Services Group, Inc., Hartford Fire Ins. Co., Twin City Fire Ins. Co., Pacific Ins. Co., Ltd., Nutmeg Ins. Co., The [*36] Hartford Fidelity & Bonding Co.); Ace Defendants (ACE Limited, ACE INA Holdings, Inc., ACE USA, Inc., ACE American Ins. Co., Westchester Surplus Lines Ins. Co., Illinois Union Ins. Co., Indemnity Ins. Co. of North America); Axis Defendants (AXIS Speciality Ins. Co. and AXIS Surplus Ins. Co.); Chicago Ins. Co., Fireman's Fund Ins. Co., National Surety Corp. Defendants; CNA Defendants (CNA Financial Corp., Continental Ins. Corp., American Cas. Co. of Reading, PA, Continental Cas. Co.); Crum & Forster Holdings Corp., U.S. Fire Ins. Co. Defendants; Liberty Mutual Defendants (Liberty Mutual Holding Co., Inc., Liberty Mutual Ins. Co., Liberty Mutual Fire Ins. Co., Wausau Underwriters Ins. Co.); American Re Defendants (American Re Corp., American Re Ins. Co., Munich American Risk Partners, American Alternative Ins. Corp.); Travelers Defendants (The Travelers Companies, Inc., St. Paul Fire and Marine Ins. Co., Gulf Ins. Co., St. Paul Mercury Ins. Co., Travelers Cas. & Surety Co. of America, The Travelers Indemnity Co., Athena Assurance Co.); Greenwich Ins. Co., Indian Harbor Ins. Co., XL Capital Ltd. Defendants; The Chubb Defendants (The Chubb Corp., Federal Ins. Co., Executive Risk Indem., [*37] Vigilant Ins. Co.); Marsh Defendants (Marsh & McLennan Companies, Inc., Marsh Inc., Marsh USA Inc. (Conn.), Mercer Inc., Mercer Human Resource Consulting LLC, Mercer Human Resources Consulting of Texas, Inc., Seabury & Smith, Inc.; Wells Fargo & Co., Accordia, Inc. Defendants; Willis Defendants (Willis Group Holdings Limited, Willis Group Limited, Willis North America Inc., Willis of New York, Inc.); Aon Defendants (Aon Corp., Aon Broker Services, Inc., Aon Risk Services Companies, Inc., Aon Risk Services, Inc. of Maryland; Aon Risk Services, Inc. of Louisiana, Aon Risk Services of Texas, Inc., Aon Risk Services, Inc. of Michigan, Aon Group, Inc., Aon Services Group, Inc., Affinity Ins. Services, Inc., Aon Consulting, Inc.); Hilb Rogal & Hobbs Company Defendants; Munchener Ruckversicherungs-Gesellschaft Defendant; XL Defendants (Greenwich Ins. Co., Indian Harbor Ins. Co., XL Capital Ltd.). Employee-Benefits Defendants: Life Insurance Company of North America, Connecticut General Life Ins. Co. Defendants; MetLife Defendants (MetLife, Inc., Metropolitan Life Ins. Co.,

Paragon Life Ins. Co.); AIG Defendants; Hartford Defendants; Prudential Defendants (Prudential Financial, Inc., Prudential [*38] Ins. Co. of America); UnumProvident Defendants (UnumProvident Corp., Unum Life Ins. Co. of America; Provident Life and Accident Ins. Co.); USI Defendants (USI Holdings Corp., USI Services Corp., USI Consulting Group, Inc.).

**BACKGROUND**

This action involves numerous class actions filed against various insurance brokers and insurers. The class actions allege violations of federal and state antitrust laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO") and common law. These class actions have been consolidated into the present action.

Plaintiffs filed an amended complaint on or about August 1, 2005, and a corrected amended complaint on or about August 15, 2005. After these causes of action were aligned and severed into two types of matters (one involving commercial property and casualty insurance coverages ("Commercial Case") and the other involving employee benefits insurance plans ("Employee-Benefits Case")), the Court consolidated all actions into two accordingly aligned dockets. See In re Ins. Brokerage Antitrust Litig., 04-5184 (GEB), Docket Entry No. 118 (D.N.J. May 25, 2005); In re Employee-Benefits Brokerage Antitrust Litig., 05-1079 (GEB), Docket Entry No. 20 (D.N.J. [*39] Aug. 8, 2005). Consequently, Plaintiffs filed one consolidated amended complaint per each respective docket, and then altered these two submissions by filing two corrected amended complaints. See In re Ins. Brokerage Antitrust Litig., 04-5184 (GEB), Docket Entry No. 201 (D.N.J. May 25, 2005); In re Employee-Benefits Ins. Brokerage Antitrust Litig., 05-1079 (GEB), Docket Entry No. 21 (D.N.J. Aug. 8, 2005).

The extensive facts and procedural history in this case have been set forth previously by the Court and are repeated only where relevant to the instant motion.

In the Court's October 3, 2006 Opinion regarding the motions to dismiss, the Court concluded that the allegations set forth in Plaintiffs' First Consolidated Amended Complaints "have insufficient particularity to demonstrate 'concerted action' by all of the Defendants under the Sherman Act." In re Ins. Brokerage Antitrust Litig. 04-5184, (GEB), Docket Entry No. 720, at 26 (D.N.J. Oct. 3, 2006). The Court further stated that in lieu of filing an amended complaint, Plaintiffs were permitted to file a Supplemental Statement of Particularity which "shall set forth, with the degree of particularity required under 9(b), the identity [*40] of the conspirators and the role of each Defendant in the alleged conspiracies." Id. at 29. The Court further required Plaintiffs to "aver sufficient facts to inform each Defendant of its alleged participation in the conspiracies." Id. The Court concluded that Plaintiffs did not allege sufficient facts to show that an "implied or express agreement existed between the alleged conspirators." Id. at 26. Pursuant to the two orders of the Court and accompanying opinion, see In re Ins. Brokerage Antitrust Litig, 04-5184 (GEB), Docket Entries Nos. 123, 720-21 (D.N.J. May 25, 2005 and Oct. 3, 2006), Plaintiffs filed their RICO Case Statement and Statements of Particularity supplementing the Complaints. See, e.g., In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entries Nos. 843, 844, 845.

On April 5, 2007, the Court granted Defendants' renewed motion to dismiss the consolidated complaints, and permitted Plaintiffs the opportunity to file Second Amended Consolidated Complaints ("SAC") and Revised Statements of Particularity. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry Nos. 1125-1127; 05-1079, Docket Entry Nos. 597-599. Plaintiffs filed their Second Amended Complaints on [*41] May 22, 2007, accompanied by Revised Particularized Statements. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry Nos. 1239-1241; 05-1079, Docket Entry Nos. 675-677. In the Second Amended Complaints, Plaintiffs make claims on behalf of a proposed class of insureds who purchased or renewed insurance policies with the Defendant Insurers through the Defendant Brokers. Plaintiffs allege that the Defendants "engaged in a series of unlawful horizontal conspiracies, the purpose and effect of which were to reduce or eliminate competition among members of the various conspiracies described herein, by among other things, allocating customers to and among members of the conspiracies and protecting those conspirators from competition for those customers' business. Defendants' customer allocation agreements and other schemes were naked restraints of trade in violation of section 1 of the Sherman Act." (SAC, P 64). On June 21, 2007, Defendants filed the current motions to dismiss the Second Amended Complaints in both the Commercial and Employee-Benefits cases.

**DISCUSSION**

**I. Standard for a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) [*42] may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. Oran v. Stafford, 226 F.3d 275, 279 (3d Cir. 2000); Langford v. City of Atlantic City, 235 F.3d 845, 850 (3d Cir. 2000); Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986). In a recent decision, the Supreme Court held that to survive a Rule 12(b)(6) motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact." [2] Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 127 S.Ct. at 1969. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).

2 In Twombly, the Supreme Court rejected the language previously used by the Court in Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), [*43] which provided that "[i]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46. In Twombly, the Court held that the Conley "no set of facts" language "has earned its retirement" and "is best forgotten."

**II. Second Amended Consolidated Complaints and Revised Statements of Particularity**

**A. Plaintiffs' Amended Allegations**

According to Plaintiffs, the Second Amended Complaints allege that the Defendants engaged in a series of "hub and spoke" conspiracies, in each of which a Broker Defendant "hub" coordinated an illegal customer allocation scheme among the Insurer Defendant "spokes." In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 12 (Pl.'s Opp.). Plaintiffs also supply facts regarding the formation and operation of an alleged global conspiracy in which the Broker Defendants agreed not to compete for each others' customers by disclosing the existence and adverse premium price impact of their rivals' broker-centered [*44] schemes. Id. at 13 (SAC PP 64-65).

With regard to the alleged scheme, Plaintiffs claim that the method for minimizing competition was two-fold: (1) in exchange for the payment of contingent commissions, the participants in each Broker-Centered conspiracy agreed that the broker would allocate the bulk of its business to the conspiring insurers, protecting them from having to compete with insurers outside the arrangement; and (2) the participants in each Broker-Centered conspiracy agreed to reduce or eliminate competition among the conspiring insurers as to that secured book of business. Id. (SAC P 66). Specifically, Plaintiffs contend that the insurers agreed with each other not to compete for each others' existing customers, and the brokers allegedly facilitated this plan by using various incumbent protection devices. Id. Plaintiffs claim that incumbent protection was a crucial element in the conspiracies, and that Broker Defendants shielded their insurer partners from normal competition by agreeing not to bid renewals competitively or by limiting the circumstances under which renewals could be marketed. Id. (SAC P 73). Plaintiffs allege that the Broker Defendants provided competitive [*45] advantages to the insurer partners by disclosing other carriers' bids, providing first or last looks and other methods. Id. at 14 (SAC PP 110, 169, 221, 288, 337).

Plaintiffs allege that the method of allocation involved incumbent protection. Id. (SAC PP 19-128). Plaintiffs also contend that the brokers' decision to consolidate their markets was a dramatic departure from their previous business methods and the brokers consolidated their markets to increase their leverage and contingent commission revenue. Id. (SAC PP 83, 362, 162, 206, 269, 329, 450). Plaintiffs insist that the contingent commissions were almost pure profit with no discernable associated costs and that these costs were built into the formulas used to develop premium with the result that the contingent commission arrangements increased premium levels for all purchases, resulting in defendants enjoying supra-competitive profits. Id. at

14-15 (SAC PP 360-61, 370-72, SAC EB PP 310-11). Plaintiffs allege that the participants in the conspiracies were aware of and agreed to an allocation of customers and business, and expected an unfair competitive advantage and protection from competition, including protection of their renewal [*46] business and access to a guaranteed flow of premium volume in return for contingent payments. Id. (SAC P 133, 134, 282, 307; RPS PP61-62).

Plaintiffs claim that the conspiracy was facilitated by the exchange of information to assure the insurers that each was committed to a similar agreement with a broker. Id. Plaintiffs allege that the Broker Defendants made sure that each of its partner carriers were aware of who the other partner carriers were, all tiers or levels of preferred status and the requirements for that status, and the details of rival insurer's contingent commission agreements. Id. at 16 (SAC EB PP 173, 262, 171, 190.3 195; SAC PP 142, 143, 144, 351; RPS PP 82, 89, 225; RPS EB PP 194, 231-232).

Plaintiffs describe several broker-centered conspiracies in both the Commercial and EB complaints. In the Commercial Complaint, Plaintiffs set forth specific facts describing the Marsh, Aon, HRH, Wells Fargo/Acordia, and Willis broker-centered conspiracies. See SAC, Counts I - IV, VI - VII; SAC EB Counts I-III, V. Plaintiffs allege that in the Marsh and Marsh Excess Casualty broker-centered conspiracies, the principal component was an agreement not to compete for the incumbent business [*47] of other insurers and an understanding that Marsh would take action to facilitate that agreement. Id. at 17. Plaintiffs claim that because most of Marsh's premium volume was renewal business, Defendants' agreement not to compete for existing customers eliminated or minimized competition for the bulk of Marsh's book of business. Id. (SAC P 96, SAC EB P 113). Plaintiffs contend that this conspiracy is supported by more than parallel conduct, and there are specific facts that suggest that a scheme to protect incumbent business existed and that the participants engaged in behavior that resulted in the placement of business with their competitors. Id. at 18 (SAC PP 105-106, 108-109, 111, 115-17, 119-28, 122-26, 129-30, SAC EB PP 114-21, 125-128).

Regarding the Aon broker-centered conspiracy, Plaintiffs allege that Aon altered its business practices by consolidating the bulk of its business with a few insurers,

who agreed to pay contingent commissions in exchange for the reduction or elimination of competition for Aon's business. Id. at 19 (SAC P 158, SAC EB P 140). The key component of the agreement involved the retention of incumbent business. Id. Plaintiffs contend that facts exist to [*48] support this conspiracy, for example, internal discussions among the conspiring insurers indicating knowledge of the division of Aon's business, the levels of premium volume promised to insurers, the protection of incumbent accounts and the steering of business to meet premium threshold levels. Id. (SAC PP 161, 170, 171, 174-76, SAC EB PP 144, 159-62, 169-74). The HRH broker-centered conspiracy allegedly involved a scheme that consolidated HRH's business by eliminating hundreds of other insurers from competing equally with the three conspiring insurers for almost all of HRH's small business customers and about a third of HRH's total commercial customers. Id. at 20 (SAC P 237, 239-42). Plaintiffs claim that the insurers were aware of this allocation and agreed to participate in the allocation scheme. Id. at 21 (SAC PP 237, 245-46, 253, 251-52).

Plaintiffs also describe a conspiracy involving Wells Fargo and Acordia, in which certain insurers carried out an alleged arrangement known as the Millennium Partnership Agreement, pursuant to which specified business was divided among five insurers, each aware of the allocation. Id. (SAC PP 201, 203-207). Plaintiffs allege that this agreement [*49] divided a substantial portion of Wells Fargo/Acordia's small business markets among the five insurers and a substantial portion of its small commercial accounts to two insurers. Id. (SAC PP 201, 204-208). Plaintiffs also claim that the arrangement limited competitive bidding of renewals and placed incumbent business at higher prices than needed. Id. at 22 (SAC PP 213-15, 218-20, 224-25). The final Commercial broker-centered conspiracy involved Willis, in which the insurers agreed that each insurer would keep its own incumbent business and that Willis would protect that business from competition using a variety of incumbent protection devices. Id. Plaintiffs submit facts that purportedly establish the willingness of insurers to submit losing quotes, that demonstrate the shifting of large blocks of premium volume to co-conspirators and that support Willis' promise to deliver specified volumes of premium to conspiring insurers. Id. at 23 (SAC PP 274, 277-78, 281-89, 305, 307; SAC EB P 277). The ULR broker-centered conspiracy allegedly involved an agreement that more than 90% of ULR's business would be shared by four insurers and that in return for

contingent commission payments, ULR would [*50] protect the participating insurers from competition for that business. Id. at 25. Plaintiffs plead facts regarding ULR's purported standardization of its relationships with its preferred partners, actions against interest including agreements to make contingent commission payments that were not earned under the agreements and insurer approval of higher rates to customers to allow ULR to incorporate its fee in the increased rate, and the protection of incumbent business. Id. at 26 (SAC EB PP 181-82, 186-87, 198, 201, 209-11; SAC EB PP 284-89, 292-95).

Plaintiffs also set forth allegations regarding a global conspiracy, involving the Broker Defendants, not to compete with one another by disclosing the true nature and effect of the parties' contingent commission arrangements and the premium price impact of those arrangements. Id. at 27; SAC Count VIII, SAC EB Count VI; (SAC P 354). Plaintiffs contend that the Broker Defendants expressly or tacitly agreed not to disclose the existence of the contingent commission agreements or strategic partnerships and the resulting supra-competitive profits derived there from, either to their own customers or in an effort to steal the customers of rival [*51] brokers. Id. (SAC PP 353-56). The common goal consisted of maintaining an independent anti-competitive scheme and not having a super-competitive profit undermined by truthful price disclosures or advertising. Id. at 28 (SAC PP 356, 360-61). Plaintiffs allege that the co-conspirators accomplished these goals through the CIAB and other means. Id. (SAC PP 406-31, 442-470). In the Employee Benefits Complaint, Plaintiffs allege facts they claim support the coordinated non-disclosure of broker commissions on Form 5500, and that the brokers and insures agreed not to disclose the commissions on these forms. Id. at 29 (SAC EB PP 316, 327-38, 372-73).

### III. The McCarran-Ferguson Act

In support of the motions to dismiss, Defendants contend that the McCarran-Ferguson Act exemption applies to this matter, and warrants its dismissal. The Court's October 3, 2006 Opinion addressed this argument, and determined that the McCarran-Ferguson Act did not apply in this case. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 720. The Court stated that "the alleged bid-rigging and steering activities do not constitute the 'business of insurance.' Therefore, the McCarran-Ferguson exemption does [*52] not apply." Id. The Court concluded that the exemption was not applicable because the alleged practices were not sufficiently "related to risk-allocation."

Defendants contend, however, that the Court should re-evaluate its previous decision that the Act does not exempt this matter from litigation. Defendants submit that Plaintiffs have amended their pleadings twice since the Court's initial ruling on the applicability of the Act, and that "[w]hile neither the basic factual content (or lack thereof) nor the gravamen of plaintiffs' pleadings has changed materially, the manner in which plaintiffs have presented their case has shifted in response to the Court's opinions." In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1228, at 31 (Def.'s Omnibus Reply). Defendants note that when the Court first considered this issue, Plaintiffs placed heavy emphasis on allegations of bid-rigging and steering based on the payment of contingent commissions. Id. at 31-32. In Plaintiffs' amended pleadings, Defendants submit that the allegations stress the market allocation which was allegedly intended to achieve "incumbency protection." Defendants contend that the Court did not previously [*53] consider the legal question whether antitrust claims based on incumbency protection were exempt pursuant to the McCarran-Ferguson Act. Id. at 32.

Plaintiffs claim that the Court's October 3rd decision regarding the Act is the law of the case, which can only be reassessed in extraordinary circumstances, which include when "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." Pub. Interest Research Group of N.J. v. Magnesium Elektron, Inc., 123 F.3d 111, 117 (3d Cir. 1997). Defendants claim that all three exceptions apply here. Specifically, that new evidence exists as Plaintiffs' twice amended complaints and particularized statements have shifted the theory of the case from "bid rigging" and "steering" practices to "incumbency protection;" that supervening new law, namely, Credit Suisse Sec.(USA) LLC v. Billing, 127 S.Ct. 2383, 168 L. Ed. 2d 145 (2007), should be considered; and that the Court's prior ruling on the McCarran-Ferguson Act was clearly erroneous. The McCarran-Ferguson Act provides for a limited, conditional exemption from federal antitrust laws. Section 1012(b) of the Act states, [*54] in relevant part:

> No Act of Congress shall be construed to

> invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee of tax upon such business, unless such Act specifically relates to the business of insurance ....; *Provided* that ... the Sherman Act shall be applicable to the business of insurance to the extent that such business is not regulated by State law ....

15 U.S.C. § 1012(b) (emphasis in original). Section 1013(b) provides that "[n]othing contained in this Chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." Therefore, the Act exempts from federal antitrust liability conduct that (1) is part of the "business of insurance;" (2) is "regulated by state law;" and (3) does not constitute a "boycott, coercion or intimidation." The Supreme Court, in Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129, 102 S. Ct. 3002, 73 L. Ed. 2d 647 (1982), enumerated three specific criteria for determining whether particular conduct constitutes the business of insurance. "[F]irst, whether the practice has the effect of transferring or spreading a policyholder's [*55] risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." Pireno, 458 U.S. at 129.

Defendants claim that Plaintiffs' allegations that policyholder-broker-insurer relationships were corrupted through illegal market allocation and steering, go to the core of the business of insurance. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1228, at 31 (Def.'s Omnibus Reply). Defendants also claim that because the challenged practices involve the payment of contingent commissions to brokers, these practices are integral to the policy relationship between insurers and insureds, and that the conduct alleged is limited to entities within the insurance industry, thus placing the conduct within the purview of the Act. Id. at 32. Defendants claim that the alleged allocation of insureds to incumbent insurers would necessarily implicate the transfer and spreading - here through retention of business - of desirable risks, and goes to the essence of risk-spreading. Id. at 37. Plaintiffs, however, maintain that they have never limited any of [*56] their claims to bid-rigging but rather allege that "Defendants conspired to allocate broker business without competition among insurers in exchange for contingent commissions and other fees that were then built into artificially inflated premiums charge to Plaintiffs and the Class." Pl.'s Sur-reply, at 18.

Defendants contend that the Court should re-evaluate the applicability of the Act due to the twice amended complaints and the additional facts supplied to the Court that were not previously considered. However, while Plaintiffs have presented amended complaints with a focus on incumbency protection as a method of allocation, the Court concludes that this is not a significant enough change in theory to satisfy the "new evidence" exception to the law of the case doctrine. Rather, the fundamental allegations raised in the Second Amended Complaints still involve the steering of business to certain preferred insurer partners in the alleged conspiracies. The Court previously considered whether this type of steering of business constituted the business of insurance, and concluded that the practice itself does not transfer or spread a policyholder's risk, as required by the first Pireno factor. [*57] Pireno, 458 U.S. at 129; see also In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 720, at 18.

Defendants next assert that the Court's prior ruling should be re-evaluated due to new law, specifically, the Supreme Court's decision in Credit Suisse Sec.(USA) LLC v. Billing, 127 S.Ct. 2383, 168 L. Ed. 2d 145 (2007). Defendants contend that the Court's previous opinion relied on the well-established principle that "exemptions from the antitrust laws are to be narrowly construed." In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 720. Defendants assert that the conduct alleged in this action is central to the marketing of insurance and lies at the core of the business of insurance and is actively regulated under state insurance law. In Credit Suisse, the Court explained that the conduct at issue was exempt from the antitrust laws under the doctrine of implied immunity because that conduct lies "at the core of marketing of new securities" and is regulated by the Securities Exchange Commission. Id. at 2396. Further, the Court found that the conduct at issue should be treated as exempt from the antitrust laws because "the threat of antitrust lawsuits, through error and [*58] disincentive, could seriously alter underwriter conduct in undesirable ways" and "threaten serious harm to the efficient functioning of the securities markets." Id. at 2396. Defendants contend that the same is true for the

conduct at issue in the present matter. Plaintiffs argue that Credit Suisse involved the question of whether and to what extent federal securities laws impliedly preclude the application of federal antitrust law to claims against underwriters for illegally restricting and conditioning the sale of stock in connection with initial public offerings. Pl.'s Sur-reply, at 19. Plaintiffs note that a traditional preemption analysis was used by the Court because of the absence of any express statutory bar or preemptive provision like McCarran-Ferguson. Id. Plaintiffs contend that while new policy arguments may exist in Credit Suisse, the case does not satisfy the "supervening new law" condition required to trigger the exception to the law of the case. Id.

Despite the recent Supreme Court decision, at this juncture the decision does not impact the set of facts presently before the Court. The Court's previous ruling, while relying on the principle that exemptions from antitrust [*59] laws are to be narrowly construed, took into consideration each aspect of the application of the McCarran-Ferguson Act, and succinctly concluded that the exemption was not applicable in this matter. The Court does not find the abovementioned case law to have changed the law of this case so as to warrant a reconsideration of that prior ruling.

Finally, Defendants contend that the Court's previous ruling regarding the Act was clearly erroneous. As stated above, the Court concludes that Defendants have not presented a sufficient reason to reassess the law of the case, namely the application of the McCarran-Ferguson Act, and will rely on the previous ruling concluding that the exemption provided by the Act does not apply here.

