## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ANKL LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-cv-10624 |
| | ) | |
| v. | ) | ECF Case |
| | ) | |
| AIRCAST LLC, AIRCAST HOLDING | ) | |
| COMPANY LLC, and DJO, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF ANKL LIQUIDATING TRUST'S FIRST THROUGH FIFTH, NINTH AND TENTH CLAIMS FOR RELIEF

PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
Attorneys for Plaintiff

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   STANDARD OF REVIEW ....................................................................................2

III.   ARGUMENT ...........................................................................................................2

     A.    ANKL Met the Contract Requirements to Contest Defendants'
         Determination That They Did Not Owe ANKL Any Earnout
         Payments. ........................................................................................................2

         1.    Defendants Improperly Ask the Court to Make a Factual
                Determination Whether ANKL Provided Enough Detail in Its
                Dispute Notice. ................................................................................3

         2.    Defendants Did Not Provide ANKL Access to Records and
                Employees to Determine Whether Their Net Sales Calculation
                Was Accurate. ..................................................................................5

         3.    The 45-Day Period for ANKL to Dispute the Net Sales
                Calculation and Defendants' Financial Statements Has Not Yet
                Commenced. .....................................................................................8

     B.    The Earnout Dispute Should Not Be Decided by an Auditor. ...........12

         1.    Defendants Breached Conditions Precedent to Arbitration. ..................12

         2.    The Court Should Stay Any Decision Whether to Refer the
                Earnout Dispute to an Auditor Pending Defendants'
                Production of Documents and Information Relating to Net
                Sales. ...............................................................................................14

     C.    Plaintiff's Fraud Count States a Claim upon Which Relief Can Be
         Granted. ........................................................................................................15

         1.    A General Merger Clause Does Not Bar a Fraud Claim. .......................16

         2.    ANKL's Fraud Allegations are Pled with Sufficient
                Particularity. ....................................................................................19

         3.    Punitive Damages Can Be Awarded to ANKL Under New York
                Law. ..................................................................................................21

     D.    ANKL Has Stated a Claim for Negligent Misrepresentation. ...............23

     E.    ANKL's Conversion Count States a Claim Upon Which Relief May Be
         Granted. ........................................................................................................24

IV.   CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. Suozzi,*
   433 F.3d 220 (2d Cir. 2005) ........................................................................6

*ATSI Communications, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007) .........................................................................2

*AXA Versicherung AG v. New Hampshire Insurance Co.,*
   2007 WL 2142302 (S.D.N.Y. July 23, 2007)...........................................22

*Bell Atlantic Corp. v. Twombly,* ---,
   U.S. -- 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).................................1, 2

*Chevron U.S.A., Inc. v. Consolidated Edison Co.,*
   872 F.2d 534 (2d Cir. 1989) ....................................................................12

*Collins & Aikman Products Co. v. Building System, Inc.,*
   58 F.3d 16 (2d Cir. 1995)........................................................................15

*Dimon, Inc. v. Folium, Inc.,*
   48 F. Supp. 2d 359 (S.D.N.Y. 1999) .......................................................18

*DKR Capital, Inc. v. AIG Intern. West Broadway Fund, Ltd.,*
   2003 WL 22283836 (S.D.N.Y. Oct. 2, 2003)....................................10-11

*DynCorp v. GTE Corp.,*
   215 F. Supp. 2d 308 (S.D.N.Y. 2002) ................................................16-17

*E*Trade Finance Corp. v. Deutsche Bank A.G.,*
   420 F. Supp. 2d 273 (S.D.N.Y. 2006) .................................................12, 14

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y.,*
   375 F.3d 168 (2d Cir. 2004) ....................................................................23

*Fireman's Fund Insurance Co. v. Allied Programs Corp.,*
   1993 WL 481344 (S.D.N.Y. Nov. 13, 2007)...........................................24

*Granite Partners, L.P. v. Bear Stearns & Co., Inc.,*
   58 F. Supp. 2d 228 (S.D.N.Y. 1999) .......................................................19

*Henneberry v. Sumitomo Corp. of America,*
   532 F. Supp. 2d 523 (S.D.N.Y. 2007).......................................................23

*In re MarketXT Holdings Corp.,*
   2006 WL 2864963 (Bankr. S.D.N.Y. Sept. 29, 2006) ........................................24

*Kidder, Peabody & Co. v. IAG International Acceptance Group, N.V.,*
   1999 WL 11553 (S.D.N.Y. Jan. 13, 1999) ........................................23

*LaSalle Bank Nat. Association v. Nomura Asset Capital Corp.,*
   424 F.3d 195 (2d Cir. 2005) ........................................9

*Lazard Freres & Co. v. Protective Life Insurance Co.,*
   108 F.3d 1531 (2d Cir. 1997) ........................................18

*Manufacturers Hanover Trust Co. v. Yanakas,*
   7 F.3d 310 (2d Cir. 1993) ........................................ 16, 17

*Mazzaro de Abreu v. Bank of America Corp.,*
   525 F. Supp. 2d 381 (S.D.N.Y. 2007)A ........................................2

*O'Brien v. Price Waterhouse,*
   740 F. Supp. 276 (S.D.N.Y. 1990) ........................................19

*Payday Advance Plus, Inc. v. Findwhat.com, Inc.,*
   478 F. Supp. 2d 496 (S.D.N.Y. 2007) ........................................23-24

*Postlewaite v. McGraw-Hill, Inc.,*
   411 F.3d 63 (2d Cir. 2005) ........................................10

*RJE Corp. v. Northville Industrial Corp.,*
   329 F.3d 310 (2d Cir. 2003) ........................................9

*Rogath v. Siebenmann,*
   129 F.3d 261 (2d Cir. 1997) ........................................10

*Roth v. Jennings,*
   489 F.3d 499 (2d Cir. 2007) ........................................2

*Spanos v. Skouras Theatres Corp.,*
   364 F.2d 161 (2d Cir. 1966) ........................................13

*Stern v. Leucadia National Corp.,*
   844 F.2d 997 (2d Cir. 1988), cert. den., 488 U.S. 852 (1988) ........................................20

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.,*
   380 F. Supp. 2d 250 (S.D.N.Y. 2005) ........................................21-23

*Warner Theatre Associates L.P. v. Metropolitan Life Insurance Co.,*
   149 F.3d 134 (2d Cir. 1998) ........................................18

### STATE CASES

*Abate v. Abate,*
  441 N.Y.S.2d 506 (N.Y. App. Div. 1981) ...................................................19

*CooperVision, Inc. v. Intek Integration Technologies, Inc.,*
  794 N.Y.S.2d 812 (N.Y. Sup. Ct. 2005)....................................................17

*Danann Realty Corp. v. Harris,*
  5 N.Y.2d 317 (1959)) .................................................................................17

*Ferguson Electric Co. v. Kendal at Ithaca, Inc.,*
  274 A.D.2d 890, 711 N.Y.S.2d 246 (N.Y. App. Div. 2000) .....................13

*Greystone Staffing, Inc. v. Vincenzi,*
  801 N.Y.S.2d 234, 2005 WL 118319 (N.Y. Sup. Ct. 2005) ......................22

*Loughry v. Lincoln First Bank,*
  67 N.Y.2d 369, 502 N.Y.S.2d 965, 494 N.E.2d 70 (1986) ......................23

*Lusins v. Cohen,*
  853 N.Y.S.2d 685 (N.Y. App. Div. 2008) ..................................................24

*Mead v. ReliaStar Life Insurance Co.,*
  2008 WL 850675 (D.Vt. March 27, 2008) ...................................................6

*Nardelli v. Stamberg,*
  44 N.Y.2d 500 (1978)..................................................................................23