**IV. The Sherman Act, Section 1**

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared illegal." 15 U.S.C. § 1. To properly plead a violation of Section 1, a plaintiff must allege "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; [*60] and (4) that the plaintiff was injured as a proximate result of the concerted action." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).

The first element, concerted action, constitutes the "very essence of a section 1 claim." Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 998 (3d Cir. 1994) (noting that "unilateral action, no matter what its motivation, cannot violate [section] 1") (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 110 (3d Cir. 1980)). The Third Circuit has stated that "[a] general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action." Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 182 (3d Cir. 1988). Only "allegations of conspiracy which are particularized. . . will be deemed sufficient." Id. at 181 (quoting Garshman v. Universal Resources Holding, Inc., 641 F.Supp. 1359, 1370 (D.N.J. 1986); id. at 182 (stating that, on a motion to dismiss, plaintiffs must "present evidence 'that tends to exclude the possibility that the alleged conspirators acted independently.'") (citations omitted).. To [*61] adequately allege concerted activity, Plaintiffs are not required, at this stage of the proceedings, to provide all the details of the alleged conspiracies. Id. (quoting Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 231-32 (3d Cir. 1941)). But they must, at a minimum, "plead the facts constituting the conspiracy, its object and accomplishment," such as "the date of the alleged conspiracy," or "its attendant circumstances." Id.; see also Mowrer v. Armour Pharmaceutical Co., Civ. No. 92-6905, 1993 U.S. Dist. LEXIS 18367, at *8 (E.D. Pa. Dec. 30, 1993) (holding that plaintiffs must plead "the general composition of the conspiracy, some or all of its broad objectives, and [each defendant's] general role in that conspiracy.").

The requirement that conspiracy allegations be pled with adequate specificity is not a mere technicality, but rather, is grounded in considerations of judicial economy and fairness to the defendants. Zimmerman, 836 F.2d at 182 ("It is simply not fair to the defendants, and it would be an onerous imposition on the judicial process, to permit litigation to go forward on the basis of [] conclusory and speculative allegations."); see also Phillip E. Areeda & Herbert Hovenkamp, [*62] Antitrust Law P 1409, at 55 (2003) ("Conspiracy allegations frequently name one or two specific persons or firms and also sweep in other unnamed conspirators. The openness of the charge invites confusion where only a few of the possible conspirators have engaged in readily proved collaborative conduct."); see finally In re Tower Air, Inc., 416 F.3d 229, 237 (3d Cir. 2005) ("[e]ven at the pleading stage, a defendant deserves fair notice of the general factual

background for the plaintiff's claims.').

The Supreme Court recently considered whether a Section 1 complaint can survive a motion to dismiss when it alleges parallel conduct unfavorable to competition, without some factual context suggesting an agreement, as distinct from identical, independent action. Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1961, 167 L. Ed. 2d 929 (2007). According to the Court, "'the crucial question' is whether the challenged anticompetitive conduct 'stems from independent decision or from an agreement, tacit or express.'" Id. (quoting Theatre Enterprises v. Paramount Film Dist. Corp., 346 U.S. 537, 540, 74 S. Ct. 257, 98 L. Ed. 273 (1954)). "While a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder [*63] may infer agreement,' it falls short of 'conclusively establishing agreement or . . . itself constituting a Sherman Act offense.'" Id. (quoting Theatre Enterprises, 346 U.S. at 540-41).

The Court held that stating a Section 1 claim, "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." Id. at 1966. The Court concluded that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." Id. In short, the Court found that "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Id.

**A. Sufficiency of Facts: Broker-Centered [*64] Conspiracies**

*1. Defendants claim that the broker-centered conspiracy allegations lack factual support*

In the April 5th Opinion, this Court concluded that "while it might have been plausible that the Defendants agreed to engage in some sort of behavior, [this claim] cannot survive as a horizontal conspiracy unless what the competitors agreed to do was unlawful." In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 1126. Accordingly, the Court dismissed the First Amended Complaints, but permitted Plaintiffs a chance to cure the defects in their pleadings by filing amended complaints and particularized statements.

Defendants contend that Plaintiffs' Second Amended Complaints do not allege facts sufficient to support the claims of multiple horizontal conspiracies. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1232, at 7 (Def.'s Omn. Br.). Defendants submit that despite two years of discovery, Plaintiffs have not identified any communications reflecting an agreement among the insurers in the broker centered conspiracies, nor any basis to infer an agreement. Id. at 10. Defendants note that Plaintiffs' theory of market allocation consists of a horizontal [*65] agreement among the insurer defendants pursuant to which they agreed to pay contingent commissions to brokers in exchange for the brokers consolidating the bulk of their business with those carriers, however, Defendants claim there are no facts alleged to support this alleged scheme. Id. Defendants claim that once a broker decided to consolidate, it was in the independent business interest of each insurer to compete to be one of those select insurers. Id.

Defendants argue that the second part of the conspiracy, the agreement among the strategic partner insurers not to compete for each other's existing customers, also lacks factual support. Id. at 11. Defendants claim that the "incumbent protection" devices allegedly used by the brokers and insurers to further the agreement, can be explained by "the obvious independent economic self-interest of each individual insurer." Id. at 11. Defendants explain that an incumbent insurer is already familiar with the risks posed by an existing customer, which enables it to expend less money and resources to underwrite the risk. Id. Defendants claim it is "natural (and sensible) for an insurer to pay contingent commissions that reward renewal of exiting [*66] accounts." Id.

*2. Plaintiffs contend that the broker-centered conspiracies are sufficiently supported*

Plaintiffs, however, contend that the broker-centered conspiracies are adequately alleged. Plaintiffs assert that they need not plead or prove an express agreement or direct communication among the insurers in order to establish a horizontal conspiracy. In re Ins. Brokerage

Antitrust Litig., 04-5184, Docket Entry No. 1263, at 31 (Pl.'s Opp.). As noted in the Court's April 5th Opinion, "if the 'spokes' on the wheel have . . . accepted the alleged practices based on the participation of others in the scheme, a common conspiracy may be inferred." In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 1126, at 29; see also Masonite, 316 U.S. at 274-75, 62 S. Ct. 1070, 86 L. Ed. 1461 ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators . . . . Acceptance by competitors without previous agreement of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."). Plaintiffs claim [*67] there is enough evidence to conclude that each broker was the "ringmaster" of a horizontal arrangement, involving the insurers as co-conspirators, to allocate premium and reduce competition among members of each conspiracy. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 32 (Pl.'s Opp.).

Plaintiffs claim that the members of the conspiracy were aware of each others' involvement as partners, were aware of each others' arrangements with the broker, and were aware that they and their partners were protected from competition. Id. The alleged conspiracy was dependent on a mechanism by which the insurers could check for deviation from the scheme, as participation of all insurers to whom a broker was directing a substantial share of its business was necessary. Id. Plaintiffs allege facts that they claim support this theory, and that information was demanded and shared amongst the participants, specifically, the insurers own confidential information was shared with the partners to ensure the participants were cooperating. Id. at 33.

Plaintiffs contend that participants in the Marsh Broker-Centered conspiracy actually admitted that the bid-rigging conduct of the insurers [*68] was in furtherance of a scheme to protect insurers' incumbent business, and insurer participants in the scheme admitted that they engaged in practices to protect a rival's incumbent business so that their own business would be protected in return. Id. at 34; see e.g., SAC P 115 (Marsh employee admitted that "the primary goal of th[e] scheme was to maximize Marsh's profits by controlling the market, and protected incumbent insurance carriers when their business was up for renewal"); SAC P 119 (AIG employee admits that AIG provided false quotes "to pretend to show competition where there is none" so that AIG would not face competition on its own renewals); SAC P 106 (Marsh employee admits that if an incumbent meets Marsh's target price and provided the coverage it wanted then Marsh would protect them and make sure they get the business); SAC PP 115-117 (the agreement between Marsh and co-conspirators was to protect the incumbent by providing "artificial" quotes that were non-competitive); SAC P 126 (Fireman's Fund renewal business was protected from competition by false quotes provided by AIG, ACE, Liberty Mutual, and Zurich). Plaintiffs claim that internal insurance company documents [*69] reflect that the insurers were aware of and agreed to the arrangement, for example, of the HRH Conspiracy, to divide HRH's business among the "Big 3" insurance partners. Id. at 36; SAC PP 245, 252-53.

**B. Sufficiency of Facts: Global Conspiracy**

***1. Defendants claim that the global conspiracy allegations lack factual support***

With respect to the global conspiracy, Defendants claim that the Second Amended Complaints are devoid of facts to support the allegations of a global conspiracy among the Broker Defendants. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1232, at 12 (Def.'s Omn. Br.). Defendants contend that the brokers consolidated the markets over a period of several years, which undercuts the inference of a global conspiracy. Id. Defendants claim that the global conspiracy is implausible because brokers disclosed their own contingent commission income to customers. Id. at 13 (citing Third RICO Statement, 21-22). Defendants maintain that the non-disclosure of the commission agreements occurred because each broker recognized that it was in its own unilateral economic self-interest not to disclose other brokers' contingent commissions. Id. Defendants also note that the [*70] Court previously concluded that "Plaintiffs' general assertions that the Defendants have communicated and shared information through various trade groups and conferences" are insufficient to support an inference of "actual concert of action." In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 720, at 26-27.

***2. Plaintiffs contend that the global conspiracies are sufficiently supported***

Plaintiffs contend that they have alleged adequate

facts to support the global conspiracy claims, and that Defendants enjoyed supra-competitive profits as a result of their anti-competitive scheme. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 37 (Pl.'s Opp.). Plaintiffs claim that the Broker Defendants realized billions of dollars in additional revenue due to the payment of contingent commissions, which is allegedly pure profit for the brokers. Id. (SAC PP 81, 90, 360, 369-72). Plaintiffs allege that Defendants agreed not to disclose the existence of the contingent commission payments, and the resulting impact on premium levels to their own clients or the clients of another broker, in an effort to steal that broker's client. Id. (SAC P 356). Plaintiffs allege [*71] that the Broker Defendants adopted collective and inadequate disclosure policies through CIAB and LIMRA to prevent inquiry rather to inform; adopted similar confidentiality provisions in contingent commission agreements; and the Insurer Defendants failed to disclose the payments in Form 5500 although required by ERISA. Id. at 37-38 (SAC PP 442-48, 462; SAC EB PP 449-57; SAC PP 439, 443-58, 462-66, 404-13; SAC EB PP 389-448, 327-38).

Plaintiffs claim that horizontal agreements restricting the nature of price disclosures to customers are a form of output restriction, and are naked restraints of trade. Id. at 38. Plaintiffs contend that by making similar vague and incomplete disclosures regarding the contingent commissions, the Broker Defendants, aided by the Insurer Defendants, insulated themselves from competition from one another on the basis of these commissions and protected the resulting profits. Id. at 38 (SAC PP 360-61). Plaintiffs assert that unlike Twombly, the global conspiracy claims here do not rest on allegations that the brokers operated the same way in failing to make these disclosures, but rather are based on evidence of agreements to collectively implement similar disclosure [*72] (or non-disclosure) policies. Id. at 39. Plaintiffs claim that the crux of the global conspiracy is a horizontal agreement among brokers not to disclose the nature and effect of the contingent commission arrangements, and the creation and implementation of disclosure policies that were designed to hide the scheme. Id.

**C. Per Se Claims and Market Allocation**

The *per se* approach "permits categorical judgments with respect to certain business practices that have proved to be predominately anti-competitive. Courts can thereby avoid the 'significant costs' in 'business certainty and litigation efficiency' that a full-fledged rule-of-reason inquiry entails." Northwest Wholesale Stationers, 472 U.S. 284, 289, 105 S. Ct. 2613, 86 L. Ed. 2d 202 (1985) (quoting Arizona v. Maricopa Cty. Medical Society, 457 U.S. 332, 343-44, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1983)). "Per se rules are invoked when surrounding circumstances make the likelihood of anti-competitive conduct so great as to render unjustified further examination of the challenged conduct." Id. at 290 (quoting National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma, 468 U.S. 85, 103-104, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984)). A classic examples of a *per se* violation of Section 1 is "an agreement between competitors [*73] at the same level of the market structure to allocate territories in order to minimize competition . . . . This Court has reiterated time and time again that 'horizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.' Such limitations are per se violations of the Sherman Act." Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49, 111 S. Ct. 401, 112 L. Ed. 2d 349 (1990) (citations omitted). "The essence of market a market allocation violation, however, is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers." Mid-West Underground Storage v. Porter, 717 F.2d 493, 497 (1983); see also Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United, 1993 U.S. Dist. LEXIS 3446, 1993-1 Trade Cas. (CCH) P 70,235, at 70,161 (N.D. Ill. 1993) ("Characterization of an agreement as horizontal or vertical is important because certain horizontal agreements have been declared *per se* illegal while vertical agreements covering the same subject matter have not.").

***1. Defendants claim that Plaintiffs have not alleged naked restraints that support a per se claim***

Defendants contend that even if the Second Amended Complaints adequately alleged [*74] a horizontal agreement, they still fail to allege an agreement amounting to a naked restraint of the type necessary to sustain a *per se* claim. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1232, at 15 (Def.'s Omn. Br.). Defendants claim that the conduct alleged describes a variety of practices, such as the development of strategic partnerships with insurers, use of last looks and other bidding-related practices that allegedly favor incumbents. Id. Defendants claim that on

their face, these practices are pro-competitive. Id. at 16 (citing Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19-20, 99 S. Ct. 1551, 60 L. Ed. 2d 1 (1979) (to be *per se* illegal a practice must "facially appear[] to be one that would always or almost always tend to restrict competition," rather than "one designed to increase economic efficiency and render markets more, rather than less, competitive")).

Defendants also claim that Plaintiffs have not alleged a plausible market allocation method. Id. Defendants contend that because Plaintiffs allegations involve contingent commissions based on either renewal business, volume or growth, with different payment thresholds and rates which changed over time, these variations created multiple, [*75] conflicting incentives that caused brokers to sometimes seek to place risks with the incumbent, while other times move clients among strategic partners. Id. at 17. Defendants submit that the allegations show that insurers used contingent commissions to compete with one another for the services of brokers, and that any alleged steering of business in exchange for lucrative commissions does not constitute a horizontal conspiracy to allocate the market. Id. at 18. Defendants also note that incumbent protection devices such as first and last looks would be unnecessary if there was an agreement in place among insurers that the incumbent would retain its accounts without facing competition. Id.

Defendants contend that the conduct alleged by Plaintiffs does not constitute a naked restraint of trade. Id. at 20. Defendants argue that there are many legitimate pro-competitive reasons for a broker to consolidate its business and form strategic partnerships with certain insurers. Id.; see also In re Ins. Brokerage Antitrust Litig., 05-1079, Docket Entry No. 664, at 8 (EB Insurers' Br.). For example, Defendants claim that improved organizational efficiency and increased leverage in negotiating with [*76] insurers are both legitimate business objectives, both achieved by utilizing strategic partnerships. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1232, at 21 (Def.'s Omn. Br.). According to Defendants, the strategic partnerships alleged in the Second Amended Complaints are akin to the "preferred provider" arrangements that are common throughout the economy, which Defendants contend have been held not to be *per se* illegal. Id. at 23 (citing Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 62 (1st Cir. 2004)). Defendants also contend that the Second Amended Complaint is riddled with examples of competition among the Insurer Defendants. In re Ins. Brokerage Antitrust Litig., 05-1079, Docket Entry No. 664, at 9 (EB Insurers' Br.) (SAC EB PP 211, 282, 285, 176, 205, 220, 239, 242).

*2. Plaintiffs contend that the allegations sufficiently support a per se claim*

According to Plaintiffs, "many horizontal market division agreements cover something less than, or different from, absolute bans on selling in one another's designated territory or to one another's designated customers . . . The case law is clear that a market division need not be an agreement [*77] that each firm will stay completely out the assigned territory of another." In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 41 (Pl.'s Opp. Br.) (quoting XII Herbert Hovenkamp, *Antitrust Law*, P 2030). Plaintiffs also note that it is "clear that an agreement between rivals is not saved [from *per se* condemnation] merely because it is not 'airtight' . . . . The fact that the two firms are competing in part of their output does not change the status of the agreement pertaining to the other part." Id. (quoting XII Herbert Hovenkamp, *Antitrust Law*, P 2030); see also Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1243 (3d Cir. 1993) ("While it may be true that the defendants did not use the same prices or run their internal operations identically, the evidence shows that they acted similarly by refraining from competing on existing accounts, while at the same time competing actively for new accounts.")).

Plaintiffs contend that the insurers within each Broker-Centered conspiracy agreed with each other to gain an undue competitive advantage for new customers by participating as preferred partners in the broker's consolidation scheme. Id. at 42. [*78] Plaintiffs contend that the conspiring insurers paid the brokers large contingent commissions in exchange for the benefit of having to compete only against a few other Insurer Defendants rather than the entire insurance industry. Id. Plaintiffs maintain that variations in the specific terms of the contingent commission agreements does not mean that any incumbent protection scheme premised on contingent commissions would be implausible. Id. at 43. Plaintiffs explain that the method of allocation was generally through the delivery of premium volume (*i.e.*, the combined premiums paid by "books" or other combinations of customers) rather than the delivery of specific customers or specific lines of business to the

participating insurers. Id. at 44. Plaintiffs contend that because premium dollars are fungible, it did not matter which customers' business or which lines of insurance were delivered to achieve the desired volume thresholds. Id. Plaintiffs claim that the retention of incumbent business was the easiest way to achieve the required premium volume, and incumbent business was the most profitable for the insurers, thus an agreement not to compete for each other's incumbent business [*79] was consistent with the allocation scheme. Id.

Plaintiffs also note that Defendants' contention that the conduct such as book rolls, bid disclosure and last looks is "manifestly pro-competitive" is undercut by the fact that the practice of collecting contingent commissions has been curtailed. Id. at 51. Plaintiffs also explain, for example, that Defendants have agreed to refrain from "first looks, last looks, rights of first refusal or limiting the number of quotes sought from insurers for insurance placement." Id. at 51 (citing Gallagher Assurance Discontinuance of Illinois, p. 15, P 9; Chubb Assurance of Discontinuance, p. 31, PP 22, 24).

**D. Plaintiffs' Second Amended Complaints and Particularized Statements Do Not Sufficiently Allege Facts to Support Section 1 Claims**

***1. Broker-Centered Conspiracies***

The Court has already determined that "Plaintiffs have established facts which could show, if proven, that a horizontal collusion among the insurers was plausible in the broker-centered conspiracies." In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 1126. However, this Court also concluded that "while it might have been plausible that the Defendants agreed to engage [*80] in some sort of behavior, it cannot survive as a horizontal conspiracy unless what the competitors agreed to do was 'unlawful.'" Id.; see also Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984); American Tobacco Co., 328 U.S. at 801, 66 S. Ct. 1125, 90 L. Ed. 1575. Plaintiffs' First Amended Complaints lacked sufficient facts to demonstrate that it was the Insurer Defendants, at the same level of competition, that participated in the division of the market in some way or agreed to an unlawful scheme initiated by the Broker Defendants.

In the Second Amended Complaints, Plaintiffs allege the Broker-Centered Conspiracies as two-fold. Specifically, in the first part of the alleged scheme Plaintiffs claim that the Insurer Defendants agreed with the Broker Defendants to pay contingent commissions in exchange for the allocation of a certain amount of premium volume. This was supposedly accomplished through the formation of strategic partnerships among "preferred insurers" who received the benefit of a smaller competitive market for the broker's business in exchange for higher commissions paid for that business. Plaintiffs allege that the Insurer Defendants agreed to and colluded with fellow Insurer Defendants [*81] and the Broker Defendants to curb competition and allocate the market to a select few insurers. Plaintiffs assert that this allocation of the business was accomplished by agreements among the Defendants.

Keeping in mind the standard for a motion to dismiss an antitrust claim, this Court concludes that Plaintiffs have not established a plausible scheme for the first part of the alleged conspiracy, namely, the consolidation of the Broker Defendants' business with a few preferred partner insurers. Plaintiffs have not set forth facts to support the theory that the Insurer Defendants agreed with each other, either expressly or impliedly, to pay the Broker Defendants contingent commissions in order to receive the benefit of lessened competition by some discernable method. Plaintiffs' explanation of this purported conspiracy has not significantly changed since the Court initially dismissed the First Amended Complaints. The allocation of premium volume in exchange for contingent commission payments consists of a vertical relationship among the Broker Defendants and the Insurer Defendants. Plaintiffs have not set forth facts to demonstrate that these relationships involved a horizontal agreement, [*82] either express or implied, among the Insurer Defendants to divide the brokers' business and refrain from competition. Plaintiffs attempt to explain this horizontal agreement by stating that the Insurer Defendants, by agreeing to pay these contingent commissions, conspired to restrain competition between the preferred partner insurers and all other insurers not privy to the arrangement. However, there is no indication that the Insurer Defendants agreed to such a plan. Rather, the facts as alleged demonstrate an attempt by the Broker Defendants to consolidate their markets and drive up their own revenue by eliciting increased payments by a select few insurers. That these insurers, individually, decided to pay the brokers higher commissions in order to gain access to a much narrower pool of competition is not in and of itself a horizontal conspiracy to restrain trade. Plaintiffs need something more to tie this behavior

together and demonstrate an agreement amongst the insurer-competitors in order to establish the required horizontal element. Thus, this Court cannot conclude, as is required by the Sherman Act, that what the defendants agreed to do was *per se* unlawful.

Additionally, while [*83] Plaintiffs insist that this consolidation of business and these partnerships were the trappings of an illegal conspiracy, their logic and facts fall short of satisfying the requirements set forth by Section 1 and relevant case law due to the market allocation alleged. In addition to a lack of agreement among the insurers, Plaintiffs theory is devoid of a plausible market allocation as required by this Court. Plaintiffs insist that the market was divided based on premium volume, and that no discernable method of allocation apart from dollar amounts was necessary. However, Plaintiffs' theory fails, as there is no basis for this Court to infer that an agreement existed among the competitors, the Insurer Defendants, to divide the broker's business in such a way. As noted in the Court's previous opinion, more facts supporting a discernable division of the brokers' business are necessary in order to sustain the allegations that the market was divided amongst these participants in an illegal manner.

The second part of the conspiracy occurred after the market was initially consolidated, and according to Plaintiffs, involved the protection of incumbent business. Plaintiffs contend that once [*84] the business was allocated to the preferred partners, the Insurer Defendants conspired with each other and the Broker Defendants to ensure that each participant retained their renewal accounts. Plaintiffs presented a panoply of facts to this Court which allege that certain actions were taken by the Insurer Defendants at the request of the Broker Defendants, such as first looks, last looks, and some instances of protective bidding and bid-rigging, purportedly in order to protect their own renewal accounts. Plaintiffs cite to facts which indicate that the Insurer Defendants were aware of the preferred partnership agreements among Insurer Defendants and Broker Defendants, including details of the arrangements. Plaintiffs also offer facts which suggest that the Insurer Defendants understood that if they complied with the Broker's demands, then their business would be protected upon renewal.

The Court recognizes Plaintiffs' argument that the incumbent protection devices, *i.e.* first looks, last looks, bid-rigging, etc., were the devices by which Defendants allegedly advanced the conspiracy and protected insurers from losing renewal business. Defendants argue that these devices offer potential [*85] pro-competitive benefits and are not *per se* unlawful, but rather enhance competition. Consequently, Defendants claim that these practices cannot be used to infer a horizontal agreement among the Defendant Insurers to engage in a conspiracy to curb competition. Defendants contend that it is in the independent self-interest of each individual insurer to retain existing customers, explaining that an incumbent insurer is already familiar with the risks of an existing customer, which enables it to expend less money and resources to underwrite the risk. Thus, Defendants claim that it is natural and logical for an insurer to pay contingent commissions that reward renewal of existing accounts. Plaintiffs, however, explain that just because the practices could have a pro-competitive use in this industry, that does not eliminate the possibility that they were used as a means to further this alleged unlawful conspiracy. As noted in American Tobacco Co., "[i]t is not of importance whether the means used to accomplish the unlawful objective are themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. 328 U.S. at 801. Yet, if they are part [*86] of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition." Plaintiffs cite to facts that demonstrate, if true, that brokers demanded this behavior of each insurer participant - specifically, that the Insurer Defendants were directed to submit a false quote or give a fellow competitor a first or last look on renewal, upon the instruction of the broker. No communications are alleged to have occurred directly among the insurer competitors, as the exchange of information was purportedly done through the broker as an intermediary.