*Reinhardt v. Reinhardt,*
  613 N.Y.S.2d 89 (N.Y. App. Div. 1994) ....................................................13

*Sheridan Drive-In, Inc. v. State of New York,*
  228 N.Y.S.2d 576 (N.Y. App. Div. 1962) ..................................................19

*Stardial Committee Corp. v. Turner Construction Co.,*
  305 A.D.2d 126 (N.Y. App. Div. 2003) ......................................................13

*Zurich American Insurance Co. v. Whitmore Group, Ltd.,*
  2006 WL 759685 (N.Y. Sup. Feb. 7, 2006).................................................24

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 9(b)................................................................................................4, 19-20

Fed. R. Civ. P. 12(b)(6)..............................................................................................2, 21

## SECONDARY SOURCES

1 Restatement of Agency 2d, § 256 ............................................................................19

## I.    INTRODUCTION

When Defendants bought Aircast, a provider of high quality orthopedic devices, from ANKL Liquidating Trust ("ANKL"),[1] they obtained sole possession of all information about the Aircast business, including all financial information and other books and records.  Accordingly, the parties negotiated specific safeguards to ensure ANKL's access to books and records that it needed to liquidate its business, respond to tax audits, and for other purposes.  Despite Defendants' agreement that they would both preserve Aircast's books and records and make them available to ANKL, Defendants have never met their obligations.

Defendants' entire course of dealings with ANKL has been marked by obstruction, and that obstruction is reflected throughout ANKL's Complaint, including the particular claims that Defendants now move to dismiss.  Defendants agreed to pay up to $15 million to ANKL if certain sales targets were met (the "earnout").  The parties structured the APA to require not only that Defendants inform ANKL whether the sales targets were met, but also to enable ANKL to independently verify Defendants' representations.  Defendants agreed that ANKL could review the same documents upon which they based their sales calculations, interview the employees who made the calculations, and review the company's financial statements and audit work papers.  In reality, Defendants fraudulently induced ANKL into releasing certain earnout claims by misrepresenting that sales targets were not met.  Defendants then did everything possible to avoid opening their books and revealing that they misled ANKL.  Defendants' refusal to provide books and records to ANKL has not only resulted in a monetary windfall for Defendants (by retaining part of the purchase price due to ANKL), but also has exposed ANKL to tax penalties, expensive efforts to

---

[1] Plaintiff ANKL Liquidating Trust is an assignee of ANKL, Inc., and ANKL International, L.L.C. (collectively, "Sellers").  Sellers entered into an Asset Purchase Agreement ("APA") with Defendants Aircast LLC ("Purchaser") and Aircast Holding Company LLC (collectively with Purchaser, "Earnout Obligors").  Defendant DJO, LLC succeeded to or otherwise assumed, in part or whole, the obligations of Purchaser and Earnout Obligors under the APA.

liquidate its business, and other liabilities—leaving ANKL with no alternative but to bring this action.

## II.    STANDARD OF REVIEW

Dismissal is improper where the complaint's "[f]actual allegations [are] enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (citations omitted); *see* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Mem.")  at 9 (acknowledging this standard).  "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Twombly*, --- U.S. ---, 127 S.Ct. at 1964. "[T]he bottom-line principle is that 'once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.'" *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quoting *Twombly*, --- U.S. ---, 127 S.Ct. at 1969).

In evaluating Defendants' Motion to Dismiss, this Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."  *Roth*, 489 F.3d at 510 (quoting *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)).  The Court also "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to [ANKL] and upon which [ANKL] relied in bringing the suit." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## III.    ARGUMENT

### A.    ANKL Met the Contract Requirements to Contest Defendants' Determination That They Did Not Owe ANKL Any Earnout Payments.

Defendants attempt to escape any scrutiny of their determination regarding ANKL's entitlement to $14.3 million of earnout payments by disputing the truth of ANKL's factual

2

allegations.  For example, Defendants argue that ANKL failed to provide a timely notice of disagreement with Earnout Obligors' calculation of Net Sales, did not sufficiently "detail the particulars of the basis for its disagreement," and did not "exercise diligence" to review documents and audit work papers, and interview employees.  *See* Mem. at 11.  These are disputed factual issues that must be determined by the trier of fact.  *See Mazzaro de Abreu v. Bank of America Corp.,* 525 F. Supp. 2d 381, 387 (S.D.N.Y. 2007) ("The issue on a motion to dismiss is not whether a plaintiff is likely ultimately to prevail, 'but whether the claimant is entitled to offer evidence to support the claims.'") (quoting *Weisman v. LeLandais*, 532 F.2d 308, 311 (2d Cir. 1976) (per curiam)).  Therefore, the Court should deny Defendants' motion to dismiss Plaintiff's First, Second, Fifth and Tenth Claims.  *See* Mem. at 10.

> **1.     Defendants Improperly Ask the Court to Make a Factual Determination Whether ANKL Provided Enough Detail in Its Dispute Notice.**

Defendants contend that Sellers failed to properly object to the Earnout Obligors' Net Sales calculation within 45 days of receiving it on June 6, 2006, making that calculation "final, binding and conclusive."  Mem. at 15 (citing APA § 1.8(d)).  Defendants concede—as they must—that Sellers <u>did</u> deliver their dispute letter to Earnout Obligors "on July 19, 2006, 43 days after Defendants delivered their Net Sales calculation."  Mem. at 7; *see* Schacter Decl., Ex. E.  Although Sellers disputed Earnout Obligors' Net Sales calculation "by notifying Purchaser of such disagreement in writing, setting forth in detail the particulars of such disagreement," APA § 1.8(d), Defendants improperly ask the Court to find that Sellers' timely dispute letter does not contain sufficient detail under the APA.  *See* Mem. at 11-12.  Whether Sellers' dispute letter provided enough detail is a question of fact that is not justiciable on a motion to dismiss.  Even such a determination were

permitted at this stage of the proceedings, Sellers did in fact provide enough detail to dispute Earnout Obligors' Net Sales calculation.[2]

Contrary to Defendants' assertion, Sellers informed Earnout Obligors why they disagreed with the Net Sales calculation. When Earnout Obligors delivered their Net Sales calculation to Sellers on June 6, 2006, they did not explain how they arrived at that calculation or provide any supporting documentation. *See* Schacter Decl., Ex. C. Accordingly, Sellers delivered their dispute notice pursuant to APA section 1.8(d), stating in part:

> In particular, we note that the calculation you provided in your June 6th fax is within 1.6% of the earnout target. Without detailed examination of the following information relating to both Gross Revenue and Net Revenue for the Change of Control Period, we cannot agree with the accuracy of this calculation: … .

Schacter Decl., Ex. E. Therefore, Sellers' letter informed the Earnout Obligors of two reasons why Sellers disputed the calculation. First, Earnout Obligors did not provide any information to enable Sellers to test the accuracy of the Net Sales calculation. Second, Earnout Obligors' calculation of Net Sales was so close to the target that Sellers could not blindly presume that Earnout Obligors did not make any error when they calculated Net Sales. Although Defendants quibble with the language of Sellers' dispute notice, Sellers' notice was as detailed as possible under the circumstances and informed Defendants why Sellers did not agree with the calculation.

Defendants attempt to convert the factual sufficiency of Sellers' dispute notice into a legal question by asking this Court to interpret the APA as requiring Sellers' dispute notice to meet the particularized standard for pleading fraud under Fed. R. Civ. P. 9(b). *See* Mem. at 12 ("[W]hen pleading fraud, a plaintiff must allege 'with particularity' the details of the alleged fraudulent statement … .") (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d

---

[2] If the Court were to determine, as a matter of law, that ANKL failed to deliver a sufficient dispute notice, which it did not, any deficiency was a direct consequence of Defendants' failure to deliver documents and information relating to the Net Sales calculation. *See* Section IV.A, *infra*, addressing Defendants' inability to enforce a contract provision when they have frustrated its performance.