The fact that Broker Defendants demanded or expected certain behavior from the Insurer Defendants does not necessarily amount to a horizontal agreement amongst the Defendant Insurers. Plaintiffs claim that each insurer conspirator accepted and agreed to engage in the broker-centered business allocation scheme based on, and because, each of the other Insurer Defendants also agreed to participate in the scheme. Plaintiffs claim that in this way, the Broker Defendants orchestrated a horizontal agreement among rival insurers not to compete for each others' customers. It was the hub, the broker, [*87] that Plaintiffs claim was the means by which the Insurer

"spokes" received the information about the alleged conspiracy. Plaintiffs claim that it was this knowledge that the other insurers had agreed to participate in the scheme which indicates a horizontal conspiracy among the Insurer Defendants.

Plaintiffs rely on U.S. v. Masonite Corp., in which the Court noted that "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. . . . Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." 316 U.S. 265, 275, 62 S. Ct. 1070, 86 L. Ed. 1461, 1942 Dec. Comm'r Pat. 777 (1942) (quoting Interstate Circuit v. United States, 306 U.S. 208, 227, 59 S. Ct. 467, 83 L. Ed. 610 (1939)). Plaintiffs contend that they need not plead or prove an express agreement or direct communication among the "spokes of the wheel." In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 31 (Pl.'s Opp.) (citing Phillip E. Areeda and Herbert Hovencamp, Antitrust Law Vol. VI, P 1426 (2002 ed.) ("This [*88] is the meaning of the 'hub and spoke' or 'hub and wheel' conspiracy metaphor. Interstate Circuit at the hub converses along a spoke with each distributor out at the wheel end of each spoke. Through the medium of the hub, each distributor communicates with other distributors and thus forms a conspiracy along the wheel's outer circumference."). However, by alleging this hub and spoke conspiracy, Plaintiffs face the problem of the "rimless wheel" - a situation in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction. Dickson v. Microsoft Corp., 309 F.3d 193, 204 (4th Cir. 2002); Kotteakos v. United States, 328 U.S. 750, 755, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946) ("The pattern was that of separate spokes meeting at a common center, though we may add without the rim of the wheel to enclose the spokes."); ABA Section of Antitrust Law, Antitrust Law Developments 25 (6th ed. 2007) ("What makes the series of agreements an actionable conspiracy, however, is some set of facts that shows a connecting agreement among the horizontal competitors that form the spokes; this is [*89] the 'rim' of the wheel."). The Court in Kotteakos determined that the rimless wheel conspiracy amounts to multiple conspiracies between the common defendant and each of the other defendants. Id. At 768-69, 772. "Although some of the earlier hub-and-spoke cases have suggested at least the theoretical possibility that an actionable conspiracy might be found where there were hub and spokes but no rim, more recent cases require that a plaintiff must present evidence sufficient to allow the inference of an agreement constituting the rim of the conspiracy." Brunson Communs., Inc. v. Arbitron, Inc., 239 F. Supp. 2d 550, 562 (D. Pa. 2002).

While this Court previously held that the conspiracy allegations were faulty because they failed to show some sort of recognizable allocation of the market (a way for the insurers to understand what they were actually agreeing to divide), it appears that the allegations as presently drafted suffer from a more serious defect. This hub and spoke conspiracy is devoid of a factual basis for this Court to infer that an agreement existed among the competitors - in this case, the Insurer Defendants. Plaintiffs want this Court to view the specific facts regarding [*90] the "incumbency protection racket" through their lens - which colors each demand from a broker to an insurer as being part of an agreement to restrain competition that already exists. However, when stepping back and viewing these facts in the aggregate, there is nothing in this record to suggest that there was any sort of express agreement among the insurers. While it is not necessary for the agreement to be explicit, the facts are simply too tenuous to intimate an implied agreement - a rim to this hub and spoke conspiracy. The brokers demanded certain behavior of the insurers, but that does not constitute a horizontal agreement among insurers to collude.

In a recent decision by the Supreme Court, it was determined that "[a] statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." Twombly, 127 S.Ct. at 1966. "An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating [*91] a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. Plaintiffs discount the relevance of Twombly in the present case, contending that the facts set forth in the pleadings provide this

"something more" than merely parallel conduct. However, the Court concluded that § 1 claims "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Id. Twombly is instructive in the case at hand, as Plaintiffs have set forth various facts which they contend clearly indicate an agreement among the Insurer Defendants. However, this Court, is not persuaded that the facts, as alleged, satisfy the requirement that the alleged conspiracy be plausible and not just a series of vertical agreements between brokers and insurers, or a series of acts taken without a common scheme in place.

As noted in Twombly, "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." Id. at 1967. Here, Plaintiffs [*92] have engaged in a plethora of discovery to date, and have been given several chances by this Court to craft the deficient complaints in a manner that complies with the appropriate pleading requirements. The large number of participants in these alleged conspiracies, along with the difficulty of detecting cheating by an insurer with a broker and the temptation of the insurers to pursue an independent profit-maximizing course with a broker detracts from the plausibility of the broker-centered conspiracies; See Antitrust Analysis, Phillip Areeda, Louis Kaplow, Aaron Edlin (6th ed. 2004). Despite the hard work and effort set forth by the Plaintiffs, the Second Amended Complaints fall short of the pleading requirements. Accordingly, this Court concludes that Plaintiffs have not sufficiently stated a claim for a § 1 violation of the Sherman Act relating to the Broker-Centered conspiracies, and those claims are hereby dismissed.

*2. Global Conspiracy*

Plaintiffs also claim that the Broker Defendants engaged in a global conspiracy not to disclose the existence of the contingent commission payments and the resulting impact on premium levels to their own clients, or the clients of another broker [*93] in an effort to steal that broker's clients. Plaintiffs claim the Broker Defendants adopted collective and inadequate disclosure policies to prevent inquiry and failed to disclose payments. Through industry studies and communications with each other, Plaintiffs allege the Broker Defendants knew they had each consolidated their markets and allocated business in exchange for contingent commissions. Plaintiffs allege that each broker knew the details of these arrangements, and that exposing these agreements would threaten a broker's own contingent commission profit. Based on this threat of exposure, Plaintiffs claim that the brokers expressly or tacitly agreed among themselves not to disclose the existence of the agreements to rival brokers' customers. Plaintiffs claim that the arrangements were not revealed to customers by competing brokers can only be explained by the existence of a horizontal conspiracy. Plaintiffs claim that all of the Insurer Defendants also agreed, with their respective hubs and each other, not to disclose the existence of the arrangements. Plaintiffs claim that this conspiracy was furthered by the adoption of confidential provisions which kept the details of the [*94] arrangement from the insureds.

As explained above, the Court in Twombly requires more than parallel conduct to allege a conspiracy, particularly one in which so many conspiring, competing parties are involved. Defendants claim that the non-disclosures occurred because it was in the brokers own unilateral self-interest not to disclose the details of the contingent commission agreements. Plaintiffs contend that the basis for the global conspiracy is not simply that each broker did not divulge the information about the arrangements, but rather that the brokers cooperated in the creation and implementation of disclosure policies that were designed to hide the scheme. Plaintiffs explain that the similar operation of each broker centered conspiracy is just one piece of evidence to support the existence of a global conspiracy.

This Court is still not satisfied that Plaintiffs have supplied sufficient facts to establish a global agreement among these competitor-brokers. Plaintiffs claim that this conspiracy is unlike Twombly because there the brokers actually agreed to and implemented policies to designed to hide their schemes. Defendants, however, note that the plausibility of a global scheme [*95] is undercut by the lack of facts alleged to explain how this conspiracy was possible when the consolidation of markets for each broker occurred during various time periods. This Court previously concluded that Defendants' membership in various trade groups and the sharing of information are insufficient to support an inference of actual concert of action. Plaintiffs have failed to provide facts for this Court to base an inference of an agreement among the Broker Defendants. While Plaintiffs present facts to

support the possibility of inadequate disclosures by the brokers to the insureds, the Complaints are bereft of allegations to demonstrate that this was more than brokers adopting sub-par disclosure methods to protect their own, lucrative agreements. The issue before this Court is whether a conspiracy among competitors restrained trade in violation of the Sherman Act. Whether these disclosures were appropriate does not assist this Court in its determination of whether some common plan was implemented. The adoption of similar disclosure policies and the opportunity to collude through various industry methods is not enough to infer that such a large group of participants engaged in [*96] a conspiracy. Further, the lack of support for the broker-centered conspiracies also cuts against the Plaintiffs' claims that a larger agreement existed. Plaintiffs have not shown that

the Insurer Defendants colluded among themselves in the broker centered conspiracies, and thus it is improbable that they colluded to further this global agreement as well. Accordingly, Plaintiffs' antitrust claims with regard to the global conspiracy are dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are granted. Plaintiffs' claims alleging violations of 15 U.S.C. § 1 are dismissed. An appropriate form of Order accompanies this Opinion.

Dated: August 31, 2007

s/ Garrett E. Brown, Jr., U.S.D.J.

Westlaw.

Not Reported in F.Supp.2d Page 1
Not Reported in F.Supp.2d, 1999 WL 619633 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

International Motor Sports Group, Inc. v. Gordon
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
INTERNATIONAL MOTOR SPORTS GROUP, INC., Plaintiff,
v.
Karen S. GORDON, Defendant/Counterclaimant,
v.
Andrew L. EVANS, Additional Defendant on Counterclaims.
**No. 82709, 98 CIV 5611(MBM).**

Aug. 16, 1999.

Howard E. Heiss, Esq., Kenneth M. Dreifach, Esq., Charles E. Tebbe III, Esq., Morrison & Foerster, LLP, New York, for Plaintiff and Andrew L. Evans.
Jeffrey L. Smith, Esq., William Slamkowski, Esq., Ballard Spahr Andrews & Ingersoll, LLP, Denver, Co, Co-Counsel for Karen S. Gordon.
Daniel J. Thomasch, Esq., Dennis M. Larochelle, Esq., Orrick Herrington & Sutcliffe, LLP, New York, Co-Counsel for Karen S. Gordon.

OPINION AND ORDER

MUKASEY, D.J.

*1 This suit involves a merger agreement dated June 27, 1997 (the "Merger Agreement") between Karen S. Gordon Productions, Inc., d/b/a Apex Communications ("Apex"), and International Motor Sports Group, Inc. ("IMSG"). By stipulation dated October 14, 1998, IMSG's complaint was dismissed without prejudice. Karen S. Gordon's counterclaims against IMSG and Andrew L. Evans, the President of IMSG (together, the "Counterclaim Defendants"), seeking rescission of the Merger Agreement and damages on the ground of fraud, are the only claims remaining. Counterclaim Defendants now move to dismiss Gordon's counterclaim complaint (the "Counterclaim") pursuant to Fed.R.Civ.P. 9(b), for failure to plead fraud with particularity, and Fed.R.Civ.P. 12(b)(6), for failure to state a claim. In addition, they move to strike Gordon's requests for benefit-of-the-bargain damages and punitive damages. For the reasons stated below, Counterclaim Defendants' motion to dismiss is granted in part and denied in part, and their motion to strike is granted.

I.

The following relevant facts, taken from the Counterclaim and documents incorporated by reference therein, are presumed true for the purposes of this motion. *See, e.g., Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993) (stating that, on a motion to dismiss for failure to state a claim, a court may consider facts alleged in the pleadings as well as documents attached as exhibits or incorporated by reference in the pleadings). Gordon, a sports video producer, was the founder and sole shareholder of Apex, a "long-term player in the media segment of motor sports" and the owner of "an extensive video library." (Counterclaim ¶¶ 3-4) IMSG, now a wholly owned subsidiary of Automotive Performance Group, Inc., is involved in several aspects of sports car racing. (*Id.* ¶¶ 5-7)

In April 1997, Gordon began negotiating with Evans and Paul S. Herendeen, Secretary, Treasurer and Director of IMSG, to sell Apex to IMSG. (*Id.* ¶ 9) During these negotiations, which took place "[i]n an approximate[ly] 60-day period during April-June 1997," Evans and Herendeen made several oral representations to Gordon. (*Id.*) Evans told Gordon that "she would 'get rich" ' as a result of the proposed deal, and Herendeen told her that the proposed transaction would make her " 'a major shareholder' of IMSG." (*Id.* ¶ 9(a)-(b)) Additionally, Herendeen told Gordon that the IMSG common stock had a value of $1.00 per share. (*Id.* ¶ 9(b)) To support this contention, Herendeen stated that "[f]riends and family" had purchased IMSG stock for $1.00 per share and that IMSG had "just sold"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 619633 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

stock "to an outsider" at that price also.(*Id.*)

On June 27, 1997, Gordon agreed to sell "all of her stock in Apex Communications to IMSG in exchange for 500,000 shares of common stock of IMSG."(*Id.; see* Agrmt. Section 2.8) [FN1] According to the Counterclaim, Gordon believed at the time of the closing, "based upon the information she had been provided by IMSG," that "she was receiving IMSG stock with a market value of $500,000 in exchange for her ownership in Apex Communications."(Counterclaim ¶ 15) The Counterclaim alleges further that "Gordon would not have completed the merger" had she learned that the IMSG stock was worth less than this amount. (*Id.*)

FN1. "Agrmt." refers to the Merger Agreement, which is attached as Exhibit A to IMSG's complaint and incorporated by reference in the Counterclaim.

A. *The Merger Agreement*

*2 The Merger Agreement executed by the parties on June 27, 1997 contains several provisions relevant here.

First, Article IV of the agreement records the "Representations and Warranties of Seller," Gordon. In pertinent part, Section 4.2 warrants that Gordon was an "executive officer" of Apex, that she was "sophisticated in financial matters" and that she was "able to evaluate and bear the risks and benefits of the investment in the [IMSG] Stock."(Agrmt. Section 4.2) Section 4.3 (the "Due Diligence Clause") represents further that Gordon and/or her counsel had an opportunity to perform due diligence prior to executing the Merger Agreement.(*Id.* Section 4.3) Specifically, the Due Diligence Clause states:

The Seller has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the [IMSG] Stock and has had full access to such other information concerning [IMSG] as the Seller has requested. Seller and its counsel have reviewed, or has had an opportunity to review copies of this Agreement.

(*Id.*)

Article VI of the Merger Agreement details the "Representations and Warranties" of IMSG. Five of the article's six sections pertain, in large part, to IMSG's authority to enter the Merger Agreement. (*Id.* Sections 6.1 to 6.4, 6.6) However, Section 6.5 (the "Warranty Clause"), titled "Accuracy of Representations," warrants as follows:

No representation or warranty made by [IMSG] in this Agreement or any document delivered, or to be delivered, by or on behalf of [IMSG] pursuant hereto contains or, as of the Closing Date, will contain any untrue statement of material fact or omits or, as of the Closing Date, will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

(*Id.* Section 6.5)

Finally, to the extent relevant here, Section 7.6 specifies that the Merger Agreement "shall be governed by, and construed in accordance with," New York law, and Section 7.10 (the "Merger Clause") states that the Merger Agreement constitutes the "entire agreement" between the parties. (*Id.* Sections 7.6 & 7.10) Specifically, the Merger Clause reads in relevant part: "This Agreement ... constitute[s] the entire agreement among the parties with respect to the matters covered hereby and supersedes all previous written, oral or implied understandings among them with respect to such matters."(*Id.* Section 7.2)

B. *Discovery of the Alleged Fraud*

In or about November 1997, Gordon obtained a copy of an IMSG private placement memorandum dated July 2, 1997. (Counterclaim ¶ 18) From the memorandum, Gordon learned that notwithstanding Herendeen's oral representations regarding the value of IMSG stock, in June 1997 IMSG had sold 15,000,000 shares of common stock in a private of-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 619633 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

fering for only $0.20 per share. (*Id.* ¶ 13(b)) Additionally, Gordon discovered that during her negotiations with IMSG, Evans and Herendeen had failed to disclose that IMSG "had purchased or was about to purchase from Evans all of the outstanding stock of Team Scandia, Inc.," a car racing team. (*Id.* ¶ 13(c))

*3 According to the Counterclaim, Gordon knew that car racing teams "generally lose money." (*Id.* ¶ 16) Thus, the Counterclaim alleges that "[h]ad Gordon known of the Scandia transaction, the private placement of common stock at $.20 per share, or that IMSG stock had not recently been sold at $1 per share, she would never had [*sic* ] completed the merger."(*Id.* ¶ 14) By letter dated July 20, 1998, Gordon "demanded rescission of the merger and tendered her IMSG shares to IMSG."(*Id.* ¶ 10;*see also* Compl. Ex. B) [FN2]

FN2. "Compl." refers to IMSG's original complaint, dated August 6, 1998.

C. *Gordon's Counterclaims*

The Counterclaim asserts three claims for fraud, one each against IMSG and Evans under both § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (" § 10(b)"), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5") (Counterclaim ¶¶ 20-22, 27-29), and one against both Counterclaim Defendants under New York common law (*id.* ¶¶ 30-36). [FN3] Gordon seeks, *inter alia,* (1) rescission of the Merger Agreement; (2) "recessionary [*sic* ] damages" in the amount of $500,000, plus interest; (3) compensatory damages "in an amount equal to the difference of value between the IMSG stock Gordon thought she was acquiring and its actual value"; and (4) punitive damages.(*Id.* at p. 14) She requests punitive damages with respect to only her New York common law fraud claim. (*Id.* ¶ 36;*see* Gordon Mem. in Opp'n at 17)

FN3. Initially, the Counterclaim asserted also two claims under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2). (*See* Counterclaim ¶¶ 11-19, 23-26) Gordon has since withdrawn these claims. (*See* Gordon Mem. at 1 n. 1) Accordingly, they are dismissed.

II.

Counterclaim Defendants contend, first, that the Counterclaim should be dismissed for failure to satisfy Fed.R.Civ.P. 9(b), which requires "the circumstances constituting fraud" to be "stated with particularity" in "all averments of fraud." To plead fraud with sufficient particularity, a complaint "must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."*Harsco Corp. v. Segui,* 91 F.3d 337, 347 (2d Cir.1996); *accord Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127-28 (2d Cir.1994). The purpose of the rule is "(1) to provide a defendant with fair notice of plaintiff's claim, (2) to safeguard a defendant's reputation from 'improvident charges of wrongdoing' and (3) to protect against the institution of a strike suit."*Harsco,* 91 F.3d at 347 (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995)).

Notwithstanding the Second Circuit's use of the word "must" in *Harsco,* it is well established that "there is no bright line rule for deciding whether a complaint has satisfied Rule 9(b)."*I .M. Oberman Assocs., Inc. v. Republic Fin. Servs., Inc.,* No. 92 Civ. 1843(MBM), 1993 WL 88209, at *2 (S.D.N.Y. Mar. 25, 1993). Indeed, in analyzing the sufficiency of a pleading under Rule 9(b), a district court must balance the rule with both Fed.R.Civ.P. 8(a), which requires only a "short and plain statement" of the claims for relief, and Fed.R.Civ.P. 8(f), which provides that "all pleadings shall be so construed as to do substantial justice."*See Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990); *see also Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989) (stating that, in deciding a Rule 9(b) motion, "a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 619633 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

court must read the complaint generously, and draw all inferences in favor of the pleader"); *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984) ("[I]n applying Rule 9(b), focusing exclusively on its 'particularity' language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules."(internal quotation marks and citation omitted)). Thus, a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint "gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based."*Spear, Leeds & Kellogg v. Public Serv. Co.*, 700 F.Supp. 791, 793 (S.D.N.Y.1988); *see* 2 James Wm. Moore *et al., Moore's Federal Practice* § 9.03[1][b], at 9-18 (3d ed. 1999) ("Moore") ("[P]laintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts, provided they use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.").

*4 In the present case, taking the allegations in the Counterclaim as true, *see, e.g., DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1244 (2d Cir.1987), and drawing all reasonable inferences in favor of Gordon, *see, e.g., Cosmas*, 886 F.2d at 11, the Counterclaim sets forth the details of the alleged fraud with sufficient particularity to provide Counterclaim Defendants with an opportunity to defend. The Counterclaim alleges that in the course of the negotiations between Gordon and Evans and Herendeen, Herendeen misrepresented to Gordon the value of IMSG stock as $1.00 per share, and failed to disclose that 15,000,000 shares were sold in a private offering for only $0.20 per share. Additionally, the Counterclaim alleges that Evans and Herendeen failed to disclose that IMSG had acquired or was about to acquire Team Scandia.

To be sure, the Counterclaim does not identify precisely where these alleged misrepresentations and omissions occurred, and specifies only that they occurred "[i]n an approximate[ly] 60-day period during April-June 1997."(Counterclaim ¶ 9) But Rule 9(b)"does not require that a complaint plead fraud with the detail of a desk calendar or a street map."*Gelles v. TDA Indus., Inc.*, No. 90 Civ. 5133(MBM), 1991 WL 39673, at *6 (S.D.N.Y. Mar. 18, 1991); *see also id.*(stating that when there are "only two" alleged perpetrators of a fraud, requiring the plaintiff to specify "an exact time and location would violate the liberal pleading requirements of the Federal Rules"). Nor does it require, or legitimate, "the pleading of detailed evidentiary matter."*Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 n. 20 (2d Cir.1979). Instead, Rule 9(b) requires only that a complaint provide "adequate information" to allow the defendants "to frame a response," *id.* at 557-58, which the Counterclaim does.

Notwithstanding the principles stated above, Counterclaim Defendants cite several cases for the proposition that "[a]lleging a time frame of several months ... does not satisfy Rule 9(b)."*In re Newbridge Networks Sec. Litig.*, 962 F.Supp. 166, 175 (D.D.C.1997); *see Skylon Corp. v. Guilford Mills, Inc.*, No. 93 Civ. 5581(LAP), 1997 WL 88894, at *2 (S.D.N.Y. Mar. 3, 1997) ("Although plaintiff outlines a four-month window during which all of the misrepresentations occurred, this does not satisfy the pleading standard of Rule 9(b)."); *Cooper v. Parsky*, No. 95CIV10543 (JGK)(NRB), 1997 WL 242534, at *18 (S.D.N.Y. Jan. 8, 1997) ("[A] period of months is not sufficient identification of the time of the statements for 9(b) purposes."), *modified,*1997 WL 150934 (S.D.N.Y. Mar. 27, 1997), *aff'd in part, vacated in part,*140 F.3d 433 (2d Cir.1998); *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, 876 F.Supp. 41, 44 (S.D.N.Y.1995) (holding that a "vague reference to a period of several months ... fails to satisfy Rule 9(b)"); *Sendar Co. v. Megaware Inc.*, 705 F.Supp. 159, 161 (S.D.N.Y.1989) (dismissing a complaint which "merely alleg[ed] that statements were made some time during a two month period"). However, in several of these cases, the lack of precision with respect to the time of the alleged fraud was merely one factor supporting the Court's decision. *See, e.g.*,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Newbridge Networks*, 962 F.Supp. at 175;*Skylon Corp.*, 1997 WL 88894, at *2;*Lomaglio Assocs.*, 876 F.Supp. at 44. Additionally, in several of the cases, the alleged fraud did not take place in the course of a discrete period of negotiation, as it did here. *See, e.g., Newbridge Networks*, 962 F.Supp. at 171-80;*Cooper*, 1997 WL 242534, at *1-5. Otherwise, to the extent these cases are inconsistent with my ruling, I decline to follow them on the ground that they fail to comport with the liberal pleading requirements of the Federal Rules.