168, 187 (2d Cir. 2004) (stating Rule 9(b) standard).  The APA does not contain any provision

relating to Rule 9(b) pleading requirements, and the APA does not restrict Sellers to disputing the

Net Sales calculation only when Earnout Obligors commit fraud.  Therefore, the Court should reject

Defendants' grasping attempt to bootstrap heightened pleading standards into the APA.[3]

### 2.    Defendants Did Not Provide ANKL Access to Records and Employees to Determine Whether Their Net Sales Calculation Was Accurate.

Realizing that Sellers provided the most detailed dispute notice possible in light of Earnout

Obligors' failure to provide any information relating to their calculation of Net Sales, Defendants

argue that the APA "required ANKL to exercise diligence in the 45 day 'access' period by reviewing

documents and audit work papers, and interviewing employees."  Mem. at 11.  Defendants contend

that "ANKL's failure to avail itself of this access meant that it would not be able to validly dispute

the calculation."  Mem. at 13.  Defendants ask this Court to read requirements into the APA that do

not exist.  Pursuant to APA Section 1.8, Sellers had a right to know and Earnout Obligors had a

duty to establish how Earnout Obligors calculated Net Sales.

Defendants argue that even though "Section 1.8(d) grants ANKL reasonable ***access***" to

employees and records, ANKL must specifically request that access from Defendants.  Mem. at 12-

13 (emphasis in original).   As explained in more detail below, Sellers <u>did</u> specifically request

documents to evaluate the accuracy of Earnout Obligors' Net Sales calculation.   Regardless, the

APA does not contain any requirement that Sellers must affirmatively request access to the

categories of information specified in Section 1.8(d) before Defendants have any obligation to

provide it.  Defendants are simply speculating that the word "access"—which they cite in isolation

from the other language of Section 1.8(d)—means that whatever is being accessed must first be

requested.   Defendants specifically distinguish the word "access" from Earnout Obligors' other

---

[3] Defendants make similar arguments that the Sellers were required to identify "GAAP irregularities, miscalculation, etc." in their dispute notice.  Mem. at 12.  The APA contains no such obligation.

obligations in the APA to "provide" or "deliver" information to Sellers without Sellers first requesting it. Mem. at 12-13. Defendants' argument is perplexing because Section 1.8(d) also contains the word "provide," as well as other words establishing Earnout Obligors' obligation to affirmatively provide access to documents and employees without waiting for Sellers to request it:

> <u>Upon delivery</u> to the Holders' Representative of the calculation of the Net Sales for any given … Change of Control Period, Purchaser <u>will</u> (i) <u>provide</u> the Holders' Representative with reasonable access to the employees …, (ii) <u>provide</u> the Holders' Representative with access to all of the records … reasonably related to the calculation of the Net Sales … and (iii) use commercially reasonable efforts to <u>provide</u> the Holders' Representative and his accountants access to the work papers of the independent auditor….

APA § 1.8(d) (emphasis added); *see also Adams v. Suozzi*, 433 F.3d 220, 228 (2d Cir. 2005) ("'A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'") (quoting *Westmoreland Coal Co. v. Entech, Inc.,* 100 N.Y.2d 352, 358 (2003)). Section 6.8 of the APA uses similar terminology that Earnout Obligors must "provid[e] access" to books and records, but also explicitly states that Earnout Obligors are only required to provide such access "*to the extent reasonably requested.*" APA § 6.8 (emphasis added). As Section 1.8(d) did not contain any such caveat, Earnout Obligors were required to provide access to records and employees—without waiting for Sellers to request such access—at the same time they delivered the Net Sales calculation (*i.e.,* at the commencement of the 45-day period to dispute the calculation and the financial statements). Earnout Obligors also were required to provide their financial statements to Sellers because Sellers had the right to dispute both the Net Sales calculation and "any element of the Earnout Financial Statements for such Earnout Year or the financial statements relevant to the Change of Control Period." APA § 1.8(d). Despite these obligations, Earnout Obligors did not provide any financials statements, documents or other information to Sellers relating to their Net Sales calculation; they did not even advise Sellers when

and where they could review documents and auditor work papers, and interview employees.  *See* Schacter Affidavit, Ex. C.

The only case Defendants proffer in support of their contention that Sellers had to request access to records and employees before disputing the Net Sales calculation is an unpublished decision from the District of Vermont.  Mem. at 13.  In *Mead v. ReliaStar Life Ins. Co.*, 2008 WL 850675, at *6 (D.Vt. March 27, 2008) (slip opinion), the court did not interpret contract language like that found in Section 1.8 of the APA.  The court addressed a regulatory requirement that a claimant under the Employee Retirement Income Security Act "'shall be provided, <u>upon request</u> and free of charge, reasonable access to, and copies of all documents, records, and other information ….'"  *Id.* (quoting 29 C.F.R. § 2560.503-1(h)(2)(iii)) (emphasis added).  This regulation explicitly puts the onus on the party without the records to request access.  In contrast, the APA does not contain any provision requiring Sellers to lodge a formal request before the Earnout Obligors must provide access to records and employees.  Defendants' own authority reinforces the fact that Sellers did not have to request access to records or employees before contesting Earnout Obligors' Net Sales calculation.

Ultimately, Defendants' attempt to create an obligation that Sellers must request access is irrelevant because Sellers <u>did</u> request access to information in order to determine the accuracy of Earnout Obligors' Net Sales calculation.  In their July 19, 2006 dispute letter, Sellers requested documents and information relating to Earnout Obligors' calculation of Net Sales.  *See* Schacter Decl., Ex. E.  Defendants concede that Sellers delivered their request to Earnout Obligors within 45 days of Earnout Obligors' delivery of their Net Sales calculation.  *See* Mem. at 7, 12.  Defendants also concede that "that access, and the information obtained as a result of it, is precisely what ANKL needed" to evaluate whether Earnout Obligors' Net Sales calculation were accurate.  Mem. at 13.

In an attempt to circumvent the fatal fact that Sellers did request information, Defendants attempt to graft yet another new requirement onto the APA.  Defendants ask the Court to find, as a matter of fact, that Sellers' request for information, although timely delivered within 45 days of the delivery of the unsupported Net Sales calculation, was not timely <u>enough</u>.  *See* Mem. at 11 ("[t]his would have required ANKL to exercise diligence in the 45 day 'access' period").  Defendants do not specify the supposed deadline by which Sellers had to request records and employee interviews, and Defendants do not specify how quickly they would have had to respond to such a request.  In fact, the contract does not contain any provision requiring Sellers to request access, much less that they request access within a particular time period after receiving the Earnout Obligors' Net Sales calculation.  Therefore, the Defendants invite the Court to make yet another improper factual finding—this time whether Sellers requested information early enough in the 45-day period to determine whether to dispute the Net Sales calculation.  At this stage of the proceedings, the Court must reject the speculative factual contentions on which Defendants' motion to dismiss is based.