III.

*5 Counterclaim Defendants' remaining arguments for dismissal are raised pursuant to Fed.R.Civ.P. 12(b)(6). In considering a Rule 12(b)(6) motion, a court should dismiss the complaint if it appears " 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" ' *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 44 (2d Cir.1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). It is not the court's function to weigh the evidence that might be presented at trial; instead, the court must merely determine whether the complaint itself is legally sufficient. *See Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). In doing so, the court must accept the material facts alleged in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995). The issue before the court "is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.'" ' *Id.* (quoting *Weisman v. LeLandais*, 532 F.2d 308, 311 (2d Cir.1976) (per curiam)).

IV.

Counterclaim Defendants' first argument for dismissal for failure to state a claim relies on the delay between Gordon's discovery of the alleged fraud and her efforts to rescind the Merger Agreement. Under both federal law and New York law, if a party seeks to rescind a contract on the ground of fraud, he must act promptly. *See, e.g., Shappirio v. Goldberg*, 192 U.S. 232, 242 (1904) ("It is well settled by repeated decisions of this court that where a party desires to rescind upon the ground of misrepresentation or fraud, he must, upon the discovery of the fraud, announce his purpose and adhere to it."); *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 47 (2d Cir.1991) (citing *Schenck v. State Line Tel. Co.*, 238 N.Y. 308, 313 (1924)). Where the parties are seeking settlement or compromise, however, rescission need not be sought until the negotiations collapse. *See Banque Arabe & Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F.Supp. 1199, 1211 (S.D.N.Y.1994), *aff'd*,57 F.3d 146 (2d Cir.1995). Unlike the defense of laches, the promptness requirement is an element of a *prima facie* rescission action and the burden of proof is on the plaintiff. *See id.*

In the present case, Gordon discovered the alleged fraud in or about November 1997, and did not seek rescission of the Merger Agreement until July 20, 1998-a delay of nearly eight months. This length of time might constitute an unreasonable delay. *Cf. Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96 CIV. 3231(RPP), 1998 WL 167330, at *23 (S.D.N.Y. Apr. 8, 1998) (dismissing fraud claims in part because the plaintiff "did not seek rescission for approximately six months"); *88 Blue Corp. v. Reiss Plaza Assocs.*, 183 A.D.2d 662, 664, 585 N.Y.S.2d 14, 16-17 (1st Dep't 1992) (granting summary judgment in part because of the "eleven month delay between the time that plaintiff first acquired knowledge of the [alleged fraud] and took any steps to rescind the agreement"). However, " '[o]rdinarily, the question of what is a reasonable time for rescission is a question of fact for the jury.'" ' *West Tsusho Co. v. Prescott Bush & Co.*, No. 92 CIV. 3378(MBM), 1993 WL 228072, at *4 (S.D.N.Y. June 23, 1993) (quoting *Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F.Supp. 49,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 (S.D.Ohio 1986)), *modified*, 1993 WL 339085 (S.D.N.Y. Aug. 25, 1993). Further, as in *Allen*, "[a]t this point in the litigation ..., there is little evidence probative of the reasonableness of any delay." *Allen*, 945 F.2d at 47. Thus, I cannot say "beyond doubt" that Gordon can prove no set of facts in support of her claims which would entitle her to relief. *Conley*, 355 U.S. at 45-46.FN4

FN4. For example, it would appear from IMSG's original complaint that the parties were engaged in some sort of settlement negotiations, albeit related to an employment agreement between Gordon and IMSG, in December 1997. (Compl. ¶¶ 21-26 & Ex. D) These negotiations may or may not be relevant to the reasonableness of Gordon's delay in seeking rescission.

V.

*6 Counterclaim Defendants' principal arguments for dismissal pertain to the issue of reasonable reliance. Under both New York law and the federal securities laws, reasonable reliance is a necessary element for establishing a fraud claim. *See Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir.1996) (citing, *inter alia*, *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994), and *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262 (1958)); *see also Banque Arabe & Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 156 (2d Cir.1995) (noting that reasonable reliance is necessary to state a claim for fraudulent concealment). Counterclaim Defendants argue that Gordon's reliance was unreasonable as a matter of law for either of two reasons: (1) because she disclaimed reliance on extra-contractual representations through the Merger Clause, or (2) because Gordon could have discovered the true facts through due diligence. I disagree with the first contention and agree only in part with the second.

A. *The Merger Clause*

Counterclaim Defendants argue, first, that Gordon cannot prove reasonable reliance on IMSG's alleged misrepresentations and omissions because the Merger Clause specifies that the Merger Agreement "constitute[s] the entire agreement among the parties with respect to the matters covered hereby and supersedes all previous written, oral or implied understandings among them with respect to such matters."(Agmt. Section 7.10) Under New York law, "where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon."*Harsco*, 91 F.3d at 345 (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599 (1959)); *accord Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir.1993) (citing *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 94-95, 495 N.Y.S.2d 309, 311 (1985); *Danann Realty*, 5 N.Y.2d at 320-21, 184 N.Y.S.2d at 602). This rule, enunciated by the New York Court of Appeals in *Danann Realty*, applies also in the securities fraud context. *See Harsco*, 91 F.3d at 345 (citing *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1033 (2d Cir.1993)).

In order to invoke the rule from *Danann Realty*, however, the clause at issue must contain an adequately specific disclaimer. *See Chavin v. McKelvey*, 25 F.Supp.2d 231, 235 (S.D.N.Y.1998), *aff'd*, --- F.3d ---, No. 98-9574, 1999 WL 491879 (2d Cir. July 9, 1999); *see also Yanakas*, 7 F.3d at 316 ("[T]he touchstone is specificity."). To be adequately specific, the clause "must contain *explicit* disclaimers of the *particular* representations that form the basis of the fraud-in-the-inducement claim."*Yanakas*, 7 F.3d at 316 (emphasis added); *see O'Hearn v. Bodyonics, Ltd.*, 22 F.Supp.2d 7, 13 (E.D.N.Y.1998) ("A specific disclaimer typically consists of a clause stipulating that the parties are not 'relying' upon *specified*, extra-contractual representations."(emphasis added)). Thus, a general merger clause "stating that the signatories acknow-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 619633 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

ledge the written document supersedes all prior agreements and constitutes the sole embodiment of their obligations" does not bar an action for fraud. *O'Hearn,* 22 F.Supp.2d at 13;*accord Yanakas,* 7 F.3d at 316-17 (citing cases); *Plapinger,* 66 N.Y.2d at 94-95, 495 N.Y.S.2d at 311. In contrast, when a signatory explicitly disclaims reliance on the subject of the allegedly fraudulent statement, or when the contract states that the defendant makes no representations other than those contained in another, more "exhaustive" clause of the contract, a fraud claim may be precluded. *See Harsco,* 91 F.3d at 345-47;*see also Yanakas,* 7 F.3d at 317 (citing cases).

*7 In the present case, the Merger Agreement does not specifically disclaim reliance on the kinds of representations that underlie Gordon's fraud claim. The Merger Clause states only that the Merger Agreement is the "entire agreement among the parties" and that it "supersedes all previous understandings ... among them."*Cf. Northwestern Nat'l Ins. Co. v. Alberts,* 717 F.Supp. 148, 154 (S.D.N.Y.1989); *Sabo v. Delman,* 3 N.Y.2d 155, 161 (1957). And the Warranty Clause, unlike the clause at issue in *Harsco,* does not expressly limit reliance on IMSG's representations to those contained in another, more exhaustive section of the Merger Agreement. *Cf. Harsco,* 91 F.3d at 345-56. To be sure, as Counterclaim Defendants contend, the Warranty Clause guarantees the accuracy of only those representations made by IMSG in the Merger Agreement and related documents. But Gordon's action is for fraud, not for breach of the Warranty Clause, and nowhere in the Warranty Clause, or elsewhere in the Merger Agreement, did Gordon-the party now alleging fraud-disclaim reliance on extra-contractual representations of the sort at issue here. In short, Gordon is not precluded under the *Danann Realty* rule from raising her fraud claims.

B. *Due Diligence*

Next, Counterclaim Defendants argue that, even assuming they misrepresented or omitted material facts, Gordon's reliance on such misrepresentations or omissions was unreasonable because she should have discovered the truth. Under New York law,

if the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.

*Danann Realty,* 5 N.Y.2d at 322, 184 N.Y.S.2d at 603;*accord Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1541 (2d Cir.) (citing cases), *cert. denied,*118 S.Ct. 169 (1997). Similarly, under the federal securities laws, "[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."*Brown,* 991 F.2d at 1032;*see id.*(listing eight factors that federal courts have considered to determine whether investors acted without justifiable reliance under the federal securities laws); *see also Shappirio v. Goldberg,* 192 U.S. 232, 241-42 (1904)."Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access," courts are "particularly disinclined to entertain claims of justifiable reliance."*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984) (discussing New York case law).

Gordon, by her own admission, is a "sophisticated" businesswoman who represented that she was "able to evaluate and bear the risks and benefits of the investment" in IMSG and that she "determined that such investment ... [was] suitable for [her], based upon [her] financial situation and needs."(Agrmt. Section 4.2) Further, Gordon represented in the Due Diligence Clause of the Merger Agreement that she "had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the [IMSG] Stock and ... had full access to such other information concerning [IMSG] as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 619633 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

[she] requested."(*Id.* Section 4.3) Under these circumstances, Gordon had an obligation-if, as she contends, she sold Apex based on Herendeen's representation that IMSG stock was worth $1.00 per share-to secure and review documentation that IMSG stock had, in fact, been valued at $1.00 per share. As the Second Circuit stated in *Lazard Freres,*

*8 "[W]here, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament."

*Lazard Freres,* 108 F.3d at 1543 (quoting *Rodas v. Manitaras,* 159 A.D.2d 341, 343 552 N.Y.S.2d 618, 620 (1st Dep't 1990)) (alteration in original) (emphasis omitted); *see also Belin v. Weissler,* No. 97 Civ. 8787(RWS), 1998 WL 391114, at *8 (S.D.N.Y. July 14, 1998) ("Having explicitly represented that he had an opportunity to verify the accuracy of information provided to him, [the plaintiff] cannot now be heard to complain that he relied on information that he declined to verify ....").

The same cannot be said for the other component of Gordon's fraud claims, namely the nondisclosure of the Team Scandia purchase. According to the Counterclaim, IMSG failed to advise Gordon that "it had purchased *or was about to purchase* from Evans all of the outstanding stock of Team Scandia, Inc." (Counterclaim ¶ 13 (emphasis added)) Thus, the pleadings do not establish beyond doubt that, prior to execution of the Merger Agreement, the Team Scandia purchase was at such a stage that Gordon should have discovered it "by the exercise of ordinary intelligence."*Danann Realty,* 5 N.Y.2d at 322, 184 N.Y.S.2d at 603.[FN5] If, for example, IMSG executives intended to purchase Team Scandia at the time of the Merger Agreement, but had not yet reduced those intentions to writing, Gordon could not be expected reasonably to have discovered the truth on her own. *Cf. Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984) (rejecting a claim of justifiable reliance because "*all* of the information that plaintiffs now claim was concealed from them was either a matter of public record, was not pursued by plaintiffs, or was disclosed, at least in part," by the defendant (emphasis added)). At this stage in the litigation, therefore, I cannot say "beyond doubt," *Conley,* 355 U.S. at 45-46, that Gordon's reliance on the nondisclosure of the Team Scandia purchase was unreasonable as a matter of law. Accordingly, dismissal of her fraud claims insofar as they are premised on such nondisclosure is unwarranted.

FN5. Indeed, in its original complaint, IMSG alleged that it "did not purchase [Team] Scandia until after the Closing Date of the merger."(Compl.¶ 14)

VI.

Finally, Counterclaim Defendants move to strike Gordon's requests for benefit-of-the-bargain damages and punitive damages. Although they made this motion pursuant to Fed.R.Civ.P. 12(b)(6), it is properly raised pursuant to Fed.R.Civ.P. 12(f).*See* 2 Moore, *supra,* § 12.37[3], at 12-96 to -97; *see also, e.g., Barr v. McGraw-Hill, Inc.,* 710 F.Supp. 95, 97-98 (S.D.N.Y.1989). Motions to strike requests for certain types of relief "are generally granted if such relief is not recoverable under the applicable law." 2 Moore, *supra,* § 12.37[3], at 12-98 (citing cases).

A. *Benefit-of-the-Bargain Damages*

*9 As noted, Gordon seeks as relief compensatory damages "in an amount equal to the difference of value between the IMSG stock Gordon thought she

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was acquiring and its actual value."(Counterclaim at p. 14) Under New York law, however, a plaintiff alleging common law fraud may recover only out-of-pocket damages, measured as "the difference between the purchase price and true value of the stock."*In re Crazy Eddie Sec. Litig.*, 948 F.Supp. 1154, 1165 (E.D.N.Y.1996) (discussing damages in federal securities fraud actions); *see Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 766 (2d Cir.1986). Accordingly, Gordon's request for benefit-of-the-bargain damages with respect to her common law fraud claim is stricken.

Whether Gordon can recover benefit-of-the-bargain damages under § 10(b) and Rule 10b-5 is more complicated. The statute and regulation do not prescribe a particular method of calculating damages, but the Second Circuit has allowed benefit-of-the-bargain damages in some circumstances. In *Osofsky v. Zipf*, 645 F.2d 107 (2d Cir.1981), for example, the plaintiffs were offered a specific price for their stock in a tender offer, but after they tendered their stock they received a lower price than they had been offered. *See id.* at 109-10.The Court allowed the plaintiffs to recover benefit-of-the-bargain damages, reasoning that such damages were appropriate in the context of tender offers, and noting that the key to awarding such damages is the degree of certainty to which they can be established. *See id.* at 114.In subsequent cases, the Second Circuit has "focused on the plaintiff's ability to establish benefit-of-the-bargain damages with some reasonable degree of certainty."*McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1049-50 (2d Cir.1995) (citing cases). Further, the Court has cautioned that "the damages sustained by a defrauded buyer of securities are more speculative and thus different from the damages of" the defrauded sellers in *Osofsky*,"who [did] not get what [they were] promised."*Id.* at 1049 (citing *Osofsky*, 645 F.2d at 112).

In the present case, Gordon cannot establish her benefit-of-the-bargain damages arising from IMSG's failure to disclose its purchase of Team Scandia to the requisite degree of certainty. Calculating such damages would require, at a minimum, determination of what effect, if any, IMSG's purchase of Team Scandia had on the value of its stock. Any such determination would be inherently speculative. *Cf. Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 615 (2d Cir.1994) ("The concept of recovery of damages for a benefit-of-the-bargain is founded on the agreement made, not on a proposed hypothetical agreement built on outside evidence and on speculation regarding what the parties might have done or received had the circumstances surrounding the agreement been different."). In contrast, Gordon might have been able to establish to a reasonable certainty her benefit-of-the-bargain damages arising from Herendeen's alleged representation that IMSG stock was valued at $1.00 per share. However, her claims based on that representation are barred for the reasons discussed above.

B. *Punitive Damages*

*10 As noted, Gordon seeks punitive damages with respect only to her New York common law fraud claim. (*See* Counterclaim ¶ 16; Gordon Mem. in Opp'n at 17) Under New York law, damages for fraud ordinarily are limited to the amount necessary to remedy the private wrong, but punitive damages may be awarded if necessary to vindicate a public right. *See City of New York v. Coastal Oil N.Y., Inc.*, No. 96 Civ. 8667(RPP), 1999 WL 493355, at *14 (S.D.N.Y. July 12, 1999); *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 315-16, 639 N.Y.S.2d 283, 287 (1995); *Rocanova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 342 (1994). Specifically, New York law allows punitive damages in fraud claims arising from a contractual relationship only where a plaintiff demonstrates "egregious conduct directed to the plaintiff which is part of a 'pattern of similar conduct directed at the public generally.' " *Kidder, Peabody & Co. v. IAG Int'l Acceptance Group, N.V.*, No. 94 Civ. 4725(CSH), 1999 WL 11553, at *11 (S.D.N.Y. Jan. 13, 1999) (quoting *Rocanova*,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 619633 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 10

83 N.Y.2d at 613, 612 N.Y.S.2d at 339, and citing cases applying the public wrong requirement to claims of fraud); *see also W.S.A., Inc. v. ACA Corp.*, No. 94 Civ. 1493(CSH), 1998 WL 635536, at *2 (S.D.N.Y. Sept. 15, 1998).

In the present case, Gordon fails to allege that Counterclaim Defendants' actions were part of any larger "pattern," let alone that they were "directed at the public generally." To the contrary, the alleged fraud was part of a discrete transaction, and directed solely at Gordon. Although the question of whether the public wrong requirement is satisfied is "ordinarily for the jury to decide,"*Kidder, Peabody*, 1999 WL 11553, at *12, where, as here, a pleading alleges no facts that could satisfy the requirement, striking a request for punitive damages is appropriate. *See also New York Univ.*, 87 N.Y.2d at 316, 639 N.Y.S.2d at 287 (referring to the public wrong requirement as a "pleading element[ ]").

For the reasons stated above, Counterclaim Defendants' motion to dismiss is granted in part, and denied in part, and the Counterclaim is dismissed except insofar as it alleges that the nondisclosure of IMSG's purchase of Team Scandia constituted fraud in violation of § 10(b), Rule 10b-5 and New York common law. Additionally, Gordon's requests for benefit-of-the-bargain damages and punitive damages are stricken.

SO ORDERED:

S.D.N.Y.,1999.
International Motor Sports Group, Inc. v. Gordon
Not Reported in F.Supp.2d, 1999 WL 619633 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



H Matsumura v. Benihana Nat. Corp.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Mei Ping (Barbara) MATSUMURA and Carl Milner, as Trustee of the Trust u/w/o Arthur Cutler, individually and as shareholders of Haru Holding Corp., Plaintiffs,
v.
BENIHANA NATIONAL CORPORATION, Haru Holding Corp., and Darwin Dornbush, Defendants.
No. 06 Civ. 7609(NRB).

Jan. 25, 2008.

Alfred N. Metz, Esq., Deutsch, Coffey & Metz, LLP, New York, NY, for Plaintiffs Mei Ping (Barbara) Matsumura and Carl Milner, as Trustee of the Trust u/w/o Arthur Cutler.
Alan H. Fein, Esq., Adam M. Schachter, Esq., Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, FL, Lewis R. Clayton, Esq., Amir Weinberg, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendants Benihan National Corporation and Haru Holding Corporation.
Jonathan J. Lerner, Esq., Maura Barry Grinalds, Esq., Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY, for Defendant Darwin Dornbush.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.
*1 This opinion addresses Darwin Dornbush's ("Dornbush") motion to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6). The plaintiffs Mei Ping (Barbara) Matsumura ("Matsumura") and Carl Milner ("Milner" and collectively "plaintiffs") filed the instant suit against Darwin Dornbush alleging breach of fiduciary duty, fraud in the inducement, constructive fraud, negligent misrepresentation, and aiding and abetting breach of fiduciary duty. Their claims arise from alleged representations made by Dornbush, while serving as legal counsel for Benihana National Corporation ("Benihana"), regarding Benihana's prospective performance under a stock purchase agreement that governed the plaintiffs' sale of a controlling interest in Haru Holding Corp. ("Haru Holding") to Benihana.[FN1] For the reasons stated herein, Dornbush's motion is granted.

FN1. At oral argument on the motions to dismiss the amended complaint, the Court sustained the breach of fiduciary duty and breach of contract claims against Benihana and dismissed the remaining claims against defendants Benihana and Haru.

## BACKGROUND[FN2]

FN2. In considering a 12(b)(6) motion to dismiss, this Court must accept as true the facts alleged in the amended complaint, *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995), drawing all reasonable inferences in favor of the plaintiffs. *See Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir.2004). For purposes of dismissal, the amended complaint "is deemed to include any document that is fairly "integral" to the allegations. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir.2002).

The background of the business transaction that is the genesis of this lawsuit may be summarized as follows.

*Dornbush Introduces the Plaintiffs to Benihana*

The plaintiffs are restaurateurs who owned and operated Haru, a New York City sushi restaurant chain. (Am.Compl.¶¶ 9-10). While Dornbush served as Benihana's general counsel, corporate secretary, and a member of its board of directors, he was also the plaintiffs' attorney for a variety of Haru-related matters. (Am.Compl.¶¶ 10-14). In early 1999, Benihana indicated an interest in acquiring the Haru franchise from the plaintiffs and Dornbush arranged several preliminary discussions between the parties to explore the possibility of a purchase. (Am.Compl.¶ 16). Notably, neither Benihana nor the plaintiffs retained independent counsel for the purpose of deciding whether the transaction was viable.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Am.Compl.¶ 19). The parties reached an agreement in principle in July, 1999: Benihana would acquire a majority, controlling interest in Haru but also grant the plaintiffs a put option requiring Benihana to purchase their remaining shares at some future time. (Am.Compl.¶¶ 16, 29).

The plaintiffs allege that Dornbush made several statements during this introductory period that are actionable:

> On or about May 26, 1999, Dornbush transmitted a term sheet directly to Matsumura, ... and Carl Milner, "outlin[ing] the principal business terms of the transaction for sale of 80% of Haru to Benihana, Inc.". Item 3 of the term sheet, entitled "No Liabilities", specified that "except for trade debt, none of the corporations shall have any debt; and there should be sufficient cash-on-hand to pay the trade debt."

* * *

> In or about July and August 1999, BNC and Dornbush represented to Plaintiffs, that the mechanism for pricing the Put Option would provide them with the fair market value of their stock in Haru.

* * *

> Commencing in or about July 1999 and on numerous occasions thereafter, ... Dornbush further represented to Plaintiffs that by retaining 20% of Haru with a "Put Option" to sell at a later date, Plaintiffs would reap the benefits of the opening of new Haru restaurants which would be funded by BNC.

*2 (Am.Compl.¶ 17, 29, 30)

*The Parties Draft The Purchase Agreement*

Once the parties had reached a tentative understanding of the basic terms of the transaction, Dornbush suggested that the plaintiffs obtain independent representation before any documents were drafted. (Am.Compl.¶¶ 6, 19). The plaintiffs hired Michael Paikin ("Paikin") to represent them and Dornbush served as legal counsel for Benihana. (Am. Compl. ¶¶ 6, 19; Pl. Opp. at 43 n. 14). Nevertheless, the plaintiffs saw Paikin's retention as "a mer e formality" and, according to the complaint, persisted in the belief that Dornbush would represent their interests in structuring the transaction.[FN3] (Am.Compl.¶ 20).

> FN3. While negotiations with Benihana were still ongoing, Dornbush continued to represent the plaintiffs in connection with ancillary matters pertaining to Haru and their other restaurants. (Am.Compl.¶ 12, 13, 19, 21, 33).

One of the negotiated terms of sale was the valuation of plaintiffs' shares covered by the put option. Initially, the parties contemplated that the exercise (or put) price would be the "fair market value" of the plaintiffs' shares. (Am.Compl.¶ 28). By November, 1999, the put price had been defined with much greater precision through a pricing formula that accounted for Haru Holding's consolidated cash flow and total outstanding debt. (Am.Compl.¶ 37, 42). This definition was eventually incorporated into the parties' interim drafts and the Stockholders' Agreement memorializing the sale. (Am.Compl.¶ 37-41).