   **3.    The 45-Day Period for ANKL to Dispute the Net Sales Calculation and Defendants' Financial Statements Has Not Yet Commenced.**

Sellers had the right to dispute either "the calculation of Net Sales … or any element of the Earnout Financial Statements for such Earnout Year or the financial statements relevant to the Change of Control Period."  APA § 1.8(d).  In order to enable Sellers to evaluate and dispute the Net Sales calculation and the relevant financial statements, the APA required Earnout Obligors to provide financial statements to Sellers, as well as access to audit work papers, other documents used to prepare the Net Sales calculation, and employees who prepared the financial statements and Net Sales calculation.  APA § 1.8(d); *see also* Section III.B, *supra*.  However, the Earnout Obligors did not provide Sellers with financial statements or access to other records and employees when they delivered their calculation of Net Sales for the Change of Control Period.  *See* APA § 1.8(c) and (d). In fact, the only document Defendants ever provided to ANKL is a copy of Earnout Obligors' 2005

audited financial statements. Compl. ¶ 32, 34. Defendants provided this document to ANKL on November 20, 2007, a year and a half after it was due.[4] Compl. ¶ 45. Earnout Obligors still have not provided any financial statements for the Change of Control Period,[5] access to audit work papers, other relevant documents, or access to employees involved in preparing the financial statements and Net Sales calculation. Compl. ¶ 46. Therefore, Sellers' 45-day period to evaluate and dispute the accuracy of Earnout Obligors' Net Sales calculation and any elements of the financial statements has not yet commenced.[6]

Despite the fact that Section 1.8(d) gives Sellers the right to dispute Earnout Obligors' Net Sales calculation and financial statements, Defendants argue that the 45-day period to lodge such a dispute has expired because they did not have to provide audited financial statements for the Change of Control Period. *See* Mem. at 13-15. Defendants actually were obligated to provide Sellers with much more than audited financial statements in order to trigger the 45-day dispute window. The APA required Earnout Obligors, "upon delivery" of their Net Sales calculation, to provide Sellers with access to all records related to the calculation—including financial statements and audit work papers—and the employees who prepared the financial statements and the calculation. APA § 1.8(d). It is a matter of common sense that without this information, Sellers had no means to evaluate and dispute the Earnout Obligors' calculation of Net Sales or any element of the financial statements. Accordingly, Earnout Obligors' delivery of this information – as required under Section 1.8(d) - precedes the requirement in Section 1.8(d) that Sellers dispute the calculation and financial

---

[4] Earnout Obligors did not provide Sellers with a copy of their 2005 audited financial statements when they delivered their Net Sales calculation even though they had presumably completed them prior to June 6, 2006. The APA Earnout Obligors to complete the audit of their 2005 financial statements by April 30, 2006. APA § 1.8(b)-(c).

[5] Although Earnout Obligors have provided financial statements for the calendar year 2005, note that the Change of Control period is a fiscal year that begins April 1, 2005 and ends March 31, 2006. The financial statements provided are therefore useless in this context because they provide neither (1) a breakdown of monthly net sales included in the Control Period or (2) any means by which that information may be discerned.

[6] Despite Defendants' failure to trigger the dispute provisions, out of an abundance of caution, Plaintiff sent a timely notice to Defendants disagreeing with the calculations and requesting audited financial statements, work papers, and calculations. *See* Schacter Affidavit, Exhibit E.

statements within 45 days.  *See* APA § 1.8(d); *see also LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.  An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.") (quotations omitted); *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (same).  Because the Earnout Obligors never delivered the required information, the Sellers' 45-day window not only has not closed; it never even opened.

Defendants admit that Section 1.8(d) "explicitly" requires that Sellers have access to financial statements for the 12-month Change of Control Period.  Mem. at 15.  However, Defendants claim that they only have to provide *audited* financial statements for "the regular Earnout periods specified in the APA" because the defined term "Earnout Financial Statements" is different than the term "financial statements" (without initial capitals) associated with the Change of Control Period.  Mem. at 14.  As Defendants acknowledge, "Earnout Financial Statements" is "a defined term meaning the **audited** consolidated financial statements for the fiscal years constituting the regular Earnout periods" (*i.e.*, the twelve-month periods for each of the 2005, 2006 and 2007 calendar years).  *Id.* (emphasis in original); *see* APA § 1.8(b).  The APA does not contain any provision modifying this definition or otherwise define "financial statements" to permit Earnout Obligors to deliver only *unaudited* financial statements for the Change of Control Period.  References in the APA to "financial statements," without initial capitals, simply recognize the fact that the Change of Control Period crosses more than one "regular" Earnout period, likely requiring delivery of more than one set of audited financial statements.  In fact, the APA also uses initial capitals to refer to "Earnout Financial Statements" for the Change of Control Period: the APA specifically provides that Sellers are entitled to audit work papers relating to Sellers' "evaluation of the Earnout Financial Statements for Such

Earnout Year or Change of Control Period." APA § 1.8(d). As the APA makes no distinction between the types of financial statements that the Earnout Obligors must produce for "regular" and Change of Control Earnout periods, Earnout Obligors must produce audited financial statements for the 12-month period preceding the Change of Control. *See* Mem. at 14, n.9 ("the Change of Control Period ran from April 1, 2005 to March 31, 2006").[7]

Whether or not Earnout Obligors had to deliver audited financial statements, Defendants admit that, at a minimum, the APA requires "that Sellers have access to unaudited financial statements for the 12-month Change of Control Period." Mem. at 15. Despite this concession, Earnout Obligors still have not provided Sellers with required financial statements, audit work papers, other relevant documents, or access to employees involved in preparing the financial statements and Net Sales calculation. Earnout Obligors also failed to comply with their contractual obligation to calculate Net Sales for the Change of Control Period on a pro forma basis - making such pro forma adjustments "by mutual agreement" with ANKL - before delivering the calculation to ANKL. *See* APA § 1.8(c); Compl. ¶ 32. Therefore, the 45-day period for Sellers to dispute the Net Sales calculation and any elements of the financial statements has not yet commenced.

---

[7] Defendants' attempt to introduce ambiguity into the APA relating to their requirement to produce audited financial statements is antithetical to their motion to dismiss. A contractual term is ambiguous "where it may be ascribed 'conflicting reasonable interpretations.'" *Rogath v. Siebenmann*, 129 F.3d 261, 267 (2d Cir. 1997) (quoting *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994)). When a contractual term is ambiguous, courts will look to the intent of the parties. *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005). Determining the intent of the parties is a question of fact that cannot be resolved on a motion to dismiss. *DKR Capital, Inc. v. AIG Int'l West Broadway Fund, Ltd.*, 2003 WL 22283836, at *4 (S.D.N.Y. Oct. 2, 2003) (Koeltl, J.) ("In deciding a Rule 12(b)(6) motion to dismiss a breach of contract claim, the Court's role is not to resolve ambiguities in the language of the contract. Where the intent of the parties is too ambiguous to be gleaned from the contract alone, the Court should receive evidence that might better clarify that intent. Because evidence from outside the four corners of the Agreement is required to ascertain the parties' intent, [defendant's] motion to dismiss … is denied.") (internal citation omitted). There is no ambiguity that Earnout Obligors were required to deliver audited financial statements. Even if there was an ambiguity and the Court could consider the parties' intent, the framework of Section 1.8 establishes that the parties did not intend for Sellers to take Earnout Obligors' Net Sales calculations at face value. Earnout Obligors' Net Sales calculations were to be based on audited financial statements. *See* APA § 1.8(b)-(d). Sellers were even entitled to question the accuracy of the independent auditor's work by reviewing audit work papers and disputing "any element" of the audited financial statements. APA § 1.8(d). The Earnout provisions concerning a Change of Control do not alter the fundamental construct that Sellers would have independent auditor confirmation that the financial information Earnout Obligors' used to calculate Net Sales was accurate.