The plaintiffs insist that two of Dornbush's representations over the course of drafting and negotiating the Stockholders' Agreement were misleading:

> In or about late October or early November 1999, Dornbush orally represented to Carl Milner that the prior definition of the Put Price as based on fair market value was too "nebulous", and that the change in language was intended simply as a "clarification" so that there was no ambiguity going forward. Based upon Dornbush's representation and omission of any contrary information, Plaintiffs understood and believed that the change in language did not and would not materially adversely affect the value of the Put Price.

* * *

> In or about October and early November 1999, Dornbush represented to at least Milner that, in consideration of the relatively low salary Matsumura would be receiving, the Put Option was structured to provide her with a fair value of her stock based upon the performance of Haru, independent of the costs of acquisition and expansion.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 282021 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 3

(Am.Compl.¶ 42, 43).

*The Stockholders' Agreement and Matsumura's Employment*

On December 6, 1999, the parties executed the Stockholders' Agreement, pursuant to which Benihana acquired an eighty percent stake in the defendant-entity Haru Holding Corp. ("Haru Holding") for a cash purchase price of $8,125 million, and the plaintiffs received a one-time put option for the balance of their shares. (Am. Compl. ¶ 34, 46; Schacter Decl. Exh. D). Rather than permitting the plaintiffs to exercise the option at will, the parties restricted the exercise period to the three-month window between July 1 and September 30, 2005. (Am.Compl.¶ 36). Consistent with the parties' discussions on the matter, the exercise price was set forth as a function of, *inter alia, Haru* Holding's total indebtedness and consolidated cash flow. (Schacter Decl. Exh. D at 5).FN4 The Stockholders' Agreement also included a merger clause that stated in pertinent part: "Except as specifically set forth herein, no party has made or relied upon any representations, warranties, covenants or understandings of any party hereto in entering into this Agreement."(Schacter Decl. Exh. D. at 12).

> FN4. The Stockholders' Agreement also provided an extensive dispute resolution mechanism, which obligated Benihana and Matsumura to "promptly commence good faith negotiations with the view to resolving" any disagreements or controversy over the cash flow figures provided by Benihana and granted both parties the right to commence arbitration proceedings in the event that such efforts proved unsuccessful. (Schacter Decl. Exh. D at 7.)

*3 As a condition of closing, Matsumura agreed to serve as Haru's Vice President and Chief Operating Officer for a three-year term. In 2002, she renewed her employment agreement. (Am.Compl.¶ 49). The amended complaint alleges that, on both occasions, Dornbush's false representations induced Matsumura to accept compensation that was not commensurate with her role in Haru:

> Matsumura accepted a salary which was lower than would fully compensate her for her time and expertise, upon the representations of BNC and Dornbush in the weeks prior to her execution of her Employment Agreement that her full compensation would be realized in the value of her Put Option, and that such was based upon Haru's performance. In 2002, Matsumura agreed to BNC's request to extend her employment agreement for three years on similar terms, again upon the representations of BNC and Dornbush that the true value of her compensation would come in the exercise of her Put Option.

(Am.Compl.¶ 49). Towards the end of her second term, in November, 2004, Matsumura became concerned that Benihana was intentionally timing the expansion of Haru to coincide with the exercise period of the plaintiffs' option in order to depress the put price. (Am.Compl.¶ 63). Dornbush is alleged to have instilled false confidence in Matsumura:Dornbush orally assured Matsumura that this was not the result intended by Benihana, and that the Put Price formula would be interpreted to avoid this result.

* * *

> Upon information and belief, Dornbush confirmed that the Put Price was interpreted as "no benefit, no burden" so that in calculating the Put Price, the costs of opening the new restaurants and other financial "burdens" would not be attributed to the minority shareholders.

(Am.Compl.¶ 63, 64).

*The Plaintiffs Exercise Their Put Option*

In June, 2005, after the plaintiffs served notice of their intent to exercise their put option, Benihana valued the plaintiffs' shares at $3,717,960.20. (Am.Compl.¶ 69). The plaintiffs maintain that Benihana's accounting treatment of the factors relevant to the put price calculation-most importantly, Haru's total debt and cash flow-violates the Stockholders' Agreement. In the alternative, since the net effect of Benihana's alleged accounting improprieties was a diminution in the value of their minority interest, FN5 the plaintiffs claim that Benihana breached its fiduciary duties as a majority shareholder of Haru Holding.

> FN5. For example, the value of the plaintiffs' shares would increase by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approximately $1.84 million if Benihana's purchase price and associated expenses were excluded from the valuation. (Pl. Opp. at 7). This estimate does not account for the remaining allegations with respect to the intercorporate transfers and debt-financed expansion, which, if factored into valuation as the plaintiffs suggest, may support a further increase in the put price.

More specifically, the objection to Benihana's valuation is two-fold. First, Benihana's put price calculation was premised on a "total indebtedness" figure that included a $9.2 million debt to Benihana for (i) the $8,125 million purchase price of the eighty-percent stake in Haru Holding; (ii) the legal and investment banking fees associated with the purchase; and (iii) the costs of expanding the Haru franchise in New York and Philadelphia.FN6(Am.Compl.¶ 52).FN7 According to plaintiffs, the assumption of any debt by Haru was contrary to their understanding of the put option as a "no benefit no burden" bargain, which in their view required Benihana to absorb the costs (or burdens) of acquiring Haru and of expanding that business, but nonetheless share any benefits from the expansion. (Am.Compl.¶ 43, 64, 65). Second, the amended complaint alleges that substantially all of Haru Holding's cash and profits, totaling some $24 million, had been treated as transferred to Benihana. (Am.Compl.¶ 54). If true, Benihana's decision to finance Haru's expansion and ongoing operations with debt, rather than cash flow, further depressed the put price to the plaintiffs' detriment.FN8(Am.Compl.¶ 56, 67). In sum, these accounting arrangements are alleged to have deprived the plaintiffs of the "fair market value" of their shares, which they claim had been guaranteed to them.

FN6. These debts were not reported in Benihana's SEC filings or the Consolidated Statements of Operations, which were monthly reports of Haru's revenues and expenses generated by Benihana for Matsumura's benefit. (Am.Compl.¶¶ 61-62).

FN7. Under the Stockholders' Agreement, the put price was inversely related to Haru's total indebtedness and thus, an increase in total debt effected a concomitant decrease in the value of the plaintiffs' shares.

FN8. Since Benihana did not disburse any dividends, the plaintiffs, as minority shareholders, also seek a pro rata distribution of Haru's profits. (Am.Compl.¶ 54).

*4 This lawsuit followed unsuccessful efforts by the parties to mediate their differences.

## DISCUSSION

### I. Legal Standard

On a motion to dismiss for failure to state a claim, the issue is whether the plaintiff has established a "plausible entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007). In order to survive dismissal, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient to raise a right to relief above the speculative level,"*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) (internal quotation marks omitted), and justify "a reasonable expectation that discovery will reveal evidence" of liability. *Bell Atlantic Corp.*, 127 S.Ct. at 1959. In making this determination, the Court is obligated to accept as true the factual allegations of the amended complaint, drawing all reasonable inferences in the light most favorable to the plaintiff. *See In re NYSE Specialists Securities Litigation*, 503 F.3d 89, 95 (2d Cir.2007). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."*Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir.2002).

Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."*Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).

These heightened pleading requirements are applicable to any claim that "sounds in fraud," regardless of whether fraud is an element of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim.*Rombach v. Chang*, 355 F.3d 164, 166, 170 (2d Cir.2004). In applying this pragmatic standard to reject plaintiffs' efforts to "characterize claims by the label used in the[ir] pleading,"*id.* at 172, courts in the Second Circuit have applied Rule 9(b) to any cause of action that bears a close legal relationship to fraud or mistake, *see, e.g.*, *In re Leslie Fay Cos., Inc. Securities Litig.*, 918 F.Supp. 749, 767 (S.D.N.Y.1996) (negligent misrepresentation); *Burrell v. State Farm and Cas. Co.*, 226 F.Supp.2d 427, 438-39 (S.D.N.Y.2002) (constructive fraud), as well as to individual claims that, as pleaded, are predicated on allegations of fraud. *See, e.g., In re Parmalat Securities Litigation*, 501 F.Supp.2d at 573 (breach of fiduciary duty); *Krause v. Forex Exchange Mkt., Inc.*, 356 F.Supp.2d 332, 338 n. 49 (S.D.N.Y.2005) (aiding and abetting breach of fiduciary duty).

Moreover, where "the wording and imputations of the complaint are classically associated with fraud,"Rule 9(b) governs any non-fraud claim that the plaintiffs have made "little, if any, effort to differentiate" from the fraud allegations upon which the action is predicated, *Id.* at 172;*In re Ultrafem Inc. Secs. Litig.*, 91 F.Supp.2d 678, 691 (S.D.N.Y.2000) ("Plaintiffs cannot avoid the more stringent requirements of Rule 9(b) by merely inserting boilerplate language into their complaint stating that claims are based in negligence not fraud."(quoting *In re Stratosphere Sec. Litig.*, 1 F.Supp.2d 1096, 1104 (D.Nev.1998)). Courts are not "required to sift through allegations of fraud in search of some 'lesser included' claim."*Rombach*, 355 F.3d at 176 (citation and quotation marks omitted).

**A. Rule 9(b) Is Applicable To The Plaintiffs' Claims.**

*5 The plaintiffs fail to rebut, or even address, Dornbush's assertion that the complaint "sounds in fraud" and thus, Rule 9(b) applies to one or more of the elements of each claim. (Def. Motion at 12, 22, 23, 25; Pl. Opp. at 25, 43 n. 14, 44 n. 15, 48, 49). It is beyond cavil that plaintiffs' fraud in the inducement, constructive fraud, and negligent misrepresentation claims are subject to the rigors of Rule 9(b). The breach of fiduciary duty, and aiding and abetting breach of fiduciary duty claims are predicated on Dornbush's "false omissions and representations to deceive and to induce plaintiffs to transfer to [Benihana] the 80% interest in Haru and thereafter the right to purchase the 20% interest for less than the actual value of such interest."(Am. Compl. ¶ 107; *see also* Am. Compl. ¶ 147; Pl. Opp. at 41-42). This is a quintessential averment of fraud. Moreover, to the extent the plaintiffs have alleged a non-fraud predicate for any of their claims, they have made no effort to meaningfully distinguish the fraud allegations in the amended complaint or their opposition brief. Accordingly, Rule 9(b) applies.

**II. Analysis**

**A. Dornbush's Statements Were Not Misrepresentative.**

As noted, each of the plaintiffs' claims is premised on allegations of misrepresentations by Dornbush and thus, the falsity or misrepresentative nature of those statements lies at the heart of the amended complaint. However, the statements attributed to Dornbush were merely predictive, forward-looking statements regarding Benihana's intentions that the law does not recognize as actionable under any theory asserted here. While the plaintiffs counter that Dornbush had specific, contemporaneous knowledge of Benihana's intentions that negated the truth of each representation, which would, if true, render Dornbush's statements fraudulent, plaintiffs have utterly failed to meet the burden of pleading specific facts to support their assertion that the statements were false or misleading when made. The amended complaint pleads neither Dornbush's actual knowledge of Benihana's intentions nor any facts that might justify a strong inference of scienter. Thus, the misrepresentations alleged by the plaintiffs are not actionable and, accordingly, the amended complaint is dismissible on this basis alone.

**1. Dornbush's Allegedly Actionable Statements Are Either Accurate Or Forward-Looking.**

The plaintiffs must allege a legally cognizable "misrepresentation" to sustain any cause of action based thereon. It is axiomatic, however, that predictive or opinion statements about future events, without more, are not misrepresentations.[FN9] *See Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 74, 709 N.Y.S.2d 74, 75 (1st Dept.2000); *Hydro Investors Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 21 (2d Cir.2000); *see also Eternity Global Master Fund Ltd.*

v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187-88 (2d Cir.2004) (holding that for negligent misrepresentation claim, an alleged misrepresentation must be factual and not "promissory or related to future events."). Moreover, under New York law, a promissory statement of what will be done in the future gives rise *only* to a breach of contract cause of action. *See* Stewart v. Jackson & Nash, 976 F.2d 86, 88-89 (2d Cir.1992); *see also* Hydro, 227 F.3d at 21 ("The alleged negligent misstatements all relate to promised future conduct, if misstatements they be, and there is a lack of any element of misrepresentation as to an existing material fact so as to come within the doctrine of negligent misrepresentation ...." (quoting Hargrove, Inc. v. Lincoln First Bank of Rochester, 54 A.D.2d 1105, 1107, 388 N.Y.S.2d 958 (4th Dept.1976)). Though misrepresentations of present or past fact have the potential to create liability for the speaker, "[m]ere unfulfilled promissory statements as to what will be done in the future are not actionable" as such. Brown v. Lockwood, 76 A.D.2d 721, 432 N.Y.S.2d 186, 194 (1980); Hotel Constructors, Inc. v. Seagrave Corp., 574 F.Supp. 384, 387 (S.D.N.Y.1983).

FN9. Since Dornbush's alleged fraud is the basis for the plaintiffs' breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive fraud claims, our analysis here applies with equal force to those claims.

*6 The statements allegedly made by Dornbush may be grouped as follows: (i) the Stockholders' Agreement was a "no benefit no burden" bargain in which the costs of acquiring Haru Holding as well as expanding the Haru franchise would be borne by Benihana (Am.Compl.¶¶ 30, 43, 63, 64),; [FN10] (ii) the Stockholders' Agreement provided that Haru Holding would remain debt-free (Am.Compl.¶ 17); (iii) the exercise price of the put option would represent the "fair market value" of the plaintiffs' shares (Am.Compl.¶¶ 29, 42, 43); [FN11] and (iv) the put option would enable the plaintiffs to share in the proceeds from new restaurant openings (Am.Compl.¶¶ 30, 49).

FN10. We question the plaintiffs' interpretation of "no benefit no burden," which wholly ignores the "no benefit" portion of this phrase. The most charitable understanding of "no benefit no burden" is that the plaintiffs, through the put price of their shares, would not be forced to assume any financial burdens if, and only if, they failed to realize any benefits under the put option.

Since the value of the plaintiffs' interest in Haru Holding seems to have appreciated by at least forty-five percent (from $2,031 million to $3,125 million), the plaintiffs have clearly benefited from Benihana's ownership and control. Even in the light most favorable to the plaintiffs, it would not seem an unreasonable application of a "no benefit no burden" arrangement to, factor into the put price the costs of operating and expanding the Haru franchise, thus requiring the plaintiffs to bear their share of the financial burdens associated with the benefits they reaped.

Our observation here is supported by the text of the Stockholders' Agreement, which expressly includes the "Amount of Company Debt" as a factor in the put price calculation. (Schacter Decl. Exh. D at 2). Though the parties clearly contemplated that Haru could (and would) assume some long-term debt, we offer no guidance on whether any particular debt-financing arrangements were permissible.

FN11. The benchmark against which the plaintiffs measure the amount of consideration received in exchange for their shares is "fair market value." Though "fair market value" appears as a refrain in the amended complaint and the opposition brief, the plaintiffs have neither defined that phrase in terms that are not circular, nor identified the source of Benihana's duty to compensate them with "fair market value." Indeed, as discussed *supra*, the parties considered, but rejected, the notion of valuing the plaintiffs' shares in terms of "fair market value," opting instead for a more precise formula for calculating the put price.

Each of these statements conveys Dornbush's expectations of how Benihana *would* perform under the Stockholders' Agreement and not his representation of a present or past fact bearing on the transaction.[FN12] Indeed, in the contract claim for breach of contract which plaintiffs assert against

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Benihana in this action, plaintiffs maintains that if the Stockholders' Agreement, as drafted, is properly understood, it would preclude the assumption of debt by Haru, require Benihana to bear the costs of acquisition and expansion, and entitle the plaintiffs to the fair market value of their shares. Moreover, the parties, each represented by their own counsel, deliberated and negotiated for several months before executing the Stockholders' Agreement, which explicitly provides a mechanism for pricing the plaintiffs' put option. To the extent that Dornbush's representations could be understood as "promissory," i.e. pledging any particular performance on Benihana's behalf, we express no opinion on whether the plaintiffs could predicate a breach of contract claim on the basis of his oral representations or whether the statements would be admissible as parol evidence and hold only that they are not separately actionable under any of theories asserted here.

FN12. The plaintiffs contend that, where a fiduciary relationship has been properly alleged, statements of opinion that are insufficient to support a fraud claim will nonetheless support a breach of fiduciary duty claim. (Pl. Opp. at 44). This argument misses the mark: for many reasons.

At the outset, plaintiffs' argument conveniently downplays the facts that plaintiffs had engaged their own counsel and Dornbush was clearly Benihana's attorney. Moreover, as we noted *supra* Section I.A, the plaintiffs' breach of fiduciary duty claim is grounded in Dornbush's allegedly fraudulent conduct. Thus, Dornbush's liability on the breach of fiduciary duty claim is judged based on whether his statements constitute fraud, and not some 'lesser included' breach of fiduciary duty.

Even if were to set aside these observations, in the principal case cited for the plaintiffs' proposition, *In re Levy's Estate*, the court noted only that "*misrepresentations* of legal opinion" by a party possessing "superior knowledge" may be actionable. 19 A.D.2d 413, 417, 244 N.Y.S.2d 22, 28 (1st Dept.1963) (emphasis added). That is not this case. Even if we were to ignore the fact that the plaintiffs were represented by separate counsel who could have corrected any misrepresentations of legal opinion, under *In re Levy's Estate*, the plaintiffs cannot avoid the need to establish (i) a legally cognizable misrepresentation; or (ii) Dornbush's knowledge of the falsity or misleading character of his statements.

Though the plaintiffs suffer from no misapprehension as to Dornbush's role in the transaction-they readily admit that he was Benihana's agent and do not allege the existence of an attorney-client relationship with respect to the Haru acquisition-they nonetheless seek to hold Dornbush accountable for his statements as if he was their attorney.

Dornbush's conduct is not subject to the reasonable attorney standard because, assuming that he was a fiduciary to the plaintiffs, the scope of Dornbush's duties was not coextensive with those of an attorney representing a client.

Dornbush's suggestion that the plaintiffs would reap the benefits of new restaurant openings fails to state a claim for a second reason. Setting aside the predictive nature of this statement, the plaintiffs do not dispute the fact that Benihana's $3.7 million valuation represents an appreciation in value brought about, at least in part, by revenue from the new Haru restaurants. Since Dornbush's representation does not even endeavor to address the degree to which the plaintiffs would be able to capture the benefits of expansion, we fail to see how his statement could be interpreted as untrue.[FN13]

FN13. The plaintiffs further allege that Dornbush falsely represented that "the parties would negotiate in good faith in the event of a dispute."(Am.Compl.¶ 94). This statement cannot support a claim because it is no less predictive or promissory than those discussed *supra*.Moreover, this conclusory allegation fails to meet the particularity requirements of Rule 9(b) for not detailing when and where the statement was made.

**2. The Facts Alleged Do Not Give Rise To A 'Strong Inference' Of Scienter.**

Of course, a prediction or statement of opinion may be actionable as fraud if the speaker has knowledge of the inevitability of the future event not transpiring because, for example, the promisor has no intention of tendering performance. *See* *Deerfield*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Communications Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89 (1986); Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262-63 (1958); Sabo v. Delman, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 716-17 (1957). However, the amended complaint fails to sufficiently allege that Dornbush had contemporaneous knowledge of Benihana's intention not to perform in accordance with his representations.

*7 Though a speaker's state of mind may be averred generally, a plaintiff's supporting factual allegations must give rise to a "strong inference" of scienter. *See In re Parmalat Securities Litigation,* 501 F.Supp.2d 560, 573 (S.D.N.Y.2007). To establish the requisite inference of Dornbush's knowledge, plaintiffs must plead facts that (1) demonstrate the defendant's motive and opportunity to commit or assist in the fraud, or (2) constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness. *See Acito v. IMCERA Group,* 47 F.3d 47, 52 (2d Cir.1995). The strength of the circumstantial evidence of a defendant's recklessness or conscious misbehavior must be "correspondingly greater" than that which suffices to show motive. *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001)."A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2510 (2007) (construing the term "strong inference" in the Private Securities Litigation Reform Act of 1995 (PSLRA)).

Plaintiffs have not adduced any facts probative of Dornbush's motive to commit fraud other than his position as a director of Benihana.[FN14]Under Second Circuit precedent, however, motive must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."*Novak v. Kasaks,* 216 F.3d 300, 310-11 (2d Cir.2000) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994)). Plaintiffs cannot demonstrate Dornbush's motive by pointing merely to incentives possessed by nearly all corporate insiders, such as "the desire to maintain a high corporate credit rating ... or otherwise to sustain the appearance of corporate profitability or of the success of an investment ... and ... the desire to maintain a high stock price in order to increase executive compensation ... or prolong the benefits of holding corporate office."*Id.*

FN14. Neither Dornbush nor the plaintiffs have briefed the issue of whether Dornbush had the opportunity to commit the alleged fraud.

We next consider whether the plaintiffs have satisfied the alternative, "conscious disregard or recklessness" prong of pleading scienter. Though allegations of a defendant's knowledge of or access to information contradicting his statements are adequate to establish recklessness, *see Novak,* 216 F.3d at 310-11, it is well-established that a corporate officer or director by virtue of his status cannot, without more, be charged with knowledge of activities within the corporation. *See, e.g., In re Forest Laboratories, Inc. Derivative Litigation,* 450 F.Supp.2d 379 (S.D.N.Y.2006); *In re Keyspan Corp. Securities Litigation,* 383 F.Supp.2d 358 (E.D.N.Y.2003); ***Jacobs v. Coopers & Lybrand, LLP,*** No. 97 Civ. 3374, 1999 U.S. Dist. LEXIS 2102, at *45-48 (S.D.N.Y. Feb. 26, 1999); *Boley v. Pineloch Associates, Ltd.,* No. 87 CIV. 5124, 1990 WL 113201 (S.D.N.Y. Aug. 2, 1990); *see also Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989). Here, the plaintiffs concede their inability to plead Dornbush's actual knowledge of Benihana's intent but, as before, seek an inference of knowledge based on his position of "considerable authority" within Benihana.[FN15]This is facially insufficient given the persuasive authority rejecting the imputation of knowledge from a corporation to its officers and directors.

FN15. At oral argument on the defendants' motions to dismiss, counsel for the plaintiffs conceded that "the most that plaintiffs can say is that Mr. Dornbush was in a position of considerable authority at Benihana, [as] general counsel and a director, and that to the extent that there would be such knowledge, such knowledge would be inferred.... I don't believe we pleaded specific actual knowledge."(Oral Arg. Tr. at 43:3-10).

*8 Moreover, the plaintiffs have failed to allege a factual basis for Dornbush's access to information negating the truth of his representations that might compel a contrary result. Haru's loan obligations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were not reported in either Benihana's publicly-available financial statements or the monthly statements of Haru operations created by Benihana and provided to Matsumura. The amended complaint does not aver Dornbush's involvement in managing the company's finances and operations. Nor have the plaintiffs alleged any facts to suggest that Benihana's intentions with respect to the Stockholders' Agreement were, or could have been, common knowledge among Benihana's officers and directors.[FN16] Indeed, there is every reason to believe that Dornbush could not have had contemporaneous knowledge, some six years earlier, of Benihana's intentions because the decision to treat the costs of the acquisition and expansion as a debt of Haru occurred in the valuation process when the plaintiffs exercised their put option and not before. *See* Tellabs, Inc., 127 S.Ct. at 2510. (inference of intent "must be cogent and compelling, thus strong in light of other explanations").[FN17]

FN16. Benihana's intentions could have been common knowledge if, for example, its decision with respect to the put price valuation was crucial to its competitive success. *See, e.g.*, *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989).