### B.    The Earnout Dispute Should Not Be Decided by an Auditor.

#### 1.    Defendants Breached Conditions Precedent to Arbitration.

Defendants contradict their position that ANKL cannot dispute their Net Sales calculation by arguing that ANKL should have submitted the earnout dispute to an auditor.[8]  *See* Mem. at 15. The APA provision providing for referral of certain disputes to an auditor[9] is a narrow exception to the parties' broad agreement that disputes will be litigated exclusively in the federal and state courts located in New York.  *See* APA § 11.11.  ANKL's claims relating to its entitlement to earnout payments include disputes that fall outside the scope of the referral clause.  For those claims that otherwise would fall within the scope of the referral clause, Defendants cannot enforce this contract provision where they have failed to comply with conditions precedent to referral.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Chevron U.S.A., Inc. v. Consolidated Edison Co.*, 872 F.2d 534, 537 (2d Cir. 1989) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960)).  Where, as here, the parties have entered into both a general agreement to litigate disputes and a limited agreement to arbitrate specific disputes, "the court is not free to disregard the explicit boundaries set by the agreement between the parties."  *Id.* at 538 (citing *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988)).  "When a contract contains both a broad disputes provision permitting lawsuits and also an arbitration requirement set forth in one narrow context, courts routinely limit the arbitration requirement to disputes arising squarely in that narrow context."  *E*Trade Fin. Corp. v. Deutsche Bank A.G.*, 420 F. Supp. 2d 273, 285-87 (S.D.N.Y. 2006).

---

[8] Defendants do not seek an order referring the earnout dispute to an auditor, apparently to preserve their ability to contest whether ANKL has waived any right to auditor review.  If the Court were to determine that the dispute should be decided by an auditor (which ANKL opposes), the Court should not grant Defendants' motion, but rather should order that the dispute be referred to an auditor.

[9] Although the contract provision discusses referral of the dispute to an auditor, not an arbitrator, ANKL agrees with Defendants that it is an arbitration clause and should be applied in accordance with the Federal Arbitration Act ("FAA").  *See* Mem. at 15-17 (discussing the FAA and the federal policy embodied therein).

The referral clause in Section 1.8(d) of the APA is a narrow arbitration provision. The APA provides that the auditor will determine "based solely on the written submissions forwarded by Purchaser and the Holders' Representative, whether and to what extent (if any) the Net Sales for such … Change of Control Period requires adjustment." APA, § 1.8(d). Therefore, the only issue that the auditor is empowered to decide is whether the Net Sales calculation is correct. In particular, the auditor is not authorized to determine whether Earnout Obligors met their preceding obligations in Section 1.8(d) to provide information and documents relating to the earnout calculation. Accordingly, judicial review of the Defendants' noncompliance with their Section 1.8(d) production requirements is a necessary precondition to any auditor determination of the proper Net Sales amount.

Defendants also cannot insist upon auditor review because they have frustrated any auditor determination of the correct Net Sales amount by failing to meet their preceding obligation to provide ANKL with information and documents relating to their Net Sales calculation.[10] It is a bedrock principle of contract law that parties to a contract "owe an elementary duty not to hinder or obstruct the performance of the other party to the contract." *Reinhardt v. Reinhardt*, 613 N.Y.S.2d 89, 89 (N.Y. App. Div. 1994) (quoting *Lavington v. Edgell*, 127 A.D.2d 155, 158 (N.Y. App. Div. 1987)). Therefore, Defendants cannot insist upon a performance of a contract provision (*i.e.*, referral to an auditor) when the nonperformance was brought about by their own refusal to deliver information regarding the Net Sales calculation to Sellers. *Ferguson Elec. Co. v. Kendal at Ithaca, Inc.*, 274 A.D.2d 890, 892, 711 N.Y.S.2d 246 (N.Y. App. Div. 2000); *see also Stardial Comm. Corp. v. Turner Constr. Co.*, 305 A.D.2d 126, 126 (N.Y. App. Div. 2003) ("[I]t is undisputedly the rule that one who frustrates another's performance cannot hold that party in breach."); *Spanos v. Skouras Theatres Corp.*, 364 F.2d

---

[10] If the Court were to determine that ANKL failed to deliver a sufficient dispute notice (*see* Section III.A above), which it did not, any deficiency also was a direct consequence of Defendants' failure to deliver documents and information relating to the Net Sales calculation. Therefore, the same precedent addressed in this section precludes enforcement of the 45-day dispute notice provision.

161, 169 (2d Cir. 1966) (*en banc*) (Friendly, J.) (A party to a contract "will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised.") (quoting 3A Corbin, Contracts § 767, at 540 (1960)); *Kooleraire Serv. & Installation Corp. v. Bd. of Educ. of the City of N.Y.*, 28 N.Y.2d 101, 106-07, 320 N.Y.S.2d 46, 268 N.E.2d 782 (1971) (It is well-settled under New York law that "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition.").

Defendants repeatedly have attempted to evade review of their unsupported Net Sales calculation by refusing to provide Plaintiff with the information upon which they based their calculation. Any meaningful auditor review requires more than just a two-page summary table generated by Earnout Obligors listing the total alleged Net Sales by month. Without the underlying information upon which the calculation was based, the auditor could only rubber stamp the Earnout Obligors' Net Sales calculation based on whatever information Defendants unilaterally choose provide to the auditor. As a senior auditor stated in *E*Trade Financial*, without proper information, any audit would be nothing more than "garbage in, garbage out." 420 F. Supp. 2d 273, 281. ANKL also has a good faith belief that Defendants no longer possess, or at least are unable to locate, the records relating to their calculation of Net Sales. Accordingly, Defendants should not be able to enforce auditor review of a record that does not exist due to their own wrongful conduct. They should not be allowed to profit from their breach of the APA, in the amount of $14.3 million, by hiding the ball.

  **2.**  **The Court Should Stay Any Decision Whether to Refer the Earnout Dispute to an Auditor Pending Defendants' Production of Documents and Information Relating to Net Sales.**

If the Court were look past Defendants' refusal to comply with their preceding production obligations under Section 1.8(d) and allow Defendants to invoke an arbitration provision contained

in the same clause, the Court should still stay any decision whether to refer the matter to an auditor until after Defendants comply with their production obligations. Defendants' failure to comply with their production obligations is central to each of the breach of contract claims and the declaratory judgment claim that Defendants seek to dismiss. *See* Compl. ¶¶ 34, 36, 38-41, 46 (Count 1); 87-88, 92 (Count 2); 115-17 (Count 5); 154-56 (Count 10). The auditor does not have the authority to resolve the parties' dispute regarding Defendants' production obligations. Therefore, compelling arbitration before Defendants fulfill their prerequisite contractual obligations thwarts the disclosure requirements and puts in front of the auditor a dispute it is powerless to resolve.

It is entirely proper for the Court to address non-arbitrable aspects of each claim prior to determining whether to compel arbitration on the remaining part of the claim. This Court may not only sever arbitrable claims from non-arbitrable claims, but also may, in appropriate circumstances, like this, "sever [] a part of a claim, where that claim raises both arbitrable and non-arbitrable issues." *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995). In this case, disputes concerning Defendants' obligations to provide documents and other information to ANKL pursuant to Section 1.8(d) of the APA are non-arbitrable and must be resolved before ANKL can submit relevant documents and other information to an auditor. *See* Section IV.A, *supra.* Accordingly, the Court should not decide whether to refer the earnout dispute concerning the calculation of Net Sales to an auditor until after the parties' dispute concerning document production is resolved in this Court.[11]

### C.    Plaintiff's Fraud Count States a Claim upon Which Relief Can Be Granted.

The Complaint alleges, *inter alia,* that Geoffrey Raker, who negotiated a settlement agreement on behalf of Defendants (the "Settlement Agreement"), misrepresented to Elliott Levine, a

---

[11] Defendants would not be prejudiced if the Court were to stay its decision to refer the earnout dispute to an auditor because, among other reasons, Defendants (i) are not seeking to arbitrate the dispute (and, in fact, have objected to any form of dispute resolution); and (ii) have not moved to dismiss the entire complaint.

representative of ANKL, that "the 2005 Net Sales did not exceed the Target 2005 Net Sales and that, as a result, Earnout Obligors were not required under the APA to pay Sellers a 2005 Earnout Payment" of $5 million.  Compl. ¶ 96; *see also* Compl. ¶¶ 95, 105-06.  ANKL "justifiably relied upon Defendants' representations to Sellers when it agreed to release any claim to the 2005 Earnout Payment in the Settlement Agreement."  Compl. ¶ 100.  The Court should deny Defendants' motion to dismiss this claim because ANKL has pled fraud with sufficient specificity and did not specifically disclaim any reliance on Mr. Raker's misrepresentations.