FN17. To avoid dismissal of the plaintiffs aiding and abetting breach of fiduciary duty claim, the plaintiffs must allege that the "defendant had actual knowledge of the breach of duty."*Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dept.2003); *accord In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir.2005). Our conclusions with the respect to the insufficiency of the allegations in support of Dornbush's scienter apply with equal force to the actual knowledge element of the plaintiffs' aiding and abetting claim.

Accordingly, the plaintiffs' failure to adequately support a strong inference of Dornbush's state of mind warrants dismissal of the amended complaint in its entirety.

**B. The Plaintiffs' Reliance On Dornbush's Statements Was Not Reasonable.**

A plaintiff must prove reasonable reliance to recover on a claim for fraud in the inducement, constructive fraud, or negligent misrepresentation. *See, e.g.*, *King v. Crossland Savs. Bank*, 111 F.3d 251, 257-58 (2d Cir.1997); *Christie's Inc. v. Dominica Holding Corp.*, No. 05 Civ. 8728, 2006 U.S. Dist. LEXIS 49251, at *14 (S.D.N.Y. July 18, 2006); *Burrell v. State Farm and Cas. Co.*, 226 F.Supp.2d 427, 438 (S.D.N.Y.2002). In evaluating whether the plaintiffs' reliance was reasonable, the entire context of the transaction is considered "including factors such as its complexity and magnitude, the sophistication of the parties, and the contents of any agreements between them."*Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir.2003). When plaintiffs are sophisticated parties and the statement relates to a business transaction memorialized in a contract, New York courts are reluctant to find reliance on oral communications to be reasonable. *See* id. at 196; *Lazard Freres & Co. v. Protective Life Insurance Co.*, 108 F.3d 1531, 1543 (2d Cir.1997). This reluctance stems from the view that "a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament."*Emergent Capital*, 343 F.3d at 195 (citation omitted); *Harsco Corp. v. Segui*, 91 F.3d 337, 342-43 (2d Cir.1996).

Skepticism of fraud claims in this context is obviously compounded when the plaintiff alleges reliance on opposing counsel's opinion or advice, and not a representation of fact. Courts have routinely held that it is unreasonable for a party "to rely on the advice of adversary counsel ... when both parties are aware that adverse interests are being pursued."*Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir.1993); *I.L.G.W.U. Nat'l Ret. Fund v. Cuddlecoat, Inc.*, No. 01 Civ. 4019, 2004 U.S. Dist. LEXIS 3764, at *9 (S.D.N.Y. Mar. 11, 2004); *Petrello v. White*, 412 F.Supp.2d 215, 227 (E.D.N.Y.2006); *see also Russell-Stanley Holdings, Inc. v. Buonanno*, 327 F.Supp.2d 252, 257 (S.D.N.Y.2002).

*9 Here, plaintiffs are sophisticated entrepreneurs who built a successful restaurant franchise in one of the most challenging markets in the country and managed numerous other restaurant ventures. Benihana was proposing an $8.125 million purchase of a controlling interest in the Haru franchise. Prior to negotiating any specific terms of the acquisition or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

drafting any documents, Dornbush clearly communicated to the plaintiffs that he could not represent them in the transaction and recommended another attorney, Paikin, who was then retained by the plaintiffs. The parties negotiated the terms of the Haru acquisition for several months and the resulting Stockholders' Agreement was a complex, comprehensive and fully integrated contract. Over the course of their discussions, Benihana drew attention to the issue of the put price valuation by suggesting that "fair market value" was too "nebulous" and suggested a specific formula for calculating the put price, which was eventually incorporated into the Stockholders' Agreement.

Under these circumstances, the decision to rely upon Dornbush's opinion with respect to the interpretation of the Stockholders' Agreement or Benihana's performance under that contract was unreasonable. We find incredible, and unjustifiable if true, that such sophisticated plaintiffs treated the retention of their own attorney, Paikin, as a "mere formality" and failed to confirm with him that the express provisions of the Stockholders' Agreement adequately protected their interests. Benihana had certainly placed the plaintiffs on notice that the details of the put price valuation were of significant concern to them. If the plaintiffs had felt that the precise formula used in the Stockholders' Agreement was inartfully drafted or failed to account for their apprehensions about the imposition of debt and acquisition costs on Haru, they could have protected themselves by inserting appropriate language into that agreement. Moreover, the merger clause reflects the parties' intention to make the Stockholders' Agreement complete and comprehensive, and further undermines as a matter of law the reasonableness of plaintiffs' asserted reliance on Dornbush's oral representations.

The plaintiffs have not addressed the reasonableness of their reliance on Dornbush's statements except to repeat their arguments in support of the existence of a fiduciary duty. The fact that Dornbush had a pre-existing attorney-client relationship with the plaintiffs or that he advised the plaintiffs on several ancillary matters while the negotiations with Benihana were ongoing does little to mitigate the circumstances surrounding the sale that negate the reasonableness of their reliance. Dornbush's suggestion to hire an independent attorney should have alerted the plaintiffs to the adversarial nature of the ensuing negotiations. If the plaintiffs failed to avail themselves of their own attorney, it is no one's fault but their own; and if he failed to adequately represent them, legal responsibility may not be shifted to Dornbush, who represented the plaintiffs' adversary in the transaction. [FN18]

FN18. Counsel for the plaintiffs has indicated that any claims against Paiken would be barred by the applicable statute of limitations.

**C. The Plaintiffs Have Not Alleged A Fiduciary Relationship.**

*10 In order to sustain a claim for breach of fiduciary duty, constructive fraud, or negligent misrepresentation, a plaintiff must allege the existence of a fiduciary or special relationship with the defendant. *See, e.g.*, *Metropolitan West Asset Management, LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539(NRB), 2004 WL 1444868 at *8 (S.D.N.Y. June 24, 2004); *Petrello*, 412 F.Supp.2d at 229; *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2004 WL 2072536, at *10 (S.D.N.Y. Sept. 14, 2004). Of particular relevance to this case, a fiduciary or implied attorney-client relationship may be triggered when a putative client submits "confidential information to a lawyer with the reasonable belief that the lawyer was acting as his attorney." *Diversified Group, Inc. v. Daugerdas*, 139 F.Supp.2d 445, 454 (S.D.N.Y.2001). A party's "unilateral belief" that he is represented by counsel "does not confer upon him the status of client unless there is a reasonable basis for his belief." *Knigge ex rel. Corvese v. Corvese*, No. 01 CIV. 5743, 2001 WL 830669, at *3 (S.D.N.Y. July 23, 2001) (internal citations and quotation marks omitted).

The reasonableness of a belief that an attorney-client or fiduciary relationship has been formed often turns on whether the plaintiff was explicitly instructed to obtain outside counsel. In *Croce v. Kurnit*, the court was persuaded that the attorney owed a fiduciary duty to the plaintiff in large part because of his "failure to advise the Croces to obtain counsel." 565 F.Supp. 884, 890 (S.D.N.Y.1982). Likewise, in *Richardson v. Artrageous Inc.*, the defendant-attorney was held to be a fiduciary because the circumstances surrounding his interaction with plaintiff gave rise to the foreseeable expectation of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fiduciary relationship, which obligated him to either accept his role as her attorney or "advise her to obtain independent counsel."No. 93 Civ. 5221, 1994 WL 97222, at *3 (S.D.N.Y. Mar. 18, 1994); *see also* *Howard v. Murray*, 43 N.Y.2d 417, 422, 401 N.Y.S.2d 781 (1977) ("Any doubts on this point should readily have been resolved against the defendant, absent proof of a clear and forthright statement to his clients that he was no longer their attorney and that they should obtain outside counsel before continuing any negotiations."). Thus, in both cases, the court recognized that the suggestion to retain independent counsel is a repudiation of any special or fiduciary relationship and a powerful indicator that the attorney's interests are not aligned with those of the putative client.

The plaintiffs have failed to demonstrate the existence of a fiduciary relationship during the August to December, 1999 period in which Dornbush is alleged to have made two misrepresentations as to the put price valuation. (Am.Compl.¶¶ 42, 43) It is undisputed that, sometime in July, 1999 and after some preliminary discussions regarding the Haru acquisition, and before any documents were signed, Dornbush advised the plaintiffs to obtain separate counsel. The plaintiffs followed Dornbush's advice and retained Paikin, who acted as their legal counsel until the Stockholders' Agreement was executed in December, 1999. On these facts, we fail to see any basis for a fiduciary relationship given that Dornbush quashed any reasonable belief that he would be the plaintiffs' attorney or represent their interests in the transaction by suggesting that they hire Paikin. The plaintiffs have not cited any authority for the proposition that opposing counsel may owe fiduciary duties to an adversary who is independently represented and we decline to so hold.

*11 The plaintiffs allege that Dornbush's continuing representation with respect to other Haru-related matters led them to believe "that the role of the new attorney was as a formality."(Am.Compl.¶ 19). As a threshold matter, this subjective and "unilateral" belief that Dornbush would act in the interests of the plaintiffs is insufficient to give rise to a fiduciary relationship. More to the point, however, the fact that Dornbush continued to advise the plaintiffs on matters unrelated to negotiating and drafting the terms of the Stockholders' Agreement cannot be objectively understood as evidence of Dornbush's retreat from his earlier position that the plaintiffs should be independently represented in their dealings with Benihana. Indeed, the plaintiffs have failed to allege any objective manifestations of his intent to do so, such as, advocating on their behalf instead of Benihana's. Our conclusion here is further supported by the sophistication of the parties and the complexity of the transaction, which, as we noted *supra* Section II.B, dramatically increases the likelihood of a reasonable person under the circumstances acknowledging the shift in the parties' relationship once Dornbush had asked the plaintiffs to obtain separate counsel.

## CONCLUSION

To summarize, the statements upon which plaintiffs ground their claims against Dornbush are not actionable as a matter of law. Nor have plaintiffs approached adequately pleading knowledge or the requisite scienter on Dornbush's part to transform predictive statements into falsehoods. Moreover, plaintiffs who were represented by their own counsel in accordance with Dornbush's advice, have not pleaded reasonable reliance or the existence of a fiduciary duty. For these reasons, pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), Dornbush's motion to dismiss the amended complaint is granted in its entirety.

**IT IS SO ORDERED.**

S.D.N.Y.,2008.
Matsumura v. Benihana Nat. Corp.
Slip Copy, 2008 WL 282021 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 399396 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

H

Phoenix Four, Inc. v. Strategic Resources Corp.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
PHOENIX FOUR, INC., Plaintiff,
v.
STRATEGIC RESOURCES CORPORATION, Paul Schack, Christian M. Van Pelt, James J. Hopkins III, Robert H. Arnold, R.H. Arnold & Co. Incorporated, Joel G. Shapiro, and JGS Advisors LLC, Defendants.
No. 05 Civ. 4837(HB).

Feb. 21, 2006.

*OPINION & ORDER*

BAER, J.

*1 Plaintiff Phoenix Four, Inc. ("Phoenix") brought this action against defendants Strategic Resources Corporation ("SRC"), Paul Schack ("Schack"), Christian M. Van Pelt ("Van Pelt"), James J. Hopkins III ("Hopkins"), Robert H. Arnold ("Arnold"), R.H. Arnold & Company, Inc. ("RHAC"), Joel G. Shapiro ("Shapiro"), and JGS Advisors LLC ("JGS") alleging: (i) violations of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1*et seq.* (against SRC and RHAC only); (ii) violations of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1*et seq.*; (iii) breach of fiduciary duty; (iv) common law fraud; (v) negligent misrepresentation; (vi) breach of contract (against SRC, RHAC, and JGS only); (vii) negligence; and (viii) declaratory relief. This Court has jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1332(a)(4). All defendants except for Shapiro and JGS now move to dismiss the complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. For the reasons set forth below, the defendants' motion to dismiss is GRANTED in part and DENIED in part.

## I. BACKGROUND

The following facts are taken from the allegations in the complaint unless otherwise stated.

### A. *The Parties*

Phoenix is an investment company incorporated in the Commonwealth of the Bahamas ("The Bahamas") in 1993 and licensed as a mutual fund under Bahamian law in 1997. Complaint ("Compl.") ¶ 23. Its principal place of business is in Nassau, The Bahamas. *Id.* ¶ 9.

SRC served as Phoenix's investment adviser and provided other services to it.*Id.* ¶ 10.SRC is incorporated under the laws of New York with its principal place of business in New York City. *Id.*

Schack and Van Pelt were managing directors of Phoenix and members of its Board of Directors (the "Board") from 1994 until about April 21, 2004. *Id.* ¶¶ 11, 12.Both Schack and Van Pelt are, and at all relevant times were, principal shareholders, senior officers, and directors of SRC and in those capacities transacted business in New York City and continue to do so. *Id.* Schack is a citizen of the State of New York and resides in New York City.*Id.* ¶ 11.Van Pelt is a citizen of the State of New Jersey. *Id.* ¶ 12.

Hopkins was a member of Phoenix's Board of Directors from April 2004 through August 2004. *Id.* ¶ 13.He is also, and at all relevant times was, a principal shareholder, senior officer, and director of SRC and transacted business in New York City and continues to do so. *Id.* Hopkins is a citizen of the State of New Jersey. *Id.*

Arnold was a managing director of Phoenix and a member of its Board of Directors from at least October 1995 until about April 21, 2004. *Id.* ¶ 14.He is a citizen of the State of New York and transacted business in New York City and continues to do so.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Id.*

RHAC is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York City. *Id.* ¶ 15.Arnold is, and at all relevant times was, the senior officer and director of RHAC. *Id.* ¶¶ 15, 16.

*2 JGS is a limited liability company organized under the laws of the State of New York and has its principal place of business in New York City. *Id.* ¶ 17.The company was established by Shapiro, and performed a broad range of services for SRC and Phoenix beginning some time after July 2000. *Id.* Shapiro is a citizen of the State of New York, resides in New York City, and transacted business in New York City and continues to do so. *Id.* ¶ 18.

B. *Relationship Between Phoenix, SRC, and RHAC*

Schack, Van Pelt, and Hopkins founded and owned SRC, which was established to act as an adviser to an investment or mutual fund that they would form. *Id.* ¶ 25.These three defendants then provided assistance in establishing Phoenix, and solicited investors for the fund. *Id.* ¶¶ 26, 27.On November 5, 1993, Phoenix entered into an Investment Advisory Agreement with SRC ("Advisory Agreement") pursuant to which SRC agreed to serve as the investment adviser for Phoenix for an "indefinite period" and provide advice on the trading of securities. Advisory Agreement, Ex. 1 to Compl., art. II, V. In return for its services, SRC would earn a management fee based on the value of Phoenix's gross assets, and a performance fee based on Phoenix's net asset value per share. *Seeid.* art. III. In December 2002, after two Board members pressed SRC to decrease its fees, an amended advisory agreement was negotiated ("Amended Agreement"). Compl. ¶¶ 68, 70. SRC never signed that agreement despite language in the original Advisory Agreement that it could "not be altered or amended except in a writing signed by both parties."*Id.* ¶ 210; Advisory Agreement, Ex. 1 to Compl., art XI. In October 2003, SRC proposed yet a different fee schedule that was approved by a vote of six directors. Compl. ¶ 73.

Through May 19, 2005, SRC regularly furnished Phoenix with advice regarding the investment in, purchase, sale, or disposal of securities or other properties and, together with the Phoenix Board of Directors, conducted Phoenix's business. Compl. ¶ 29. Phoenix was SRC's sole client. *Id.* ¶ 30.From 1997 to December 2, 2002 and then again from May 1, 2003, SRC also served as Phoenix's administrator as defined by the Mutual Fund Regulations and Investment Funds Regulation of the Commonwealth of the Bahamas. *Id* . ¶ 31.

Arnold and RHAC had a business association with SRC, Schack, Van Pelt, and Hopkins. *Id.* ¶ 37.As a result of that association, SRC, Schack, and Van Pelt caused Phoenix to make Arnold a Director of Phoenix in or around 1995, and to employ RHAC as a financial adviser. *Id.* In or around April 1996, SRC caused Phoenix to enter into an investment advisory agreement with RHAC, but this agreement was never submitted to the Board or its members for approval.*Id.* ¶ 86.From at least early 2000, RHAC assisted in calculating the value of Phoenix's assets and net asset value per share. *Id.* ¶ 39.

C. *The Alleged Wrongdoing*

*3 Phoenix alleges that Schack, Van Pelt, Hopkins, Arnold, and the other Directors they caused to be appointed to the Board treated Phoenix as their "personal candy store" and incurred unwarranted expenses for their own benefit. *Id.* ¶ 4. The Directors routinely approved transactions in which they were self-interested: they invested Phoenix's money in assets in which they had financial interests and paid fees to third parties to whom they were related. *Id.* ¶ 94.In order to justify such transactions and increase SRC's fees under the Advisory Agreement, the defendants inflated the value of Phoenix's assets and those of its subsidiaries that were under SRC management.*Id.* ¶ 109.Further, Schack, Van Pelt, and Arnold caused Phoenix's Articles of Association to provide indemnification to its directors and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

officers except for willful default or gross negligence in contravention of Bahamian law.*Id.* ¶ 322.

The defendants inflated Phoenix's asset values by listing yet to be acquired assets in Phoenix's financial statements. For example, the transaction by which Phoenix was to acquire its interest in a start-up insurance company known as Insurent did not close until after March 18, 2002. *Id.* ¶¶ 110, 116, 118.Nonetheless, the defendants caused Phoenix's Consolidated Financial Statements for the Year Ending December 31, 2001 to list the value of Phoenix's interest in Insurent as $26.7 million. *Id.* ¶ 120.

The defendants also assigned inflated values to Phoenix's assets. For example, on December 14, 2002, an outside entity called Houlihan Valuation Advisers ("Houlihan") valued Insurent at $63 million. *Id.* ¶¶ 124, 130, 134.The defendants listed the value of Phoenix's then 51.38% interest in Insurent, however, as $57 million as of December 31, 2002. *Id.* ¶ 131.For that figure to be accurate, the total value of Insurent would have had to increase from $63 million to $110.9 million-a 76% increase-in seventeen days. *Id.* In addition, the defendants assigned values to other Phoenix assets-Shoppes@IV, Seacourt Pavilion, Westminster Mall-that exceeded the values reported by third party appraisers.

On February 5, 2003, the Board unanimously approved a $57 million number to Phoenix's interest in Insurent. *Id.* ¶ 133.The directors' vote was based on representations by Schack that this was the value Houlihan and BDO International ("BDO"), Phoenix's outside accountant and auditor, had assigned to this asset. *Id.* ¶ 134.On January 14, 2003, just a few weeks earlier, Schack had reported to the Board that Houlihan had valued Insurent at $70 million.[FN1] *Id.* Further, by the end of April 2003, BDO insisted that a statement be inserted in Phoenix's Consolidated Financial Statements for the Year Ending December 31, 2002 to the effect that the value assigned to Insurent was excessive. *Id.* ¶ 135.Although BDO's position was disclosed to the entire Board on April 29, 2003, the Board failed to decrease the net value assigned to Insurent. *Id.*

FN1. Phoenix asserts that Schack's report was false, because Houlihan had valued Insurent at only $63 million. Compl. ¶ 134.

*4 The Insurent agreements stated that at the same time Phoenix was to acquire its interest in Insurent, an SRC subsidiary and RHAC were also to acquire interests in Insurent. *Id.* ¶ 113.Despite these statements, Phoenix alleges that the defendants never disclosed that SRC and RHAC intended to acquire an interest in Insurent prior to causing Phoenix to enter into contracts to acquire an interest in the same entity. *Id.* ¶ 115.Further, SRC has refused to produce a complete set of the minutes of Phoenix's Board meetings, including the meetings at which the Board would have discussed the acquisition of Insurent. *Id.* ¶ 114.

Phoenix further alleges that SRC, Schack, Van Pelt, and Arnold made other fraudulent misrepresentations to the Phoenix Board. For instance, on December 27, 2002, Schack and Van Pelt represented to the Phoenix Board that a payment of $848,000 in performance fees to SRC was "on account of fees as much as two years past due" when they knew that SRC was not entitled to any such performance fees. *Id.* ¶ 179.On February 5, 2003, Schack reported at a telephonic Board meeting that SRC had obtained an independent valuation for Phoenix's asset known as South Brunswick Square when no such "truly independent valuation" had been obtained. *Id.* On February 5, 2004, SRC made various statements in a letter to the Phoenix Board regarding the return on Phoenix's assets, SRC's maximum fee, third party appraisals of assets, and that Phoenix was not facing the threat of bankruptcy. *Id.* ¶ 219.Phoenix alleges that each of these statements was false and misleading. *Id* . ¶ 220.In 2004, Arnold, SRC, Schack, and Van Pelt caused an entity called FTI to conduct a review of the fees SRC had been paid. *Id.* ¶ 76.At that time, Arnold failed to call FTI's attention to the lower fees that had been negotiated in the Amended Agreement. *Id.* ¶ 77.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 399396 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

Phoenix also alleges that SRC engaged in other self-dealing. For instance, Phoenix and SRC entered into property management and leasing agreements for almost every asset that Phoenix acquired. *Id.* ¶ 82.The contracts were not commercially reasonable because SRC charged higher fees than it could have obtained in arms-length negotiations. *Id.* ¶ 83.SRC also caused Phoenix to indirectly pay its rent, legal fees, and direct marketing, lease administration, and construction management expenses. *Id.* ¶¶ 174-75, 211-12.

As a result of these and other actions taken by the defendants, Phoenix faced a liquidity problem and was forced to suspend the sale and redemption of its shares in February 2003. *Id.* ¶ 7. In April 2004, after Schack, Van Pelt, and Arnold resigned from the Board and a new Board that included Hopkins was installed, the new Board voted to suspend payments to all third parties including SRC. *Id.* ¶ 8. The new Board also required SRC to obtain authorization from two Board members before it made any payments to itself that exceeded $50,000. *Id.* Despite this directive, SRC caused itself to be paid $2.3 million. *Id.* On April 23, 2004, SRC also caused RHAC to be paid almost $129,000, and RHAC accepted this payment, despite the knowledge that the Board had voted to suspend payments to third parties. *Id.* ¶ 190.The new Board was unaware of these payments. *Id.* ¶ 188, 192.Phoenix is currently saddled with assets that are burdened with debt and worth millions of dollars less than represented by the defendants, and is unable to attract new investors. *Id.* ¶ 7.

## II. STANDARD OF REVIEW

*5 O a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must construe all factual allegations in the complaint in favor of the non-moving party. *SeeKrimstock v. Kelly*, 306 F.3d 40, 47-48 (2d Cir.2002). The court's consideration is normally limited to facts alleged in the complaint, documents attached as exhibits to the complaint or incorporated in the pleadings by reference, and matters of which judicial notice may be taken. *SeeSamuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir.1993). A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir.2004) (*quotingConley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## III. DISCUSSION

### A. *Violations of the Investment Company Act of 1940*

Phoenix asserts that SRC and RHAC violated Sections 80a-10, 13, 15, 17, 30 and 33 of the Investment Company Act of 1940, 15 U.S.C. Sections 80a-1*et seq.* ("ICA"). Phoenix contends that these infringements by SRC and RHAC constitute a breach of their fiduciary duty to Phoenix in violation of 15 U.S.C. Section 80a-35 and entitle Phoenix to rescind its contracts with SRC and RHAC, as well as to an injunction, pursuant to 15 U.S.C. Section 80a-46.