### 1.    A General Merger Clause Does Not Bar a Fraud Claim.

Defendants claim that ANKL could not reasonably rely on their representative's misrepresentations that induced ANKL to enter into the Settlement Agreement because the Agreement contains a disclaimer clause.  Mem. at 18.  The authority upon which Defendants rely for this proposition is inapplicable here, where the Settlement Agreement does not specifically disclaim reliance on Defendants' misrepresentations that Aircast did not hit the target sales numbers for 2005 and, as a result, Defendants did not owe ANKL any Earnout Payment.  In fact, the Settlement Agreement contains express recitals establishing that when ANKL entered into the Agreement, it relied on Defendants' representations about Aircast's financial performance and that Aircast's Net Sales were too low to require Defendants to make any earnout payments under APA Section 1.8.

The New York rule regarding disclaimers of reliance is straightforward.  "[A] general merger clause is ineffective ... to preclude parol evidence that a party was induced to enter a contract by means of fraud."  *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (citing *Sabo v. Delman*, 3 N.Y.2d 155, 161-62 (1957)).  "In order to be considered sufficiently specific to bar

a defense of fraudulent inducement … a guarantee must contain explicit disclaimers of the particular

representations that form the basis of the fraud-in-the-inducement claim." *Yanakas*, 7 F.3d at 316.[12]

The Settlement Agreement contains a general merger clause that does not include any

particularized disclaimers:

> The ANKL Liquidating Trust has entered into this agreement in reliance solely
> upon its own independent investigation and analysis of the facts and
> circumstances and no representations or warranties, covenants or agreements,
> other than those expressly set forth in this agreement, were made by any of the
> Earnout Obligors, any of their respective Affiliates or any employee, officer,
> director, manager, member, partner, stockholder, equityholder, agent or
> representative of any such entity to induce the ANKL Liquidating Trust to enter
> into this Agreement.

Schacter Decl., Ex. B, § 3.1(c).  This is a prototypical example of a general merger clause that has

been consistently held to be insufficient to prevent a cause of action for fraudulent inducement.  As

the New York Court of Appeals has explained:

> Were we dealing solely with a general and vague merger clause [like the clause in
> the ANKL Settlement Agreement], our task would be simple.  A reiteration of
> the fundamental principle that a general merger clause is ineffective to exclude
> parol evidence to show fraud in inducing the contract would then be dispositive
> of the issue.  To put it another way, where the complaint states a cause of action
> for fraud, the parol evidence rule is not a bar to showing the fraud - either in the
> inducement or in the execution - despite an omnibus statement that the written
> instrument embodies the whole agreement, or that no representations have been
> made.

*Danann* Realty, 5 N.Y.2d at 320; *see also Yanakas*, 7 F.3d at 315; *CooperVision, Inc. v. Intek Integration*

*Technologies, Inc.*, 794 N.Y.S.2d 812, 822 (N.Y. Sup. Ct. 2005).

---

[12] Defendants rely on *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 319 (S.D.N.Y. 2002), for the proposition that "[a]
party to a contract cannot allege that it reasonably relied on a parol representation when, in the same contract, it
'specifically disclaims reliance upon [that] particular representation.'"  This quotation addresses specific disclaimers and is
irrelevant to the resolution of ANKL's fraudulent inducement claim.  DynCorp alleged that GTE had "misled it about
the current and future values and profitability of GTE Information."  *Id.* at 314.  The contractual disclaimer specifically
precluded DynCorp from alleging misrepresentation as to "probable success or profitability."  *Id.* at 319.  Thus, in
contrast to ANKL's claim, the representations upon which DynCorp based its claim were specifically disclaimed in the
contract.  *See id.* at 319 ("DynCorp's *particularized* disclaimers make it impossible for it to prove … that it reasonably
relied on the representations that it alleges were made to induce it to enter into the Purchase Agreement.") (citing
*Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-21 (1959)) (emphasis added).

Defendants also *assert* that there was "no representation regarding Net Sales for 2005, for the Change of Control Period or for any other time," essentially begging the Court to make improper factual findings on a motion to dismiss. Mem. at 6. The Settlement Agreement itself reveals the fallacy of Defendants' assertion. The recitals to the Settlement Agreement establish that Defendant made representations regarding Aircast's Net Sales and that ANKL justifiably relied on them as a basis for entering into the Agreement. Recital D reflects that the parties understood and agreed that earnout payments would be due if certain Net Sales targets were met:

> Under Section 1.8(a)(vi) of the [APA], all outstanding Earnout Payments (as defined therein) will become due upon the occurrence of a Change of Control (as defined therein) if certain conditions specified therein relating to the financial performance (the "Acceleration Conditions") of Aircast … during the Change of Control Period (as defined therein) are satisfied (the "Earnout Obligations Acceleration").

Schacter Decl., Ex. B, Recital D (emphasis in original). The recitals also reflect that Defendants, who had all of Aircast's financial performance information and did not share it with ANKL,[13] represented to ANKL that Net Sales for the Change of Control Period—which included the last three quarters of 2005—were too low to obligate Defendants to make any earnout payments:

> Although the closing of the Stock Purchase pursuant to the terms and conditions of the DJ Purchase Agreement (the "DJ Purchase Agreement closing") will constitute a Change of Control for purposes of Section 1.8(a)(vi) of the [APA], the parties anticipate that the Acceleration Conditions will not be satisfied as of the DJ Purchase Agreement Closing and, as a result, the DJ Purchase Agreement Closing is not expected to result in the Earnout Obligations Acceleration.

---

[13] *See* Section III.B, *supra*. New York courts will not give effect to contractual disclaimers if, as here, the "allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge." *Warner Theatre Assocs. L.P. v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998); *see also Dimon, Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999). "'[E]ven where the parties have executed a specific disclaimer of reliance on a seller's representations, a purchaser may not be precluded from claiming reliance on any … misrepresentations if the facts allegedly misrepresented are peculiarly within the seller's knowledge ....'" *Dimon*, 48 F. Supp. 2d at 368 (quoting *Tahini Invs., Ltd. v. Bobrowsky*, 470 N.Y.S.2d 431, 433 (N.Y. App. Div. 1984)). "When matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997) (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980)).

*Id.* at Recital E (emphasis in original).   Therefore, Defendants made specific representations to ANKL about Aircast's financial performance, including representations that Aircast's Net Sales were below the targets necessary to obligate Defendants to make any earnout payments under Section 1.8 of the APA.   The Settlement Agreement specifies that ANKL can rely on these representations "set forth in this agreement" as an "induce[ment] … to enter into this Agreement."   Schacter Decl., Ex. B, § 3.1(c).   Based on these specific representations in the Settlement Agreement and the absence of any particular disclaimer in the general merger clause, ANKL has stated a claim of justifiable reliance on representations made by Defendants' chief negotiator of the Settlement Agreement.