The defendants contend that Phoenix's claim is time barred. Those courts that have considered this question share the defendants' view and have applied the one-year/three-year statute of limitations applicable to various provisions of the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act").*SeeGreen v. Fund Asset Mgmt. L.P.*, 19 F.Supp.2d 227 (D.N.J.1998); *Friedlob v. Trustees of the Alpine Mut. Fund Trust*, 905 F.Supp. 843 (D.Colo.1995); *Merine v. Prudential-Bache Util. Fund, Inc.*, 859 F.Supp. 715 (S.D.N.Y.1994). Those courts reason that: (i) "federal interests in predictability and judicial economy counsel adoption of a uniform limitations period" for ICA claims; (ii) the uniform limitations period should derive from a federal source because ICA claims are multi-state in nature; and (iii) the ICA claims fit closely with causes of action subject

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 399396 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

to the one-year/three-year limitations period under the 1933 and 1934 Acts because all these statutes are "intended to facilitate the central goal of protecting investors, in part by imposing similar restrictions and reporting requirements."*Friedlob,* 905 F.Supp. at 855;*accordGreen,* 19 F.Supp.2d at 232;*Merine,* 859 F.Supp. at 720-21. Moreover, in adopting a one-year/three-year limitations period for an action for rescission under the Investment Advisers Act ("IAA"), the Second Circuit in *Kahn v. Kohlberg, Kravis, Roberts & Co.* noted that both the ICA and IAA were "enacted at the same time" and "impose similar requirements on investment advisers and investment companies and proscribe similar conduct."*Id.,* 970 F .2d 1030, 1037 (2d Cir.1992).

*6 Following these precedents, an action for rescission accrues when the contract is executed. *Seeid.* at 1042.Here, the Advisory Agreement between Phoenix and SRC was executed on November 5, 1993. Phoenix alleges that the advisory contract between it and RHAC was executed in or around April 1996. Applying the longer limitations period of three years from the wrong, Phoenix must have brought its ICA claim against SRC by November 5, 1996 and against RHAC by April 1999. Because Phoenix waited until May 2005 to file its ICA claim, the claim is untimely.

Phoenix attempts to revive its ICA claim by arguing that the limitations period should not be predicated on the execution of the original Advisory Agreement with SRC but rather on the Amended Agreement negotiated in December 2002. *See* 11/22/2005 Transcript of Oral Argument on Motion to Dismiss ("Tr.") at 18-19. Alternatively, Phoenix asserts that a new ICA cause of action accrued in 2002 when SRC failed to register Phoenix under the Act after it amended its Articles of Association to allow U.S. residents to be shareholders. *Seeid.* at 20-21.Phoenix further argues that the two-year/five year statute of limitations provided for in the Public Company Accounting Reform and Investor Protection Act of 2002 ("Sarbanes-Oxley") is applicable here. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 3 ("Pl.'s Opp'n Mem"). Should Sarbanes-Oxley govern, Phoenix goes on to argue that an action that accrues in 2002 would be timely before 2007. Sadly for Phoenix, its argument is unavailing.

First, the Amended Agreement on which Phoenix pins its hopes was never executed by SRC. Second, Phoenix cites no authority for its assertion that SRC was obligated to register Phoenix under the ICA after U.S. residents were allowed to be shareholders, nor have I found any.[FN2] Finally, the Sarbanes-Oxley statute of limitations applies only to actions arising under the securities laws that "involve[ ] a claim of fraud, deceit, manipulation, or contrivance."28 U.S.C. § 1658 (West 2005). Neither 15 U.S.C. Section 80a-46 nor any of the other sections of the ICA on which Phoenix's Section 80a-46 claim relies fall within this category. Accordingly, the Sarbanes-Oxley limitations period is not applicable to Phoenix's claim. *Cf.In re Global Crossing, Ltd. Sec. Litig .,* 313 F.Supp.2d 189, 196-97 (S.D.N.Y.2003) (declining to apply Sarbanes-Oxley statute of limitations to claims that do not require a showing of fraudulent intent).

FN2.15 U.S.C. Section 80a-7(d) prohibits transactions in interstate commerce by "companies not organized under laws of the United States or a State" unless the Securities and Exchange Commission issues an order that permits that company to register under the ICA and "make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce."*Id.* (West 1997). If this is the authority that Phoenix depends on for its assertion, it is not applicable here because the complaint fails to allege that Phoenix made a public offering of its securities.

Phoenix finally argues that the applicable statute of limitations is tolled because the defendants concealed their misconduct and failed to disclose their conflicts of interest. The defendants respond that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tolling does not apply because the one-year/three-year statute of limitations under the 1933 and 1934 Acts is a statute of repose.

Defendants are once again correct. The Supreme Court has stated that "the equitable tolling doctrine is fundamentally inconsistent" with the one-year/three-year statute of limitations of the 1933 and 1934 Acts. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991). The Court stated that the three-year limit is "a period of repose." *Id.* The Second Circuit has explained that a statute of repose, unlike a statute of limitations, "defines the right involved in terms of the time allowed to bring suit."*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102 (2d Cir.2004). In other words, once the specified period of time has expired, the right is no longer available. *Seeid.* Therefore, a statute of repose runs without interruption once it is triggered and is not subject to equitable considerations. *Seeid.*

*7 That prong of Defendants' motion to dismiss Phoenix's time barred ICA claim is granted.

B. *Violations of the Investment Advisers Act of 1940*

Phoenix claims that SRC and RHAC engaged in fraudulent, deceptive, or manipulative acts in its dealings with Phoenix in violation of the IAA, specifically 15 U.S.C. Section 80b-6(1), 6(2), and 6(4). Phoenix further claims that the individual defendants aided and abetted SRC or RHAC and received some of the fees paid to those entities. Therefore, Phoenix seeks a rescission of its agreements with SRC and RHAC and restitution of all consideration paid to those entities and individual defendants pursuant to 15 U.S.C. Section 80b-15(b).

The Second Circuit has held that actions for rescission under the IAA are subject to the one-year/three-year statute of limitations applicable to various provisions of the 1933 and 1934 Acts. *SeeKahn*, 970 F.2d at 1038-39. Consequently, as discussed in Section III.A *supra*, Phoenix's claims for rescission of the November 5, 1993 agreement with SRC and the April 1996 agreement with RHAC are untimely.

Phoenix again contends that 2002 is the proper time from which to calculate the running of the statute of limitations, for the same reasons given in its ICA claim, and asserts that the Sarbanes-Oxley two-year/five-year limitations period applies to its IAA claim. As I explained in my discussion of the ICA claim, this argument is unavailing. In light of this conclusion, even if the Sarbanes-Oxley limitations period were applicable here, it would not save Phoenix's claim. Under that statute of limitations, Phoenix would have to file its IAA claim by the earlier of five years from the execution of the agreements or two years from discovery of the facts constituting the fraud. Phoenix alleges that it did not discover any of the defendants' misconduct until after April 2004, and so it has until April 2006 to file its claim. *See* Pl.'s Opp'n Mem. at 6, 10. Clearly the earlier of the two-year/five-year limitations period is what governs, and using the five-year period, Phoenix would have been required to file for rescission of the SRC agreement on or before November 5, 1998, and for rescission of the RHAC agreement by April 2001. Phoenix's complaint, filed in May 2005, fails to meet those time lines and this prong of the motion is granted.

C. *Common Law Claims*

1. *Governing Law*

The parties dispute whether Phoenix has given adequate notice that Bahamian law applies to some of its common law claims. Federal Rule of Civil Procedure 44.1 states: "A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonably written notice."*Id.* The 1966 Advisory Committee Notes point out that the notice "may, but need not be, incorporated in the pleadings."Moreover, as an authoritative treatise has stated, "[t]he function of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 399396 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

notice is not to spell out the precise contents of foreign law but rather to inform the court and the litigants that it is relevant to the lawsuit."Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2443 (2d ed.1994). It is sufficient if the notice "specif[ies] the segment of the controversy thought to be governed by foreign law and identif[ies] the country whose law is claimed to control."*Id.*

*8 Here, the complaint states that Phoenix was incorporated under the laws of The Bahamas and licensed as a mutual fund pursuant to the Bahamian Mutual Funds Act of 1995. Compl. ¶ 23. Further, the complaint gives notice that Bahamian law governs (i) the duties SRC and RHAC owed Phoenix as its investment adviser and administrator, *id.* ¶¶ 31-32; (ii) the applicable standard of care, *id.* ¶¶ 306-09; and (iii) the right to indemnification, *id.* ¶¶ 307-08, 322.These statements were more than sufficient to alert the defendants that Bahamian law is relevant to those claims that involve corporation law, specific duties owed by one party to another, standards of care, or indemnification. Therefore, Phoenix gave the defendants reasonable notice that Bahamian law governs its claims for breach of fiduciary duty, negligent misrepresentation, negligence, and declaratory relief that certain indemnification provisions in Phoenix's Articles of Association and the Advisory Agreement are void or voidable.[FN3]

FN3. Because Phoenix failed to discuss Bahamian law in its Opposition Brief despite its assertion that Bahamian law governs these claims, and because this Court has no ready access to Bahamian legal materials, I asked Phoenix on February 9, 2006 to provide the court with pertinent Bahamian law. In response, Phoenix addressed only Bahamian law governing the breach of fiduciary duty claim. Therefore, I assume that Bahamian law accords with New York law on the negligent misrepresentation and negligence claims. *SeeSmith v. Soros,* No. 02 Civ. 4229, 2003 WL 22097990, at *7, n. 3 (S.D.N.Y. Sept. 5, 2003).

Unlike those claims, however, common law fraud is not predicated on any of the legal provisions or standards referenced in the complaint. Consequently, the defendants could not reasonably have known that Phoenix intended Bahamian law to govern this claim, and New York law will govern. Phoenix specifies that its breach of contract claim is governed by New York law under the choice of law provisions in its contracts with SRC and RHAC. *See* Pl.'s Opp'n Mem. at 15 n. 21.

2. *Breach of Fiduciary Duty*

Phoenix contends that the defendants owed a fiduciary duty to Phoenix as its directors, investment advisers, or administrator, and that they breached their fiduciary duty by engaging in acts that involved self-dealing or conflicts of interest.

Bahamian law imposes on directors, officers, and agents of a company the duty to "act honestly and in good faith with a view to the best interest of the company and exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances."Int'l Bus. Cos. Act of the Commonwealth of the Bahamas § 55 (2000). Bahamian law does not, however, prohibit directors of a company from voting on agreements or transactions in which they have an interest if "the material facts of the interest ... are disclosed in good faith" and "the [a]greement or transactions is [sic] approved or ratified by a resolution of members."*Id.* § 57.

The defendants assert that Phoenix's breach of fiduciary duty claim fails because Phoenix has not alleged that the defendants' purported misconduct was concealed from Phoenix's Board. Under Bahamian law, however, the critical issue is whether the members of the corporation approved the conduct. It is therefore irrelevant whether the directors knew of the alleged misconduct. Moreover, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaint does not state or imply that the entire Board was aware of the third party appraisals of Phoenix assets such as the Shoppes@IV, Seacourt Pavilion, or Westminster Mall, or that the independent directors were aware that SRC had entered into allegedly commercially unreasonable property management contracts with Phoenix. In addition, the complaint expressly alleges that SRC's payments to itself and RHAC after the April 2004 Board resolution to suspend payments to third parties were hidden from the Board. Accordingly, the defendants' motion to dismiss Phoenix's claim of breach of fiduciary duty is denied.

3. *Common Law Fraud*

*9 To plead a claim for fraud under New York law, a plaintiff must allege the "misrepresentation of a material fact made with scienter that induces reliance to the detriment of the party to whom the misrepresentation is directed."*See, Investor Prot. Corp. v. BDO Seidman, LLP,* 49 F.Supp.2d 644, 655 (S.D.N.Y.1999).Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be pleaded with particularity, including an explanation of why a representation is fraudulent. *SeeEternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York,* 375 F.3d 168, 187 (2d Cir.2004). As to scienter, this Circuit requires plaintiffs to allege either (i) "facts to show that defendants had both motive and opportunity to commit fraud," or (ii) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."*Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,* No. 02 Civ. 1230, 2003 WL 21088506, at *6 (S.D.N.Y. May 14, 2003).

a. *SRC*

The parties focus on four alleged misrepresentations by SRC: (i) Schack's statement that Houlihan had valued Insurent at $70 million; (ii) Schack's report that SRC had obtained an independent valuation for Phoenix's South Brunswick square asset; (iii) SRC's representations in the February 5, 2004 letter to the Phoenix Board; and (iv) the December 27, 2002 representation by Schack and Van Pelt that Phoenix's payment of $848,000 to SRC was on account of fees two years past due when they knew that SRC was not entitled to any payment at that time.

The first three representations fail to support Phoenix's fraud claim. Phoenix fails to establish how the first statement was material in light of its allegation that the Board approved a $57 million value for Phoenix's interest in Insurent based on Schack's later report that Houlihan and BDO had valued the asset at this figure. Phoenix fails to allege with particularity how the next two statements were fraudulent. It claims that no "truly independent valuation" had been obtained for the South Brunswick Square asset, but does not explain why the valuation was not "truly" independent. As to the letter, Phoenix only asserts conclusorily that "[e]ach of these statements was false and misleading."

The last statement has, however, been properly pled. In addition to specifying "who, what, and when," Phoenix has alleged that Schack and Van Pelt had a fraudulent motive because they benefited from fees paid to SRC. I am aware that the receipt of professional fees alone is generally held insufficient to support a claim of fraud. *SeeDuncan v. Pencer,* No. 94 Civ. 0321, 1996 WL 19043, at *9 (S.D.N.Y. Jan. 18, 1996). The rationale for this rule is that professionals will not be deemed to risk their reputations for a fee that represents a small percentage of their incomes. *Seeid.* at *10.Here, however, Phoenix has alleged that it was SRC's sole client. Consequently, the *Duncan* rationale does not apply and I am reluctant, under the facts here, to hold that the receipt of fees fails to provide a sufficient motive for fraud.

*10 The defendants' motion to dismiss the common law fraud claim against SRC, Schack, and Van Pelt is denied.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 399396 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

b. *RHAC*

Phoenix alleges the following misrepresentations by RHAC: (i) participation in inflating the value of Phoenix assets that were under SRC management; (ii) Arnold's failure to call to FTI's attention the lower fees to which SRC had agreed in the Amended Agreement; and (iii) the failure to disclose that RHAC had an interest in Insurent prior to causing Phoenix to enter into contracts to acquire an interest in the same entity.

The first ground fails for lack of particularity in alleging that RHAC was aware that the assigned values were inflated-the complaint states only that RHAC modeled the cash flows that were used by SRC and the Board to value Phoenix's assets. Next, Phoenix fails to establish how an omission to a third party, FTI, can support a claim of fraud by Phoenix. A third party may recover for fraud "if he can establish that he relied upon [a misrepresentation] to his detriment and that the defendant intended the misrepresentation to be conveyed to him."*Sec. Investor Prot. Corp.*, 49 F.Supp.2d at 655. The complaint fails to allege that Phoenix relied on Arnold's misrepresentation or that Arnold intended his omission to be conveyed to Phoenix. Finally, the complaint itself contradicts Phoenix's third allegation because it states that the acquisition of interests in Insurent by SRC and RHAC was disclosed in the Insurent agreements themselves.

Therefore, the common law fraud claim is dismissed against Arnold and RHAC.

4. *Negligent Misrepresentation*

To state a claim for negligent misrepresentation, a plaintiff must establish that "the defendant had a duty to use reasonable care to convey correct information due to the existence of a 'special relationship,' that the information provided was incorrect or false, and that the plaintiff reasonably relied upon the information."*Citibank, N.A. v. Itochu Int'l Inc.*, No. 01 Civ. 6007, 2003 WL 1797848, at *5 (S.D.N.Y. Apr. 4, 2003). Allegations of negligent misrepresentation must comply with the particularity requirements of Federal Rule of Civil Procedure 9(b).*SeeSiemens Westinghouse Power Corp. v. Dick Corp.*, 293 F.Supp.2d 336, 343 (S.D.N.Y.2003).

The "special relationship" element is met by Phoenix's allegations that the defendants were Phoenix's fiduciaries. Phoenix's negligent misrepresentation claim is, however, based on the same factual allegations as its fraud claim, and suffers from the same deficiencies in pleading. *See* Section III.C.3 *supra*.Accordingly, my decisions as to Phoenix's fraud claim apply equally to its negligent misrepresentation claim, and defendants' motion to dismiss this claim is denied as to SRC but granted as to RHAC.

5. *Breach of Contract*

In a breach of contract claim, a plaintiff must "plead the provisions of the contract upon which the claim is based."*Window Headquarters, Inc. v. MAI Basic Four, Inc.*, Nos. 91 Civ. 1816, 92 Civ. 5283, 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993) (quoting *Griffin Bros., Inc. v. Charles Yatto*, 415 N.Y.S.2d 114 (N.Y.App.Div.1979)). The complaint must "set forth the terms of the agreement upon which liability is predicated, either by express reference or by attaching a copy of the contract."*Id.* (quoting *Chrysler Capital Corp. v. Hilltop Egg Farms, Inc.*, 514 N.Y.S.2d 1002, 1003 (N.Y.App.Div.1987)).

a. *SRC*

*11 Phoenix has attached a copy of the 1993 Advisory Agreement to its complaint. Phoenix has also alleged that SRC breached this Agreement by: (i) paying itself $848,000 in performance fees to which it was not entitled; (ii) causing Phoenix to indirectly pay SRC's rent, legal fees, and other expenses; and (iii) failing to comply with the provisions of Bahamian law that were implied terms of the Agreement, such as reporting inflated values for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Phoenix's assets, causing Phoenix to approve indemnity agreements, and failing to keep accurate records and provide them to the new Board. These allegations sufficiently plead a breach of the Advisory Agreement.

As to the Amended Agreement, however, Phoenix admits that SRC never signed the amendment although the original Advisory Agreement required all alterations and amendments to be in a writing signed by both parties. Further, even if there were an agreement, it would be void under the Statute of Frauds. In New York, "contracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds."*Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02 Civ. 2628, 2002 WL 31398933, at *3 (S.D.N.Y. Oct. 24, 2002) (collecting cases). Phoenix concedes that the Amended Agreement revised only the compensation provisions of the original Advisory Agreement. *See* Pl.'s Opp'n Mem. at 25. Therefore, the term of the Amended Agreement was the same as in the Advisory Agreement, and that term was for an indefinite period. Consequently, the Amended Agreement would be unenforceable under the Statute of Frauds and there was no agreement that could have been breached.

The motion to dismiss Phoenix's breach of contract claim against SRC is denied as to the Advisory Agreement but granted as to the Amended Agreement.

b. *RHAC*

Phoenix has not attached a copy of the agreement with RHAC to the complaint, nor has it set forth the terms of the agreement on which liability for breach of contract is predicated. Phoenix has stated only that RHAC provided assistance with the valuation of Phoenix assets, but has not expressly alleged that this service was a term of the agreement.[FN4] Therefore, Phoenix has failed to properly plead its breach of contract claim against RHAC. The defendants' motion to dismiss this claim is granted.

FN4. Indeed, to the extent that the complaint alleges that the RHAC agreement was never submitted to Phoenix's Board or members for approval, it is questionable whether there was a valid agreement.

6. *Negligence*

Allegations of negligence need meet only the requirements of Federal Rule of Civil Procedure 8(a).*SeeIn re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 322-23 (S.D.N.Y.2003).

The Advisory Agreement absolves SRC, its directors, and officers from liability for negligence in connection with the performance of the agreement. *See* Advisory Agreement, Ex. 1 to Compl., art. VI. Phoenix alleges that the RHAC agreement has the same clause. Compl. ¶ 237. Because such provisions are enforceable in New York, Phoenix's claim of negligence against SRC, RHAC, their directors, and officers are dismissed insofar as the alleged conduct was in connection with performance of the agreements. *SeeAm. Motorist Ins. Co. v. Morris Goldman Real Estate Corp.*, 277 F.Supp.2d 304, 307 (S.D.N.Y.2003). Phoenix's allegations of negligent conduct by SRC, Shack, Van Pelt, and Arnold that occurred outside the performance of the agreements are adequately pleaded and survive this motion to dismiss.[FN5] Phoenix has not alleged any such acts of negligence as to RHAC, however, so this claim is dismissed as to that defendant.

FN5. These allegations are summarized in Phoenix's opposition brief, with citations to the complaint. *See* Pl.'s Opp'n Mem. at 33.

7. *Declaratory Relief*

***12** Phoenix seeks a declaration that certain indemnification provisions in Phoenix's Articles of Association, the Advisory Contract, and other agreements are void or voidable as violative of Bahamian law. Setting aside the question of whether this

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 399396 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 11

issue is ripe for adjudication, Phoenix has failed to provide the specific Bahamian law it claims is violated despite this Court's request for it to do so. I decline to entertain a demand for declaratory relief in the absence of the law that purportedly governs the parties' rights. The defendants' motion to dismiss Phoenix's request for declaratory relief is granted.

## IV. CONCLUSION

The defendants' motion to dismiss Phoenix's federal claims is granted. The motion to dismiss the following common law claims is denied: (i) breach of fiduciary duty against all defendants; (ii) fraud against SRC, Schack, and Van Pelt; (iii) negligent misrepresentation against SRC, Schack, and Van Pelt; (iv) breach of contract against SRC as to the Advisory Agreement; and (v) negligence against all defendants but RHAC. The motion to dismiss the following common law claims is granted: (i) fraud against all defendants but SRC, Schack, and Van Pelt; (ii) negligent misrepresentation against all defendants but SRC. Schack, and Van Pelt; (iii) breach of contract against SRC as to the Amended Agreement and against RHAC; and (iv) negligence against RHAC. The motion to dismiss Phoenix's request for declaratory relief is granted. Phoenix may cure the deficiencies in its complaint, if it chooses, by filing an amended complaint within 20 days from the date hereof. Trial on the surviving claims is set for July 2006. Fully briefed dispositive motions, if any, are due on or before May 10, 2006. The Clerk of the Court is instructed to close this motion and remove it from my docket.

IT IS SO ORDERED.

S.D.N.Y.,2006.
Phoenix Four, Inc. v. Strategic Resources Corp.
Not Reported in F.Supp.2d, 2006 WL 399396 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy Page 1
Slip Copy, 2007 WL 2044656 (S.D.N.Y.), RICO Bus.Disp.Guide 11,329
(Cite as: Slip Copy)

**H**
Ritchie Capital Management, L.L.C. v. Coventry First LLC
S.D.N.Y.,2007.

United States District Court,S.D. New York.
RITCHIE CAPITAL MANAGEMENT, L.L.C., Ritchie Risk-Linked Strategies Trading (Ireland), Limited, Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited, Walkers SPV Limited, as trustee for Ritchie Risk-Linked Life Strategies Trust I and Ritchie Life Strategies Master Trust, and Ritchie Risk-Linked Strategies Trading, Ltd., Plaintiffs,
v.
COVENTRY FIRST LLC, the Coventry Group, Inc., Montgomery Capital, Inc., LST I LLC, Alan Buerger, Constance Buerger, Reid S. Buerger, Antonio Muniz, Alex Seldin, Neal Jacobs, Eileen Shovlin, and Jim Dodaro, Defendants.
No. 07 Civ. 3494(DLC).

July 17, 2007.

Lawrence S. Robbins, Gary A. Orseck, Daniel R. Walfish, Rachel S. LiWai Suen, Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, DC, Thomas P. Puccio, Law Offices of Thomas P. Puccio, New York, NY, for Plaintiffs.
George A. Borden, of Counsel, Dane H. Butswinkas, Robert M. Cary, David A. Forkner, Williams & Connolly, LLP, Washington, D.C., for Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.
*1 The defendants have moved to dismiss this RICO complaint, filed on May 2, 2007. Their motion is granted, with a limited leave to amend. This is essentially a breach of contract claim governed by two complex agreements negotiated between sophisticated parties. The plaintiffs' effort to add other statutory and common law claims largely fails.