### 2.     ANKL's Fraud Allegations are Pled with Sufficient Particularity.

Contrary to Defendants' assertion, ANKL has pled its fraud allegations with sufficient particularity.[14]   The complaint identifies what was said (the 2005 Net Sales did not exceed the Target 2005 Net Sales and that, as a result, Earnout Obligors were not required under the APA to pay Sellers a 2005 Earnout Payment), the speaker (Geoffrey Raker), when the statements were made (between February 1, 2006 and March 31, 2006), to whom (Elliot Levine), the context (in negotiations regarding the Settlement Agreement), and why the statements were fraudulent (because 2005 Net Sales exceeded the Target Net Sales and because Defendants did not calculate the Net Sales as required by the APA or in accordance with U.S. GAAP in the 2002-2003 Financial Statements).   Compl. ¶¶ 95-98.   Plaintiff's allegations are sufficient to meet the purpose of Rule 9(b), which is to "provide the defendant fair notice of the plaintiff's claims, and to enable the defendant to prepare a suitable defense, protect his reputation or goodwill from harm, and reduce the number

---

[14] Defendants' cite *Granite Partners, L.P. v. Bear Stearns & Co., Inc.*, 58 F. Supp. 2d 228 (S.D.N.Y. 1999), to highlight that the court dismissed the plaintiffs' fraud claim for pleading on information and belief.   *Granite Partners* holds that fraud pleadings can be based on information and belief when, as in this case, they are dealing with facts peculiarly within the defendants' knowledge.   *Id.* at 258-59.   The court did dismiss the case, but it did so because the plaintiffs had pled fraud on information and belief as to facts within their *own* knowledge.   *Id.* at 259.   Therefore, this case is inapposite to the present dispute.

of strike suits." *O'Brien v. Price Waterhouse*, 740 F. Supp. 276, 279 (S.D.N.Y. 1990). Defendants are unquestionably on notice as to the statements ANKL alleges were fraudulent.

Moreover, as Defendants acknowledge: "[F]raud allegations may be so pleaded [on information and belief] as to facts peculiarly within the opposing party's knowledge…." Mem. at 20 (quoting *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir. 1988), cert. den., 488 U.S. 852 (1988)). Whether Mr. Raker and Defendants knew that their statements were false is a fact peculiarly within their own knowledge.[15] *See Stern,* 844 F.2d at 1003 ("Rule 9(b) permits '[m]alice, intent, knowledge, and other condition of mind' to be 'averred generally.' In this regard, we have noted that it would be unworkable and unfair to require great specificity in pleading scienter, since 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'") (quoting *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)). ANKL has set forth facts upon which it believes that Defendants' representations were false. For example:

- ANKL alleged, and Defendants concede, that the Net Sales Defendants reported in their 2005 audited financial statements is a different amount than Defendants reported to ANKL. *See* Compl. ¶ 97; Mem. at 21. Defendants try to minimize the variance, but the fact is that the audit of Defendants' 2005 financial statements was completed on April 7, 2006. Schacter Decl., Ex. D at 1 (Report of Independent Auditors). Two months later, on June 6, 2006, Defendants represented to ANKL that Net Sales were *lower* than the amount listed in their own audited financial statements. Schacter Decl., Ex. C at p. 5. Defendants also withheld the 2005 audited financial statements from ANKL despite their obligation to produce them pursuant to Section 1.8(d) of the APA. *See* Compl. ¶ 41.

---

[15]  Defendants attempt to rewrite the complaint and limit the scope of the fraud claim to whether Mr. Raker himself knew that his statements were false when he made them. *See* Mem. at 21; *c.f.* Compl. ¶ 98 ("On information and belief, *Defendants* were aware that their representations to Sellers were false when they made them.") (emphasis added). Mr. Raker negotiated the Settlement Agreement as an agent of Defendants, and therefore, Defendants are bound by his misrepresentations, whether or not he knew them to be false:

> If a principal knows facts unknown to a servant or other agent and which are relevant to a transaction which the agent is authorized to conduct, and, because of his justifiable ignorance, the agent makes a material misstatement of facts, the principal: (a) is subject to liability for an intentional misrepresentation if he believed the agent would make the statement, or for a negligent misrepresentation, if he had reason to know the agent would make the statement.

1 Restatement of Agency 2d, § 256; *Abate v. Abate*, 441 N.Y.S.2d 506, 514 (N.Y. App. Div. 1981) ("defendant may be held liable for [agent's] misrepresentations as though made intentionally by defendant himself, regardless of whether [agent] made them innocently"); *Sheridan Drive-In, Inc. v. State of New York*, 228 N.Y.S.2d 576, 584 (N.Y. App. Div. 1962).

- The APA required Defendants to calculate Net Sales (*i.e.,* "total sales revenue less returns, allowances and rebates and any other deductions used in the development of net sales as reported") by computing them "in accordance with U.S. GAAP in the 2002-2003 Financial Statements." APA, Art. X at p. 63. ANKL specified in its complaint Defendants apparently did not compute Net Sales in accordance with U.S. GAAP in the 2002-2003 Financial Statements. Compl. ¶ 97. Defendants' notice of its Net Sales calculation did not make any adjustment to Net Sales to account for changes in accounting procedures after the 2002-2003 Financial Statements were prepared. *See* Schacter Decl., Ex. C. For example, Defendants' 2005 audited financial statements reflect that they changed their method for amortizing goodwill and other intangible assets in 2004 and 2005, including writing off excess goodwill as an expense. Schacter Decl., Ex. D at p. 13; *see also id.* at 11 (changes in inventory cost accounting). Defendants knew about this contract requirement but did not adjust Net Sales to remove the effect of their changes in accounting practices, thereby misrepresenting that Net Sales were below the earnout threshold.

- DJO Inc.'s SEC Form 10-K for the period ending December 31, 2006 reflects that the auditors determined that Aircast had "a material weakness in internal control over financial reporting … that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." Guiffré Decl., Ex. A at p. 99; *see ATSI Communications, Inc.*, 493 F.3d at 98 (The Court "may consider any … legally required public disclosure documents filed with the SEC …" to decide a Rule 12(b)(6) motion.). DJO reported that "[o]ur performance of additional detailed procedures resulted in adjustments to the inventory and costs of goods sold which were *material to net income.*" *Id.* (emphasis added). Although this Annual Report was for 2006, it is reasonable to believe that Aircast also was not properly accounting for inventory and costs of goods sold in 2005, and as a result, that Aircast misrepresented its Net Sales for 2005.

Based on these facts, ANKL has set forth its reasonable belief that Defendants fraudulently induced

it to release millions of dollars worth of claims by misrepresenting Aircast's financial condition.

### 3.     Punitive Damages Can Be Awarded to ANKL Under New York Law.

Defendants erroneously claim that ANKL is foreclosed from obtaining punitive damages for

their fraudulent inducement. Defendants first assert that the Settlement Agreement contains a

waiver of punitive damages.[16] *See* Mem. at 22; Schacter Decl., Ex. B § 4.16. That contract clause is

irrelevant because fraud that predates a contract, as Defendants' fraudulent inducement must, does

---

[16] Defendants assert that the waiver covers "any proceeding arising from the transaction contemplated in the APA and Settlement Agreement." Mem. at 22. Only the Settlement Agreement contains a waiver of punitive damages, and that waiver is limited to the Settlement Agreement itself. *See* Schacter Decl., Ex. B § 4.16.

not arise out of or result from the contract. *See Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 266 (S.D.N.Y. 2005) ("When all of the essential contours of a claim *precede* the subsequent contractual relationship, such a claim cannot … arise from that relationship. Rather, the contract simply constitutes the culmination of the allegedly tortious conduct.") (emphasis in original). Defendants' argument that the contractual waiver of punitive damages survives the termination of the contract is equally unavailing. *See* Mem. at 22; *see Topps*, 380 F. Supp. 2d at 266 n.23 ("Jurisprudential deference to contractual remedies is not warranted where one party was induced into a contract based upon intentional and material misrepresentations of the other. The contractual relationship would not have been consummated but for those misrepresentations."). When ANKL succeeds on its fraudulent inducement claim, the Settlement Agreement will be void (not terminated), and none of its provisions will be given effect. *Greystone Staffing, Inc. v. Vincenzi*, 801 N.Y.S.2d 234, 2005 WL 118319**,** at *3 (N.Y. Sup. Ct. 2005) ("'Under New York law, a contract induced by misrepresentation or fraud is void.'") (quoting *Allen v. Westpoint-Pepperill, Inc.,* 11 F. Supp. 2d 277, 288-9 (S.D.N.Y. 1997)).