*Background*

The following is drawn from the complaint and the two contracts which underlie this lawsuit, each of which is integral to the complaint. The parties are engaged in the life settlements industry, a secondary market for life insurance policies. The industry operates as follows. Paying a sum of money that is more than the price an owner of a life insurance policy would receive if a policy were returned to the issuing insurance company, and yet less than the death benefit, a buyer acquires the policy and continues to pay premiums until the insured's death. The buyer then receives the death benefit, and if the costs of paying premiums have been less than the death benefit, makes a profit.

The plaintiffs allege that the four corporate defendants, which they refer to collectively as Coventry, are leading players in the life settlements industry, having purchased over 1,300 life insurance policies representing more than $3 billion in death benefits between 2001 and 2005. Beginning in 2005, plaintiff Ritchie Capital Management, L.L.C. ("Ritchie Capital") entered into negotiations with Coventry to purchase policies. At some point it contributed the majority of the financing that Coventry used to purchase policies, while Coventry exercised its expertise in analyzing which policies should be purchased and in servicing purchased policies. Ritchie Risk-Linked Strategies Trading (Ireland), Limited ("Ritchie I") and Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited ("Ritchie II") sent money to Coventry to buy the policies that Coventry acquired, and the policies were then transferred "to plaintiffs." After purchasing the policies, Ritchie I and II sent money to pay the monthly premiums in the amounts that Coventry determined were owed, and Coventry arranged for those funds to be disbursed to the issuing life insurance companies.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2044656 (S.D.N.Y.), RICO Bus.Disp.Guide 11,329
(Cite as: Slip Copy)

Page 2

The first agreement between the parties governing this arrangement is the September 8, 2005 agreement between Ritchie I and defendant LST I LLC ("LST") signed by defendant Alex Seldin ("Seldin"). A second agreement dated December 15, 2005, was executed between Richie II and LST, and signed again by Seldin. The two agreements contain the following three representations, among others, by the seller LST:

The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof will not violate any United States federal, state or local law or regulation ....

There is no action, suit or proceeding before or by any court, regulatory body, administrative agency or other governmental agency or body, domestic or foreign, now pending, or to the Seller's knowledge, threatened, against or affecting the Seller or its assets or properties: ... seeking any determination or ruling that might materially and adversely effect [sic] the performance by the Seller of its obligations under ... this Agreement.

....

*2 All Life Settlement Policies ... have been [ ] Originated by the Seller ... in one or more transactions that in all material respects were in accordance with and in compliance with all applicable United States federal, state and local laws, rules and regulations applicable to life settlement transactions and the purchase and resale of life insurance policies ....

Section 7.12 of each agreement contained the following integration clause:

... [T]his Agreement sets forth the entire understanding of the parties hereto relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement.... The Purchaser [Ritchie I or II] expressly acknowledges that the Seller [LST] has not made any representations and warranties other than as set forth herein and in the other Transaction Documents. The Purchaser represents and warrants to the Seller that, independently and without reliance upon the Seller (other than its reliance on the Seller's representations, warranties and covenants set forth in the Transaction Documents) and based upon such documents and information as it has deemed appropriate, it has made and will continue ... to make its own appraisal of and investigation into the business, operations, ... financial and other conditions ... of the Seller, and its own decision to enter into this Agreement and to take, or omit to take, action under any Transaction Document. Except for items specifically required to be delivered hereunder, the Seller shall not have any duty or responsibility to provide the Purchaser or any of its Affiliates any information that comes into the possession of the Seller or any of its officers, directors, employees ... or Affiliates.

Finally, the agreements had New York choice of law and forum selection clauses. They also waived the right to a jury trial for any action or cause of action "arising out of or in any way related to this agreement."

The complaint alleges that the defendants engaged in fraud by both defrauding the insureds, and concealing from the plaintiffs that dishonesty and an ongoing investigation of the fraud being conducted by the Attorney General of the State of New York ("Attorney General"). Coventry defrauded the insureds by bribing brokers, who assisted Coventry in acquiring the policies from insureds, not to act on bids for the policies placed by Coventry's competitors. Coventry also falsified documents to conceal from the insureds the amount paid in brokerage commissions. The plaintiffs learned of this scheme in October 2006, when the Attorney General sued Coventry. Coventry first revealed the existence of an investigation to the plaintiffs in June 2006.[FN1] In conversations in June 2006, Seldin implied that Coventry was not engaged in precisely the conduct which was the target of an Attorney General's subpoena.

FN1. While the complaint alleges that Coventry disclosed the investigation in June 2007, it appears that the plaintiffs in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tended to allege that the disclosure was made to them in June 2006.

The plaintiffs allege that the defendants conspired with each other to defraud the insureds through acquiring policies in a rigged bidding process and to induce institutional investors like Ritchie Capital to acquire the policies. They list purported violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343. In addition to repeating allegations from the lawsuit filed by the Attorney General concerning the fraud on the insureds, the complaint contains two RICO predicate acts related to the deception of the plaintiffs. The first asserts that during the negotiations of the two agreements with Ritchie I and II, defendants Seldin, Reid Buerger, and Antonio Muniz ("Muniz") sent emails which contained the following misrepresentations: that the transactions the parties were about to enter would not violate federal or state law; that no proceeding before any government agency was then proceeding to "the Seller's knowledge" which would affect the performance of the Seller under the contemplated agreements; that the Seller had perfected ownership in each policy; and that the purchases of the policies were in compliance with laws applicable to life settlement transactions and the purchase and resale of life insurance policies. The second relevant predicate act asserts that in June 2006, defendant Reid Buerger misrepresented to plaintiffs the nature of the Attorney General's investigation.

*3 Insofar as damages are concerned, the complaint asserts that the value of the policies purchased by Ritchie I and II has greatly diminished "since the New York Attorney General's action was commenced."It contends that the plaintiffs had anticipated profiting from the sale of the policies to others in a securitization transaction, and for that purpose had obtained a pre-sale report and rating from the Moody's service on a number of the policies. Moody's withdrew its rating because of the Attorney General's investigation. By interfering with the resale value of the policies, the defendants harmed not only Ritchie I and II, but the plaintiffs that own or are beneficially interested in Ritchie I and II. The complaint also asserts that Coventry owed fiduciary duties to these other plaintiffs.

The complaint contains seven causes of action. The first three are RICO claims pleaded against all of the defendants. A fraud claim and a fraudulent inducement claim are pleaded against the Coventry defendants, Alan and Reid Buerger, Muniz, and Seldin. Finally, breach of fiduciary duty and breach of contract claims are pleaded against the Coventry defendants. The plaintiffs seek, *inter alia*, $700 million, and demand a jury trial. The October 26, 2006 complaint filed by the Attorney General against Coventry First LLC, Montgomery Capital, Inc., the Coventry Group, Inc., and Reid Buerger is attached as an exhibit.

*Discussion*

The defendants seek dismissal of this lawsuit for failure to state a claim and for lack of personal jurisdiction over each of the individual defendants and two of the corporate defendants. They also move to strike the demand for a jury trial. As of now it may be that only two of the plaintiffs-Ritchie I and II-will succeed in stating a claim, and that claim is a breach of contract claim against the corporate defendants. It is therefore unnecessary at this time to reach the issue of personal jurisdiction over the individual defendants. Moreover, since Ritchie I and II have waived their right to a jury trial, it is unnecessary at this point to reach the jury demand issue.FN2

FN2. The plaintiffs have not asked for leave to amend their complaint. Nonetheless, they will be granted leave to amend in those limited instances where it appears from the briefing that the plaintiffs may be able to cure identified defects in their pleading.

Under the pleading standard set forth in Rule 8(a)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the Federal Rules of Civil Procedure, complaints must include "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2)."[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests."*Leibowitz v. Cornell Univ.*, 445 F .3d 586, 591 (2d Cir.2006).Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff."*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir.2007) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss."*Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir.2006) (citation omitted). A court must apply a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."*Iqbal v. Hasty*, 490 F.3d 143, 2007 WL 1717803, at *9 (2d Cir.2007) (citing *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1968-69 (2007)). Although the focus should be on the pleadings, a court may also consider any written instrument attached to the complaint as an exhibit, "or any statements or documents incorporated in it by reference."*Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991).

*4 Under Rule 9(b), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b). The Rule requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir.2006). Under Rule 9(b)"[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). Nonetheless, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent."*Lerner*, 459 F.3d at 290 (citation omitted). The inference "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."*Id.* at 290-91 (citation omitted).

I. Breach of Contract

The complaint brings a breach of contract claim against each of the four corporate defendants. LST signed the two agreements at issue, and it is alleged to be a wholly owned subsidiary of Coventry First LLC ("Coventry First"), and an alter ego, agent, and instrumentality of the Coventry corporate family. Montgomery Capital, Inc. ("Montgomery Capital") is the sole member of Coventry First. The Coventry Group, Inc. is the fourth corporate defendant, and is owned by Alan and Constance Buerger, who with others also own Montgomery Capital.

The complaint alleges that the following contractual commitments were breached by the four corporate defendants: that Coventry's acquisition of policies complied with all laws, and that no government body was seeking to prevent the transactions contemplated by the agreements or seeking a determination that might affect the performance of Coventry under the agreements; that Coventry would take all reasonable actions under applicable law to perfect its ownership of the policies before conveying them to Ritchie I or II; and that in acquiring the policies, Coventry had complied with law.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The defendants contend that only plaintiffs Ritchie I and II have standing to bring this claim; that only LST is properly named as a defendant since the complaint does not plead facts sufficient to pierce the corporate veil; and that the claim must be dismissed in its entirety since it does not allege the satisfaction of a condition precedent, that is, the agreements' 30-day notice provision. The plaintiffs concede that only Ritchie I and II may bring the breach of contract claim.

In New York, "[q]uestions relating to the internal affairs of corporations ... are generally decided in accordance with the law of the place of incorporation."[FN3] *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 106 (2d Cir.2000). LST is a Delaware limited liability company. Therefore, the law of Delaware on piercing the corporate veil should be applied.

FN3. Federal choice of law rules would most likely also require application of the place of incorporation to a determination of whether to disregard the corporate form, "[s]ince choice of law rules seek to insure that a case will be resolved under the same rules of conduct whatever the forum, and that rights of foreign sovereigns will be respected."*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp.2d 633, 683 n. 10 (S.D.N.Y.2006) (citing *Lauritzen v. Larsen*, 345 U.S. 571, 578 (1953)).

*5 "Persuading a Delaware court to disregard the corporate entity is a difficult task."*Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch.1999) (citation omitted)."Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."*Id.* at 1184 (citation omitted)."To prevail on an alter ego theory of liability, a plaintiff must show that the two corporations operated as a single economic entity such that it would be inequitable ... to uphold a legal distinction between them."*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir.1995) (citation omitted). The plaintiffs have sufficiently alleged pursuant to Rule 8 their theories of liability for the three corporate defendants who did not sign the agreements.

The parties debate whether the agreements' notice provision, which waives the right to bring a claim if notice is not given of a breach within 30 days of knowledge of the breach, is a condition precedent or subsequent, whether it constitutes an affirmative defense, and whether a plaintiff has the obligation to plead satisfaction of the provision. The plaintiffs assert that they did comply with the notice provision and are prepared to prove that they did.

Rule 9(c) directs that "[i]n pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity."Fed.R.Civ.P. 9(c). Some courts have found that this requires at least "a general averment of performance of a condition precedent."*See, e.g., Udell v. Berkshire Life Ins. Co. of Am.*, No. CV03272ISJFKAM, 2005 WL 1243497, at *5 (E.D.N.Y. May 25, 2005). On the other hand, Rule 9(c)"does not in terms require the plaintiff to allege the performance or occurrence of conditions precedent; it simply permits a plaintiff to do so generally and requires specificity in the denial of any such allegation."*ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 243 (S.D.N.Y.1997). Since the plaintiffs will be given leave to amend in any event, plaintiffs will be permitted to file an amended breach of contract claim containing a general declaration that Ritchie I and II satisfied the notice requirement.

II. Breach of Fiduciary Duty

Each of the plaintiffs brings a breach of fiduciary duty claim against the four corporate defendants. The claim asserts that the four defendants were partners, joint venturers, and co-venturers of Ritch-

ie Capital, which created a fiduciary duty to each of the plaintiffs. The defendants move to dismiss this claim based on the agreements' express disclaimer of the creation of such relationships. Under the heading "Tax Classification," the agreements provide that

*6 *Nothing contained in this Agreement is intended to* or shall be deemed or construed by the parties hereto or by any third person to *create* the relationship of principal and agent (including dependent agent) or of *a partnership or joint venture.* The parties hereto agree that they will not take any action contrary to the foregoing intention and agree to report the transaction for all tax purposes consistent with the foregoing intention unless and until determined to the contrary by an applicable tax authority.

(Emphasis supplied.)

Where parties to a contract deal in an "arms length" commercial transaction, a fiduciary relationship will not be found "absent extraordinary circumstances." *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield,* 276 F.3d 123, 130 (2d Cir.2002) (citation omitted).[FN4] Thus, a conventional business relationship "without more" is not converted into a fiduciary relationship "by mere allegation." *Oursler v. Women's Interart Ctr.,* 566 N.Y.S.2d 295, 297 (App.Div.1991); *see also Northeast General Corp. v. Wellington Advertising, Inc.,* 624 N.E.2d 129, 132-33 (N.Y.1993). In fact, in this case, there was an express disclaimer of such a relationship.

FN4. Given the agreements' choice of New York law and the parties' joint reliance on New York law in this briefing, New York law will be applied to all common law claims unless there is a specific reason to decline to do so.

The plaintiffs' effort to avoid the contractual denial of a partnership and joint venture fails. They assert that the provision only applies to tax consequences since it is contained in a section of the agreements entitled "Tax Classification." As another provision of the agreements provides, however, the contract headings are "for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision hereof."

The plaintiffs next assert that the contract bar only applies to the signatories Ritchie I and II and not to non-signatory plaintiffs. The remaining plaintiffs, however, have pleaded no adequate bases for establishment of a fiduciary relationship absent one between the defendants and Ritchie I and II.

III. Fraud

A fraud claim is brought by all plaintiffs against the four corporate defendants as well as Alan and Reid Buerger, Muniz, and Seldin. It asserts that these defendants made material misstatements or omissions regarding both the circumstances under which owners of life insurance policies were induced to part with their policies, and the existence and target of the Attorney General's investigation. The defendants move to dismiss this claim on the ground that the complaint largely fails to identify misrepresentations made by particular defendants as required by Rule 9(b), and is in any event barred by the agreements' integration clause. Insofar as the fraud claim rests on omissions, the defendants argue that the complaint fails to plead a duty to disclose, particularly given the express bar in the agreements. Finally, to the extent the fraud claim rests on misrepresentations or omissions concerning representations and warranties contained in the agreements, then these duplicate the breach of contract claim and are barred for that reason.

*7 The defendants are correct that the complaint does not sufficiently identify speakers to survive scrutiny under Rule 9(b)'s standards. If this were the only defect, however, the plaintiffs could be given an opportunity to cure. The defects in this claim, however, extend further.

Under New York law, a fraud claim will not lie if it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

arises "out of the same facts as plaintiff's breach of contract claim."*Telecom Intl. Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir.2001) (citation omitted). Even with the addition of the allegation that the "defendant never intended to perform" the contract, "the fraud claim is redundant and plaintiff's sole remedy is for breach of contract."*Id.* In order to succeed on a fraud claim arising from a breach of contract, a plaintiff must show: (1) "a legal duty separate from the duty to perform under the contract"; (2) "a fraudulent misrepresentation collateral or extraneous to the contract"; or (3) "special damages that are caused by the misrepresentation and unrecoverable as contract damages."*Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir.1996). The plaintiffs have not pointed to any separate legal duty to support the fraud claim or any special damages. Nor have they identified a representation collateral to the contract. The fraud claim appears to rest entirely on the subjects covered in the representations and warranties contained in the agreements. To the extent that there was a misrepresentation or omission in connection with those contractual representations and commitments, then that conduct must be pleaded as a breach of contract claim. The fraud claim is dismissed.

IV. Fraudulent Inducement

The plaintiffs bring a fraudulent inducement claim against the four corporate defendants as well as Alan and Reid Buerger, Muniz, and Seldin for their misleading statements and concealments regarding Coventry's practices in purchasing life insurance policies. The defendants make essentially the same arguments in connection with this claim as they did in moving to dismiss the fraud claim.

The fraudulent inducement claim fails to meet the pleading requirements under Rule 9(b). Beyond that deficiency, however, the claim is explicitly barred by the agreements, in which Ritchie I and II acknowledge that LST had not made representations other than as set forth in the agreements. Under

New York law, "a general merger clause is ineffective ... to preclude parol evidence that a party was induced to enter the contract by means of fraud."*Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir.1993)."When, however, the contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations."*Id.*"[W]here a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon."*Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir.1996) (citing *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y.1959)).

*8 The integration clause in the agreements that governed this commercial transaction bars the fraud claim; the plaintiffs expressly disclaimed reliance on the very representations they now claim were fraudulent. In that clause, Ritchie I and II "expressly acknowledge[ ] that the Seller has not made any representation and warranties other than as set forth herein and in the other Transaction Documents."[FN5] The integration clause also specifically finds that "without reliance upon the Seller," the purchaser "has made and will continue ... to make its own appraisal of and investigation into the business, operations, ... financial and other conditions ... of the Seller."Furthermore, although it is true that even without a fiduciary duty, "during the course of negotiations surrounding a business transaction, a duty to disclose may arise ... where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge,"*Lerner*, 459 F.3d at 292 (citation omitted), the clause specifically dispels any duty of the seller to "provide the Purchaser or any of its Affiliates any information."Since the acts which the plaintiffs allege the fraud induced were the entry into the two agreements that Ritchie I and II executed, the acknow-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ledgment in the agreements is sufficient to bind not just the signatories but the other plaintiffs.

FN5. Transaction Documents are defined to include the Master Policy Purchase Agreement, the Servicing Agreement, and other documents to which the plaintiffs have not pointed in their complaint.

Finally, the alleged fraudulent statements and omissions on which this claim hinges are statements which the plaintiffs also contend are encompassed by the agreements themselves, that is, that the transaction in which LST purchased the policies "were in accordance with and in compliance with all applicable United States federal, state and local laws, rules and regulations applicable to life settlement transactions and the purchase and resale of life insurance policies."These representations or concealments are not extraneous to the contract, and therefore must be asserted as a breach of contract claim and not as a fraudulent inducement claim. *See Bridgestone/Firestone,* 98 F.3d at 20.

V. RICO

The first three claims are brought against all defendants under RICO, 18 U.S.C. § 1962. A claim under Section 1962(a) alleges that Ritchie I and II are enterprises, and that the defendants received income or proceeds derived directly or indirectly from a pattern of racketeering activity, and used or invested that income and proceeds in the acquisition of an interest in or the establishment or operation of Ritchie I and II. A claim under Section 1962(c) alleges that two or more of the individual defendants or any one of the corporate defendants is an enterprise,[FN6] and that the defendants are distinct from that enterprise and conducted or participated directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity with one exception. To the extent the enterprise consists of one corporate defendant, then that defendant is not alleged to have violated this provision of the law by conducting its own affairs. Finally, a claim under Section 1962(d) alleges that the defendants conspired to violate Section 1962(c), that is, to conduct the enterprises' affairs through a pattern of racketeering activity. The definition of enterprise is taken from the Section 1962(c) claim except that, to the extent the enterprise consists solely of one corporate defendant, that corporate defendant is not charged with conspiring with others to conduct its own affairs.

FN6. The complaint asserts that there is an enterprise "consisting of all of the individual Defendants, or any combination thereof, or any of the corporate defendants alone."

*9 The defendants proffer many grounds for dismissing the RICO claims. The complaint does not allege proximate causation since the harm it describes was caused by the disclosure of the policy origination practices to the market and not by the RICO violations. The plaintiffs have not alleged a clear and definite injury. Many of the plaintiffs seek to recover only because they had a beneficial interest in another plaintiff's investment, which is insufficient to confer standing. With respect to the Section 1962(a) claim, the complaint fails to allege an investment of income or proceeds in Ritchie I or II, which are the defined enterprises, or any investment by the individual defendants in the enterprises. The Section 1962(c) claim asserts tens of thousands of potential enterprises. Finally, no conspiracy can be alleged under Section 1962(d) since corporate employees and affiliates cannot conspire with each other.

The Section 1962(a) claim must be dismissed. Section 1962(a) reads in pertinent part:

*It shall be unlawful* for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ...*to use* or invest, directly or indirectly, any part of such *income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise* which is engaged in, or the activities of which affect, interstate or foreign com-

merce.

18 U.S.C. § 1962(a) (emphasis supplied). The complaint alleges that LST sold the policies to Ritchie I and II. Assuming for the moment that the policies constitute "income" derived from racketeering activity, the issue becomes whether the complaint has adequately alleged that the policies were used or invested to "acquire an interest" in or to "establish or operate" either Ritchie I or II.

The plaintiffs do not contend that the sale of policies to Ritchie I and II constitutes the necessary acquisition of an interest. "Under the plain language of this section, a violation of § 1962(a) consists of investing income derived from a pattern of racketeering activity to acquire an interest in, establish, or operate an enterprise; the violation is not established by mere participation in predicate acts of racketeering."*Ouaknine v. MacFarlane*, 897 F.2d 75, 82 (2d Cir.1990)."[A] plaintiff must allege injury 'by reason of' defendants' investment of racketeering income in an enterprise."*Id.* at 82-83.

The plaintiffs point to the following set of allegations in the complaint to support the Section 1962(a) claim. The complaint alleges that Coventry, which it elsewhere defines as the four corporate defendants, "jointly committed capital to, and became owners of subordinated securities in, Ritchie I and Ritchie II, which entitled ... Coventry to receive the profits of Ritchie I and Ritchie II after other debts have been paid."[FN7] This is insufficient to state a Section 1962(a) claim. The complaint alleges that the policies were acquired through the pattern of racketeering activity, and it is the policies or the proceeds from those policies that must be used to acquire an interest in the enterprise. The separate investment of capital to acquire subordinated securities in the enterprise is insufficient. And, of course, the alleged RICO injury is not alleged to have arisen from the investment made to acquire subordinated securities of Ritchie I and II.

FN7. This allegation would not support a claim against any of the individual defendants, and engages in impermissible group pleading as to the corporate defendants.

*10 As for the remaining two RICO claims, the plaintiffs will be allowed to replead the Sections 1962(c) and (d) claims in order to identify with more specificity the enterprise or enterprises involved in those violations. The defendants estimate that the current formulation has about 40,000 permutations. It is impossible to assess whether the complaint states a claim without having a more definite statement of the claim. As currently formulated, these two claims fail to give the defendants fair notice.

VI. Personal Jurisdiction: Coventry Group, Inc. and Montgomery Capital, Inc.

Although defendants' motion to dismiss has been granted on all counts, leave to replead has been granted on the breach of contract and two of the RICO claims. In addition, plaintiffs have sufficiently pled facts to pierce the corporate veil. Therefore, personal jurisdiction as to the Coventry Group, Inc. and Montgomery Capital, Inc. is considered here.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists."*Best Van Lines, Inc. v. Walker*, 04-3924-cv, slip op. at 5, 490 F.3d 239, 2007 WL 1815511 (2d Cir. June 26, 2007) (citation omitted). Where, as here, there has been no discovery, the plaintiff need only make "legally sufficient allegations of jurisdiction" through its pleading and affidavits in order to survive a motion to dismiss. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir.2003) (per curiam).

Personal jurisdiction has been sufficiently pled over the two corporate defendants based on plaintiffs' claim for veil piercing. "It is true that the presence of a local corporation does not create jurisdiction over a related, but independently managed, foreign

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.