Defendants next claim that theirs was only a "garden-variety fraud," and that false statements must be "malicious or brought about by evil motives" or part of "a pattern of similar conduct directed at the public generally." Mem. at 22 (citations omitted). Defendants overstate the standard:

> [U]nder New York law a court may award punitive damages on a tort claim unrelated to a contractual relationship if plaintiff can simply demonstrate that the defendant committed "gross, wanton or willful fraud or other morally culpable conduct." *Borkowski v. Borkowski*, 39 N.Y.2d 982, 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976). No showing of a public wrong is required. Neither need plaintiff demonstrate the degree of egregiousness (namely, wanton dishonesty implying a criminal indifference to civil obligations) necessary to recover punitive damages on a claim arising from a contractual relationship. Thus, punitive damages are more likely to be available on a tort claim that does not arise from a contractual relationship.

*Topps*, 380 F. Supp. 2d at 265;[17] *see also AXA Versicherung AG v. New Hampshire Ins. Co.*, 2007 WL 2142302, at *2 (S.D.N.Y. July 23, 2007) ("It is doubtful, however, that this doctrine [of showing public harm] applies to a claim for fraudulent inducement, which, under established New York law, sounds in fraud not contract, and by definition precedes the formation of any contract.") (citations omitted).

This is not the proper stage of the proceedings to determine whether ANKL is entitled to punitive damages. "Because punitive damages are intended to punish the wrongdoer and deter others so inclined, their availability is measured by the severity of defendant's conduct, which is a determination that can best be made after each party has a full opportunity to present their evidence." *Id.* at 267 (citing *Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207, 411 N.Y.S.2d 66, 69 (N.Y. App. Div. 1978) ("Hence, whether [defendant's] conduct was sufficiently egregious to satisfy [the] 'gross and wanton' test is a question best answered by the finder of fact."); *see also Kidder, Peabody & Co. v. IAG Int'l Acceptance Group, N.V.*, 1999 WL 11553, at *12 (S.D.N.Y. Jan. 13, 1999) (whether the requirements for an award of punitive damages "have been satisfied is ordinarily for the jury to decide"); *Loughry v. Lincoln First Bank*, 67 N.Y.2d 369, 378, 502 N.Y.S.2d 965, 494 N.E.2d 70 (1986) ("the decision to award punitive damages in any particular case, as well as the amount, are generally matters within the sound discretion of the trier of fact"); *Nardelli v. Stamberg*, 44 N.Y.2d 500, 503 (1978). Accordingly, the Court should deny Defendants' motion to dismiss ANKL's fraudulent inducement claim and permit ANKL to pursue punitive damages.

### D. ANKL Has Stated a Claim for Negligent Misrepresentation.

Defendants argue that no "special relationship" exists between the parties. Mem. at 24. New York courts recognize that ANKL's reliance on Defendants' misrepresentations about Aircast's financial information and whether the Net Sales target was met—facts that were exclusively

---

[17] The Court made it clear that "while not all torts are independent of contract claims, a properly-pled fraudulent inducement claim is a fundamentally independent claim." *Topps*, 380 F. Supp. 2d at 265 n.17.

known to Defendants—can create exactly the sort of special relationship necessary to support a claim for negligent misrepresentation. *See* Section III (withholding of records and information) and Section VI (misrepresentations; facts peculiarly within Defendants' knowledge), *supra*; *see also Eternity Global*, 375 F.3d at 189 ("[A] relationship sufficiently special to justify reliance (and a subsequent action for negligent misrepresentation) may arise when a person 'wholly without knowledge seek[s] assurances from one with exclusive knowledge.'") (quoting *Heard v. City of N.Y.*, 82 N.Y.2d 66, 75 (1993)); *see also Henneberry v. Sumitomo Corp. of America*, 532 F. Supp. 2d 523, 540 (S.D.N.Y. 2007).

Defendants also cite *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496, 506 (S.D.N.Y. 2007) (Koeltl, J.), to argue that the parties' contractual relationship precludes ANKL's negligent misrepresentation claim. Mem. at 24. Contrary to Defendants' statement, the plaintiff in *Payday* did not assert a claim for negligent misrepresentation. *See Payday*, 478 F. Supp. 2d at 499; Mem. at 24. The Court dismissed a *negligence* claim based on the principle that "[w]here the only duty owed to plaintiff arises because of a valid contract, a negligence claim does not lie." *Payday*, 478 F. Supp. 2d at 505. In contrast, for a *negligent misrepresentation* claim, a plaintiff "must demonstrate 'that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity.'" *Lusins v. Cohen*, 853 N.Y.S.2d 685, 688 (N.Y. App. Div. 2008) (quoting *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 382 (1992)). ANKL has not alleged a negligence claim, and ANKL's negligent misrepresentation claim is not based on Defendants' breach of a contractual duty. Therefore, *Payday* is inapplicable.

### E. ANKL's Conversion Count States a Claim Upon Which Relief May Be Granted.

Defendants do not dispute that their conversion of ANKL's bank accounts, as described in the Complaint, satisfies all the elements of a conversion claim under New York law. *See* Mem. at 24-25. Instead, Defendants attempt to avoid their tort liability by arguing that this conversion duplicates ANKL's claim for breach of contract. Defendants fail to appreciate the fact that

"'separate tort claims may be maintained where they rest upon a legal duty independent of the contract itself.'" *In re MarketXT Holdings Corp.*, 2006 WL 2864963, at *22 (Bankr. S.D.N.Y. Sept. 29, 2006) (quoting *Pandisc Music Corp. v. Red Distrib., LLC*, 2005 WL 646216, at *1 (S.D.N.Y. March 18, 2005)); *see also Fireman's Fund Ins. Co. v. Allied Programs Corp.*, 1993 WL 481344, at *8 (S.D.N.Y. Nov. 13, 2007) ("plaintiffs' claim for conversion is sufficient in that they have alleged an injury separate and distinct from the breach of contract"); *Zurich American Ins. Co. v. Whitmore Group, Ltd.*, 2006 WL 759685, at *5 (N.Y. Sup. Feb. 7, 2006) ("conversion claim may be asserted separately from a contract claim where it arises out of a duty distinct from that imposed by the contract"). ANKL owned the bank accounts and the assets in them before the parties entered into the APA. *See* APA § 1.3(a)(vii) (excluding these assets from assets purchased in the APA). Therefore, ANKL's conversion claim is not duplicative and should not be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety.

Dated: April 30, 2008                              **PATTON BOGGS LLP**

                                         By:    s/ T. Michael Guiffré
                                                T. Michael Guiffré (TG4507)
                                                2550 M Street, NW
                                                Washington, DC 20037
                                                Telephone: (202) 457-6000
                                                Facsimile:  (202) 457-6315
                                                mguiffre@pattonboggs.com

                                                *Attorneys for Plaintiff ANKL Liquidating Trust*

25